**DAVID H. ANGELI**, OSB No. 020244
david@angelicalfo.com
**PETER D. HAWKES,** OSB No. 071986
peter@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**MATTHEW S. OWEN, P.C.** (*pro hac vice* forthcoming)
matt.owen@kirkland.com
**MEREDITH M. POHL** (*pro hac vice* forthcoming)
meredith.pohl@kirkland.com
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| ABBVIE INC. (a Delaware corporation); ALLERGAN, INC. (a Delaware corporation); DURATA THERAPEUTICS, INC. (a Delaware corporation); ABBVIE PRODUCTS LLC (a Georgia limited liability company); PHARMACYCLICS LLC (a Delaware limited liability company); ALLERGAN SALES, LLC (a Delaware limited liability company), | Case No.: 6:25-cv-01332<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | |

PAGE 1 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

v.

DAN RAYFIELD, in his official
capacity as ATTORNEY GENERAL
OF THE STATE OF OREGON,

and

KATHLEEN CHINN, in her official
capacity as BOARD PRESIDENT OF
THE OREGON BOARD OF
PHARMACY; RICHARD JOYCE, in
his official capacity as BOARD VICE
PRESIDENT OF THE OREGON
BOARD OF PHARMACY; and
SHANNON BEAMAN, JENNIFER
HALL, AMY KIRKBRIDE,
VICTORIA KROEGER, PRIYAL
PATEL, ANA PINEDO, and BRYAN
SMITH, in their official capacities as
BOARD MEMBERS OF THE
OREGON BOARD OF PHARMACY.

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie

Products LLC, Pharmacyclics LLC, Allergan Sales, LLC (collectively "AbbVie"),

by and through their undersigned attorneys, bring this action for declaratory and

injunctive relief against the Attorney General of the State of Oregon and the Oregon

Board of Pharmacy, challenging the applicability and constitutionality of H.B. 2385.

In support, AbbVie alleges as follows:

PAGE 2 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

1.     AbbVie brings this lawsuit to challenge the constitutionality of H.B. 2385—a recently enacted Oregon law that requires AbbVie to transfer its pharmaceutical products to certain commercial pharmacies at substantially discounted prices on pain of criminal penalties.  In so doing, Oregon's statute violates the Supremacy Clause by impermissibly changing the terms of a federal drug-pricing regime—the federal 340B Program—and significantly increasing the cost of participation in that regime.

2.     In addition, H.B. 2385 effects an unconstitutional taking in violation of the Takings Clause of the Fifth Amendment.

3.     H.B. 2385 arises out of a long-running dispute about the requirements that the federal 340B Program places upon drug manufacturers.  In short, the federal 340B statute, 42 U.S.C. § 256b, establishes a comprehensive program that requires pharmaceutical manufacturers to offer their drugs at statutorily set and significantly reduced prices to a list of fifteen specifically enumerated types of healthcare providers known as "covered entities."  Opting into the 340B Program and making these offers of drugs at the significantly reduced prices is required for manufacturers who want to participate in federal Medicaid and Medicare programs.  *See* 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

4.      Under the 340B statute, manufacturers are required only to "offer" their drugs to covered entities at the 340B price—not "sell" them ***unconditionally***.  42 U.S.C. § 256b(a)(1).  That is, the 340B statute requires only that manufacturers make an offer at a particular price to a particular set of covered entities but preserves the liberty of manufacturers to insist upon other non-price terms.  And commercial pharmacies, like Walgreens and CVS, are not among the 340B statute's list of entities entitled to an "offer" of the 340B price.

5.      The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") ***exclusive*** authority to enforce its provisions. *See* 42 U.S.C. § 256b(d).  The statute leaves no role for states or other third parties to change the requirements of the federal 340B Program or the conditions it imposes on manufacturers in return for participating in Medicaid and Medicare.  Nor do states or other third parties have any authority to enforce the federal statute's requirements. The Supreme Court has held that third-party enforcement "would undermine the agency's efforts to administer" the 340B Program and other related federal programs "harmoniously and on a uniform, nationwide basis."  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119–20 (2011).

6.      Further, because forcing manufacturers to transfer their drugs at discounted prices to covered entities would raise serious constitutional concerns, Congress did not mandate participation in the 340B Program outright and instead

tied it to a voluntary choice: participation in Medicaid and Medicare. And to further incentivize manufacturer participation in 340B—i.e., to prevent the cost of participation from becoming too high—Congress carefully limited the program and adopted certain safeguards to ensure that manufacturers' discounted drugs would be used to help needy patients, rather than become a buy-low, sell-high scheme for commercial entities. For example, in a statutory provision designed to prevent "diversion," Congress prohibited covered entities from transferring manufacturers' reduced-price drugs to anyone other than the entity's own patients. *See* 42 U.S.C. § 256b(a)(5)(B). In effect, that provision prohibits other commercial entities from either participating in the 340B Program or profiting from the sale of manufacturers' drugs at the 340B-discounted price.

7.    Nevertheless, over the last decade covered entities have entered into novel contractual arrangements with commercial pharmacies (called "contract pharmacies") that have allowed those pharmacies to profit from the sale of manufacturers' drugs. Instead of serving the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference. Contract pharmacies accomplish this arbitrage through a complicated accounting system known as the "replenishment model," described in more detail below. The bottom-line result is that for-profit commercial

pharmacies and the covered entities they contract with are able to pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B Program.

8.      Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States.  They solely exist in the 340B context, where they are unauthorized by statute.  AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model.  Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

9.      In response to these abuses—and because Congress left room for manufacturers to impose reasonable conditions on their 340B offers—manufacturers (including AbbVie) have exercised that right by implementing policies that effectively condition the sale or transfer of drugs at 340B-discounted prices to covered entities and their affiliated contract pharmacies.  AbbVie's policy reflects the reality that the federal statute requires only that manufacturers "offer" their drugs at discounted prices to the covered entities.  It does not compel unconditional sales, nor does it require manufacturers to transfer 340B-discounted drugs wherever a covered entity demands.  And it certainly does not require manufacturers to subsidize commercial pharmacy *profits* under the guise of 340B compliance.

10.    Manufacturers' decisions to address these abuses resulted in litigation between manufacturers and HHS and, in early 2023, the U.S. Court of Appeals for the Third Circuit confirmed that the manufacturers' policies are lawful and permitted under federal law.  Again, Congress required manufacturers to **offer** their covered outpatient drugs at discounted prices in return for participating in Medicaid and Medicare; it did not impose any additional obligation on manufacturers to provide their drugs to third-party commercial pharmacies, or to otherwise support arbitrage of their charitable discounts.  Commercial pharmacies are not covered entities, and they are not entitled to benefit from the federal 340B Program or access manufacturers' drugs at the 340B-discounted price.  *See generally Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023).

11.    In May 2024, the U.S. Court of Appeals for the District of Columbia Circuit agreed with the Third Circuit's conclusion, holding that because "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount," the statute gives manufacturers freedom "to impose at least some delivery conditions."  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).  And because conditions such as limiting delivery to "a single contract pharmacy designated by the covered entity" in no way impair a manufacturer's offer to sell drugs at the 340B-discounted price,

the restrictions fall within the ambit of freedom manufacturers enjoy under the federal 340B statute. *Id.* at 462–64.

12.     Numerous states—including Oregon—participated in the Third Circuit and D.C. Circuit cases as *amici curiae*, on the losing side. After those losses, many states turned to their own legislatures to propose and implement legislation to reach their desired 340B outcomes and attempt to impose requirements under the federal 340B statute that Congress chose not to impose. Oregon's H.B. 2385 is an example of one such piece of legislation.

13.     In particular, H.B. 2385 not only eliminates manufacturers' federally preserved ability to impose reasonable conditions on their 340B offers—it imposes new conditions on Medicare and Medicaid participation that Congress never authorized. *See id.* at 460 ("[W]e think that this silence *preserves*—rather than abrogates—the ability of sellers to impose at least some delivery conditions." (emphasis added)). Among other things, H.B. 2385 prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] directly or indirectly with the *acquisition* of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity to receive and dispense 340B drugs on behalf of the covered entity in this state unless the acquisition, delivery or dispensation is prohibited by the United States Department of Health and Human Services." H.B. 2385, § 1(2)(a) (emphasis

added).  The text of the law effectively transfers to covered entities ***and commercial pharmacies*** unfettered authority to demand manufacturers' property at significantly reduced prices for the benefit of private parties.

14.    To be clear, the harm AbbVie challenges in this action arises not from the federal 340B Program or the replenishment model itself, but from H.B. 2385's prohibition on manufacturers' ability to condition their federal 340B offers.  Even in the absence of the replenishment model, Oregon's law would injure manufacturers like AbbVie because H.B. 2385 would still compel AbbVie to transfer its drugs at confiscatory prices under conditions AbbVie would not agree to and beyond what the federal statute requires as a matter of Medicare and Medicaid participation.  AbbVie's injury stems from the state law's expansion of AbbVie's obligations—not from the design or administration of the 340B Program.

15.    This state-imposed harm—compelling manufacturers to transfer their drugs at discounted prices on terms not required by federal law and to which AbbVie would not agree—cannot stand because it violates the United States Constitution.  H.B. 2385 should be enjoined.

16.    ***First***, H.B. 2385 is preempted by federal law under the Supremacy Clause.  The doctrine of federal preemption requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138 (1988) (quoting *Free*

*v. Bland*, 369 U.S. 663, 666 (1962)).  H.B. 2385 seeks to regulate pricing where it purports to prohibit manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] directly or indirectly with the ***acquisition*** of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by," any contract pharmacy.  H.B. 2385, § 1(2)(a) (emphasis added).  By seeking to change the requirements of when and to which entities manufacturers must offer drugs at a discounted price as a condition of participating in the federal Medicaid program, H.B. 2385 unlawfully modifies the requirements of the federal 340B Program.  H.B. 2385 likewise obstructs the 340B statute's objectives by imposing obligations on drug manufacturers that conflict with actual federal requirements, thereby raising the costs of Medicaid participation above those set by Congress and deterring manufacturers from participating at all.  H.B. 2385 also blocks manufacturers from accessing the federal 340B administrative dispute resolution system ("ADR") by preventing them from demanding necessary claims data.  *See* H.B. 2385, § 1(2)(b).  Finally, H.B. 2385 impermissibly injects the Oregon Attorney General and the Oregon Board of Pharmacy, armed with state law penalties, into what Congress intended to be an exclusively federal scheme.

17.  ***Second***, H.B. 2385 is an impermissible taking under the Fifth Amendment, made applicable to the states through the Fourteenth Amendment. Neither the federal government nor the states have any authority to force A-to-B

transfers of private property for the benefit of private parties.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Because the U.S. Constitution prohibits the government from forcing the transfer of property at confiscatory prices to private parties for their own private benefit, *see* U.S. Const. amend. V, the federal government has defended the federal 340B statute on grounds that manufacturers are not being ***forced*** to transfer their property to for-profit pharmacies, but instead supposedly agreed to do so at the request of covered entities "voluntarily" in exchange for the benefit of participation in the federal Medicaid program.  Oregon has no such defense.

18.    Oregon's law requires manufacturers like AbbVie to transfer their property at steeply discounted prices to other private entities if those entities have ***third-party*** contracts that purport to allow them to access AbbVie's drugs at those discounted prices.  And H.B. 2385's text makes clear that it seeks to regulate "the acquisition of" said drugs at the discounted 340B price.  *See* H.B. 2385, § 1(2)(a); *id.* (1)(c) (defining "340B drug" as "a drug that has been subject to an offer of a reduced price by a manufacturer pursuant to" federal law "and is purchased by a covered entity.").  Oregon has no authority to take AbbVie's private property for private use, and no authority to deprive AbbVie of its property without due process

of law.  By seeking to change the requirements for when drug manufacturers must provide 340B-priced drugs to contract pharmacies at the request of covered entities, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose.  *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking).

19.    AbbVie seeks a declaration that H.B. 2385 is unconstitutional because it is preempted by federal law and constitutes an unconstitutional taking.  AbbVie further seeks injunctive relief barring the Oregon Attorney General and the Oregon Board of Pharmacy from enforcing H.B. 2385 against AbbVie.

## PARTIES TO THE ACTION

20.    AbbVie, Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience.   Since 2012, AbbVie, Inc. has participated in the federal 340B Drug Discount Program, helping uninsured and vulnerable patients obtain access to the medications they need.   AbbVie's headquarters are located in North Chicago, Illinois.  AbbVie, Inc. is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to

PAGE 12 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

executed 340B Pharmaceutical Pricing Agreements, with the HHS Health Resources and Services Administration ("HRSA").[1]

21.    Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22.    Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

23.    AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

24.    Pharmacyclics LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

---

[1]    On February 11, 2025, President Trump issued Executive Order 14210, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative." *See* 90 Fed. Reg. 9,669 (Feb. 11, 2025). On March 27, 2025, HHS announced it intended to restructure, including by creating an Administration for a Healthy America ("AHA") which will have authority over, among other sub-agencies, HRSA. *See* Dep't of Health & Hum. Servs., *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025), https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

PAGE 13 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25.    Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

26.    Defendant Dan Rayfield is the Attorney General of the State of Oregon. The Attorney General has the power to enforce the laws of the state of Oregon, including H.B. 2385.  *See generally* Or. Rev. Stat. § 180.060 (1).  Indeed, H.B. 2385 explicitly provides that manufacturers like AbbVie may incur, in addition to the civil penalties levied by the Board of Pharmacy, "other liabilit[ies] or penalt[ies] provided by law." H.B. 2385, § 2(1).  This suit is brought against the Attorney General solely in his official capacity.

27.    Defendants Kathleen Chinn, Richard Joyce, Shannon Beaman, Jenniffer Hall, Amy Kirkbride, Victoria Kroeger, Priyal Patel, Ana Pinedo, and Bryan Smith are members of the Oregon Board of Pharmacy.  The Board is empowered to enforce H.B. 2385 and discipline violators.  See *id.* ("the Board of Pharmacy may impose a civil penalty for any violation").  This suit is brought against the Board's members solely in their official capacities.

## JURISDICTION AND VENUE

28.    AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

29.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

30.    The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable powers, including the power to enjoin the actions of state officials if contrary to the United States Constitution or federal law.  *See Ex parte Young*, 209 U.S. 123, 159–60 (1908).

31.    Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges an Oregon law that is applicable to AbbVie's sale and distribution of drugs within this District.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements.  Venue is also proper because Defendants maintain offices within this District through which they would enforce the challenged law.

## GENERAL ALLEGATIONS

### A.    The 340B Drug Pricing Program

32.    This case concerns section 340B of the federal Public Health Service Act, which created the federal "340B Program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

33.    The purpose of the federal 340B Program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves." Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

34.    Before Congress created the 340B Program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients.  In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts.  H.R. Rep. No. 102-384, pt. 2, at 9–10 (1992).  Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B Program, turning the manufacturers' previous voluntary support into a federal mandate.

35.    The 340B statute requires that any manufacturer that participates in the federal Medicaid Drug Rebate Program must "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients.  42 U.S.C. § 256b(a)(1).

36.    The statute expressly limits participation in the 340B Program to "covered entities." *See id.* § 256b(a)(4).  The statute defines "covered entities" to

include only organizations and service providers that predominantly serve low-income patients. The definition includes, for example, federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients. *Id*. For-profit commercial pharmacies are not included in the statutory list of "covered entities." *Id*. Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies. *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom. Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).

37.     The discounted 340B price for each of the manufacturer's drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at section 1927 of the Social Security Act. 42 U.S.C. §§ 256b(a)(1)–(2) & (b). The resulting prices, called the 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers. For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market. *See* 42

U.S.C. § 1396r-8(c); 42 U.S.C. § 256b(a)(1).  Many mandatory 340B ceiling prices are as little as one penny per unit of drug.

38.    To indicate their agreement to participate in the federal 340B Program and comply with its requirements, manufacturers sign a form contract with HHS, called the Pharmaceutical Pricing Agreement ("PPA").  That agreement is drafted by HHS.  It has "no negotiable terms," and it "incorporate[s] the statutory obligations and record[s] the manufacturers' agreement to abide by them."  *Astra*, 563 U.S. at 117–18.

39.    The PPA imposes no obligation on participating manufacturers to make **unconditional** sales to covered entities.  Additionally, the PPA neither requires manufacturers to sell discounted drugs to contract pharmacies nor to facilitate the transfer of their discounted drugs to contract pharmacies.  Nor does it grant covered entities any right to obtain unfettered access to manufacturers' drugs at discounted prices through contract pharmacies.

40.    Both the PPA and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B Program or profiting from the sale of manufacturers' discounted drugs at commercial prices.  Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies.  Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat the

indigent and uninsured patients that visit a covered entity and receive healthcare services from the covered entity itself, commercial contract pharmacies sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by the covered entity through the federal 340B Program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

41.    In recent years, commercial contract pharmacies have earned annually over $3.3 **billion** in "spread." *See* Eric Percher et al., Nephron Rsch. LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption*, at 3, 30, 31 (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).

42.    These abuses of the federal 340B Program violate the letter and spirit of the federal 340B statute.  Congress designed the 340B statute with the intent that there would be a close nexus between the federal drug pricing program and its only valid public purpose—helping low-income and uninsured patients obtain access to medications at discounted prices.  Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the program.

43.    The federal statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs

"to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.").

44.    The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id.* § 256b(a)(5)(A).

45.    H.B. 2385 unconstitutionally compels AbbVie to make sales under conditions it would not agree to, thereby enabling and perpetuating the very abuses federal law forbids.

46.    The 340B statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the program's integrity by "provid[ing] for improvements in compliance by covered entities . . . in order to prevent diversion" and violations of the statute's duplicate discount prohibition.  *Id.* § 256b(d)(2)(A).

47.    The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal ADR process.  *See id.* §§ 256b(d)(l)(B)(v), (d)(3).  Notably, HRSA recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR

process. *See* 89 Fed. Reg. 28,643 (April 19, 2024). The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, a "340B ADR Panel" within HRSA is tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue H.B. 2385 seeks to address. *See* 42 C.F.R. §§ 10.3, 10.21(a)(1); *accord id.* § 10.22(c)(1) ("A manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that facilitate the sale or distribution of its drugs to covered entities."); 89 Fed. Reg. at 28,649 ("HHS agrees and has modified § 10.21(a)(1) to further explain that an overcharge claim generally includes claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."); *id.* at 28,644 ("[T]he 340B Program is related to drug pricing and drug distribution.").

48.    The statute entrusts enforcement of the 340B statute *exclusively* to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. §§ 256b(a)(5)(C)–(D), (d)(l)(B)(v), (d)(3). As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B Program, and private enforcement by covered entities "would undermine

the [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119–20.

49.    The 340B statute provides no private right of action to covered entities. *Id.* at 113–14.

50.    Failure to comply with the statutory requirements under the 340B Program may result in termination of the PPA (and the manufacturer's ability to participate in Medicaid), federal enforcement actions, and potentially the imposition of large civil penalties. *See* 42 U.S.C. §§ 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

**B.    The Growth in Contract Pharmacy Arrangements**

51.    In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities ***that lacked an in-house pharmacy*** from entering into a contractual relationship with a ***single*** outside pharmacy to dispense covered outpatient drugs to the covered entity's patients. 61 Fed. Reg. 43,549 (Aug. 23, 1996). The guidance made clear that it "create[d] no new law and create[d] no new rights or duties." *Id.* at 43,550.

52.    Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations. They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

53.    In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B Program. The guidance stated, for the first time, that the agency would allow covered entities to enter into contractual relationships with an *unlimited* number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own. 75 Fed. Reg. 10,272, 10,276 (Mar. 5, 2010).

54.    Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers. Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations. *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law"). In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

55.    Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 12,000% between 2010 and 2024. *See* Elanor Blalock, *For-Profit Pharmacy Participation in the 340B Program: 2024 Update*, BRG at 2 (Jan. 2025) ("BRG Report"). As of 2023, over 33,000 pharmacy locations—"more than half of the

entire U.S. pharmacy industry"—acted as 340B contract pharmacies, up from fewer than 1,300 pharmacy locations in 2010. *See* U.S. Senate Comm. on Health, Educ., Labor & Pensions, 119th Cong., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* at 3 (Apr. 2025) ("Cassidy Report"), https://tinyurl.com/44c6w2en. This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B-discounted drugs. For example, in 2009 sales of 340B-priced drugs totaled just $4.2 billion, but by 2023 they had increased by more than 30-fold to $124 billion. *See* Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments*, USC Schaeffer Cntr. For Health Pol'y & Econ. at 5 (Oct. 2021) ("Mulligan"), https://tinyurl.com/mry8p45c; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023*, IQVIA at 2 (2024), https://tinyurl.com/ywkdbbju.

56.    Similarly, the number of covered entities participating in the program jumped from around 15,000 in 2010 to more than 50,000 by 2020. *See* Mulligan, *supra*, at 4; U.S. Gov't Accountability Off., *Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements*, GAO-20-108, at 23 (2019), https://www.gao.gov/assets/d20108.pdf ("Given the weaknesses in HRSA's oversight, some hospitals that do not appear to meet the statutory requirements for

program eligibility are participating in the 340B Program and receiving discounted prices for drugs for which they may not be eligible.").

57.    This is also true in Oregon, where the 340B program has expanded over time, both with respect to the number of covered entities and the number of contract pharmacies participating in the program.  Much of this recent growth has taken place in geographic areas with more affluent populations, as evidenced by poverty rates and median income in those areas.

58.    Nor does the program's explosive growth correlate with an increase in indigent patients, or improvements in care.  Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%.  *See* Kenneth Finegold et al., U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, Trends in the U.S. Uninsured Population, 2010–2020, Issue Brief No. HP-2021-02, at 2 (Feb. 11, 2021), https://tinyurl.com/4rf9cm8t.

59.    Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities.  The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts.  Contract pharmacies are not "agents" of the covered entities; they are merely business partners.  Indeed, large contract pharmacies like CVS and Walgreens charge "complex fees for pharmacy and

administrative services to covered entities" that increase year over year.  Cassidy Report, *supra*, at 18.  Importantly, these arrangements do not exist outside the context of the federal 340B Program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted drugs to their customers at full prices.

60.    Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

61.    A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B-purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B-purchased inventory.

62.    Most contract pharmacies, however, use what is known as the "replenishment" model.  The replenishment model is, as covered entities self-describe it, "an accounting mechanism" by which they retroactively match discounts for the pharmacy with previous (full price) dispensing events to customers.  *See* Summ. J. Hr'g Tr. at 59-60 (Ron Connelly, counsel for the Louisiana Primary Care Ass'n), *AbbVie Inc. et al. v. Murrill*, No. 6:23-CV-01307-RRS-CBW, (W.D. La. June 6, 2024) ("*Murrill*"), ECF No. 84; 61 Fed. Reg. at 43,555.  In practice, the replenishment model permits the "transfer" of 340B-priced drugs to contract

pharmacies with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not.



Figure 1. Replenishment Model Step-By-Step.

63.    Under the replenishment model, no 340B-purchased drugs are kept in stock at the contract pharmacy.  Instead, "the pharmacy has an initial stock of drugs" obtained through ordinary commercial purchases at the non-340B price (Figure 1, step 1).  *See Murrill*, Summ. J. Hr'g Tr. at 60 (Ron Connelly, counsel for the Louisiana Primary Care Ass'n).  Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities.  As explained below, the pharmacy determines which previous dispenses were 340B eligible and

once sufficient eligible dispenses for a particular drug accumulate, the covered entity

orders additional quantities of that drug at the federal 340B price (Figure 1, step 6).

The covered entity directs AbbVie to transfer those drugs to the contract pharmacy

to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the

covered entity's behalf (Figure 1, step 2).  *See* Decl. of RADM Krista M. Pedley,

Dir., Off. of Pharmacy Affs., HRSA ¶¶ 3–11, *Eli Lilly & Co. v. Becerra*, No. 1:21-

cv-00081-SEB-MJD (S.D. Ind.), ECF No. 125-2.  Sometimes the contract pharmacy

actually places the order on behalf of the covered entity for more drugs at the federal

340B price.

64.    Once the contract pharmacy receives the replenishment order, the

340B-priced drugs are "placed on the shelf, become[] 'neutral inventory,' and may

be dispensed to any subsequent patient" (Figure 1, step 3).  *See id.* at ¶ 11.

65.    In other words, under the replenishment model, contract pharmacies do

not keep a separate inventory of 340B-priced drugs but instead dispense drugs to

both 340B and non-340B patients alike out of their general inventories.  Nor do most

contract pharmacies attempt to determine prior to or at the point of sale whether the

patient is eligible for a 340B discounted drug.  In almost all instances, contract

pharmacies dispense the 340B-priced drugs to their customers at full price without

knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible

patient (Figure 1, step 4).  The pharmacy or a third-party administrator ("TPA")

carries out a 340B determination at the back end, well after a drug has been dispensed (and likely consumed) by the patient. This determination is made using a black box algorithm (unknown by AbbVie) based on the contract pharmacy's own criteria, without any involvement from the covered entities (Figure 1, step 5). If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B-priced drugs AbbVie must sell. But in reality, the contract pharmacies' criteria often include prior patients, who no longer receive the 340B-discounted drugs at the pharmacy but that are included under a "once-a-patient-always-a-patient" approach, so the covered entity and its pharmacies are able to maximize the arbitrage profits from the 340B Program. As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457–58.

66.    Aside from diversion created by the pharmacies and covered entities' use of their own distorted criteria to mark otherwise 340B-ineligible sales as deserving the federally mandated low prices, the replenishment model encourages diversion by allowing covered entities to transfer federally discounted drugs to pharmacies, who are not "a patient of the entity." *See* 42 U.S.C. § 256b(a)(5)(B).

67.    Although HRSA interpreted the federal 340B statute to allow the use of pharmacies, it did so because "[w]e believe that the relationship between the covered entity and the contract pharmacy is one of agency." 61 Fed. Reg. at 43,554. Additionally, HRSA noted that the covered entity purchases the drug, and must retain title and responsibility for the drug even after directing shipment to the contract pharmacy. *Id.* at 43,553.

68.    However, in practice, covered entities do not retain title to the drugs.

69.    As explained above, contract pharmacies (typically through a TPA) instruct covered entities to place orders—sometimes even placing the order itself, without going through a covered entity—of additional quantities of drugs at the discounted 340B price to "replenish" the general inventories that they will use to supply non-340B-eligible sales. *See also id.* at 43,552 (noting that "[b]ecause the covered entity will have no knowledge of the inventory levels of the pharmacy, it would be unrealistic to include a provision that the covered entity will order 340B drugs."). Significantly, as a result of such replenishment, even though the drugs are purchased by or on behalf of covered entities, contract pharmacies effectively take title to the drugs. At no point in time does a covered entity take title to the drugs under this model. *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Contract Pharmacies*, 340B Report (June 13, 2024), https://tinyurl.com/bdmx88wu (according to a covered entity spokesperson, "in

order for the replenishment model to function, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory.'"). AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity.

70.    In practice, therefore, covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans. For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices.

71.    By dramatically expanding the pool of individuals who can access the discounted drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B Program.  One study found that in 2018 alone, covered entities and their contract pharmacies generated approximately $64 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices. *See* BRG Report, *supra*, at 7.  And a recent report from the U.S. Senate Committee on Health, Education, Labor & Pensions found that a covered entity in

Virginia generated $276.5 million in 340B savings and revenue from September 2018 through September 2023, while another covered entity in Ohio accrued $933.7 million in 340B savings and revenue from April 2020 through June 2023. Cassidy Report, *supra*, at 6.

72.    When commercial pharmacies are brought into the program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity. As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real-time like a covered entity can). HHS Office of Inspector General, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431, at 1 (2014) ("HHS Report"), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

73.    Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increases, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit. *See* U.S. Gov't Accountability Off., *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 44 (June 2018), https://www.gao.gov/assets/d18480.pdf (noting that approximately two-thirds of

PAGE 32 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

diversion findings in HRSA audits involved drugs distributed at contract pharmacies); *id.* at 35, 43–44 (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies; and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

74.    Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B Program, but uninsured and underinsured patients are not benefitting.  *See* HHS Report, *supra*, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Cassidy Report, *supra*, at 9 (explaining that the covered entities under investigation "do not pass 340B discounts directly to their patients and differ on how patients receive discounts on their 340B drugs"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall. St. J. (Sept. 10, 2020), https://tinyurl.com/yxehpc7v (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, IQVIA at 12 (Sept. 27, 2022), https://tinyurl.com/2wdtuh52  ("The

340B Drug Discount Program as it exists today is a complex system of arbitrage . . . in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum at 2 (June 17, 2022), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2793530  (finding that contract pharmacy growth from 2011 to 2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

75.    For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B Program to enrich themselves rather than to serve vulnerable communities," and that the hospitals "expanded into wealthier neighborhoods with a higher percentage of insured individuals who could pay more for the drugs."  Dale R. Folwell, N.C. Dep't of State Treasurer, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program*, N.C. State Health Plan at 3, https://tinyurl.com/4cy8an69. This state is no different: nearly half of Oregon's contract pharmacies are located in affluent neighborhoods.  *See* Pioneer Institute Public Policy Research, *340B in Oregon* ("340B in Oregon"), https://tinyurl.com/5fc7xcjx.

76.    While commercial pharmacies are driving massive growth in the 340B Program—at double-digit annual rates—charity care by hospitals has decreased. Commentators have noted, for example, that as the 340B Program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined.  *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program, at 7–8 (Oct. 30, 2020), https://tinyurl.com/mvkfp3cy; Adam J. Fein, *EXCLUSIVE: 340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019), https://tinyurl.com/4z8dmjsv.  And that is not just true nationally but in Oregon as well.  Oregon hospitals provide less charity care annually than the national average. *See* 340B in Oregon, *supra* (explaining Oregon hospitals provided about 1.86% charity care, compared to the national average of 2.15%).  Oregon Health & Science University has the highest operating expenses of any hospital in the state eligible for 340B discounts, yet it provides charity care at numbers well below the state and national averages (1.52%).  *See id.*

77.    Hospitals participating in the 340B program also do not appear to be using their substantial profits to forgive the debts of patients who cannot pay.  If hospitals were using 340B profits to forgive patient debts, the proportion of so-called "bad debt" as a share of uncompensated care would be expected to decrease with

increasing profits. Instead, in recent years, the bad debt shares for both 340B and non-340B hospitals have tended to track each other closely, both nationwide and in Oregon. Taken together with the trends in charity care, this suggests that 340B hospitals are not allocating 340B profits to programs that would decrease patients' costs.

78.    Nor have the increased profits translated to improved patient outcomes. Patients with common conditions like heart attacks, heart failure, hip or knee replacements, and pneumonia have fared the same or worse at 340B hospitals than they have at non-340B hospitals. Moreover, there is no clear improvement in mortality or readmission rates for patients treated at hospitals that just barely qualify for the 340B program relative to those that just barely miss qualifying for the program.

79.    Instead of reducing patient costs or improving patient outcomes, significant shares of 340B discounts go to contract pharmacies and third-party administrators.

80.    Both the New York Times and Wall Street Journal have run exposés describing the flaws in contract pharmacy arrangements, flaws that enable large scale arbitrage and damage the very communities that the federal 340B Program was designed to help. *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*,

NY Times (Sept. 24, 2022), https://tinyurl.com/3sbxuswa (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients.*, Wall. St. J. (Dec. 22, 2022), https://tinyurl.com/yc2uc6yp ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose").

81.    Almost half of 340B contract pharmacies for the Oregon hospitals with the most contract pharmacies are based outside the state, with some pharmacies being located as far away as Florida. *See* 340B in Oregon, *supra*.

82.    A recent New York Times investigation into Apexus, the government contractor managing 340B drug pricing, exposed systemic price manipulation, lack of oversight, and financial exploitation within contract pharmacy arrangements— allowing for significant financial abuse at the expense of the communities the program was meant to protect. Apexus, which is responsible for negotiating better prices and access to mediations, has a direct financial incentive to expand the program and maximize hospital profits. Because Apexus "is allowed to collect a fee for almost every drug sold under the program," it has actively developed strategies

to drive 340B sales and increase covered entity revenue. These strategies include training covered entities on how to maximize 340B revenue; operating a "purchasing optimization team" advising hospitals on which drugs to generate the highest margins; and running a certification program teaching hospitals how to capture more patients and prescriptions under 340B. These tactics have prioritized profit generation over patient benefit, increasing Apexus's and covered entities' financial gains at the expense of patients, insurers, and manufacturers. Hospitals face no restrictions on which outpatient prescriptions they classify as 340B, allowing them to mine patient records from as far back as 36 months to claim additional patients under the program—even if those patients never directly benefit from the discounts. In some cases, hospitals have passed inflated drug costs onto patients instead of sharing the savings. *See* Ellen Gabler, *How a Company Makes Millions Off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 15, 2025), https://tinyurl.com/33ftpfdf.

83.    Congress has also expressed concern over growing abuses in the 340B Program. On April 24, 2025, the Majority Staff of the Senate Health, Education, Labor & Relations ("HELP") Committee, chaired by Senator Cassidy, released a report titled "Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program,"—the culmination of a nearly two-year investigation into contract pharmacy arrangements and other 340B-related issues. In its findings, the Senate

HELP Committee determined that more than half of all U.S. pharmacies in operation today—over 33,000 pharmacy locations—acted as 340B contract pharmacies, representing a significant jump from the approximately 1,300 contract pharmacies in 2010. And major commercial pharmacy chains like CVS, Walgreens, Express Scripts, OptumRx, and Walmart, account for 75% of all contract pharmacy relationships. *See* Cassidy Report, *supra*, at 3.

84. As part of the Senate HELP Committee's investigation, several covered entities expressly told Congress that they do not pass on discounts to patients, and do not specifically account for 340B revenue in their budgets. *See id.* at 10. And large commercial pharmacy chains like CVS and Walgreens disclosed that they collect significant fees associated with 340B dispensing and administrative fees that increase every year, *id.* at 18. For example, for patients with third-party insurance, CVS collects between $35 and $85 per brand-name drug dispensing event depending on the days-supply of the prescription dispensed. *E.g.*, *id.* at 18. CVS reported to the Committee that in 2023 it made $382 million in 340B-related dispensing fees and "annual gross and net revenues generated from the 340B Program." *Id.* at app. 106.

85. While the replenishment model contributes to the abuses described above—issues manufacturers are rightfully trying to address—H.B. 2385 goes further: it mandates that manufacturers sell or transfer discounted drugs on terms

Congress never required and that manufacturers never agreed to. The injuries manufacturers face under H.B. 2385 do not stem from the 340B Program itself or even from the replenishment model specifically, but from the state's attempt to override federal law and impose state requirements on AbbVie's participation in a federal program. Even if the replenishment model were eliminated entirely, H.B. 2385 would still compel manufacturers to transfer property under conditions they oppose, stripping them of their federally acknowledged ability to impose reasonable limitations on their 340B offers. In doing so, H.B. 2385 not only conflicts with federal law—it also effects a taking. The statute forces manufacturers to sell valuable property at below-market rates, to third parties, with no room to impose conditions or decline a sale. That is AbbVie's injury. The abuses simply underscore the stakes.

### C. Manufacturers' Response to HRSA's Overreach

86.    AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B-priced drugs to an unlimited number of commercial pharmacies.

87.    AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B-discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing covered entities.

88.    As 340B abuse continued to grow, with covered entities seeking the provision of 340B-priced drugs to an excessive number of for-profit pharmacies— sometimes located more than 100 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies.   Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for the in-house pharmacy.  However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located within 40 miles of the HRSA-registered covered entity parent site, and the covered entity submits limited claims data on 340B utilization for that pharmacy location.[2]  In addition, Grantee Covered Entities may use an unlimited number of contract pharmacies as long as the Grantee registers with 340B ESP[TM], a web-based platform made available to covered entities at no cost to submit claims data.  *See* Ltr. from E. Scheidler to 340B Covered Entities (Feb. 27, 2025), https://tinyurl.com/mr2rac4u.

89.    In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered

---

[2]    "Claims data," as used in the administration of the 340B Program, refers to prescription-level information necessary to determine whether a drug is subject to a 340B discount, a Medicaid rebate, or both, and whether the recipient is a patient of a covered entity.

outpatient drugs "at or below the applicable ceiling" price set by statute.  *See* 42 U.S.C. § 256b(a)(1).  AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's 340B-discounted drugs to qualifying patients.  If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

90.    In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B Program by covered entities and contract pharmacies.  Like AbbVie's, these policies do not refuse to supply drugs at discounted prices under the federal 340B Program solely because the covered entity has an arrangement with a number of contract pharmacies; instead, they are directed at addressing program abuses.

91.    AbbVie's policy is not only consistent with those upheld by the Third and D.C. Circuits but also gives covered entities and contract pharmacies more convenience at its own expense.  *See Sanofi*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463–64.

92.    AbbVie's compelled compliance is directly attributable to Oregon's enactment of H.B. 2385, which is set to come into effect on September 28, 2025.

*See* H.B. 2385, § 3 ("Act takes effect on the 91st day after the date on which the 2025 regular session of the Eighty-third Legislative Assembly adjourns sine die").

### D.    Litigation in Federal Courts

93.    HHS initially recognized that it lacked authority to compel manufacturers to transfer drugs to contract pharmacies. *See* Tom Mirga, HRSA Says Its 340B Contract Pharmacy Guidance Is Not Legally Enforceable, 340B Report (July 9, 2020), https://340breport.com/hrsa-says-its-340b-contract-pharmacy/. HHS then reversed its position and attempted to impose a new obligation on manufacturers.

94.    On December 30, 2020, HHS issued a final decision—labeled an "Advisory Opinion"—that for the first time ever purported to require manufacturers to facilitate the transfer of their products to for-profit commercial pharmacies. *See* U.S. Dep't of Health & Hum. Servs., Advisory Op. No. 20-06, Contract Pharmacies Under the 340B Program at 1 (Dec. 30, 2020), https://tinyurl.com/2ca6rmnm. Various manufacturers brought suit in early 2021 to challenge this HHS decision.

95.    On May 17, 2021, the government sent certain manufacturers "violation" letters purporting to enforce the 340B statute. AbbVie received a violation letter on October 17, 2022, stating that HHS had made a final determination that AbbVie's policy violated the 340B statute by not agreeing to transfer 340B discounted drugs to unlimited contract pharmacies because "AbbVie's actions have

resulted in overcharges." *See* U.S. Dep't of Health & Hum. Servs., Violation Letter to AbbVie (Oct. 17, 2022), https://tinyurl.com/47ybp3kw.

96.    While the December 30 decision was later withdrawn following a ruling from the federal district court for the district of Delaware, *see AstraZeneca*, 543 F. Supp. 3d 47, the previously issued violation letters were not withdrawn.

97.    Oregon and other states filed amicus briefs in the Third and D.C. Circuit Courts of Appeals in support of HHS, expressing disapproval of the manufacturers' policies. *See* Brief of Amicus Curiae States, *Sanofi*, 58 F.4th 696 (3d Cir. 2023) (Nos. 21-3167 et. al), 2022 WL 1617655; Corrected Brief of Amicus Curiae States, *Novartis*, 102 F.4th 452 (D.C. Cir. 2024) (Nos. 21-5299 et al.), 2022 WL 1644996.

98.    On January 30, 2023, the Third Circuit issued a decision recognizing that Congress intentionally "chose not to" impose delivery-related obligations on manufacturers, explaining that the federal 340B statute's plain text suggests that Congress intended "one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies." *See Sanofi*, 58 F.4th at 704.

99.    The Third Circuit further found that manufacturers' policies do not prevent covered entities from participating in the 340B Program or entering into contractual relationships with commercial pharmacies. Under manufacturers' policies, covered entities "can still buy and dispense unlimited discounted drugs by having them delivered to an in-house or contract pharmacy." *Id*. at 703.

100.   The Third Circuit rejected the argument that manufacturers were not permitted to address program abuses, such as diversion and duplicate discounting, by imposing restrictions on when they will transfer drugs to commercial pharmacies.

101.   On May 21, 2024, the D.C. Circuit issued its own opinion endorsing the same view, holding that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460.   As a result, as long as a manufacturer's policy "neither precludes [it] from making a bona fide 'offer' nor increases its contract 'price'"— such as only "deliver[ing] section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity"—the condition is legitimate and may be enforced without running afoul of section 340B. *Id.* at 463–64.

102.   In the face of those federal decisions, several states enacted their own laws trying to achieve what HHS could not.   Those state laws—passed in Arkansas, Louisiana, Maryland, Mississippi, Missouri, West Virginia, South Dakota, North Dakota, Utah, and others—try to limit manufacturers' ability to condition the federal offer by forcing them to transfer their drugs to an unlimited number of contract pharmacies at the 340B-discounted prices.   A new round of federal litigation commenced.   Manufacturers challenged the laws as unconstitutional on several grounds, and that litigation continues today.

103.   Some courts have allowed the state laws to take effect. *See, e.g.*, *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024) (Arkansas).  By contrast, the Southern District of West Virginia preliminarily enjoined West Virginia's contract pharmacy law, holding the law unconstitutionally conflicted with section 340B. *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 451–460 (S.D. W. 2024).  The West Virginia court found that Laws like Oregon's H.B. 2385 regulate "price, not delivery." *Id.* at 455.  Under such laws, "[t]he question is only about what price the pharmacy and the covered entity will pay." *Id.*  In other words, "the system is about delivery *at a given price*, not delivery *per se*." *Id.*

104.   Other cases await decisions in district court, and multiple appeals are now pending before the United States Courts of Appeals for the Fourth and Fifth Circuits.

### E.    The Oregon Law

105.   While federal courts were deciding that the federal 340B statute grants manufacturers the freedom to adopt policies to combat abuse of the 340B Program by contract pharmacies, Oregon turned to its own legislature to enact a law that purports to take that freedom away.

106.   On January 13, 2025, the Oregon House introduced H.B. 2385, Oregon's attempt to limit manufacturers' right to attach reasonable conditions to the federal 340B offer made to covered entities.  As of May 28, 2025, H.B. 2385 passed

both legislative chambers. Conferees for the House concurred in the Senate's amendments, recommending passage of H.B. 2385 on June 3, 2025. After the Speaker of the House and the Senate President signed the Bill on June 3, 2025, H.B. 2385 passed and was sent to Governor Tina Kotek. The Governor signed H.B. 2385 on June 11, 2025, and it is set to go into effect on September 28, 2025. *See* H.B. 2385, § 3.

107. The text of H.B. 2385 makes clear that changing the terms of the federal 340B Program and compelling a private wealth transfer of 340B-priced drugs from one party to another, are its regulatory objects. Start with its key defined terms: H.B. 2385 defines "340B drug" as "a drug that has been subject to an offer of a reduced price by a manufacturer pursuant to 42 U.S.C. 256b and is purchased by a covered entity," which in turn is defined with reference to the 340B statute. *See* H.B. 2385, §§ 1(1)(a) ("Covered entity"), (c) ("340B drug"). In other words, the Oregon statute cannot exist except in the context of the federal 340B Program.

108. H.B. 2385 directly eliminates manufacturers' ability to adopt policies to prevent 340B abuse or prevent the taking of their own property by entities not otherwise entitled to it: "A manufacturer or third party on behalf of a manufacturer may not: Deny, restrict, prohibit, or otherwise interfere directly or indirectly with the acquisition of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity to receive and dispense

340B drugs on behalf of the covered entity in this state unless the acquisition delivery or dispensation is prohibited by the United States Department of Health and Human Services." *Id.* § 1(2)(a).

109.  Further, the state statute restricts manufacturers' right to request claims data: "A manufacturer . . . may not . . . [r]equire, either directly or indirectly, a covered entity to submit a claim or utilization review data as a condition for the acquisition of a 340B drug by, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity . . . unless the claims or utilization review data submission is required by the United States Department of Health and Human Services." *Id.* at § 1(2)(b).

110.  H.B. 2385 prevents manufacturers from collecting basic claims and utilization data from covered entities—data that covered entities are already generating and sharing with their third-party vendors.  *See* Cassidy Report, *supra*, at 19 (explaining CVS's contract pharmacy agreement "specifically requires [the covered entity] to use a CVS Health subsidiary, Wellpartner, LLC, as its 340B administrative services provider (TPA) for contract pharmacy services for 340B transactions at CVS pharmacies and to pay related administrative fees, adding another layer of revenue for the parent pharmacy company (CVS)"); *accord id.* at app. 87 (explaining Wellpartner assists covered entities with "ESP data submissions").  This data allows manufacturers to address illegal diversion and

duplicate discounting, and, critically, it is an important means by which manufacturers may access the exclusive federal audit and ADR. The West Virginia district court enjoined West Virginia's 340B statute containing a similar prohibition on claims data requests. *Morrisey*, 760 F. Supp. 3d at 450-53.

111.   Any state legislation attempting to modify manufacturers' requirements under the federal 340B statute is unconstitutional. H.B. 2385 purports to affirmatively grant control over AbbVie's 340B-priced drugs to covered entities and any "pharmacy that has contracted with a covered entity," directly conflicting with the federal 340B statute's prohibition against diversion, in violation of the Supremacy Clause. *See* H.B. 2385 § 1(2)(a); *see also* 42 U.S.C. § 256b(a)(5)(B) (providing that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."). Additionally, H.B. 2385 plainly expands the pool of entities authorized by Congress to receive drugs purchased at the 340B prices by granting access to any "pharmacy that has contracted with a covered entity[.]" *See* H.B. 2385, § 1(2)(a).

112.   The statute cites no source, under the 340B statute or elsewhere, that permits Oregon to add requirements to the conditions for participating in the federal 340B Program, or that authorizes Oregon to establish an enforcement process for the Attorney General to seek remedies for alleged violations of the federal 340B requirements.

113.   A violation of H.B. 2385 allows the Attorney General to bring a civil action to enjoin a violation of Section 1.  *See* Or. Rev. Stat. § 180.060(1)(a) ("The Attorney General shall: Appear for the state in the trial of all civil … causes"); H.B. 2385 § 2(1) (referencing "other liability or penalt[ies] provided by law" in addition to State Board of Pharmacy "civil penalty" enforcement power).

114.   H.B. 2385 also empowers the State Board of Pharmacy to enforce the law and to collect a "civil penalty" that "may not exceed $5,000 per day on a manufacturer for each violation."  *Id.* at § 2(1).

115.   H.B. 2385 purports to limit its scope in Section 2(a), stating that the law's provisions do not apply where federal law prohibits or requires otherwise.  *See* H.B. 2385, § 1(2)(a) (manufacturer shall not "[d]eny, restrict, prohibit, or otherwise interfere . . . with the acquisition . . .of a 340B drug . . . unless the receipt is prohibited by the United States Department of Health and Human Services"); *id.* § 2(b) (only permitting manufacturer to require claims submission if "the claims or utilization review data submission is required by the United States Department of Health and Human Services.").

116.   Despite stating that it should not be construed to conflict with federal law, there is no way to read H.B. 2385 in congruence with the 340B statute.  There is no role for states to regulate the transfer of 340B-priced drugs to pharmacies who are not permitted as a matter of federal law to participate in the federal program and

obtain access to manufacturers' drugs at discounted prices. The specific provisions of H.B. 2385 conflict with Section 340B's requirements for drug manufacturers as well as its enforcement and penalty scheme.

## STANDING

117.   Article III standing is a threshold issue that limits the jurisdiction of federal courts to actual "cases" or "controversies." U.S. Const. art. 3, § 2, cl. 1. To establish standing, a plaintiff must demonstrate three elements: (1) a concrete, particularized and actual or imminent, injury in fact; (2) that "the injury [is] 'fairly … trace[able] to" the defendant's challenged conduct; and (3) that the injury is redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury is concrete if it is "real, and not abstract," and particularized if it affects the plaintiff "in a personal and individual way." *Spokeo*, 578 U.S. at 339–40 (internal quotations omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). The injury must also be fairly traceable to the challenged conduct and "likely" to be redressed by judicial relief. *Lujan*, 504 U.S. at 561. Finally, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general

allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (citation omitted).

118.   AbbVie is injured by H.B. 2385 because H.B. 2385 imposes state-level requirements not mandated by Congress and that directly conflict with and frustrate the federal 340B Program.  H.B. 2385 overrides the discretion manufacturers retain under federal law to impose reasonable conditions on their 340B offers, and subjects AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions.

119.   H.B. 2385 causes financial injury to AbbVie because it prohibits AbbVie's contract-pharmacy policy and, in turn, compels AbbVie to provide its drugs at 340B prices to contract pharmacies when AbbVie would otherwise not do so.  As a factual matter, that means AbbVie will be forced to provide more 340B discounts to more contract pharmacies.  That will have significant negative financial consequences for AbbVie.

120.   On top of financial losses flowing from increased contract-pharmacy sales, AbbVie will also suffer from increased compliance costs.  H.B. 2385 imposes state-level requirements that directly conflict with and frustrate the federal 340B program.  And it subjects AbbVie to conflicting obligations, compliance burdens, and potential enforcement actions by the Oregon Attorney General and Oregon Board of Pharmacy.

121.   H.B. 2385 will also inflict constitutional harms on AbbVie because it will force AbbVie to provide its private property to another private party in an unlawful—and unprecedented—A to B wealth transfer.  That violates AbbVie's rights under the Fifth Amendment's takings clause and the property rights AbbVie enjoys in its products.

122.   Plaintiffs are signatories to 340B PPAs, and/or are successors-in-interest to executed 340B PPAs, with HRSA.

123.   As a result, AbbVie satisfies the injury-in-fact requirement because H.B. 2385 will require AbbVie to provide more 340B discounts to more contract pharmacies at a significant financial cost to AbbVie.  It will also injure AbbVie in its constitutional and property rights.  H.B. 2385 does all those things by compelling AbbVie to complete 340B sales that it otherwise would not complete.

124.   Further, AbbVie's injuries are fairly traceable to H.B. 2385 because it is the newly enacted state law—not the federal 340B statute or any other federal source of authority—that compels AbbVie to provides its drugs to unlimited contract pharmacies at the 340B price.  It is H.B. 2385 that compels AbbVie to accept 340B orders it would otherwise not accept, or on terms to which it would not otherwise agree.

125.   If H.B. 2385 were repealed, enjoined, or otherwise without effect, these injuries would be alleviated.  That is because AbbVie could enforce its contract-

pharmacy policy, and significantly limit the number of contract pharmacies to which it will provide drugs at the 340B price. In the absence of H.B. 2385, the sales it compels would not occur. Put differently, the existence and enforcement of H.B. 2385 is the difference between a sale at the discounted price occurring or not.

126.    Finally, a favorable ruling is likely to redress the injuries to AbbVie that flow from H.B. 2385. If H.B. 2385 were enjoined, AbbVie would not be compelled to accept unlimited orders for 340B drugs from contract pharmacies. Rather, AbbVie could continue to enforce its policy, which limits contract pharmacies to one per covered entity. Meaning, it would, of course, alleviate the constitutional and property harms that would result. But it would also alleviate the significant financial burdens that Oregon's new law would impose. Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions and accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

127.    "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Moreover, where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm generally exists. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) ("The moratorium [on collecting rent during

COVID-10 pandemic] has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery."); *see also Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable harm . . . [E]conomic damages are not traditionally considered irreparable *because the injury can later be remedied by a damage award*."), *vacated on other grounds sub nom., Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *Chamber of Com. of U.S. v. Becerra*, 438 F. Supp. 3d 1078, 1104 (E.D. Cal. 2020) ("Imposition of monetary damages that cannot later be recovered . . . constitutes irreparable injury" (citation omitted)).

128.    Moreover, a taking occurs each and every time that a drug manufacturer is required against its own volition to transfer its drugs at the 340B-discounted price to a commercial pharmacy for the private benefit of that for-profit pharmacy. Effecting an unconstitutional taking of AbbVie's private property in a forced transfer to another private party for no recognized public use or purpose constitutes an irreparable injury.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)).

129.    Further, if H.B. 2385 is not enjoined as applied to AbbVie, AbbVie would be exposed to additional state law requirements as a condition of participating

in the federal 340B Program and would risk violating H.B. 2385 simply by performing its federally mandated functions. *See Brooks v. Francis Howell Sch. Dist.*, 599 F. Supp. 3d 795, 805 (E.D. Mo. 2022) ("Well-settled law holds that the loss of [constitutional] freedoms, even for minimal periods of time, 'unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))). A party may be irreparably injured in the face of the threatened enforcement of a preempted law. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding irreparable harm where party faced "Hobson's choice" of continually violating state law and risking liability or obeying during litigation and suffering interim harm); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013) (granting preliminary injunction where federal immigration law preempted state law aiding unauthorized aliens); *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016); *Craig v. Simon*, 980 F.3d 614, 617–18 (8th Cir. 2020); *United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) (finding that likelihood of success on preemption claim satisfied irreparable harm requirement); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 847–48 (8th Cir. 1999) (concluding that where the plaintiff proves preemption and "that it will suffer irreparable harm if the State is not enjoined from enforcing [the preempted law], then the question of harm to the State and the matter of the public interest drop from the case, for [the plaintiff] will be entitled to injunctive relief no matter what the harm to the State, and the public interest will

perforce be served by enjoining the enforcement of the invalid provisions of state law"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (concluding that a plaintiff has standing to "bring a preenforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder" (internal quotation marks and citation omitted)).

130.   If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is beyond the capacity of Oregon to compensate with damages.  Discounted purchases under the program reached approximately $66.3 billion for fiscal year 2023 in the U.S.  *See* Health Res. & Servs. Admin., *2023 340B Covered Entity Purchases* (Oct. 2024), https://tinyurl.com/56nzphvm.

131.   Any attempt to subsequently recover losses from Oregon would likely be barred by the doctrine of sovereign immunity under the Eleventh Amendment.  *See Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1133–34 (9th Cir. 2012).  That alone renders AbbVie's financial losses "irreparable injury" for purposes of seeking an injunction.  *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *see also Cal. Pharmacists Ass'n*, 563 F.3d at 851–52.

132.   The cost to AbbVie of complying with state laws like Oregon's is substantial.  AbbVie estimates that, for example, the cost of complying with similar

state laws in Mississippi and Missouri last year cost AbbVie around $33.1 million and $35 million, respectively. And as the number of states adopting these kinds of laws increases, so too do AbbVie's compliance costs and so does the irreparable harm imposed on AbbVie. For instance, AbbVie estimates compliance with Tennessee's and Colorado's contract pharmacy laws over the next year alone will cost around $67 million and 76.4 million, respectively. *See E. Enters. v. Apfel*, 524 U.S. 498, 521 (1998) (plurality op.) (noting that the Supreme Court has considered injunctive relief where there is a "lack of a compensatory remedy").

133.  As of filing, 20 other states have already passed contract-pharmacy laws akin to Oregon's H.B. 2385—but with material differences among and between those state laws, complicating compliance and subjecting manufacturers to different and varying enforcement:

| | AR | CO | HI | LA | MD | ME | MN | MO | MS | ND | NE | NM | OK | OR | RI | SD | TN | UT | VT | WV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restricts collection of claims data | – | ✓ | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Defines "340B entity" to include pharmacies | – | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | – | – | ✓ | ✓ | ✓ | – |
| Applies only to certain 340B covered entities | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – |
| Prohibits conditioning 340B offers on receipt of contracts | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – |

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Requires "acquisition" by a pharmacy or entity | – | ✓ | ✓ | ✓ | ✓ | ✓ | – | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Requires delivery to any location | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ |
| Prohibits "interfering" with "eligible patients" or pharmacies | – | – | – | – | – | ✓ | – | – | – | ✓ | – | ✓ | ✓ | – | – | – | – | – | ✓ | – |
| Prohibits use of rebates | – | – | – | – | – | – | – | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | – |
| Restricts right to impose time limits on replenishment orders | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | ✓ | – | – |
| Applies to an "agent" or "affiliate" | – | ✓ | ✓ | – | – | ✓ | – | ✓ | – | – | ✓ | ✓ | – | – | ✓ | – | ✓ | ✓ | ✓ | ✓ |
| Imposes criminal sanctions | – | – | ✓ | – | ✓ | – | – | – | ✓ | ✓ | – | ✓ | ✓ | – | – | – | ✓ | ✓ | – | – |
| Creates a private right of action | – | ✓ | ✓ | – | – | ✓ | – | – | – | – | – | – | – | – | ✓ | ✓ | ✓ | – | ✓ | – |

134.    Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from H.B. 2385.  That is, the law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the private benefit of those pharmacies and for no recognized public use, in violation of the U.S. Constitution.  The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B Program.  And H.B. 2385 threatens to impose significant penalties on manufacturers if they do not capitulate to Oregon's

PAGE 59 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

attempt to modify the terms of that federal program. The deprivation of constitutional rights constitutes irreparable injury for purposes of a preliminary injunction. *See Melendres*, 695 F.3d at 1002 ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury'" (citation omitted)); *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)).

135. Granting injunctive relief here would not harm the Oregon. It is well settled that the states have no interest in enforcing a regulation that violates federal law. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (finding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns"); *Upshaw v. Alameda Cnty.*, 377 F. Supp. 3d 1027, 1033 (N.D. Cal. 2019) ("[T]he government cannot be harmed by an injunction that forbids an unconstitutional practice."); *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir.1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Moreover, there is no evidence that uninsured and needy patients—in Oregon or anywhere else—benefit from the use of contract pharmacies, and Oregon has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

136.   Granting injunctive relief would be in the public interest.  The public has no legitimate interest in enforcing unconstitutional laws, particularly those that force a transfer of private property for no public use or purpose.  *See Ariz. Dream Act Coal.*, 757 F.3d at 1069 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . On the contrary, the public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'" (citations omitted)); *Firearms Pol'y Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1129 (E.D. Cal. 2016) ("The public has no interest in enforcing unconstitutional laws.").  By contrast, the public has a strong interest in preventing states from imposing unconstitutional requirements that force the transfer of private property for the private benefit of private commercial parties.  *See Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) ("[A]ll citizens have a stake in upholding the Constitution.").  Further, the public has a strong interest in enforcing federal law and not permitting states to change the requirements for participation in federal healthcare programs.

## FIRST CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Federal Preemption Under the Supremacy Clause, U.S. Const. art. VI, cl. 2*

137.   AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

138.   Under the Supremacy Clause of the Constitution, federal law is "the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."   U.S. Const. art. VI, cl. 2.   As a result, federal statutes and regulations properly enacted and promulgated can nullify or "override[] a [conflicting] state law" or local actions.   *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).   In other words, "if a state law 'conflicts with, or frustrates, federal law, the former must give way.'"   *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 654 (9th Cir. 2021) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993)).

139. Preemption can take multiple forms: express preemption, field preemption, and conflict preemption.   *See FMC Corp. v. Holliday*, 498 U.S. 52, 56– 57 (1990); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007).

140.   One type of implied preemption is field preemption.   Field preemption occurs when Congress "occupies an entire field" of regulation so comprehensively that it has "foreclose[d] any state regulation in the area, even if it is parallel to federal

standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012); *see also Crosby*, 530 U.S. at 372–73.  Field preemption also occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401.

141.  Every element of the program—from eligibility and pricing to compliance and enforcement—is governed by federal law.  "Price regulation is exclusively controlled by the federal statute, and state enforcement of it would necessarily intrude on the federal scheme."  *Morrisey*, 760 F. Supp. 3d. at 458 (internal citation omitted).

142.  H.B. 2385 prohibits manufacturers from conditioning their 340B offers by declining to deliver their drugs to contract pharmacies *at a particular price*.  *See id.* at 455–56.  Manufacturers violate laws like H.B. 2385 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering [their] drugs to those pharmacies."  *Id.*  That the state law defines the drugs in issue as "340B drug[s]" confirms that H.B. 2385 is a price regulation: "***Price*** is what distinguishes between an 'ordinary drug' and a 340B Program drug—a fact that seems to be reflected in the [Oregon] statute itself."  *Id.* (emphasis added).

143.  H.B. 2385 was enacted in response to manufacturers' policies, which (according to HRSA and HHS) result in overcharges.  But the federal statute does not authorize state regulation concerning 340B pricing and who is entitled to access

manufacturers' drugs at discounted 340B prices. It leaves no room for states to interfere with the carefully designed 340B Program. *See Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, state laws that impose additional obligations are preempted).

144. Indeed, H.B. 2385 ***expressly*** regulates 340B drug pricing. The law defines "340B drug" to mean a drug that is "subject to an offer of a reduced price by a manufacturer pursuant to [the 340B Program]." H.B. 2385, § 1(1)(c). And it prohibits manufacturers from denying, restricting, prohibiting, or otherwise interfering with "the acquisition of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by a pharmacy that has contracted with a covered entity," *id.* at § 1(2)(a).

145. The federal 340B statute carefully prescribes who may access 340B discounts, when, and under what conditions—including compliance with federal anti-diversion and duplicate discount requirements. The federal statute governs how prices and discounts are calculated and what obligations manufacturers must follow, requiring them to offer 340B pricing only to covered entities—not third parties. *See* 42 U.S.C. § 256b(a)(1) (stating that a manufacturer that participates in Medicaid shall agree that the price charged for covered outpatient drugs to covered entities will "not exceed an amount equal to the average manufacturer price . . . reduced by the rebate percentage described in" title XIX of the Social Security Act). *See also*

*Arizona*, 567 U.S. at 401 (holding that where Congress has occupied the field, state laws that impose additional obligations are preempted).

146.   It is foundational constitutional law that States may not regulate Congress's creations.  *See generally McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819).  A state law may not change the conditions for participation in the federal Medicare and Medicaid programs.  Any attempt by Oregon to regulate in this area impermissibly changes the requirements for participating in federal healthcare programs and nullifies the "natural effect" of federal law.  *Crosby*, 530 U.S. at 372–73.

147.   Another type of implied preemption is conflict preemption.  Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations omitted); *see also Spirit Airlines*, 508 F.3d at 470 ("Courts may find conflict preemption when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law.").

148.   Congress specifically defined which entities qualify for 340B discounts and intentionally chose not to mandate manufacturer participation in contract pharmacy arrangements.  *See AstraZeneca*, 543 F. Supp. 3d at 60.

149.   H.B. 2385 expands the number of entities entitled to receive 340B-discounted prices and attempts to force manufacturers to transfer their drugs to third parties—specifically, commercial pharmacies—who are not covered entities.  This regulation directly conflicts with the statute, which authorizes discounts only to covered entities and leaves manufacturers free to impose reasonable conditions on those offers.

150.   Oregon has no lawful authority to force manufacturers to transfer their drugs under the 340B Program at deeply discounted prices to any entity, let alone commercial pharmacies that do not qualify as covered entities under the federal program.

151.   The carefully delineated obligation for manufacturers to offer 340B priced drugs to covered entities is lawfully imposed by federal law solely as a condition of a manufacturer's participation in federal healthcare programs.  To the extent that Oregon seeks to impose, through H.B. 2385, any substantive obligation on manufacturers beyond what federal law requires, that state law obligation is preempted by federal law.

152.   Further, the replenishment model results in diversion, which the federal statute forbids. See 42 U.S.C. § 256b(a)(5)(B).  Thus, H.B. 2385 is preempted to the extent it expressly and impliedly protects the use of the replenishment model, a practice clearly in conflict with Congress' mandates.

153.   Federal law contemplates that manufacturers can request claims data. *See* 61 Fed. Reg. 65,406, 65,407 (Dec. 12, 1996) (providing that "audits are to be performed only when there is a reasonable cause to believe that there has been a violation" of the 340B statute).  The 340B statute forbids the transfer of 340B-discounted drugs to anyone but a covered entity's patients, and if a manufacturer suspects that such diversion is occurring between a covered entity and its contract pharmacy, the only way to enforce that violation is through the federal ADR process (not the state law).  *See* 42 U.S.C. § 256b(a)(5)(B).  Yet H.B. 2385 imposes an absolute ban on requiring claims data, preventing manufacturers from engaging in federally permitted compliance efforts—indeed the only avenue available to manufacturers to vindicate their federal defenses.  *See* H.B. 2385, § 1(2)(b).  This categorical prohibition creates an irreconcilable conflict with federal law and obstructs the objectives of the federal 340B program.

154.  H.B. 2385 also installs a parallel enforcement regime, granting enforcement authority to state officials.  H.B. 2385 and other relevant Oregon laws purport to grant substantive authority to the Oregon Board of Pharmacy and Attorney

General over the 340B program's administration and enforcement, despite and in conflict with the comprehensive compliance and enforcement regime Congress provided and made exclusive. Neither the Oregon Board of Pharmacy nor Oregon's Attorney General are the entities Congress tasked with enforcement of the 340B statute. "Congress . . . made HHS administrator of both the Medicaid Rebate Program and 340B Program." *Astra*, 563 U.S. at 120. State enforcement "would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Id.*

155. Congress not only defined who was entitled to administer the 340B Program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B Program for handling disputes among manufacturers and covered entities concerning program compliance. *See* 42 U.S.C. §§ 256b(d)(l)(B)(v), (d)(3). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B Program and engage in "overcharging." *See id.* §§ 256b(d)(l)(B)(vi), (d)(2)(B)(v). Oregon's attempt to install an alternative compliance and enforcement regime, with different regulators and distinct penalties is preempted as it conflicts with the procedures

detailed in the 340B statute and any lawfully promulgated federal rules implementing the statute.

156.   Finally, the growing patchwork of divergent state laws exacerbates the constitutional and compliance problems.  The difficulty of complying with varying state regulatory frameworks only increases as more states pass new and different laws relating to the 340B Program.  As of filing, 17 states have passed contract pharmacy laws akin to H.B. 2385.  State laws such as those passed by Utah, Maryland, West Virginia, Mississippi, Minnesota, Missouri, Arkansas, Kansas, Louisiana, New Mexico, Nebraska, South Dakota, North Dakota and Tennessee have material differences among and between themselves, complicating compliance by manufacturers and subjecting manufacturers to different and varying enforcement.  *Compare* W. Va. Code Ann. § 60A-8-6a (extending similar prohibitions to an "agent, or affiliate" of a manufacturer), La. Rev. Stat. § 40:2883 (prohibiting a manufacturer from "prevent[ing] or interfer[ing] with *any patient's choice* to receive such drugs from the 340B entity" (emphasis added)), NM H.B. 78, § 1(A)(4), 57th Leg., 1st Sess. (2025) (covering only entities "receiv[ing] federal grant funding"), *and* NE L.B. 168, § 3(1), 109th Leg., 1st Sess. (2025) (compelling delivery to "*any location*" authorized by a covered entity (emphasis added)).  Some states, like New Mexico, prohibit requiring the submission of claims data, while others, like Oregon, do not.  *Compare* Md. Health Occupations Code § 12-6C-09.1

(prohibiting restrictions on "delivery" or "acquisition" of "340B drugs") *with* ND H.B. 1473, § 1(b)(3), 69th Leg., 1st Sess. (2025) (restricting the collection of "any claims, encounter, or utilization data") *and* NE L.B. 168, § 3(2), 109th Leg., 1st Sess. (2025) (restricting the collection of "any claim data, utilization data, encounter data, medical data, purchasing data, or other data").  Some states, like Oregon, also impose financial penalties for failure to comply, while others do not.  *Compare* H.B. 2385 § 2(1) (imposing fines in amounts ranging from $500 to $2,500 for violations of the Act) *with* NE L.B. 168, § 4 (allowing the Attorney General to seek "an injunction or other process to restrain or prevent any violation" of the Act, but not specifying financial penalties).  And some, like Utah, impose criminal penalties for failure to comply, while others do not.  *Compare* Mo. Rev. Stat. §§ 407.095, 407.100, 407.110 (allowing for civil penalties) *with* Utah Code Ann. § 31A-2-308(9) (making violations of the statute a Class B misdemeanor).

157.   As these laws continue to accrete, administration of the 340B Program and compliance with a patchwork of state laws, may become untenable, with potential catastrophic effects for the nationwide prescription drug industry.  *See* Adam J. Fein, *EXCLUSIVE: The 340B Program Soared to $38 Billion in 2020—Up 27% vs. 2019*, Drug Channels (June 16, 2021), https://tinyurl.com/4jdjhh7u (analyzing HRSA data to find the 340B Program accounted for "16% of . . . total U.S. gross sales of brand-name drugs at list prices" in 2020).

158.   Importantly, the injury here flows **not** from the federal program itself, but from the state's attempt to override and distort it.  H.B. 2385 does not merely interact with the 340B statute—it imposes new obligations that conflict with the structure Congress created.  Here, AbbVie does not challenge Congress's design or dispute the requirements imposed under federal law.  Rather, it challenges Oregon's effort to rewrite those requirements by transforming a conditional federal offer into a mandatory, state-enforced sale on terms the federal statute does not require (and which may in fact even **violate** the federal statute), and by effectively foreclosing AbbVie's ability to access the federal enforcement scheme.  Oregon's law does not fill a gap—it tears through the fabric of the federal scheme Congress designed to be uniform, voluntary, and within the exclusive federal enforcement authority of HHS.

## SECOND CLAIM FOR RELIEF

### *Prospective Injunctive Relief and Declaratory Relief – Violation of Takings Clause, U.S. Const. amend. V, cl. 4*

159.   AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

160.   The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.; *see also Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 234–

35 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

161.    The Takings Clause extends to both real and personal property.  *Horne*, 576 U.S. at 358.  It is not limited to instances when the government physically appropriates property for its own use through eminent domain.  A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights.  *See E. Enters.*, 524 U.S. at 529.

162.    Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("[i]t is against all reason and justice" to allow government to "take[] property from A. and give[] it to B").

163.    "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).  Statutes or regulations that mandate the physical transfer of personal

property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

164.   H.B. 2385 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.   On its face, Oregon's H.B. 2385 prohibits manufacturers from "[d]eny[ing], restrict[ing], prohibit[ing] or otherwise interfer[ing] directly or indirectly with the acquisition of a 340B drug by a pharmacy that has contracted with a covered entity to receive and dispense 340B drugs on behalf of the covered entity."  H.B. 2385 § 1(2)(a).  A close reading of the statutory text reveals that manufacturers could even be held liable—potentially criminally so—for refusing to transfer drugs to a private ***third*** party at the request of a contract pharmacy. *See id.*  If Oregon requires manufacturers to provide their drugs to other private entities, including contract pharmacies, at below-market prices—by purporting to add that as a state-law obligation attached to the federal 340B scheme—then Oregon is engaged in an impermissible per se violation of the Constitution's Takings and Due Process Clauses.

165.   H.B. 2385 mandates that pharmaceutical manufacturers provide 340B-priced drugs at below-market prices, depriving them of control over their own pricing structures and revenue.  It compels sales or transfers of AbbVie's drugs at the 340B-discounted that, in the absence of H.B. 2385, would not occur.  AbbVie's offer is made conditional upon a covered entity's acceptance of AbbVie's contract

pharmacy policy.  In the absence of H.B. 2385, if a covered entity counter-offered with a term requiring unlimited contract pharmacy access, AbbVie would simply refuse that covered entity's counteroffer and no sale at the 340B-discounted price would take place.  However, H.B. 2385 operates to compel AbbVie to accept the counteroffer and complete the sale at the discounted price on terms AbbVie would not otherwise have agreed to.

166.   H.B. 2385 expands the federal 340B Program requirements in a way that shifts financial burdens onto manufacturers, reducing revenue and eliminating rebate offsets, without just compensation and with no justified public use.

167.   In the alternative, H.B. 2385 effectuates a partial regulatory taking.

168.   In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

169.   H.B. 2385's purported requirement that manufacturers transfer their drugs to commercial pharmacies is constitutionally impermissible because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use; imposes significant financial losses on AbbVie and other manufacturers; interferes with drug manufacturers' reasonable investment backed

expectations; and serves no valid government purpose because it deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties.

## PRAYER FOR RELIEF

**WHEREFORE,** AbbVie prays for the following relief:

1.  A declaration, order, and judgment holding H.B. 2385 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

2.  A declaration, order, and judgment declaring that H.B. 2385 effects an impermissible taking of AbbVie's property for private benefit;

3.  A declaration, order, and judgment holding that the 340B statute does not require drug manufacturers to unconditionally provide 340B pricing to covered entities or contract pharmacies or transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

4.  A preliminary and permanent injunction against enforcement of H.B. 2385;

5.  An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

6.  Any other relief that this Court deems just and proper.

PAGE 75 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: July 30, 2025                    Respectfully submitted,

                                        */s/ Peter D. Hawkes*
                                        **DAVID H. ANGELI**, OSB No. 020244
                                        david@angelicalfo.com
                                        **PETER D. HAWKES,** OSB No. 071986
                                        peter@angelicalfo.com
                                        ANGELI & CALFO LLC
                                        121 SW Morrison Street, Suite 400
                                        Portland, OR 97204
                                        Telephone: (503) 954-2232
                                        Facsimile: (503) 227-0880

                                        **MATTHEW S. OWEN, P.C.** (*pro hac vice*
                                        forthcoming)
                                        matt.owen@kirkland.com
                                        **MEREDITH M. POHL** (*pro hac vice*
                                        forthcoming)
                                        meredith.pohl@kirkland.com
                                        KIRKLAND & ELLIS LLP
                                        1301 Pennsylvania Avenue N.W.
                                        Washington, D.C. 20004
                                        Telephone: (202) 389-5000

                                        *Counsel for Plaintiffs*

PAGE 76 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF