# Exhibit 3

# Table of Contents

**340B Preemption Cases**                                                                                          **Page #**

**Arkansas**

*Pharm. Rsch. & Manufacturers of Am.  v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022), *aff'd*, 95 F.4th 1136, 1139 (8th Cir. 2024), *cert. denied*, No. 24-118, 145 S. Ct. 768 (2024)…………………............................................................... 1, 14, 25

**Louisiana**

*Pharm. Rsch. & Manufacturers of Am.  v. Murrill,* No. 6:23-cv-00997 (W.D. La. Sept. 30, 2024), ECF 82, *aff'd sub nom.*, *AbbVie, Inc. v. Murrill*, 166 F.4th 528 (5th Cir. 2026)………………………………………………………………….. 26, 58

**Mississippi**

Order Denying Mot. for Prelim. Inj., *Pharm. Rsch. & Manufacturers of Am. v. Fitch*, No. 1:24-cv-00160 (S.D. Miss. July 1, 2024), ECF 21, *aff'd*, No. 24-60340 (5th Cir. Apr. 9, 2026), …………………………………………………. 78, 118

Order Denying Mot. for Prelim. Inj., *Novartis Pharms. Corp. v. Fitch*, No. 1:24-CV-00164 (S.D. Miss. July 1, 2024), ECF 29, *aff'd*, No. 24-60342 (5th Cir. Apr. 9, 2026) ……………………………………………...................................... 129, 154

Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Fitch*, No. 1:24-cv-00184 (S.D. Miss. July 22, 2024), ECF 28, *aff'd*, *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025)……………………………………………………………………. 162, 210

Order Denying Mot. for Prelim. Inj., *AstraZeneca Pharms. LP v. Fitch*, No. 1:24-cv-00196 (S.D. Miss. Dec. 23, 2024), ECF 36 ………………………………… 224

**Missouri**

Order Granting, in Part, Mot. to Dismiss, *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131(W.D. Mo. Feb. 13, 2025), ECF 77………………………………... 243

Order Granting, in Part, Mot. to Dismiss, *AstraZeneca Pharms. LP v. Bailey*, No. 2:24-cv-04143(W.D. Mo. Feb. 27, 2025), ECF 90………………………………... 258

Order Granting, in Part, Mot. to Dismiss, *Pharm. Rsch. & Manufacturers of Am. v. Bailey*, No. 2:24-cv-04144 (W.D. Mo. Feb. 27, 2025), ECF 88……………………... 271

**Tennessee**

Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519 (M.D. Tenn. June 30, 2025), ECF 45……………………………………………... 285

Order Granting Defense's Mot. to Dismiss, *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519 (M.D. Tenn. Feb. 26, 2026), ECF 68, *appeal docketed*, No. 26-5279 (6th Cir. Apr. 1, 2026)……………………………………………………………………. 333

Order Granting Defense's Mot. to Dismiss, *Pharm. Rsch. & Manufacturers of Am.*, No. 3:25-cv-00582, (M.D. Tenn. June 30, 2025), ECF 4, *appeal docketed*, No. 26-5275 (1st Cir. Mar. 31, 2026)…………………………………………………………... 362

**Maine**

Order Denying Mot. for Prelim. Inj., *Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407 (D. ME. Sept. 23, 2025), ECF 44 (includes order for *AbbVie v. Frey*, No. 1:25-cv-00416-JCN), *appeal docketed*, No. 25-1908 (1st Cir. Sept. 24, 2025) …….... 395

Order Denying Mot. for Prelim. Inj., *Pharm. Rsch. & Manufacturers of Am. v. Frey*, 1:25-CV-00469-JCN (D. ME. Jan. 23, 2026), ECF 51, *appeal docketed*, No. 26-1099 (1st Cir. Jan. 28, 2026)…………………………………………………………... 432

**Rhode Island**

Order Denying Mot. for Prelim. Inj., *Novartis Pharms. Corp. v. Neronha*, No. 1:25-cv-00387-JJMAEM (D. RI. Sept. 30, 2025)(includes order for AbbVie v. Neronha, No. 1:25-cv-00388), *appeal docketed*, No. 25-1941 (1st Cir. Oct. 7, 2025) ………... 469

Order Denying Mot. for Prelim. Inj., *Pharm. Rsch. & Manufacturers of Am. v. Neronha*, No. No. 1:25-cv-00501-JJM-AEM (D.RI. Dec. 29, 2025), *appeal docketed*, No. 26-1039 (1st Cir. Jan. 15, 2026)………………………………………… 471

**Colorado**

Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Weiser*, 1:25-cv-01847-WJM-KAS (D. CO. Oct. 31, 2025), ECF 115, *appeal docketed*, No. 25-1439 (10th Cir. Nov. 21, 2025) ……………………………………………………………………. 474

Order Denying Mot. for Prelim. Inj., *AstraZeneca Pharms. LP v. Weiser*, 1:25-cv-02685-STV (D.CO. Dec. 17, 2025), ECF 72, *appeal docketed*, No. 25-1466 (10th Cir. Dec. 22, 2025)............................................................................................ 503

**Hawaii**

Order Denying Mot. for Prelim. Inj., *AstraZeneca Pharms. LP v. Lopez*, 1:25-cv-00369-MWJS-WRP (D. Haw. Feb. 23, 2026), ECF 99, *appeal docketed*, No. 26-1172 (9th Cir. Feb. 27, 2026)…………………………………………………………. 526

**890**    **645 FEDERAL SUPPLEMENT, 3d SERIES**

Royal bag was [*id.* 1:31]. Mr. Lusk said, "It's gone, sir" [*id.*].

Mr. Lusk argues that this statement was inculpatory. He points to no other admission that he seeks to suppress. As such, the court need only consider whether Mr. Lusk's encounter with law enforcement up to the time this statement was made was custodial. *See Jones*, 21 F.3d at 170. The court need not consider later facts—that officers told Mr. Lusk he was being detained, that he was not free to leave, that he was handcuffed, or that he was placed in the back of a squad car—that may have transformed the interaction with law enforcement into a custodial interrogation when none of his statements during this later time prove of concern.

Given the totality of the circumstances, the encounter with law enforcement up to the statement about the Crown Royal bag wasn't custodial. Though three uniformed officers questioned Mr. Lusk in a poorly-lit area, after moving him to another place outside the factory floor, they didn't use any physical restraints or display their weapons. It was conducted in an open area of the parking lot, not in a squad car or police station. Officer Wagner was the only one to pose questions to this point, and he did so in a conversational, courteous manner. Mr. Lusk made the statement at issue just one minute into his encounter with law enforcement. No officer had informed him at this point that he could not leave.

**[30]** The exclusion of incriminating statements isn't appropriate "outside the context of the inherently coercive custodial interrogations for which it was designed." *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). Here, Mr. Lusk was not in custody for purposes of receiving *Miranda* warnings when he said that the Crown Royal bag had been in the workplace but wasn't any longer. A reasonable person in Mr. Lusk's situation would not have thought himself in custody then. Accordingly, the court must deny the motion to suppress this statement.

CONCLUSION

Law enforcement had the constitutional authority to search Mr. Lusk's workstation and Crown Royal bag in the trash can, so the firearm wasn't recovered in violation of the Fourth Amendment. Given the totality of the circumstances, the encounter with law enforcement up to the statement about the Crown Royal bag was not custodial, so the statement wasn't taken in violation of the Fifth Amendment. The court thus DENIES both suppression motions [ECF 21, 22].

SO ORDERED.



**PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, Plaintiff**

**v.**

**Alan MCCLAIN, in his official capacity as Commissioner of the Arkansas Insurance Department, Defendant**

**Community Health Centers of Arkansas; Piggott Community Hospital, Intervenors**

**Case No. 4:21-CV-864-BRW**

United States District Court, E.D. Arkansas, Central Division.

Signed December 12, 2022

**Background:** Association representing several prescription drug manufacturing

### PHARMA. RESEARCH AND MANUF. OF AMERICA v. MCCLAIN  891
Cite as 645 F.Supp.3d 890 (E.D.Ark. 2022)

companies brought action against Commissioner of the Arkansas Insurance Department (AID), alleging provisions in Arkansas law protecting contract pharmacy arrangements in Arkansas inappropriately regulated and altered federal prescription drug discount program in violation of supremacy clause. City-owned hospital and non-profit organization intervened. Association and intervenors filed motions for summary judgment on issue of preclusion.

**Holdings:** The District Court, Billy Roy Wilson, Senior District Judge, held that:

(1) field preemption did not apply to bar enforcement of Arkansas law;

(2) Arkansas law did not require illegal conduct under statute governing program, thus, impossibility preemption did not apply to bar enforcement of law;

(3) Arkansas law did not undermine program's purpose, thus, obstacle preemption did not apply to bar enforcement of law; and

(4) Arkansas law was not preempted by FDCA.

Ordered accordingly.

**1. Federal Preemption ⟜6**

State laws that interfere with, or are contrary to the laws of congress, made in pursuance of the Constitution are invalid, or preempted.  U.S. Const. art. 6, cl. 2.

**2. Federal Preemption ⟜14**

Whether a particular federal statute preempts state law depends upon congressional purpose.  U.S. Const. art. 6, cl. 2.

**3. Federal Preemption ⟜20**

In analyzing issue of preemption under the supremacy clause, the Supreme Court is highly deferential to state law in areas traditionally regulated by states. U.S. Const. art. 6, cl. 2.

**4. Federal Preemption ⟜13**

Under the supremacy clause, federal law may preempt state law where Congress has expressly stated that it intends to prohibit state regulation in a particular area.  U.S. Const. art. 6, cl. 2.

**5. Federal Preemption ⟜9**

Federal law may preempt state law under the supremacy clause where Congress has implicitly preempted state regulation by the occupation of a field.  U.S. Const. art. 6, cl. 2.

**6. Federal Preemption ⟜9**

A field is occupied by federal law, for purposes of preemption under the supremacy clause, when the federal regulatory scheme is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it.  U.S. Const. art. 6, cl. 2.

**7. Federal Preemption ⟜7, 8**

Even if Congress has not completely precluded the ability of states to regulate in a field, state regulations are preempted under the supremacy clause if they conflict with federal law; such conflict exists when it is impossible to comply with both state and federal law, or where state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.  U.S. Const. art. 6, cl. 2.

**8. Federal Preemption ⟜10, 14**

To determine Congressional intent, for purposes preemption under the supremacy clause, the district court may consider the statute itself and any regulations enacted pursuant to the statute's authority.  U.S. Const. art. 6, cl. 2.

**9. Federal Preemption ⟜24**

The plaintiff bears the burden of proving preemption.  U.S. Const. art. 6, cl. 2.

**10. Federal Preemption ⊜9**

Even if a federal statute does not expressly preempt a state law, it may do so through "field preemption" when the scope of the statute indicates that Congress intended federal law to occupy the field exclusively; the critical question is whether the federal law so thoroughly occupies the legislative field as to make reasonable the inference that Congress left no room for states to supplement it.

> See publication Words and Phrases for other judicial constructions and definitions.

**11. Federal Preemption ⊜56**
    **Health ⊜107**

Field preemption did not apply to bar enforcement of Arkansas law prohibiting pharmaceutical manufacturers from denying drugs to pharmacies that contracted with entities authorized to participate in a federal drug discount program, in action brought by association representing manufacturers, alleging provisions in Arkansas law inappropriately regulated the program in violation of the supremacy clause; statute governing the program was silent on what role contract pharmacies played and pharmacies were not mentioned in any of the provisions regarding manufacturers' obligations, guidance on the program was silent as to permissible drug distribution systems, and the practice of pharmacy was an area traditionally left to state regulation. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. §§ 256b(a)(1), 256b(a)(4).

**12. Federal Preemption ⊜56**
    **Health ⊜107**

Arkansas law prohibiting pharmaceutical manufacturers from denying drugs to pharmacies that contracted with entities authorized to participate in a federal drug discount program did not require illegal conduct under provision of program's governing statute precluding covered entities from transferring drugs to any person who was not a patient of a covered entity, and thus impossibility preemption did not apply to bar enforcement of the law, in action alleging the law regulated the program in violation of the supremacy clause; under Arkansas' "replenishment model," entities never physically possessed the drugs, as manufacturers shipped them to pharmacies for dispensing to all patients, and did not know whether prescriptions were written by medical providers at covered entities. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b(a)(1); Ark. Code Ann. § 23-92-604(c).

**13. Federal Preemption ⊜7**

To establish impossibility preemption, a party must be unable to comply with both federal law and state law.

**14. Federal Preemption ⊜7**

When determining whether impossibility preemption implies, a court must look to whether it is lawful under federal law to accomplish what the state law requires.

**15. Federal Preemption ⊜56**
    **Health ⊜107**

Arkansas law prohibiting pharmaceutical manufacturers from denying drugs to pharmacies that contracted with entities authorized to participate in a federal drug discount program did not undermine the program's purpose, and thus obstacle preemption did not apply to bar enforcement of the law, in action alleging the law regulated the program in violation of the supremacy clause; the effects of the law's disputed provisions were limited to the distribution of and access to discounted drugs, and there was no indication the law interfered with covered entities' pricing agreements, as the law had no bearing on setting the ceiling price, and penalties that

could be assessed for violations of the law related to activities outside the scope of the program's enforcement procedures. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b(a)(1); Ark. Code Ann. § 23-92-604(c).

**16. Federal Preemption ⟂85**

**Health ⟂107**

Arkansas law prohibiting pharmaceutical manufacturers from denying drugs to pharmacies that contracted with entities authorized to participate in a federal drug discount program was not preempted by provision of the FDCA permitting the Food and Drug Administration (FDA) to require that potentially high-risk drugs be dispensed to patients only in certain health care settings, in action alleging the law regulated the program in violation of the supremacy clause; law did not regulate drug safety, but rather merely prevented manufacturers from refusing to supply discounted drugs ordered by covered entities solely because the entity had an arrangement with a contract pharmacy. U.S. Const. art. 6, cl. 2; Federal Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Public Health Service Act § 340B, 42 U.S.C.A. § 256b(a)(1); Ark. Code Ann. § 23-92-604(c).

———

Andrew D. Prins, Pro Hac Vice, Philip J. Perry, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, Joshua C. Ashley, Friday, Eldredge & Clark, LLP, Little Rock, AR, for Plaintiff.

Kendall Booth Rand, Arkansas Insurance Department, Legal Division, Little Rock, AR, for Defendant.

Barbara Straub Williams, Pro Hac Vice, Ronald S. Connelly, Pro Hac Vice, Powers Pyles Sutter & Verville, Washington, DC, George Nathan Steel, Robert Alexander Gaines, Steel | Wright | Gray PLLC, Little Rock, AR, for Intervenors.

### ORDER

BILLY ROY WILSON, UNITED STATES DISTRICT JUDGE

Pending are Plaintiff's Motion for Summary Judgment on Preemption (Doc. No. 24), Defendant Leslie Rutledge's Cross-Motion for Summary Judgment (Doc. No. 32), and Intervenors' Cross-Motion for Summary Judgment on Preemption (Doc. No. 35). The parties have responded and replied.[1] For the reasons set out below, Plaintiff's motion is DENIED. Intervenors' cross-motion is GRANTED. Defendant Leslie Rutledge's cross-motion is DENIED as MOOT.

### I. BACKGROUND [2]

Plaintiff claims Act 1103 enacted by the Arkansas General Assembly in 2021 is unconstitutional. Plaintiff represents several prescription drug manufacturing companies. Defendant Alan McClain is the Commissioner of the Arkansas Insurance Department, which is the agency charged with the implementation and enforcement of Act 1103.

Plaintiff named Leslie Rutledge in her official capacity as the Attorney General of Arkansas as a Defendant in this case.[3] On September 9, 2022, Ms. Rutledge filed a

---

**1.** Doc. Nos. 29, 38, 41, 45.

**2.** Unless otherwise noted the Background information comes from the parties' Statements of Facts (Doc. Nos. 25, 31, 37, 38, 42).

**3.** Doc. No. 1.

motion for summary judgment arguing that she was not a proper party to he lawsuit under Arkansas law.[4] On October 5, 2022, the parties filed a stipulation of dismissal where they agreed that Ms. Rutledge has no authority to enforce the relevant Arkansas law at issue, and requested that she be dismissed.[5] On that same day, I granted the dismissal.[6] Accordingly, Ms. Rutledge's Cross-Motion for Summary Judgment is DENIED as MOOT.

Intervenor Piggott Community Hospital ("PCH") is located in Piggott, Arkansas, and is designated under the Medicare program as a critical access hospital ("CAH"). PCH is owned and operated by the City of Piggott and participates in the 340B Program based on its governmental ownership and CAH status.[7]

Intervenor Community Health Centers of Arkansas ("CHCA") is a non-profit organization comprised of eleven community health centers located in Arkansas. All of CHCA's members participate in the 340B Program by receiving funding under Section 330 of the Public Health Service Act ("PHSA").[8]

This case arises out of a dispute between drug manufacturers and the Arkansas Insurance Department ("AID") about the use of "contract pharmacies" as a part of the Federal 340B drug program. Plaintiff contends that these contract pharmacies "have found illegal ways to leverage the 340B discounts to their financial benefit, often without assisting the vulnerable patient populations that the 340B program was intended to help."[9]

Plaintiff contends that provisions found in Act 1103 inappropriately regulate and alter the Federal 340(B) Program, impose requirements that directly conflict the program, and regulate commercial transactions occurring entirely outside of Arkansas.[10] Plaintiff argues that Act 1103 is invalid under both the Supremacy and Commerce Clauses of the U.S. Constitution. Plaintiff seeks declaratory judgment and injunctive relief.[11]

On September 29, 2021, Plaintiff filed its Complaint.[12] On August 9, 2022, the parties filed an joint motion to stay the proceedings on the commerce clause claim until the preemption claim has been resolved.[13] I granted the motion on that same day.[14] So, the only issue ripe for consideration at this point is preemption.

On August 8, 2022, Plaintiff filed its Motion for Summary Judgment on Claim I.[15] First, Plaintiff contends that the 340B Program is strictly a federal scheme that is not subject to state regulation. Second, Plaintiff argues that Act 1103 conflicts with the 340B Program by essentially adding "contract pharmacies" to the list of "covered entities" as defined in the statute. Third, Plaintiff asserts that Act 1103 conflicts with the enforcement authority granted to HHS and its agency the Health Resources and Services Administration

4.  Doc. No. 32.

5.  Doc. No. 39.

6.  Doc. No. 40.

7.  42 U.S.C. §§ 256b(a)(4)(N), 1395i–4(c)(2); 42 C.F.R. §§ 485.601–485.647.

8.  42 U.S.C. §§ 254b, 256b(a)(4)(A), 1396d(*l* ).

9.  Doc. No. 1, p. 2.

10.  *Id.*

11.  *Id.*

12.  *Id.*

13.  Doc. No. 27.

14.  Doc. No 28.

15.  Doc. No. 24.

PHARMA. RESEARCH AND MANUF. OF AMERICA v. MCCLAIN     **895**
Cite as 645  F.Supp.3d  890  (E.D.Ark.  2022)

("HRSA") by establishing a separate enforcement scheme with additional penalties. Fourth, Plaintiff contends that Act 1103 conflicts with the Federal Food, Drug, and Cosmetic Act ("FDCA") "by mandating how federally regulated drugs may be distributed in Arkansas" without regard to federal safety standards.[16]

In response, Defendant and Intervenors seek a narrow interpretation of the provisions in Act 1103 and contend that even if I agree with Plaintiff's broad interpretation of Act 1103, a fact issue remains on the ownership status of the discounted drugs as they are distributed through the system.[17]

On September 9, 2022, Intervenors filed a Cross-Motion for Summary Judgment on Claim I.[18] Intervenors contend that the 340(B) Program only regulates drug pricing, and the disputed provisions in Act 1103 only regulate drug distribution in Arkansas, so no preemption exists. I agree.

## II.  SUMMARY  JUDGMENT  STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[19] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[20]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[21] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[22] This court must view the facts in the light most favorable to the party opposing the motion.[23] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, "[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should

---

**16.** Doc. No. 26, p. 13.

**17.** Doc. Nos. 30, 35.

**18.** Doc. Nos. 35, 36.

**19.** *Holloway v. Lockhart,* 813 F.2d 874, 879 (8th Cir. 1987); Fed R. Civ. P. 56.

**20.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**21.** *Inland Oil & Transport Co. v. United States,* 600 F.2d 725, 727 (8th Cir. 1979).

**22.** *Id.* at 728.

**23.** *Id.* at 727-28.

896                    645 FEDERAL SUPPLEMENT, 3d SERIES

be granted.[24] Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[25]

## III.  DISCUSSION

### A.   340(B) Drug Program

The 340B Drug Program, is a federal prescription drug discount plan established by Congress in 1992 [26]. The Secretary of HHS administers the program. The 340(B) Program requires, as a condition of a manufacture's participation in Medicaid and Medicare Part B, that it sell its outpatient drugs at a discounted price to "covered entities," which are defined by statute to include 15 types of public and not-for-profit hospitals, community centers, and other federally funded clinics serving low-income patients.[27]

Specifically, all drug manufacturers participating in the 340B Program must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."[28] The 340B Program "ceiling prices," which are calculated according to a prescribed statutory formula,[29] are lower than the amounts other purchasers would pay. These drug pricing discounts are intended to "enable [covered entities] to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[30]

To participate in the 340B Program, manufacturers are required to sign a contract with HHS known as the Pharmaceutical Pricing Agreement ("PPA"), which incorporates the statutory obligations of the 340B Program and expresses the manufacturers' agreement to abide by those obligations.[31] If, at some point, HHS determines that a drug manufacturer has failed to comply with its 340B Program obligations, the manufacturer's PPA can be terminated, which prevents the manufacturer from receiving coverage for its drugs under Medicare and Medicaid.[32]

Under the 340B Program, covered entities are prohibited from requesting "duplicate discounts or rebates," which means that covered entities may not request both a 340B Program discount and a Medicaid rebate for the same drug.[33] Covered entities are also prohibited from engaging in "diversion," which is defined by statute as the practice of "resell[ing] or otherwise transfer[ring]" a covered outpatient drug "to a person who is not a patient of the entity."[34]

24.  *Counts v. MK-Ferguson Co.,* 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.,* 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

25.  *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

26.  See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967-71 (codified as amended at 42 U.S.C. § 256b).

27.  See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967–71 (1992), codified at § 340B Public Health Service Act, 42 U.S.C. § 256b (1992).

28.  42 U.S.C. § 256b(a)(1).

29.  See *id.* § 256b(a)(1), (a)(4), (b)(1).

30.  H.R. Rep. No. 102-384, pt. 2 at 12 (1992) (conf. report).

31.  See 42 U.S.C. § 1396r-8(a)(1), (5).

32.  See *id.* § 1396r-8(b)(4)(B)(v); 61 Fed. Reg. 65,406, 65,412–65, 413 (Dec. 12, 1996).

33.  42 U.S.C. § 256b(a)(5)(A).

34.  *Id.* § 256b(a)(5)(B).

## PHARMA. RESEARCH AND MANUF. OF AMERICA v. MCCLAIN    897
### Cite as 645 F.Supp.3d 890 (E.D.Ark. 2022)

### B.   Act 1103

Plaintiff's organization permitted 340B discounted drugs to be shipped to pharmacies under contract with covered entities and treated contract pharmacies the same as in-house pharmacies for over 25 years.[35] Beginning in July 2020, drug manufacturers began implementing policies that either eliminated or restricted distribution of 340B drugs delivered to contract pharmacies through bill-to-ship contract pharmacy arrangements.[36] To date, eighteen manufacturers have unilaterally imposed restrictions the ability of covered entities to access 340B drugs through contract pharmacy arrangements.[37] In May 2021, the Arkansas General Assembly enacted Act 1103 to protect contract pharmacy arrangements in Arkansas.

Plaintiff challenges two specific provisions found in Act 1103 enacted by the Arkansas General Assembly in 2021. The relevant provisions of the act provide:

A pharmaceutical manufacturer shall not:

(1) Prohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer; or

(2) Deny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing.[38]

Additionally, the AID has promulgated Rule 123, 340B Drug Program Nondiscrimination Requirements which includes the same language found in Ark. Code Ann. § 23-92-604(c)[39] and defines "340B drug pricing" as "the acquisition and delivery of 340B-priced drugs as established under section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585."[40]

### C.   340(B) Program Preemption

[1–3]   The federal preemption doctrine stems from the Constitution's Supremacy Clause, which states that laws of the United States made under the Constitution are the "supreme law of the land."[41] "[S]tate laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid," or preempted.[42] "Whether a particular federal statute preempts state law depends upon congressional purpose."[43] In analyzing the issue of preemption, the Supreme Court is highly deferential to state law in areas traditionally regulated by the states.[44]

[4–9]   The Eighth Circuit has stated that "there are three primary ways that federal law may preempt state law."[45]

---

35.  Doc. No. 37, p. 6.

36.  *Id.*

37.  *Id.*

38.  Ark. Code Ann. § 23-92-604(c).

39.  Rule 123 340B Drug Program Nondiscrimination Requirements Part IV(9)(c)(1)-(2).

40.  *Id.* at Part II (7).

41.  U.S. Const. Art. VI, cl. 2.

42.  *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).

43.  *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.,* 621 F.3d 781, 791 (8th Cir. 2010).

44.  *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654-55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

45.  *N. Natural Gas Co. v. Iowa Utils. Bd.,* 377 F.3d 817, 821 (8th Cir. 2004).

First, federal law may preempt state law where Congress has expressly stated that it intends to prohibit state regulation in a particular area.[46] Second, federal law may preempt state law where Congress has implicitly preempted state regulation by the "occupation of a field."[47] A field is occupied when the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."[48] Finally, even if Congress has not completely precluded the ability of states to regulate in a field, state regulations are preempted if they conflict with federal law.[49] Such a conflict exists "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."[50] To determine Congressional intent, courts "may consider the statute itself and any regulations enacted pursuant to the statute's authority."[51] Plaintiff bears the burden of proving preemption.[52] The 340(B) Program contains no express preemption clause, so only implied preemption applies to this case.

### 1. Field Preemption

[10]   Even if a federal statute does not expressly preempt a state law, it may do so through field preemption "when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively."[53] The critical question is whether the "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it."[54]

Plaintiff contends that the 340B Program is a solely federal scheme. Plaintiff cites *Astra USA, Inc. v. Santa Clara Cnty., Cal.*,[55] to support its position that "Congress intended to operate the 340B Program 'on a uniform, nationwide basis.' "[56]

In *Astra*, a collection of "covered entities" sued drug manufacturers for alleged overcharges on 340B Program-covered drugs.[57] Both sides "conceded that Congress authorized no private right of action under § 340B for covered entities who claim they have been charged prices exceeding the statutory ceiling."[58] Unable to sue the drug companies directly under the

**46.**  *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001)).

**47.**  *Id.*

**48.**  *Id.* (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

**49.**  *Id.* (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).

**50.**  *Id.*

**51.**  *Aurora Dairy*, 621 F.3d at 792.

**52.**  *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967 (8th Cir. 2021) (citing *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009)).

**53.**  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995).

**54.**  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quotation omitted).

**55.**  563 U.S. 110, 121, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011).

**56.**  Doc. No. 26, p. 26. 563 U.S. at 120, 131 S.Ct. 1342; see also id. at 113-14, 131 S.Ct. 1342 (rejecting attempt by covered entities to enforce 340B Program through suit against manufacturers alleging breach of contract).

**57.**  *Id.*

**58.**  *Id.* at 113, 131 S.Ct. 1342.

**PHARMA. RESEARCH AND MANUF. OF AMERICA v. MCCLAIN    899**
Cite as 645 F.Supp.3d 890 (E.D.Ark. 2022)

340B Program, the covered entities pursued their claims under a breach of contract theory as third-party beneficiaries of contracts between HHS and drug companies that create 340B Program discount-ceiling prices.[59]

The Supreme Court was not persuaded. The Court pointed to the fact that Congress had provided an alternative administrative process in which to resolve disputes under the 340B Program.[60] Specifically, Congress had responded to reports of inadequate 340B Program oversight and enforcement, by providing for the establishment of an ADR process within the agency.[61] "Congress thus opted to strengthen and formalize" the agency's enforcement "to make the new adjudicative framework the proper remedy for covered entities complaining of 'overcharges and other violations of the discounted pricing requirements,'" with the agency's resolution of ADR complaints subject to review under the APA.[62]

[11]  I am not convinced that the Supreme Court's narrow holding concerning third-party lawsuits in *Astra* makes the 340B Program a solely federal scheme immune from any type of state regulation.

I note that the 340B Program is silent on what role (if any) contract pharmacies play in its discount drug scheme. Pharmacies are not mentioned anywhere in it—neither in 42 U.S.C. § 256b(a)(1), which contains the "sum total of the statute's language regarding manufacturers' obli-

gations," nor in § 256b(a)(4), which defines "covered entity." As the district court in *AstraZeneca Pharms. LP v. Becerra* observed:

> When a statute does not include even a single reference to the pertinent word (e.g., "pharmacy"), it is highly unlikely (if not impossible) that the statute conveys a single, clear, and unambiguous directive with respect to that word. Here, the absence of any reference to 'pharmacies' is a strong indication that the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.[63]

HHS stated in its 1996 Guidance that the 340B Program "is silent as to permissible drug distribution systems" and contains "many gaps."[64] Additionally, the practice of pharmacy is an area traditionally left to state regulation.[65]

Based on the record, Arkansas's covered entities have filled in this gap through contract pharmacy arrangements. The 340B Program is not "so pervasive as to make reasonable the inference that Congress left no room for States" to protect their specific drug distribution systems.[66] This is not "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws . . . ."[67] Accordingly, Act 1103 is not subject to field preemption under the 340(B) Program.

### 2. Impossibility Preemption

[12–14]  To establish impossibility preemption, a party must be unable to comply

---

**59.** *Id.*

**60.** *Id.* at 121, 131 S.Ct. 1342

**61.** *Id.* at 121-22, 131 S.Ct. 1342 (citing 42 U.S.C. § 256b(d)).

**62.** *Id.*

**63.** 543 F. Supp. 3d 47, 59 (D. Del. 2021).

**64.** 61 Fed. Reg. at 43,549.

**65.** *Pharm. Care Mgmt. Ass'n v. Wehbi,* 18 F.4th 956, 972 (8th Cir. 2021).

**66.** *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

**67.** *Id.*

with both federal law and state law.[68] When determining whether impossibility preemption implies, a court must look to whether it is lawful under federal law to accomplish what the state law requires.[69] The 340B Program provides that "a covered entity shall not resell or otherwise transfer" drugs to any "person who is not a patient of the entity."[70] Plaintiff contends that this provision bars the distribution of 340B-discounted drugs by covered entities to anyone other than their patients, which Plaintiff contends Act 1103 requires. I disagree.

Under the "replenishment model," which is used in Arkansas, manufacturers ship prescription drugs to pharmacies for dispensing to all patients. At the time of dispensing, the pharmacies do not know whether the prescriptions were written by medical providers at covered entities and qualify for 340B discounts. After 340B eligibility is later determined (typically using an algorithm), the manufacturers process charge backs to account for the 340B Program drugs' discounted prices. The covered entities never physically possess the drugs.[71]

Plaintiff contends Act 1103 requires manufacturers to participate in diversion because the drugs are delivered to contract pharmacies, instead of the covered entities' patients.

However, to the extent that contract pharmacy arrangements can be characterized as transfers or resales to non-patients, Plaintiff's position is not a reasonable construction of the statute. The 340B Program's non-transfer/resale provision refers to situations where medications are given to individuals who are not receiving health care services from covered entities or are receiving services inconsistent with the type of services for which the covered entity qualified for 340B status.[72]

I note that it is beyond my purview to determine whether purchases made using the replenishment model constitute diversion as Congress explicitly required manufacturers to address diversion and duplicate-discounting concerns in the ADR process and to audit covered entities before availing themselves of the ADR process.[73] There can be no dispute that Congress mandated that any concerns regarding diversion be addressed first through ADR procedures, not in federal court. Accordingly, Act 1103 does not require illegal conduct under the 340(B) Program and is not preempted under the impossibility doctrine.

### 3. Obstacle Preemption

Obstacle preemption requires a more thorough analysis than impossibility preemption. The Supreme Court has previously said:

> What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects: For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force

---

**68.** *PLIVA, Inc. v. Mensing,* 564 U.S. 604, 618, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011); *Merck Sharp & Dohme Corp. v. Albrecht,* —— U.S. ——, 139 S.Ct. 1668, 1672, 203 L.Ed.2d 822 (2019).

**69.** See *id.*

**70.** 42 U.S.C. § 256b(a)(5)(B).

**71.** See *AstraZeneca Pharms. LP v. Becerra,* 543 F. Supp. 3d 47, 61 (D. Del. 2021).

**72.** See *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.,* 570 F. Supp. 3d 129, 194 n. 50 (D.N.J. 2021).

**73.** 42 U.S.C. § 256b(d)(3)(B)(iv).

**PHARMA. RESEARCH AND MANUF. OF AMERICA v. MCCLAIN**    **901**
Cite as 645 F.Supp.3d 890 (E.D.Ark. 2022)

than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.[74]

Plaintiff argues that Act 1103 is preempted because it places contract pharmacies on the 340(B) Program's covered entities list and interferes with the 340B Program's enforcement mechanism, thereby undermining the purpose of the 340B Program. In response, Defendants contend that Act 1103 only applies to the distribution of the discounted drugs and the contracts between covered entities and pharmacies within the state, not pricing.

[15]  I agree with the Defendant and Intervenors. Even though the title of Act 1103 includes pricing in its name, the effects of the disputed provisions are limited to the distribution of and access to the discounted drugs. Plaintiff has provided no evidence that Act 1103 interferes with PPA agreements between covered entities and HHS, or, in effect, adds contract pharmacies to the covered entities list. The drug-ceiling price has already been set at the point Act 1103 becomes applicable to any specific drug shipment. Act 1103 has no bearing on setting the ceiling price. Further, the penalties that may be assessed for violations of Act 1103 relate to activities outside the scope of the 340(B) Program's enforcement procedures which are focused overcharging covered enti-

ties.[75] Accordingly, Act 1103 is not obstacle to the purpose and objective of the 340(B) Program.

### D.  FDCA Preemption

Plaintiff contends that Act 1103 is preempted by the FDCA's Risk Evaluation and Mitigation Strategies ("REMS") program. The REMS program was established in 2007 to ensure the safe use of potentially high-risk products that might otherwise not be approved for use.[76] The Food and Drug Administration ("FDA") can require a REMS when "necessary to ensure that the benefits of the drug outweigh the risks of the drug."[77] To evaluate a REMS program, the FDA must consider whether the REMS requirements are "unduly burdensome on patient access to the drug," whether they "minimize the burden on the health care delivery system," and whether the REMS program is "compatible with established distribution, procurement, and dispensing systems for drugs."[78] Under the statute, the FDA is permitted to require, that "pharmacies . . . that dispense [a] drug [covered by a REMS] are specially certified" or that a drug "be dispensed to patients only in certain health care settings."[79] A manufacturer who violates a REMS is subject to federal monetary penalties and potentially criminal liability.[80]

Plaintiff contends that Act 1103 requires manufacturers to provide contract pharmacies the 340(B) Program's discounted drugs regardless of whether the drug is

---

**74.**  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal citations and quotations omitted).

**75.**  *Id.* at 256b(a)(1), (a)(4), (b)(1).

**76.**  21 U.S.C. § 355-1.

**77.**  *Id.* § 355-1(a).

**78.**  *Id.* § 355-1(f)(2)(C), (D)(ii).

**79.**  *Id.* § 355-1(f)(3)(B)–(C).

**80.**  See *id.* § 352(y); *id.* § 355(p); *id.* § 333(f)(4); *id.* § 333(a).

subject to the REMS program. Plaintiff argues that manufacturers are forced to choose between either violating federal law or state law.

[16]   However, the FDCA does not include any statement preempting state laws governing distribution of prescription drugs.[81] Nothing in Act 1103 prevents manufacturers from limiting the pharmacies that may dispense drugs as required under a REMS. Act 1103 does not regulate drug <u>safety</u>. Again, Act 1103 prevents drug manufacturers from refusing to supply 340(B) Program discounted drugs ordered by covered entities solely because the covered entity has an arrangement with any number of contract pharmacies. Act 1103 and the FDCA regulate completely different subject matter and activities. Accordingly, the FDCA does not preempt Act 1103.

Act 1103 is not preempted by either the 340(B) Program or the FDCA. The parties are directed to submit an agreed proposed briefing schedule on the remaining commerce clause claim within five days of the date of this Order. The January 3, 2023 trial date is continued, and will be reset by a revised scheduling to be entered at a future date.

### CONCLUSION

For the reasons set out above, Plaintiff's Motion for Summary Judgment on Claim I (Doc. No. 24) is DENIED. Intervenors' Cross-Motion for Summary Judgment on Claim I (Doc. No. 35) is GRANTED. Defendant Leslie Rutledge's Cross-Motion for Summary Judgment (Doc. No. 32) is DENIED as MOOT. The case will proceed to the Commerce Clause claim issue.

---

**81.**  *Wyeth v. Levine,* 555 U.S. 555, 567, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); *Lefaivre v.*

IT IS SO ORDERED this 12th day of December, 2022.



**Billy Jo A. MCDONALD, Plaintiff,**

**v.**

**Kilolo KIJAKAZI, Acting Commissioner of the Social Security Administration, Defendant.**

**Case No. 4:18-cv-00457-SMR-SBJ**

United States District Court,
S.D. Iowa, Central Division.

Signed December 12, 2022

**Background:**  Claimant brought action seeking reversal of Social Security Commissioner's determination that she was ineligible for Social Security Disability benefits. After reversing Commissioner's decision, and after claimant succeeded before Social Security Administration, the United States District Court for the Southern District of Iowa, Stephanie M. Rose, J., 2022 WL 17581962, awarded claimant attorneys' fees under Social Security Act in an amount less than claimant requested. Claimant filed motion for reconsideration of award.

**Holdings:**  The District Court, Stephanie M. Rose, J., held that:

(1) claimant was not entitled to reconsideration of court's award of attorneys' fees on grounds court's method of calculating hourly fee was a manifest error of law;

(2) claimant was not entitled to reconsideration of court's award of attorneys' fees

*KV Pharm. Co.,* 636 F.3d 935, 941 (8th Cir. 2011).

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.



**PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, Plaintiff - Appellant**

v.

**Alan MCCLAIN, in his official capacity as Commissioner of the Arkansas Insurance Department, Defendant - Appellee**

**Community Health Centers of Arkansas; Piggott Community Hospital, Intervenors - Appellees**

**American Hospital Association; Arkansas Hospital Association; 340B Health, Amici on Behalf of Appellee(s)**

**No. 22-3675**

United States Court of Appeals, Eighth Circuit.

Submitted: September 20, 2023

Filed: March 12, 2024

**Background:** Association of pharmaceutical manufacturers brought action against Arkansas Insurance Department Commissioner alleging, inter alia, that federal drug pricing program of Public Health Services Act and the Federal Food, Drug, and Cosmetic Act (FDCA) preempted Arkansas statute prohibiting drug manufacturers from limiting covered entities' ability to contract with outside pharmacies. On cross-motions for summary judgment, the United States District Court for the Eastern District of Arkansas, Billy Roy Wilson, Senior District Judge, 645 F.Supp.3d 890,

granted summary judgment to Commissioner as to issue of preclusion. Manufacturers appealed.

**Holdings:** The Court of Appeals, Melloy, Circuit Judge, held that:

(1) federal pricing program did not preempt state statute under theory of field preemption;

(2) federal pricing program did not preempt state statute under theory of obstacle preemption; and

(3) risk mitigation program of FDCA did not preempt state statute under theory of impossibility preemption.

Affirmed.

**1. Federal Preemption ⬅3**

Congress may preempt, that is, invalidate, a state law through federal legislation.

**2. Federal Preemption ⬅4**

Even where a federal statute does not refer expressly to preemption, Congress may implicitly preempt a state law, rule, or other state action.

**3. Federal Preemption ⬅13**

Where preemption of a state law by a federal law is alleged, the purpose of Congress is the ultimate touchstone of the analysis.

**4. Federal Preemption ⬅6, 9**

Congress may impliedly preempt state law either through field preemption or conflict preemption.

**5. Federal Preemption ⬅9**

Field preemption exists where Congress has forbidden state to take action in field that federal statute preempts.

---

ing the barge, the allegations in his operative complaint do not support that claim. *Cf. Pirelli Armstrong Tire Corp. Retiree Med. Benefits*

*Tr. v. Walgreen Co.,* 631 F.3d 436, 448 (7th Cir. 2011) (explaining that allegations in pleadings cannot amend a complaint).

## PHARMACEUTICAL RESEARCH & MANUFACTURERS v. MCCLAIN    **1137**
### Cite as 95 F.4th 1136 (8th Cir. 2024)

**6. Federal Preemption ⊂⊃7, 8**

Conflict preemption exists where compliance with both state and federal law is impossible or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

**7. Federal Preemption ⊂⊃6, 9**

Whether there is either field or conflict preemption, federal law must prevail over state law.

**8. Federal Preemption ⊂⊃24**

Notwithstanding supremacy of federal law, consideration of preemption issues arising under Supremacy Clause starts with assumption that the historic police powers of states are not to be superseded by federal act unless that is the clear and manifest purpose of Congress.   U.S. Const. art. 6, cl. 2.

**9. Federal Preemption ⊂⊃24**

There is presumption that state or local regulation of matters related to health and safety is not invalidated under Supremacy Clause.   U.S. Const. art. 6, cl. 2.

**10. Federal Courts ⊂⊃3604(4), 3675**

Court of Appeals reviews de novo the district court's resolution of cross-motions for summary judgment, viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences.

**11. Federal Preemption ⊂⊃9**

When a federal regulatory scheme occupies the field because of its pervasive nature, leaving no room for state action, field preemption applies.

**12. Federal Preemption ⊂⊃9**

Field preemption applies when Congress intends to foreclose any state regulation in the regulated area, irrespective of whether state law is consistent or inconsistent with federal standards.

**13. Federal Preemption ⊂⊃9**

Congress's intent to preempt a field can be inferred from a framework of regulation so pervasive that Congress left no room for the states to supplement it or a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

**14. Federal Preemption ⊂⊃56**
   **Health ⊂⊃107**

Federal drug pricing program under Public Health Services Act, under which drug manufacturers could receive incentives for providing healthcare providers with pricing discounts on certain drugs prescribed to individuals whose income fell below federal poverty level, did not, under theory of field preemption, preempt Arkansas statute precluding a manufacturer participating in the federal program from prohibiting a pharmacy from contracting or participating with an entity authorized to participate in the federal program by denying access to manufacturer's drugs, and precluding a drug manufacturer from denying or prohibiting pricing under the federal program for certain drugs received by a community pharmacy based in state; text of statute setting out federal program was silent about delivery of drugs to patients, and practice of pharmacy was an area traditionally left to state regulation. Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Ark. Code Ann. § 23-92-604(c).

**15. Federal Preemption ⊂⊃8**

What qualifies as a sufficient obstacle accomplishment and execution of the full purposes and objectives of Congress, as could support finding of obstacle preemption of a state law, is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.

15

**1138**         95 FEDERAL REPORTER, 4th SERIES

**16. Federal Preemption ⊷8**

Under doctrine of obstacle preemption, if purpose of a federal act cannot otherwise be accomplished, that is, if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect, conflicting state law must yield to regulation of Congress within sphere of its delegated power.

**17. Federal Preemption ⊷56**
    **Health ⊷107**

Federal drug pricing program under Public Health Services Act, under which drug manufacturers could receive incentives for providing healthcare providers with pricing discounts on certain drugs prescribed to individuals whose income fell below federal poverty level, did not, under theory of obstacle preemption, preempt Arkansas statute precluding a manufacturer participating in the federal program from prohibiting a pharmacy from contracting or participating with an entity authorized to participate in the federal program by denying access to manufacturer's drugs, and precluding a drug manufacturer from denying or prohibiting pricing under the federal program for certain drugs received by a community pharmacy based in state; state law did not set or enforce discount pricing. Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Ark. Code Ann. § 23-92-604(c).

**18. Federal Preemption ⊷85**
    **Health ⊷107**

Risk mitigation program of Food, Drug, and Cosmetic Act (FDCA), through which Food and Drug Administration (FDA) could, for high-risk pharmaceutical products, impose more restrictive methods of distribution to ensure safety, resulting in limits on which pharmacies were qualified to dispense high-risk drugs, did not preempt, under theory of impossibility preemption, Arkansas statute prohibiting drug manufacturers from denying healthcare providers which were covered entities

under drug pricing program of Public Health Services Act, creating incentives for pricing discounts for prescriptions by covered entities to individuals with incomes below federal poverty level, the ability to contract with third-party pharmacies for dispensation of drugs covered by pricing program; if a pricing-program drug was also subject to risk mitigation requirements, healthcare provider bore responsibility of contracting with a pharmacy that met those requirements. Federal Food, Drug, and Cosmetic Act § 505-1, 21 U.S.C.A. § 355-1; Ark. Code Ann. § 23-92-604(c).

**19. Federal Preemption ⊷7**

Impossibility preemption exists when it is impossible for private party to comply with both state and federal requirements.

**20. Federal Preemption ⊷7**

The question for whether impossibility preemption exists is whether private party could independently do under federal law what state law requires of it.

————

Appeal from United States District Court for the Eastern District of Arkansas - Central

Counsel who presented argument on behalf of the appellant and appeared on the appellant's brief, was Philip J. Perry, of Washington, DC. The following attorney(s) also appeared on the appellant's brief; Andrew D. Prins, of Washington, DC., Brittany M.J. Record, of Washington, DC., Cherish Alise Drain, of Washington, DC., Joseph Eli Begun, of Washington, DC.

Counsel who presented argument on behalf of appellee Alan McClain and appeared on the appellee's brief, was Kendall Booth Rand, of Little Rock, AR. The following attorney(s) also appeared on the appellee's brief; Allison Plowman Hatfield, of Little Rock, AR.

16

**PHARMACEUTICAL  RESEARCH  &  MANUFACTURERS v. MCCLAIN**  **1139**
Cite as 95 F.4th 1136 (8th Cir. 2024)

Counsel who presented argument on behalf of appellees Community Health Centers of Arkansas and Piggott Community Hospital, and appeared on the appellees' brief, was Ronald S. Connelly, of Washington, DC. The following attorney(s) also appeared on the appellees' brief; William von Oehsen, of Washington, DC., Barbara Straub Williams, of Washington, DC., Mark Ogunsusi, of Washington, DC., Fernando Montoya, of Washington, DC.

Counsel who appeared on the amicus brief of 340B Health, American Hospital Association and Arkansas Hospital Association was William B. Schultz, of Washington, DC., and Casey Trombley-Shapiro Jonas, of Washington, DC.

Before SMITH, Chief Judge,[1] MELLOY and ERICKSON, Circuit Judges.

MELLOY, Circuit Judge.

Pharmaceutical Research and Manufacturers of America ("PhRMA"), an association representing pharmaceutical manufacturers, initially brought this case against Arkansas Insurance Department Commissioner Alan McClain in his official capacity arguing that federal law impliedly preempts Arkansas Code § 23-92-604(c) ("Act 1103"). PhRMA argues that both the Section 340B Program and the Federal Food, Drug, and Cosmetic Act ("FDCA") preempt Act 1103 under theories of field, obstacle, and impossibility preemption. The district court[2] found that Act 1103 was not preempted by federal law under any theory. We affirm.

I.

For three decades, many Arkansas health care providers have participated in the Section 340B Program, a drug pricing program established by Congress in 1992.

42 U.S.C. § 256b(a)(1). Section 340B incentivizes pharmaceutical manufacturers to provide qualified health care providers, referred to as "covered entities," with pricing discounts on certain drugs prescribed to individuals and families whose incomes fall below the federal poverty level. Since the beginning, covered entities have contracted with outside pharmacies, referred to as "contract pharmacies," for the distribution and dispensation of 340B drugs. This is in large part due to the fact that building or maintaining a pharmacy is cost-prohibitive for many covered entities. Additionally, the outsourcing of pharmacy services has allowed for drug dispensation closer to where low-income patients reside. Furthermore, in some states, like Arkansas, state law prohibits most nonprofit and government-funded providers from operating their own in-house pharmacies.

For 25 years, drug manufacturers represented by PhRMA distributed 340B drugs to covered entities' contract pharmacies. Then, in 2020, drug manufacturers began implementing distribution policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. This caused covered entities dependent on contract pharmacies to become unable to serve patients in need. The Arkansas General Assembly responded in 2021 by passing Act 1103, Ark. Code Ann. § 23-92-604(c), which applies to drug distribution agreements between manufacturers and covered entities in Arkansas. Act 1103 prohibits manufacturers from limiting covered entities' ability to contract with outside pharmacies.

After the passage of Act 1103, PhRMA brought this lawsuit against Commissioner

---

**1.** Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

**2.** The Honorable Billy Roy Wilson, United States District Judge for the Eastern District of Arkansas.

17

**1140**                    **95 FEDERAL REPORTER, 4th SERIES**

McClain, the head of the agency charged with enforcing Act 1103. For purposes of this appeal, PhRMA takes issue with Ark. Code Ann. § 23-92-604(c), arguing that it is preempted by Section 340B and the FDCA and is therefore unconstitutional.[3] After PhRMA filed suit, Piggott Community Hospital and Community Health Centers of Arkansas (collectively, "Intervenors") intervened. Piggott Community Hospital is a 340B hospital that is owned and operated by the City of Piggott, Arkansas. Community Health Centers of Arkansas is a nonprofit comprised of eleven community health centers that all participate in the 340B Program. PhRMA and Intervenors filed cross-motions for summary judgment, which the district court granted in favor of Intervenors. PhRMA appeals the district court's decision. We affirm.

## II.

[1–7] "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (citing Art. VI, cl. 2). It has long been established "that state law that conflicts with federal law is 'without effect.'" *Id.* (citation omitted); *see, e.g.*, *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819). "Congress may . . . preempt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). "But even where, as here, a statute does not refer expressly to pre-emption, Congress may implicitly preempt a state law, rule, or other state action." *Id.* Where preemption is alleged, "'[t]he purpose of Congress is the ultimate

touchstone' of pre-emption analysis." *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). Congress may impliedly preempt state law "either through 'field' pre-emption or 'conflict' preemption." *Oneok, Inc.*, 575 U.S. at 377, 135 S.Ct. 1591. Field preemption exists where "Congress has forbidden the State to take action in the *field* that the federal statute pre-empts." *Id.* "By contrast, conflict preemption exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)) (internal quotation marks omitted). In either situation, federal law must prevail.

[8, 9] Notwithstanding the supremacy of federal law, "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Indeed, there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

[10] PhRMA argues that Section 340B impliedly preempts Act 1103 through field

---

**3.** PhRMA also argues that Act 1103 violates the Commerce Clause of the U.S. Constitution. The district court granted the parties' joint motion to stay proceedings on the Com-

merce Clause issue pending the outcome of the preemption issue. Accordingly, the Commerce Clause issue is not before us on appeal.

**PHARMACEUTICAL RESEARCH & MANUFACTURERS v. MCCLAIN   1141**
Cite as 95 F.4th 1136 (8th Cir. 2024)

and obstacle preemption and that the FDCA preempts Act 1103 through impossibility preemption. "We review de novo the district court's resolution of cross-motions for summary judgment, 'viewing the evidence in the light most favorable to the nonmoving party and giving the nonmoving party the benefit of all reasonable inferences.'" *Principal Nat'l Life Ins. Co. v. Rothenberg*, 70 F.4th 1046, 1052 (8th Cir. 2023) (quoting *Dallas v. Am. Gen. Life & Accident Ins. Co.*, 709 F.3d 734, 736 (8th Cir. 2013)). We will affirm a district court's grant of summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

### 1.

PhRMA first argues that Section 340B preempts Act 1103 under theories of field and obstacle preemption. Congress established Section 340B of the Public Health Services Act as a pharmaceutical pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011); 42 U.S.C. § 256b. These health care providers "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support," and the 340B Program was designed in part to support this work. *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738, 142 S.Ct. 1896, 213 L.Ed.2d 251 (2022). The 340B Program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA," an HHS agency), who help implement and enforce the prices that pharmaceutical manufacturers charge to covered entities.

*Astra USA, Inc.*, 563 U.S. at 113, 131 S.Ct. 1342; 42 U.S.C. § 256b.

The 340B Program "has three basic parts: (1) a cap on drug makers' prices, (2) restrictions on covered entities, and (3) compliance mechanisms" for both covered entities and manufacturers. *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023). First, as a condition of participating in Medicaid, drug manufacturers must "opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement" with the Secretary of HHS. *Astra USA, Inc.*, 563 U.S. at 113, 131 S.Ct. 1342. The Pharmaceutical Pricing Agreement requires manufacturers to sell drugs to covered entities at a discounted "ceiling price." 42 U.S.C. § 256b(a)(1). The ceiling price is determined by a statutory formula. 42 U.S.C. §§ 256b(a)(2), 1396r-8(c). The second part of 340B mandates that discounted prices are only made available to covered entities. *Id.* § 256b(a). Covered entities are defined by statute to include fifteen different types of public and not-for-profit hospitals, community centers, and clinics that are "dominantly, local facilities that provide medical care for the poor." *Astra USA, Inc.*, 563 U.S. at 115, 131 S.Ct. 1342; *see also* 42 U.S.C. § 256b(a)(4).

Finally, the 340B Program includes compliance mechanisms, penalties for noncompliance or abuse by manufacturers and covered entities, and a dispute resolution process through HHS. *See, e.g.*, *Astra USA, Inc.*, 563 U.S. at 115–16, 131 S.Ct. 1342; *Sanofi Aventis U.S. LLC*, 58 F.4th at 701–02. Manufacturers are required to report their 340B ceiling prices to the HRSA on a quarterly basis and are subject to auditing. 42 U.S.C. § 256b(a)(1), (a)(5)(C). Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for

19

**1142**    95 FEDERAL REPORTER, 4th SERIES

the same drug. *Id.* § 256b(a)(5)(A)–(B). Additionally, covered entities may not engage in diversion of covered outpatient drugs through "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). Both the Secretary of HHS and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate provisions. *Id.* § 256b(a)(5)(C). Drug manufacturers and covered entities that fail to comply "can be fined, and covered entities can be kicked out of the program." *Sanofi Aventis U.S. LLC*, 58 F.4th at 700. When payment, pricing, diversion, or discount disputes arise between manufacturers and covered entities, 340B mandates parties first go through HHS's dispute resolution process to resolve the issue. 42 U.S.C. § 256b(d)(3).

As the Third Circuit has observed, the 340B Program "is silent about delivery" and distribution of pharmaceuticals to patients. *Sanofi Aventis U.S. LLC*, 58 F.4th at 703. The pharmaceutical distribution chain is complex, and contract pharmacies are not the only third parties involved in getting 340B drugs from manufacturers to patients. Pharmaceutical manufacturers sell their drugs to wholesalers who then distribute and sell drugs to pharmacies or health care providers. Section 340B addresses drug wholesalers but does not mention pharmacies or the delivery of drugs by pharmacies to patients. Yet pharmacies are essential, and legally required, as part of the drug distribution chain. Thus, pharmacies have always been important participants in delivering 340B drugs to patients.

Although some covered entities have in-house pharmacies, many do not. Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house

pharmacies. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996). Therefore, since the 1990s, covered entities have contracted with outside pharmacies to handle the acquisition, distribution, and dispensation of 340B drugs.

When covered entities enter into agreements with contract pharmacies, these pharmacies do not become beneficiaries of the 340B Program. Rather, HRSA has clarified that "the use of contract services is *only* providing those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing" for patients. 61 Fed. Reg. at 43,550. "Covered entities using contract pharmacies . . . still order and pay for the drugs, but they [are] shipped directly to the pharmacies." *Sanofi Aventis U.S. LLC*, 58 F.4th at 700. Covered entities maintain legal title to the 340B drugs. 61 Fed. Reg. at 43,552. "The mechanism does not in any way extend this pricing to entities which do not meet program eligibility." *Id.* at 43,550. This includes contract pharmacies. Instead, the pharmacy becomes an agent of the covered entity with the authorization to "dispense 340B drugs to patients of the covered entity pursuant to a prescription." *Id.*

2.

In May 2021, the Arkansas General Assembly enacted Act 1103 in response to the growing practice among pharmaceutical companies of prohibiting or restricting covered entities from contracting with outside pharmacies. PhRMA argues that the following section of Act 1103 is preempted:

(c) A pharmaceutical manufacturer shall not:

(1) Prohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug

pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer; or

(2) Deny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing.

Ark. Code Ann. § 23-92-604(c). Act 1103 defines "340B drug pricing" as "the program established under section 602 of the Veterans Health Care Act of 1992," referring to the 340B Program. *Id.* § 23-92-602(5). The Arkansas Insurance Division also promulgated a rule that defines "340B drug pricing" as "the acquisition and delivery of 340B-priced drugs as established under section 602 of the Veterans Health Care Act of 1992, Pub. L. No. 102-585." 003-22-123 Ark. Code R. § II(7) (West 2022). The first subsection of section 23-92-604(c) prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs. The second subsection prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution.

### 3.

[11–14]  PhRMA first argues that Act 1103 is unconstitutional because the 340B Program preempts the field. In cases where, as here, a statute does not expressly preempt state law, it may nonetheless do so through field preemption. When a federal regulatory scheme occupies the field because of its pervasive nature, leaving no room for state action, field preemption applies. *Cipollone*, 505 U.S. at 516, 112 S.Ct. 2608. Field preemption also applies when Congress "intend[s] 'to foreclose any state regulation in the [regulated] *area*,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'" *Oneok, Inc.*, 575 U.S. at 377, 135 S.Ct. 1591 (quoting *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)). Congress's intent to preempt a field "can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it'" or a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). Neither inference is present here.

First, the 340B Program is not "so pervasive . . . that Congress left no room for the States to supplement it." *Id.* Pharmacies have always been an essential part of the 340B Program. Yet, the text of 340B "is silent about delivery" of drugs to patients. *Sanofi Aventis U.S. LLC*, 58 F.4th at 703. This silence contrasts with 340B's provisions that directly address distribution by third-party wholesalers. *See, e.g.*, 42 U.S.C. § 256b(a)(8). Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field.

Furthermore, "the practice of pharmacy is an area traditionally left to state regulation." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021). Indeed, when it comes to pharmaceuticals, the federal government has "'traditionally regarded state law as a complementary form of drug regulation' and has 'long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation.'" *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 940–41 (8th Cir. 2011) (quoting *Wyeth v. Levine*, 555 U.S. 555, 578–79, 129

S.Ct. 1187, 173 L.Ed.2d 51 (2009)). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Id.* at 940 (citation omitted). We believe Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B. Therefore, Congressional silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field.

PhRMA contends that 340B preempts the field because Congress intended to create a "closed system" with the statute. To support this argument, PhRMA first asserts that Act 1103 impermissibly interferes with 340B's "closed system" by adding pharmacies to the enumerated list of covered entities eligible to receive 340B pricing on drugs. This misconstrues what Act 1103 does. Pharmacies do not purchase 340B drugs, and they do not receive the 340B price discounts. Covered entities purchase and maintain title to the 340B-discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients. *Sanofi Aventis U.S. LLC*, 58 F.4th at 700.

Second, PhRMA argues that Act 1103 creates its own oversight and enforcement scheme by empowering a state agency to exact penalties on manufacturers who refuse to distribute to contract pharmacies. PhRMA argues this contravenes HHS's exclusive 340B jurisdiction. Again, PhRMA conflates the two statutes. Act 1103 ensures that covered entities can utilize contract pharmacies for their distribution needs and authorizes the Arkansas Insurance Division to exact penalties and equitable relief if manufacturers deny 340B drugs to covered entities' contract pharmacies. Ark. Code Ann. § 23-92-604(c). The 340B Program, on the other hand, addresses discount pricing. Therefore, HHS has jurisdiction over different disputes: disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs.

Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted. *Pharm. Care Mgmt. Ass'n*, 18 F.4th at 972. For these reasons, we conclude that in enacting Section 340B, Congress did not intend to preempt the field.

4.

[15–17]    PhRMA next argues that Act 1103 is unconstitutional because of obstacle preemption. "Where state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011) (citation omitted). Obstacle preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). What qualifies as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted).

Act 1103 does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: Act

**PHARMACEUTICAL RESEARCH & MANUFACTURERS v. MCCLAIN  1145**
Cite as 95 F.4th 1136 (8th Cir. 2024)

1103 assists in fulfilling the purpose of 340B. In arguing otherwise, PhRMA presents no evidence of an obstacle. Instead, PhRMA raises the same arguments it raised with field preemption. We reject these same arguments again here.

Act 1103 does not require manufacturers to provide 340B pricing discounts to contract pharmacies. Act 1103 does not set or enforce discount pricing. As such, the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle. Additionally, Act 1103's penalties are aimed at activity that falls outside the purview of 340B: Act 1103 incentivizes compliance through monetary penalties and equitable relief. Arkansas is simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements. There is no obstacle for pharmaceutical manufacturers to comply with both Act 1103 and Section 340B.

### B.

[18]  PhRMA also argues that Act 1103 is unconstitutional because of impossibility preemption. PhRMA argues that as to certain highly regulated drugs, Act 1103's distribution requirement is at odds with the FDCA's Risk Evaluation and Mitigation Strategies ("REMS") Program. 23 U.S.C. § 355-1. The REMS Program is administered by the Food and Drug Administration ("FDA") and regulates high-risk pharmaceutical products to ensure their safe distribution and use. Through this statutory scheme, the FDA can attach a REMS requirement to ensure that a pharmaceutical's benefits outweigh the risk of harm if not properly distributed or dispensed. 21 U.S.C. § 355-1. REMS requirements can impose more restrictive methods of distribution or dispensation to ensure safety. Additionally, the REMS Program may require pharmacies to become certified to dispense REMS medication, and REMS may also limit which pharmacies qualify to

receive and dispense REMS drugs. *Id.* § 355-1(e). As such, "[d]rug makers often comply by limiting distribution to a few pharmacies that are specially trained to educate and monitor patients." *Sanofi Aventis U.S. LLC*, 58 F.4th at 705.

[19, 20]  Act 1103 does not make it impossible for drug manufacturers and wholesale distributors to comply with the REMS Program, and therefore the FDCA does not preempt Act 1103. Impossibility preemption exists when it is "impossible for a private party to comply with both state and federal requirements." *PLIVA, Inc.*, 564 U.S. at 618, 131 S.Ct. 2567 (citation omitted). "The question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." *Id.* at 620, 131 S.Ct. 2567. Impossibility preemption "arises when 'compliance with both federal and state regulations is a physical impossibility.'" *Hillsborough Cnty., Fla.*, 471 U.S. at 713, 105 S.Ct. 2371 (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)).

Act 1103 does not force pharmaceutical manufacturers to violate REMS. Act 1103 prohibits drug manufacturers from denying 340B covered entities the ability to contract with third-party pharmacies for dispensation of 340B drugs. If a 340B drug is also subject to REMS safety requirements and the covered entity wants to contract with a pharmacy for dispensation, the covered entity bears the responsibility of contracting with a pharmacy that meets the REMS requirements. Providers, manufactures, and pharmacies are subject to many legal and regulatory requirements in the area of drug distribution. Just because a medication is subject to multiple legal requirements does not make it impossible to comply with Act 1103. PhRMA alleges no circumstance where a covered entity's

contract pharmacy arrangement has made simultaneous compliance with state and federal law impossible. As such, the FDCA does not preempt Act 1103.

### III.

For the foregoing reasons, Arkansas Act 1103 is not preempted by Section 340B or the FDCA's REMS Program. We affirm.



**ANHUI POWERGUARD TECHNOL-OGY COMPANY, LIMITED, Plaintiff - Appellee**

**v.**

**DRE HEALTH CORPORATION, Defendant - Appellant**

**No. 23-1820**

United States Court of Appeals, Eighth Circuit.

Submitted: January 9, 2024

Filed: March 14, 2024

**Background:** Seller of personal protective equipment (PPE) brought breach-of-contract action against buyer, alleging failure to remit payment for purchase orders that seller had fulfilled. The United States District Court for the Western District of Missouri, No. 4:22-CV-00395-GAF, Gary A. Fenner, J., denied buyer's motion to stay litigation and to compel arbitration under Federal Arbitration Act (FAA). Buyer appealed.

**Holdings:** The Court of Appeals, Shepherd, Circuit Judge, held that under Missouri law, prefatory phrase of parties' contract required buyer's completion of initial payment as condition precedent for seller's agreement to arbitrate.

Affirmed.

**1. Alternative Dispute Resolution ⟊213(5)**

Court of Appeals reviews denial of motion to compel arbitration, including under Federal Arbitration Act (FAA), de novo. 9 U.S.C.A. § 1 et seq.

**2. Alternative Dispute Resolution ⟊113, 134(1), 143**

Arbitration agreements are favored by federal law and will be enforced under the Federal Arbitration Act (FAA) as long as valid agreement exists and dispute falls within scope of that agreement. 9 U.S.C.A. § 1 et seq.

**3. Alternative Dispute Resolution ⟊112**

Despite arbitration's favored status, party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

**4. Alternative Dispute Resolution ⟊205**

The threshold inquiry in analysis of a motion to compel arbitration, including under Federal Arbitration Act (FAA), is whether the parties contractually agreed to arbitrate their dispute. 9 U.S.C.A. § 1 et seq.

**5. Alternative Dispute Resolution ⟊210**

Party seeking to compel arbitration, including under the Federal Arbitration Act (FAA), bears burden of proving that arbitration agreement exists and is enforceable. 9 U.S.C.A. § 1 et seq.

**6. Federal Courts ⟊3053**

In analysis of a motion to compel arbitration under the Federal Arbitration Act (FAA), state contract law governs threshold question of whether enforceable arbitration agreement exists between litigants; if enforceable agreement exists, federal substantive law of arbitrability governs whether litigants' dispute falls within scope of arbitration agreement. 9 U.S.C.A. § 1 et seq.

**768**                    **145 SUPREME COURT REPORTER**

**1**

**Sabino ZUNIGA-AYALA, Petitioner,**

**v.**

**Merrick B. GARLAND,
Attorney General.**

**No. 24-103**

Supreme Court of the United States.

December 9, 2024

Case below, 2024 WL 1507854.

Petition for writ of certiorari to the United States Court of Appeals for the Fifth Circuit denied.



**2**

**Gregory SAVOY, Petitioner,**

**v.**

**Peter FRANCHOT, Comptroller
of Maryland.**

**No. 24-5696**

Supreme Court of the United States.

December 9, 2024

Motion of petitioner for leave to proceed *in forma pauperis* denied. Petitioner allowed until December 30, 2024, within which to pay the docketing fee required by Rule 38(a) and to submit a petition in compliance with Rule 33.1 of the Rules of this Court.



**3**

**PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF
AMERICA, Petitioner,**

**v.**

**Alan MCCLAIN, in His Official Capacity as Commissioner of the Arkansas
Insurance Department, et al.**

**No. 24-118**

Supreme Court of the United States.

December 9, 2024

Case below, 95 F.4th 1136.

Petition for writ of certiorari to the United States Court of Appeals for the Eighth Circuit denied.



**4**

**David SCHIEFERLE, Petitioner,**

**v.**

**UNITED STATES.**

**No. 24-120**

Supreme Court of the United States.

December 9, 2024

Case below, 2024 WL 1905326.

Petition for writ of certiorari to the United States Court of Appeals for the Eleventh Circuit denied.



Exhibit 3

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA** | **CASE NO.  6:23-CV-00997** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **LIZ MURRILL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **ASTRAZENECA PHARMACEUTICALS LP** | **CASE NO. 6:23-CV-01042** |
| **VERSUS** | |
| **LIZ MURRILL** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **ABBVIE, INC., ET AL** | **CASE NO. 6:23-CV-01307** |
| **VERSUS** | |
| **LIZ MURRILL** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## MEMORANDUM RULING

Presently before the Court in three related matters are: (1) Motions for Summary Judgment filed by Plaintiffs AstraZeneca Pharmaceuticals LP ("AstraZeneca"), AbbVie, Inc. ("AbbVie"), and Pharmaceutical Research and Manufacturers of America ("PRMA") (collectively, "Plaintiffs");[1] (2) Cross Motions for Summary Judgment[2] by defendant, Liz Murrill; and (3) Cross Motions for Summary Judgment[3] by the intervenor, Louisiana Primary Care Association

---

[1] ECF No. 21 in 6:23-cv-997; ECF No. 21 in 6:23-cv-1042; and ECF No. 28 in 6:23-cv-1307.
[2] ECF No. 41 in 6:23-cv-997; ECF No. 43 in 6:23-cv-1042; and ECF No. 49 in 6:23-cv-1307.
[3] ECF No. 44 in 6:23-cv-997; ECF No. 45 in 6:23-cv-1042; and ECF No. 61 in 6:23-cv-1307.

Page **1** of **32**

("LPCA"). The Court held a consolidated hearing on the various motions on June 6, 2024. After oral arguments, the Court took all the motions under advisement.

## I.

### BACKGROUND

Two pharmaceutical companies—AstraZeneca and AbbVie—and Pharmaceutical Research and Manufacturers of America filed the three above-captioned cases challenging Louisiana's recently enacted Act 358 on the grounds, *inter alia*, that it is preempted by the federal Section 340B discount drug program, located at 42 U.S.C. § 256b, *et seq*. Section 340B of the Public Health Service Act was enacted as part of the Veterans Health Care Act of 1992 and requires pharmaceutical companies to offer discounts on covered outpatient drugs to specified "safety-net" health care providers as a condition of the companies' voluntary participation in the Medicaid and Medicare Part B programs.[4] The safety-net hospitals and clinics that are eligible to participate in the Section 340B program are defined as "covered entities," and the eligibility criteria for covered entities are set forth in the statute.[5] The Section 340B program is administered by the Health Resources and Services Administration ("HRSA"), which is a component of the federal Department of Health and Human Services ("HHS").

The present dispute centers on the role of "contract pharmacies" in the Section 340B program. The summary judgment record reflects that many covered entities, including LPCA's members, cannot afford to establish and operate "in-house" pharmacies but instead must enter into contracts with independent, private pharmacies to dispense discounted drugs to their patients.[6] The

---

[4] 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).

[5] *Id*. § 256b(a)(4) (listing the healthcare providers eligible to participate in the program).

[6] *See* ECF No. 44-4 at 4-5, *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023) ("*PRMA*"); *see also* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (recognizing that many 340B covered entities cannot afford to "expend precious resources to develop their own in-house pharmacies . . . .").

Page **2** of **32**

record also includes evidence that some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population.[7]

In a 1996 guidance document, HHS permitted covered entities to contract with one outside pharmacy if they did not maintain an in-house pharmacy to distribute discounted drugs under the Section 340B program.[8] In 2010, HHS modified its guidance on contract pharmacies and permitted covered entities to contract with an unlimited number of outside pharmacies.[9] As a result of this change and guidance, the number of contract pharmacies increased from approximately 1,300 in 2010 to approximately 20,000 in 2017.[10]

Beginning in 2020, a number of pharmaceutical companies imposed restrictions and limitations on the distribution of Section 340B discounted drugs to contract pharmacies.[11] In response, HHS issued an opinion stating that "covered entities under the 340B program are entitled to purchase covered outpatient drugs at no more than the 340B ceiling price—and manufacturers are required to offer covered outpatient drugs at no more than the 340B ceiling price—even if those covered entities use contract pharmacies to aid in distributing those drugs to their patients."[12] HHS went on to conclude that the "plain meaning" of Section 340B precluded participating pharmaceutical companies from restricting or otherwise limiting contracts between covered entities and outside, retail pharmacies.[13] Plaintiff AstraZeneca and other pharmaceutical companies challenged HHS' contract pharmacy opinion and, ultimately, prevailed in the Third

---

[7] *Id.*

[8] *Id.*

[9] Notice Regarding 340B Drug Pricing Program – Contract Pharmacy Services, 75 Fed. Reg. 10,272 (Mar. 5, 2010).

[10] U.S. Gov't Accountability Office, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement 2 (June 2018), https://www.gao.gov/assets/700/692697.pdf (last viewed September 10, 2024).

[11] *See, e.g.,* Sanofi Policy, SANOFI (Feb. 1, 2021), https://340besp.com/sanofi-policy-2021-02-02- 09_18_19.pdf.

[12] *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 52-53 (D. Del. 2021).

[13] *Id.*

Exhibit 3

Circuit in *Sanofi Aventis U.S. LLC (Sanofi) v. U.S. Dep't of Health and Human Services*.[14] In that case, the Third Circuit held that Section 340B is silent with respect to contract pharmacies and, therefore, HHS lacked the statutory authority to issue its opinion restricting the ability of participating pharmaceutical companies to adopt policies on the distribution of discounted drugs to contract pharmacies.[15]

During the *Sanofi* litigation, some states began to enact legislation governing the distribution of 340B drugs to contract pharmacies. In 2021, Arkansas became the first state to successfully pass a law addressing this issue.[16] PhRMA challenged the Arkansas Act on the basis of preemption and on March 12, 2024, the Eighth Circuit held that the Arkansas Act was not barred by preemption.[17] In 2023, Louisiana enacted La. R.S. 40:2881 *et seq.* ("Act 358"), which prevents pharmaceutical companies from restricting contract pharmacy arrangements made by Section 340B covered entities. Louisiana's Act 358, provides that:

> A. A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States Department of Health and Human Services.
>
> B. A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.[18]

Act 358 provides that a violation of these provisions is considered a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 ("LUTPA").[19] Importantly, § 40:2886(B)(1) provides that "Nothing in this Chapter is to be construed or applied

---

[14] 58 F.4th 696 (3d Cir. 2023).
[15] *Id.* at 703-706.
[16] *See* Ark. Code Ann. § 23-92-604.
[17] *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024).
[18] La. R.S. § 40:2884.
[19] *Id.* § 40:2885.

to be in conflict with . . . [a]pplicable federal law and related regulations." Act 358 grants the Louisiana Attorney General enforcement authority over LUTPA violations including violations of the Act.[20] That authority includes the power "[t]o investigate, conduct studies and research, [] conduct public or private hearings . . . otherwise investigate complaints [and] institute legal proceedings" concerning acts or practices declared unlawful under LUTPA.[21]

The three above-captioned lawsuits have been filed against Liz Murrill in her official capacity as Attorney General for the State of Louisiana. In 6:23-cv-997, Pharmaceutical Research and Manufacturers of America ("PRMA") alleges that Act 358 is unconstitutional based upon preemption and vagueness. In 6:23-cv-1042, AstraZeneca Pharmaceuticals LP argues that Act 358 is unconstitutional based upon preemption and a violation of the Contracts Clause. In 6:23-cv-1307, AbbVie, Inc., et al ("AbbVie") assert that Act 358 is unconstitutional based upon preemption, vagueness and a violation of the Takings Clause. Louisiana Primary Care Association has intervened as a defendant in each of the three cases. Based upon the similar and overlapping issues, the Court consolidates the ruling in this matter and directs that the ruling be filed into each of the three cases.

## II.
### LAW AND ANALYSIS

### A. <u>Summary Judgment Standard.</u>

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[22] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[20] *Id*. § 51:1404.
[21] *Id*.
[22] Fed. R. Civ. P. 56(a).

the movant is entitled to judgment as a matter of law."[23] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[24] As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[25]

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached."[26] "Credibility determinations are not part of the summary judgment analysis."[27] Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof."[28]

### B. Preemption.

The Court first addresses Plaintiffs' claims that the statutory and regulatory framework of the Section 340B program preempts Louisiana's Act 358. Federal preemption of state law flows from the Supremacy Clause of the United States Constitution, which makes federal law "the

---

[23] *Id.*

[24] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

[25] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

[26] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).

[27] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

[28] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).

supreme law of the land."[29] Under the Supremacy Clause, if there is a conflict between federal law and state law, the latter is "preempted" by federal law.[30] That is, federal law controls and the state law is set aside to the extent it conflicts with federal law.[31] Preemption may be either express or implied. State law is expressly preempted when "Congress expresses an explicit intent to preempt state law."[32] Where Congress has not explicitly displaced state law, federal law may nevertheless impliedly preempt state law where there is a clear congressional intent to preempt state or local law. Courts have identified at least three types of implied preemption: "field" preemption, "conflict" preemption, and "obstacle" preemption.[33] While Plaintiffs' arguments primarily rely on field and conflict preemption, some of their arguments can be construed as arguments for obstacle preemption. Accordingly, the Court will address all three grounds for preemption.

### 1. Field Preemption

Plaintiffs' preemption arguments rely heavily on field preemption. Field preemption arises where "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[34] Congress may expressly provide that it intends to occupy a given field and that state regulation is therefore preempted with respect to that field.[35] When Congress has not expressly stated its intent to occupy a given field, field preemption may also "be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to

---

[29] U.S. CONST. art. VI, cl. 2.
[30] *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88. 108 (1992).
[31] *Id.*
[32] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995).
[33] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013). Some courts treat "obstacle" preemption as a form of "conflict" preemption.
[34] *Arizona v. United States*, 567 U.S. 387, 399 (2012).
[35] *United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024)

supplement it."[36] However, "federal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained."[37] Congress has not expressly preempted state regulatory powers with respect to the Section 340B program. Plaintiffs thus argue that field preemption should be inferred.[38]

The gravamen of Plaintiffs' field preemption arguments is that the nature of the Section 340B program is such that Congress left no room for Louisiana to exercise its regulatory powers with respect to contract pharmacies.[39] They argue that "Congress designed 340B to provide a comprehensive and exclusive plan for delivering a unique federal benefit—a substantial drug discount to specific, statutorily defined healthcare providers," and that "340B works through a carefully calibrated incentive structure."[40] They argue that, to achieve this "calibrated incentive structure," Congress "made 304B a closed system."[41] Presumably, Plaintiffs mean that Congress limited the program to the enumerated "covered entities," and precluded the distribution of Section 340B discounted drugs to ineligible healthcare providers or patients of ineligible providers.[42] Plaintiffs also point to HHS' "multi-faceted administrative enforcement scheme," which ensures that participants comply with the rules of the program and prevents the diversion of discounted

---

[36] *English v. Gen. Elec. Co*., 496 U.S. 72, 79 (1990) (quoting *Rice v. Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947))

[37] *De Canas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)).

[38] ECF No. 21-1 at 14, *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023); ECF No. 21-1 at 23-25, *AstraZeneca Pharmaceuticals LP v. Murrill*, Civ. No. 6:23-cv-1042 (W.D. La. Aug. 8, 2023); ECF No. 28-1 at 20-27, *AbbVie, et al. v. Murrill*, Civ. No. 6:23-cv-1307 (W.D. La. Sept. 21, 2023).

[39] *Id.*

[40] *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023) (ECF No. 21-1 at 14). Here, the Court quotes from the brief of Plaintiff Pharmaceutical Research and Manufacturers of America because that brief appears to contain most, if not all, of the arguments raised by the other Plaintiffs. The arguments in the *PRMA* brief also reflect the tenor of the arguments in the other Plaintiffs' briefs with respect to field preemption.

[41] *Id.* at 15.

[42] *Id.* at 14-15.

drugs to ineligible recipients.[43] Plaintiffs also note the interrelationship between the Section 340B program and the much larger federal Medicare and Medicaid programs and argue that this interrelationship requires uniformity because "[o]bligations under 340B, and violations of 340B, can have collateral consequences on these other federal programs."[44] Plaintiffs argue that Congress addressed this need for uniformity by making HHS the exclusive administrator of the Section 340B program and eliminating any role for the states: "Congress understandably chose to vest HHS and the federal courts—rather than 50 individual States—with the power to make carefully considered determinations regarding disputes, enforcement, and penalties."[45] Plaintiffs thus contend that "Act 358 invades the field *substantively* by purporting to define as a matter of state law the scope of manufacturers' 340B obligations," and invades "the federal field *procedurally* by creating its own scheme of oversight and enforcement."[46]

In *PhRMA v. McClain*,[47] the Eight Circuit recently affirmed the district court's ruling granting summary judgment and dismissing preemption claims involving an Arkansas statute similar to Act 358. Although *PhRMA* is not binding, the Court finds the reasoning of the district court and Eight Circuit in that case persuasive for the following reasons.

The statutory text governing the Section 340B program does not support the broad field preemption arguments made by Plaintiffs. The regulatory and enforcement framework outlined by Plaintiffs focuses on participating pharmaceutical companies and certain "covered entities" defined and delineated in the governing statutes and regulations.[48] Under the Section 340B program, pharmaceutical companies that wish to participate in the Medicare or Medicaid program

---

[43] *Id.* at 15.
[44] *Id.* at 17.
[45] *Id.*
[46] *Id.* at 18 (emphasis added).
[47] 95 F.4th 1136 (8th Cir. 2024).
[48] 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

must enter into written agreements with HHS to provide discounted prices "for covered outpatient

drugs purchased by a covered entity."[49] The "covered entities" are health care providers who

generally provide services to low-income and rural patients.[50] As Plaintiffs correctly point out, the

statute defines which health care providers qualify as "covered entities" eligible to receive

discounted drugs under the Section 340B program.[51] The statute places restrictions on covered

entities receiving the discounts to ensure that they do not receive duplicate discounts on drugs

subject to a Medicare or Medicaid discount-sometimes referred to as "double dipping."[52] The

statute also restricts "diversion" by providing that covered entities receiving discounted drugs can

only provide them to their patients.[53] And Plaintiffs are correct that the federal statutory scheme

imposes significant enforcement mechanisms to ensure compliance.[54]

However, Section 340B is silent with respect to the role of pharmacies who enter into

contracts with covered entities to receive and dispense discounted drugs under Section 340B. The

statute does not mention contract pharmacies in defining the health care providers qualified as

"covered entities," nor does it refer to contract pharmacies in delineating the obligations of

participating pharmaceutical companies with respect to covered entities.[55] Plaintiffs seem to

suggest that Louisiana's Act 358 expands the federal statute's definition of "covered entities" to

include contract pharmacies and, as a result, that it creates new substantive obligations on

participating pharmaceutical companies to provide covered drugs directly to contract pharmacies

---

[49] 42 U.S.C. § 1396r-8(a); 42 C.F.R. Part 10 §§ 10.2, 10.3.
[50] *Astra USA, Inc. v. Santa Clara County, Cal.*, 563 U.S. 110, 115 (2011); 42 C.F.R. Part 10 §10.3.
[51] 42 U.S.C § 256b(a); *Astra USA*, 563 U.S. at 115.
[52] 42 U.S.C. § 256b(a)(5)(A)(i).
[53] 42 U.S.C. § 256b(a)(5)(B).
[54] *See, e.g.*, 42 U.S.C. § 256b(d); 42 C.F.R. §§ 10.10, 10.20 - 10.25.
[55] These requirements are sometimes referred to as the "purchase by" or "shall offer" requirements. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699-700 (3d Cir. 2023). Specifically, Section 340B requires participating pharmaceutical companies to provide discounts on covered drugs "purchased by" covered entities. *Id.* It also requires these companies to "offer each covered entity covered outpatient drugs" at a discount. *Id.*

**Exhibit 3**

without regard to the statutory and regulatory provisions governing the Section 340B program.[56] They also suggest that Act 358 essentially gives these pharmacies the same status as "covered entities" under the federal program.[57]

Plaintiffs, however, mischaracterize the relationship between covered entities and their contract pharmacies. In each case, discounted drugs under the program delivered to contract pharmacies are delivered *on behalf of* covered entities and subject to the contract between those entities and the pharmacies. When the pharmacies distribute those drugs, they distribute them on behalf of and for the benefit of a covered entity. Section 340B does not prevent covered entities from entering into contracts with independent pharmacies, but these contract pharmacies are not "covered entities" and nothing in Act 358 treats them as such.

The Fifth Circuit has cautioned that in applying the field preemption doctrine courts should define the relevant field "narrowly."[58] Here, Plaintiffs improperly frame the relevant field broadly to include the regulation of contract pharmacies on which the governing statute is silent. Accordingly, even if the 340B program constitutes an exclusive federal "field" with respect to the relationship between participating pharmaceutical companies and healthcare providers that qualify as "covered entities," the field does not extend to the relationship between contract pharmacies and covered entities and Act 358 does not, therefore, intrude on any exclusive federal regulatory scheme.

Moreover, as the courts point out in *PhRMA*, Plaintiffs' field preemption arguments also overstate the extent which the federal government "occupies" the field with respect to covered

---

[56] *See, e.g.*, ECF No. 21-1 at 18, *PRMA* ("Notwithstanding the closed system, Act 358 nonetheless requires manufacturers to also 'offer' 340B-discounted drugs to contract pharmacies … expanding the scope of the federal obligation.") (citations omitted).

[57] *Id.*

[58] *United States v. Texas*, 97 F.4th at 278 (quoting *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018)) ("When analyzing field preemption, 'the relevant field should be defined narrowly.'").

health care providers and their contract pharmacies.[59] According to the Eighth Circuit, "the practice of pharmacy is an area traditionally left to state regulation" and "the federal government has 'traditionally regarded state law as a complementary form of drug regulation and has long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation.'"[60] Given that Section 340B is silent on contract pharmacies that dispense Section 340B drugs under contract with covered entities, the Eighth Circuit was unwilling to dislodge the state from its traditional role in regulating pharmacies.[61]

Plaintiffs' reliance on the Third Circuit's decision in *Sanofi Aventis U.S. LLC (Sanofi) v. U.S. Dep't of Health and Human Services* to support their field preemption claim is misplaced.[62] Plaintiffs argue that *Sanofi* essentially creates a federal right under Section 340B allowing participating pharmaceutical companies to restrict the delivery of discounted drugs to contract pharmacies.[63] According to Plaintiffs, Louisiana's Act 358 intrudes on this right by preventing pharmaceutical companies who participate in the Federal  program from restricting deliveries of discounted drugs under Section 340B to contract pharmacies.[64] They also argue that *Sanofi* holds that the statutory silence on contract pharmacies precludes the state from "supplementing" Section 340B by adopting regulations on contract pharmacies.[65]

The Court disagrees on both counts. In *Sanofi*, the plaintiff challenged a regulation promulgated by the Department of Health and Human Services requiring pharmaceutical companies participating in the Section 340B program to provide 340B discounted drugs to an

---

[59] 95 F.4th at 1143.
[60] *Id.* (cleaned up).
[61] *Id.* at 1144.
[62] 58 F.4th 696 (3d Cir. 2023).
[63] ECF No. 28-1 at 14-16, *AbbVie*; ECF No. 21-1 at 22-23, *PRMA*; ECF No. 21-1 at 23-24, *AstraZeneca Pharmaceuticals*.
[64] *Id.*
[65] *Id.*

unlimited number of private pharmacies under contract with "covered entities" eligible to receive the discounted drugs.[66] Prior to the implementation of the regulation, pharmaceutical companies participating in the Section 340B program had imposed policies and restrictions on covered entities receiving discounted drugs.[67] These policies generally provided that participating pharmaceutical companies would deliver Section 340B discounted drugs to only one outside contract pharmacy for each covered entity.[68] Participating pharmaceutical companies implemented these policies in response to a proliferation of outside pharmacies that entered into contracts with covered entities eligible to receive discounted drugs.[69] In response, HHS took the position that Section 340B precludes participating pharmaceutical companies from limiting the number of contract pharmacies eligible to receive discounted drugs under the program.[70] The district court rejected HHS' reading of the statute, noting that the statute "never mentions pharmacies, which is a 'strong indication that the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.'"[71] The district court then entered a permanent injunction enjoining HHS from implementing the new regulation prohibiting participating pharmaceutical companies from restricting contract pharmacies.

---

[66] 58 F.4th at 701-703.

[67] *Id.* at 700-701.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 701-701.

[71] *AstraZeneca Pharms. LP v. Becerra ("Becerra II")*, No. CV 21-27-LPS, 2022 WL 484587, at *6 (D. Del. Feb. 16, 2022) (quoting *AstraZeneca Pharms. LP v. Becerra ("Becerra I")*, 543 F. Supp. 3d 47, 59 (D. Del. 2021). In *Becera I*, the same district court again noted the limited scope of the Section 340B program:

> The statute is silent as to the role that contract pharmacies may play in connection with covered entities' purchases of 340B drugs. Pharmacies are not mentioned anywhere in the statutory text – neither in § 256b(a)(1), which (as both parties agree) contains the relevant command, nor in § 256b(a)(4), which provides the definition of "covered entity." When a statute does not include even a single reference to the pertinent word (e.g., "pharmacy"), it is highly unlikely (if not impossible) that the statute conveys a single, clear, and unambiguous directive with respect to that word. ***Here, the absence of any reference to "pharmacies" is a strong indication that the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.***

543 F. Supp. 3d at 59 (emphasis added).

In affirming the district court's permanent injunction, the Third Circuit agreed that the text of the statute does not require "delivery to an unlimited number of contract pharmacies."[72] Like the district court, the Third Circuit noted that "nowhere does section 340B mention contract pharmacies."[73] The court reasoned that section 340B does not address the contractual relationship between covered entities and their contract pharmacies or how discounted drugs are delivered or distributed as long as the drugs are "purchased by" or "offered to" a "covered entity" and the covered entity complies with the program's restrictions on "double dipping" and diversion.[74] Accordingly, the court held that HHS did not have the statutory authority under section 340B to prevent participating pharmaceutical companies from placing restrictions on their deliveries of discounted drugs to contract pharmacies.[75]

Plaintiffs not only misread the scope of *Sanofi*'s holding, but the holding also directly undercuts Plaintiffs' field preemption argument. *Sanofi* addresses only the limited question of HHS' statutory authority to implement a regulation regarding the use of contract pharmacies by covered entities. The courts in *Sanofi* held that HHS lacked statutory authority to regulate contract pharmacies in connection with the Section 340B program because the "statute is silent as to the role that contract pharmacies may play in connection with covered entities' purchases of 340B drugs."[76] The fact that HHS lacks authority to regulate contract pharmacies under Section 340B does not, however, mean that the statute affirmatively precludes state regulation pertaining to contract pharmacies or otherwise "occupies the field."[77] If, as the courts in *Sanofi* hold, Section 340B "does not compel any particular outcome with respect to covered entities' use of

---

[72] *Sanofi*, 58 F.4th at 704.
[73] *Id.* at 703.
[74] *Id.* at 704.
[75] *Id.*
[76] *Becera I*, 543 F. Supp. 3d at 59.
[77] *Id.* ("the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.").

Page **14** of **32**

pharmacies," Plaintiffs cannot maintain a field preemption claim on the grounds that "Congress has unmistakably so ordained" that Section 340B displaces state law regulations on contract pharmacies.[78]

Plaintiffs "procedural invasion" argument for field preemption similarly fails. Plaintiffs contend that Louisiana's Act 358 intrudes on the enforcement scheme adopted by HHS to police the Section 340B program. They argue that this enforcement scheme is exclusive and, citing the Supreme Court's decision in *Astra USA, Inc. v. Santa Clara Cnty., Cal.*,[79] argue that "no gap exists and federal authority is exclusive" with respect to enforcement of the parties' rights and obligations under the Section 340B program.[80]

As with *Sanofi*, Plaintiffs misread the Supreme Court's holding in *Astra*. In *Astra*, Santa Clara County sued pharmaceutical companies participating in the Section 340B program for overcharges on covered drugs.[81] The county operated covered entities eligible to participate in the program and alleged that the participating pharmaceutical companies breached the agreements that they entered into with HHS to provide discounted drugs.[82] The Court held that HHS' enforcement mechanism was the exclusive means for policing the pricing requirements of Section 340B and that the statute precluded a private right of action by covered entities seeking to enforce the terms of the agreements between HHS and participating pharmaceutical companies.[83] The Court did not, however, address the role of contract pharmacies—its ruling pertains solely to participating pharmaceutical companies, covered entities, and their compliance with the pricing requirements of the Section 340B program.

---

[78] *De Canas*, 424 U.S. at 356 (quoting *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)).
[79] 563 U.S. 110 (2011).
[80] ECF No. 21-1 at 19.
[81] 563 U.S. at 116.
[82] *Id.*
[83] *Id.* at 118-120.

Turning to the text of Act 358, the Louisiana statute creates an enforcement mechanism, but that mechanism pertains solely to pharmaceutical companies' actions toward pharmacies who enter into contracts with covered entities under the Section 340B program.[84] The Louisiana statute does not address the pharmaceutical companies' agreements with HHS or the pricing, diversion, or "double dipping" restrictions addressed in the HHS' enforcement scheme. Accordingly, even if the federal statute "occupies the field" with respect to the enforcement of the Section 340B program, Louisiana's Act 358 does not encroach on that enforcement scheme.

Finally, the Court turns to Plaintiffs' argument based on the interrelationship between the Section 340B program and the Medicaid and Medicare programs. Plaintiffs argue that this interrelationship requires uniformity and precludes states from regulating contract pharmacies.[85] Again, the Court disagrees. As explained above, Section 340B is silent with respect to contract pharmacies, and Plaintiffs have not pointed to any provisions in the statutes governing the Medicare or Medicaid programs that address pharmacies who enter into contracts with covered entities under Section 340B. Accordingly, it is unclear to the Court how the interrelationship between Section 340B and the Medicare and Medicaid programs requires uniformity with respect to contract pharmacies when none of these statutes address contract pharmacies.

In sum, the Court concludes that Plaintiffs cannot establish that "Congress has unmistakably so ordained" that state regulatory power be displaced with respect to contract pharmacies under the Section 340B program. Plaintiffs' field preemption claim therefore fails.

---

[84] La. R.S. 40:2885.
[85] *See, e.g.*, ECF No. 21-1 at 17.

### 2.  **Conflict Preemption Based on *Sanofi*.**

The Court now turns to Plaintiffs' "conflict" preemption claim.[86] "Conflict" preemption applies "where complying with both federal law and state law is impossible…."[87] In arguing conflict preemption, Plaintiffs re-urge many of the same arguments they urge with respect to field preemption: that Act 358 conflicts with the balance of incentives created by the Section 340B program, imposes additional obligations on pharmaceutical companies that conflict with their obligations under the federal statute, and conflicts with HHS' enforcement scheme. For the same reasons explained above with respect to field preemption, these arguments do not support conflict preemption. The statute governing the Section 340B program does not address contract pharmacies, which are the subject matter of Louisiana's Act 358. Therefore, Louisiana's contract pharmacy regulations cannot, by definition, *conflict* with Section 340B. Plaintiffs also, again, rely heavily on *Sanofi* to support their conflict preemption claim.[88] But, as with Plaintiffs' field preemption claim, *Sanofi*'s holding is fatal to Plaintiffs' conflict preemption claim. Specifically, if Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B. Put another way, Plaintiffs cannot credibly argue that it is impossible to comply with both Louisiana Act 358 and the federal Section 340B program in light of *Sanofi*.

Plaintiff AstraZeneca Pharmaceuticals also argues that conflict preemption applies because Louisiana Act 358 is "a price regulation that conflicts with, and is preempted by, the federal patent law."[89] In that regard, Plaintiffs cite *Biotechnology Indus. Org. ("BIO") v. District of Columbia*.[90]

---

[86] In *PhRMA*, the Eighth Circuit also rejected the plaintiff's "conflict" and "obstacle" preemption claims. For the reasons that follow, the Court finds the Eighth Circuit's reasoning persuasive.
[87] *Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 200 (5th Cir. 2013).
[88] ECF No. 21-1 at 13, *AstraZeneca Pharmaceuticals*.
[89] ECF No. 21-1 at 16, *AstraZeneca Pharmaceuticals*; ECF No. 228-1.
[90] 496 F.3d 1362 (Fed. Cir. 2007).

The *BIO* case does not support AstraZeneca's conflict preemption argument based on federal patent law. In *BIO*, the District of Columbia City Council adopted legislation prohibiting "any patented drug from being sold in the district for an excessive price."[91] The Federal Circuit first observed that one of the objectives of the Patent Clause of the Constitution as well as federal patent statutory protections is to balance the tension between two objectives: "to reward innovators with higher profits and to keep prices reasonable for consumers."[92] The court held that the District of Columbia price statute expressly targeted the price of patented drugs and thus falls directly "within the scope of the patent laws, and its effect is to shift the benefits of a patented innovation from inventors to consumers."[93] Accordingly, the District of Columbia statute "re-balance[s] the statutory framework of rewards and incentives insofar as it relates to inventive new drugs."[94] The Federal Circuit concluded that the D.C. Council's efforts in this regard conflicted with "the goals established by Congress in the patent laws" because the D.C. Council's legislation was expressly "targeted at the patent right" and "applies only to patented drugs."[95]

Here, unlike the D.C. Council's legislation, Louisiana's Act 358 does not, on its face, target patent rights or, by its terms, apply only to patented drugs or the price of patented drugs. As a condition of participating in Medicare and Medicaid, participating pharmaceutical companies agree to provide discounted drugs in the Section 340B program. These discounts are set by the federal government, not the State of Louisiana or Act 358.[96] Act 358, addresses only contract pharmacies, a matter that is not addressed in Section 340B. Accordingly, *BIO* does not support Plaintiffs' conflict preemption claims.

---

[91] *Id*. at 1364.
[92] *Id*. at 1372.
[93] *Id*. at 1373.
[94] *Id*. at 1374.
[95] *Id*.
[96] 42 U.S.C. § 256b(a)(1); 42 C.F.R. Part 10 § 10.10.

### 3. Obstacle Preemption

Finally, the Court turns to Plaintiffs' "obstacle" preemption claims. "Obstacle" preemption occurs where "state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[97] As with their conflict preemption arguments, Plaintiffs' re-urge most of the same arguments urged with respect to their field preemption claims, namely that Act 358 conflicts with the balance of incentives created by the Section 340B program, imposes additional obligations on pharmaceutical companies that conflict with their obligations under the federal statute, and conflicts with HHS' enforcement scheme. For the reasons discussed above, Act 358's provisions addressing contract pharmacies do not create "an unacceptable obstacle to the accomplishment and execution" of Congress' objectives reflected in Section 340B because Section 340B does address contract pharmacies. Moreover, Act 358 arguably *advances* Congress' objectives with respect to the Section 340B program. In *Sanofi*, the Third Circuit noted the objectives of the Section 340B program:

> "[C]overed entities," typically care for low-income and rural persons. Section 340B helps providers do that. First, it gives them **extra revenue from serving insured patients**: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. Second, **it enables them to give uninsured patients drugs at little or no cost**.[98]

Louisiana's Act 358 arguably advances these objectives by allowing covered entities who do not operate in-house pharmacies to contract with multiple pharmacies and thus increase their revenues from insured patients who use those pharmacies. Multiple contract pharmacies also arguably provide wider coverage for patients of covered entities.

---

[97] *Janvey,* 712 F.3d at 200.
[98] *Sanofi*, 58 F.4th at 699.

In sum, Plaintiffs' "obstacle" preemption challenge to Act 358 similarly fails. The Court grants the Defendants' Motions for Summary Judgment with respect to Plaintiffs' preemption claims.

### C.  <u>Vagueness.</u>

The Court next addresses the claims by Plaintiffs PRMA and AbbVie that Act 358 is unconstitutionally vague and, therefore, violates the Due Process Clause of the Fourteenth Amendment.[99] A law is unconstitutionally vague when it: "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement."[100] Mere imprecision does not render a statute vague.[101] In fact, "[a] facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[102]

PRMA's and AbbVie's vagueness challenge centers on the use of the term "interfere" in Act 358. Part A of the statute states that a pharmaceutical manufacturer or distributor "shall not deny, restrict, prohibit, or *otherwise interfere* with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity …."[103] Part B of the statute simply provides that the manufacturer or distributor "shall not *interfere* with a pharmacy contracted with a 340B entity."[104] According to Plaintiffs, the statute "gives no indication of what conduct will be called 'interference' with 'the acquisition of a 340B drug' under a contract-pharmacy arrangement."[105] As a result, they argue that the statute fails to provide them

---

[99] U.S. CONST. Amend. XIV, § 1.
[100] *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999).
[101] *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983).
[102] *Id*. (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).
[103] La. R.S. 40:2884(A).
[104] La. R.S. 40:2884(B).
[105] ECF No. 28-1 at 44.

with reasonable notice whether their "conduct is prohibited and is so indefinite that it authorizes the Attorney General to engage in arbitrary and discriminatory enforcement."[106] Plaintiffs argue that Act 358's "geographic scope is also vague" in that it "applies to any 'pharmacy' in the entire United States where 'drugs are dispensed and pharmacy primary care is provided to residents of [Louisiana].'"[107]

Act 358 does not define the term "interfere." But the state argues that the statutory context of the term "interfere" in Part A of Act 358 gives the term a definite meaning sufficient to overcome a vagueness challenge. The Court agrees. The state's argument relies on the *"noscitur a sociis"* canon of statutory construction.[108] That canon is alternatively referred to as the "associated-words canon" and provides that "[w]hen several nouns or verbs or adjectives or adverbs—any words— are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."[109] In Act 358, the term "interfere" is used in the context of the statutory prohibition to "deny, restrict, prohibit, or *otherwise* interfere" with the acquisition or delivery of a Section 340B drug to a contract pharmacy.[110] All of the preceding words in this list involve actions designed to prevent or hinder the acquisition or delivery of these discounted drugs to contract pharmacies designated by covered entities. Accordingly, the term "interfere" as used in Act 358 should be construed as proscribing actions that prevent or hinder the acquisition or delivery of Section 340B drugs to contract pharmacies. This is consistent with one of the dictionary definitions of the term: "to be or create a hindrance or obstacle."[111] It is also consistent with the introductory title of the statute: "Prohibition of certain discriminatory

---

[106] *Id*. at 43.
[107] *Id.* At 46.
[108] ECF No. 49-4 at 25.
[109] SCALIA & GARNER, READING LAW 195 (2012)
[110] La. R.S. 40:2884(A).
[111] "Interfere," *American Heritage Dictionary* (2022), https://www.ahdictionary.com/word/search.html?q=interfere (accessed Sept. 23, 2024).

actions by a manufacturer or distributor related to 340B entities."[112] Considering the definition of "interfere" and its textual context in Act 358, the term is sufficiently definite to provide notice of the conduct proscribed and to prevent arbitrary or discriminatory enforcement, at least with respect to Part A.

Part B of Act 358 does not have the textual clues of Part A with respect to the scope of the term "interfere"—it simply states that a pharmaceutical company "shall not interfere" with a contract pharmacy.[113] However, nothing in the statute suggests that the term "interfere" in part B should be given a meaning different from that in Part A. Part A and Part B should be construed consistently to proscribe conduct that prevents or hinders the delivery of Section 340B drugs to pharmacies under contract with covered entities eligible to receive the drugs. As with the use of the term in Part A, this reading of the term "interfere" is consistent with the dictionary definition of the term and the title of the statute, which covers both Part A and Part B of La. R.S. 40:2884.

Moreover, Plaintiffs' reliance on *Carolina Youth Action Project ("CYAP"), et al. v. Wilson* to argue that Act 358 use of the term "interfere" is unconstitutionally vague is misplaced.[114] The plaintiffs in *CYAP* challenged a state statute that made it a crime to "willfully or unnecessarily" "interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State," "to loiter about such school or college premises," or "to act in an obnoxious manner thereon."[115] The court noted that, in assessing a constitutional vagueness challenge "[t]he degree of vagueness tolerated ... depends in part on the type of statute."[116] Because "the 'consequences of imprecision are qualitatively less severe,'" "[l]ess clarity is required in purely

---

[112] La. R.S. 40:2884.
[113] La. R.S. 40:2884(B).
[114] 60 F.4th 770, 786 (4th Cir. 2023).
[115] *Id.*
[116] *Id.* at 781 (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019)).

Page **22** of **32**

civil statutes," while "laws imposing 'criminal penalties' or 'threaten[ing] to inhibit the exercise of constitutionally protected rights' are subject to 'a stricter standard.'"[117] The court concluded that, given the disjunctive text of the statute, the statute failed to "explain the law's scope" or limit the discretion of prosecutors, and thus posed the danger of sweeping in protected speech.[118]

Act 358 does not pose the same danger to constitutionally protected activities as the statute at issue in *CYAP*. Act 358 is enforceable through civil penalties and injunctive relief under Louisiana's Unfair Trade Practices and Consumer Protection Law and thus does not invoke criminal penalties in contrast to the law at issue in *CYAP*.[119] Moreover, as explained above, Act 358 provides sufficient textual context for the term "interfere" to allow Plaintiffs to determine the scope of the law and to limit the discretion of the state in enforcing the statute. Moreover, the law at issue in the other case implicated significant First Amendment concerns given how the term "interfere" or "interference" was used in the statute. Here, Plaintiffs suggest that Act 358 may similarly infringe protected speech. But the statutory context of the term "interfere" limits its application to unprotected, non-expressive conduct aimed at preventing or hindering contract pharmacies from acquiring or receiving Section 340B drugs on behalf of covered entities.

Finally, Plaintiffs argue that Act 358 is "geographically" vague in the sense that it is not limited to contract pharmacies in the State of Louisiana, but instead broadly applies to any pharmacy in the United States that serves patients in Louisiana. The Court disagrees. Act 358 is specifically limited to pharmacies under contract with a covered entity in Louisiana—in other words, a Louisiana healthcare provider—and that provider's Louisiana-based patients. It is unclear to the Court how this provision renders the statute "geographically" vague given that the statute

---

[117] *Id.* (quoting *Manning*, 930 F.3d at 272)
[118] *Id.* (quoting *Manning*, 930 F.3d at 272)
[119] La. R.S. 40:2885.

**Exhibit 3**

turns on the existence of a contractual relationship between the pharmacy—whether in-state or out-of-state—and a Louisiana healthcare provider. The limitation of the statute to pharmacies that have a contractual relationship with a covered entity in Louisiana provides some boundaries and limitations on the scope of the Act 358.

In sum, Plaintiffs' constitutional vagueness arguments fail as a matter of law. Accordingly, the Court grants the Defendants' Motions for Summary Judgment with respect to these claims.

### D. Contracts Clause.

The Contracts Clause prohibits States from passing laws "impairing the Obligation of Contracts."[120] The Supreme Court's current two-step analysis for Contracts Clause challenges requires that a court first determine whether the state law at issue substantially impairs a contractual relationship, and if so, whether it does so for a legitimate purpose.[121] The Fifth Circuit, relying on the last Supreme Court case to strike down a state law on the basis of a Contracts Clause violation,[122] has adopted basically the same test, albeit in three steps: (1) the court must determine whether the state law has in fact operated as a substantial impairment of a contractual relationship; (2) if it does, the court must consider the justification offered by the state for that impairment, which must be significant and legitimate; and (3) if the state offers a legitimate justification for the impairment, the court must determine whether the impairment is reasonable and necessary.[123]

Under the Section 340B Program, private prescription drug companies, as a condition of having their outpatient drugs covered through Medicaid and Medicare Part B, are required to enter a pharmaceutical pricing agreement ("PPA") with the HHS Secretary under which they agree to

---

[120] U.S. CONST. art. I, § 10.
[121] *Sven v. Melin*, 138 S. Ct. 1815, 1822 (2018).
[122] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).
[123] *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010); *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504–05 (5th Cir. 2001).

Exhibit 3

offer Section 340B providers outpatient drugs at or below an applicable discounted and statutorily determined price referred to as the "ceiling price."[124] The terms of a PPA effectively mirror the statute. In fact, the Supreme Court has held that "the PPAs simply incorporate statutory obligations and record the manufacturers' agreement to abide by them. The form agreements, composed by HHS, contain no negotiable terms . . . . [Thus,] the 340B Program agreements serve [merely] as the means by which drug manufacturers opt into the statutory scheme."[125]

Plaintiff AstraZeneca alleges that Act 358 expands the list of covered entities and is therefore an "expansion of beneficiaries."[126] But Act 358 does not change or expand which entities qualify as 340B "covered entities." Thus, it does not expand or otherwise enlarge the beneficiaries of the Section 340B program. Nor does Act 358 change what prices drug companies may charge covered entities—Act 358 only affects the *delivery* or *acquisition* of Section 340B drugs. As a result, AstraZeneca cannot point to any way in which the Act expands or contradicts its PPA because, like the statute, the PPA is silent as to delivery to or acquisition of Section 340B drugs to contract pharmacies.

The cases on which AstraZeneca predicates its Contracts Clause claim are easily distinguishable. In *Allied Structural v. Spannaus*, the Supreme Court struck down a Minnesota law that required a company to provide additional pension benefits after it had agreed to provide such benefits under specific contractual provisions.[127] Unlike the Act, the Minnesota law in that case effectively changed the terms of the contract. Here, the terms of the PPA remain unchanged. Similarly, in *United Healthcare Ins. Co. v. Davis,* the Fifth Circuit held that the Contracts Clause prohibited Louisiana from enacting legislation increasing obligations on companies that had

---

[124] See 42 U.S.C. § 256b(a)(1).
[125] *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011).
[126] See Complaint, ECF No. 1, at ¶¶ 78-79.
[127] 438 U.S. at 245–46.

agreed to insure state employees under specific conditions.[128] Nothing that Louisiana has done in Act 358 increases or in any way changes AstraZeneca's obligations under its PPA. Finally, in *Lipscomb v. Columbus Municipal Separate School District*, the Fifth Circuit determined that the voiding of longstanding land leases violated the Contacts Clause.[129] Act 358, in contrast, does not void any contracts.

Even if the Court were to find that Act 358 somehow impairs AstraZeneca's PPA by preventing restrictions on contract pharmacies, the State would have a legitimate purpose for doing so. The Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'"[130] The Fifth Circuit has also stated that "[u]nder modern caselaw, states have some leeway to alter parties' contractual relationships 'to safeguard the vital interests of [their] people.'"[131] The Fifth Circuit has also observed that "remedying . . . a broad and general social or economic problem qualifies as a significant and legitimate public purpose."[132] As the Eighth Circuit noted in *PhRMA*, the practice of pharmacy is an area traditionally left to state regulation" and "the federal government has 'traditionally regarded state law as a complementary form of drug regulation and has long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation.'"[133] The state could credibly argue that Act 358 promotes greater access to discounted drugs by preventing restrictions on the distribution of those drugs through multiple contract pharmacies.

---

[128] 602 F.3d at 630.
[129] 269 F.3d at 514.
[130] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413 (1983) (citations omitted)).
[131] *Next Era Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 328 (5th Cir. 2022) (quoting Energy Reserves Grp., 459 U.S. at 410).
[132] *Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 242 (5th Cir. 2015).
[133] *Id.* (cleaned up).

The Fifth Circuit also recently observed that "the Contracts Clause is not what it once was."[134] One of the principles that "sapped the Contracts Clause of its earlier force" is applicable in the present case, namely the expectation that contracting parties must recognize that regulation is possible, which rings "especially true in highly regulated industries."[135] The drug industry is a "pervasively regulated business."[136] Since AstraZeneca can reasonably expect regulation with respect to the sale of drugs and, especially with respect to its voluntary participation in federal benefit programs such as Medicaid and Medicare, its claim "fails at the threshold question for proving a modern Contracts Clause violation."[137]

### E. Takings Clause.

The Takings Clause of the Fifth Amendment to the Constitution, which is "applicable to the States through the Fourteenth Amendment,"[138] provides: "[N]or shall private property be taken for public use, without just compensation."[139] Takings claims are recognized as to both personal property, including goods, and real property.[140] A taking can be either *per se* or regulatory, both of which entitle the property owner to just compensation.[141] A *per se* taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it."[142]

---

[134] *NextEra Energy Cap. Holdings, Inc.,* 48 F.4th at 328.
[135] *Id.*
[136] *United States v. Schiffman*, 572 F.2d 1137, 1142 (5th Cir. 1978).
[137] *NextEra Energy Cap. Holdings, Inc.,* 48 F.4th at 328; *see also United Healthcare Ins. Co. v. Davis,* 602 F.3d 618, 627-28 (5th Cir. 2010).
[138] *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021).
[139] U.S. Const. Amend. V.
[140] *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015).
[141] *Cedar Point Nursey*, 594 U.S. at 147–49.
[142] *Id.* at 147.

A taking can also occur as a result of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign."[143] The Supreme Court has held that a regulatory taking occurs when a regulation "goes too far" in limiting an owner's use of her property.[144]

In order to determine whether a regulation amounts to a taking, courts apply the test developed in *Penn Central Transportation Company v. City of New York*.[145] The *Penn Central* test requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[146] A regulation that deprives a property owner of "all economically beneficial uses" of her property constitutes a regulatory taking.[147]

Regardless of whether the government pays just compensation for a taking, property may only "be taken for public use."[148] The Supreme Court has held that the phrase "public use" requires that the taking "serve[ ] a 'public purpose.'"[149] The Court has "defined that concept broadly, reflecting [the Court's] longstanding policy of deference to legislative judgments" in redevelopment of property, and in "a purely economic context" as well.[150]

The Fifth Circuit has held that when private parties "voluntarily accept responsibilities under" federal law because "they consider it in their best interest to do so," no taking occurs.[151] Under this principle, "[g]overnmental regulation that affects a group's property interests does not

---

[143] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks and citation omitted).

[144] *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

[145] 438 U.S. 104 (1978).

[146] *Id*.

[147] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019–20 (1992) (emphasis in original) (finding a regulatory taking, and thus requiring just compensation, when enforcement of a "coastal-zone construction ban" rendered beachfront property "valueless").

[148] U.S. Const. Amend. V.

[149] *Kelo v. New London,* 545 U.S. 469, 480 (2005).

[150] *Id*. at 480–82 (citing Berman v. Parker, 348 U.S. 26 (1954), *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984), and *Monsanto*, 467 U.S. at 1014).

[151] *Burditt v. U.S. Dep't of Health & Hum. Servs.,* 934 F.2d 1362, 1376 (5th Cir. 1991).

Page **28** of **32**

constitute a taking of property where the regulated group is not required to participate in the regulated industry."[152] In *Burditt*, the Fifth Circuit held that a "state law limiting fees that nursing homes voluntarily participating in Medicaid may charge non-Medicaid patients effects no taking '[d]espite the strong financial inducement to participate in Medicaid.'"[153]

The Supreme Court has also applied the *Penn Central* test to determine whether a voluntary exchange with the federal government constituted a taking. In *Monsanto*, the Supreme Court rejected in part a takings challenge to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, as amended, 7 U.S.C. § 136, *et seq*. 467 U.S. at 1006–08.[154] The 1978 amendments to FIFRA allowed the Environmental Protection Agency ("EPA") to disclose trade secrets contained in applications for licenses to sell pesticides ten years after the applicant filed its application. The Court rejected the takings claim to the extent an applicant was "aware of the conditions under which the data [were] submitted" because "a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking."[155] *Monsanto* framed the issue under the *Penn Central* test.[156] After considering the *Penn Central* factors, the Court focused on the third factor: the statute's "interference with reasonable investment-backed expectations."[157] As to submissions of applications after 1978—meaning, those submitted with knowledge of the potential for disclosure of trade secrets contained therein—"the force of [the third] factor [was] so overwhelming" as to

---

[152] *Id*. (internal quotation marks and citations omitted).
[153] *Id*. (quoting parenthetically *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985)).
[154] 467 U.S. at 1014
[155] *Id*.
[156] *See id*. at 1005–06.
[157] *Id*. (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)).

**Exhibit 3**

be dispositive.[158] The Court further concluded that "the conditions [were] rationally related to a legitimate Government interest" in regulating pesticides.[159]

The Court disagrees with Plaintiffs' characterization of Act 358 as compelling direct, confiscatory sales to private pharmacies. Discounted drugs are sold to *covered entities* under the terms and conditions of the PPAs and the Section 340B program—they are not sold to pharmacies that enter into contracts to dispense the drugs on behalf of covered entities. Act 358 only prevents pharmaceutical companies from restricting the ability of covered entities to contract with multiple pharmacies to dispense Section 340B drugs to their patients. Because Act 358 does not compel Plaintiffs to directly sell 340B drugs to pharmacies, it is not a taking for purposes of the Takings Clause.

In *Eli Lilly*,[160] the court rejected the argument AbbVie asserts here that an unconstitutional private taking occurs when the government requires that a drug company transfer its drugs to contract pharmacies as a condition of obtaining coverage of its drugs under federal health insurance programs. The court there reasoned that the plaintiff's voluntary participation in these programs "foreclosed the possibility that the statute could result in an imposed taking of private property."[161] The Court finds this reasoning persuasive. Act 358 does not compel drug manufacturers to transfer Section 340B discounted drugs either to the government or to a private party. The statute only applies to drug manufacturers who voluntarily participate in the Medicaid and Medicare programs. AbbVie is not compelled to participate in these programs.

Furthermore, consideration of the *Penn Central* factors suggest that Act 358 is not so onerous as to constitute a regulatory taking. The history of the Section 340B program and litigation

---

[158] *Id.*
[159] *Id.* at 1007.
[160] 2021 WL 5039566 (S.D. Ind. 2021).
[161] *Id.*

surrounding it suggests that regulations requiring delivery and forbidding restrictions against delivery to contract pharmacies were foreseeable. In *Penn Central*,[162] the Supreme Court recognized that a taking is less readily found in a case where the governmental interference with property arises from a public program that adjusts to benefits and burdens of economic life to promote public welfare. This character of regulation stands in contrast to a physical invasion of property by the government. The character of the regulations at issue resembles the former and not the latter.

In sum, AbbVie cannot succeed on its takings claim. The Court, therefore, grants Defendants' Motions for Summary Judgment with respect to this claim.

### III.
#### CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1) PRMA's Motion for Summary Judgment in Case No. 6:23-cv-997 [ECF No. 21] is DENIED;

(2) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No. 41] and the Louisiana Primary Care Association [ECF No. 44] in Case No. 6:23-cv-997 are GRANTED; all claims asserted in Case No. 6:23-cv-997 are DISMISSED;

(3) AstraZeneca's Motion for Summary Judgment in Case No. 6:23-cv-1042 [ECF No. 21] is DENIED;

(4) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No. 43] and the Louisiana Primary Care Association [ECF No. 45] in Case No. 6:23-cv-1042 are GRANTED; all claims asserted in Case No. 6:23-cv-1042 are DISMISSED;

---

[162] 438 U.S. 104 (1978).

(5) AbbVie's Motion for Summary Judgment in Case No. 6:23-cv-1307 [ECF No. 28] is

DENIED;

(6) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No. 49] and the Louisiana Primary Care Association [ECF No. 61] in Case No. 6:23-cv-1307 are GRANTED; all claims asserted in 6:23-cv-1307 are DISMISSED.

THUS DONE in Chambers on this 30th day of September, 2024.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 61 of 576

**Exhibit 3**

166 F.4th 528
United States Court of Appeals, Fifth Circuit.

ABBVIE, INCORPORATED; Allergan, Incorporated; Durata Therapeutics, Incorporated; AbbVie Products, L.L.C.; Aptalis Pharma US, Incorporated; Allergan Sales, L.L.C.; Pharmacyclics, L.L.C., Plaintiffs—Appellants,

v.

Liz MURRILL, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee,

AstraZeneca Pharmaceuticals, L.P., Plaintiff—Appellant,

v.

Liz Murrill, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee.

Pharmaceutical Research and Manufacturers of America, Plaintiff—Appellant,

v.

Liz Murrill, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee,

No. 24-30645
|
consolidated with No. 24-30651,
consolidated with No. 24-30673
|
FILED February 9, 2026

**Synopsis**

**Background:** Pharmaceutical manufacturers and trade association brought actions alleging that Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was preempted by federal law and violated Takings Clause, Contracts Clause, and Due Process Clause's prohibition on vagueness. The United States District Court for the Western District of Louisiana, Carol B. Whitehurst, United States Magistrate Judge, 2024 WL 5453479, allowed membership organization of federally qualified health centers to intervene, and the same court, Robert R. Summerhays, J., 2024 WL 4361597, entered summary judgment in state's favor. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Willett, Circuit Judge, held that:

[1] federal question jurisdiction existed over actions;

[2] law was not field preempted by federal law;

[3] law was not conflict preempted by federal law;

[4] law did not effect physical taking;

[5] law did not effect regulatory taking;

[6] law did not violate Contracts Clause;

[7] law was not unconstitutionally vague; and

[8] organization was not entitled to intervene as of right.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion to Intervene; Motion for Summary Judgment.

West Headnotes (34)

| [1] | **Federal Courts** 🔑 Summary judgment |
| | **Federal Courts** 🔑 Summary judgment |

Court of Appeals reviews summary judgment de novo, viewing all evidence in light most favorable to nonmoving party and drawing all

reasonable inferences in that party's favor. Fed. R. Civ. P. 56(a).

**[2]** **Federal Courts** 🔑 Theory and Grounds of Decision of Lower Court

**Federal Courts** 🔑 Grounds for sustaining decision not relied upon or considered

Court of Appeals may affirm summary judgment on any ground supported by record, even if it is different from that relied on by district court.

**[3]** **Federal Courts** 🔑 Matters of Procedure in General

**Federal Courts** 🔑 Governments and Political Subdivisions

Federal courts have federal question jurisdiction over claims that assert federal preemption and seek declaratory and injunctive relief against state official. 28 U.S.C.A. § 1331.

**[4]** **Federal Courts** 🔑 "Well-pleaded complaint" rule

Under well-pleaded complaint rule, federal court does not have federal question jurisdiction unless federal question appears on face of plaintiff's well-pleaded complaint. 28 U.S.C.A. § 1331.

**[5]** **Federal Courts** 🔑 Environment and health

Federal courts had federal question jurisdiction over actions brought by pharmaceutical manufacturers and trade association alleging that Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was preempted by federal law and violated Takings Clause, Contracts Clause, and Due Process Clause's prohibition on vagueness. U.S. Const. art. 1, § 10, cl. 1; U.S. Const. art. 6, cl. 2; U.S. Const. Amend. 14; 28 U.S.C.A. § 1331; La. Rev. Stat. Ann. § 40:2884.

More cases on this issue

**[6]** **Federal Preemption** 🔑 Presumptions and burden of proof

When evaluating preemption, court begins with presumption against preemption, particularly in areas of law traditionally reserved to states. U.S. Const. art. 6, cl. 2.

2 Cases that cite this headnote

**[7]** **Federal Preemption** 🔑 Traditionally or historically regulated by states

**Federal Preemption** 🔑 Health, safety, morals, and welfare

Public health and consumer protection fall squarely within state's historic police powers, and thus where those interests are at stake, assumption is that historic police powers of states were not to be superseded by federal act unless that was clear and manifest purpose of Congress. U.S. Const. art. 6, cl. 2.

2 Cases that cite this headnote

**[8]** **Federal Preemption** 🔑 Occupation of field; field preemption

Field preemption fundamentally is question of congressional intent; it arises only when Congress, acting within its proper authority, has determined that certain conduct must be regulated by its exclusive governance, thereby leaving no room for state regulation. U.S. Const. art. 6, cl. 2.

**[9]** **Federal Preemption** 🔑 Presumptions and burden of proof

Matters unaddressed by Congress in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to disposition provided by state law.

**[10]** **Antitrust and Trade Regulation** 🔑 Preemption

**Federal Preemption** 👈 Trade Regulation

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not field preempted by federal law; law implicated two traditional general areas of state regulation and police power—public health and consumer protection—and federal law evinced no clear and manifest intent to preempt state laws regulating distribution of drugs to patients and role of pharmacies in such distribution. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

4 Cases that cite this headnote
More cases on this issue

[11]    **Federal Preemption** 👈 Impossibility of complying with both state and federal law

**Federal Preemption** 👈 State law as obstacle to objectives or purpose of federal law

Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where state law creates unacceptable obstacle to accomplishment and execution of full purposes and objectives of Congress. U.S. Const. art. 6, cl. 2.

[12]    **Antitrust and Trade Regulation** 👈 Preemption

**Federal Preemption** 👈 Trade Regulation

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not conflict preempted by federal law, despite manufacturers' contentions that law impermissibly expanded universe of covered entities, and clashed with Congress's enforcement scheme; pharmacies did not purchase drugs or receive price discounts, but merely dispensed drugs to covered entities'

patients, there was no overlap between state and federal enforcement schemes, law did not regulate prices, only conduct, and Congress did not undertake regulation of delivery of discounted drugs or role of pharmacies in that process. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

7 Cases that cite this headnote
More cases on this issue

[13]    **Eminent Domain** 👈 Necessity of just or full compensation or indemnity

When government physically acquires private property for public use, takings clause imposes clear and categorical obligation to provide owner with just compensation. U.S. Const. Amend. 5.

[14]    **Eminent Domain** 👈 What Constitutes a Taking; Police and Other Powers Distinguished

"Physical taking" occurs when government uses its power of eminent domain to formally condemn property or when it physically takes possession of property without acquiring title to it. U.S. Const. Amend. 5.

1 Case that cites this headnote

[15]    **Eminent Domain** 👈 What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain** 👈 Necessity of just or full compensation or indemnity

Government may effect taking—obligating government to provide just compensation—through regulation. U.S. Const. Amend. 5.

1 Case that cites this headnote

[16]    **Eminent Domain** 👈 What Constitutes a Taking; Police and Other Powers Distinguished

When evaluating claim that government effected taking by imposing regulations that restrict owner's ability to use his own property, courts must determine whether restriction goes too far, applying fact-specific, flexible test

60

that balances regulation's economic impact, its interference with reasonable investment-backed expectations, and government action's character. U.S. Const. Amend. 5.

1 Case that cites this headnote

[17] **Eminent Domain** 🔑 Health

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not effect physical taking of manufacturer's property; law did not compel manufacturers to complete more sales in first instance, but instead applied only after covered entities had purchased discounted drugs and directed their delivery. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

[18] **Eminent Domain** 🔑 Health

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not effect regulatory taking of manufacturer's property, even though law might increase number of drugs for which manufacturer had to provide discounts; manufacturer would still receive large percentage of market price, law did not significantly interfere with manufacturer's reasonable investment-backed expectations, and law advanced core public purpose of ensuring that low-income and rural patients had access to discounted medications. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

[19] **Constitutional Law** 🔑 Existence and extent of impairment

**Constitutional Law** 🔑 Police power; purpose of regulation

To determine whether law violates Contracts Clause, court must first ask whether law operates as substantial impairment of contractual relationship, and if it does, court must then examine whether it is drawn in appropriate and reasonable way to advance significant and legitimate public purpose. U.S. Const. art. 1, § 10, cl. 1.

[20] **Constitutional Law** 🔑 Existence and extent of impairment

In determining whether state law operates as substantial impairment of contractual relationship, as used to decide whether state law violates Contracts Clause, court must consider factors such as extent to which law undermines contractual bargain, interferes with party's reasonable expectations, and prevents party from safeguarding or reinstating its rights. U.S. Const. art. 1, § 10, cl. 1.

[21] **Antitrust and Trade Regulation** 🔑 Validity
**Constitutional Law** 🔑 Contracts with United States

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not substantially impair manufacturer's contractual relationship with federal government under its pharmaceutical pricing agreement (PPA), in violation of Contracts Clause, by expanding universe of covered entities and imposing new obligations on it as result of its PPA; industry was heavily regulated, PPA did not contain delivery terms, and law did not alter terms of manufacturer's PPA, but only regulated relationships between covered entities and their contract pharmacies, and did not expand its

61

obligation to provide discounts. U.S. Const. art. 1, § 10, cl. 1; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

5 Cases that cite this headnote

**[22]    Constitutional Law** 🔑 Existence and extent of impairment

In evaluating claim that state law violates Contracts Clause, courts look to contract's terms to determine parties' reasonable expectations. U.S. Const. art. 1, § 10, cl. 1.

**[23]    Antitrust and Trade Regulation** 🔑 Validity

**Constitutional Law** 🔑 Particular Subjects and Regulations

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not unconstitutionally vague, in violation of Due Process Clause, despite manufacturer's contention that term "interfere" was so open-ended that it could prohibit manufacturers from even asking for information for audits, thus chilling lawful conduct; "interfere" appeared alongside "deny, restrict, prohibit," indicating that "interfere" targeted conduct that obstructed or impeded acquisition or delivery of discounted drugs to contract pharmacies—not routine communications or lawful auditing practices. U.S. Const. Amend. 14; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

**[24]    Constitutional Law** 🔑 Certainty and definiteness;  vagueness

"Void-for-vagueness doctrine"—a component of due process—bars enforcement of statute that either forbids or requires doing of act in terms so vague that men of common intelligence must

necessarily guess at its meaning and differ as to its application. U.S. Const. Amends. 5, 14.

**[25]    Constitutional Law** 🔑 Certainty and definiteness;  vagueness

Law is unconstitutionally vague under Due Process Clause only when it fails to specify standard of conduct at all—not when it merely requires person to conform his conduct to imprecise but comprehensible normative standard. U.S. Const. Amends. 5, 14.

**[26]    Constitutional Law** 🔑 Certainty and definiteness;  vagueness

In civil context, statute is unconstitutionally vague, in violation of due process, only if it is so vague and indefinite as really to be no rule at all. U.S. Const. Amends. 5, 14.

**[27]    Statutes** 🔑 Associated terms and provisions;  noscitur a sociis

Under canon "noscitur a sociis," word is known by its associates, i.e., word is given more precise content by neighboring words with which it is associated.

**[28]    Federal Courts** 🔑 Parties

Court of Appeals reviews district court's ruling on motion to intervene de novo. Fed. R. Civ. P. 24.

**[29]    Federal Civil Procedure** 🔑 Intervention

Federal courts should allow intervention where no one would be hurt and greater justice could be attained. Fed. R. Civ. P. 24.

**[30]    Federal Civil Procedure** 🔑 Proceedings for intervention

Although rule governing intervention is to liberally construed, movant still bears burden of

establishing its right to intervene. Fed. R. Civ. P. 24.

**[31]    Federal Civil Procedure** 🔑 Grounds and Factors

To intervene as of right, applicant must satisfy four requirements: (1) application for intervention must be timely; (2) applicant must have interest relating to property or transaction that is subject of action; (3) applicant must be so situated that action's disposition action may, as practical matter, impair, or impede his ability to protect that interest; (4) applicant's interest must be inadequately represented by existing parties to suit. Fed. R. Civ. P. 24(a)(2).

**[32]    Federal Civil Procedure** 🔑 Inadequacy of representation of applicant's interest

When state is already party, applicant for intervention as of right must demonstrate that its interest is in fact different from that of state and that its interest will not be represented by state. Fed. R. Civ. P. 24(a)(2).

**[33]    Federal Civil Procedure** 🔑 Inadequacy of representation of applicant's interest

Applicant for intervention as of right need not show that representation by state will certainly be inadequate; rather, applicant must show that representation of its interests may be inadequate. Fed. R. Civ. P. 24(a)(2).

**[34]    Federal Civil Procedure** 🔑 Particular Intervenors

Membership organization of federally qualified health centers was not entitled to intervene as of right in pharmaceutical manufacturer's action against state challenging Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies, even though it sought to protect business interests of

its members, absent showing that its interests diverged from state's, or that it offered any defense distinct from state's. La. Rev. Stat. Ann. § 40:2884; Fed. R. Civ. P. 24(a)(2).

More cases on this issue

Appeals from the United States District Court for the Western District of Louisiana, USDC Nos. 6:23-CV-1307, 6:23-CV-1042, 6:23-CV-997, Robert R. Summerhays, U.S. District Judge

**Attorneys and Law Firms**

Matthew Scott Owen, Lucas Henry Funk, Meredith Marie Pohl, Kirkland & Ellis, L.L.P., Washington, DC, for Plaintiffs—Appellants in No. 24-30645.

Allon Kedem, Jeffrey Handwerker, Arnold & Porter Kaye Scholer, L.L.P., Washington, DC, Brent Bennett Barriere, Fishman Haygood, L.L.P., New Orleans, LA, for Plaintiff—Appellant in No. 24-30651.

Louis Victor Gregoire, Jr., Esq., Kean Miller, L.L.P., Baton Rouge, LA, Philip J. Perry, Cherish Alise Drain, Andrew D. Prins, Abid Qureshi, Latham & Watkins, L.L.P., Washington, DC, Jeffrey Joseph Gelpi, I, Esq., Kean Miller, L.L.P., New Orleans, LA, for Plaintiff—Appellant in No. 24-30673.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for Defendant—Appellee in No. 24-30645.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Michael Brent Hicks, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Riley T. Svikhart, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., New Orleans, LA, for Defendant—Appellee in No. 24-30651.

Jorge Benjamin Aguinaga, Alexander Theodore Reinboth, Louisiana Department of Justice, Baton Rouge, LA, Michael Brent Hicks, Baker, Donelson, Bearman, Caldwell &

Berkowitz, P.C., Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Riley T. Svikhart, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., New Orleans, LA, for Defendant—Appellee in No. 24-30673.

Ronald S. Connelly, Delaney Bounds, Hannah E. Hauer, Fernando Montoya, Esq., Powers, Pyles, Sutter & Verville, P.C., Washington, DC, for Intervenor Defendant—Appellee in Nos. 24-30645 and 24-30651.

Ronald S. Connelly, Delaney Bounds, Hannah E. Hauer, Fernando Montoya, Esq., Powers, Pyles, Sutter & Verville, P.C., Washington, DC, Carroll Devillier, Jr., Attorney, Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, LA, for Intervenor Defendant—Appellee in No. 24-30673.

William B. Schultz, Margaret Dotzel, Alyssa Howard, Zuckerman Spaeder, L.L.P., Washington, DC, for Amici Curiae.

Before Higginson, Willett, and Engelhardt, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

 **\*534**  When Congress created the Section 340B Drug Pricing Program, it struck a straightforward bargain: drug manufacturers that choose to participate in Medicaid must provide discounted drugs to certain "covered entities"—most often clinics and hospitals that serve low-income and rural patients.[1] The goal was simple: stretch scarce healthcare dollars and expand access to essential medications for vulnerable communities.

In practice, many covered entities lack the resources to operate in-house pharmacies. To bridge that gap—particularly in rural and underserved areas—they purchase discounted drugs and partner with independent contract pharmacies to dispense them. Some manufacturers, however, have bristled at that arrangement, characterizing it as an "arbitrage opportunity" for pharmacies rather than a lifeline for patients. Acting on that view, certain manufacturers adopted policies restricting **\*535** covered entities' use of contract pharmacies.

Louisiana responded as other states have in matters of pharmaceutical regulation. It enacted Act 358, which prohibits manufacturers from interfering with covered entities' ability to obtain and deliver discounted drugs through contract pharmacies. The statute does not seek to upend the federal scheme; rather, it seeks to preserve access to medicines for the populations Congress sought to protect.

States regulate pharmacies—and the distribution of drugs to those pharmacies—every day. Act 358 fits comfortably within that tradition. We hold that it is not preempted by federal law and does not violate the Takings Clause, the Contracts Clause, or the Due Process Clause's prohibition on vagueness. We further hold that the district court erred in permitting the Louisiana Primary Care Association to intervene, because it failed to show that it would offer any defense distinct from the State or that its divergent interests otherwise affect this litigation.

We therefore AFFIRM the district court's grant of summary judgment for Louisiana and REVERSE its order granting the LPCA's motion to intervene in the underlying *AbbVie* case.

I

A

Congress enacted 42 U.S.C. § 256b as part of the Veterans Healthcare Act of 1992.[2] Section 256b created what is commonly known as the 340B Program, which requires pharmaceutical manufacturers that participate in Medicaid and Medicare Part B to sell certain outpatient drugs at "no more than the statutorily-set ceiling price" to designated healthcare providers.[3]

These providers—called "covered entities"—include federally qualified health centers, family-planning projects, state-operated AIDS facilities, black lung clinics, and other safety-net institutions that serve low-income and uninsured patients.[4] In exchange for access to discounted drugs, the statute "places several key restrictions on covered entities," including prohibitions on duplicate discounts and drug diversion, audit requirements, and penalties for noncompliance.[5]

The Health Resources and Services Administration (HRSA), an agency within the Department of Health and Human Services, administers the 340B Program.[6] Manufacturers

"opt into the 340B Program by signing" Pharmaceutical Pricing Agreements (PPAs) with HHS.[7] These agreements "are not transactional, bargained-for contracts"—rather, they are "uniform agreements" that merely "recite" the statutory obligations of manufacturers and the HHS Secretary.[8] By signing a PPA, a manufacturer agrees to provide 340B discounts to covered entities as a condition of receiving Medicaid and Medicare Part B reimbursements.

**\*536**  From the program's inception, Congress has said nothing about how discounted drugs must be dispensed. In 1996, HRSA issued guidance addressing that silence. Recognizing that many covered entities lacked in-house pharmacies—particularly in rural or underserved areas—HRSA permitted such entities to contract with a single outside pharmacy to dispense 340B drugs.[9] Under that arrangement, covered entities would purchase and pay for drugs, while manufacturers would ship them to the contract pharmacy for distribution to eligible patients. The pharmacy functioned solely as a distribution intermediary.

Fourteen years later, HRSA significantly expanded that model. In 2010, it issued guidance allowing *all* covered entities—including those with their own pharmacies—to contract with an unlimited number of outside pharmacies.[10] The effects were swift and significant. After the 2010 guidance, "the use of contract pharmacies skyrocketed."[11]

Manufacturers soon pushed back. Expressing concern that contract pharmacies were unlawfully profiting from these discounted drugs rather than merely dispensing them, manufacturers adopted policies limiting the distribution of Section 340B drugs through contract pharmacies.[12] In 2020, HHS responded, "act[ing] quickly" to issue an advisory opinion "stating that, 'to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs.' "[13] Unsurprisingly, manufacturers sued.

Both the Third Circuit and the D.C. Circuit rejected HHS's opinion, holding that the 340B statute does not require manufacturers to deliver discounted drugs to an unlimited number of contract pharmacies.[14] In the wake of those decisions, states began to "attempt to do by [state law] what

HHS had done in its advisory opinion"[15]—thereby setting the stage for the dispute before us.

### B

In 2023, Louisiana enacted Act 358, joining a growing number of states responding to manufacturers' restrictions on the distribution of 340B drugs.[16] The statute imposes two core prohibitions on manufacturers and distributors of 340B drugs:

> A. A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy **\*537**  that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States Department of Health and Human Services.

> B. A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.[17]

Violations of either provision constitute violations of Louisiana's Unfair Trade Practices and Consumer Protection Law,[18] exposing manufacturers to various "investigative demands, remedies, and penalties."[19]

### C

Two manufacturers and one trade association promptly challenged Act 358 in separate suits against Louisiana's Attorney General, Liz Murrill, in her official capacity. Each asserted that Act 358 is preempted by § 340B—but each also advanced its own combination of federal constitutional claims seeking declaratory and injunctive relief.[20]

AbbVie, Inc. alleged federal preemption, an unconstitutional taking, and unconstitutional vagueness. AstraZeneca Pharmaceuticals, L.P. brought preemption and Contracts Clause claims. And Pharmaceutical Research & Manufacturers of America (PhRMA) asserted preemption and vagueness challenges.

The district court resolved all three cases together. In a single opinion, it denied the manufacturers' motions for summary judgment and granted summary judgment in

favor of Louisiana—and the LPCA—on every claim.[21] The manufacturers appealed, and the three appeals are consolidated before us.

## II

**[1]  [2]**  We review summary judgment *de novo*, "viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor."[22] "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' "[23] "We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court."[24]

## III

**[3]**  We begin, as always, with jurisdiction. Federal courts have subject-matter jurisdiction over cases "arising under" federal law.[25] And it is "well-established" that **\*538** federal courts have jurisdiction over claims that assert federal preemption and seek declaratory and injunctive relief against a state official.[26]

Louisiana nonetheless argues that the district court lacked subject-matter jurisdiction over the manufacturers' preemption claims. In support, the State invokes our decision in *Elam v. Kansas City Southern Railway Co.*, quoting the "black-letter" proposition that "[d]efensive preemption does not create federal jurisdiction and simply declares the primacy of federal law, regardless of the forum or the claim."[27]

That argument misses the mark. *Elam* involved a state-law tort action in which preemption was raised defensively.[28] This case is different. As AstraZeneca correctly observes, this is "a classic *Ex parte Young* suit."[29] The manufacturers invoke the Supremacy Clause as a sword, not a shield, seeking prospective relief against state officials alleged to be enforcing a preempted statute.

**[4]  [5]**  Defensive-preemption cases like *Elam*—which turn on the well-pleaded complaint rule, under which "a federal court does not have federal question jurisdiction unless a federal question appears on the face of the plaintiff's well-pleaded complaint"[30]—are therefore inapposite. Here, the federal question appears on the face of the complaint. Federal-question jurisdiction therefore exists.[31]

With jurisdiction secure, we turn to the merits. Each manufacturer presses a federal preemption challenge and advances additional constitutional claims. AbbVie contends that Act 358 violates the Takings Clause. AstraZeneca argues that the Act violates the Contracts Clause. And PhRMA asserts that the statute is unconstitutionally vague. We also address AbbVie's challenge to the district court's decision allowing LPCA to intervene. We consider each issue in turn.

## IV

We begin with the claim common to all three manufacturers: federal preemption. The district court rejected AbbVie's, AstraZeneca's, and PhRMA's arguments that Act 358 is preempted by federal law under theories of field, conflict, or obstacle preemption. We agree.

**\*539**  A

The Supremacy Clause declares that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[32] Through it, Congress possesses "the power to preempt state law"[33]—either "through express language in a statute" or implicitly.[34] But the exercise of that power is not lightly presumed.

**[6]  [7]**  When evaluating preemption, we begin with the "presumption against preemption," particularly in "areas of law traditionally reserved to the states."[35] Public health and consumer protection fall squarely within a State's historic police powers. Where those interests are at stake, "the assumption [is] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[36]

The manufacturers urge us to dispense with that presumption, arguing that Louisiana's police powers cannot regulate conduct touching the federal 340B Program. We are unpersuaded. Act 358 does not regulate the 340B Program

66

itself. It regulates the distribution of drugs to patients and the role of pharmacies in this distribution—areas left free under the 340B Program for state supplementation.[37] In close cases, "when there is doubt about preemption, the tie goes to the state."[38]

We need not reinvent the wheel. Just months ago, we held in *AbbVie, Inc. v. Fitch* that Mississippi's materially indistinguishable law raises no preemption concerns—whether under field, conflict, or obstacle preemption.[39] *Fitch* controls here.[40]

[8] Field preemption "fundamentally is a question of congressional intent."[41] It arises only when "Congress, acting within its proper authority, has determined [that certain conduct] must be regulated by its exclusive governance," thereby leaving no room for state regulation.[42] For that reason, the Supreme Court has cautioned courts to hesitate to infer field preemption absent a showing of "complete ouster of state power."[43]

**\*540** In *Fitch*, we examined § 340B—the very same federal program and statutory provision at issue here—and concluded that its regulatory scheme is not "so pervasive that Congress left no room for state supplementation."[44] We catalogued what § 340B *does* regulate: price ceilings for covered outpatient drugs; eligibility criteria for covered entities; prohibitions on duplicate discounts and diversion; audit and enforcement mechanisms; and the terms governing manufacturers' and wholesalers' sales of discounted drugs to covered entities.[45]

[9] We also identified what § 340B conspicuously *does not* regulate: "neither the distribution of drugs to patients nor the role of pharmacies in this distribution"[46]—the precise subjects addressed by Mississippi's law in *Fitch* and Louisiana's Act 358 here. Our sister circuits have reached the same conclusion,[47] emphasizing § 340B's "silence" on contract pharmacies and delivery logistics.[48] Where Congress has left such matters "unaddressed in an otherwise comprehensive and detailed federal regulatory scheme," they "are presumably left subject to the disposition provided by state law."[49]

[10] Further, as with Mississippi's analogous statute, Louisiana's Act 358 "implicates two traditional general areas

of state regulation and police power: public health and consumer protection."[50] And because § 340B evinces "no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution," Act 358 is not field preempted.[51]

[11]    [12]    Nor is it conflict preempted. "Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[52]

The manufacturers advance several conflict-preemption theories. None is persuasive.

First, AbbVie and PhRMA argue that Act 358 impermissibly "expands" the universe of covered entities by requiring manufacturers to provide discounted drugs to contract pharmacies. That argument ignores the basic mechanics of the 340B Program.

As we explained in *Fitch*, laws like Mississippi's—and Louisiana's—require manufacturers to provide discounted drugs to contract pharmacies "only insofar as they have partnered with covered entities to **\*541** *distribute* the drugs to patients."[53] Put simply: "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts. Covered entities purchase and maintain title to the 340B-discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients."[54] The manufacturers' contrary characterization was rejected in *Fitch* as "simply incorrect,"[55] and it fares no better here.

AbbVie and PhRMA's second conflict-preemption argument likewise falls short. They contend that Act 358 impermissibly "clashes with Congress's enforcement scheme" which vests HHS with exclusive authority to enforce 340B. That framing presents a false conflict. Two things can be true at once.

While "it is true that Congress made HHS the sole enforcer of Section 340B,"[56] it is also true that Louisiana's Attorney General enforces Act 358. The two regimes operate in distinct spheres. As Louisiana explains, if a manufacturer believes a covered entity has engaged in duplicate discounting, "only the 340B statute provides recourse ... and Act 358 has nothing to say about it." Conversely, if a manufacturer refuses to deliver discounted drugs to a contract pharmacy acting on behalf of a covered entity, "only Act 358 provides recourse" because

67

§ 340B is silent on delivery logistics.[57] As in *Fitch*, there is no overlap in the enforcement Venn Diagram—and thus no conflict.[58]

We are similarly unpersuaded by AstraZeneca's obstacle-preemption theory. This argument rests on the premise that Act 358 "regulates pricing on its face." We reject that premise—just as the Eighth Circuit did when evaluating Arkansas's materially similar statute.[59]

AstraZeneca reasons that Act 358 must regulate pricing because a *violation* would occur whenever a manufacturer attempts to sell a § 340B drug at full price rather than the discounted price. But that is circular reasoning. Act 358 does not regulate **\*542** prices; it regulates conduct. By its terms, the statute prohibits manufacturers from interfering with the "acquisition" by—or "delivery" to—a "pharmacy that is under contract with a 340B entity."[60] The district court correctly recognized that distinction.[61]

AstraZeneca further argues that even if Act 358 does not regulate pricing, it nevertheless " 'skews' the program's 'delicate balance of statutory objectives' " because Act 358 applies only to 340B participants. "As with any piece of legislation, Congress did indeed seek to strike a balance among a variety of interests" in enacting the Section 340B Program.[62] But "[p]art of that balance ... involved allocating authority between the Federal Government and the States."[63] Congress decided not to undertake regulation of the delivery of 340B drugs or the role of pharmacies in that process—thereby leaving, absent congressional amendment, those matters to state law.

Act 358 operates comfortably within that space. The statute does not disturb the federally regulated relationship between manufacturers and covered entities. Manufacturers must still offer covered entities the 340B ceiling price, exactly as federal law requires. Act 358 comes into play only after a covered entity has purchased the drugs and directs their delivery to a contract pharmacy. Far from frustrating § 340B's objectives, the two laws work in tandem to advance Congress's central aim: ensuring that "manufacturers participating in Medicaid ... offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor."[64]

Federal law therefore does not preempt Act 358.

V

Because Act 358 is not preempted, we turn to the remaining constitutional claims—beginning with AbbVie's Takings Clause argument.[65]

[13] [14] [15] [16] "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation."[66] A physical taking occurs when the government "uses its power of eminent domain to formally condemn property" or when it "physically takes possession of property without acquiring title to it."[67] The government may also effect a taking—obligating the government to provide just compensation—through regulation. "[W]hen the government ... imposes regulations that restrict an owner's ability to use his own property,"[68] courts must determine whether the restriction "goes too far,"[69] applying **\*543** a fact-specific, "flexible test" that balances "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[70]

AbbVie insists that Act 358 effects a *physical* taking, not a regulatory one. As a fallback, AbbVie argues that even if Act 358 is analyzed as a regulatory taking, it still violates the Fifth Amendment. Under either theory, AbbVie's claim fails.

[17] We begin with AbbVie's frontline contention: that Act 358 effects a physical taking "because it compels the transfer of AbbVie's property to private parties that will sell the drugs at regular prices and retain the profit for themselves." That argument is foreclosed by *Fitch.*

In *Fitch*, AbbVie advanced the same theory against Mississippi's virtually identical statute. We rejected it, explaining that the law:

> [D]oes not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone. Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price. Under [the Mississippi law], AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B. [The Mississippi law] simply

imposes on drug manufacturers a negative obligation of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.[71]

The same is true here. Although AbbVie disagrees with *Fitch*'s characterization of how such statutes operate, it identifies no material difference between Mississippi's law and Act 358 that would justify a different result. We adhere to *Fitch.* Like its Mississippi counterpart, Act 358 does not deprive AbbVie of anything to which § 340B entitles it. Act 358 does not compel manufacturers to "complete more sales in the first instance," as AbbVie asserts; rather, it applies only "*after* [covered entities] have purchased" the discounted drugs and directed their delivery.[72]

 [18]  AbbVie's alternative regulatory-taking theory fares no better. In determining whether a law crosses the line between permissible regulation and impermissible taking, courts "balanc[e] factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[73] The first factor weighs against AbbVie. While Act 358 "could increase the number of drugs for which [AbbVie] must provide discounts ... for most drugs, [AbbVie] will still receive a large percentage of the market price."[74] The second factor likewise cuts against AbbVie. Contract pharmacies have been **\*544** part of the 340B landscape for decades, and Act 358 "does not significantly interfere" with AbbVie's reasonable investment-backed expectations.[75] Finally, the character of the government action favors the State. Act 358 advances a core public purpose: ensuring that low-income and rural patients have access to discounted medications.

Relying on *Fitch*, we conclude that Act 358 effects neither a physical nor a regulatory taking.[76]

VI

We next consider AstraZeneca's Contracts Clause challenge.

The Contracts Clause limits a State's power to disrupt contractual relationships, providing that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."[77] The Clause applies broadly—"to any kind of contract."[78] But it does not insulate contracts against all legislative change. As the Supreme Court has long recognized, "states have some leeway to alter parties' contractual relationships 'to safeguard the vital interests of [their] people.' "[79] Indeed, "parties contract with an expectation of possible regulation"—"especially ... in highly regulated industries."[80]

 [19]   [20]   To determine whether a law violates the Contracts Clause, the Supreme Court "has long applied a two-step test."[81] First, we ask whether the law "operate[s] as a substantial impairment of a contractual relationship."[82] This "threshold issue" considers factors such as "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights."[83] Only if a substantial impairment exists do we proceed to step two, examining the "means and ends" of Act 358—specifically whether it is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.' "[84]

 [21]  Because Act 358 does not substantially impair AstraZeneca's contractual obligations, "we may stop after step one."[85]

AstraZeneca argues that Act 358 substantially impairs its contractual relationship with the federal government under its pharmaceutical pricing agreement (PPA). Under the § 340B Program, manufacturers sign PPAs with HHS promising to provide **\*545** discounted drugs to covered entities as a condition of receiving Medicaid and Medicare Part B reimbursements. According to AstraZeneca, Act 358 interferes with that agreement by expanding the universe of covered entities and "imposing costly new obligations on it *only* as a result of entering into" the PPA.

We disagree. Act 358 does not alter the terms, rights, or obligations of AstraZeneca's PPA with the federal government. The statute regulates relationships between covered entities and their contract pharmacies—relationships to which AstraZeneca is not a party.[86] Where Act 358 addresses acquisition and delivery of discounted drugs to contract pharmacies, the PPAs are silent.

Nor does Act 358 "undeniably expand[ ]" AstraZeneca's obligations to "provide discounts for unlimited contract

pharmacy sales." The D.C. Circuit and Third Circuit decisions on which AstraZeneca relies held only that HHS lacks authority under § 340B to mandate delivery to unlimited contract pharmacies. They did not hold—nor suggest—that States lack authority to regulate delivery through their traditional police powers.[87]

AstraZeneca's reliance on *Allied Structural Steel Co. v. Spannaus* also fails. There, Minnesota imposed retroactive pension obligations that "substantially altered" contractual relationships by superimposing duties "conspicuously beyond those that it had voluntarily agreed to undertake."[88] The law imposed "a sudden, totally unanticipated, and substantial retroactive obligation," effectively rewriting the contract, and the Supreme Court held it unconstitutional.[89]

Act 358 does nothing of the sort. It does not rewrite PPAs or impose new contractual terms. AstraZeneca points to nothing in its PPA that addresses—much less limits—delivery to contract pharmacies.[90] And unlike Minnesota's statute in *Allied Structural Steel*, Louisiana's Act 358 implicates "traditional general areas of state regulation and police power,"[91] not "a field it had never before sought to regulate."[92]

The absence of delivery terms in the PPAs is dispositive. Because delivery logistics were never part of the federal pricing agreements, a covered entity's decision to use a contract pharmacy—and Act 358's requirement that manufacturers not interfere with that choice—does not alter the contractual bargain between AstraZeneca and the federal government.

 [22]  Reasonable expectations confirm the point. "Courts look to terms of the contract to determine the parties' reasonable expectations."[93] And where a "market [is] heavily regulated at the time the parties entered the contract," the parties are on notice that "the landscape [in which they do business] is subject to change."[94]

 *546  Consider *Energy Reserves Group, Incorporated v. Kansas Power and Light Company.*[95] There, the Supreme Court rejected a Contracts Clause challenge to a Kansas law imposing intrastate gas price controls—even though the contracts at issue contemplated only *federal* price regulation. The Court emphasized the natural gas industry's long history of pervasive regulation and held that the parties could not

reasonably expect regulatory stasis. Although "Kansas did not regulate natural gas prices specifically," state authority to do so "was well established," and "its supervision of the industry was extensive and intrusive."[96] In that setting, the Court explained, parties could not claim that supplemental state regulation violated their contractual rights.[97]

So too here. AstraZeneca entered into its PPA as part of a comprehensive federal program governing pharmaceutical pricing—within a heavily regulated industry in which state and federal oversight have long coexisted. "That history of regulation" puts manufacturers "on notice."[98] And while the PPAs do not expressly contemplate state regulation of delivery to contract pharmacies, that silence cuts against AstraZeneca, not in its favor. Because the agreements say nothing about delivery at all, AstraZeneca could not reasonably expect that delivery obligations would arise exclusively from federal law.

For all these reasons, Act 358 does not substantially impair AstraZeneca's contractual obligations under the PPA. The district court correctly concluded that Act 358 comports with the Contracts Clause.

VII

 [23]  Nor is Act 358 unconstitutionally vague, as PhRMA contends.

 [24]    [25]    [26]  "In our constitutional order, a vague law is no law at all."[99] The void-for-vagueness doctrine—a component of due process—"bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' "[100] But a law is unconstitutionally vague only when it fails to specify a standard of conduct "at all"—not when it merely "requires a person to conform his conduct to an imprecise but comprehensible normative standard."[101] In the civil context, the bar is especially high: "[T]he statute must be so vague and indefinite as really to be no rule at all."[102]

Act 358 does not come close to that line. The statute provides that "[a] manufacturer ... shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to,

a pharmacy that is under contract with a 340B entity."[103] It further bars manufacturers **\*547** from "interfer[ing] with a pharmacy contracted with a 340B entity."[104]

PhRMA's vagueness challenge focuses on a single word: "interfere." According to PhRMA, the term is so open-ended that it could "prohibit manufacturers from even asking for information" for audits, thus chilling lawful conduct.

[27] The text forecloses that reading. Under the familiar canon *noscitur a sociis*, a word is "known by its associates."[105] "This canon 'counsels that a word is given more precise content by the neighboring words with which it is associated.' "[106] Here, "interfere" appears alongside "deny, restrict, prohibit"[107]—terms that plainly mean "to refuse to grant, to withhold" (deny),[108] "to limit, to confine" (restrict),[109] and "to forbid by authority or command, to interdict" (prohibit).[110] Read in context, "interfere" targets conduct that obstructs or impedes the acquisition or delivery of 340B drugs to contract pharmacies—not routine communications or lawful auditing practices. While that standard may be "imprecise" at the margins, it is readily "comprehensible."[111] Act 358, therefore, is not unconstitutionally vague.

VIII

[28] Finally, we address LPCA's intervention, which we review *de novo*.[112]

[29]    [30]   In each of the three consolidated cases, LPCA moved to intervene—though we address it only in AbbVie's case because the other Plaintiffs do not challenge the intervention. We recognize our "broad policy favoring intervention"[113] and the principle that "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained."[114] Even so, although "Rule 24 is to liberally construed,"[115] the movant still "bears the burden of establishing its right to intervene."[116] LPCA has not met that burden here.

**\*548**  [31]   To intervene as of right under Rule 24(a)(2),[117] LPCA must satisfy four requirements:

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.[118]

[32]    [33]   Here, the fourth prong is dispositive. When a State is already a party, "the applicant for intervention must demonstrate that its interest is in fact different from that of the state and that the interest will not be represented by the state."[119] But an applicant need not show that representation by the State will certainly be inadequate; rather, an applicant satisfies this requirement when it shows that representation of its interests "may be" inadequate.[120] That requirement flows from the settled presumption that, "[i]n a suit involving a matter of sovereign interest, the State is presumed to represent the interests of all of its citizens."[121]

[34]   Only AbbVie opposes LPCA's intervention. It argues that "LPCA's interests are adequately represented by the Attorney General" of Louisiana and that, because LPCA lacks any right to enforce Act 358, it "has no interest" requiring protection. LPCA responds that it is intervening as a defendant, not suing, and that its interests diverge from the State's because Louisiana "has a broad interest in protecting laws that impact the public health of Louisianans," whereas LPCA seeks to protect the business interests of its members. LPCA does not explain why or how its divergent interests would affect the defense of this case.

We rejected similar reasoning in *Hopwood v. Texas.*[122] There, private organizations sought to intervene alongside Texas to defend the State's affirmative-action policy, asserting that their interests were more focused and that the State's broader obligations would dilute its defense. They contended that "the State must balance competing goals," whereas they were "sharply focused on preserving the admissions policy," and that the State therefore was "not in as good a position to bring in evidence" supporting the policy.[123] We disagreed, holding that the proposed intervenors failed to show either that they possessed an interest "that the State w[ould] not adequately represent" or that the State would not "strongly defend its affirmative action program."[124] Critically, they also failed to

demonstrate that they may offer any defense distinct from the one the State intended to present.[125]

**\*549**  The same is true here. LPCA has not shown that it would advance a defense of Act 358 different from Louisiana's. At most, it has shown that it would be an *additional* defender—not a *necessary* one. Under our precedent, that is insufficient where the State is already a party presumed to represent the relevant interests.

Because LPCA failed to satisfy Rule 24(a)(2)'s inadequate-representation requirement, its intervention was improper.

* * *

Accordingly, we AFFIRM summary judgment for Louisiana on all counts and REVERSE the district court's order permitting LPCA to intervene in *AbbVie*'s case.

**All Citations**

166 F.4th 528, 123 Fed.R.Serv.3d 1430

Footnotes

1    *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011) (citations omitted).

2    42 U.S.C. § 256b.

3    *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 639–40 (5th Cir. 2025) (per curiam) (citing 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5) (internal quotation marks omitted)).

4    *See* § 256b(a)(4) (defining covered entity).

5    *Fitch*, 152 F.4th at 640; §§ 256b(a)(5)(A)–(D).

6    *See Astra*, 563 U.S. at 117, 131 S.Ct. 1342 ("Congress vested authority to oversee compliance with the 340B Program in HHS.").

7    *Id.* at 113, 131 S.Ct. 1342.

8    *Id.* at 113, 131 S.Ct. 1342.

9    *Notice Regarding Section 602 of the Veterans Health Care Act of 1992-Contract Pharmacy Services*, 61 Fed. Reg. 43549, 43550 (Aug. 23, 1996).

      "340B drugs" refer to the discounted drugs purchased by covered entities pursuant to 42 U.S.C. § 256b.

10   *Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services*, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010).

11   *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023).

12   *Fitch*, 152 F.4th at 640–641.

13   *Id.* at 641 (quoting *Advisory Op. 20-06 on Contract Pharmacies Under the 340B Program*, 2020 WL 11422965, at *1 (Dec. 30, 2020) (footnote omitted)).

14   *See Sanofi*, 58 F.4th at 703–04; *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024).

15   *Fitch*, 152 F.4th at 641.

16   *See, e.g.*, Ark. Code Ann. § 23-92-604(c) (2021); Miss. Code Ann. § 41-149-1 *et seq* (2024).

17   La. Stat. Ann. § 40:2884 (2023).

18    *Id.* § 51:1401 *et seq.*

19    *Id.* § 40:2885.

20    We note that the Louisiana Primary Care Association (LPCA) moved to intervene in each case, and only AbbVie opposed. The district court granted LPCA's intervention in each case.

21    *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, Nos. 6:23-CV-1042, 6:23-CV-1307, 2024 WL 4361597, at *15 (W.D. La. Sept. 30, 2024).

22    *Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*, 98 F.4th 161, 165 (5th Cir. 2024) (quoting *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007)).

23    *Id.* (quoting Fed. R. Civ. P. 56(a)).

24    *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001) (citing *Tex. Refrigeration Supply, Inc. v. FDIC*, 953 F.2d 975, 980 (5th Cir. 1992)).

25    28 U.S.C. § 1331.

26    *Planned Parenthood of Hou. & Se. Tex. v. Sanchez*, 403 F.3d 324, 331 (5th Cir. 2005) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.")); *see also New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 330 (5th Cir. 2008) ("[T]he principle articulated in *Shaw*—that a plaintiff who seeks injunctive relief on preemption grounds necessarily presents a federal question—does not apply in a suit exclusively between private parties, in the absence of some showing of state action.").

27    635 F.3d 796, 803 (5th Cir. 2011) (cleaned up).

28    *See id.* at 802–04.

29    *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Reed v. Goertz*, 598 U.S. 230, 234, 143 S.Ct. 955, 215 L.Ed.2d 218 (2023) ("[T]he *Ex parte Young* doctrine allows suits ... for declaratory or injunctive relief against state officers in their official capacities.") (citing *Young*, 209 U.S. at 159–61, 28 S.Ct. 441)).

30    *See Elam*, 635 F.3d at 803 (citation omitted).

31    *See Planned Parenthood*, 403 F.3d at 331 (internal quotations omitted).

32    U.S. Const. art. VI, cl. 2.

33    *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *see Gibbons v. Ogden*, 22 U.S. 1, 82, 9 Wheat. 1, 6 L.Ed. 23 (1824).

34    *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015).

35    *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (cleaned up).

36    *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

37    *Fitch*, 152 F.4th at 646–47.

38    *Id.* at 645 (internal quotation omitted).

39    *Id.* at 645–48. The operative language of the Mississippi law is nearly identical to that of Act 358. *Compare* Miss. Code Ann. § 41-149-7 (2024), *with* La. Stat. ANN. § 40:2884 (2023).

40    Plaintiffs attempt to cabin *Fitch*'s holding by emphasizing its language that the holding was based on the "specific claims and sparse record" of a preliminary-injunction proceeding. *See id.* at 639. Of course, we recognize the summary-judgment posture here. Even so, we are not only persuaded, but *bound*, by this on-point decision.

41    *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

42    *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (cleaned up).

43    *De Canas v. Bica*, 424 U.S. 351, 357, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

44    *Fitch*, 152 F.4th at 646.

45    *Id.*

46    *Id.*

47    *Id.*

48    *See Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir. 2024), *cert. denied*, —— U.S. ——, 145 S. Ct. 768, 220 L.Ed.2d 272 (2024) (noting "Congressional silence on pharmacies in the context of 340B"); *Sanofi*, 58 F.4th at 703 (describing Section 340B as "silent about delivery" of drugs to patients and contract pharmacies); *Novartis*, 102 F.4th at 460 (describing Section 340B as "silent about delivery conditions").

49    *Fitch*, 152 F.4th at 646 (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks omitted)).

50    *Id.*

51    *Id.* at 647.

52    *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quotation omitted), *cert. denied*, —— U.S. ——, 144 S. Ct. 557, 217 L.Ed.2d 296 (2024).

53    *Fitch*, 152 F.4th at 647 (emphasis added).

54    *McClain*, 95 F.4th at 1144 (citing *Sanofi*, 58 F.4th at 700).

55    *Fitch*, 152 F.4th at 647.

56    *Id.*

57    In its briefing and during oral argument, AbbVie emphasized § 340B's federal Alternative Dispute Resolution process, maintaining that Act 358 forces "Louisiana courts to answer the same questions as federal ADR panels." But AbbVie's own arguments highlight the flaw in its reasoning. It argues that Act 358 covers enforcement "whenever a manufacturer 'denies, restricts, or prohibits ... acquisition of a 340B drug by, or delivery of a 340B drug' " to a contract pharmacy. *See* La. Stat. Ann. § 40.2884(A). We note that AbbVie omitted the statutory prohibition on "interfere[nce]." *See id.* § 40:2884(B). Other than that, we agree with AbbVie's characterization. What we find surprising is AbbVie's concern that Act 358's enforcement scheme somehow conflicts with "the federal scheme [that] covers claims 'by a covered entity ... that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price.' " *See* 42 C.F.R. § 10.21(a)(1). Act 358 provides the mechanism by which Louisiana can enforce the *delivery* of the 340B drugs to the contract pharmacies. By contrast, the federal scheme allows HHS to enforce covered entities' *ability to purchase* 340B drugs. These are distinct matters.

58    *See Fitch*, 152 F.4th at 647–48 (finding no conflict with the Mississippi law's enforcement scheme because it "does not concern the same subject matter as Section 340B") (cleaned up).

59    *See McClain*, 95 F.4th at 1142–45 (rejecting preemption arguments because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies" and "does not set or enforce discount pricing").

60    La. Rev. Stat. § 40:2884(A).

61    *See Murrill*, 2024 WL 4361597, at *8 (finding Act 358 "does not address the pharmaceutical companies' agreements with HHS or the pricing, diversion, or 'double dipping' restrictions addressed in the HHS[ ] enforcement scheme").

62    *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 606–07, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (plurality op.).

63    *Id.*

64    *Astra*, 563 U.S. at 115, 131 S.Ct. 1342.

65    *See* U.S. Const. amend. V.

66    *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021).

67    *Id.* (collecting cases).

68    *Id.* at 148, 141 S.Ct. 2063.

69    *Id.* (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

70    *Id.* (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

71    *Fitch*, 152 F.4th at 643.

72    *Id.* (emphasis added). We appreciate AbbVie's point that "[t]he 340B offer is *always* held open to *all* covered entities," so in practice, "there is no period" before the "offer" to a covered entity. But that does not lead to AbbVie's conclusion that Act 358 somehow forces a series of sales at the outset. It simply means Act 358 prevents drug makers from interfering *post*-sale.

73    *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646.

74    *Fitch*, 152 F.4th at 644.

75    *Id.* (describing "the potential for dispensation of Section 340B drugs by contract pharmacies" as "foreseeable").

76    And following *Fitch*, because we reject both the physical and regulatory takings theories, "we need not consider the parties' additional arguments" regarding the voluntary participation doctrine, whether the alleged taking was for a "public use," or whether injunctive relief is available for a regulation that advances a public use. *Id.* at 644 n.4.

77    U.S. Const. art. I, § 10, cl. 1.

78    *Sveen v. Melin*, 584 U.S. 811, 818, 138 S.Ct. 1815, 201 L.Ed.2d 180 (2018) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)).

79    *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 328 (5th Cir. 2022) (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)).

80    *Id.*

81    *Sveen*, 584 U.S. at 819, 138 S.Ct. 1815.

82    *See id.* (quoting *Allied Structural Steel*, 438 U.S. at 244, 98 S.Ct. 2716).

83    *Id.*

84    *See id.* (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411–12, 103 S.Ct. 697).

85    *See id.*

86    *See* La. Stat. Ann. § 40:2884 (2023).

87    *See Novartis*, 102 F.4th at 460, 464; *Sanofi*, 58 F.4th at 703.

88    438 U.S. at 240, 98 S.Ct. 2716.

89    *Id.* at 249, 98 S.Ct. 2716.

90    And, as the courts in *Novartis* and *Sanofi* concluded, the PPAs *couldn't* contain terms about contract pharmacies—because HHS lacked authority to regulate those entities. *See Novartis*, 102 F.4th at 460, 464; *Sanofi*, 58 F.4th at 703.

91    *Fitch*, 152 F.4th at 646.

92    *See Allied Structural Steel*, 438 U.S. at 249, 98 S.Ct. 2716.

93    *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) (citation omitted).

94    *See id.* at 630–31 (citation omitted).

95    459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

96    *Id.* at 413–14, 103 S.Ct. 697.

97    *Id.* at 416, 103 S.Ct. 697.

98    *See NextEra Energy*, 48 F.4th at 328.

99    *United States v. Davis*, 588 U.S. 445, 447, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019).

100   *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

101   *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

102   *Tex. v. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quoting *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000)).

103   La. Stat. Ann. § 40:2884(A) (2023).

104   *Id.* § 40:2884(B).

105   Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012); *see also Yates v. United States*, 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015).

106   *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 243 (5th Cir. 2022) (quoting *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)).

107   *See* § 40:2884(A).

108   *Deny*, Webster's New Int'l Dictionary (2d ed. 1939).

123 Fed.R.Serv.3d 1430

109    *Restrict*, Webster's New Int'l Dictionary (2d ed. 1939).

110    *Prohibit*, Webster's New Int'l Dictionary (2d ed. 1939).

111    *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686. We note that the use of "interfer[e]" in § 40:2884(B) likewise clears the void-for-vagueness bar—even though that provision does not mention the neighboring words of "deny, restrict, prohibit." *See* § 40:2884(B). Our precedent requires a statute to provide "a fair and reasonable warning," not "the utmost precision." *Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d 471, 477 (5th Cir. 2020). Section 40:2884(B)'s prohibition on "interfer[ing] with a pharmacy contracted with a 340B entity" does just that.

112    *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994).

113    *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016).

114    *Sierra Club*, 18 F.3d at 1205 (internal quotation marks and citation omitted).

115    *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (citation omitted).

116    *Id.*

117    Fed. R. Civ. P. 24(a)(2).

118    *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (internal quotation marks and citation omitted).

119    *Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994) (citations omitted).

120    *Texas*, 805 F.3d at 661 (citation omitted).

121    *Hopwood*, 21 F.3d at 605.

122    21 F.3d 603, 605 (5th Cir. 1994) (internal citation omitted). LPCA is correct that we have held that "associations representing licensed business owners have a right to intervene in lawsuits challenging the regulatory scheme that governs the profession." *Wal-Mart Stores*, 834 F.3d at 567.

123    *Hopwood*, 21 F.3d at 605.

124    *Id.* at 606 (cleaned up).

125    *Id.* (citation omitted).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA** | § § § § § | **PLAINTIFF** |
| **v.** | § § § | **Civil No. 1:24-cv-160-HSO-BWR** |
| **LYNN FITCH** *in her official capacity as Attorney General of the State of Mississippi* | § § § § | **DEFENDANT** |

## <u>MEMORANDUM OPINION AND ORDER DENYING MOTION [7] FOR PRELIMINARY INJUNCTION</u>

This matter comes before the Court on Plaintiff Pharmaceutical Research and Manufacturers of America's ("PhRMA" or "Plaintiff") Motion [7] for Preliminary Injunction. Having considered the allegations set forth in Plaintiff's Complaint [1], the parties' Memoranda [8], [15], and relevant legal authority, and having heard argument at a hearing held on June 27, 2024, the Court will deny the Motion [7].

## I. <u>INTRODUCTION</u>

Plaintiff's Motion [7] asks the Court to enjoin the enforcement of Mississippi's recently enacted "Defending Affordable Prescription Drug Costs Act," 2024 Miss. H.B. 728 ("H.B. 728"), which is set to take effect on July 1, 2024. House Bill 728 concerns a federal program referred to as Section 340B. *See* 42 U.S.C. § 256b. Under Section 340B, pharmaceutical manufacturers who participate in Medicaid and Medicare Part B must offer certain drugs at discounted prices to certain healthcare providers, called "covered entities," that generally provide care for the

1

poor. *See infra*, Part I.A. In essence, H.B. 728 requires manufacturers to deliver drugs ordered through the 340B program to for-profit pharmacies called "contract pharmacies" with which covered entities have arrangements under which the pharmacy will dispense discounted drugs to the covered entity's patients.

Plaintiff claims that H.B. 728, in requiring its members to deliver discounted drugs to an unlimited number of contract pharmacies, invalidly expands their obligation to provide discounted drugs to covered entities. *See* Memo [8] at 14–29. It asserts that H.B. 728 is preempted by § 256b. *See id.* Plaintiff also claims that H.B. 728 unconstitutionally regulates out-of-state conduct, and that it is unconstitutionally vague. *See id.* at 30–33. Plaintiff therefore seeks a preliminary injunction to stay the enforcement of H.B. 728. Because it is unable to satisfy the necessary elements for such relief, Plaintiff's Motion [7] will be denied.

A.      The Section 340B program

Section 340B requires pharmaceutical manufacturers that want the federal government to cover their drugs under Medicaid and Medicare Part B to provide discounts on their drugs to certain healthcare providers. 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5); *see Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). Those healthcare providers are "called '340B' or 'covered' entities," and "include public hospitals and community health centers, many of" which are "providers of safety-net services to the poor." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011). The 340B Program "is

2

superintended by the Health Resources and Services Administration," ("HRSA"), "a unit of the Department of Health and Human Services," ("HHS").  *Id.*

"Drug manufacturers," including Plaintiff's members, "opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement" ("PPA") "used nationwide."  *Id.*  These agreements "are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS."  *Id.*  PPAs must "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  § 256b(a)(1).

Through Section 340B, Congress leverages the federal government's market power in healthcare—Medicare and Medicaid cover "almost half the annual nationwide spending on prescription drugs," *Sanofi Aventis*, 58 F.4th at 699 (citing Cong. Budget Off., *Prescription Drugs: Spending, Use, and Prices* 8 (2022))—to aid covered entities in their mission to care for low-income Americans, *see id.*  The statute enables covered entities "to give uninsured patients drugs at little or no cost."  *Id.*  Covered entities also obtain "extra revenue from serving insured patients" because "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."  *Id.* (citing Gov't Accountability Off., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011)).

3

80

Section 340B contains two provisions that prohibit covered entities from abusing their ability to obtain discounted drugs. Covered entities cannot "resell or otherwise transfer" discounted drugs "to a person who is not a patient of the entity." § 256b(a)(5)(B). Covered entities also cannot obtain "duplicate discounts or rebates," meaning they cannot obtain Medicaid rebates under title XIX of the Social Security Act, *see* 42 U.S.C. § 1396 *et seq.*, for drugs that they purchase at a discount under Section 340B, *see* § 256b(a)(5)(A)(i).

To ensure covered entities do not resell discounted drugs or obtain duplicate discounts, the statute contains an auditing provision. It states:

> A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

§ 256b(a)(5)(C). And "[i]f the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing," that the covered entity illegally resold discounted drugs or obtained duplicate discounts, "the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . provided under the agreement between the entity and the manufacturer." § 256b(a)(5)(D).

The Secretary can impose additional sanctions. Covered entities that the Secretary finds knowingly and intentionally resold discounted drugs must "pay a monetary penalty to a manufacturer or manufacturers in the form of interest on

4

81

sums for which the covered entity is found liable under [§ 256(a)(5)(D)].”

§ 256b(d)(2)(B)(v)(I).  Where the Secretary finds the covered entity's reselling "was

systematic and egregious as well as knowing and intentional," the Secretary can

remove the covered entity from the program entirely.  § 256b(d)(2)(B)(v)(II).

B.      <u>The dispensation of 340B drugs at contract pharmacies and related litigation</u>

The issue in this case concerns a matter notably absent from the foregoing

discussion: how discounted drugs under Section 340B are to be delivered to patients

of covered entities.  Between 1996 and March 2010, HRSA's 1996 Guidance

"acknowledged that section 340B 'is silent as to permissible drug distribution

systems,' but it nonetheless sought to fill 'gaps in the legislation' and thereby 'move

the program forward.'"  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456–57

(D.C. Cir. 2024) (quoting Notice Regarding Section 602 of the Veterans Health Care

Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549–50 (Aug. 23,

1996) ("1996 Guidance")).  Given that "many covered entities use outside

pharmacies to distribute drugs to their patients," HRSA's 1996 Guidance "stated

that a covered entity without an in-house pharmacy may contract with a single

outside pharmacy to dispense drugs at a single location."  *Id.* at 457 (citing 1996

Guidance at 43,555).  The 1996 Guidance also required that, "in directing shipments

to its contract pharmacy," the covered entity "must retain title to the drugs and

thus 'be responsible' for any diversion or duplicate discounts."  *Id.* (citing 1996

Guidance at 43,553).

In 2010, HRSA shifted course.  HRSA's 2010 Guidance took the position that "covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies."  *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")).  In its view, this Guidance "would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients."  2010 Guidance at 10,273.  HRSA did not change its view that covered entities "must maintain title to and responsibility for the drugs."  *Novartis*, 102 F.4th at 457 (citing 2010 Guidance at 10,277).  HRSA considered comments following the release of proposed guidelines in 2007, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 72 Fed. Reg. 1,540 (Jan. 12, 2007), asserting that allowing covered entities to dispense Section 340B drugs through multiple contract pharmacies would enable diversion and duplicate discounts, *see* 2010 Guidance at 10,272–75.  But it ultimately decided that covered entities could use multiple contract pharmacies if "they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition," including that "[a]uditable records must be maintained to demonstrate compliance with those requirements."  *Id.* at 10,273.

In 2020, many pharmaceutical manufacturers sought to prevent covered entities from using multiple contract pharmacies to dispense Section 340B drugs by

6

83

Exhibit 3

implementing policies "limit[ing] the number and kinds of contract pharmacies to which they would ship orders." *Novartis*, 102 F.4th at 458. As Plaintiff argues in its Memorandum [8], pharmaceutical manufacturers were and remain concerned about the model covered entities and contract pharmacies often use in dispensing and accounting for Section 340B drugs. *See* Memo [8] at 8–10. Plaintiff refers to that model as the "replenishment model." *Id.* Put simply, under this model, a contract pharmacy first dispenses prescription drugs to all its customers from one supply of drugs, which it purchased at full price from the manufacturer. *Id.* After dispensing the drugs, the pharmacy—or a third-party administrator—determines which customers were covered-entity patients. *Id.* The pharmacy then informs the covered entity of the quantity of drugs it dispensed to the entity's patients. *Id.* The covered entity then places an order of Section 340B drugs in that quantity as a "replenishment" of the drugs dispensed to covered-entity patients.[1] *See id.*

As the D.C. Circuit recognized, "[m]anufacturers," such as Plaintiff's members, "have argued that these arrangements lead to unlawful diversion and duplicate discounts." *Novartis*, 102 F.4th at 458. Under the replenishment model, "[t]he covered entity [and] the pharmacy . . . often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. So, covered entities and contract pharmacies both have "a financial incentive

---

[1] *Novartis* stated that "the pharmacy places an order to replenish its section 340B purchases," as opposed to the covered entity. 102 F.4th 457. An Office of Inspector General report that it cited states that, given the quantity of drugs dispensed to covered-entity patients at the pharmacy, "the covered entity purchases that quantity of the drug at the discounted 340B price and has it delivered to the contract pharmacy." S. Wright, Off. of the Inspector Gen., OEI-05-13-00431, Memorandum Report: Contract Pharmacy Arrangements in the 340B Program 5 (2014).

7

Case 6:25-cv-01332-HSO-BWR  Document 21  Filed 06/09/26  Page 88 of 576
Case 1:24-cv-01332-HSO-BDW  Document 112  Filed 07/01/24  Page 8 of 46

Exhibit 3

to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457–58.

In 2020, HHS, concerned about manufacturers' policies limiting covered-entity patients' access to medications, issued an advisory opinion stating that pharmaceutical manufacturers are *required* to ship Section 340B drugs to an unlimited number of contract pharmacies. *See Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., *Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program* (Dec. 30, 2020), https://perma.cc/L7W2-H597 ("2020 Advisory Opinion")). "HHS reasoned that 340B drugs are 'purchased by' a covered entity no matter how they are distributed," and so, "the 'situs of delivery . . . is irrelevant.'" *Id.* at 701 (citing 2020 Advisory Opinion at 1–3). Both the Third Circuit and the D.C. Circuit concluded, however, that Section 340B is silent about delivery, and that the federal statute's requirement that manufacturers offer discounts to covered entities did not implicitly permit HHS to mandate that they comply with any delivery practice the covered entities desire. *See id.* at 703–06; *Novartis*, 102 F.4th at 460–63.

In response, states have begun to impose explicitly what HHS had purported to impose by guidance. For example, in 2021, Arkansas enacted Act 1103, which "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs," and "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug

8

85

pricing to covered entities who use contract pharmacies for distribution." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024) (citing Ark. Code Ann. § 23-92-604(c)). The Pharmaceutical Research and Manufacturers of America, an association of pharmaceutical manufacturers— Plaintiff here as well—sought an injunction against enforcement of the Arkansas law on a theory that Section 340B preempts it. *Id.* at 1139–40. The Eighth Circuit, however, disagreed. *Id.* As to field preemption, the Eighth Circuit concluded that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it," given that the statute is "'is silent about delivery' of drugs to patients." *Id.* at 1143 (quoting *Sanofi Aventis U.S. LLC*, 58 F.4th at 703) (other quotation marks and citation omitted). Concerning conflict preemption, because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies," and "does not set or enforce discount pricing," the Eighth Circuit found that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to the statute's purpose. *Id.* at 1145. In fact, the Eighth Circuit observed that the Arkansas law "assists in fulfilling the purpose of 340B," in that it facilitates the distribution and dispensation of discounted 340B drugs. *Id.*

On April 12, 2024, the Governor of Mississippi signed H.B. 728, which had been enacted by the state legislature. Ex. [14-1] (H.B. 728). House Bill 728 provides that "[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug

9

by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity." H.B. 728 § 4. The law defines a "340B drug" as a covered outpatient drug "that has been subject to any offer for reduced prices by a manufacturer pursuant to [Section 340B]." H.B. 728 § 2(a). A violation of H.B. 728 constitutes a violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1 *et seq*, *see* H.B. 728 § 5, which provides for both civil and criminal penalties and is enforced by Mississippi's Attorney General, *see* Miss Code Ann. §§ 75-24-9 (covering injunctive relief), 75-24-19 (covering civil penalties for violations of injunctions issued under § 75-24-9, and for knowing and willful violations of the statute), 75-24-20 (covering criminal penalties for knowing and willful violations). House Bill 728 does not, however, create any private right of action. H.B. 728 § 5.

C.      Procedural history

On May 30, 2024, Plaintiff filed a Complaint [1] in this Court seeking a declaratory judgment under 28 U.S.C. § 2201 that H.B. 728 is preempted by federal law; that H.B. 728 violates the dormant Commerce Clause and the Due Process Clause by regulating out-of-state commerce; and that H.B. 728 is unconstitutionally vague. *See* Compl. [1] at 47. It likewise sought temporary, preliminary, and permanent injunctive relief against the Attorney General of Mississippi, enjoining her from enforcing H.B. 728 against Plaintiff's members. *Id.* at 47. Plaintiff filed a Motion [7] for Preliminary Injunction on June 17, 2024, and argues that H.B. 728 is

unconstitutional under the theories alleged in the Complaint [1]. *See generally* Memo [8]. Defendant, Attorney General Lynn Fitch ("Defendant"), responded on June 24, 2024, Resp. [14], and The American Hospital Association, 340B Health, the Mississippi Hospital Association, and the Rural Hospital Alliance filed an Amicus Brief [17] on June 25, 2024, in support of Defendant. The Court held a hearing on the Motion [7] on June 27, 2024.

## II. DISCUSSION

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest." *Clark v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023); *see* Fed. R. Civ. P. 65. Factors three and four, "[t]he balance-of-harms and public-interest factors[,] merge when the government opposes an injunction." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

Plaintiff cannot satisfy the first requirement because it has not demonstrated a "substantial likelihood of success on the merits." *Clark*, 74 F.4th at 640. The Court will therefore deny the Motion [7] and need not reach the other elements.

A.      Plaintiff's Standing

Defendant takes the position that Plaintiff lacks standing to maintain this suit. *See* Memo [15] at 8–10. According to the Complaint [1], PhRMA is "a trade association representing the nation's leading innovative biopharmaceutical research companies." Compl. [1] at 9. Plaintiff claims its members "manufacture and sell pharmaceutical products, participate in the federal 340B program and will thus be forced to supply their drugs at a steeply reduced price to Mississippi pharmacies under HB 728 or otherwise face significant criminal or civil penalties." *Id.* at 10. And it alleges that "[n]either the claims asserted nor the relief sought in the Complaint requires the participation of any individual member of PhRMA." *Id.*

Plaintiff has associational standing to bring this case. Associational standing derives from an association's members, and an association

> has standing to bring claims on behalf of its members when (1) individual members would have standing, (2) the association seeks to vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation.

*Students for Fair Admissions, Inc. v. University of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (footnote omitted). In turn, individuals have standing to sue if they "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Association of American Physicians & Surgeons Educational Foundation v. American Board of Internal Medicine*, 103 F.4th 383, 390 (5th Cir. 2024) (internal quotation marks and citation omitted).

12

89

Case 3:24-cv-00336-HSO-BWR   Document 21   Filed 06/09/26   Page 93 of 576
Case 6:25-cv-00163-JDK   Document 112-2   Filed 06/09/25   Page 31 of 740

Exhibit 3

The first two factors of the associational standing test "address constitutional requirements, while the third prong is solely prudential." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). "[N]either unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites" to associational standing. *Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981).

Here, the Court concludes that PhRMA's members have standing such that the first two factors, which "address constitutional requirements," *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550, are met. Pharmaceutical manufacturers who claim federal law preempts Mississippi from, in effect, requiring them to ship 340B drugs to contract pharmacies face an "imminent threat of harm" in the form of prosecution. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). This threat is not eliminated even "by simply not doing what [they] claim[] the right to do"; meaning manufacturers who accept being coerced into compliance with H.B. 728 still have a justiciable controversy with the State of Mississippi. *See id.* ("The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152 (1967)). Vindicating its members' interests in curbing alleged abuses of the Section 340B program, *see* Memo [8] at 8–

13

90

Case 1:25-cv-00133-HSO-BWR   Document 21   Filed 06/09/25   Page 94 of 576
Case 1:24-cv-00113-HSO-BWR   Document 112   Filed 06/09/24   Page 14 of 57

Exhibit 3

11, is also germane to Plaintiff's alleged purposes in promoting the development of new pharmaceutical products, *see* Compl. [1] at 9–10.

Turning to the third prong, the Court's analysis focuses on "matters of administrative convenience and efficiency." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). "Courts assess [the third] prong by examining both the relief requested and the claims asserted," *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 551, and "requests for declaratory or injunctive relief rarely require individual determinations," *Tex. Ass'n for Rights of Unemployed v. Serna*, 663 F. Supp. 3d 703, 711 (W.D. Tex. 2023) (internal quotation marks and citation omitted). On the other hand, "an association's action for damages running solely to its members would be barred for want of the association's standing to sue." *Brown Grp.*, 517 U.S. at 546. Insofar as evidence is needed, the Court should consider whether PhRMA's "claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry." *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 552.

Defendant argues that Plaintiff lacks standing because one of its members, Novartis Pharmaceuticals Corporation ("Novartis"), has brought its own lawsuit. *See* Complaint, *Novartis Pharmaceuticals Corporation v. Fitch*, No. 1:24-cv-164 (S.D. Miss. June 3, 2024), ECF No. 1.[2] Defendant reasons that if Novartis saw fit to

---

[2] On June 27, 2024, the Court held a consolidated hearing on the present Motion [7] and Novartis's Motion for Preliminary Injunction, *Novartis Pharmaceuticals Corporation v. Fitch*, No. 1:24-cv-164 (S.D. Miss. June 4, 2024), ECF No. 4.

bring its own suit, then this case must require participation of individual members. The Court does not agree.

Both PhRMA and Novartis raise similar legal questions about H.B. 728 and the Section 340B program in which Novartis and PhRMA's other members participate.  And both seek the same declaratory and injunctive relief.  *Compare* Compl. [1] at 47, *with* Complaint, *Novartis Pharmaceuticals Corporation v. Fitch,* No. 1:24-cv-164 (S.D. Miss. June 3, 2024), ECF No. 1.  Individual participation from PhRMA's members is not required in order for the Court to determine the constitutional validity of H.B. 728, or whether it should enjoin the Mississippi Attorney General from enforcing it.  Nor is the Court persuaded that Novartis's actions in another case can pull the rug out from under PhRMA's standing.  *See Daunt v. Benson,* 956 F.3d 396, 418 (6th Cir. 2020) (concluding an association had standing to sue when its individual members had filed their own claims).  The Court therefore finds that PhRMA has associational standing to maintain this suit, and it will proceed to address the merits of Plaintiff's Motion [7].

B.      Preemption generally

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  Art. VI, cl. 2.  "Under this principle, Congress has the power to preempt state law."  *Arizona v. United States,* 567 U.S. 387, 399 (2012).

15

**Exhibit 3**

When a party raises preemption, "'[t]he purpose of Congress is the ultimate touchstone' of [the] analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)) (other citations and quotations omitted).  Preemption may be "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation marks and citation omitted).  But the Court cannot "assume[] lightly that Congress has derogated state regulation, but instead [should] address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  And "[d]eference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks and citations omitted).

Three categories of preemption exist: "when (1) a federal statute expressly preempts state law," ("express preemption"); "(2) federal legislation pervasively occupies a regulatory field," ("field preemption"); "or (3) a federal statute conflicts with state law," ("conflict preemption").  *Deanda v. Becerra*, 96 F.4th 750, 760–61 (5th Cir. 2024) (citing *Arizona*, 567 U.S. at 398–400).  Plaintiff does not contend that Section 340B expressly preempts H.B. 728.  *See generally* Memo [8].  Rather,

16

**Exhibit 3**

Plaintiff contends that the 340B Program implicitly preempts H.B. 728 under conflict preemption and field preemption. *Id.* at 15–30.

C.      Section 340B does not preempt H.B. 728 under conflict preemption

Conflict preemption arises "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100, 101 (1989)) (other internal quotation marks omitted). "In either situation, federal law must prevail." *Id.*

Plaintiff does not contend that compliance with both Mississippi and federal law is impossible. *See generally* Memo [8]. So, Plaintiff must show that Mississippi law "produce[s] a result inconsistent with the objective of the federal statute," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), such that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). Plaintiff must meet "a high threshold" to succeed on such a theory. *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)), *cert. denied*, 144 S. Ct. 557 (2024). "Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is

17

94

Congress rather than the courts that pre-empts state law.'" *Id.* (quoting *Whiting*,

563 U.S. at 607) (alteration in original).[3]

In a case like this one, "[p]reemption analysis begins 'with the assumption

that the historic police powers of the States [are] not to be superseded by the

Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda*,

96 F.4th at 761 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).  That is

because a state law regulating health and safety falls within a state's traditional

police powers.  *See Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S.

707, 710, 716 (1985) (holding that a local regulation of blood donation centers,

including "donor testing and recordkeeping requirements beyond those contained in

the federal regulations," was not preempted because the challenger did not "present

a showing of implicit pre-emption of the whole field, or of a conflict between a

particular local provision and the federal scheme, that [was] strong enough to

overcome the presumption that state and local regulation of health and safety

matters can constitutionally coexist with federal regulation"); *Elam v. Kansas City*

*S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) (discussing how the Court should

"begin with the assumption that Congress did not intend to supersede the historic

police powers of the states to protect the health and safety of their citizens"

(internal quotation marks and citation omitted)).

---

[3] In *Whiting*, the implied preemption analysis received only four votes, while Justice Thomas joined the rest of the opinion and concurred in the judgment, 563 U.S. at 586, likely because he had "become increasingly skeptical of [the Supreme] Court's 'purposes and objectives' pre-emption jurisprudence," *Wyeth v. Levine*, 555 U.S. 555, 583 (2009) (Thomas, J., concurring); *see Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 675 F.3d 802, 829 n.5 (5th Cir. 2012) (Elrod, J., concurring in part and dissenting in part) (discussing Justice Thomas's fifth vote in *Whiting*), *on reh'g en banc*, 726 F.3d 524 (5th Cir. 2013).

18

House Bill 728 plainly falls under the umbrella of a health and safety regulation. It prohibits manufacturers from refusing to deliver Section 340B drugs to contract pharmacies, presumably to maximize covered-entity patients' access to drugs for which the manufacturers have already agreed to provide a discount. The state statute therefore triggers the presumption against preemption. *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (plurality opinion of Stevens, J.) (applying "[t]he presumption against federal pre-emption of a state statute designed to foster public health" (citing *Hillsborough Cnty.*, 471 U.S. at 715–18), and rejecting a preemption claim challenging a Maine policy that subjected drug manufacturers' pharmaceuticals to prior authorization procedures before providing state Medicaid coverage for them unless the manufacturers agreed to provide rebates to Maine residents beyond rebates the Medicaid Act provides for); *Wyeth v. Levine*, 555 U.S. 555, 578 (2009) ("[T]he FDA traditionally regarded state law as a complementary form of drug regulation."); *McClain*, 95 F.4th at 1144 (holding that Section 340B does not preempt state law prohibiting manufacturers from precluding covered entities from making dispensation contracts with pharmacies in part because "[p]harmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted").

True, in *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012), the Fifth Circuit expressed uncertainty about the strength and scope of

19

96

**Exhibit 3**

the presumption against preemption. 672 F.3d at 378–79. But *Lofton* merely observes that "whatever value or relevance a presumption against preemption of state tort law should play is uncertain" given its observation that the Supreme Court's "majority opinion in [*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)] made no reference to the 'presumption' in the course of upholding implied conflict preemption over state law claims for failure to maintain adequate warning labels for FDA-approved generic drugs." 672 F.3d at 378. *Lofton*'s statements about the scope of the presumption against preemption do not mean that the presumption against preemption no longer applies.

Further, *Lofton*'s statement that "the primacy of the state's police powers is not universal" is inapplicable here. *Id.* *Lofton* discussed state-law tort claims based on fraud on the FDA. *See id.* at 378–79. In that context, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 378 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). House Bill 728 does not purport to prohibit fraud on a federal agency.

Nor does *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232 (5th Cir. 2012), relied upon by PhRMA, indicate that the presumption against preemption should not apply here. *Teltech*, in addressing a Mississippi statute that prohibited the use of a fake caller ID to deceive the recipient of a phone call, explained that "[a]lthough interstate telecommunications has been an area of significant federal presence, [the

20

97

Mississippi law] is grounded instead in consumer protection, an area traditionally reserved to the States. Therefore, here the presumption remains in favor of no preemption." 702 F.3d at 236 (internal quotation marks and citations omitted). Though *Teltech* concluded the Mississippi statute was preempted, it applied the presumption against preemption based on the state's police power to protect consumers, notwithstanding that federal law had traditionally regulated interstate telecommunications. *See id.* Here, the Court finds that H.B 728 aims to promote the health and welfare of its citizens and triggers the presumption against preemption, even if it applies to "an area of significant federal presence." *Id.* (internal quotation marks and citations omitted).

Applying the presumption against preemption, the Court does not find that Section 340B exhibits a clear purpose to preempt state laws that would require manufacturers to deliver covered entities' drugs to contract pharmacies for distribution. Section 340B does not explicitly mandate how delivery of discounted drugs is to occur. *See McClain*, 95 F.4th at 1142 ("[T]he 340B Program 'is silent about delivery' and distribution of pharmaceuticals to patients." (quoting *Sanofi Aventis*, 58 F.4th at 703)).[4] Section 340B merely requires participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price." § 256b(a)(1).

---

[4] Section 340B discusses distribution, directing the Secretary to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution." § 256b(a)(8) (emphasis added). Section 256b(a)(8) do not mandate how delivery is to occur.

21

*Sanofi Aventis* and *Novartis* concluded that, under the terms of Section 340B, HHS may not *require* manufacturers to ship drugs intended for covered-entity patients to any contract pharmacy the entity deals with. *Sanofi Aventis*, 58 F.4th at 703 (concluding that "Section 340B does not require delivery to an unlimited number of contract pharmacies"); *Novartis*, 102 F.4th at 460–63. But the same "statutory silence[]," *Sanofi Aventis*, 58 F.4th 699, that does not *implicitly mandate* that manufacturers deliver to any contract pharmacy does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients, *see McClain*, 95 F.4th at 1145 (concluding that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to Section 340B's objectives). If anything, H.B. 728 arguably promotes Section 340B's objective of ensuring covered-entity patients can conveniently access their medications. *See id.* at 1144–45 (explaining how Arkansas's prohibition on manufacturers preventing covered entities from contracting with pharmacies for drug distribution "does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: [the law] assists in fulfilling the purpose of 340B").

The upshot of Plaintiff's argument is that Congress deliberately left to pharmaceutical manufacturers the discretion to refuse to ship 340B discounted drugs to contract pharmacies simply because it was silent in the statute about delivery. *See* Memo [8] at 24 (citing *Novartis*, 102 F.4th at 460). Plaintiff is correct

22

that federal law can preempt state law when Congress, or a federal agency implementing federal law, makes a policy choice that balances competing objectives in such a way that a state regulation aimed at the same subject matter upsets the balance that the federal government struck. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 864–81 (2000). But that is not this case.

In *Geier*, for example, the Court held that a Department of Transportation regulation, FMVSS 208, requiring automobile manufacturers to equip some, but not all, of their 1987 vehicles with passive restraints—such as airbags—preempted state tort law requiring airbags beyond what that regulation required. *Id.* at 864–65. But there, the Supreme Court found that "clear evidence of a conflict" existed between state tort law and the regulation. *Id.* at 885. The Court reached this conclusion based on the agency's "contemporaneous explanation" of several "significant considerations" it had in mind in designing the regulation. *See id.* at 877–81. The regulation "deliberately provided [car manufacturers] with a range of choices among different passive restraint devices," so as to "lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance." *Id.* at 875.

Here, Plaintiff does not persuasively show, at least at this stage of the proceedings, how H.B. 728 creates a substantial obstacle to Section 340B's purposes, or what consideration Congress had in mind in not addressing delivery of 340B drugs. In other words, there is no clear evidence of an "actual," "significant" conflict. *Id.* at 884–85 (internal quotation marks and citation omitted). House Bill

23

100

728 does not require pharmaceutical manufacturers to offer 340B drugs below applicable ceiling prices, expand the definition of what a 340B healthcare provider is, or expand the remedies available to a covered entity when a manufacturer overcharges it for 340B drugs.  House Bill 728 prohibits manufacturers from interfering with covered entities ordering delivery of Section 340B drugs to pharmacies for distribution—something Section 340B may not require, but does not implicitly preclude either.

To the extent that delivering discounted drugs to contract pharmacies raises the risk of diversion, Section 340B prohibits diversion and provides for comprehensive enforcement mechanisms.  *See supra*, Part I.A.  If Section 340B healthcare providers are conspiring with pharmacies to divert discounted drugs, HHS can require the provider to compensate the manufacturer for its losses, § 256b(a)(5), and remove the provider from the program, § 256b(d)(2)(B)(v)(II).  The Court is not prepared to find Section 340B likely preempts H.B. 728 on a theory that Congress's remedial scheme under Section 340B is inadequate to deter violations of federal law.  As written, H.B. 728 and Section 340B do not conflict.

Congress also increased enforcement mechanisms against diversion in the Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 7102, 124 Stat. 119 (enacted March 23, 2010), by adding § 256b(d), *id.* at 823–26, 18 days after the 2010 HRSA Guidance that advised that covered entities can use an unlimited number of contract pharmacies, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010).  Thus,

24

Congress was presumably aware of the potential for diversion through the use of an unlimited number of contract pharmacies, and it increased enforcement against diversion, yet remained silent about delivery—not to mention about preemption. And while "failures to enact legislation 'are not reliable indicators of congressional intent,'" *Novartis*, 102 F.4th at 462 (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989)), Plaintiff's argument relies on an inference of preemptive intent from Congress's silence as to delivery, so the Court considers legislative context relevant in interpreting that silence, *see Arizona*, 567 U.S. at 405–406 (discussing policy proposals Congress did not enact in analyzing preemption).[5]

Plaintiff also argues that "H.B. 728's limitations on data access and the collection of claims data . . . will prevent manufacturers from utilizing the federal ADR process and determining if duplicate discounting is occurring." Memo [8] at 26. The Court is not persuaded that H.B. 728 actually limits data access for manufacturers.

Plaintiff asserts that "H.B. 728 broadly prohibits manufacturers from 'interfer[ing]' with 'the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity'" or from "'interfer[ing] with a pharmacy contracted with a 340B entity.'" *Id.* (quoting H.B. 728, § 4). While the term "interfere" is fairly broad, the Court is not persuaded that it prohibits any data

---

[5] Ordinarily, it is the party claiming preemption that will "rely on legislative history to demonstrate Congress" intended to preempt state law by inaction. *TelTech*, 702 F.3d at 238. For that reason, Justice Thomas has noted his skepticism of purposes and objectives preemption, arguing that, under it, "the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law." *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring in the judgment).

25

collection efforts by a manufacturer. The obvious point of H.B. 728, as explained in

Plaintiff's discussion of the Section 340B program, *see* Memo [8] at 6–13, is to

prevent manufacturers from refusing to deliver 340B drugs purchased by covered

entities to contract pharmacies. Importantly, H.B. 728 states that it should not be

construed to conflict with federal law, H.B. 728 § 6, and the Court must apply the

presumption against preemption to construe state laws not to conflict with federal

law when possible, *see Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as

statutes fairly may be construed in such a way as to avoid doubtful constitutional

questions they should be so construed; and it is to be presumed that state laws will

be construed in that way by the state courts." (citation omitted)). And "conflict

preemption is not triggered by ordinary incongruities or minor annoyances" that

upset any federal-state balance "to some extent." *Barrosse*, 70 F.4th at 323.

Accordingly, the Court does not find that any potential data-collection issue

between manufacturers and covered entities is sufficiently clear or substantial to

show H.B. 728 is preempted.

In arguing that H.B. 728 conflicts with data-collection efforts, Plaintiff also

cites H.B. 728 § 3(1)(a)(ii)(5), which prohibits a health insurance company or third-

party payor from imposing

> [r]equirements that a claim for a drug include any identification, billing
> modifier, attestation, or other indication that a drug is a 340B drug in
> order to be processed or resubmitted *unless it is required by the Centers
> for Medicare and Medicaid Services or the Division of Medicaid for the
> administration of the Mississippi Medicaid program*.

H.B. 728 § 3(1)(a)(ii)(5) (emphasis added). Plaintiff contends that, in recent

guidance on how to comply with 42 U.S.C. § 1320f-3, under which HHS is to

26

103

"negotiate" with manufacturers the "maximum fair price[s]" for certain drugs, § 1320f(3)(a), "the Centers for Medicare and Medicaid Services," ("CMS") "has encouraged dispensing entities to use claims codes indicating when drugs are dispensed under the 340B program." Memo [8] at 27 (citing Draft Guidance on the Medicare Drug Price Negotiation Program, https://www.cms.gov/files/document/medicare-drug-price-negoti ation-draft-guidance-ipay-2027-and-manufacturer-effectuation-mfp-2026-2027.pdf (last visited June 28, 2024)). According to Plaintiff, "[t]o avoid duplicate discounting, this scheme necessarily requires identifying when a drug is dispensed as a 340B drug." *Id.* Even assuming Plaintiff has standing to claim a regulation of healthcare insurers or other third-party payors is preempted, H.B. 728, § 3(1)(a)(ii)(5) likely protects itself from preemption through its exception for cases when CMS requires identifications or other modifiers indicating a drug is a 340B drug.

In addition, Plaintiff argues that H.B. 728 conflicts with Section 340B's enforcement mechanisms because Congress intended that only the federal government oversee Section 340B. Memo [8] at 27–28 (citing *Astra*, 563 U.S. at 113). The Court disagrees: H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms. *Astra* held that covered entities lack a cause of action as third-party beneficiaries to PPA's to sue manufacturers for overcharging them for 340B drugs. 563 U.S. at 118–19. An overcharging claim[6] is

---

[6] Section 340B provides for administrative enforcement against overcharging by manufacturers in § 256b(d)(1).

27

different from a claim that the manufacturer interfered with a covered entity's contract with a pharmacy. *See McClain*, 95 F.4th at 1144 (concluding an Arkansas law similar to H.B. 728 "ensures that covered entities can utilize contract pharmacies for their distribution needs and authorizes the Arkansas Insurance Division to exact penalties and equitable relief if manufacturers deny 340B drugs to covered entities' contract pharmacies," while "[t]he 340B Program . . . addresses discount pricing").

The Court therefore concludes that Plaintiff has not shown a substantial likelihood that it will succeed on the merits of its conflict-preemption claim.

D.   Section 340B does not preempt H.B. 728 under field preemption

The Court is also unpersuaded that Section 340B preempts H.B. 728 under a theory of field preemption. Field preemption requires that Congress has passed such comprehensive legislation in an area that it has "occupied the field." *Arizona*, 567 U.S. at 401. Congress's intent to displace state law can be inferred from its enactment of a federal regulatory scheme "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice*, 331 U.S. at 230). Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986).

28

105

"Field preemption of state law is disfavored." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024). The Fifth Circuit has emphasized that "Courts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Id.* (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). "And importantly, field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation.'" *Id.* (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

House Bill 728 implicates a traditional area of state regulation, triggering the presumption against preemption, *see supra*, Part II.C., and rendering inapplicable *Arizona*'s discussion of dominant federal interests, *see Arizona*, 567 U.S. at 399. Section 340B also does not control how manufacturers must deliver discounted drugs to patients of covered entities. *See supra*, Part II.C. Section 340B thus leaves room for states to impose their own regulations on delivery of Section 340B drugs to promote patients' access to their medications. "[M]erely because [Section 340B is] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." *Hillsborough Cnty.*, 471 U.S. at 717. While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with the statute's requirements, *see supra*, Part

29

I.A., Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs.

The Court is also not persuaded that field preemption is compelled by *Astra*'s holding that covered entities cannot bring overcharging claims as third-party beneficiaries to PPAs. *See Astra*, 563 U.S. at 117–19. *Astra* rejected an argument that, despite a covered entity's "inability to assert a statutory right of action" under Section 340B itself, "PPAs implementing the 340B Program are agreements enforceable by covered entities as third-party beneficiaries." *Astra*, 563 U.S. at 117. Because PPAs are essentially contracts whereby manufacturers opt into Section 340B, the Court reasoned that "[a] third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself." *Id*. at 118. Accordingly, "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id*.

The Supreme Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here. *See Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." (internal quotation marks and citations

30

omitted)). The Court therefore concludes that Plaintiff has not shown a substantial

likelihood of success on the merits of its field preemption claim.

E.   Plaintiff has not shown a substantial likelihood of success on the merits of its Constitutional claims based on extraterritoriality

Plaintiff also argues that H.B. 728 violates the Constitution because it

constitutes an extraterritorial regulation. Plaintiff raises this claim under the

Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and the Fourteenth Amendment's Due

Process Clause, U.S. Const. amend. XIV, § 1. The Court is unpersuaded.

Plaintiff first invokes the principle that the "Commerce Clause . . . precludes

the application of a state statute to commerce that takes place wholly outside of the

State's borders, whether or not the commerce has effects within the State." *Healy v.*

*Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.,* 457 U.S.

624, 642–43 (1982) (plurality opinion)); *see* Memo [8] at 30–31. It is first worth

noting that the Supreme Court recently discussed how *Healy* does not establish any

"*per se* rule against state laws with extraterritorial effects." *Nat'l Pork Producers*

*Council v. Ross*, 598 U.S. 356, 373 (2023) (internal quotation marks omitted).

Rather, *Healy* concluded that a Connecticut law had a "*specific* impermissible

'extraterritorial effect'—[it] deliberately 'prevent[ed out-of-state firms] from

undertaking competitive pricing' or 'deprive[d] businesses and consumers in other

States of "whatever competitive advantages they may possess.""" *Id.* at 374 (quoting

*Healy*, 491 U.S. at 338–39 (quoting *Brown-Forman Distillers Corp. v. New York*

*State Liquor Auth.*, 476 U.S. 573, 580 (1986))) (first alteration added). *National*

*Pork Producers* also clarifies that the "antidiscrimination principle lies at the very

31

core of our dormant Commerce Clause jurisprudence," meaning "the Commerce Clause prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369 (internal quotation marks and citations omitted).

Here, Plaintiff does not argue that H.B. 728 discriminates against out-of-state commerce. *See* Memo [8] at 30–32. It instead contends that H.B. 728 violates the Commerce Clause because it "*directly* regulate[s] out-of-state transactions by those with *no* connection to the State," a Constitutional claim that *National Pork Producers* noted may not be a "Commerce Clause question as much as one testing the territorial limits of state authority under the Constitution's horizontal separation of powers." 598 U.S. at 376 n.1; Memo [8] at 31. Plaintiff also cites "the due process principle that a state is without power to exercise extra territorial jurisdiction, that is, to regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (internal quotation marks omitted); *see* Memo [8] at 31–32. However the claim is framed, the United States Constitution does not permit Mississippi to directly regulate out-of-state conduct without a connection to the state. But House Bill 728 does not do so.

Under Mississippi law, "[u]nless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country

32

109

**Exhibit 3**

enacting it." *Tattis v. Karthans*, 215 So. 2d 685, 689 (Miss. 1968).  Rather, a Court interpreting Mississippi law applies a "presumption [] that [a] statute is intended to have no extraterritorial effect." *Id.*  This Court should therefore construe the statute to "apply only within the territorial jurisdiction of the state or country enacting it." *Id.*  "Accordingly, a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it," and this presumption "appl[ies] to statutes using general words, such as 'any' or 'all,' in describing the persons or acts to which the statute applies." *Id.* at 689–90. The presumption against extraterritoriality is "particularly applicable where the statute would be declared invalid if given an interpretation resulting in its extraterritorial operation." *Id.* at 690.  If not for this presumption, every state law in every state would potentially need a disclaimer that it only applies to in-state conduct, which bread-and-butter state laws often lack.  *See, e.g.*, Miss. Code Ann. § 97-3-19 (defining "murder" and "capital murder" without explicitly limiting the crime to conduct taking place in Mississippi).

House Bill 728 does not exhibit a clear intent to regulate out-of-state conduct. It provides that pharmaceutical manufacturers[7] "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a

---

[7] House Bill 728 § 2(d) defines "manufacturer" by referencing Miss Code. Ann. § 73-21-73, which provides: "'Manufacturer' means a person, business or other entity engaged in the production, preparation, propagation, conversion or processing of a prescription drug or device, if such actions are associated with promotion and marketing of such drugs or devices."  Miss Code. Ann. § 73-21-73(t).

33

340B entity," or "interfere with a pharmacy contracted with a 340B entity."  H.B. 728 § 4.  The House Bill's "general words" referring to 340B entities, manufacturers, and pharmacies are "prima facie operative only as to persons or things within the territorial jurisdiction of" Mississippi.  *Tattis*, 215 So. 2d at 689–90.  To the extent that the definitions of any of those terms might, in the abstract or by reference to other provisions of Mississippi law, literally include out-of-state entities, the Court finds that H.B. 728 must be construed to only regulate conduct occurring "within the territorial jurisdiction of the state."  *Id.*  The Court thus concludes that Plaintiff has not shown it is likely to succeed on the merits of its extraterritoriality claim.

F.      Plaintiff not shown a substantial likelihood of success on the merits of its vagueness claim

The Court finally turns to Plaintiff's claim that H.B. 728 is unconstitutionally vague.  The Due Process Clause "proscribes laws so vague that persons of common intelligence must necessarily guess at [their] meaning and differ as to [their] application."  *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (internal quotation marks and citation omitted).  "A law that does not reach constitutionally protected conduct" is not "unduly vague, in violation of due process," unless "the complainant [can] demonstrate that the law is impermissibly vague in all of its applications."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982).  "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment."  *Id.* at 498.  "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more

34

111

narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* (citation omitted). The Supreme Court "has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," though "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* at 498–99.

But "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). Plaintiff argues that H.B. 728 regulates speech in an unconstitutionally vague manner. According to Plaintiff:

> The Act's vague and broad prohibition on interference would appear to bar manufacturers from a host of actions, including precluding a wide swath of speech. Specifically, as to 340B, the Act seems to block manufacturers from requesting information from covered entities and contract pharmacies that is necessary to utilize the federal 340B audit and ADR mechanism, and potentially keeps manufacturers from reporting misconduct to the federal government. Similar considerations demonstrate the Act's impact on speech. Manufacturers are prohibited from engaging in "interference" with a pharmacy. That vague language would seem to prohibit manufacturers from even advocating for the position that 340B limits the use of contract pharmacies or making statements regarding contract pharmacy usage that are perceived as unfavorable.

Memo [8] at 33. Plaintiff focuses its argument on the term "interfere," arguing that "[l]aws that prohibit 'interference' are notoriously vague." *Id.* (citing *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023)).

The Court first addresses Plaintiff's contention that H.B. 728 infringes on its First Amendment rights. Plaintiff cites no authority to support its position that

35

112

requesting information from covered entities is protected speech under the First Amendment. *See id.* at 32–33. House Bill 728 also does not actually prohibit manufacturers from requesting information from covered entities. *See supra*, Part II.C. Because the Court must construe state laws not to conflict with federal law when possible, *see Fox*, 236 U.S. at 277, the Court likewise does not find that H.B. 728 prohibits manufacturers from exercising their audit rights under § 256b(a)(5)(C) or otherwise reporting misconduct to HRSA or HHS. And the Court is entirely unconvinced that H.B. 728 purports to prohibit manufacturers from engaging in any policy advocacy.

Accordingly, H.B. 728 is an "economic regulation [that] is subject to a less strict vagueness test" than that applicable to a law that infringes on constitutional rights. *Vill. of Hoffman Ests.*, 455 U.S. at 498. Under this less strict standard, the term "interfere" does not render H.B. 728 unconstitutionally vague.

"[P]ersons of common intelligence" would not "necessarily guess at" H.B. 728's meaning. *Women's Med. Ctr. of Nw. Houston*, 248 F.3d at 421 (internal quotation marks and citation omitted). Black's Law Dictionary defines "interference" as "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." Interference, *Black's Law Dictionary* (11th ed. 2019). House Bill 728 thus prohibits manufacturers from "obstructing [the] normal operations" of, "or intervening or meddling in the affairs" of a contract pharmacy receiving and dispensing 340B drugs to 340B patients.

36

113

The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in their dispensation of 340B drugs. The Court need not determine the precise contours of the statute in every hypothetical application because Plaintiff's "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023) (internal quotation marks and citation omitted), *cert. denied*, 144 S. Ct. 348 (2023), *reh'g denied*, 144 S. Ct. 629 (2024).

House Bill 728's context and history also clarify its meaning. The word "interfere" in H.B. 728 "should be 'interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole.'" *Texas v. Biden*, 646 F. Supp. 3d 753, 767 (N.D. Tex. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The history behind H.B. 728, recounted *supra* in Parts I.A.–B., indicates that H.B. 728 requires manufacturers who have agreed to offer discounted drugs to covered entities under Section 340B to deliver those drugs to contract pharmacies for dispensation without otherwise interfering with covered entities' agreements with contract pharmacies.

The other terms H.B. 728 employs also inform its meaning. House Bill 728 provides that "[a] manufacturer or distributor shall not deny, restrict, [or] prohibit . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a" contract pharmacy. H.B. 728 § 4(a). Section (4)(a) plainly mandates that manufacturers

37

deliver 340B drugs to contract pharmacies.  To the extent that the concept of interference is unclear, § 4 confirms that H.B. 728 was written to ensure manufacturers deliver 340B drugs to contract pharmacies.

True, criminal laws must be clearer than laws carrying only civil liability. *Vill. of Hoffman Ests.*, 455 U.S. at 498–99.  House Bill 728 creates criminal liability, but only for violations committed "knowingly and willfully."  Miss Code Ann. § 75-24-20(a).  This high mens rea requirement mitigates any vagueness there may be. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99.

"The word 'willful' is sometimes said to be a word of many meanings whose construction is often dependent on the context in which it appears."  *Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks and citation omitted).  But generally speaking, "willfully" means "undertaken with a 'bad purpose,'" such that, "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"  *Id.* at 191–92 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)) (other citations omitted); *see also Fortune v. State*, 110 So. 3d 831, 835 (Miss. Ct. App. 2013) (quoting trial court jury instructions defining "willfully" to "mean[] that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with [a] bad purpose either to disobey or disregard the law").  Because Miss. Code. Ann. § 75-24-20 also uses the term "knowingly," avoiding superfluity demands reading "willfully" in the elevated sense discussed above.  *See Hoops v. State*, 681 So. 2d 521, 534 (Miss. 1996) (explaining

38

115

how, as used in jury instructions, "[t]he phrase 'knowingly and wilfully'

contemplates that the accused must act with knowledge and deliberation; therefore,

the instruction does not deem mere knowledge sufficient to find one guilty"),

*abrogated on other grounds by Nash v. State*, 293 So. 3d 265 (Miss. 2020), and *Willis*

*v. State*, 300 So. 3d 999 (Miss. 2020).  Accordingly, the high mens rea requirement

under Miss. Code. Ann. § 75-24-20 avoids any constitutional vagueness issue based

on criminal liability that might result from enforcement of H.B. 728.

It is also worth noting that Miss. Code Ann. § 75-24-19 imposes the same

high, "knowing[] and willfull[]" scienter requirement in a civil action by the state

Attorney General seeking damages.  *See* Miss. Code Ann. § 75-24-19(1)(b).  So, if the

manufacturer does not commit a knowing and willful violation of H.B. 728, the only

available relief is an injunction under Miss. Code Ann. § 75-24-9.  Such *prospective*

relief would require a court order that must "describe in reasonable detail . . . the

act or acts sought to be restrained," Miss R. Civ. P. 65(d)(1), providing additional

notice to a manufacturer found to have violated H.B. 728 before a court could

impose monetary damages.  All told, the Court does not find that Plaintiff has

shown a substantial likelihood of success on the merits of its vagueness claim.

### III. CONCLUSION

Because Plaintiff has not shown a substantial likelihood of success on the

merits as required to obtain a preliminary injunction, it is not entitled to such relief,

and the Court need not address the remaining Rule 65 factors.  *See Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008) (declining to address other

preliminary injunction factors after finding against the plaintiffs on one such

factor). To the extent the Court has not addressed any of the parties' remaining

arguments, it has considered them and determined they would not alter the Court's

conclusion.

**IT IS, THEREFORE, ORDERED AND ADJUDGED THAT**, Plaintiff

Pharmaceutical Research and Manufacturers of America's Motion [7] for

Preliminary Injunction is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 1st day of July, 2024.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

40

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2026

Lyle W. Cayce
Clerk

No. 24-60340

PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,

*Plaintiff—Appellant*,

*versus*

LYNN FITCH, *in her official capacity as Attorney General of Mississippi*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:24-CV-160

Before KING, HO, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[*]

Pharmaceutical Research and Manufacturers of America ("PhRMA") appeals the denial of its motion to preliminarily enjoin the enforcement of a state law governing the distribution of drugs that are discounted under a federal program. It contends that the state law is

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

118

preempted by federal law, unconstitutionally regulates out-of-state conduct, and is unconstitutionally vague. We AFFIRM.

I

PhRMA represents biopharmaceutical research companies across the country and serves as the industry's principal policy advocate. Many of its members participate in Section 340B of the Public Health Service Act. Section 340B requires drug manufacturers to offer covered outpatient drugs at discounted prices to specified "covered entities," such as eligible nonprofit and public hospitals, community health centers, and clinics. 42 U.S.C. §§ 256b(a)(1), (a)(4). The Health Resources and Services Administration, which administers the Section 340B program, has interpreted the statute to permit covered entities to dispense 340B priced drugs to their patients through pharmacies with which they contract. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43549 (Aug. 23, 1996); Notice Regarding 340B Drug Pricing Program–Contract Pharmacy Services, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010). The statute prohibits covered entities from diverting discounted drugs by reselling or transferring them to nonpatients and from obtaining duplicate discounts through receipt of both Section 340B discounts and Medicaid rebates for the same drug. 42 U.S.C. §§ 256b(a)(5), (b)(2). To enforce those restrictions, manufacturers may audit covered entities' records to verify compliance and may seek prescription claims data from covered entities in connection with those audits. *Id.* § 256b(a)(5)(c).

Many participating drug manufacturers adopted policies restricting covered entities' use of contract pharmacies to dispense 340B priced drugs based on concerns that the arrangements create opportunities for abuse of the Section 340B program and impose significant costs on drug

119

manufacturers. In response, several states, including Mississippi, enacted laws regulating drug manufacturers' treatment of contract pharmacies.

Mississippi's statute, H.B. 728, prohibits drug manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition . . . or delivery of" 340B priced drugs to contract pharmacies. MISS. CODE ANN. § 41-149-7(1) (2024). It also bars manufacturers from "interfer[ing] with a pharmacy contracted with a 340B entity." *Id.* § 41-149-7(2). A violation of H.B. 728 is considered a violation of the Mississippi Consumer Protection Act, MISS. CODE ANN. § 75-24-1 *et seq.* (2025), subject to its remedies and penalties, including civil and criminal penalties for knowing and willful violations. *See id.* §§ 75-24-9, -11, -19, -20.

PhRMA sued the Attorney General of Mississippi for declaratory and injunctive relief and sought a preliminary injunction against the enforcement of H.B. 728 on grounds that it was preempted by federal law, violated the Constitution's bar on regulating out-of-state commerce, and was unconstitutionally vague. The district court found that PhRMA had not shown a substantial likelihood of success on the merits of its claims and denied the motion for a preliminary injunction. PhRMA appealed.

## II

We review the denial of a preliminary injunction for abuse of discretion, reviewing underlying legal determinations de novo and factual findings for clear error. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025).

A party seeking a preliminary injunction must establish:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied

outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*AbbVie*, 152 F.4th at 642 (quoting *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018)). When the government is a party, factors three and four merge. *Id.*

### III

PhRMA initially argues that because H.B. 728 "refashions" the scope of Section 340B, the district court erred in finding that it failed to show a likelihood of success on the merits of its claim that under the Supremacy Clause, H.B. 728 is preempted by federal law.

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "Congress may implicitly preempt state law in two ways: field preemption and conflict preemption." *AbbVie*, 152 F.4th at 645. Field preemption occurs when Congress's intent to exclusively occupy a field can be inferred from pervasive federal regulation or a dominant federal interest. *Arizona v. United States*, 567 U.S. 387, 399 (2012); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013). Conflict preemption occurs when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. In areas traditionally regulated by the states, courts apply a presumption against preemption, requiring a clear and manifest congressional intent to displace state law. *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024).

PhRMA contends that the district court erred by finding that H.B. 728 is not field preempted by federal law because Congress, in its view,

intended Section 340B to occupy the entire field of the program's administration and drug distribution. We recently rejected a substantially similar pre-enforcement preemption challenge to H.B. 728 in *AbbVie*. *AbbVie* explained that Section 340B is a drug pricing program that regulates costs, eligibility, and compliance; it does *not* govern "the distribution of [340B priced] drugs to patients and the role of pharmacies" in that process. 152 F.4th at 647; *see also AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026) (applying *AbbVie* to a materially indistinguishable Louisiana law and finding that it was not field preempted by Section 340B). H.B. 728, by contrast, regulates distribution-related functions that Section 340B leaves unaddressed and, therefore, remains subject to state regulation. *AbbVie*, 152 F.4th at 646.

*AbbVie* also applied the presumption against preemption because drug distribution and pharmacy operations fall within traditional state police powers—public health and consumer protection—and Congress included no indication in Section 340B that it meant to displace state authority in those areas. *Id.* at 646–47. The presumption against preemption reinforces the finding that H.B. 728 is not field preempted. *Id.*

Next, PhRMA argues that the district court erred by finding that H.B. 728 is not conflict preempted by federal law because it interferes with Section 340B's requirements. Its arguments rest on the premise that Section 340B governs manufacturers' obligations regarding contract pharmacies, compliance mechanisms, and enforcement. But *AbbVie* rejected that premise, explaining that Section 340B regulates drug pricing and requires manufacturers to "offer" discounted drugs to covered entities. *Id.* at 647. H.B. 728, instead, regulates the delivery of those drugs to patients and pharmacies' role in their distribution. *Id.* Because H.B. 728 does not change manufacturers' obligations under Section 340B, it does not interfere with Section 340B's compliance or enforcement scheme. *Id.* at 647–48. *AbbVie*,

therefore, held that H.B. 728 does not stand as an obstacle to Section 340B's objectives. *Id.* at 647.

PhRMA attempts to distinguish *AbbVie*, contending that it did not address its argument "about how the . . . [Section] 340B program addresses the obligations of manufacturers to provide 340B-priced drugs to 'contract pharmacies.'" It argues that H.B. 728 conflicts with federal law because it compels manufacturers to make additional sales beyond what Section 340B requires. But *AbbVie* squarely held that H.B. 728 "does not compel manufacturers to 'offer' discounted drugs to contract pharmacies"; it only requires them to allow covered entities to *receive* 340B priced drugs through the pharmacies they use to distribute drugs. 152 F.4th at 647 (citation modified). Because H.B. 728 does not impose additional requirements under Section 340B, it does not conflict with federal law. *AbbVie* therefore controls, and we are bound by that holding under our rule of orderliness. *See Murrill*, 166 F.4th at 539 (finding that "[*AbbVie*] controls" the conflict preemption analysis for a materially identical Louisiana statute); *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.").

Because PhRMA failed to show that H.B. 728 is neither field preempted nor conflict preempted by federal law, the district court did not err by finding that it failed to show a likelihood of success on the merits of its preemption claim. *See AbbVie*, 152 F.4th at 648.

IV

PhRMA next argues that because H.B. 728 seeks to regulate conduct outside of its borders, the district court erred in finding that it failed to show

123

a likelihood of success on the merits of its claim that H.B. 728 violates the Commerce Clause.[1]

The Commerce Clause prohibits "the application of a state statute to commerce that takes place wholly outside of the State's borders." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982)). The Commerce Clause's "critical inquiry" is whether the statute's practical effect is to control conduct outside the state, "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id.*

But under Mississippi law, the Legislature's intent determines the practical effect. In interpreting Mississippi law, we start from the presumption that statutes "operat[e] only as to persons or things within" the Mississippi Legislature's "territorial jurisdiction." *Tattis v. Karthans*, 215 So. 2d 685, 689–90 (Miss. 1968) (quoting 50 AM. JUR. *Statutes* § 487 (1944)). And that presumption is overcome only if "the intention to have a statute operate beyond the limits of the state . . . is clearly expressed or indicated . . . ." *Id.*

Here, the statute evinces no such intent. It provides that drug manufacturers "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity." MISS. CODE ANN. § 41-149-7(1). Nothing in the text extends H.B. 728 beyond Mississippi's borders or indicates that the Legislature intended it to apply extraterritorially. And PhRMA's contention that H.B. 728 applies

---

[1] Although PhRMA also alleged a violation of the Due Process Clause, it has forfeited this argument by failing to adequately brief it. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal.").

extraterritorially because the statutory definition of "pharmacy" contains no explicit geographic limitation flips this presumption on its head and does little to rebut it. Consequently, Mississippi's presumption against extraterritorial effect stands, and the Commerce Clause does not bar enforcement of H.B. 728.

Because PhRMA fails to show that H.B. 728 regulates out-of-state commerce, the district court did not err in finding that it failed to show a likelihood of success on the merits.

V

Finally, PhRMA argues that H.B. 728 is unconstitutionally vague because it fails to provide manufacturers notice of prohibited conduct.

Under the Due Process Clause, the void-for-vagueness doctrine "bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citation modified). A law is unconstitutionally vague only when it fails to specify a standard of conduct "at all," and in the civil context the threshold is especially high: "the statute must be so vague and indefinite as really to be no rule at all." *Murrill*, 166 F.4th at 546 (citation modified).

As noted, H.B. 728 prohibits a manufacturer from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfere[ing] with" the acquisition or delivery of 340B priced drugs to a contract pharmacy. Miss. Code Ann. § 41-149-7(1). It also bars manufacturers from "interfer[ing] with a pharmacy contracted with a 340B entity." *Id.* § 41-149-7(2).

PhRMA contends that the scope of the term "interfere" is so unclear that it *could* chill lawful conduct by "prohibiting manufacturers from even requesting information" necessary to conduct compliance audits permitted

under Section 340B.[2] We recently rejected a similar vagueness challenge to an identically worded Louisiana statute in *Murrill*. Applying the canon that "a word is known by its associates," *Murrill* explained that "interfere," read in context with its neighboring terms—"deny, restrict, [and] prohibit"—"targets conduct that obstructs or impedes the acquisition or delivery of 340B drugs to contract pharmacies—not routine communications or lawful auditing practices." 166 F.4th at 547 (citation modified). Because *Murrill* has already interpreted "interfere" to reach only obstructive conduct in the context of the very same language as H.B. 728, that interpretation controls. *Jacobs*, 548 F.3d at 378. PhRMA's vagueness challenge is therefore foreclosed, and the district court did not err in finding that it failed to show a likelihood of success on the merits.

## VI

Because PhRMA has failed to show a likelihood of success on the merits of all its claims, the district court did not abuse its discretion in denying a preliminary injunction. *See AbbVie*, 152 F.4th at 648. We AFFIRM.

---

[2] PhRMA asserts in passing that the vagueness doctrine requires heightened clarity because H.B. 728 "reaches speech" and imposes criminal penalties. But PhRMA does not develop a First Amendment vagueness argument, and H.B. 728 regulates conduct, not protected expression. *AbbVie*, 152 F.4th at 647–48. Although H.B. 728 carries criminal penalties, liability attaches only for knowing and willful violations, thereby limiting liability to manufacturers who act with awareness of the prohibited conduct, which in turn mitigates potential notice concerns. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (explaining that a scienter requirement can mitigate vagueness, especially with respect to the notice).

Case 2:25-cv-01012-2 Filed 06/03/25 Filed 04/09/2026

**Exhibit 3**

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

April 09, 2026

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding: Fifth Circuit Statement on Petitions for Rehearing
or Rehearing En Banc

No. 24-60340    Phrmctl Rsrch v. Fitch
USDC No. 1:24-CV-160

Enclosed is a copy of the court's decision.  The court has entered judgment under Fed. R. App. P. 36.  (However, the opinion may yet contain typographical or printing errors which are subject to correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41 govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require you to attach to your petition for panel rehearing or rehearing en banc an unmarked copy of the court's opinion or order.**  Please read carefully the Internal Operating Procedures (IOP's) following Fed. R. App. P. 40 for a discussion of when a rehearing may be appropriate, the legal standards applied and sanctions which may be imposed if you make a nonmeritorious petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  Fed. R. App. P. 41 provides that a motion for a stay of mandate under Fed. R. App. P. 41 will not be granted simply upon request.  The petition must set forth good cause for a stay or clearly demonstrate that a substantial question will be presented to the Supreme Court.  Otherwise, this court may deny the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court and/or on appeal, and are considering filing a petition for <u>certiorari</u> in the United States Supreme Court, you do not need to file a motion for stay of mandate under Fed. R. App. P. 41.  The issuance of the mandate does not affect the time, or your right, to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible for filing petition(s) for rehearing(s) (panel and/or en banc) and writ(s) of certiorari to the U.S. Supreme Court, unless relieved of your obligation by court order.  If it is your intention to file a motion to withdraw as counsel, you should notify your client promptly, **and advise them of the time limits for filing for** **<u>rehearing and certiorari</u>**.  Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

**Exhibit 3**

The judgment entered provides that Appellant pay to Appellee the costs on appeal.  A bill of cost form is available on the court's website www.ca5.uscourts.gov.

                        Sincerely,

                        LYLE W. CAYCE, Clerk


                        By: _____
                        Casey A. Sullivan, Deputy Clerk
                        504-310-7642


Enclosure(s)

Ms. Margaret Dotzel
Ms. Cherish Alise Drain
Mr. Philip Hammersley
Mr. Michael Brent Hicks
Ms. Alyssa Howard
Mr. Pope Shannon Mallette
Mr. Justin Lee Matheny
Mr. James Cal Mayo Jr.
Ms. Erin Murphy
Mr. Philip J. Perry
Mr. Andrew D. Prins
Mr. Abid Qureshi
Mr. Matthew Rowen
Mr. William B. Schultz
Mr. Rex Morris Shannon III
Mr. Scott G. Stewart
Mr. Riley T. Svikhart

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NOVARTIS PHARMACEUTICALS** § | | **PLAINTIFF** |
| **CORPORATION** § | | |
| § | | |
| § | | |
| **v.** § | | **Civil No. 1:24-cv-164-HSO-BWR** |
| § | | |
| § | | |
| **LYNN FITCH** § | | |
| *in her official capacity as Attorney* § | | |
| *General of the State of Mississippi* § | | **DEFENDANT** |

<u>**MEMORANDUM OPINION AND ORDER DENYING MOTION [4] FOR**</u>
<u>**PRELIMINARY INJUNCTION**</u>

This matter comes before the Court on Plaintiff Novartis Pharmaceuticals

Corporation's ("Novartis" or "Plaintiff") Motion [4] for Preliminary Injunction.

Having considered the allegations set forth in Plaintiff's Complaint [1], the parties'

Memoranda [5], [12], [27], and relevant legal authority, and having heard argument

at a hearing held on June 27, 2024, the Court will deny the Motion [4].

I. <u>BACKGROUND</u>

Plaintiff's Motion [4] asks the Court to enjoin the enforcement of Mississippi's

recently enacted "Defending Affordable Prescription Drug Costs Act," 2024 Miss.

H.B. 728 ("H.B. 728"), which is set to take effect on July 1, 2024.  House Bill 728

concerns a federal program referred to as Section 340B.  *See* 42 U.S.C. § 256b.

Under Section 340B, pharmaceutical manufacturers who participate in Medicaid

and Medicare Part B must offer certain drugs at discounted prices to certain

healthcare providers, called "covered entities," that generally provide care for the

poor.  *See infra,* Part I.A.  In essence, H.B. 728 requires manufacturers to deliver

1

drugs ordered through the 340B program to for-profit pharmacies called "contract pharmacies" with which covered entities have arrangements under which the pharmacy will dispense discounted drugs to the covered entity's patients.

Plaintiff claims that H.B. 728, in requiring it to deliver discounted drugs to an unlimited number of contract pharmacies, invalidly expands its obligation to provide discounted drugs to covered entities. *See id.* at 2, 6–7. It asserts that H.B. 728 is preempted by § 256b and various federal laws—such as patent laws—that provide regulatory exclusivities that enable manufacturers to reap high profits as incentives for innovation in pharmaceuticals. *See id.* at 1–3. Plaintiff therefore seeks a preliminary injunction to stay the enforcement of H.B. 728. Because it is unable to satisfy the necessary elements for such relief, Plaintiff's Motion [4] will be denied.

A.      The Section 340B program

Section 340B requires pharmaceutical manufacturers that want the federal government to cover their drugs under Medicaid and Medicare Part B to provide discounts on their drugs to certain healthcare providers. 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5); *see Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). Those healthcare providers are "called '340B' or 'covered' entities," and "include public hospitals and community health centers, many of" which are "providers of safety-net services to the poor." *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011). The 340B Program "is

2

130

superintended by the Health Resources and Services Administration," ("HRSA"), "a unit of the Department of Health and Human Services," ("HHS"). *Id.*

"Drug manufacturers," such as Plaintiff, "opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement" ("PPA") "used nationwide." *Id.* These agreements "are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.* PPAs must "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." § 256b(a)(1).

Through Section 340B, Congress leverages the federal government's market power in healthcare—Medicare and Medicaid cover "almost half the annual nationwide spending on prescription drugs," *Sanofi Aventis*, 58 F.4th at 699 (citing Cong. Budget Off., *Prescription Drugs: Spending, Use, and Prices* 8 (2022))—to aid covered entities in their mission to care for low-income Americans, *see id.* The statute enables covered entities "to give uninsured patients drugs at little or no cost." *Id.* Covered entities also obtain "extra revenue from serving insured patients" because "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.* (citing Gov't Accountability Off., *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011)).

Section 340B contains two provisions that prohibit covered entities from abusing their ability to obtain discounted drugs. Covered entities cannot "resell or otherwise transfer" discounted drugs "to a person who is not a patient of the entity." § 256b(a)(5)(B). Covered entities also cannot obtain "duplicate discounts or rebates," meaning they cannot obtain Medicaid rebates under title XIX of the Social Security Act, *see* 42 U.S.C. § 1396 *et seq.*, for drugs that they purchase at a discount under Section 340B, *see* § 256b(a)(5)(A)(i).

To ensure covered entities do not resell discounted drugs or obtain duplicate discounts, the statute contains an auditing provision. It states:

> A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

§ 256b(a)(5)(C). And "[i]f the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing," that the covered entity illegally resold discounted drugs or obtained duplicate discounts, "the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . provided under the agreement between the entity and the manufacturer." § 256b(a)(5)(D).

The Secretary can impose additional sanctions. Covered entities that the Secretary finds knowingly and intentionally resold discounted drugs must "pay a monetary penalty to a manufacturer or manufacturers in the form of interest on

4

sums for which the covered entity is found liable under [§ 256(a)(5)(D)]."

§ 256b(d)(2)(B)(v)(I). Where the Secretary finds the covered entity's reselling "was

systematic and egregious as well as knowing and intentional," the Secretary can

remove the covered entity from the program entirely. § 256b(d)(2)(B)(v)(II).

B.     The dispensation of 340B drugs at contract pharmacies and related litigation

The issue in this case concerns a matter notably absent from the foregoing

discussion: how discounted drugs under Section 340B are to be delivered to patients

of covered entities. Between 1996 and March 2010, HRSA's 1996 Guidance

"acknowledged that section 340B 'is silent as to permissible drug distribution

systems,' but it nonetheless sought to fill 'gaps in the legislation' and thereby 'move

the program forward.'" *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456–57

(D.C. Cir. 2024) (quoting Notice Regarding Section 602 of the Veterans Health Care

Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549–50 (Aug. 23,

1996) ("1996 Guidance")). Given that "many covered entities use outside

pharmacies to distribute drugs to their patients," HRSA's 1996 Guidance "stated

that a covered entity without an in-house pharmacy may contract with a single

outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing 1996

Guidance at 43,555). The 1996 Guidance also required that, "in directing shipments

to its contract pharmacy," the covered entity "must retain title to the drugs and

thus 'be responsible' for any diversion or duplicate discounts." *Id.* (citing 1996

Guidance at 43,553).

In 2010, HRSA shifted course. HRSA's 2010 Guidance took the position that

5

"covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")). In its view, this Guidance "would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients." 2010 Guidance at 10,273. HRSA did not change its view that covered entities "must maintain title to and responsibility for the drugs." *Novartis*, 102 F.4th at 457 (citing 2010 Guidance at 10,277). HRSA considered comments following the release of proposed guidelines in 2007, Notice Regarding 340B Drug Pricing Program— Contract Pharmacy Services, 72 Fed. Reg. 1,540 (Jan. 12, 2007), asserting that allowing covered entities to dispense Section 340B drugs through multiple contract pharmacies would enable diversion and duplicate discounts, *see* 2010 Guidance at 10,272–75. But it ultimately decided that covered entities could use multiple contract pharmacies if "they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition," including that "[a]uditable records must be maintained to demonstrate compliance with those requirements." *Id.* at 10,273.

In 2020, many pharmaceutical manufacturers sought to prevent covered entities from using multiple contract pharmacies to dispense Section 340B drugs by implementing policies "limit[ing] the number and kinds of contract pharmacies to

6

Exhibit 3

which they would ship orders." *Novartis*, 102 F.4th at 458. As Plaintiff argues in its Memorandum [5], pharmaceutical manufacturers were and remain concerned about the model covered entities and contract pharmacies often use in dispensing and accounting for Section 340B drugs. *See* Memo [5] at 14–15. Plaintiff refers to that model as the "replenishment model." *Id.* Put simply, under this model, a contract pharmacy first dispenses prescription drugs to all its customers from one supply of drugs, which it purchased at full price from the manufacturer. *Id.* According to Plaintiff, the pharmacy—or a third-party administrator—determines whether a customer was a covered-entity patient after it dispenses the drug "based on an opaque formula generally not shared with manufacturers." *Id.* The pharmacy then informs the covered entity of the quantity of drugs it dispensed to the entity's patients. *Id.* The covered entity then places an order of Section 340B drugs in that quantity as a "replenishment" of the drugs dispensed to covered-entity patients. *See id.*

As the D.C. Circuit recognized, "[m]anufacturers," such as Plaintiff, "have argued that these arrangements lead to unlawful diversion and duplicate discounts." *Novartis*, 102 F.4th at 458. Under the replenishment model, "[t]he covered entity [and] the pharmacy . . . often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. So, covered entities and contract pharmacies both have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457–58.

In 2020, HHS, concerned about manufacturers' policies limiting covered-

7

135

entity patients' access to medications, issued an advisory opinion stating that pharmaceutical manufacturers are *required* to ship Section 340B drugs to an unlimited number of contract pharmacies. *See Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., *Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program* (Dec. 30, 2020), https://perma.cc/L7W2-H597 ("2020 Advisory Opinion")). "HHS reasoned that 340B drugs are 'purchased by' a covered entity no matter how they are distributed," and so, "the 'situs of delivery . . . is irrelevant.'" *Id.* at 701 (citing 2020 Advisory Opinion at 1–3). Both the Third Circuit and the D.C. Circuit concluded, however, that Section 340B is silent about delivery, and that the federal statute's requirement that manufacturers offer discounts to covered entities did not implicitly permit HHS to mandate that they comply with any delivery practice the covered entities desire. *See id.* at 703–06; *Novartis*, 102 F.4th at 460–63.

In response, states have begun to impose explicitly what HHS had purported to impose by guidance. For example, in 2021, Arkansas enacted Act 1103, which "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs," and "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024) (citing Ark. Code Ann. § 23-92-604(c)). An association of pharmaceutical

8

manufacturers sought an injunction against enforcement of the Arkansas law on a theory that Section 340B preempts it. *Id.* at 1139–40. The Eighth Circuit, however, disagreed. *Id.* As to field preemption, the Eighth Circuit concluded that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it," given that the statute is "'is silent about delivery' of drugs to patients." *Id.* at 1143 (quoting *Sanofi Aventis U.S. LLC*, 58 F.4th at 703) (other quotation marks and citation omitted). Concerning conflict preemption, because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies," and "does not set or enforce discount pricing," the Eighth Circuit found that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to the statute's purpose. *Id.* at 1145. In fact, the Eighth Circuit observed that the Arkansas law "assists in fulfilling the purpose of 340B," in that it facilitates the distribution and dispensation of discounted 340B drugs. *Id.*

On April 12, 2024, the Governor of Mississippi signed H.B. 728, which had been enacted by the state legislature. Ex. [12-1] (H.B. 728). House Bill 728 provides that "[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity." H.B. 728 § 4. The law defines a "340B drug" as a covered outpatient drug "that has been subject to any offer for reduced prices by a

9

137

manufacturer pursuant to [Section 340B]." H.B. 728 § 2(a).  A violation of H.B. 728 constitutes a violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1 *et seq*, *see* H.B. 728 § 5, which provides for both civil and criminal penalties and is enforced by Mississippi's Attorney General, *see* Miss Code Ann. §§ 75-24-9 (covering injunctive relief), 75-24-19 (covering civil penalties for violations of injunctions issued under § 75-24-9, and for knowing and willful violations of the statute), 75-24-20 (covering criminal penalties for knowing and willful violations).

C.      Procedural history

On June 3, 2024, Plaintiff Novartis Pharmaceuticals Corporation filed a Complaint [1] in this Court seeking a declaratory judgment under 28 U.S.C. § 2201 that H.B. 728 is preempted by federal law.  Compl. [1] at 24.  It likewise sought temporary, preliminary, and permanent injunctive relief against the Attorney General of Mississippi, enjoining her from enforcing H.B. 728 against Plaintiff.  *Id.* at 25.  Plaintiff filed a Motion [4] for Preliminary Injunction on June 4, 2024, and argues that H.B. 728 is preempted under conflict and field preemption.  *See generally* Memo [5].  Defendant, Mississippi Attorney General Lynn Fitch, ("Defendant") responded on June 17, 2024, Resp. [11], and the American Hospital Association, 340B Health, the Mississippi Hospital Association, and the Rural Hospital Alliance filed an Amicus Brief [17] on June 18, 2024, in support of Defendant.  The Court held a hearing on the Motion [4] on June 27, 2024.

## II. <u>DISCUSSION</u>

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest." *Clark v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023); *see* Fed. R. Civ. P. 65. Factors three and four, "[t]he balance-of-harms and public-interest factors[,] merge when the government opposes an injunction." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

Plaintiff cannot satisfy the first requirement because it has not demonstrated a "substantial likelihood of success on the merits." *Clark*, 74 F.4th at 640. The Court will therefore deny the Motion [4] and need not reach the other elements.

A.      <u>Preemption generally</u>

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

11

139

**Exhibit 3**

When a party raises preemption, "'[t]he purpose of Congress is the ultimate touchstone' of [the] analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)) (other citations and quotations omitted). Preemption may be "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation marks and citation omitted). But the Court cannot "assume[] lightly that Congress has derogated state regulation, but instead [should] address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). And "[d]eference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks and citations omitted).

Three categories of preemption exist: "when (1) a federal statute expressly preempts state law," ("express preemption"); "(2) federal legislation pervasively occupies a regulatory field," ("field preemption"); "or (3) a federal statute conflicts with state law," ("conflict preemption"). *Deanda v. Becerra*, 96 F.4th 750, 760–61 (5th Cir. 2024) (citing *Arizona*, 567 U.S. at 398–400). Plaintiff does not contend that the 340B Program, or federal drug laws that provide regulatory and patent exclusivity periods, expressly preempt Mississippi law. *See generally* Memo [5].

12

140

Case 6:24-cv-00352-HSO-BWR   Document 29   Filed 06/09/24   Page 144 of 576
Case 6:24-cv-01332-HSO-BWR   Document 112   Filed 06/27/25   Page 143 of 575

Exhibit 3

Rather, Plaintiff argues that the 340B Program implicitly preempts Mississippi law under conflict preemption and field preemption, *id.* at 22–28, and that Mississippi law conflicts with federal drug laws that provide regulatory and patent exclusivity periods, *id.* at 28–31.

B.      Section 340B does not preempt H.B. 728 under conflict preemption

Conflict preemption arises "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC America Corp.*, 490 U.S. 93, 100, 101 (1989)) (other internal quotation marks omitted). "In either situation, federal law must prevail." *Id.*

Plaintiff does not contend that compliance with both Mississippi and federal law is impossible. *See generally* Memo [5]. So, Plaintiff must show that Mississippi law "produce[s] a result inconsistent with the objective of the federal statute," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), such that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). Plaintiff must meet "a high threshold" to succeed on such a theory. *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011)), *cert. denied*, 144 S. Ct. 557 (2024). "Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is

13

141

Congress rather than the courts that pre-empts state law.'" *Id.* (quoting *Whiting*, 563 U.S. at 607) (alteration in original).

In a case like this one, "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda*, 96 F.4th at 761 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). That is because a state law regulating health and safety falls within a state's traditional police powers. *See Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 710, 716 (1985) (holding that a local regulation of blood donation centers, including "donor testing and recordkeeping requirements beyond those contained in the federal regulations," was not preempted because the challenger did not "present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that [was] strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation"); *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) (discussing how the Court should "begin with the assumption that Congress did not intend to supersede the historic police powers of the states to protect the health and safety of their citizens" (internal quotation marks and citation omitted)).

House Bill 728 plainly falls under the umbrella of a health and safety regulation. It prohibits manufacturers from refusing to deliver Section 340B drugs to contract pharmacies, presumably to maximize covered-entity patients' access to

14

142

drugs for which the manufacturers have already agreed to provide a discount.  The state statute therefore triggers the presumption against preemption.  *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (plurality opinion of Stevens, J.) (applying "[t]he presumption against federal pre-emption of a state statute designed to foster public health" (citing *Hillsborough Cnty.*, 471 U.S. at 715–18), and rejecting a preemption claim challenging a Maine policy that subjected drug manufacturers' pharmaceuticals to prior authorization procedures before providing state Medicaid coverage for them unless the manufacturers agreed to provide rebates to Maine residents beyond rebates the Medicaid Act provides for); *Wyeth v. Levine*, 555 U.S. 555, 578 (2009) ("[T]he FDA traditionally regarded state law as a complementary form of drug regulation."); *McClain*, 95 F.4th at 1144 (holding that Section 340B does not preempt state law prohibiting manufacturers from precluding covered entities from making dispensation contracts with pharmacies in part because "[p]harmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted").

Plaintiff argues that the law does not trigger this presumption, but the Court is unpersuaded.  *See* Reply [27] at 2.  Plaintiff cites *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012), to assert that "the Supreme Court has often declined to apply the presumption in its conflict-preemption analysis."  *Id. Lofton* merely states that "whatever value or relevance a presumption against

15

143

preemption of state tort law should play is uncertain" given its observation that the Supreme Court's "majority opinion in [*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)] made no reference to the 'presumption' in the course of upholding implied conflict preemption over state law claims for failure to maintain adequate warning labels for FDA-approved generic drugs." 672 F.3d at 378. *Lofton*'s statements about the scope of the presumption against preemption do not mean that the presumption against preemption no longer applies.

Further, *Lofton*'s statement that "the primacy of the state's police powers is not universal" is inapplicable here. *Id.* *Lofton* discussed state-law tort claims based on fraud on the FDA. *See id.* at 378–79. In that context, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 378 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). House Bill 728 does not purport to prohibit fraud on a federal agency.

Applying the presumption against preemption here, the Court does not find that Section 340B exhibits a clear purpose to preempt state laws that would require manufacturers to deliver covered entities' drugs to contract pharmacies for distribution. Section 340B does not explicitly mandate how delivery of discounted drugs is to occur. *See McClain*, 95 F.4th at 1142 ("[T]he 340B Program 'is silent about delivery' and distribution of pharmaceuticals to patients." (quoting *Sanofi*

16

144

**Exhibit 3**

*Aventis*, 58 F.4th at 703)).[1]  Section 340B merely requires participating

manufacturers to "offer each covered entity covered outpatient drugs for purchase

at or below the applicable ceiling price."  § 256b(a)(1).

  *Sanofi Aventis* and *Novartis* concluded that, under the terms of Section 340B,

HHS may not *require* manufacturers to ship drugs intended for covered-entity

patients to any contract pharmacy the entity deals with.  *Sanofi Aventis*, 58 F.4th at

703 (concluding that "Section 340B does not require delivery to an unlimited

number of contract pharmacies"); *Novartis*, 102 F.4th at 460–63.  But the same

"[s]tatutory silence[]," *Sanofi Aventis*, 58 F.4th 699, that does not *implicitly*

*mandate* that manufacturers deliver to any contract pharmacy does not, on the

other hand, show that Congress clearly intended to *preclude states* from enacting

their own public health regulations aimed at maximizing the availability of low-cost

drugs for covered-entity patients, *see McClain*, 95 F.4th at 1145 (concluding that

"the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing

creates no obstacle" to Section 340B's objectives).  If anything, H.B. 728 arguably

promotes Section 340B's objective of ensuring covered-entity patients can

conveniently access their medications.  *See id.* at 1144–45 (explaining how

Arkansas's prohibition on manufacturers preventing covered entities from

contracting with pharmacies for drug distribution "does not create an obstacle for

---

[1] Section 340B discusses distribution, directing the Secretary to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution."  § 256b(a)(8) (emphasis added).  These provisions do not mandate how delivery is to occur.

17

Exhibit 3

pharmaceutical manufacturers to comply with 340B, rather it does the opposite: [the law] assists in fulfilling the purpose of 340B").

The upshot of Plaintiff's argument is that Congress deliberately left to pharmaceutical manufacturers the discretion to refuse to ship 340B discounted drugs to contract pharmacies simply because it was silent in the statute about delivery. *See* Reply [27] at 4 (citing *Novartis*, 102 F.4th at 460). Plaintiff is correct that federal law can preempt state law when Congress, or a federal agency implementing federal law, makes a policy choice that balances competing objectives in such a way that a state regulation aimed at the same subject matter upsets the balance that the federal government struck. *See* Memo [5] at 26 (citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000)). But that is not this case.

In *Geier*, the Court held that a Department of Transportation regulation, FMVSS 208, requiring automobile manufacturers to equip some, but not all, of their 1987 vehicles with passive restraints—such as airbags—preempted state tort law requiring airbags beyond what that regulation required. 529 U.S. at 864–65. But there, the Supreme Court found that "clear evidence of a conflict" existed between state tort law and the regulation. *Id.* at 885. The Court reached this conclusion based on the agency's "contemporaneous explanation" of several "significant considerations" it had in mind in designing the regulation. *See id.* at 877–81. The regulation "deliberately provided [car manufacturers] with a range of choices among different passive restraint devices," so as to "lower costs, overcome technical safety problems, encourage technological development, and win

18

146

widespread consumer acceptance." *Id.* at 875.

Here, Plaintiff does not persuasively show, at least at this stage of the proceedings, how H.B. 728 creates a substantial obstacle to Section 340B's purposes, or what consideration Congress had in mind in not addressing delivery of 340B drugs. In other words, there is no clear evidence of an "actual," "significant" conflict. *Id.* at 884–85 (internal quotation marks and citation omitted). House Bill 728 does not require pharmaceutical manufacturers to offer 340B drugs below applicable ceiling prices, expand the definition of what a 340B healthcare provider is, or expand the remedies available to a covered entity when a manufacturer overcharges it for 340B drugs. House Bill 728 prohibits manufacturers from interfering with covered entities ordering delivery of Section 340B drugs to pharmacies for distribution—something Section 340B may not require, but does not implicitly preclude either.

To the extent that delivering discounted drugs to contract pharmacies raises the risk of diversion, Section 340B prohibits diversion and provides for comprehensive enforcement mechanisms. *See supra*, Part I.A. If Section 340B healthcare providers are conspiring with pharmacies to divert discounted drugs, HHS can require the provider to compensate the manufacturer for its losses, § 256b(a)(5), and remove the provider from the program, § 256b(d)(2)(B)(v)(II). The Court is not prepared to find Section 340B likely preempts H.B. 728 on a theory that Congress's remedial scheme under Section 340B is inadequate to deter violations of federal law. As written, H.B. 728 and Section 340B do not conflict.

19

147

Congress also increased enforcement mechanisms against diversion in the Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 7102, 124 Stat. 119 (enacted March 23, 2010), by adding § 256b(d), *id.* at 823–26, 18 days after the 2010 HRSA Guidance that advised that covered entities can use an unlimited number of contract pharmacies, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010). Thus, Congress was presumably aware of the potential for diversion through the use of an unlimited number of contract pharmacies, and it increased enforcement against diversion, yet remained silent about delivery—not to mention about preemption. And while "failures to enact legislation 'are not reliable indicators of congressional intent,'" *Novartis*, 102 F.4th at 462 (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989)), Plaintiff's argument relies on an inference of preemptive intent from Congress's silence as to delivery, so the Court considers legislative context relevant in interpreting that silence, *see Arizona*, 567 U.S. at 405–406 (discussing policy proposals Congress did not enact in analyzing preemption).

In addition, Plaintiff argues that "H.B. 728 erects a substantial obstacle to that centralized federal process" for enforcing Section 340B's requirements "by creating its own enforcement pathway before state administrative agencies." Memo [5] at 27. The Court disagrees: H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms. The Court therefore concludes that

Plaintiff has not shown a substantial likelihood that it will succeed on the merits of its conflict-preemption claim.

C.     Section 340B does not preempt H.B. 728 under field preemption

The Court is also unpersuaded that Section 340B preempts H.B. 728 under a theory of field preemption. Field preemption requires that Congress has passed such comprehensive legislation in an area that it has "occupied the field." *Arizona*, 567 U.S. at 401. Congress's intent to displace state law can be inferred from its enactment of a federal regulatory scheme "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice*, 331 U.S. at 230). Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986).

"Field preemption of state law is disfavored." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024). The Fifth Circuit has emphasized that "Courts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Id.* (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). "And importantly, field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation.'" *Id.* (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

House Bill 728 implicates a traditional area of state regulation, triggering the presumption against preemption, *see supra*, Part II.B., and rendering inapplicable *Arizona*'s discussion of dominant federal interests, *see Arizona*, 567 U.S. at 399. Section 340B also does not control how manufacturers must deliver discounted drugs to patients of covered entities. *See supra*, Part II.B. Section 340B thus leaves room for states to impose their own regulations on delivery of Section 340B drugs to promote patients' access to their medications. "[M]erely because [Section 340B is] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." *Hillsborough Cnty.*, 471 U.S. at 717. While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with the statute's requirements, *see supra*, Part I.A., Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs.

The Court is also not persuaded that field preemption is compelled by *Astra*'s holding that covered entities cannot bring overcharging claims as third-party beneficiaries to PPAs. *See Astra*, 563 U.S. at 117–19. *Astra* rejected an argument that, despite a covered entity's "inability to assert a statutory right of action" under Section 340B itself, "PPAs implementing the 340B Program are agreements enforceable by covered entities as third-party beneficiaries." *Astra*, 563 U.S. at 117. Because PPAs are essentially contracts whereby manufacturers opt into Section

22

150

340B, the Court reasoned that "[a] third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself." *Id.* at 118. Accordingly, "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id.*

The Supreme Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here. *See Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." (internal quotation marks and citations omitted)). The Court therefore concludes that Plaintiff has not shown a substantial likelihood of success on the merits of its field preemption claim.

D.    Federal laws that provide regulatory exclusivities do not preempt H.B. 728

Plaintiff next contends that H.B. 728 "is preempted by federal drug laws, including those governing regulatory exclusivity and patent protection periods." Memo [5] at 28. The Court disagrees.

The patent laws and other regulatory exclusivities cited by Plaintiff, including the Food, Drug, and Cosmetic Act and Hatch-Waxman Act, create bargains whereby, "[i]n exchange for bringing new designs and technologies into the public domain through disclosure . . . an inventor receives a limited term of

23

151

protection from competitive exploitation." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 604 (2023) (internal quotations and citations omitted). In considering preemption of state laws which potentially conflict with federal patent law, courts look to whether a state law "clashes with the objectives of the federal patent laws." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974) (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964)). Plaintiff asserts, and the Court assumes, that the same logic applies to preemption claims based on other federal regulatory exclusivities that incentivize innovation in pharmaceuticals; that is, that state laws capping prices on drugs that federal law insulates from competition interfere with the objectives of federal law. *See* Memo [5] at 30 (citing *Biotechnology Indus. Org. v. D.C.*, 496 F.3d 1362, 1374 (Fed. Cir. 2007) (concluding that, "[b]y penalizing high prices—and thus limiting the full exercise of the exclusionary power that derives from a patent—the District has chosen to re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs")).

Section 340B does not impose discounts on drugs beyond those for which manufacturers have already agreed to provide discounts in order to participate in Medicare Part B and Medicaid. *See supra*, Part I.A. Because H.B. 728 does not purport to lower prices on any drugs not already discounted under Section 340B, it does not substantially interfere with the incentives created by patent laws or other federal laws establishing regulatory exclusivities. The Court therefore does not find that Plaintiff has shown a substantial likelihood of success on the merits of its preemption claim based on federal regulatory exclusivities.

## III. CONCLUSION

Because Plaintiff has not shown a substantial likelihood of success on the merits as required to obtain a preliminary injunction, it is not entitled to such relief, and the Court need not address the remaining Rule 65 factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008) (declining to address other preliminary injunction factors after finding against the plaintiffs on one such factor). To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined they would not alter the Court's conclusion.

**IT IS, THEREFORE, ORDERED AND ADJUDGED THAT**, Plaintiff Novartis Pharmaceuticals Corporation's Motion [4] for Preliminary Injunction is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 1st day of July, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

25

Exhibit 3

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2026

Lyle W. Cayce
Clerk

No. 24-60342

Novartis Pharmaceuticals Corporation,

*Plaintiff—Appellant*,

*versus*

Lynn Fitch, *in her official capacity as Attorney General of the State of Mississippi*,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:24-CV-164

Before King, Ho, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Novartis Pharmaceuticals Corporation appeals the denial of its motion to preliminarily enjoin the enforcement of a state law governing the distribution of drugs that are discounted under a federal program. It contends that the state law is preempted by federal law. We AFFIRM.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60342

I

Section 340B of the Public Health Service Act requires drug manufacturers that participate in Medicaid and Medicare Part B, like Novartis, to offer covered outpatient drugs at discounted prices to specified "covered entities," such as eligible nonprofit and public hospitals, community health centers, and clinics. 42 U.S.C. §§ 256b(a)(1), (a)(4). The Health Resources and Services Administration, which administers the Section 340B program, has interpreted the statute to permit covered entities to dispense 340B priced drugs to their patients through pharmacies with which they contract. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43549 (Aug. 23, 1996); Notice Regarding 340B Drug Pricing Program–Contract Pharmacy Services, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010). The statute prohibits covered entities from diverting discounted drugs by reselling or transferring them to nonpatients and from obtaining duplicate discounts through receipt of both Section 340B discounts and Medicaid rebates for the same drug. 42 U.S.C. §§ 256b(a)(5), (b)(2).

Many participating drug manufacturers adopted policies restricting covered entities' use of contract pharmacies to dispense 340B priced drugs based on concerns that the arrangements create opportunities for abuse of the Section 340B program and impose significant costs on drug manufacturers. In response, several states, including Mississippi, enacted laws regulating drug manufacturers' treatment of contract pharmacies. Mississippi's H.B. 728 prohibits drug manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with, either directly or indirectly, the acquisition . . . or delivery of" 340B priced drugs to contract pharmacies. Miss. Code Ann. § 41–149–7 (2024).

2

No. 24-60342

Novartis sued the Attorney General of Mississippi for declaratory and injunctive relief and sought a preliminary injunction against the enforcement of H.B. 728 on grounds that it was preempted by federal law. The district court found that Novartis had not shown a substantial likelihood of success on the merits of its claim and denied the motion for a preliminary injunction. Novartis appealed.

## II

We review the denial of a preliminary injunction for abuse of discretion, reviewing underlying legal determinations de novo and factual findings for clear error. *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025).

A party seeking a preliminary injunction must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*AbbVie*, 152 F.4th at 642 (quoting *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018)). When the government is a party, factors three and four merge. *Id.*

## III

Novartis argues that because H.B. 728 "dramatically expands" the scope of Section 340B, the district court erred in finding that it failed to show a likelihood of success on the merits of its claim that under the Supremacy Clause, H.B. 728 is preempted by federal law.

The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or

No. 24-60342

Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. "Congress may implicitly preempt state law in two ways: field preemption and conflict preemption." *AbbVie*, 152 F.4th at 645. Field preemption occurs when Congress's intent to exclusively occupy a field can be inferred from pervasive federal regulation or a dominant federal interest. *Arizona v. United States*, 567 U.S. 387, 399 (2012); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013). Conflict preemption occurs when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. In areas traditionally regulated by the states, courts apply a presumption against preemption, requiring a clear and manifest congressional intent to displace state law. *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024).

Novartis first argues that the district erred in applying the presumption against preemption because H.B. 728 does not regulate traditional state police powers. We recently rejected a pre-enforcement preemption challenge to H.B. 728 substantially similar to that of Novartis in *AbbVie*. *AbbVie* explained that H.B. 728 regulates the distribution of drugs to patients and the role of pharmacies in that process—areas of public health and consumer protection traditionally governed by the states. 152 F.4th at 646–47; *see also AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026) (applying *AbbVie* to a materially indistinguishable Louisiana law and rejecting the argument that the presumption against preemption did not apply because the Louisiana law regulates public health and consumer protection, areas traditionally within a state's police powers). Because *AbbVie* found that H.B. 728 regulates areas traditionally governed by the states, the presumption against preemption applies, and the district court did not err in applying it.

Novartis next argues that the district erred by finding that H.B. 728 is not field preempted by federal law because Congress intended to occupy

4

**Exhibit 3**

No. 24-60342

the field of the Section 340B program. *AbbVie* explained that Section 340B is a drug pricing program that regulates costs, eligibility, and compliance, but it does not govern "the distribution of [340B priced] drugs to patients and the role of pharmacies in such distribution." 152 F.4th at 647. Because Congress left those matters unaddressed, they remained subject to state regulation. *Id.* at 646–47. And in any event, because H.B. 728 regulates areas traditionally reserved for the states, the presumption against preemption applies, reinforcing *AbbVie*'s conclusion that Congress did not intend to exclusively occupy the field. *Id.* at 647.

Finally, Novartis argues that the district erred by not finding that H.B. 728 interferes with federal requirements. *AbbVie* found that H.B. 728 "does not compel manufacturers to 'offer' discounted drugs to contract pharmacies in the way that Section 340B compels . . . [manufacturers] to 'offer' these drugs to covered entities." *Id.* at 647. Nor does "H.B. 728's enforcement scheme . . . conflict with Section 340B's enforcement scheme," it noted, because the statutes do not regulate the same subject matter. *Id.* at 647–48. For these reasons, *AbbVie* held, H.B. 728 does not stand as an obstacle to Section 340B's objectives. *Id.*

Novartis seeks to distinguish *AbbVie*, noting that it found insufficient record evidence to show that H.B. 728 permits diversion of discounted drugs in violation of Section 340B. Here, Novartis argues that H.B. 728 prohibits drug manufacturers from maintaining contract pharmacy policies that are permitted under federal law, which in turn forces them to extend discounts beyond what Section 340B requires. But *AbbVie* expressly found that H.B. 728 "does not compel manufacturers to 'offer' discounted drugs to contract pharmacies"; it only requires them to allow covered entities to *receive* 340B priced drugs through the pharmacies they use to distribute drugs. 152 F.4th at 647 (citation modified). Because *AbbVie* rejected the same theories that Novartis advances here, it controls, and we are bound by that

5

No. 24-60342

holding under our rule of orderliness. *See Murrill*, 166 F.4th at 539 (finding that "[*AbbVie*] controls" the preemption analysis for a materially identical Louisiana statute); *Jacobs v. Nat'l Drug Intel. Ctr.,* 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.").

Because Novartis failed to show a likelihood of success on the merits of its preemption claim, the district court did not abuse its discretion by denying a preliminary injunction. *See AbbVie*, 152 F.4th at 648.

AFFIRMED.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

April 09, 2026

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

    No. 24-60342   Novartis Pharmaceuticals v. Fitch
                   USDC No. 1:24-CV-164

Enclosed is a copy of the court's decision.  The court has entered judgment under Fed. R. App. P. 36.  (However, the opinion may yet contain typographical or printing errors which are subject to correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41 govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require you to attach to your petition for panel rehearing or rehearing en banc an unmarked copy of the court's opinion or order**.  Please read carefully the Internal Operating Procedures (IOP's) following Fed. R. App. P. 40 for a discussion of when a rehearing may be appropriate, the legal standards applied and sanctions which may be imposed if you make a nonmeritorious petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  Fed. R. App. P. 41 provides that a motion for a stay of mandate under Fed. R. App. P. 41 will not be granted simply upon request.  The petition must set forth good cause for a stay or clearly demonstrate that a substantial question will be presented to the Supreme Court.  Otherwise, this court may deny the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court and/or on appeal, and are considering filing a petition for <u>certiorari</u> in the United States Supreme Court, you do not need to file a motion for stay of mandate under Fed. R. App. P. 41.  The issuance of the mandate does not affect the time, or your right, to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible for filing petition(s) for rehearing(s) (panel and/or en banc) and writ(s) of certiorari to the U.S. Supreme Court, unless relieved of your obligation by court order.  If it is your intention to file a motion to withdraw as counsel, you should notify your client promptly, **and advise them of the time limits for filing for <u>rehearing and certiorari</u>**.  Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

The judgment entered provides that appellant pay to appellee the costs on appeal.  A bill of cost form is available on the court's website www.ca5.uscourts.gov.

                         Sincerely,

                         LYLE W. CAYCE, Clerk

                         *Lisa E. Ferrara*

                    By: _____
                         Lisa E. Ferrara, Deputy Clerk
                         504-310-7675

Enclosure(s)

Ms. Susan Cook
Ms. Margaret Dotzel
Ms. Jessica Lynn Ellsworth
Mr. Marlan Golden
Ms. Alyssa Howard
Mr. Carey Thompson Jones
Mr. James William Manuel
Mr. Justin Lee Matheny
Mr. William B. Schultz
Mr. Rex Morris Shannon III
Ms. Catherine Emily Stetson
Mr. Scott G. Stewart

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ABBVIE INC., et al.** | § | **PLAINTIFFS** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-184-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH** | § | |
| *in her official capacity as the* | § | |
| *Attorney General of the State of* | § | |
| *Mississippi* | § | **DEFENDANT** |

### <u>MEMORANDUM OPINION AND ORDER DENYING MOTION [8] FOR PRELIMINARY INJUNCTION</u>

This matter comes before the Court on Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, and Allergan Sales, LLC's (collectively "Plaintiffs") Motion [8] for Preliminary Injunction.  Having considered the allegations set forth in Plaintiffs' Complaint [1], the parties' Memoranda [9], [23], [25], and relevant legal authority, and having heard argument at a hearing held on July 12, 2024, the Court will deny the Motion [8].

### I. <u>BACKGROUND</u>

Plaintiffs' Motion [8] asks the Court to enjoin the enforcement of Mississippi's recently enacted "Defending Affordable Prescription Drug Costs Act," 2024 Miss. H.B. 728 ("H.B. 728"), which took effect on July 1, 2024.  House Bill 728 concerns a federal program referred to as Section 340B.  *See* 42 U.S.C. § 256b.  Under Section 340B, pharmaceutical manufacturers who participate in Medicaid and Medicare Part B must offer certain drugs at discounted prices to certain healthcare providers,

1

called "covered entities," that generally provide care for the poor. *See infra*, Part

I.A. In essence, H.B. 728 requires manufacturers to deliver drugs ordered through

the 340B Program to for-profit pharmacies called "contract pharmacies" with which

covered entities have arrangements under which the pharmacy will dispense

discounted 340B drugs to the covered entity's patients.

Plaintiffs assert that H.B. 728, in requiring them to deliver 340B drugs to an

unlimited number of contract pharmacies, invalidly expands their obligation under

federal law to provide discounted drugs to covered entities. *See* Mem. [9] at 13–16.

They assert that H.B. 728 is preempted by § 256b, and that it constitutes a per se

unconstitutional taking for private use under the Fifth Amendment to the United

States Constitution. *See id.* at 13–22. Plaintiffs therefore seek a preliminary

injunction to stay the enforcement of H.B. 728. *Id.* at 26. Because they are unable

to satisfy the necessary elements for such relief, Plaintiffs' Motion [8] will be denied.

A.     The Section 340B program

Section 340B requires pharmaceutical manufacturers that want the federal

government to cover their drugs under Medicaid and Medicare Part B to provide

discounts on their drugs to certain healthcare providers. 42 U.S.C. §§ 256b, 1396r-

8(a)(1), (5); *see Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum.*

*Servs.*, 58 F.4th 696, 699 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL

1325507 (3d Cir. Jan. 30, 2023). Those healthcare providers are "called '340B' or

'covered' entities," and "include public hospitals and community health centers,

many of" which are "providers of safety-net services to the poor." *Astra USA, Inc. v.*

2

163

*Santa Clara Cnty.*, 563 U.S. 110, 113 (2011); *see* Ex. [24-20] at 13–14 (outlining categories of covered entities). The 340B Program "is superintended by the Health Resources and Services Administration," ("HRSA"), "a unit of the Department of Health and Human Services," ("HHS"). *Astra*, 563 U.S. at 113.

"Drug manufacturers," such as Plaintiffs, "opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement" ("PPA") "used nationwide." *Id.* These agreements "are not transactional, bargained-for contracts. They are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.* PPAs must "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." § 256b(a)(1).

Through Section 340B, Congress leverages the federal government's subsidization of healthcare—Medicare and Medicaid cover "almost half the annual nationwide spending on prescription drugs," *Sanofi Aventis*, 58 F.4th at 699 (citing Cong. Budget Off., *Prescription Drugs: Spending, Use, and Prices* 8 (2022))—to aid covered entities in their mission to care for low-income Americans, *see id.* The statute enables covered entities "to give uninsured patients drugs at little or no cost." *Id.* Covered entities also obtain "extra revenue from serving insured patients" because "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Id.* (citing Gov't Accountability Off., *Drug Pricing: Manufacturer Discounts in the 340B Program*

3

*Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011)).

As the Supreme Court recently observed, Congress arguably "intended for the 340B program's drug reimbursements to subsidize other services provided by 340B hospitals" because they "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730, 738 (2022). A federal district court has also discussed how "the purpose of the 340B program was to provide a means to make 340B entities profitable." *Genesis Health Care, Inc. v. Becerra*, No. 4:19-CV-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023).

According to a House Report on Section 340B, Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress enacted the Omnibus Budget Reconciliation Act of 1990, which created the Medicaid Drug Rebate Program. *Id.* (citing H.R. Rep. No. 102-384(II), at 7–11 (1992)). Congress's goal, as stated in House Report 384(II), was to protect covered entities from such price increases because they "reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *Id.* (quoting H.R. Rep. No. 102-384(II), at 11).

A 1991 House Report on Section 340B specifically noted "sharp increases in drug prices to the" Department of Veterans Affairs. H.R. Rep. No. 102-384(I), at 1 (1991). The Committee on Veterans' Affairs "believe[d] that, absent the enactment of legislation which would result in rolling back prices VA pays for needed

4

165

pharmaceuticals to levels comparable to those in place prior to [the Omnibus Budget Reconciliation Act of 1990], veterans [would] suffer." *Id.* at 2. "As graphically depicted in [House Report 384(I)], the veteran has become the ultimate and unwitting victim of pharmaceutical companies' circumventing Congress' intent by raising VA prices to protect their profit margins." *Id.* Following these price increases:

> the Co[m]mittee received correspondence from many veterans who wrote to complain that they had received "Dear Veteran" letters informing them that as of a specified date their VA medical center would discontinue filling outpatient prescriptions for specified drugs as an economy measure. Some centers responded to the pharmacy budget dilemma which these price increases posed by substituting lower cost drugs for higher cost medications or even by denying outpatient medications to nonservice-connected veterans altogether.

*Id.* at 6. The VA Secretary testified before Congress that, to make up for an estimated $60 million annual increase in drug acquisition costs per year, the VA would likely need to "cut programs" and "[c]lose beds." *Id.* at 7.

Congress's goal was that "the 340B program would 'enable [covered entities] to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" *Genesis Health Care*, 2023 WL 7549156, at *1 (quoting H.R. Rep. 102-384(II), at 12) (alteration in original). In other words, Congress wanted to ensure certain healthcare providers can afford to provide the care that qualifies an entity to be a covered entity under § 256b. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549 (Aug. 23, 1996) (hereinafter "August 1996 Guidance") (discussing how covered entities could "use savings

5

166

realized from participation in the program to help subsidize prescriptions for their lower income patients, increase the number of patients whom they can subsidize and expand services and formularies"). Section 256b(a)'s text plainly exhibits that purpose by requiring that manufacturers offer covered entities discounts. *See* § 256b(a)(1)–(4). And by "stretch scarce Federal resources," House Report 102-384(II) presumably referred to the fact that many covered entities are federally funded. *See Genesis Health Care*, 2023 WL 7549156, at *1, *10; H.R. Rep. No. 102-384(II), at 7 ("The purpose of H.R. 2890 is to enable the Department of Veterans Affairs and certain Federally-funded clinics to obtain lower prices on the drugs that they provide to their patients.").[1]

Section 340B contains two provisions that prohibit covered entities from abusing their ability to obtain discounted drugs. Covered entities cannot "resell or otherwise transfer" discounted drugs "to a person who is not a patient of the entity." § 256b(a)(5)(B). Covered entities also cannot obtain "duplicate discounts or rebates," meaning they cannot obtain Medicaid rebates under title XIX of the Social Security Act, *see* 42 U.S.C. § 1396, *et seq.*, for drugs that they purchase at a discount under Section 340B, *see* § 256b(a)(5)(A)(i).

To ensure covered entities do not resell discounted drugs or obtain duplicate discounts, the statute contains an auditing provision. It states:

---

[1] Although a different provision of the same Act specifically addresses prescription drugs acquired by the VA, *see* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 603, 106 Stat. 4943, 4971 (1992); 38 U.S.C. § 8126, the historical context recorded in House Report 384(I) illustrates why Congress provided discounts to covered entities, thus clarifying Congress's purposes and objectives, *see infra*, Part II.B. and note 3.

6

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

§ 256b(a)(5)(C). And "[i]f the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing," that the covered entity illegally resold discounted drugs or obtained duplicate discounts, "the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . provided under the agreement between the entity and the manufacturer." § 256b(a)(5)(D).

The Secretary can impose additional sanctions. Covered entities that the Secretary finds knowingly and intentionally resold discounted drugs must "pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under [§ 256(a)(5)(D)]." § 256b(d)(2)(B)(v)(I). Where the Secretary finds the covered entity's reselling "was systematic and egregious as well as knowing and intentional," the Secretary can remove the covered entity from the program entirely. § 256b(d)(2)(B)(v)(II).

B.      The dispensation of 340B drugs at contract pharmacies and related litigation

The issue in this case concerns a matter notably absent from the foregoing discussion: how discounted drugs under Section 340B are delivered to patients of covered entities. *See* August 1996 Guidance at 43,549 ("The statute is silent as to permissible drug distribution systems."). Section 340B does discuss distribution,

7

168

directing the Secretary to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution." § 256b(a)(8) (emphasis added). These provisions do not mandate how delivery is to occur. And § 256b(a)(8) does not expressly permit or forbid covered entities to pay for drugs to be delivered or dispensed to patients off their physical premises.

HRSA has attempted to fill the statutory silence about delivery with guidance. Between 1996 and March 2010, HRSA's August 1996 Guidance "acknowledged that section 340B 'is silent as to permissible drug distribution systems,' but it nonetheless sought to fill 'gaps in the legislation' and thereby 'move the program forward.'" *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456–57 (D.C. Cir. 2024) (quoting August 1996 Guidance at 43,549–50). Given that "many covered entities use outside pharmacies to distribute drugs to their patients," HRSA's 1996 Guidance "stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing August 1996 Guidance at 43,555). The August 1996 Guidance also required that, "in directing shipments to its contract pharmacy," the covered entity "must retain title to the drugs and thus 'be responsible' for any diversion or duplicate discounts." *Id.* (citing 1996 Guidance at 43,553).

The August 1996 Guidance did not conclude that use of a contract pharmacy, in and of itself, constitutes illegal diversion under § 256b(a)(5)(B). *See* August 1996

8

Exhibit 3

Guidance at 43,549–50 ("If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance."); *see also id.* (explaining how, because "[t]he statute is silent as to permissible drug distribution systems," and "[t]here is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself," that "[i]t is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities"). The August 1996 Guidance responded to extensive comments concerning "[p]otential [d]rug [d]iversion." *Id.* at 43,552. HRSA ultimately concluded that risks of diversion did not warrant precluding covered entities without in-house pharmacies from dispensing 340B drugs that they purchase at a contract pharmacy, and it noted how "[a]lthough some manufacturers expressed concerns regarding the potential for drug diversion, the Department ha[d] received no evidence of diversion that has required an official Departmental investigation." *See id.* at 43,549, 43,552.

HRSA also noted that, while its guidelines would require that "only one site [be] used for" contract pharmacy services, the Office of Drug Pricing ("ODP") would "be evaluating the feasibility of permitting these covered entities to contract with more than one site and contractor." *Id.* at 43,555. The August 1996 Guidance appears to have set forth guidelines in the way of compromise, not an interpretation that the statute's silence about delivery implies a one-pharmacy limit for covered

entities without in-house pharmacies. *See id.* at 43549–50 (referring to its proposal as "guidelines" issued because "there were many gaps in the legislation and some form of program structure was necessary to move the program forward").

In 2010, HRSA decided it was no longer appropriate for its guidelines to limit the number of contract pharmacies that covered entities could use. HRSA's 2010 Guidance took the position that "covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Novartis*, 102 F.4th at 457 (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) (hereinafter "2010 Guidance")). In its view, this Guidance "would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients." 2010 Guidance at 10,273. HRSA also explained how, "[s]ince 2001, covered entities that have wanted to use other types of arrangements, or to blend the method of providing services (e.g. contract pharmacy to supplement an in-house pharmacy)," which would go beyond the August 1996 Guidance, "have needed to apply to the [Office of Pharmacy Affairs] for an Alternative Methods Demonstration Project (AMDP) and secure approval in order to proceed." *Id.* "Upon review of the evidence" it collected from these demonstration projects, "HRSA [did] not find sufficient basis to continue limiting contract pharmacies to a single site." *Id.*

10

Exhibit 3

In its 2010 Guidance, HRSA did not change its view that covered entities "must maintain title to and responsibility for the drugs." *Novartis*, 102 F.4th at 457 (citing 2010 Guidance at 10,277). HRSA considered comments following the release of proposed guidelines in 2007, Notice Regarding 340B Drug Pricing Program— Contract Pharmacy Services, 72 Fed. Reg. 1,540 (Jan. 12, 2007) (hereinafter "2007 HRSA Notice"), asserting that allowing covered entities to dispense Section 340B drugs through multiple contract pharmacies would enable diversion and duplicate discounts, *see* 2010 Guidance at 10,272–75. But it ultimately decided that covered entities could use multiple contract pharmacies if "they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition," including that "[a]uditable records must be maintained to demonstrate compliance with those requirements." *Id.* at 10,273.

In 2020, many pharmaceutical manufacturers sought to prevent covered entities from using multiple contract pharmacies to dispense Section 340B drugs by implementing policies "limit[ing] the number and kinds of contract pharmacies to which they would ship orders." *Novartis*, 102 F.4th at 458. As Plaintiffs argue in their Memorandum [9], pharmaceutical manufacturers were and remain concerned about the model covered entities and contract pharmacies often use in dispensing and accounting for Section 340B drugs. *See* Mem. [9] at 17–18. Plaintiffs refer to that model as the "replenishment model." *Id.* Put simply, under this model, a contract pharmacy first dispenses prescription drugs to all its customers from one supply of drugs, which it purchased at full price from the manufacturer. *Id.*

11

According to Plaintiffs, the pharmacy—or a third-party administrator—determines whether a customer was a covered-entity patient after it dispenses the drug. *Id.* The pharmacy then informs the covered entity of the quantity of drugs it dispensed to the entity's patients. *Id.* The covered entity then places an order of Section 340B drugs in that quantity as a "replenishment" of the drugs dispensed to covered-entity patients. *See id.*

According to Plaintiffs, sometimes the pharmacies or third-party administrators in fact place the order. *Id.* "Surprisingly, a covered entity might not even be aware that the pharmacy is placing this order as the pharmacy (or its third-party vendor) often places such orders." *Id.* (citing Ex. [8-1] at 7, Scheidler Dec., at ¶ 13). But Plaintiffs have not adduced evidence that anyone but the covered entity ever *pays for* replenishment orders, or that pharmacies nakedly place orders on their own behalf for non-340B purposes.

As the D.C. Circuit recognized, "[m]anufacturers," such as Plaintiffs, "have argued that these arrangements lead to unlawful diversion and duplicate discounts." *Novartis*, 102 F.4th at 458. Under the replenishment model, "[t]he covered entity [and] the pharmacy . . . often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. So, covered entities and contract pharmacies both have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457–58. Conversely, it seems evident that pharmaceutical manufacturers would prefer as few orders of their products be considered discount-eligible as possible.

12

In 2020, in response to manufacturers' policies limiting distribution to contract pharmacies, HHS issued an advisory opinion stating that pharmaceutical manufacturers were *required* to permit Section 340B drugs to be delivered to an unlimited number of contract pharmacies. *See Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., *Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program* (Dec. 30, 2020), https://perma.cc/L7W2-H597 (hereinafter "2020 Advisory Opinion")). "HHS reasoned that 340B drugs are 'purchased by' a covered entity no matter how they are distributed," and so, "the 'situs of delivery . . . is irrelevant.'" *Id.* at 701 (citing 2020 Advisory Opinion at 1–3). Both the Third and the D.C. Circuits concluded, however, that Section 340B is silent about delivery, and that the federal statute's requirement that manufacturers offer discounts to covered entities did not implicitly permit HHS to mandate that they comply with any delivery practice the covered entities desire. *See id.* at 703–06; *Novartis*, 102 F.4th at 460–63.

In response, states have begun to impose explicitly what HHS had purported to impose by guidance. For example, in 2021, Arkansas enacted Act 1103, which "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs," and "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution." *Pharm.*

13

174

*Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024) (citing Ark. Code Ann. § 23-92-604(c)).

An association of pharmaceutical manufacturers sought an injunction against enforcement of the Arkansas law on a theory that Section 340B preempts it. *Id.* at 1139–40. The Eighth Circuit disagreed. *Id.* As to field preemption, the Eighth Circuit concluded that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it," given that the statute is "'is silent about delivery' of drugs to patients." *Id.* at 1143 (quoting *Sanofi Aventis U.S. LLC*, 58 F.4th at 703) (other quotation marks and citation omitted). Concerning conflict preemption, because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies," and "does not set or enforce discount pricing," the Eighth Circuit found that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to the statute's purpose. *Id.* at 1145. In fact, the Eighth Circuit observed that the Arkansas law "assists in fulfilling the purpose of 340B," in that it facilitates the distribution and dispensation of discounted 340B drugs. *Id.*

On April 12, 2024, the Governor of Mississippi signed H.B. 728, which had been enacted by the state legislature. Ex. [22-1] (H.B. 728). House Bill 728 provides that "[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on

14

175

behalf of the covered entity." H.B. 728 § 4. The law defines a "340B drug" as a covered outpatient drug "that has been subject to any offer for reduced prices by a manufacturer pursuant to [Section 340B]." H.B. 728 § 2(a). A violation of H.B. 728 constitutes a violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*, *see* H.B. 728 § 5, which provides for both civil and criminal penalties and is enforced by Mississippi's Attorney General, *see* Miss Code Ann. §§ 75-24-9 (covering injunctive relief), 75-24-19 (covering civil penalties for violations of injunctions issued under § 75-24-9, and for knowing and willful violations of the statute), 75-24-20 (covering criminal penalties for knowing and willful violations).

C. <u>Procedural history</u>

On June 18, 2024, Plaintiffs filed a Complaint [1] in this Court seeking a declaratory judgment under 28 U.S.C. § 2201 that H.B. 728 is unlawful and unenforceable. Compl. [1] at 46. They likewise sought temporary, preliminary, and permanent injunctive relief against the Attorney General of Mississippi, enjoining her from enforcing H.B. 728 against Plaintiffs. *Id.* Plaintiffs filed a Motion [8] for Preliminary Injunction on June 19, 2024, arguing that H.B. 728 is preempted under conflict and field preemption, and that it coerces transfers of discounted drugs to private pharmacies such that it amounts to an unconstitutional taking for private use. *See generally* Mem. [9]. Defendant, Mississippi Attorney General Lynn Fitch, ("Defendant") responded on July 8, 2024, Resp. [22]. The Court held a hearing on the Motion [8] on July 12, 2024.

15

176

**Exhibit 3**

## II. <u>DISCUSSION</u>

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest." *Clark v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023); *see* Fed. R. Civ. P. 65. Factors three and four, "[t]he balance-of-harms and public-interest factors[,] merge when the government opposes an injunction." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

Plaintiffs cannot satisfy the first requirement because they have not demonstrated a "substantial likelihood of success on the merits." *Clark*, 74 F.4th at 640. The Court will therefore deny the Motion [8] and need not reach the other elements.

### A.    <u>Preemption generally</u>

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the

16

Contrary notwithstanding." Art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

When a party raises preemption, "'[t]he purpose of Congress is the ultimate touchstone' of [the] analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)) (other citations and quotations omitted). Preemption may be "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation marks and citation omitted). But the Court cannot "assume[] lightly that Congress has derogated state regulation, but instead [should] address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). And "[d]eference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks and citations omitted).

Three categories of preemption exist: "when (1) a federal statute expressly preempts state law," ("express preemption"); "(2) federal legislation pervasively occupies a regulatory field," ("field preemption"); "or (3) a federal statute conflicts with state law," ("conflict preemption"). *Deanda v. Becerra*, 96 F.4th 750, 760–61 (5th Cir. 2024) (citing *Arizona*, 567 U.S. at 398–400). Plaintiffs do not contend that

17

178

the 340B Program expressly preempts Mississippi law. *See generally* Mem. [9].

Rather, Plaintiffs argue that the 340B Program implicitly preempts Mississippi law

under conflict preemption and field preemption. *Id.* at 13–19.

B.      Section 340B does not preempt H.B. 728 under conflict preemption

Conflict preemption arises "where 'compliance with both state and federal

law is impossible,' or where 'the state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'"

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC*

*America Corp.*, 490 U.S. 93, 100, 101 (1989)) (other internal quotation marks

omitted). "In either situation, federal law must prevail." *Id.*

Plaintiffs do not contend that compliance with both Mississippi and federal

law is impossible. *See generally* Mem. [9]. So, Plaintiffs must show that the

Mississippi law "produce[s] a result inconsistent with the objective of the federal

statute," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), such that it

"stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). Plaintiffs must

cross "a high threshold" to succeed on such a theory. *Barrosse v. Huntington*

*Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*,

563 U.S. 582, 607 (2011)), *cert. denied*, 144 S. Ct. 557 (2024). "Courts may not

conduct 'a freewheeling judicial inquiry into whether a state statute is in tension

with federal objectives [because] such an endeavor would undercut the principle

18

179

that it is Congress rather than the courts that pre-empts state law.'" *Id.* (quoting *Whiting*, 563 U.S. at 607) (alteration in original).

In a case like this one, "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda*, 96 F.4th at 761 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). That is because a state law regulating health and safety falls within a state's traditional police powers. *See Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 710, 716 (1985) (holding that a local regulation of blood donation centers, including "donor testing and recordkeeping requirements beyond those contained in the federal regulations," was not preempted because the challenger did not "present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that [was] strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation"); *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) (discussing how the Court should "begin with the assumption that Congress did not intend to supersede the historic police powers of the states to protect the health and safety of their citizens" (internal quotation marks and citation omitted)).

House Bill 728 plainly falls under the umbrella of a health and safety regulation. It prohibits manufacturers from refusing to deliver Section 340B drugs to contract pharmacies, presumably to maximize covered-entity patients' access to

19

180

drugs for which the manufacturers have already agreed to provide a discount. The state statute therefore triggers the presumption against preemption. *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (plurality opinion of Stevens, J.) (applying "[t]he presumption against federal pre-emption of a state statute designed to foster public health" (citing *Hillsborough Cnty.*, 471 U.S. at 715–18), and rejecting a preemption claim challenging a Maine policy that subjected drug manufacturers' pharmaceuticals to prior authorization procedures before providing state Medicaid coverage for them unless the manufacturers agreed to provide rebates to Maine residents beyond rebates the Medicaid Act provides for); *Wyeth v. Levine*, 555 U.S. 555, 578 (2009) ("[T]he FDA traditionally regarded state law as a complementary form of drug regulation."); *McClain*, 95 F.4th at 1144 (holding that Section 340B does not preempt state law prohibiting manufacturers from precluding covered entities from making dispensation contracts with pharmacies in part because "[p]harmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted").

Plaintiffs argue that the law does not trigger this presumption, but the Court is unpersuaded. *See* Reply [25] at 7. Plaintiffs cite *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012), but *Lofton* merely states that "whatever value or relevance a presumption against preemption of state tort law should play is uncertain" given its observation that the Supreme Court's "majority

20

181

opinion in [*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)] made no reference to the 'presumption' in the course of upholding implied conflict preemption over state law claims for failure to maintain adequate warning labels for FDA-approved generic drugs." 672 F.3d at 378. *Lofton*'s statements about the scope of the presumption against preemption do not mean that the presumption against preemption no longer applies.

Further, *Lofton*'s note that "the primacy of the state's police powers is not universal" does not alter whether the presumption against preemption applies. *Id.* *Lofton* discussed state-law tort claims based on fraud on the FDA. *See id.* at 378–79. In that context, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Id.* at 378 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)). House Bill 728 does not purport to prohibit fraud on a federal agency.

Plaintiffs also argue that the presumption against preemption does not apply because H.B. 728 "explicitly depends on a federal statute," Section 340B, and "imposes additional terms and conditions on drug manufacturers' 340B arrangements with the federal government." Reply [25] at 7. The argument is essentially that, by regulating the delivery of drugs discounted under a federal program, Mississippi is in effect amending a federal regulation, not enacting its own health and safety regulation under its police powers. But the Fifth Circuit has explained how, even when a given field is "an area of significant federal presence," a

state law regulating the same subject matter can be "grounded instead in consumer protection, an area traditionally reserved to the States," and thus entitled to the presumption against preemption. *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012).

Notably, the Supremacy Clause's text does not indicate that states cannot regulate by reference to pre-existing federal programs. The Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. This language indicates federal law governs despite a conflict with state law, but not that states lack the power to enact regulations by reference to federal law. *See McCulloch v. Maryland*, 4 Wheat. 316, 361 (1819) ("By this declaration, the states are prohibited from passing any acts which shall be repugnant to a law of the United States."). True, "[s]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (citing *McCulloch*, 4 Wheat. at 436). But the authorities cited show that state laws that do not conflict with the federal law are constitutional.

Applying the presumption against preemption here, the Court does not find that Section 340B exhibits a clear purpose to preempt state laws that would require manufacturers to deliver covered entities' drugs to contract pharmacies for dispensation. Section 340B does not explicitly mandate how delivery of discounted drugs is to occur. *See McClain*, 95 F.4th at 1142 ("[T]he 340B Program 'is silent

22

183

about delivery' and distribution of pharmaceuticals to patients." (quoting *Sanofi Aventis*, 58 F.4th at 703)).  Section 340B merely requires participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."  § 256b(a)(1).  And it prohibits the resale of those discounted drugs to anyone "who is not a patient of the entity." § 256b(a)(5)(B).

*Sanofi Aventis* and *Novartis* concluded that, under the terms of Section 340B, HHS may not *require* manufacturers to ship drugs intended for covered-entity patients to any contract pharmacy the entity deals with.  *Sanofi Aventis*, 58 F.4th at 703 (concluding that "Section 340B does not require delivery to an unlimited number of contract pharmacies"); *Novartis*, 102 F.4th at 460–63.  But the same "[s]tatutory silence[]," *Sanofi Aventis*, 58 F.4th 699, that does not *implicitly mandate* that manufacturers deliver to any contract pharmacy does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients, *see McClain*, 95 F.4th at 1145 (concluding that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to Section 340B's objectives).  If anything, H.B. 728 arguably promotes Section 340B's objective by ensuring covered-entity patients can conveniently access 340B drugs.  *See id.* at 1144–45 (explaining how Arkansas's prohibition on manufacturers preventing covered entities from contracting with pharmacies for drug distribution "does not create an obstacle for pharmaceutical

23

184

manufacturers to comply with 340B, rather it does the opposite: [the law] assists in fulfilling the purpose of 340B").

Even if most covered-entity patients who obtain discounted drugs at contract pharmacies have insurance that reimburses the pharmacy—which passes on the reimbursement to the covered entity, less service and administrative fees, *see* Ex. [24-20] at 19—*some* patients lack insurance and rely on 340B discounts at pharmacies. Plaintiffs cite a study based on an analysis of pharmacy claims data that found 1.4% of contract-pharmacy dispensations of branded 340B drugs were to patients using "340B discount cards," which are cards pharmacies give to uninsured covered-entity patients. Ex. [24-10] at 8–12. On average, patients with these cards received a 92.9% discount. *Id.* at 11. Of other dispensations, 50.8% were paid by Medicaid or Medicare coverage, and 39.0% were paid by commercial insurance. *Id.*

To support its argument that, at least in Mississippi, contract pharmacies benefit patients, Defendant submitted the Declaration of Trenton Deland Lott, Pharm.D., A.C.E., "a Managing Member and co-founder of 340B Together, LLC, which provides management services to 340B covered entities." Ex. [22-7] at 1. He declared that use of contract pharmacies "enables 340B entities to provide medications to needy Mississippians across a wider geographic area than is currently permitted under AbbVie's recently adopted restrictions," which limit covered entities to a single contract pharmacy within 40 miles of the entity. *Id.* at 2. He emphasized how covered-entity patients may struggle to transport themselves to the covered entity's in-house pharmacy or a far-away contract

24

pharmacy, rendering it more difficult for them "to obtain needed pharmaceuticals in a timely fashion." *Id.* He also stated that "[t]he Mississippi 340B hospitals and other covered entities with which [he] work[s] routinely pass on 340B savings to 340B qualified patients without third-party coverage in the form of cash cards to be used when purchasing 340B drugs." *Id.*

The Court does not find, at this juncture, that Plaintiffs have shown that patients do not benefit from contract pharmacies through H.B. 728. Regardless, Congress also intended that Section 340B would incentivize providers to provide certain kinds of care by ensuring they can obtain drugs for their patients at discounted prices. *See Am. Hosp. Ass'n*, 596 U.S. at 730, 738; *Genesis Health Care*, 2023 WL 7549156, at *1 (citing H.R. Rep. 102-384(II) at 12). The history behind the statute illustrates that Congress passed it out of concern for covered entities' margins, and that covered entities' margins affect patient care. *See supra*, Part I.A.

Plaintiffs cite several studies and reports arguing that Section 340B does not sufficiently ensure that covered entities use the margins they obtain through the program to serve patients, and that covered entities focus expansion of services and contract pharmacies in areas mostly inhabited by insured patients to maximize their margins.[2] *See* Ex. [24-3] at 6; Ex. [24-4] at 3; Ex. [24-5] at 2; Ex. [24-6] at 3–5; Ex. [24-7] at 3; Ex. [24-8] at 2–3; Ex. [24-9] at 1–4; Ex. [24-10] at 12; Ex. [24-14] at 8. But criticism of Section 340B's effectiveness in achieving its *own* purposes cannot

---

[2] Plaintiffs included these reports at least in part to argue that enjoining enforcement H.B. 728 will not disserve the public interest. *See Clark*, 74 F.4th at 640–41 (outlining the preliminary injunction factors).

give rise to a conflict-preemption claim when the state statute is not inconsistent with Section 340B's terms. *See Barrosse*, 70 F.4th at 320 ("Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" (quoting *Whiting*, 563 U.S. at 607)) (alteration in original).

The upshot of Plaintiffs' argument that Section 340B and H.B. 728 conflict is that Congress deliberately left to pharmaceutical manufacturers the discretion to refuse to ship 340B discounted drugs to contract pharmacies simply because it was silent in the statute about delivery. *See* Reply [25] at 8 (citing *Sanofi Aventis*, 58 F.4th at 704; *Novartis*, 102 F.4th at 460). True, federal law can preempt state law when Congress, or a federal agency implementing federal law, makes a policy choice that balances competing objectives in such a way that a state regulation aimed at the same subject matter upsets the balance that the federal government struck. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). But that is not this case.

In *Geier*, for example, the Court held that a Department of Transportation regulation, FMVSS 208, requiring automobile manufacturers to equip some, but not all, of their 1987 vehicles with passive restraints—such as airbags—preempted state tort law requiring airbags beyond what that regulation required. 529 U.S. at 864–65. But there, the Supreme Court found that "clear evidence of a conflict" existed between state tort law and the regulation. *Id.* at 885. The Court reached this conclusion based on the agency's "contemporaneous explanation" of several

26

187

"significant considerations" it had in mind in designing the regulation.  *See id.* at
877–81.  The regulation "deliberately provided [car manufacturers] with a range of
choices among different passive restraint devices," so as to "lower costs, overcome
technical safety problems, encourage technological development, and win
widespread consumer acceptance."  *Id.* at 875.

Here, Plaintiffs do not persuasively show, at least at this stage of the
proceedings, how H.B. 728 creates a substantial obstacle to Section 340B's
purposes, or what consideration Congress had in mind in not addressing delivery of
340B drugs.  In other words, there is no clear evidence of an "actual," "significant"
conflict.  *Id.* at 884–85 (internal quotation marks and citation omitted).  House Bill
728 does not require pharmaceutical manufacturers to offer 340B drugs below
applicable ceiling prices, expand the definition of what a 340B healthcare provider
is, or expand the remedies available to a covered entity when a manufacturer
overcharges it for 340B drugs.  House Bill 728 prohibits manufacturers from
interfering with covered entities ordering delivery of Section 340B drugs to
pharmacies for dispensation—something § 256b neither requires nor precludes.

To the extent that delivering discounted drugs to contract pharmacies raises
the risk of diversion, Section 340B prohibits diversion and provides for
comprehensive enforcement mechanisms.  *See supra*, Part I.A.  If Section 340B
healthcare providers are conspiring with pharmacies to divert discounted drugs,
HHS can require the provider to compensate the manufacturer for its losses,
§ 256b(a)(5), and remove the provider from the program, § 256b(d)(2)(B)(v)(II).  The

27

188

Court is not prepared to find Section 340B likely preempts H.B. 728 on a theory that Congress's remedial scheme under Section 340B is inadequate to deter violations of federal law.  As written, H.B. 728 and Section 340B do not conflict.

Congress also increased enforcement mechanisms against diversion in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102, 124 Stat. 119 (enacted March 23, 2010), by adding § 256b(d), *id.* at 823–26, which was enacted 18 days after the 2010 HRSA Guidance that advised that covered entities can use an unlimited number of contract pharmacies, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010).  Congress also added several categories of hospitals as covered entities.  Pub. L. No. 111-148, 124 Stat. 821–822; 42 U.S.C. § 256b(a)(4)(M)–(O). Thus, Congress was presumably aware of potential risks of diversion through the use of contract pharmacies, and it expanded Section 340B while increasing enforcement against diversion.  Yet Congress remained silent about delivery—not to mention about preemption.  And while "failures to enact legislation 'are not reliable indicators of congressional intent,'" *Novartis*, 102 F.4th at 462 (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989)), Plaintiffs' argument relies on an inference of preemptive intent from Congress's silence as to delivery, so the Court considers legislative context relevant in interpreting that silence, *see Arizona*, 567 U.S. at 405–406 (discussing policy proposals Congress did not enact in analyzing preemption).[3]

---

[3] Ordinarily, it is the party claiming preemption that will "rely on legislative history to demonstrate

28

189

In addition, Plaintiffs argue that H.B. 728 "conflicts with" Section 340B's enforcement provisions "by creating its own enforcement scheme entirely separate and apart from federal law." Mem. [9] at 17. The Court disagrees: H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms.

Plaintiffs further argue that H.B. 728's terms literally require manufacturers to sell drugs at discounts directly to private pharmacies. Plaintiffs point out how H.B. 728 requires "that '[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, *the acquisition of a 340B drug by*, or delivery of a 340B drug to, *a pharmacy* that is under contract with a 340B entity.'" Mem. [9] at 17 (quoting H.B. 728 § 4(1)) (Plaintiffs' emphasis and alteration). Plaintiffs argue that the term "acquisition" means H.B. 728 compels direct sales to pharmacies, not covered entities.

The Court cannot agree. House Bill 728 defines a "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to use pursuant to 42 USC 256b and is purchased by a covered entity as defined in 42 USC 256b(a)(4)." H.B. 728 § 2(a). Incorporating this definition into § 4(1), H.B. 728 prohibits manufacturers from interfering with delivery of drugs "purchased by a

---

Congress" intended to preempt state law by inaction. *TelTech*, 702 F.3d at 238. For that reason, Justice Thomas has noted his skepticism of purposes and objectives preemption, arguing that, under it, "the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law." *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring in the judgment).

29

190

covered entity" to contract pharmacies. *Id.* If the drugs are not purchased by a covered entity, § 4(1) does not apply.

Further, § 4(1)'s terms "should be 'interpreted in [their] statutory and historical context and with appreciation for [their] importance to the [statute] as a whole.'" *Texas v. Biden*, 646 F. Supp. 3d 753, 767 (N.D. Tex. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The rest of H.B. 728 § 4(1) plainly addresses delivery. Section 4(1) discusses the pharmacy's contract with a 340B entity, confirming that it addresses distribution of drugs, not sale of drugs directly to pharmacies. *See* H.B. 728 § 4(1). And if the Mississippi Legislature meant to use H.B. 728 to require manufacturers to sell drugs at 340B discounts to private pharmacies, it could have straightforwardly borrowed the phrase "shall . . . offer" from § 256b(a)(1), rather than deploy the phrase "deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by . . . a pharmacy under contract with" a covered entity. H.B. 728 § 4(1).

The history behind H.B. 728, *see supra*, Parts I.A.–B., further demonstrates that Mississippi passed the law to fill the gap in Section 340B concerning delivery of Section 340B drugs. HRSA recognized early on how "Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." August 1996 Guidance at 43,549. House Bill 728's broad language is thus reasonably read as ensuring manufacturers

30

191

Exhibit 3

do not craft creative distribution schemes or conditions to avoid providing discounts on 340B drugs.

Further, H.B. 728 states that it should not be construed to conflict with federal law, H.B. 728 § 6, and the Court must apply the presumption against preemption to construe state laws not to conflict with federal law when possible, *see Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." (citation omitted)). The Court will not read H.B. 728 § 4(1) to accidently conflict with federal law.

The Court finally addresses Plaintiffs' argument that H.B. 728 conflicts with § 256b(a)(5)(B) because it compels manufacturers to cooperate with the replenishment model. *See* Mem. [9] at 17–18; *supra*, Part I.B. (explaining the replenishment model). Plaintiffs assert that replenishment orders are, in and of themselves, illegal diversion. *See* Mem. [9] at 17–18. Plaintiffs' theory is that the covered entity purchases the replenishment supply at the Section 340B discount for delivery to the pharmacy, which places the drugs on its shelf in a commingled supply for dispensation to its next customer, who may be "a person who is not a patient of the [covered] entity." § 256b(a)(5)(B).

Although that may be true in a literal sense, the Court does not find that the replenishment model constitutes illegal diversion. As Plaintiffs' Exhibit [24-17], which is a copy of Intervenor Defendant's Reply in Support of Its Motion for

31

192

Summary Judgment in *AbbVie et al. v. Murrill*, No. 6:23-cv-1307-RRS-CBW (April

26, 2024), ECF No. 74, explains:

> Replenishment inventory systems are commonplace. When a manufacturer sells drugs through a wholesaler, the drugs shipped to the wholesaler are not intended to fill a particular order placed by a pharmacy; instead, they supply inventory to the wholesaler that the wholesaler then sells to a pharmacy. *See, e.g.*, Robert Handfield, Biopharmaceutical Supply Chains 11-13 (2012) (ebook). Even if the drugs shipped by the manufacturer to the wholesaler filled an order placed by a pharmacy, the drugs would not necessarily be the same drugs delivered by the wholesaler to the pharmacy because prescription drugs are manufactured in a precise and reproducible manner that make them fungible. *See* 21 U.S.C. §§ 360(e), 360eee-1; 21 C.F.R. § 207.33.

Ex. [24-17] at 11. Accordingly, it appears that pharmaceuticals distribution often

relies on pharmaceuticals' fungibility to facilitate efficiency. So, Section 340B

presumably contemplates that efficient distribution of fungible drugs to covered-

entity patients might utilize a replenishment model.

Importantly, Section 340B's terms in no way prohibit the use of contract

pharmacies. Section 340B mandates that manufacturers "offer" discounted drugs to

covered entities, § 256b(a)(1), and prohibits covered entities from diverting those

drugs to persons who are not their patients, § 256b(a)(5)(B). While § 256b discusses

distribution options, directing the Secretary to "establish a prime vendor program

under which covered entities may enter into contracts with prime vendors for the

distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains

drugs directly from a manufacturer, the manufacturer shall be responsible for the

costs of distribution," § 256b(a)(8) (emphasis added), § 256b does not mandate how

delivery must occur. HRSA has also taken the position since 1996 that "[i]f [a

32

193

covered] entity directs [a] drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance." August 1996 Guidance at 43,549–43,550. HRSA even noted the following comment and response:

> Comment: As a matter of State law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. As a general rule, a person or entity privileged to perform an act may appoint an agent to perform the act unless contrary to public policy or an agreement requiring personal performance. Restatement of Agency 2d § 17 (1995). Hence, even in the absence of Federal guidelines, covered entities have the right to contract with retail pharmacies for the purpose of dispensing 340B drugs. By issuing guidelines in this area, ODP is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law.

> Response: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion [and duplicate discounts].

*Id.* Given that § 256b's text does not prohibit distribution through contract pharmacies, and that such distribution has long been understood not to constitute diversion, the Court does not find that the replenishment model, which facilitates that distribution, can be undercut by technicality.

All told, the Court concludes that Plaintiffs have not shown a substantial likelihood that they will succeed on the merits of a conflict-preemption claim.

C.   Section 340B does not preempt H.B. 728 under field preemption

The Court is also unpersuaded that Section 340B preempts H.B. 728 under a theory of field preemption. Field preemption requires that Congress has passed such comprehensive legislation in an area that it has "occupied the field." *Arizona*, 567 U.S. at 401. Congress's intent to displace state law can be inferred from its

33

194

enactment of a federal regulatory scheme "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice*, 331 U.S. at 230). Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986).

"Field preemption of state law is disfavored." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024). The Fifth Circuit has emphasized that "Courts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Id.* (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). "And importantly, field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation.'" *Id.* (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

House Bill 728 implicates public health and welfare, a traditional area of state regulation, triggering the presumption against preemption, *see supra*, Part II.B., and rendering inapplicable *Arizona*'s discussion of dominant federal interests, *see Arizona*, 567 U.S. at 399. While H.B. 728 surely regulates in "an area of significant federal presence," that does not preclude the application of the presumption against preemption. *Teltech*, 702 F.3d at 236. Every plausible case of field preemption must involve significant federal regulation. Significant federal

34

195

regulation cannot turn traditional areas of state authority into areas dominated by federal interests, *see Arizona*, 567 U.S. at 399, if "field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation,'" *Nat'l Press Photographers Ass'n*, 90 F.4th at 796 (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

Section 340B contemplates concurrent state regulation. The statute does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities. *See supra*, Part II.B. Section 340B thus leaves room for states to impose their own regulations on delivery of Section 340B drugs to promote patients' access to their medications. "[M]erely because [Section 340B is] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." *Hillsborough Cnty.*, 471 U.S. at 717.

While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with the statute's requirements, *see supra*, Part I.A., Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs. In fact, as far back as its August 1996 Guidance about dispensation at contract pharmacies, HRSA observed that "[d]uring the early months following enactment, it became clear that there were many gaps in the legislation," demonstrating that the statute is not sufficiently comprehensive to give rise to field preemption. August 1996 Guidance at 43,549.

35

196

The Court is also not persuaded that field preemption is compelled by *Astra*'s holding that covered entities cannot bring overcharging claims as third-party beneficiaries to PPAs. *See Astra*, 563 U.S. at 117–19. *Astra* rejected an argument that, despite a covered entity's "inability to assert a statutory right of action" under Section 340B itself, "PPAs implementing the 340B Program are agreements enforceable by covered entities as third-party beneficiaries." *Astra*, 563 U.S. at 117. Because PPAs are essentially contracts whereby manufacturers opt into Section 340B, the Court reasoned that "[a] third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself." *Id.* at 118. Accordingly, "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id.*

The Supreme Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here. *See Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." (internal quotation marks and citations omitted)). The Court therefore concludes that Plaintiffs have not shown a substantial likelihood of success on the merits of their field preemption claim.

36

197

D.      House Bill 728 is not an unconstitutional taking

Plaintiffs next contend that "H.B. 728 effects an unconstitutional taking because it requires drug manufacturers to give their property to other private parties, for free, and not for any recognized public use." Mem. [9] at 3. The Court disagrees.

1.      The Takings Clause generally

The Takings Clause of the Fifth Amendment, which is "applicable to the States through the Fourteenth Amendment," *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021), provides: "[N]or shall private property be taken for public use, without just compensation," U.S. Const. amend. V.  Takings claims are cognizable as to both personal property, including goods, and real property.  *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015).  A taking can be *per se* or regulatory, both of which entitle the property owner to just compensation.  *Cedar Point Nursey*, 594 U.S. at 147–49.  A *per se* taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it."  *Id.* at 147.

A taking can also occur by virtue of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks and citation omitted).  To that end, a regulation constitutes a taking when it "goes too far" in limiting an owner's use of her property.  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

To determine whether a regulation amounts to a taking, courts apply "the flexible test developed in" *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). *Cedar Point Nursey*, 594 U.S. at 148. The *Penn Central* test requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* A regulation that deprives a property owner of "*all* economically beneficial uses*" of her property constitutes a regulatory taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019–20 (1992) (emphasis in original) (finding a regulatory taking, and thus requiring just compensation, when enforcement of a "coastal-zone construction ban" rendered beachfront property "valueless").

Regardless of whether the government pays just compensation for a taking, however, property may only "be taken for *public* use." U.S. Const. amend. V (emphasis added). The Supreme Court has held that the phrase "public use" requires that the taking "serve[] a 'public purpose.'" *Kelo v. New London*, 545 U.S. 469, 480 (2005). The Supreme Court has "defined that concept broadly, reflecting [the Court's] longstanding policy of deference to legislative judgments" in redevelopment of property, and in "a purely economic context" as well. *Id.* at 480–82 (citing *Berman v. Parker,* 348 U.S. 26 (1954), *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229 (1984), and *Monsanto,* 467 U.S. at 1014). While recognizing that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation," *Kelo* upheld a

38

199

taking for economic development by private businesses that included a research facility for Pfizer—a pharmaceutical company—restaurants, and shops.  *Id.* at 473–77.

As Plaintiffs point out, both states and the federal government are free to bargain with private parties.  When private parties "voluntarily accept responsibilities under" federal law because "they consider it in their best interest to do so," no taking occurs.  *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991).  Under this principle, "[g]overnmental regulation that affects a group's property interests does not constitute a taking of property where the regulated group is not required to participate in the regulated industry."  *Id.* (internal quotation marks and citations omitted).  To that end, a "state law limiting fees that nursing homes voluntarily participating in Medicaid may charge non-Medicaid patients effects no taking '[d]espite the strong financial inducement to participate in Medicaid.'"  *Id.* (quoting parenthetically *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984), *cert. denied,* 469 U.S. 1215 (1985)).

While the principle that no taking occurs in a voluntary exchange appears to exist independently of any *Penn Central* analysis, *see id.*, the Supreme Court has also applied *Penn Central* to determine whether a voluntary exchange with the federal government constituted a taking.  In *Monsanto*, the Supreme Court rejected in part a takings challenge to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, *as amended*, 7 U.S.C. § 136,

*et seq.* 467 U.S. at 1006–08. The 1978 amendments to FIFRA allowed the Environmental Protection Agency ("EPA") to disclose trade secrets contained in applications for licenses to sell pesticides ten years after the applicant filed its application. *See id.* The Court rejected the takings claim to the extent an applicant was "aware of the conditions under which the data [were] submitted" because "a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking." *Id.*

*Monsanto* framed the issue under the *Penn Central* test. *See id.* at 1005–06. After reciting the *Penn Central* factors, the Court focused on the third one: the statute's "interference with reasonable investment-backed expectations." *Id.* (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)). As to submissions of applications after 1978—meaning, those submitted with knowledge of the potential for disclosure of trade secrets contained therein—"the force of [the third] factor [was] so overwhelming" as to be dispositive. *Id.* The Court further concluded that "the conditions [were] rationally related to a legitimate Government interest" in regulating pesticides. *Id.* at 1007.

FIFRA's 1978 amendments also permitted EPA to disclose trade secrets contained in applications submitted before 1978, meaning before any explicit notice of the potential for disclosure. *See id.* at 1008. Because Congress amended FIFRA in 1972 to promise applicants their trade secrets would not be disclosed, *Monsanto* concluded that a taking occurred as to any disclosed trade secrets submitted in applications between 1972 and 1978. *See id.* at 1010–14.

Before the 1972 amendments to FIFRA, however, the statute "was silent with respect to EPA's authorized use and disclosure of data submitted to it in connection with an application for registration." *Id.* at 1008. Notwithstanding that the Trade Secrets Act, 18 U.S.C. § 1905, prohibited federal employees from disclosing trade secrets revealed to them in the course of their official duties, the Court found that "absent an express promise" directed to it—rather than to federal employees— "Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA." *Id.* The Court emphasized,

> In an industry that long has been the focus of great public concern and significant government regulation, the possibility was substantial that the Federal Government, which had thus far taken no position on disclosure of health, safety, and environmental data concerning pesticides, upon focusing on the issue, would find disclosure to be in the public interest.

*Id.* at 1008–09.

Conditions for permits cannot go too far, however. The inquiry turns on "whether the permit condition bears an 'essential nexus' and 'rough proportionality' to the impact of the proposed use of the property." *Cedar Point Nursery*, 594 U.S. at 161 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 386, 391 (1994)). So, the government cannot "hold hostage, to be ransomed by the waiver of constitutional protection," uses of property that are "basic and familiar." *Horne*, 576 U.S. at 366. In *Horne*, the Court concluded that a requirement that raisin growers turn over large portions of their crops to the government in exchange for "the 'benefit' of being allowed to sell" the rest of the raisins constituted a taking. *Id.* Distinguishing

41

*Monsanto*, the Court emphasized that selling produce, unlike selling pesticides, is "not a special governmental benefit that the Government may hold hostage." *Id.*

2.     <u>House Bill 728 does not work an unconstitutional taking for private use</u>

Plaintiffs claim H.B. 728 effects a *per se* taking of their pharmaceutical products for private use. They rely on "the most basic principle of takings law . . . that legislatures may not take property from private party A and give it to private party B." Mem. [9] at 20 (citing *Kelo*, 545 U.S. at 477, and *Midkiff*, 467 U.S. at 245). They claim that H.B. 728 does so because it forces pharmaceutical manufacturers subject to Section 340B to sell their products at discounted rates to private pharmacies. They accordingly assert that "a taking occurs each and every time a drug manufacturer is required, against its own volition, to transfer its drugs at the 340B discount price to a commercial pharmacy for the private benefit of that pharmacy." *Id.* at 24. In arguing that H.B. 728 effects private takings, Plaintiffs contend that "H.B. 728 advances no 'public use' recognized in American law." *Id.* at 21.

Plaintiffs also maintain that "the voluntary participation doctrine" is inapplicable here. *Id.* at 22. They acknowledge that, "[u]nder certain circumstances, voluntarily accepting a government benefit in exchange for giving up property rights can extinguish a takings claim against the government who conferred the bargained-for benefit." *Id.* (citing *Monsanto*, 467 U.S. at 1007). But "[their] participation in *federal* Medicare and Medicaid programs—and the assumption of *federal* obligations under the 340B program—cannot justify the

separate *state* requirements H.B. 728 seeks to impose" because "Mississippi provides 'no additional benefit' to AbbVie under H.B. 728." *Id.* (quoting *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023)).

First and foremost, the Court does not agree with Plaintiffs' characterization of H.B. 728 as compelling direct, confiscatory sales from them to private pharmacies. *See supra*, Part II.B. The statute only requires Plaintiffs to offer 340B drugs for purchase by covered entities, § 256b(a)(1), regardless of whether the covered entity will have those drugs delivered and dispensed to its patients at a private pharmacy with which it has an arrangement, *see supra*, Part II.B. Because H.B. 728 does not compel Plaintiffs to directly sell 340B drugs to pharmacies, it does not cause takings for private use according to Plaintiffs' theory. Nor is the Court persuaded that the manner of delivery to covered-entity patients can constitute a *per se* taking: Plaintiffs are still only required to sell at 340B discounts to covered entities, and they can still only have drugs dispensed to their patients.

To the extent that H.B. 728's delivery obligation can be conceptualized as a regulatory limit on Plaintiffs' property rights, it is not a taking under *Penn Central*. *Monsanto*, applying *Penn Central* to a voluntary exchange involving the disclosure of trade secrets contained in license applications, found such disclosure was foreseeable even before Congress amended FIFRA to explicitly warn of disclosure. 467 U.S. at 1008. That states might require Section 340B drugs to be distributed for dispensation at private pharmacies should have been foreseeable to Plaintiffs, as Section 340B has had a well-known "gap" about how delivery must occur since

43

204

Congress enacted it. *See* August 1996 Guidance at 43,549–50 (discussing "gaps" in Section 340B including that it "is silent as to permissible drug distribution systems"). Congress's silence left delivery options open because "a matter not covered is not covered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing the *casus omissus* canon).

Plaintiffs rely on HRSA's August 1996 Guidance to show that Section 340B limits dispensation at contract pharmacies, but that Guidance did not purport to find a one-pharmacy limit in the text. HRSA in fact stated that Section 340B contemplates that "various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." August 1996 Guidance at 43,549. HRSA only published "guidelines" in 1996 "to move the program forward," *id.*, and eventually backed off any limit on contract pharmacies after finding "there ha[d] been no evidence of drug diversion or duplicate manufacturer's discounts on 340B drugs in the AMDP program," which permitted use of multiple contract pharmacies and enabled ODP to study their operations, 2007 HRSA Notice at 1,540.

Further, when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500)," such that the potential for contract pharmacy dispensation was foreseeable. August 1996 Guidance at 43,550. While the August 1996 Guidance's "guideline[]" of one contract pharmacy for covered entities without in-house pharmacies is not consistent with H.B. 728, that same Guidance appears to contemplate that state law might protect

44

205

covered entities' "right" to purchase drugs at 340B prices and have them dispensed at multiple pharmacies. *See id.* (*Comment:* "As a matter of State [agency] law, [covered] entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. . . . *Response:* We agree.").

In "an industry," such as pharmaceuticals, "that long has been the focus of great public concern and significant government regulation," enhanced regulation where Congress was previously silent is foreseeable, which cuts against finding a regulatory taking. *Monsanto*, 467 U.S. at 1008–09. Likewise, because Section 340B does not preempt state laws requiring delivery of 340B drugs to contract pharmacies, *see supra*, Parts II.B.–C., Plaintiffs could have foreseen that states might enact policies favoring dispensation at contract pharmacies as well, *see Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987) ("[I]nvestment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest.").

Further, H.B. 728 is "rationally related to a legitimate Government interest." *Monsanto*, 467 U.S. at 1007. The Mississippi Legislature has evidently determined that dispensation of 340B drugs at contract pharmacies advances public health, which falls squarely within its police powers. *See supra*, Part II.B.

To the extent that dispensation of 340B drugs at contract pharmacies will increase the number of medications for which Plaintiffs must provide discounts, and thus cut into Plaintiffs' profits, "the economic impact of the regulation" is not drastic, *Cedar Point Nursery*, 594 U.S. at 148, and will not deprive Plaintiffs of all

45

economically beneficial use of their products, *Lucas*, 505 U.S. at 1019–20.  Although

a small portion of 340B discounts drop the drug price to a penny under particular

circumstances,[4] "the average discount rate appears to be between 25 and 50

percent," *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F.

Supp. 3d 129, 208 (D.N.J. 2021) *aff'd in part, rev'd in part on other grounds sub*

*nom. Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58

F.4th 696 (3d Cir. 2023); *see* Ex. [24-3] at 6 (discussing the Centers for Medicare and

Medicaid Services's estimated average discount on 340B drugs, 34.7%, which

excludes "'penny-priced' drugs"); Ex. [24-4] at 4 (same).

Even if H.B. 728 effects a taking, the Court also finds that H.B. 728 is not a

private taking, but a taking that "serves a 'public purpose.'" *Kelo*, 545 U.S. at 480.

The Supreme Court has defined the concept of a public purpose "broadly, reflecting

[its] longstanding policy of deference to legislative judgments." *Id.*  If condemning

Ms. Kelo's home so that a pharmaceutical company could build a facility served the

public purpose of economic development, then so would facilitating Mississippians'

access to medications for which manufacturers have already agreed to provide a

discount.  *See Sanofi-Aventis*, 570 F. Supp. 3d at 209 ("The 340B Program assists

uninsured patients in affording costly medications and under-resourced providers in

---

[4] *See* Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; New Categories for Hospital Outpatient Department Prior Authorization Process; Clinical Laboratory Fee Schedule: Laboratory Date of Service Policy; Overall Hospital Quality Star Rating Methodology; and Physician-Owned Hospitals, 85 Fed. Reg. 48,772, 48,886–90 (Aug. 12, 2020) (explaining the methodology underlying the estimated 34.7% average 340B discount, when drugs are penny-priced, and why CMS considered penny drugs as outliers in its analysis).

serving more people, decidedly public purposes even if it is also true that contract pharmacies benefit from the Program.").

Plaintiffs seek a preliminary injunction on the theory that H.B. 728 effects a taking for private use, which would be unconstitutional and subject to injunctive relief. *See* Mem. [9] at 20–22. On the other hand, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Monsanto*, 467 U.S. at 1016. Plaintiffs have not moved for a preliminary injunction on a theory that H.B. 728 effects a taking for public use for which just compensation is owed. *See* Mem. [9] at 20–22. So, the Court's conclusion that H.B. 728 serves a public purpose, *see Kelo*, 545 U.S. at 480, is also a sufficient reason to deny Plaintiffs' Motion [8] as to their takings claim.

## III. <u>CONCLUSION</u>

Because Plaintiffs have not shown a substantial likelihood of success on the merits as required to obtain a preliminary injunction, they are not entitled to such relief, and the Court need not address the remaining Rule 65 factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008) (declining to address other preliminary injunction factors after finding against the plaintiffs on one such factor). To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined they would not alter the Court's conclusion.

47

208

Exhibit 3

**IT IS, THEREFORE, ORDERED AND ADJUDGED THAT**, Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, and Allergan Sales, LLC's Motion [8] for Preliminary Injunction is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 22nd day of July, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

48

ABBVIE, INC. v. FITCH    **635**
Cite as 152 F.4th 635 (5th Cir. 2025)

*BIA's* power to "accommodate special cases" through *sua sponte* reopening. *Iavorski*, 232 F.3d at 131–32. And that is especially true when Congress has displaced whatever discretion we might otherwise have by statutorily limiting second and successive motions to reopen.

Finally, some of our sister circuits conclude that the Due Process Clause requires us to equitably toll the number bar—a conclusion that directly contradicts this court's precedent. The Ninth Circuit, for example, held that a petitioning alien was "denied due process" and entitled to equitable tolling of the number bar because his attorney's ineffective assistance "ultimately" cost him "the opportunity to have his first motion to reopen heard on the merits." *Ray v. Gonzales*, 439 F.3d 582, 588–90 (9th Cir. 2006); *see also Zhao v. INS*, 452 F.3d 154, 158–60 (2d Cir. 2006) (BIA erred when it refused to equitably toll the number bar for a second motion to reopen when the first motion was denied because of ineffective assistance of counsel).

[18, 19]    But our court has held that the Due Process Clause doesn't apply to proceedings involving motions to reopen at all. Indeed, "[t]he decision to grant or deny a motion to reopen is purely discretionary. . . . Even if a moving party has established a prima facie case for relief, an IJ [or the BIA] can still deny a motion to reopen." *Altamirano-Lopez v. Gonzales*, 435 F.3d 547, 550 (5th Cir. 2006) (citing 8 C.F.R. § 1003.23(b)(1)(iv)).[5] So even if Garcia Morin is right that the attorney managing his first motion to reopen was incompetent, he has "no liberty interest at stake" in his motion to reopen "given its entirely discretionary nature." *Garcia-Gonzalez v. Garland*, 76 F.4th 455, 466 (5th Cir. 2023)

(quotation omitted); *see also Finlay v. INS*, 210 F.3d 556, 557 (5th Cir. 2000) ("[T]he denial of discretionary relief does not rise to the level of a constitutional violation."). Garcia Morin's due process argument thus fails.

*

We hold, as a matter of law, that equitable tolling is unavailable to the INA's number bar. The BIA therefore did not err in refusing to reopen Garcia Morin's removal proceeding. The petition for review is DISMISSED in part and DENIED in part.



**ABBVIE, INCORPORATED, a Delaware corporation; Allergan, Incorporated, a Delaware corporation; Durata Therapeutics, Incorporated, a Delaware corporation; AbbVie Products, L.L.C., a Georgia limited liability company; Aptalis Pharma US, Incorporated, a Delaware corporation; Pharmacyclics, L.L.C., a Delaware limited liability company; Allergan Sales, L.L.C., a Delaware limited liability company, Plaintiffs—Appellants,**

**v.**

**Lynn FITCH, in her official capacity as the Attorney General of the State of Mississippi, Defendant—Appellee.**

No. 24-60375

United States Court of Appeals,
Fifth Circuit.

FILED September 12, 2025

**Background:** Manufacturers subject to price caps for uninsured and low-income

---

**5.** 8 C.F.R. § 1003.23(b)(1)(iv) addresses an IJ's power to deny a motion to reopen. But the BIA also has the discretion to deny a

motion to reopen "even if a moving party has made out a prima facie case for relief." 8 C.F.R. § 1003.2(a).

**636**              **152 FEDERAL REPORTER, 4th SERIES**

individuals brought action against Mississippi Attorney General to challenge state statutes prohibiting manufacturers from interfering with covered entities' distribution of such drugs via contract pharmacies. Manufacturers alleged takings and preemption claims and sought declaratory and injunctive relief. The United States District Court for the Southern District of Mississippi, Halil Suleyman Ozerden, Chief Judge, 2024 WL 3503965, denied manufacturers' motion for preliminary injunction. Manufacturers appealed.

**Holdings:** The Court of Appeals held that:

(1) Mississippi statutes did not effectuate physical taking of manufacturers' property;

(2) balance of factors weighed heavily in favor of state on drug manufacturers' claim of regulatory taking;

(3) state statutes were not field preempted; and

(4) they were not conflict preempted.

Affirmed.

**1. Federal Courts ⚖3616(2)**

Decision to grant or deny preliminary injunction lies within discretion of district court and may be reversed on appeal only by showing of abuse of discretion.

**2. Federal Courts ⚖3567, 3603(2)**

Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo.

**3. Injunction ⚖1075, 1572**

Preliminary injunction is extraordinary and drastic remedy which should not be granted unless movant clearly carries burden of persuasion.

**4. Injunction ⚖1092**

To obtain preliminary injunction, movant must establish: (1) substantial likelihood of success on merits, (2) substantial threat of irreparable injury if injunction is not issued, (3) that threatened injury if injunction is denied outweighs any harm that will result if injunction is granted, and (4) that grant of injunction will not disserve public interest.

**5. Injunction ⚖1244, 1246**

Preliminary injunction factors that threatened injury if injunction is denied outweighs any harm that will result if injunction is granted and that grant of injunction will not disserve the public interest merge when the government is a party.

**6. Eminent Domain ⚖81.1**

For a party to have a viable takings claim, it must show that it had a compensable property interest in the property allegedly taken at the time of the alleged taking. U.S. Const. Amend. 5.

**7. Federal Courts ⚖3069(6)**

State law governs what is property interest compensable under Fifth Amendment. U.S. Const. Amend. 5.

**8. Eminent Domain ⚖87**

Manufacturers of drugs for uninsured and low-income individuals had compensable property interest in the drugs under Mississippi law before sales to contract pharmacies, and, thus, as to unsold drugs, manufacturers satisfied requirement for takings claim challenging Mississippi statutes prohibiting manufacturers from interfering with covered entities' distribution of the drugs via contract pharmacies. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**9. Eminent Domain ⚖2.1**

Government effectuates physical taking when it physically takes possession of interest in property for some public purpose. U.S. Const. Amend. 5.

**ABBVIE, INC. v. FITCH**                    **637**
Cite as 152 F.4th 635 (5th Cir. 2025)

**10. Eminent Domain ⊕2.29**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies did not effectuate physical taking of manufacturers' property; statutes did not impose positive obligation on manufacturers to directly transfer or sell drugs to anyone or to sell larger quantities of drugs at discounted prices than required and thereby deprive them of sales at full market price, but manufacturers still received payment of full discounted amounts, and statutes simply imposed negative obligation of non-interference with covered entities' arrangements, by preventing manufacturers from refusing to sell drugs to covered entities and from restricting what covered entities could do with purchased drugs. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**11. Eminent Domain ⊕2.1**

Government effectuates a "regulatory taking" when it goes too far in imposing regulations that restrict an owner's ability to use his own property. U.S. Const. Amend. 5.

> See publication Words and Phrases for other judicial constructions and definitions.

**12. Eminent Domain ⊕2.1**

To determine whether law effectuates regulatory taking, courts apply flexible test which requires balancing factors such as economic impact of regulation, its interference with reasonable investment-backed expectations, and character of government action. U.S. Const. Amend. 5.

**13. Eminent Domain ⊕2.1**

Inquiry into factors for determining whether a law effectuates a regulatory taking necessarily entails complex factual as-

sessments of purposes and economic effects of government actions. U.S. Const. Amend. 5.

**14. Eminent Domain ⊕2.29**

Balancing economic impact, interference with reasonable investment-backed expectations, and character of government action weighed heavily in favor of state on drug manufacturers' claim of regulatory taking as result of Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies; although statutes could increase number of drugs subject to discounts and cut into profits, manufacturers would still receive large percentage of market price for most drugs, potential for dispensing drugs by contract pharmacies was foreseeable, and statutes furthered important government interests by expanding needy patients' access to care and giving covered entities better ability to improve services. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**15. Federal Preemption ⊕13**

Congress may preempt a state law, rule, or other state action through federal legislation, either through express language in a statute or implicitly. U.S. Const. art. 6, cl. 2.

**16. Federal Preemption ⊕6, 9**

Congress may implicitly preempt state law in two ways: field preemption and conflict preemption. U.S. Const. art. 6, cl. 2.

**17. Federal Preemption ⊕24**

Deference to federalism counsels presumption that areas of law traditionally reserved to states are not to be disturbed by federal preemption absent clear and manifest purpose of Congress; in keeping

**638**　　　　**152 FEDERAL REPORTER, 4th SERIES**

with this presumption, when there is doubt about preemption, tie goes to state.  U.S. Const. art. 6, cl. 2.

**18. Federal Preemption ⊕9**

States are precluded from regulating conduct in field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.  U.S. Const. art. 6, cl. 2.

**19. Federal Preemption ⊕9**

Intent to displace state law altogether can be inferred from framework of regulation so pervasive that Congress left no room for states to supplement it or where there is federal interest so dominant that federal system will be assumed to preclude enforcement of state laws on same subject.  U.S. Const. art. 6, cl. 2.

**20. Federal Preemption ⊕9, 10**
**Municipal, County, and Local Government ⊕1752**

Field preemption should not be inferred simply because agency's regulations are comprehensive; comprehensiveness of federal provisions to meet need identified by Congress does not mean that states and localities are barred from identifying additional needs or imposing further requirements in the field.  U.S. Const. art. 6, cl. 2.

**21. Antitrust and Trade Regulation ⊕458**
**Federal Preemption ⊕56**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies were not field preempted by federal statutes capping prices of covered drugs, controlling eligibility for "covered entity" status, prohibiting duplicate discounts and drug diversion, enforcing compliance with caps and bars, and governing distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers; Mississippi statutes implicated traditional areas of state regulation and police power, i.e., public health and consumer protection, and Congress expressed no clear and manifest intent to preempt state laws regulating distribution of drugs and role of pharmacies in such distribution.  U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**22. Federal Preemption ⊕7, 8**

"Conflict preemption" applies when compliance with both federal and state regulations is physical impossibility and when challenged state law stands as obstacle to accomplishment and execution of full purposes and objectives of Congress.  U.S. Const. art. 6, cl. 2.

See publication Words and Phrases for other judicial constructions and definitions.

**23. Antitrust and Trade Regulation ⊕458**
**Federal Preemption ⊕56**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies were not conflict preempted by federal statutes capping prices of covered drugs, controlling eligibility, prohibiting duplicate discounts and drug diversion, and governing distribution of discounted drugs; Mississippi statutes did not intrude upon federal enforcement authority since they did not impose penalties for violations of federal statutes, but regulated matters traditionally within domain of states and imposed penalties when manufacturers violated state law by interfering with drug distribution pursuant to covered entities' partnerships with contract pharmacies and did not concern same subject matter as federal law.  U.S. Const.

art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

————

Appeal from the United States District Court for the Southern District of Mississippi, USDC No. 1:24-CV-184, Halil S. Ozerden, Chief Judge

Matthew Scott Owen (argued), Lucas Henry Funk, Meredith Marie Pohl, Kirkland & Ellis, L.L.P., Washington, DC, William Lucien Smith, Sr., Esq., Balch & Bingham, L.L.P., Jackson, MS, for Plaintiffs-Appellants.

Justin Lee Matheny, Esq., Scott G. Stewart (argued), Rex Morris Shannon, III, Esq., Mississippi Attorney General's Office, Jackson, MS, for Defendant-Appellee.

Carey Thompson Jones, Esq., Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for Amici Curiae State of Louisiana, State of Arkansas, State of Maryland, State of Minnesota, State of Missouri.

Margaret Dotzel, Alyssa Howard, William B. Schultz, Zuckerman Spaeder, L.L.P., Washington, DC, for Amici Curiae American Hospital Association, 340B Health, Mississippi Hospital Association, Rural Hospital Alliance, American Society for Health-System Pharmacists.

Before Elrod, Chief Judge, and Clement and Ramirez, Circuit Judges.

Per Curiam:

Under the federal Section 340B program, drug manufacturers that participate in Medicaid and Medicare Part B must offer certain drugs to healthcare providers ("covered entities") that serve uninsured and low-income individuals at discounted prices. In recent years, drug manufacturers have enacted policies that prevent covered entities from contracting with third-party commercial pharmacies ("contract pharmacies") to distribute these discounted drugs to patients, allegedly to prevent contract pharmacies from improperly distributing the drugs to consumers for profit. But in 2024, to combat such policies, Mississippi enacted H.B. 728, which prohibits drug manufacturers from interfering with covered entities' distribution of Section 340B drugs via contract pharmacies.

Appellants, a group of drug manufacturers that participate in the 340B program (collectively, "AbbVie"), sued the Attorney General of Mississippi, alleging takings and preemption claims and seeking declaratory and injunctive relief from H.B. 728. The district court denied AbbVie's motion for a preliminary injunction.

If H.B. 728 works the way that AbbVie alleges it does—allowing covered entities and contract pharmacies to flout Section 340B's diversion ban by improperly reselling discounted Section 340B drugs—it would undoubtedly be a problematic statute. But on the specific claims and sparse record before us, we cannot say that injunctive relief is appropriate. The district court's denial of a preliminary injunction on this record was not erroneous, so we AFFIRM.

I

A

In 1992, Congress created the Section 340B program to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving these individuals receive crucial subsidies. *See* 42 U.S.C. § 256(b); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011). Section 340B requires drug manufacturers, as a condition of coverage of their products under Medicaid and Medicare Part B, to agree to offer

certain drugs to "covered entities" at no more than the statutorily-set "ceiling price." 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5). The list of covered entities includes, *inter alia*, federal-or state-funded hospitals and community health centers that primarily serve low-income patients. *See id.* § 256b(a)(4).

The 340B program places several key restrictions on covered entities. First, it bars "duplicate discounts or rebates," forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. *Id.* § 256b(a)(5)(A). Second, it bars "diversion," providing that a covered entity "shall not resell or otherwise transfer" a discounted drug "to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). Third, it requires covered entities to permit the Secretary of Health & Human Services ("HHS") and drug manufacturers to "audit" their records to assess compliance with the duplicate-discount and diversion bans. *Id.* § 256b(a)(5)(C). And fourth, it provides that a covered entity that violates the duplicate-discount or diversion bans "shall be liable" to the drug manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D).

### B

In 1996, four years after Section 340B's enactment, the Health Resources & Services Administration ("HRSA") noted the statute's "silen[ce] as to permissible drug distribution systems" to patients. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43549 (Aug. 23, 1996). HRSA therefore issued guidance permitting covered entities lacking an in-house dispensing pharmacy to

contract with a single third-party commercial pharmacy to receive and dispense Section 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion bans. *Id.* at 43550–55.

But in 2010, HRSA changed course, issuing new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients. Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010). Covered entities were quick to take advantage of this, and the number of contract pharmacies partnered with covered entities increased from 1,300 to 23,000 by 2019. *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-212, 340B DRUG DISCOUNT PROGRAM: OVERSIGHT OF THE INTERSECTION WITH THE MEDICAID DRUG REBATE PROGRAM NEEDS IMPROVEMENT 2 (2020). In these partnerships, "the covered entity orders and pays for the 340B drugs, which are then shipped from the manufacturer to the contract pharmacy," and the contract pharmacy then takes physical possession of but not title to the drugs. *Advisory Op. 20-06 on Contract Pharmacies under the 340B Program*, 2020 WL 11422965, at *1 (Dec. 30, 2020).[1]

By 2020, AbbVie and other drug manufacturers sought to combat the proliferation of partnerships between covered entities and contract pharmacies, which they believed "le[d] to unlawful diversion and duplicate discounts." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024). Drug manufacturers therefore began to adopt policies that restricted cov-

---

**1.** This is how contract pharmacy partnerships are supposed to work, according to HHS. AbbVie asserts that things work differently in

practice, averring that, in reality, the contract pharmacy often takes title to the drugs.

ered entities' ability to partner with contract pharmacies. AbbVie's contract-pharmacy policy, which essentially follows HRSA's 1996 guidance, permits a covered entity lacking an in-house pharmacy to distribute its Section 340B drugs through only one contract pharmacy, located within 40 miles of the covered entity.

HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies, issuing an advisory opinion in December 2020 stating that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." *Advisory Op. 20-06*, 2020 WL 11422965, at *1. Drug manufacturers took HHS and HRSA to court to challenge this advisory opinion, and several circuits upheld the drug manufacturers' contract-pharmacy policies as consistent with Section 340B. *See Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 704 (3d Cir. 2023); *Novartis*, 102 F.4th at 460. HHS ultimately withdrew the advisory opinion.

### C

Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion.

Mississippi enacted H.B. 728, which states that drug manufacturers "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity," nor can they "interfere with a pharmacy contracted with" a covered entity. Miss. H.B. 728 § 4(1)–(2) (2024). H.B. 728 defines a "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a covered entity as defined in 42 U.S.C. § 256b(a)(4)."

A manufacturer that violates H.B. 728 is subject to statutory penalties for unlawful business practices under the Mississippi Consumer Protection Act, MISS. CODE ANN. § 75-24-1 *et seq.*, including injunctions, civil penalties, criminal penalties, and restitution or revocation of licenses or certificates to "engage in business" in Mississippi. *Id.* §§ 75-24-9, -11, -19, - 20.

### D

In June 2024, AbbVie, a group of drug manufacturers that participate in the 340B program, sued the Attorney General of Mississippi, challenging H.B. 728 as unconstitutional and seeking declaratory judgment and injunctive relief.

Twelve days before H.B. 728 took effect, AbbVie moved for a preliminary injunction. In its motion, AbbVie contended that: (1) H.B. 728 effectuates an unconstitutional taking of property because it compels AbbVie to transfer its drugs at significant discounts to private, for-profit pharmacies, rather than for a "public use"; and (2) H.B. 728 is preempted by federal law because it expands manufacturers' obligations under the 340B program and brings its own enforcement scheme to bear. The district court denied AbbVie's motion, concluding that AbbVie had not shown a substantial likelihood of success on the merits of its claims and therefore was not entitled to preliminary injunctive relief. AbbVie timely appealed.

**642**          **152 FEDERAL REPORTER, 4th SERIES**

## II

**[1, 2]**  "The decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023), *cert. denied sub nom. Anibowei v. Mayorkas*, —— U.S. ——, 144 S. Ct. 551, 217 L.Ed.2d 293 (2024). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018).

**[3–5]**  "[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei*, 70 F.4th at 902. To obtain a preliminary injunction, the movant must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Jones*, 880 F.3d at 759 (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The third and fourth factors "merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

## III

We turn first to AbbVie's takings claim. AbbVie asserts that H.B. 728 effectuates a physical taking, or, in the alternative, a regulatory taking, for private use and without just compensation. We consider AbbVie's physical takings and regulatory takings arguments in turn.

**[6–8]**  Although it is possible that H.B. 728 could, as AbbVie asserts, allow covered entities and contract pharmacies to engage in illicit behavior that violates Section 340B, we conclude that, to the extent Abb-Vie has a compensable property interest in the drugs regulated by H.B. 728,[2] the dis-

---

**2.**  We "understand takings analysis to be centered on the deprivation of a former owner's property interest, and not on the accretion of that interest to the government." *United States v. 0.073 Acres of Land*, 705 F.3d 540, 544 (5th Cir. 2013). Thus, for a party to have a viable takings claim, it must show that it had a "compensable property interest" in the property allegedly taken at the time of the alleged taking. *Id.* at 544–45. State law governs "what is a property interest compensable under the Fifth Amendment." *United States v. 131.68 Acres of Land*, 695 F.2d 872, 875 (5th Cir. 1983). Here, it is unclear whether AbbVie has a compensable property interest in all drugs regulated by H.B. 728. The statute defines a "340B" drug as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. 256b and *is purchased by a covered entity* as defined in 42 U.S.C. § 256b(a)(4)." H.B. 728 § 2(a) (emphasis added). The language "is purchased by" could plausibly refer to drugs both before

and after they are purchased by a covered entity.

To the extent H.B. 728 regulates drugs pre-purchase, AbbVie has a compensable property interest in the drugs, because it still owns them. *See State v. Murphy*, 202 So.3d 1243, 1251 (Miss. 2016) (en banc) (Mississippi Constitution protects private property). But to the extent H.B. 728 regulates drugs post-purchase, AbbVie may not have a compensable property interest in the drugs, because AbbVie is no longer the drugs' owner after the point of sale. As AbbVie describes, when a covered entity partners with a contract pharmacy, orders for Section 340B drugs are placed with AbbVie using the covered entity's account. After the Section 340B drugs are purchased, AbbVie ships them to the contract pharmacy. *Advisory Op. 20-06*, 2020 WL 11422965, at \*1. While AbbVie still has physical custody of the post-purchase drugs until it ships them, we have found no indication that Mississippi law recognizes a compensable property interest in goods that a party temporarily possesses on

---

217

ABBVIE, INC. v. FITCH     **643**
Cite as 152 F.4th 635 (5th Cir. 2025)

trict court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's takings claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

### A

[9] The government effectuates a physical taking when it "physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Examples of physical takings include when the government "uses its power of eminent domain to formally condemn property," "physically takes possession of property without acquiring title to it," or "occupies property"—whether on its own behalf or for the benefit of a third party. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021).

[10] AbbVie has not shown that H.B. 728 effectuates a physical taking of AbbVie's property. The record indicates that H.B. 728 does not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone. Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price. Under H.B. 728, AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B. H.B. 728 simply imposes on drug manufacturers a negative obligation

of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.

Because AbbVie has not shown that H.B. 728 effectuates a physical taking, AbbVie cannot meet its burden of showing a substantial likelihood of success on the merits of this argument.

### B

[11–13] The government effectuates a regulatory taking when it "goes too far" in "impos[ing] regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery*, 594 U.S. at 148, 141 S.Ct. 2063 (first quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). To determine whether a law effectuates a regulatory taking, courts apply "the flexible test" announced in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery*, 594 U.S. at 148, 141 S.Ct. 2063. This inquiry "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. City*

---

the owner's behalf. To the contrary, Mississippi law might consider AbbVie a bailee with an obligation to transfer the drugs as directed by the covered entity as bailor. *See* MISS. CODE ANN. § 75-7-403 (West 2025); *Baggett v. McCormack*, 73 Miss. 552, 19 So. 89, 90 (1896) (recognizing that a bailee has ''no legal interest in [property], as against his bailor,'' but instead only a possessory interest ''in the

custody and care of the property'' that accords with the bailor's rights as owner). Consequently, it may be the case that because AbbVie does not own the Section 340B drugs after the point of sale, it has no compensable property interest in at least some of the drugs regulated by H.B. 728. We need not decide this question, though, because we conclude that AbbVie's takings claim fails regardless.

*of Escondido*, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

[14] To the extent the regulatory takings doctrine applies,[3] AbbVie has not shown that H.B. 728 effectuates a regulatory taking under the *Penn Central* test. As to the first factor: H.B. 728 may have an economic impact on drug manufacturers, because it could increase the number of drugs for which they must provide discounts and therefore cut into their profits. AbbVie asserts that it will "face the threat of millions of dollars in forced unnecessary discounts each year." But for most drugs, manufacturers will still receive a large percentage of the market price. *See Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F.Supp.3d 129, 208 (D.N.J. 2021) ("[T]he average discount rate appears to be between 25 and 50 percent . . . ."), *aff'd in part, rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023).

As to the second *Penn Central* factor: H.B. 728 does not significantly interfere with drug manufacturers' reasonable investment-backed expectations. As the district court remarked, when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500)," meaning that the potential for dispensation of Section 340B drugs by contract pharmacies was foreseeable. Notice Regarding Section 602, 61 Fed. Reg. at 43550. And while HRSA's August 1996 guidance provided a "guideline[ ]" of one contract pharmacy per covered entity without an in-house pharmacy, that guidance nonetheless appears to contemplate that state law might protect covered entities' "right" to

purchase drugs at 340B prices and have them dispensed at multiple pharmacies. *See id.* ("*Comment:* As a matter of State [agency] law, [covered] entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients . . . . *Response:* We agree.").

As to the third *Penn Central* factor: the character of the government action in H.B. 728 weighs in the state's favor. H.B. 728 was not "enacted solely for the benefit of private parties," but rather furthers "important public interests," like expanding needy patients' access to care and giving covered entities better ability to expand and improve their services. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Record evidence shows that restrictive contract-pharmacy policies detrimentally affect patient access and provider offerings.

On balance, the *Penn Central* factors weigh heavily in the state's favor, causing us to conclude that AbbVie has not shown that H.B. 728 effectuates a regulatory taking and that AbbVie therefore has not met its burden of showing a substantial likelihood of success on the merits of this argument.

\* \* \*

In sum, because AbbVie has not met its burden of showing a substantial likelihood of success on the merits of its takings claim, whether on a physical takings or regulatory takings theory, we conclude that the district court did not abuse its discretion in denying AbbVie preliminary injunctive relief on this claim.[4]

---

**3.** AbbVie asserts that the regulatory takings doctrine does not apply in this case but maintains that if it does apply, H.B. 728 effectuates a regulatory taking and AbbVie still prevails. The district court applied the doctrine and

concluded that H.B. 728 does not effectuate a regulatory taking.

**4.** Because H.B. 728 effectuates neither a physical taking nor a regulatory taking, we need not consider the parties' additional argu-

**ABBVIE, INC. v. FITCH**                **645**
Cite as 152 F.4th 635 (5th Cir. 2025)

IV

We turn next to AbbVie's preemption claim. AbbVie asserts that federal law implicitly preempts H.B. 728 under both field preemption and conflict preemption theories. The district court disagreed and denied AbbVie's request for preliminary injunctive relief. We consider AbbVie's field preemption and conflict preemption arguments in turn.

Again, it could be the case that H.B. 728 permits illicit behavior that violates Section 340B. But we conclude, as the district court did, that there is insufficient evidence in the record to support this allegation. Accordingly, we hold that the district court did not abuse its discretion as to AbbVie's preemption claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

A

**[15, 16]** The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution are "the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Consequently, Congress may "pre-empt a state law, rule, or other state action" through federal legislation, either "through express language in a statute" or "implicitly." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may implicitly preempt state law in two ways: field preemption and conflict preemption.

**[17]** "Deference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and

manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks omitted); *see Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (a "presumption against preemption" applies to "areas of law traditionally reserved to the states"). In keeping with this presumption, when there is doubt about preemption, the "tie goes to the state." *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005).

B

**[18, 19]** "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013).

**[20]** Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). Just because "federal provisions [a]re sufficiently comprehensive to meet the need identified by

ments regarding whether any alleged taking is for a ''public use'' or whether the voluntary

participation doctrine applies.

Congress d[oes] not mean that States and localities [a]re barred from identifying additional needs or imposing further requirements in the field." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

[21] Here, there is no federal framework so pervasive that Congress left no room for state supplementation. Section 340B is a drug pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra*, 563 U.S. at 113, 131 S.Ct. 1342; *see* 42 U.S.C. § 256(b), with the intent of supporting "services for low-income and rural communities," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738, 142 S.Ct. 1896, 213 L.Ed.2d 251 (2022). Section 340B explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for "covered entity" status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)-(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).

But Section 340B does not "provide a full set of standards governing" discounted drugs for needy patients. *Arizona*, 567 U.S. at 401, 132 S.Ct. 2492. Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution. *See* Notice Regarding Section 602, 61 Fed. Reg. at 43549–50 (noting "many gaps in the legislation" and that Section 340B "is silent as to permissible drug distribution systems"); *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir.) (noting "Congressional silence on pharmacies in the context of

340B"), *cert. denied*, ⸻ U.S. ⸻, 145 S. Ct. 768, 220 L.Ed.2d 272 (2024); *Novartis*, 102 F.4th at 460 (stating that Section 340B is "silent about delivery conditions"); *Sanofi Aventis*, 58 F.4th at 703 (noting that Section 340B "is silent about delivery" of drugs to patients and "[n]owhere . . . mention[s] contract pharmacies"). As the Third Circuit has pointed out, Congress "knew how to impose delivery-related requirements" and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers. *Sanofi Aventis*, 58 F.4th at 704. But Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, "matters left unaddressed" in an otherwise "comprehensive and detailed" federal regulatory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

Next, there is no dominant federal interest in the area regulated by H.B. 728. H.B. 728 implicates two traditional general areas of state regulation and police power: public health and consumer protection. *See, e.g.*, *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325, 136 S.Ct. 936, 194 L.Ed.2d 20 (2016) (noting "the State's traditional power to regulate in the area of public health"); *Castro v. Collecto, Inc.*, 634 F.3d 779, 784–85 (5th Cir. 2011) ("[S]tates have traditionally governed matters regarding contracts and consumer protections . . . ."). Although there are instances in which the Supreme Court has held that federal law preempts state law "even if the state law exercises a traditional state power," that is usually in cases in which a "principal and essential feature" of the federal law is replicated in the state law, indicating that it is a "fundamental area of

[federal] regulation." *Gobeille*, 577 U.S. at 325–26, 136 S.Ct. 936.[5]

But we have recently reiterated that "[c]ourts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir.) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, —— U.S. ——, 145 S. Ct. 140, 220 L.Ed.2d 13 (2024). Here, Congress has expressed no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution. Accordingly, applying the presumption against field preemption, we conclude that H.B. 728 is not field preempted.

### C

**[22]**  Conflict preemption applies when "compliance with both federal and state regulations is a physical impossibility" and when the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (internal quotations omitted); *see Janvey*, 712 F.3d at 200. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352

(2000). "'Conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Id.* at 380, 120 S.Ct. 2288.

**[23]**  AbbVie raises the latter of the two conflict preemption scenarios, contending that H.B. 728 "stand[s] as an obstacle to" Congress's purposes and objectives under Section 340B, *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492, because it: (1) compels manufacturers to provide their drugs at Section 340B prices to entities other than those specifically enumerated in § 256b(a)(4); and (2) imposes civil and criminal penalties for noncompliance with its provisions.

AbbVie's first argument is simply incorrect. H.B. 728 does not expand Section 340B's list of covered entities to include contract pharmacies. By its plain text, H.B. 728 requires drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients. It does not compel manufacturers to "offer" discounted drugs to contract pharmacies in the way that Section 340B compels them to "offer" these drugs to covered entities.

AbbVie's second argument also fails because H.B. 728's enforcement scheme does not conflict with Section 340B's enforcement scheme. It is true that Congress made HHS the sole enforcer of Section 340B. *See Astra*, 563 U.S. at 120, 131 S.Ct. 1342. But H.B. 728 does not intrude upon this authority because it does not impose penalties for violations of Section 340B,

---

**5.**  For instance, the Supreme Court and this court have recognized that there is a dominant federal interest in certain key areas of public health and consumer protection regulation. *See, e.g., Gobeille*, 577 U.S. at 319–20, 136 S.Ct. 936 (noting that ERISA preempts state laws that have a "reference to" ERISA plans or an impermissible "connection with"

ERISA plans); *Texas v. United States*, 945 F.3d 355, 369–71 (5th Cir. 2019) (noting the Affordable Care Act's displacement of certain state healthcare and consumer protection laws), *rev'd on other grounds sub nom. California v. Texas*, 593 U.S. 659, 141 S.Ct. 2104, 210 L.Ed.2d 230 (2021).

like failing to offer discounted drugs to covered entities or engaging in diversion. Instead, it imposes penalties when drug manufacturers violate H.B. 728 by interfering with the distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies. H.B. 728's enforcement scheme therefore does not "concern[ ] the same subject matter" as Section 340B and cannot be said to conflict with it.

Regardless, as set out above, the presumption against preemption applies here because H.B. 728 regulates matters that have traditionally been the domain of the states. *See Deanda*, 96 F.4th at 761. Applying this presumption, we conclude that H.B. 728 is not conflict preempted.

\* \* \*

Again, we recognize that H.B. 728 could, if AbbVie's allegations are true, have the effect of allowing covered entities and contract pharmacies to engage in illicit activities that flout Section 340B's diversion ban. But on the record before us, we conclude that the district court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's preemption claim because AbbVie has not proffered sufficient evidence to show a substantial likelihood of success on the merits of this claim.

V

As we understand it, AbbVie's grievance is this: it believes that when covered entities are allowed to distribute Section 340B drugs via contract pharmacies, those contract pharmacies cause covered entities to place orders for larger quantities of discounted drugs than they are actually entitled to, and the contract pharmacies then improperly resell those discounted drugs in ways that increase their profits. AbbVie avers that H.B. 728 has the practical effect of allowing this type of illicit activity to occur.

AbbVie is essentially alleging that the real problem with H.B. 728 is not a *feature* of the law, but rather a *bug*. And on this record, we cannot say that this potential bug in H.B. 728 merits a preliminary injunction. Because AbbVie has not proffered the requisite facts as to either of its claims, the district court did not abuse its discretion in denying AbbVie preliminary injunctive relief. *See Jones*, 880 F.3d at 759.

AFFIRMED.



**GENESIS ENERGY, L.P.; Genesis Energy, L.L.C., Defendants—Appellants,**

**v.**

**DANOS, L.L.C., Defendant—Appellee.**

**No. 24-20357**

United States Court of Appeals, Fifth Circuit.

FILED September 15, 2025

**Background:** Worker who was injured while transferring from offshore oil and gas platform to vessel brought state court action against company that owned platform, contractor that was hired to repair platform, and owner of vessel. After removal of action, platform owner filed cross-claim against contractor, seeking judgment that contractor was obligated to defend and indemnify platform owner against worker's claims. The United States District Court for the Southern District of Texas, Charles Eskridge, J., 724 F.Supp.3d 673, granted contractor's cross-

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP | PLAINTIFF |
| v. | CAUSE NO. 1:24CV196-LG-BWR |
| LYNN FITCH in her official capacity as the Attorney General of Mississippi | DEFENDANT |

## MEMORANDUM OPINION AND ORDER DENYING ASTRAZENECA'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff AstraZeneca Pharmaceuticals LP sued Mississippi Attorney General Lynn Fitch, claiming that Mississippi's "Defending Affordable Prescription Drug Costs Act," Miss. Code Ann. § 41-149-1 et seq., is preempted by the United States' 340B drug program, the Takings Clauses of the Mississippi and United States Constitutions, the Contracts Clause of the United States Constitution, and federal patent law. AstraZeneca now seeks a preliminary injunction as to some of its claims. Since AstraZeneca has failed to demonstrate a substantial likelihood of success on the merits, the Court finds that its [13] Motion should be denied.

## BACKGROUND

Section 340B of the Public Health Service Act requires pharmaceutical companies who wish to participate in Medicaid and Medicare Part B to offer discounts on certain outpatient drugs to covered entities, such as public hospitals and community health centers. 42 U.S.C. § 256b(a)(1). The program helps these covered entities provide "safety-net services to the poor" because the entities "turn a

224

profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023). The program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Id.* at 113; 42 U.S.C. § 256b.

"Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform agreements" that require manufacturers to offer covered entities outpatient drugs at or below a specified price 'if the drug is made available to any other purchaser at any price.'" *Id.*; 42 U.S.C. § 256b(a). "Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir. 2024) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)). Additionally, covered entities may not engage in diversion of 340B drugs through "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity." *Id.* (citing 52 U.S.C. § 256b(a)(5)(B)). HHS and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate provisions. *Id.* (citing 52 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700).

All disputes arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

"Since the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

In the 1996 Guidance, HHS permitted each covered entity that did not maintain an in-house pharmacy to contract with only one outside pharmacy. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456–57 (D.C. Cir. 2024) (citing 1996 Guidance at 43,555). In 2010, HRSA determined that covered entities should be permitted to contract "with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance"). The 2010 Guidance prompted a significant expansion in the use of contract pharmacies. *Id.*

In 2020, out of concern that the use of contract pharmacies resulted in duplicate discounts and diversion, manufacturers began adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *McClain*, 95 F.4th at 1139; *Sanofi*

-3-

**Exhibit 3**

*Aventis U.S. LLC*, 58 F.4th at 700. "This caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139.

In response to the manufacturers' new policies prohibiting or restricting contracts with outside pharmacies, HHS released an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., *Advisory Op. 20-06 on Cont. Pharmacies Under the 340B Program* (Dec. 30, 2020), https://perma.cc /L7W2-H597)). It also issued violation letters to the manufacturers, who sued HHS. *Id.* The Third Circuit held that the Advisory Opinion and violation letters were unlawful because Section 340B is silent regarding delivery to contract pharmacies. *Id.* at 706. Thus, the court enjoined HHS's "reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies" because "[l]egal duties do not spring from silence." *Id.* at 707. The D.C. Circuit reached the same conclusion. *See Johnson*, 102 F.4th at 459.

In April 2024, in an effort to prevent manufacturers and others "from engaging in certain discriminatory actions relating to entities that are participating or authorized to participate in the federal 340b drug discount program,"[1] the Mississippi Legislature enacted Miss. H.B. 728, which is codified as Miss. Code

---

[1] H.B. 728, 2024 Leg., 139th Sess. (Miss. 2024).

Ann. § 41-149-1 et seq.[2]  H.B. 728 provides:

> (1) A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States Department of Health and Human Services.
>
> (2) A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.

Miss. Code Ann. § 41-149-7.  A violation of this statute constitutes a violation of the Mississippi Consumer Protection Act, which provides for both civil and criminal penalties.  Miss. Code Ann. §41-149-9 (citing Miss. Code Ann. § 75-24-1, et seq.).

Drug manufacturer AstraZeneca filed this lawsuit, claiming that H.B. 728 is preempted because it inappropriately expands the federal 340B program by requiring discounts "to an entirely new category of transactions."  Compl. [1] at ¶5. It further asserts that the Mississippi statute is preempted by federal patent law. AstraZeneca also alleges that H.B. 728 violates the Contracts Clause of the United States Constitution and the Takings Clause of both the United States Constitution and the Mississippi Constitution.

AstraZeneca is particularly concerned with the manner in which contract pharmacies distribute 340B drugs on behalf of covered entities.  It cites the D.C. Circuit's discussion of this process, which is often called "the replenishment model":

---

[2] In the interest of clarity and consistency, the Court will refer to the Mississippi statute as "H.B. 728," just as the parties have done in their submissions to the Court.

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs. Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount. Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount. Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases. The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

Pl.'s Mem. [14] at 5 (quoting *Johnson*, 102 F.4th at 457–58). AstraZeneca argues that "[t]his means that a 340B discount is applied for the contract pharmacy sale even though the pharmacy has also benefitted from the full insurance reimbursement, resulting in a windfall—a result Congress never intended when it passed the 340B program with the goal of aiding vulnerable patients." *Id.*

In the present Motion, AstraZeneca seeks a preliminary injunction as to its preemption claims. The Court previously addressed most of the arguments asserted by AstraZeneca in the following opinions, which are incorporated herein by reference: *Novartis Pharms. Corp. v. Fitch*, No. 1:24-CV-164-HSO-BWR, 2024 WL 3276407 (S.D. Miss. July 1, 2024); *Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024); and *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024).

## DISCUSSION

Fed. R. Civ. P. 65 authorizes entry of a preliminary injunction after notice to the adverse party; nevertheless, this relief is considered an "extraordinary remedy." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). Thus, the movant must "clearly [carry] the burden of persuasion" on all four of the following requirements:

> (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Id.* (brackets and citations omitted).

## I.   WHETHER ASTRAZENECA HAS SHOWN A SUBSTANTIAL LIKELIHOOD THAT IT WILL PREVAIL ON THE MERITS

Under the United States Constitution, "both the National and State Governments have elements of sovereignty the other is bound to respect." *City of El Cenizo v. Texas,* 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). However, the Constitution's Supremacy Clause provides that federal legislation "shall be the supreme Law of the Land." *Id.* (quoting U.S. Const. art. VI, cl. 2). Thus, state law is preempted when: "(1) a federal statute expressly preempts state law ('express preemption'); (2) federal legislation pervasively occupies a regulatory field ('field preemption'); or (3) a federal statute conflicts with state law ('conflict preemption')." *Deanda v. Becerra*, 96 F.4th 750,

-7-

760–61 (5th Cir. 2024).  The first consideration in preemption analysis is whether a presumption against preemption applies.  *Id.* at 761.

## A.    WHETHER A PRESUMPTION AGAINST PREEMPTION APPLIES

A presumption against preemption applies in areas of law traditionally reserved to the states, including "state or local regulation of matters of health and safety."  *Id.*; *Pennington v. Vistron Corp.*, 876 F.2d 414, 417 (5th Cir. 1989).  This Court has previously determined that H.B. 728 "plainly falls under the umbrella of a health and safety regulation."  *See, e.g., AbbVie*, 2024 WL 3503965, at *9.  Therefore, AstraZeneca's arguments to the contrary are not well taken, and the presumption against preemption applies.

## B.    WHETHER CONFLICT PREEMPTION APPLIES

AstraZeneca argues that H.B. 728 is preempted because it conflicts with both the 340B statute and federal patent law.  The form of conflict preemption cited by AstraZeneca is called "obstacle preemption" because it applies when a state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC Amer. Corp.*, 490 U.S. 93, 100, 101 (1989)).  The question of "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528 (5th Cir. 2013) (quoting *Arizona*, 567 U.S. at 400).  This Court has previously conducted this analysis, explaining in part:

-8-

According to a House Report on Section 340B, Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress enacted the Omnibus Budget Reconciliation Act of 1990, which created the Medicaid Drug Rebate Program. *Id.* (citing H.R. Rep. No. 102-384(II), at 7–11 (1992)). Congress's goal, as stated in House Report 384(II), was to protect covered entities from such price increases because they "reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *Id.* (quoting H.R. Rep. No. 102-384(II), at 11).

*AbbVie*, 2024 WL 3503965, at *2.

### 1. WHETHER H.B. 728 IS AN OBSTACLE TO THE PURPOSES AND OBJECTIVES OF THE FEDERAL 340B PROGRAM

AstraZeneca argues that H.B. 728 "upend[s] Congress's careful structuring of the 340B program" by "dramatically increasing the scope of manufacturers' obligations under the federal program." Pl.'s Reply [30] at 6. AstraZeneca claims that H.B. 728 widens the scope of the 340B program because it reduces the price of additional drugs. Attorney General Fitch counters that H.B. 728 does not alter drug prices but pertains to delivery of drugs to patients—a topic that is not addressed in the 340B statute.

Contrary to AstraZeneca's assertions, H.B. 728 does not alter the prices of covered drugs, which are established by the following provision of the federal 340B program:

> The Secretary [of HHS] shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid . . . to the manufacturer for covered outpatient drugs . . . purchased by a covered entity does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2).

42 U.S.C. § 256b(a)(1). Furthermore, H.B. 728 does not change the drugs covered by the 340B program. *See* 42 U.S.C. § 256b(b)(2) (defining the term "covered drug"). Rather, H.B. 728 incorporates the 340B pricing formula and the drugs to which it applies by reference. *See* Miss. Code Ann. § 41-149-3(a) ("'340B drug' means a drug that has been subject to any offer for reduced prices by a manufacturer *pursuant to* [42 U.S.C. § 256b] and is purchased by a covered entity *as defined in* [42 U.S.C. § 256b(a)(4)]") (emphasis added).

H.B. 728 merely prohibits drug manufacturers and distributors from interfering with "the acquisition of a 340B drug" by a contract pharmacy or the "delivery of a 340B drug to" such a pharmacy. Miss. Code Ann. § 41-149-7. The Third, Eighth, and D.C. Circuits have held that the 340B program does not address drug delivery. *See McClain*, 95 F.4th at 1142 (holding that a similar Arkansas statute was not subject to obstacle preemption); *see also Sanofi Aventis U.S. LLC*, 58 F.4th at 703 (holding that the 340B program is "silent about delivery"); *Johnson*, 102 F.4th at 456–57 (explaining that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount" and is "silent about delivery conditions"). Since H.B. 728 addresses delivery and 340B does not, AstraZeneca has not demonstrated a conflict between H.B. 728 and HB 340. Furthermore, AstraZeneca has not explained how H.B. 728's provisions concerning delivery of 340B drugs to patients of covered entities obstruct the objectives and purposes of the 340B program.

-10-

**Exhibit 3**

AstraZeneca next argues that H.B. 728 "establishes a parallel enforcement regime that encroaches on the federal government's authority to set and define federal enforcement priorities." Pl.'s Mem. [14] at 13. Once again, H.B. 728's penalties pertain to delivery, which is not addressed by 340B's enforcement method. As a result, H.B. 728's penalties do not conflict with or obstruct 340B's penalties. *See McClain*, 95 F.4th at 1145. AstraZeneca has not demonstrated a substantial likelihood of success on the merits of its obstacle preemption claim.

> **2.     WHETHER H.B. 728 IS AN OBSTACLE TO THE PURPOSES AND OBJECTIVES OF FEDERAL PATENT LAW**

AstraZeneca asserts that H.B. 728 is preempted by federal patent law because it regulates drug pricing. It explains:

> State laws that cap or fix the price at which patented drugs may be sold are . . . preempted by federal patent law because they "re-balance the statutory framework of rewards and incentives . . . in effect diminishing the reward to patentees in order to provide greater benefit to . . . drug consumers."

Pl.'s Mem. [14] at 15 (citing *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1373-74 (Fed. Cir. 2007)).

"In considering preemption of state laws which potentially conflict with federal patent law, courts look to whether a state law 'clashes with the objectives of the federal patent laws.'" *Novartis Pharms. Corp.*, 2024 WL 3276407, at *10 (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974)). As explained previously, "H.B. 728 does not purport to lower prices on any drugs not already discounted under Section 340B." *Id.* Therefore, "it does not substantially interfere

-11-

with the incentives created by patent laws or other federal laws establishing regulatory exclusivities." *Id.* AstraZeneca has not shown a substantial likelihood of success on the merits of its claim that H.B. 728 is preempted by federal patent law.

## C.   WHETHER FIELD PREEMPTION APPLIES

Field preemption occurs when "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024).

> The intent to displace state law altogether can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The Eighth Circuit and this Court have previously held that Congress did not intend to preempt the field when it enacted 340B. *McClain*, 95 F.4th at 1144; s*ee also, e.g., Pharm. Rsch.*, 2024 WL 3277365, at *12. Both courts reasoned that matters of health and safety are traditionally left to the states. The Fifth Circuit has ruled that courts should not infer field preemption in matters reserved to the states, *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024). Thus, the Court once again finds that field preemption does not apply to H.B. 728. AstraZeneca has not shown a substantial likelihood of success on the merits as to its field preemption claim.

### D.     SUPPLEMENTAL EVIDENCE SUBMITTED BY ASTRAZENECA

After briefing of AstraZeneca's request for a preliminary injunction concluded, it filed a [31] "Notice of Supplemental Authority" along with a [31-1] 340B Contract Pharmacy Services Agreement between Walgreen Co.[3] and an Arizona covered entity named Neighborhood Outreach Access to Health.[4]  The heavily redacted Agreement was signed by its parties in April 2016.

AstraZeneca asserts that Section 3.3.5 and Section 8.10 of the Agreement support its arguments and undermine the Eighth Circuit's decision in *McClain* and this Court's prior decisions in *PhRMA*, *AbbVie*, and *Novartis.*  Specifically, AstraZeneca argues that these provisions "confirm that H.B. 728 forces AstraZeneca to offer 340B discounts, and to transfer title to its drugs, to a private company that does not qualify as a covered entity under the 340B statute."  Pl.'s Notice [31] at 2.

The first provision cited by AstraZeneca provides, "Covered Entity will hold title to replacement 340B Drugs from the time Supplier fills an order from Walgreens made on behalf of Covered Entity until the time that Walgreens takes delivery of such drugs at the applicable Pharmacy Location, at which time title shall pass to Walgreens."  Agreement [31-1] at § 3.3.5.  The Agreement defines "Supplier" as the drug manufacturer, supplier, or wholesaler "that has entered into a written agreement with Covered Entity to provide 340B Drugs to Walgreens via a

---

[3] Walgreen Co. is the parent company of Walgreens.

[4] AstraZeneca did not request the leave of Court before submitting additional evidence in support of its Motion.  Nevertheless, the Court has, out of an abundance of caution considered the evidence.

ship-to, bill-to arrangement." *Id.* at § 2.20. The second provision highlighted by

AstraZeneca states:

> None of the provisions of this Agreement are intended to create nor
> shall they be deemed or construed to create, any relationship between
> the parties hereto other than that of independent entities contracting
> solely for the purposes of effecting the provisions of this Agreement.
> Neither of the parties shall be construed to be the partner, co-venturer,
> or employee or representative of the other party.

*Id.* at § 8.10.

In *McClain*, the drug manufacturer argued that 340B "preempts the field

because Congress intended to create a 'closed system' with the statute." 95 F.4th at

1144. The *McClain* court responded:

> This misconstrues what Act 1103 does. Pharmacies do not purchase
> 340B drugs, and they do not receive the 340B price discounts. Covered
> entities purchase and maintain title to the 340B-discounted drugs,
> while contract pharmacies dispense these drugs to covered entities'
> patients.

*Id.* (citing *Sanofi Aventis U.S. LLC*, 58 F.4th at 700). These declarations in the

*McClain* decision derive from HRSA's 1996 Guidance, which explained that covered

entities retain legal title to the 340B drugs, 61 Fed. Reg. at 43,552, while contract

pharmacies become agents of the covered entity "with the authorization to 'dispense

340B drugs to patients of the covered entity pursuant to a prescription.'" *McClain*,

95 F.4th at 1142 (quoting 61 Fed. Reg. at 43,550).

AstraZeneca argues:

> The Walgreens Contract accordingly reinforces that (1) HB 728 is
> preempted by federal law because it purports to require AstraZeneca to
> charge 340B prices on sales to non-340B covered entities (contract
> pharmacies), in direct conflict with federal law; and (2) HB 728 violates
> the Takings Clause because it forces the transfer of private property

(drugs at 340B prices) from one private party (AstraZeneca) to another (Walgreens, as a putative contract pharmacy).

Pl.'s Notice [31] at 2.

The Court finds these arguments unpersuasive for several reasons. First, AstraZeneca's Takings claim is not currently before the Court since AstraZeneca does not seek a preliminary injunction as to that claim. Second, the Walgreens Agreement is not evidence supporting preemption of Mississippi's H.B. 728 because it is an eight-year-old Arizona contract. And this is particularly true because there is no indication that the Mississippi Legislature intended to authorize, ratify, or otherwise condone contract pharmacy services agreements that violate 340B. *See* Miss. Code Ann. § 41-149-7(1) (prohibiting manufacturers or distributors from interfering with delivery of a 340B drug to a contract pharmacy "*unless* such receipt is prohibited by the United States Department of Health and Human Services") (emphasis added); *see also* Miss. Code Ann. § 41-149-11 ("Nothing in this chapter is to be construed or applied to be in conflict with" applicable federal law).

Third, if the language in any contract pharmacy services agreements violates 340B, HRSA can take enforcement action pursuant to the federal statute. Fourth, the Arizona Agreement does not call the Eighth Circuit's *McClain* decision into question. The covered entity's retention of title was only one basis for the *McClain* court's finding that the Arkansas statute was not preempted. For example, the *McClain* court also held, "Pharmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." 95

-15-

F.4th at 1144.  Finally, to the extent that AstraZeneca asserts that the Walgreens

Agreement supports its prior [21] Motion for Expedited Discovery, the Court

previously denied that Motion, and AstraZeneca has not sought reconsideration of

its Motion.  *See* L.U. Civ. R. 7(b)(1) ("Any written communication with the court

that is intended to be an application for relief or other action by the court must be

presented by a motion in the form prescribed by this rule.")  Consequently,

AstraZeneca's supplemental evidence does not tend support a finding of a

substantial likelihood that AstraZeneca will succeed on the merits.

### E.  SUPPLEMENTAL AUTHORITY PROVIDED BY ASTRAZENECA

In its second [34] Notice of Supplemental Authority, AstraZeneca cites a

recent district court decision enjoining enforcement of West Virginia Code § 60A-8-

6a (hereafter called "S.B. 325") because its "No-Audits" and enforcement provisions

are preempted by the federal 340B program.  *Pharm. Rsch. & Mfrs. of Am. v.*

*Morrisey*, No. 2:24-CV-00271, 2024 WL 5147643 at *7, *12 (S.D.W. Va. Dec. 17,

2024).  Since Mississippi's H.B. 728 does not contain a provision equivalent to S.B.

325's "No-Audits" provision, it is not necessary for this Court to address that portion

of the *Morrisey* court's decision.  The "No-Restrictions" provision" of S.B. 325, is very

similar to Miss. Code Ann. § 41-149-7(1), but the *Morrisey* court did not reach the

issue of whether the "No-Restrictions" provision was preempted because the "No-

Restrictions" provision could not be severed from the remainder of the statute.

*Morrisey*, 2024 WL 5147643, at *12.

**Exhibit 3**

S.B. 325's enforcement provision imposed penalties for violation of S.B. 325's "No-Restrictions" or "No-Audits" provisions. *Morrisey*, 2024 WL 5147643 at *3; *see also* W. Va. Code § 60A-8-6a(c) (brackets omitted). While considering whether S.B. 325's enforcement provision was preempted, the *Morrisey* decision found that this Court's prior decision in *Abbvie* was distinguishable due to insufficient discussion of: (1) "the potential impact" of United States Supreme Court's opinion in *Astra* on conflict preemption analysis; (2) the replenishment model; (3) H.B. 728's enforcement provisions; and (4) the basis for finding that H.B. 728 addresses delivery while Section 340B does not. *Id.* at *9, *11 (citing *Astra*, 563 U.S. at 118–20; *Abbvie*, 2024 WL 3503965, at *10–15).

In *Abbvie,* this Court distinguished the *Astra* decision because "[t]he Supreme Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs." *Abbvie*, 2024 WL 3503965, at *16 (quoting *Astra*, 563 U.S. at 118). Furthermore, a presumption against preemption applied in *Abbvie*, while no presumption applied in *Astra*. *See id.* This Court also rejected the drug manufacturer's argument that the replenishment model of distribution was grounds for finding preemption because the text of the federal 340B statute "does not prohibit distribution through contract pharmacies, and . . . distribution has long been understood not to constitute diversion." *See id.* at *5–6, *13–15.

Finally, this Court's determination that 340B does not address delivery was based on HRSA's 1996 Guidance as well as decisions by the Third Circuit, D.C.

-17-

Circuit, and Eighth Circuit that reached the same conclusion. *Id.* at *4–7, *10

(citing *Sanofi Aventis U.S. LLC*, 58 F.4th at 703; *McClain*, 95 F.4th at 1143;

*Johnson*, 102 F.4th at 456–57; 1996 Guidance at 43,549–55). This Court explained:

> House Bill 728 does not require pharmaceutical manufacturers to offer
> 340B drugs below applicable ceiling prices, expand the definition of
> what a 340B healthcare provider is, or expand the remedies available
> to a covered entity when a manufacturer overcharges it for 340B drugs.
> House Bill 728 prohibits manufacturers from interfering with covered
> entities ordering delivery of Section 340B drugs to pharmacies for
> dispensation—something § 256b neither requires nor precludes.

*Id.* at *12.

After considering AstraZeneca's arguments and the District Court's decision

in *Morrisey*, the Court finds that the analysis and reasoning in *Abbvie* are the more

persuasive. Since the presumption against preemption applies here, AstraZeneca

was required to demonstrate that it "was the clear and manifest purpose of

Congress" to preempt Mississippi's regulation of the health and safety of its citizens

when it enacted 340B. *See Deanda*, 96 F.4th at 761. Given this "high threshold,"

*Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023), the Court

finds that AstraZeneca has filed to demonstrate a substantial likelihood of success

on the merits.

The Court finally notes that a majority of courts considering the issue have

reached the same conclusion. *See, e.g. McClain*, 95 F.4th at 1146; *Pharm. Rsch. &*

*Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *8–9 (W.D. La.

Sept. 30, 2024); *Novartis*, 2024 WL 3276407, at *7. Additionally, the United States

Supreme Court has recently denied certiorari of the Eighth Circuit's decision in

*McClain*, rejecting a manufacturer's assertions of 340B preemption. *See Pharm. Rsch. v. McClain*, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024). While this Court recognizes that the Supreme Court's denial of certiorari is not necessarily suggestive of its ultimate position on the issue, this Court is convinced that it would be imprudent to disregard mainstream decisions and the Eighth Circuit's ruling in *McClain* without clear precedential support.

## II. THE REMAINING REQUIREMENTS FOR OBTAINING A PRELIMINARY INJUNCTION

Since AstraZeneca has not demonstrated a substantial likelihood of success on the merits as to any of its claims, it is not necessary for the Court to address the other preliminary injunction factors. *See Johnson v. Fed. Emergency Mgmt. Agency*, 393 F. App'x 160, 162 (5th Cir. 2010) (citing *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 220 (5th Cir. 2010) (reversing grant of preliminary injunction, without considering all elements, because movant failed to show any likelihood of success on the merits)).

**IT IS THEREFORE ORDERED AND ADJUDGED** that Plaintiff AstraZeneca Pharmaceuticals LP's [13] Motion for Preliminary Injunction is **DENIED.**

**SO ORDERED AND ADJUDGED** this the 23rd day of December, 2024.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

-19-

242

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

|  |  |  |
|---|---|---|
| **NOVARTIS PHARMACEUTICALS CORPORATION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.  2:24-cv-04131-MDH** |
| **ANDREW BAILEY, in his official capacity as ATTORNEY GENERAL OF THE STATE OF MISSOURI; JAMES L. GRAY, in his official capacity as President of the Missouri Board of Pharmacy; CHRISTAN S. TADRUS, in his official capacity as Vice-President of the Missouri Board of Pharmacy; and DOUGLAS R. LANG, ANITA K. PARRAN, COLBY GROVE, TAMMY THOMPSON, and DARREN HARRIS, in their official capacities as members of the Missouri Board of Pharmacy,** | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |
| **v.** | ) ) | |
| **MISSOURI HOSPTIAL ASSOCIATION, And MISSOURI PRIMARY CARE ASSOCIATION,** | ) ) ) ) | |
| **Intervenors** | ) | |

## <u>ORDER</u>

Before the Court are State Defendant's Motion to Dismiss for Failure to State a Claim.
(Doc. 31) and Intervenor's Motion to Dismiss for Failure to State a Claim. (Doc. 63). Plaintiff has
filed its suggestions in opposition. (Docs. 35 and 67). Both State Defendants and Intervenor
Defendants (collectively "Defendants") have filed their replies. (Docs. 49 and 70). The matter is

now ripe for adjudication. For reasons herein, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This case arises out of Senate Bill ("S.B.") 751 which created protections to the delivery of 340B drugs to contract pharmacies on behalf of "covered entities". Section 340B incentivizes pharmaceutical manufactures to provide qualified health care providers, referred to as "covered entities," with pricing discounts on certain drugs prescribed to individuals and families whose income falls below the federal poverty level. Covered entities have contracted with outside pharmacies or "contract pharmacies," for the distribution and dispensation of 340B drugs. S.B. 751 protects hospitals, federal qualified health centers ("FQHC"), and their patients from drug manufacturers' restrictions on the number of contract pharmacies a hospital or FQHC can use and still receive discount pricing under 340B plan. Plaintiff is a pharmaceutical corporation organized in Delaware with its principal place of business in New Jersey. Defendants are all residents of Missouri that are responsible for administering and enforcing the provisions of S.B. 751. Intervenors Missouri Hospital Association and Missouri Primary Care Association are Missouri, not-for-profit member organizations.

Plaintiff alleges three Counts seeking declaratory relief that S.B. 751 is unconstitutional and injunctive relief barring enforcement of S.B. 751. Count I alleges S.B. 751 is preempted by federal patent and drug exclusivity laws under the Supremacy Clause. Count II alleges S.B. 751 is preempted by federal 340B law under the Supremacy Clause and Count III alleges S.B. 751 violates the dormant Commerce Clause. Defendants argue S.B. 751 is not preempted by the federal patent and drug exclusivity laws because S.B. 751 does not adjust 340B drug prices. Defendants next argue S.B. 751 is not preempted by the federal 340B law based on Eighth Circuit precedent.

Finally, Defendants assert that the dormant Commerce Clause is not implicated because S.B. 751 is not discriminatory nor does its burden on interstate commerce exceed the local benefits.

## STANDARD OF REVIEW

A complaint must contain factual allegations that, when accepted as true, are sufficient to state a claim of relief that is plausible on its face. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (internal citations omitted). The complaint's factual allegations must be sufficient to "raise a right to relief above the speculative level," and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 545 (2007). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## ANALYSIS

I.     **Count I – Preemption by Federal Patent and Drug Exclusivity Laws**

Count I seeks declaratory and injunctive relief claiming S.B. 751 is preempted by the federal patent and drug exclusivity laws under the Supremacy Clause of the United States Constitution. Specifically, the federal patent and drug exclusivity laws conflict preempt S.B. 751. Defendants argue that Count I should be dismissed because federal marketing exclusivity periods do not conflict preempt S.B. 751 as S.B. 751 does not adjust prices at which Plaintiff sells 340B drugs.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. art. VI, cl. 2. State laws that conflict with federal law are "without effect." *Cipollone v. Liggett grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, L.Ed.2d 407 (1992). Congress may preempt a state law through federal legislation, but where a federal statute does not refer expressly to preemption, Congress may implicitly preempt a state law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may impliedly preempt state law "either through 'field' preemption or "conflict' preemption." *Id*. Conflict preemption exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objections of Congress.'" *Id*. (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

Plaintiff argues that S.B. 751 reduces the value of the exclusivity periods and patent terms that the Food, Drug, and Cosmetic Act and federal patent laws guarantee to qualifying drug manufacturers. (Complaint ¶ 113). Plaintiff alleges that the Missouri Legislature defined a "340B drug" as a drug sold at a 340B discount. Plaintiff further alleges the Missouri statute requires manufacturers like Plaintiff to provide the 340B discount on transactions that involve contract pharmacies. (Complaint ¶¶ 57-59). Plaintiff states this is evident that S.B. 751 is not about the delivery of 340B drugs but about the pricing of the drugs. (Complaint ¶ 60). Plaintiff further alleges that state laws that cap or fix the prices at which patented drugs may be sold are preempted by federal patent law because they attempt to re-balance the carefully constructed federal statutory scheme that allocates rewards and incentives to manufacturers. (Complaint ¶ 73).

Taking the allegations as true for the purpose of a motion to dismiss, Plaintiff has failed to raise a right to relief above a speculative level. The Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v. McClain* reviewed a similar Arkansas statute where the plaintiff in that case argued an analogues Arkansas law set a price cap and thus was conflict preempted by a different federal law. The Eighth Circuit ruled the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statute set or enforce discount pricing. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1145 (8th Cir. 2024), *cert. denied*, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024). S.B. 751 likewise does the same thing as the Arkansas statute and does not require manufacturers to extend the federal 340B discount to contract pharmacies. S.B. 751 which revised Mo. Rev. Stat. § 376.414 states:

> A pharmaceutical manufacturer, third-party logistics provider, or an agent or affiliate of such pharmaceutical manufacturer or third-party logistics provider, *shall not deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with, or otherwise authorized by, a covered entity to receive 340B drugs on behalf of the covered entity* unless such receipt is prohibited by the United States Department of Health and Human Services. A wholesale drug distributer, as defined in section 338.330, shall not be considered an agent or affiliate for purposes of this subsection.

Mo. Rev. Stat. § 376.414.2. (emphasis added). The Statute by its plain terms only places restrictions on what pharmaceutical manufacturers or third-party logistic providers can restrict or prohibit regarding the acquisition or delivery of 340B drug to a contract pharmacy on a covered entity's behalf. The statute does not make any mention of exclusivity periods, patent terms, or even pricing discounts.

The 340B Program has specific enforcement measures that safeguards the prices at which manufacturers can sell their patented drug while also complying with the provisions of the 340B

program. The discounted price or "ceiling price" a drug manufacturer may change in the 340B program is determined by statutory formula. 42 U.S.C. §§ 256b(a)(2), 1396r-8(c). Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug. *Id.* § 256b(a)(5)(A)-(B). Additionally, covered entities may not engage in diversion of covered outpatient drugs through "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the [covered] entity." *Id.* § 256b(a)(5)(b).

Taking Plaintiff's allegation as true for the purposes of a motion to dismiss it has failed to show a right to relief above a speculative level. Covered entities cannot prescribe discounted 340B drugs except to those who qualify under the program. Both the plain language of the statute as well as precedent within the Eighth Circuit has established that statutes akin to S.B. 751 do not directly regulate the pricing of 340B drugs as regulation of pricing is determined by the federal 340B statute. Further, S.B. 751 does not require manufacturers to give the 340B discount to contract pharmacies. As such S.B. 751 does not conflict preempt the Federal Patent and Drug Exclusivity Laws under the Supremacy Clause. For the reasons stated, Defendants' Motion to Dismiss Count I is **GRANTED**.

## II.    Count II – Preemption by the Federal 340B Law

Count II seeks declaratory and injunctive relief claiming S.B. 751 is preempted by the Federal 340B Law under the Supremacy Clause. Specifically, Plaintiff alleges S.B. 751 is both field preempted and conflict preempted by the federal 340B law. Defendants argue that Count II should be dismissed because the Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v.*

**Exhibit 3**

*McClain*, 95 F.4th 1136 (8th Cir. 2024) has ruled a similar Arkansas statute was not field preempted or conflict preempted by federal 340B law.

### A.        Field Preemption

When a federal regulatory scheme occupies the field because of its pervasive nature, leaving no room for state action, field preemption applies. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Field preemption also applies when Congress "intend[s] 'to foreclose any state regulation in the [regulated] are,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'" *Oneok, Inc.*, 575 U.S. at 377, 135 S.Ct. 1591 (quoting *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)). Congress's intent to preempt a field "can be inferred from a framework of regulation 'so pervasive … that Congress left no room for the States to supplement it' or a "federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

Under Eighth Circuit precedent the 340B program is not "so pervasive … that Congress left no room for the States to supplement it. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136 (8th Cir. 2024) at 1144 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).  The Eighth Circuit reasoned that pharmacies have always been an essential part of the 340B program and Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field. *Id*. The practice of pharmacy is an area traditionally left to state regulation and that the case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concept and to

tolerate whatever tension there [is] between them." *Id*. Further, the Eighth Circuit analyzed the difference between a state statute that ensures an oversight and enforcement scheme in promoting its protections for covered entities to distribute 340B compared to the federal 340B Program and its means for enforcement of discount prices. *Id*. The Eighth Circuit found that a statute which establishes enforcement for the distribution of 340B drugs and the federal 340B law's enforcement scheme address two completely different issues and thus Congress did not intent to preempt the field with its 340B legislation.

Taking Plaintiff's allegation as true for the purpose of a motion to dismiss, Plaintiff fails to state a claim upon which relief can be granted given this circuit's precedent in *McClain.* For the reasons stated herein, Defendants' Motion to Dismiss Count II as it relates to field preemption is **GRANTED**.

B.        **Conflict Preemption**

"Where state and federal law 'directly conflict,' state law must give way. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Obstacle preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). What qualifies as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id*. "If the purpose of the act cannot otherwise be accomplished–if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect–the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id*.

Plaintiff argues that SB 751 imposes a substantial obstacle to the achievement of federal purpose and objections. Specifically, SB 751 requires manufacturers to provide the federal 340B

Exhibit 3

discount on an unlimited number of transactions involving contract pharmacies. (Complaint ¶ 118). A similar argument was made in *McClain*. The Eighth Circuit ruled the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statue set or enforce discount pricing revealing create no obstacle to the enforce of the 340B program. *McClain at 1145*. Additionally, the Arkansas law's enforcement scheme is in place to deter pharmaceutical manufactures from interfering with a covered entity's contact pharmacy arrangements and again creates no obstacle for pharmaceutical manufactures to comply with both the state statute and Section 340B. *Id*.

Here, S.B. 751 does the exact same. S.B. 751 does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entitles utilizing the 340B program. S.B. 751 does not set or enforce discount pricing but protects covered entities use of contract pharmacies. As such, there is no obstacle to the enforcement of the 340B program. Likewise, S.B. 751 creates an enforcement scheme that makes any violation of a pharmaceutical manufacturer or third-party logistics provider an unlawful practice. Mo. Rev. Stat. § 376.414.3. It details the appropriate statutes should a violation happen to obtain compliance through monetary penalties and equitable relief.[1] *Id*. Consistent with the precedent set by the Eighth Circuit, Plaintiff has failed to allege a claim upon which relief can be granted. For the reasons stated, Defendants' Motion to Dismiss Count II as it relates to obstacle preemption is **GRANTED**. Count II is **DISMISSED** in its entirety.

### III.    Count III – Violation of the Dormant Commerce Clause

---

[1] Mo. Rev. Stat. § 376.414.3 provides any act prohibited by subsection shall constitute an unlawful practice which any action may be authorized under Mo. Rev. Stat. §§ 407.010-407.130. Particularly relevant is Mo. Rev. Stat. § 407.100 which details remedies from the court such as restitution, civil penalties of not more than $1000.00 per violation, injunctions, temporary restraining orders, and other remedies.

Count III seeks declaratory and injunctive relief that S.B. 751 is unconstitutional as it violates the Commerce Clause of the United States Constitution. (Complaint ¶ 122). The Constitution vests Congress with the power to "regulate Commerce…among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has held the Commerce Clause gives Congress exclusive legislative jurisdiction over interstate commerce, meaning states may not enact laws that "unduly restrict interstate commerce." *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (quoting *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, --- U.S. ----, 139 S.Ct. 2449, 2459, 204 L.Ed. 2d 801 (2019). This restriction is commonly referred to as the dormant Commerce Clause. *Id*. A state statute violates the dormant Commerce Clause if it "(1) "clearly discriminates against interstate commerce in favor of in-state commerce," (2) "imposes a burden on interstate commerce that outweighs any benefits received," or (3) "has the practical effect of extraterritorial control on interstate commerce." *Grand River Enters. Six Nations, Ltd. V. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009). Plaintiff alleges S.B. 751 violates the dormant Commerce Clause in all three respects.

## A. Discrimination on Interstate Commerce

Plaintiff alleges S.B. 751 privileges in-state pharmacies while significantly burdening out-of-state manufacturers like Plaintiff. (Complaint ¶ 124). Defendants argue this is the wrong comparison under a dormant Commerce Clause analysis and that the correct analysis is whether S.B. 751 discriminates against out-of-state drug manufacturers in favor of in-state drug manufacturers. Defendants claim that S.B. 751 treats in-state manufacturers the same as out-of-state manufacturers, therefore there is no dormant Commerce Clause violation under the discriminatory intent or effect theory.

When considering a dormant Commerce Clause violation, we must first determine "whether the challenged law discriminates against interstate commerce." *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006). A state statue discriminates against interstate commerce if it accords "differential treatment of in-state and out-of-state economic interest that benefits the former and burdens the latter." *Id*. A law can discriminate in three ways: 1) it can discriminate on its face; 2) it can have a discriminatory purpose; or 3) it can have a discriminatory effect. *Id*. The dormant Commerce Clause is only implicated when the discrimination is between "substantially similar entities." *MDKC, LLC v. City of Kansas City*, No. 4:23-CV-00395-DKG, 2023 WL 6406403 at *7 (W.D. Mo. Oct. 2, 2023) (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342, 128 S. Ct. 1801, 1811, 170 L. Ed. 2d 685 (2008)).

While Defendant cites many cases that show a similar comparison of comparing the same industry and comparing the effects of the in-state industry compared to the out-of-state industry for purposes of the dormant Commerce Clause analysis, the Court finds this is not dispositive. The Court has found no case law that specifies that a dormant Commerce Clause analysis must be predicated on comparing the same industry and reviewing the effects simply from an in-state or out-of-state vantage point. A fundamental element of dormant Commerce Clause jurisprudence is the principle that "any notion of discrimination assumes a comparison of substantially similar entities." *Dep't of Revenue of Ky. v. Davis*, U.S. 328, 342 (2008). Therefore, the analysis must focus on substantially similar entities.

Taking as true the allegations for the purpose of a motion to dismiss, Plaintiff has raised the right of relief above a speculative level. Plaintiff claims the goal of S.B. 751 is to protect in state industries, such as hospitals and pharmacies, by forcing out-of-state manufacturers to give them a steep discount. (Complaint ¶ 97). Plaintiff further claims Missouri's law advantages in-

state interests by making it unlawful for out-of-state firms to refuse extending through Missouri

pharmacies a below-market bargain, or to refuse to bargain at all, it violates the dormant

Commerce Clause. *Id*. This is sufficient at this stage of the litigation to warrant further

consideration.    For the reasons stated, Defendants' Motion to Dismiss on Count III –

Discrimination on Interstate Commerce is **DENIED**.

**B.  Burden on Interstae Commerce**

Defendants first argue that *Nat'l Pork Producers Council v. Ross* eliminated the balancing

test established under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174

(1970) ("Pike Test"). The Pike Test states state legislation is valid if "the statue regulates even-

handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are

only incidental. *Id* at 142. The statute will be upheld "unless the burden imposed on such commerce

is clearly excessive in relation to the putative local benefits." *Id*.

*Nat'l Pork Producers Council v. Ross* does not eliminate the Pike Test, rather it declined

to extend Pike past what prior case precedent held.

> While Pike has traditionally served as another way to test for purposeful
> discrimination against out-of-state economic interest, and while some of our cases
> associated with that line have expressed special concern with certain state
> regulation of the instrumentalities of interstate transportation petitioners would
> have us retool Pike for a much more ambitious project. They urge us to read Pike
> as authorizing judges to strike down duly enacted state laws regulating the in-state
> sale of ordinary consumer goods (like pork) based on nothing more than their own
> assessment of the relevant law's "costs" and "benefits." That we can hardly do.

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 380, 143 S. Ct. 1142, 1159, 215 L. Ed. 2d

336 (2023) (citations omitted). Additionally, courts within the district continue to utilize the Pike

Test post *Nat'l Pork Producers Council v. Ross*. *See MDKC, LLC v. City of Kansas City*, No. 4:23-

CV-00395-DKG, 2023 WL 6406403 (W.D. Mo. Oct. 2, 2023). As such, the Pike Test has not been

**Exhibit 3**

eliminated by *Nat'l Pork Producers Council v. Ross* and is still good law today within the district and the Eighth Circuit.

Defendant next argues that even if the Pike Test applies, Plaintiff still cannot state a claim because it has not pleaded facts showing that S.B. 751 imposes a "substantial burden" on interstate commerce. The Court must analyze whether the burden imposed by the Statute is excessive compared to the benefits. *Turtle Island Foods, SPC v. Thompson*, 725 F. Supp. 3d 963, 977 (W.D. Mo. 2024). The extent of the burden that will be tolerated will depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*. (quoting *Ass'n to Pres. & Protect Loc. Livelihoods v. Town of Bar Harbor*, 721 F. Supp. 3d 56, 95 (D. Me. 2024)). But even so, "preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy', something courts should do only 'where the infraction is clear.'" *Id*.

Plaintiff has alleged four burdens within its Complaint. Plaintiff first alleges that the bargaining power favors in-state pharmacies and covered entities at the expense of out-of-state drug manufacturers. (Complaint ¶ 99). Second, Manufacturers will have to contend with a patchwork of state laws with different terms and different requirements, each purporting to regulate transactions that are primarily nationwide in nature. (Complaint ¶ 100). Third, it will be virtually impossible for manufacturers and wholesalers to map multiple overlapping and insistent state laws onto nationwide contracts without creating conflicts and forcing violations of competing state law. (Complaint ¶ 101). Fourth, as more state laws like S.B. 751 become prevalent in different states the burden on interstate commerce will snowball. (Complaint ¶¶ 102).

**Exhibit 3**

Taking Plaintiff's factual allegations as true for the purposes of a motion to dismiss, Plaintiff has raised the right of relief above a speculative level. Plaintiff sufficiently alleges four burdens that would result in a significant burden upon interstate commerce for Plaintiff individually and those similarly situated. While there are local benefits that may warrant further scrutiny of this claim, at this state of the litigation Plaintiff's allegations are sufficient. For the reasons stated, Defendants' Motion to Dismiss on Count III – Burden on Interstate Commerce is **DENIED**.

## C. Extraterritorial Control on Interstate Commerce

Defendants argue that S.B. 751 does not apply extraterritorially and even so S.B. 751 does not directly regulate transactions taking place wholly outside the state and involving individuals having no connection with the state. Plaintiff asserts that the practical discriminatory effect of Missouri's law is to directly regulate wholly out-of-state transactions between manufacturers and other private entities.

The Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the state. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). A statute directly controlling wholly out-of-state commerce "is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id*. However, there is no per se rule under the dormant Commerce Clause forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, when those laws do not purposely discriminate against out-of-state economic interests. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 143 S. Ct. 1142, 1159, 215 L. Ed. 2d 336 (2023).

For the purposes of a motion to dismiss, Plaintiff has alleged facts that raise a right to relieve above a speculative level. Plaintiff alleges that drug manufacturers typically sell its products to national wholesalers and distributors located around the county. (Complaint ¶ 96) Those wholesalers then sell the products to national chain pharmacies which in turn will be dispensed by contract pharmacies to patients located in Missouri. *Id*. The 340B discount than travels back in the opposite direction when covered entities file a chargeback with the wholesalers who file a retroactive request for payment with manufacturers. *Id*. Plaintiff alleges it is that last transaction which runs afoul of the extraterritorial concerns and which S.B. 751 compels manufacturers and wholesalers to act in accordance with Missouri law outside Missouri. *Id*. These allegations are sufficient at this stage of the litigation to continue. For the reasons stated, Defendants' Motion to Dismiss on Count III – Extraterritorial Control on Interstate Commerce is **DENIED**.

**CONCLUSION**

For reasons herein, Defendants' Motion is Dismiss is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Dismiss Count I is **GRANTED**. Defendants' Motion to Dismiss Count II is **GRANTED** and Defendants' Motion to Dismiss Count III is **DENIED**.

**IT IS SO ORDERED**.
DATED: February 13, 2025

/s/ Douglas Harpool
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**

**Exhibit 3**

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| ASTRAZENCA PHARMACEUTICALS LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:24-cv-04143-MDH |
| | ) | |
| ANDREW BAILEY, in his official capacity as | ) | |
| ATTORNEY GENERAL OF THE STATE OF | ) | |
| MISSOURI; JAMES L. GRAY, in his official | ) | |
| capacity as President of the Missouri Board of | ) | |
| Pharmacy; CHRISTAN S. TADRUS, in his | ) | |
| official capacity as Vice-President of the | ) | |
| Missouri Board of Pharmacy; and DOUGLAS | ) | |
| R. LANG, ANITA K. PARRAN, COLBY | ) | |
| GROVE, TAMMY THOMPSON, and DARREN | ) | |
| HARRIS, in their official capacities as members | ) | |
| of the Missouri Board of Pharmacy, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MISSOURI HOSPTIAL ASSOCIATION, | ) | |
| And MISSOURI PRIMARY CARE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Intervenors | ) | |

## ORDER

Before the Court are State Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 30) and Intervenor's Motion to Dismiss for Failure to State a Claim. (Doc. 68). Plaintiff has filed its suggestions in opposition. (Docs. 50 and 74). Both State Defendants and Intervenor Defendants (collectively "Defendants") have filed their replies. (Docs. 58 and 76). The matter is now ripe for adjudication. For reasons herein, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This case arises out of Senate Bill ("S.B.") 751 which created protections to the delivery of 340B drugs to contract pharmacies on behalf of "covered entities". Section 340B incentivizes pharmaceutical manufactures to provide qualified health care providers, referred to as "covered entities," with pricing discounts on certain drugs prescribed to individuals and families whose income falls below the federal poverty level. Covered entities have contracted with outside pharmacies or "contract pharmacies," for the distribution and dispensation of 340B drugs. S.B. 751 protects hospitals, federal qualified health centers ("FQHC"), and their patients from drug manufacturers' restrictions on the number of contract pharmacies a hospital or FQHC can use and still receive discount pricing under 340B plan. Plaintiff is a limited partnership organized under the laws of Delaware with its principal place of business in Wilmington, Delaware. State Defendants are all residents of Missouri that are responsible for administering and enforcing the provisions of S.B. 751. Intervenors Missouri Hospital Association and Missouri Primary Care Association are Missouri, not-for-profit member organizations.

Plaintiff alleges three Counts seeking declaratory relief that S.B. 751 is unconstitutional and injunctive relief barring enforcement of S.B. 751. Count I alleges S.B. 751 is preempted by federal patent laws under the Supremacy Clause. Count II alleges S.B. 751 violates the Contracts Clause of the U.S. Constitution and Count III alleges S.B. 751 violates the Takings Clause of the U.S. Constitution. Defendants argue S.B. 751 is not preempted by federal patent laws because S.B. 751 does not adjust 340B drug prices nor does it fit the requirements for conflict preemption. Defendants next argue Plaintiff has not pleaded facts that would give rise to relief of a violation of the Contracts Clause. Finally, Defendants assert that S.B. 751 neither forcibly takes property from Plaintiff nor is a regulatory taking.

**Exhibit 3**

## STANDARD OF REVIEW

A complaint must contain factual allegations that, when accepted as true, are sufficient to state a claim of relief that is plausible on its face. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (internal citations omitted). The complaint's factual allegations must be sufficient to "raise a right to relief above the speculative level," and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 545 (2007). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## ANALYSIS

### I.    Count I – Preemption by Federal Patent Laws

Count I seeks declaratory and injunctive relief claiming S.B. 751 is preempted by federal patent laws under the Supremacy Clause of the United States Constitution. Specifically, federal patent laws conflict preempt S.B. 751. Defendants argue that Count I should be dismissed because S.B. 751 does not cap or fix drug prices, only the federal 340B program does. Additionally, Defendants argue that S.B. 751 does not otherwise fit the requirements for conflict preemption.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. art. VI, cl. 2. State laws that conflict with federal law are "without

effect." *Cipollone v. Liggett grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, L.Ed.2d 407 (1992). Congress may preempt a state law through federal legislation, but where a federal statute does not refer expressly to preemption, Congress may implicitly preempt a state law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may impliedly pre-empt state law "either through 'field' preemption or "conflict' preemption." *Id*. Conflict pre-emption exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objections of Congress.'" *Id*. (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

Plaintiff argues that S.B. 751 restricts the prices at which manufacturers can sell their patented drugs by requiring drug manufacturers to make 340B drugs available for unlimited contract pharmacy sales. (Complaint ¶ 64). Plaintiff asserts S.B. 751 functions as a price cap for an unlimited number of contract pharmacy sales that impermissibly constrains manufacturers' "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id*. (quoting *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007).

The Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v. McClain* reviewed a similar Arkansas statute where the plaintiff in that case argued an analogues Arkansas law set a price cap and thus was conflict preempted by a different federal law. The Eighth Circuit ruled the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statute set or enforce discount pricing. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1145 (8th Cir. 2024), *cert. denied*, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024). S.B. 751 likewise does the same thing as the Arkansas statute and does not require

**Exhibit 3**

manufacturers to extend the federal 340B discount to contract pharmacies. S.B. 751 which revised

Mo. Rev. Stat. § 376.414 states:

> A pharmaceutical manufacturer, third-party logistics provider, or an agent or affiliate of such pharmaceutical manufacturer or third-party logistics provider, *shall not deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with, or otherwise authorized by, a covered entity to receive 340B drugs on behalf of the covered entity* unless such receipt is prohibited by the United States Department of Health and Human Services. A wholesale drug distributer, as defined in section 338.330, shall not be considered an agent or affiliate for purposes of this subsection.

Mo. Rev. Stat. § 376.414.2. (emphasis added). The statute by its plain terms only places restrictions

on what pharmaceutical manufacturers or third-party logistic providers can restrict or prohibit

regarding the acquisition or delivery of 340B drug to a contract pharmacy on a covered entity's

behalf. The statute does not make any mention of exclusivity periods, patent terms, or even pricing

discounts.

The 340B Program has specific enforcement measures that safeguards the prices at which

manufacturers can sell their patented drug while also complying with the provisions of the 340B

program. The discounted price or "ceiling price" a drug manufacturer may change in the 340B

program is determined by statutory formula. 42 U.S.C. §§ 256b(a)(2), 1396r-8(c).  Covered entities

may only prescribe 340B discounted drugs to patients who qualify and may not request or receive

duplicative 340B discounts and Medicaid rebates for the same drug. *Id*. § 256b(a)(5)(A)-(B).

Additionally, covered entities may not engage in diversion of covered outpatient drugs through

"resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the [covered]

entity." *Id*. § 256b(a)(5)(b).

Taking Plaintiff's allegation as true for the purposes of a motion to dismiss it has failed to

show a right to relief above a speculative level. Covered entities cannot prescribe discounted 340B

drugs except to those who qualify under the program. Both the plain language of the statute as well as precedent within the Eighth Circuit has established that statutes akin to S.B. 751 do not directly regulate the pricing of 340B drugs as regulation of pricing is determined by the federal 340B statute. Further, S.B. 751 does not require manufacturers to give the 340B discount to contract pharmacies. As such S.B. 751 does not conflict preempt federal patent laws under the Supremacy Clause. For the reasons stated, Defendant's Motion to Dismiss on Count I are **GRANTED**.

## II.    Count II – Violation of the Contracts Clause

Count II seeks declaratory and injunctive relief alleging S.B. 751 violates the Contracts Clause of the U.S. Constitution. Specifically, S.B. 751 substantially impairs the pharmaceutical pricing agreements ("PPA") entered to participate in the federal 340B program and that the State of Missouri has no legitimate justification for requiring unlimited contract pharmacy arrangements. Defendants argue that Plaintiff has not pleaded facts that would give rise to relief of a violation of the Contracts Clause.

The Contract Clause of the United States Constitution provides that no state shall "pass any law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. A three-part test determines whether state action violates the Contract Clause. First the court asks whether "the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Am. Fed'n of State, Cnty. & Mun. Emps. v. City of Benton, Arkansas*, 513 F.3d 874, 879 (8th Cir. 2008) (quoting *Equip. Mfrs. Inst. V. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002). The first prong involves a three-part inquiry: "(1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial." *Gen. Motors Corp v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). If substantial impairment existed, the court will determine whether the state has a "significant and legitimate

public purpose behind the regulation." *Educ. Employees Credit Union v. Mut. Guar. Corp.*, 50 F.3d 1432, 1438 (8th Cir. 1995). If there is no significant and legitimate public purpose, the state law is unconstitutional under the Contract Clause. *See Equip. Mfrs.*, 300 F.3d at 850. If, however the state identifies such a public purpose, the court will consider "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

Taking as true Plaintiff's allegations for the purpose of a motion to dismiss, it has raised its right to relief above a speculative level. Plaintiff alleges that it signed a PPA to participate in the federal 340B program. (Complaint ¶ 69). As part of the terms of the PPA is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of covered entities. *Id*. Neither the 340B statute nor the PPA requires drug manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies. *Id*. Plaintiff claims that S.B. 751 expands its obligations under the PPA to unlimited contract pharmacies thus causing a substantial impairment of Plaintiff's expectation of the 340B program. (Complaint ¶ 70). Plaintiff further argues that the State of Missouri has no legitimate justification for requiring unlimited contract pharmacy arrangements. Plaintiff states its policy already ensures that every covered entity is offered those drugs at a discount and that its polices allow covered entities to designate a single contract pharmacy if it does not have an on-site pharmacy to dispense the 340B drugs. (Complaint ¶ 72). Additionally, Plaintiff argues that S.B. 751 will advance the economic interest of for-profit entities without a cost-reduction for patients. (Complaint ¶¶ 73 and 74).

Taking as true Plaintiff's allegations, it has raised a right to relief above a speculative level. Plaintiff has sufficiently alleged the existence of a contract, that would be substantially impaired

by S.B. 751. For the reasons stated, Defendants' Motion to Dismiss on Count II of Plaintiff's Complaint is **DENIED**.

### III.     Count III – Violation of the Takings Clause

Count III alleges that S.B. 751 violates the Takings Clause by a physical appropriation of manufactures prescription drugs by contract pharmacies and covered entities. Alternatively Count III alleges if not a physical appropriation, it would still constitute a regulatory taking. Defendants argue that S.B. 751 neither forcibly takes property from Plaintiff nor is a regulatory taking.

The Takings Clause of the Fifth Amendment to the Constitution, which is "applicable to the States through the Fourteenth Amendment," provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. Takings claims are recognized as to both personal property, including goods, and real property. *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015). A taking can be either per se or regulatory, both of which entitle the property owner to just compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49, 141 S. Ct. 2063, 2071, 210 L. Ed. 2d 369 (2021). A per se taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it." *Id*. at 147. A taking can also occur as a result of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 968, 1005-06 (1984). The Supreme Court has held that a regulatory taking occurs when a regulation "goes too far" in limiting an owner's use of her property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L.Ed. 322 (1922).

   a.  **Physical Appropriation**

**Exhibit 3**

Defendants argue that S.B. 751 does not forcibly take any property from Plaintiff or compel a transfer of title to contract pharmacies and thus Plaintiff's argument for a physical appropriation of private property must fail. Further, Defendants argue that because Plaintiff has voluntarily participated in the federal 340B program it cannot give rise to an unconstitutional taking. Plaintiff argues that S.B. 751 takes the private property of drug manufacturers to transfer their prescription drugs to private entities, covered entities and the pharmacies with which they contract. (Complaint ¶ 78). Plaintiff asserts this forced transfer results in the physical appropriation of manufacturers' prescription drugs by contract pharmacies and covered entities, and it therefore constitutes a per se taking. (Complaint ¶ 80).

When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation. *Se. Arkansas Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (quoting *Minnesota Ass'n of Health Care Facilities, Inc.*, 742 F.2d at 446 (8th Cir. 1984)). As described above, Plaintiff has voluntarily agreed to be a part of the federal 340B program. Plaintiff signed a PPA to participate in the federal 340B program. (Complaint ¶ 69). As part of the terms of the PPA is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of covered entities. Plaintiff voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right of just compensation. For the reasons stated Defendants' Motions to Dismiss Plaintiff's Physical Appropriation Claim is **GRANTED**.

b.  **Unconstitutional Regulatory Taking**

Defendants argue that S.B. 751 is not an unconstitutional regulatory taking because Plaintiff has failed to allege facts showing it is a taking under the *Penn Central* test. Plaintiff argues that S.B. 751 has (1) a profound economic impact on the value of the property subject to the law; (2) significantly interferes with its investment-backed expectations; and (3) forces Plaintiff to transfer title to their property, depriving them of full use and enjoyment of said property.

The default test for determining whether a regulation constitutes a taking is known as the *Penn Central* Test. The *Penn Central* Court crafted a test that focuses largely "upon the particular circumstances [in each] case." *Becker v. City of Hillsboro, Missouri*, 125 F.4th 844, 852 (8th Cir. 2025) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662, 57 L. Ed. 2d 631 (1978)).Under the *Penn Central* balancing test, courts consider: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-back expectations," and (3) "the character of the government action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662, 57 L. Ed. 2d 631 (1978).

While Plaintiff has not specified in its third count the specific facts to illustrate the elements of a *Penn Central* taking, the Complaint does allege facts that allows the Court to consider this claim at the motion to dismiss stage of the litigation. Plaintiff alleges that the economic impact of the regulation stems from the below market costs the 340B drugs costs Plaintiff by providing them to covered entities and contract pharmacies. (Complaint ¶¶ 95-96). Plaintiff argues that it joined the 340B program with the expectation and understanding that it would be required to provide discounted drugs only for a limited category of sales to covered entities and accepted that obligation when it joined the federal 340B program. (Complaint ¶ 70). Lastly, Plaintiff argues that Missouri has no legitimate justification for requiring unlimited contract arrangements, which will

**Exhibit 3**

advance the economic interest of for-profit entities at the expense of drug manufacturers. (Complaint ¶ 73).

Taking these allegations as true for the purpose of a motion to dismiss, Plaintiff has failed to raise a right to relief above a speculative level. A reasonable investment-backed expectation requires "more than a 'unilateral expectation or an abstract need.'" *Becker v. City of Hillsboro, Missouri*, 125 F. 4th 844, 858 (8th Cir. 2025) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 968, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). The reasonableness of an expectation may be shaped by "the regulatory regime in place at the time the claimant acquires the property." *Id*. (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 633, 121, S. Ct. 2448, 2465, 150 L. Ed. 2d 592 (2001)). The 340B program "is silent about delivery" and distribution of pharmaceuticals to patients. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1142 (8th Cir. 2024), cert. denied, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024) (quoting Sanofi Aventis U.S. LLC v. *United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 702 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). Investment-backed expectations are often "informed by the law in force in the State in which the property is located." *Id*. (quoting *Ark. Game & Fish Comm'n v. United States*, 568, U.S. 23, 38, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012)). The practice of pharmacy is an area traditionally left to state regulation. *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021).

Here, the regulatory regime in place when Plaintiff entered the 340B program was silent about delivery. States were free to change delivery and acquisition requirements regarding 340B drugs in their respective jurisdictions. This is consistent with the idea that the practice of pharmacy is an area traditionally left to state regulation. Plaintiff did not have a reasonable investment-backed expectation that states would not, at some point, deicide to change requirements of the

340B program that Congress had deliberately left silent in an area that is traditionally left to the states to regulate.  As such, Plaintiff has not demonstrated a reasonable investment-backed expectation.

Further, Plaintiff has not shown the character of the government action is that of a regulatory taking. The inquiry into character of the government action focuses on "whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Becker v. City of Hillsboro, Missouri*, 125 F. 4th 844, 859 (8th Cir. 2025) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082, 161 L. Ed. 2d 876 (2005)). As discussed above regarding a physical appropriation, S.B. 751 does not create any new obligation outside of the federal 340B program except with regard to delivery and acquisition of 340B drugs to contract pharmacies. S.B. 751 was intended to ensure delivery of 340B drugs to covered entities and contract pharmacies to which help disseminating the drugs to those patients who are qualified through the federal 340B program. As such, the character of the government action does not suggest a physical taking but merely adjusting the benefits and burdens of economic life to promote the common good. For the reasons stated, Defendants' Motion to Dismiss Count III as a regulatory taking is **GRANTED**.

## CONCLUSION

For reasons herein, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motions to Dismiss Count I are **GRANTED**. Defendants' Motion to Dismiss Count II are **DENIED** and Defendants' Motion to Dismiss Count III are **GRANTED**.

**Exhibit 3**

**IT IS SO ORDERED**.

DATED: February 27, 2025

/s/ Douglas Harpool
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**

**Exhibit 3**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.  2:24-cv-04144-MDH |
| ANDREW BAILEY, in his official capacity as ATTORNEY GENERAL OF THE STATE OF MISSOURI; JAMES L. GRAY, in his official capacity as President of the Missouri Board of Pharmacy; CHRISTAN S. TADRUS, in his official capacity as Vice-President of the Missouri Board of Pharmacy; and DOUGLAS R. LANG, ANITA K. PARRAN, COLBY GROVE, TAMMY THOMPSON, and DARREN HARRIS, in their official capacities as members of the Missouri Board of Pharmacy, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| v. | ) ) | |
| MISSOURI HOSPTIAL ASSOCIATION, And MISSOURI PRIMARY CARE ASSOCIATION, | ) ) ) ) | |
| Intervenors | ) | |

## ORDER

Before the Court are State Defendant's Motion to Dismiss for Failure to State a Claim. (Doc. 68) and Intervenor's Motion to Dismiss for Failure to State a Claim. (Doc. 66). Plaintiff has filed its suggestions in opposition. (Doc 84). Both State Defendants and Intervenor Defendants (collectively "Defendants") have filed their replies. (Docs. 86 and 87). The matter is now ripe for

**Exhibit 3**

adjudication. For reasons herein, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This case arises out of Senate Bill ("S.B.") 751 which created protections to the delivery of 340B drugs to contract pharmacies on behalf of "covered entities". Section 340B incentivizes pharmaceutical manufactures to provide qualified health care providers, referred to as "covered entities," with pricing discounts on certain drugs prescribed to individuals and families whose income falls below the federal poverty level. Covered entities have contracted with outside pharmacies or "contract pharmacies," for the distribution and dispensation of 340B drugs. S.B. 751 protects hospitals, federal qualified health centers ("FQHC"), and their patients from drug manufacturers' restrictions on the number of contract pharmacies a hospital or FQHC can use and still receive discount pricing under 340B plan. Plaintiff is a trade association with its headquarters and principal place of business in Washington, D.C. Defendants are all residents of Missouri that are responsible for administering and enforcing the provisions of S.B. 751. Intervenors Missouri Hospital Association and Missouri Primary Care Association are Missouri, not-for-profit member organizations.

Plaintiff alleges three Counts seeking declaratory relief that S.B. 751 is unconstitutional and injunctive relief barring enforcement of S.B. 751. Count I alleges S.B. 751 is preempted by the Supremacy Clause based on claims data policies. Count II alleges S.B. 751 is preempted by federal 340B law and the Supremacy Clause based on contract pharmacy policies. Count III alleges S.B. 751 is preempted generally under the Supremacy Clause and the federal 340B statute. Lastly, Count IV alleges S.B. 751 is an unconstitutional extraterritorial regulation. Defendants argue S.B.

751 is not preempted based on Eighth Circuit precedent in *Pharm. Rsch. & Manufacturers of Am. v. McClain* and that S.B. 751 does not apply exterritorialy.

## STANDARD OF REVIEW

A complaint must contain factual allegations that, when accepted as true, are sufficient to state a claim of relief that is plausible on its face. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (internal citations omitted). The complaint's factual allegations must be sufficient to "raise a right to relief above the speculative level," and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 545 (2007). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## ANALYSIS

### I.    Count I – Conflict Preemption Under the Supremacy Clause of the U.S. Constitution – Claims Data Policies

Count I seeks declaratory and injunctive relief claiming S.B. 751 is conflict preempted by claims data policies under federal law. Specifically, that manufactures are permitted to require certain types of data as a precondition of their "offer" to provide 340B priced drugs to covered entities. Defendants argue that the 340B statute does not control claims data policies, and state may regulate in that empty space.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. art. VI, cl. 2. State laws that conflict with federal law are "without effect." *Cipollone v. Liggett grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, L.Ed.2d 407 (1992). Congress may preempt a state law through federal legislation, but where a federal statute does not refer expressly to preemption, Congress may implicitly preempt a state law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may impliedly pre-empt state law "either through 'field' preemption or "conflict' preemption." *Id*. Conflict pre-emption exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objections of Congress.'" *Id*. (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

Plaintiff argues that the federal 340B statutes requires only that manufacturers "offer' 340B priced drugs to covered entities. (Complaint ¶ 122). Plaintiff assets multiple courts have concluded that manufacturers may impose reasonable conditions on their offers of 340B priced drugs that require covered entities and contract pharmacies to provide certain claims data related to restrictions that were purportedly dispensed as 340B drugs. *Id*.  If a potential buyer will not agree to a manufacturer claims data requirement in the offer, there is no offer and acceptance, and thus no "purchase" of a 340B drug by a covered entity under federal law. (Complaint ¶ 123). As such the 340B pricing requirement does not apply under federal law. *Id*. Plaintiff thus asserts that S.B. 751 mandates the 340B pricing obligation even where the federal statute does not and is therefore a conflict with the federal law. (Complaint ¶ 124). Plaintiff lastly asserts that S.B. 751's restrictions also impermissibly limit drug manufacturers' ability to utilize the federal enforcement scheme and

will contribute to duplicate discounts and diversion of 340B drugs to ineligible recipients. (Complaint ¶¶ 126-127).

Under Eighth Circuit precedent the 340B program "is silent about delivery" and distribution of pharmaceuticals to patients. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1142 (8th Cir. 2024), cert. denied, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024) (quoting *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703 (3d. Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). The 340B program is not "so pervasive … that Congress left no room for the States to supplement it. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136 (8th Cir. 2024) at 1144 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The Eighth Circuit reasoned that pharmacies have always been an essential part of the 340B program and Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field. *Id*. The practice of pharmacy is an area traditionally left to state regulation and that the case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concept and to tolerate whatever tension there [is] between them." *Id*.

Taking Plaintiff's allegations as true for the purposes of a motion to dismiss it has failed to show a right to relief above a speculative level. Here, the federal 340B program was silent as to delivery of 340B drugs and thus drug manufacturers were able to impose conditions. However, S.B. 751 restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entitles utilizing the 340B program. Missouri in enacting S.B. 751 was allowed to promulgate rules concerning the delivery and acquisition of 340B drugs based on

the silence of the federal 340B program and because the practice of pharmacy is traditionally left to state regulation. This includes terms regarding the claim data policies.

Plaintiff's claim that S.B. 751's restrictions also impermissibly limit drug manufacturers' ability to utilize the federal enforcement scheme also fails to raise a right of relief above a speculative level. 42 U.S.C. § 256b puts limitation on prices of drugs purchased by covered entities. Specifically, 42 U.S.C. §256b(a)(5)(C) details the process for the Secretary of Health and Human Services or a drug manufacturer on the process to audit a covered entity. "A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug with the entity to audit at the Secretary's or the manufacturer's expense the records of the entity." 42 U.S.C. § 256b(a)(5)(C). The federal 340B law creates an auditing scheme that allows any drug manufacturer to be able to audit a covered entity. S.B. 751 does nothing to change how audits are conducted on covered entities and claims data polices that condition the sale of 340B drugs on transfer of data collected at the expenses and effort of covered entities would be directly contrary to the 340B statutes provision that audits occur only at the expense of the Secretary or manufacturer.  For the reasons stated, Defendants' Motion to Dismiss Count I is **GRANTED**.

## II.    Count II – Conflict Preemption Under the Supremacy clause of the U.S. Constitution and the Federal 340B Statute – Contract Pharmacy Policies

Count II seeks declaratory and injunctive relief claiming S.B. 751 is conflict preempted by the federal 340B law under the Supremacy Clause with respect to contract pharmacy policies. Specifically, Plaintiff alleges S.B. 751 mandates that manufacturers provide the 340B priced drugs to any and all contract pharmacies that a covered entity choses to contract with, which expands drug manufacturers' obligations under the federal program and conflicts with the original scope of

those obligations. Defendants argue that Count II should be dismissed because the Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) has held restrictions on drug manufacturers contract policies was not conflict preempted by federal 340B law.

"Where state and federal law 'directly conflict,' state law must give way. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011). Obstacle preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). What qualifies as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id*. "If the purpose of the act cannot otherwise be accomplished–if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect–the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id*.

Plaintiff argues that Congress imposes a requirement to "offer" 340B priced drugs on manufacturers and as part of the federal offer manufacturers may include limitations on the use of contract pharmacies. (Complaint ¶ 131). Plaintiff states the 340B pricing obligation attaches only where covered entities accept the terms of the offer. *Id*. Plaintiff argues that by mandating that manufacturers provide 340B priced drugs to all contract pharmacies that a covered entity choses to contract with, the Missouri statute dramatically expands manufacturers' obligations under the federal program and directly conflicts with the scope of those obligations. (Complaint ¶ 132). Plaintiff contends S.B. 751 extends the pricing to contract pharmacies even when the covered entity has not "purchased" a covered drug under federal law and a manufacturer therefore has no federal obligation to provide 340B pricing. (Complaint ¶ 134). Lastly, Plaintiff asserts S.B. 751's

state-law enforcement provision also conflicts with the calibrated system created by Congress to ensure 340B compliance. (Complaint ¶ 136).

A similar argument was made in *McClain*. The Eighth Circuit ruled the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statue set or enforce discount pricing revealing create no obstacle to the enforce of the 340B program. *McClain at 1145.* Additionally, the Arkansas law's enforcement scheme is in place to deter pharmaceutical manufactures from interfering with a covered entity's contact pharmacy arrangements and again creates no obstacle for pharmaceutical manufactures to comply with both the state statute and Section 340B. *Id.*

Here, S.B. 751 does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entitles utilizing the 340B program. S.B. 751 does not set or enforce discount pricing but protects covered entities use of contract pharmacies. As such, there is no obstacle to the enforcement of the 340B program. Likewise, S.B. 751 creates an enforcement scheme that makes any violation of a pharmaceutical manufacturer or third-party logistics provider an unlawful practice. Mo. Rev. Stat. § 376.414.3. It details the appropriate statutes should a violation happen to obtain compliance through monetary penalties and equitable relief.[1] *Id.* Consistent with the precedent set by the Eighth Circuit, Plaintiff has failed to allege a claim upon which relief can be granted. For the reasons stated, Defendants' Motion to Dismiss Count II as it relates to obstacle preemption is **GRANTED**. Count II is **DISMISSED** in its entirety.

---

[1] Mo. Rev. Stat. § 376.414.3 provides any act prohibited by subsection shall constitute an unlawful practice which any action may be authorized under Mo. Rev. Stat. §§ 407.010-407.130. Particularly relevant is Mo. Rev. Stat. § 407.100 which details remedies from the court such as restitution, civil penalties of not more than $1000.00 per violation, injunctions, temporary restraining orders, and other remedies.

### III.     Count III – Preemption Under the Supremacy Clause of the U.S. Constitution and the Federal 340B Statute – Preemption Generally

Count III seeks declaratory and injunctive relief claiming S.B. 751 is conflict and field preempted by the Federal 340B Law under the Supremacy Clause. Defendants argue that Count III should be dismissed because the Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136 (8th Cir. 2024) has held an analogous Arkansas statute was not field nor conflict preempted by federal 340B law.

### A.     Field Preemption

When a federal regulatory scheme occupies the field because of its pervasive nature, leaving no room for state action, field preemption applies. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Field preemption also applies when Congress "intend[s] 'to foreclose any state regulation in the [regulated] are,' irrespective of whether state law is consistent or inconsistent with 'federal standards.'" *Oneok, Inc.*, 575 U.S. at 377, 135 S.Ct. 1591 (quoting *Arizona v. United States*, 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012)). Congress's intent to preempt a field "can be inferred from a framework of regulation 'so pervasive … that Congress left no room for the States to supplement it' or a "federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

Under Eighth Circuit precedent the 340B program is not "so pervasive … that Congress left no room for the States to supplement it. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136 (8th Cir. 2024) at 1144 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).  The Eighth Circuit reasoned that pharmacies have always

been an essential part of the 340B program and Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field. *Id*. The practice of pharmacy is an area traditionally left to state regulation and that the case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest and has nonetheless decided to stand by both concept and to tolerate whatever tension there [is] between them." *Id*. Further, the Eighth Circuit analyzed the difference between a state statute that ensures an oversight and enforcement scheme in promoting its protections for covered entities to distribute 340B compared to the federal 340B Program and its means for enforcement of discount prices. *Id*. The Eighth Circuit found that a statute which establishes enforcement for the distribution of 340B drugs and the federal 340B law's enforcement scheme address two completely different issues and thus Congress did not intent to preempt the field with its 340B legislation.

Taking Plaintiff's allegation as true for the purpose of a motion to dismiss, Plaintiff fails to state a claim upon which relief can be granted given this circuit's precedent in *McClain*. For the reasons stated herein, Defendants' Motion to Dismiss Count III as it relates to field preemption is **GRANTED**.

B.        **Conflict Preemption**

Plaintiff argues that S.B. 751 is conflict preempted because Congress placed strict limits on the types of entities entitled to 340B pricing and the types of patients that may receive drugs sold at a 340B price. (Complaint ¶ 144). Plaintiff states Congress provided that only "covered entities' are eligible to receive 340B pricing, and it expressly defined that term to include only fifteen enumerated types of medical facilities to which contract pharmacies are not one. *Id*. Plaintiff asserts the 340B statue does not expressly allow covered entities to transfer drugs to retail

pharmacies or require manufacturers to engage in such transfers on behalf of covered entities. (Complaint ¶ 145). Plaintiff alleges that S.B. 751 requires drug manufactures to transfer drugs at 340B prices to pharmacies that maintain a contract with a covered entity without regard to whether those drugs will ultimately be dispensed to any patient of a covered entity. (Complaint ¶ 146).

As discussed previously, the Eighth Circuit ruled in *McClain* that the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statue set or enforce discount pricing revealing no obstacle to the enforce of the 340B program. *McClain at 1145.* Here, S.B. 751 does the exact same. S.B. 751 does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entitles utilizing the 340B program. S.B. 751 does not set or enforce discount pricing but protects covered entities use of contract pharmacies. As such, there is no obstacle to the enforcement of the 340B program. Consistent with the precedent set by the Eighth Circuit, Plaintiff has failed to allege a claim upon which relief can be granted. For the reasons stated, Defendants' Motion to Dismiss Count III as it relates to obstacle preemption is **GRANTED**. Count III is **DISMISSED** in its entirety.

## IV.    Count IV – Unconstitutional Extraterritorial Regulation

Court IV seeks declaratory and injunctive relief that S.B. 751 is unconstitutional as it is an unconstitutional extraterritorial regulation. Specifically, Plaintiff argues much of the conduct regulated by S.B. 751 will occur beyond Missouri boarders and will operate even where the transactions occur out-of-state and involve only-out-state actors. Court IV cites the Commerce Clause, Article IV §§ 1-3, the Due Process Clause, and the Commerce Clause of the United States Constitution in support of its unconstitutional extraterritorial regulation argument. Defendants argue that S.B. 751 does not apply extraterritorially and even so S.B. 751 does not directly regulate

transactions taking place wholly outside the state and involving individuals having no connection with the state.

## A.  The Contracts Clause, Article IV §§ 1-3, and the Due Process Clause of the Constitution

The Contract Clause of the United States Constitution provides that no state shall "pass any law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Article IV. § 1 of the United States Constitution represents the Full Faith and Credit clause. U.S. Const. art. IV. Article IV, §§ 2-3 of the United States Constitution covers the Privileges and Immunities clause, and clause for admitting new states.  The Due Process Clause of the United States Constitution as applied through the fourteenth amendment provides that no person shall be deprived of life, liberty, or property, without due process of the law. U.S. Const. amend. V.

Taking as true Plaintiff's allegations for the purpose of a motion to dismiss, it has failed to raise its right to relief above a speculative level. Plaintiff's Complaint provides no facts that would allege a Contract Clause violation, Article IV violation, or a Due Process clause violation. Plaintiff's complaint merely states "states are denied certain powers that a sovereign might ordinarily impose, U.S. Const. art. I. § 10; and required to honor certain rights of other states, U.S. Const. art. IV. §§ 1, 2, 3." (Complaint ¶ 150). "Similarly, the Due Process clause limits a state's ability to regulate conduct occurring wholly outside its borders." Id. "S.B. 751 is unconstitutional under these principles. (Complaint ¶ 151). To the extent that Plaintiff attempts to make an unconstitutional extraterritorial argument under any of these provisions under the Constitution, it has failed to list any factual allegation that would warrant serious consideration. For the reasons stated, Defendants' Motion to Dismiss Count IV – Unconstitutional Extraterritorial Regulation as to the Contracts Clause, Article IV, and Due Process Clause claims are **GRANTED**.

**Exhibit 3**

## B. Commerce Clause

The Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the state's borders, whether or not the commerce has effects within the state. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). A statute directly controlling wholly out-of-state commerce "is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id*. However, there is no per se rule under the dormant Commerce Clause forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, when those laws do not purposely discriminate against out-of-state economic interests. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 143 S. Ct. 1142, 1159, 215 L. Ed. 2d 336 (2023).

For the purposes of a motion to dismiss, Plaintiff has alleged facts that raise a right to relieve above a speculative level. Plaintiff alleges S.B. 751 broadly bans all pharmaceutical manufacturers, many of whom have no physical presence in Missouri, from denying, restricting, or prohibiting, either directly or indirectly, a contract pharmacy's acquisition of a 340B drug. (Complaint ¶ 151). This will apply to out-of-state transactions between out-of-state manufacturers and out-of-state distributors. (Complaint ¶ 152). Likewise, it will apply to out-of-state transactions between out-of-state manufacturers or out-of-state distributors, on one side, and out-of-state covered entities. *Id*.  In sum, S.B. 751 will operate even where the transactions occur out-of-state and involve only out-of-state actors. *Id*. These allegations are sufficient at this stage of the litigation to continue. For the reasons stated, Defendants' Motion to Dismiss on Count IV – Unconstitutional Extraterritorial Regulation as to the dormant Commerce Clause is **DENIED**.

### CONCLUSION

**Exhibit 3**

For reasons herein, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motions to Dismiss Count I are **GRANTED**. Defendants' Motions to Dismiss Count II are **GRANTED.** Defendants' Motions to Dismiss Count III are **GRANTED**. Defendants' Motions to Dismiss Count IV as to the Contracts Clause, Article IV §§ 1-3, and Due Process Clause arguments are **GRANTED** and as to the Commerce Clause is **DENIED**.

**IT IS SO ORDERED**.

DATED: February 27, 2025

_/s/ Douglas Harpool_
**DOUGLAS HARPOOL**
**UNITED STATES DISTRICT JUDGE**

**Exhibit 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **ABBVIE INC. *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00519** |
| | ) | **Judge Aleta A. Trauger** |
| **JONATHAN SKRMETTI, in his official** | ) | |
| **capacity as ATTORNEY GENERAL OF** | ) | |
| **THE STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM</u>

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively "AbbVie" or "plaintiffs") seek to enjoin the enforcement of a recently enacted Tennessee law (the "Act" or "S.B. 1414"), which the defendant, Jonathan Skrmetti, sued in his official capacity as the Attorney General of the State of Tennessee (referred to herein as the "State"), calls the Hospital Protection Act. The Act was signed by Tennessee Governor Bill Lee on May 5, 2025 and went into effect immediately, although some provisions of it are not slated to take effect until July 1, 2025. (*See* Doc. No. 23-1.)[1]

AbbVie characterizes the Act as mandating pharmaceutical manufacturers to sell drugs at discounted prices to commercial pharmacies. (Doc. No. 1, Compl. ¶ 1.) It contends that, in doing so, the Act "impermissibly chang[es] the terms of a federal drug-pricing regime—the federal 340B program—and significantly increase[s] the cost of participation in that regime." (*Id.*) AbbVie challenges the Act as unconstitutional on the grounds that it (1) violates the Supremacy Clause;

---

[1] The Act is to be codified at Tenn. Code Ann. § 47-18-13. (*See* Doc. No. 23-1, Act § 1.)

**Exhibit 3**

(2) effects a taking in violation of the Takings Clause; (3) "unlawfully discriminates against or unduly burdens interstate commerce in violation of the Commerce Clause, as established by Dormant Commerce Clause principles"; (4) is unconstitutionally vague in violation of the Due Process Clause; and (5) "violates the First Amendment's Free Speech and Petition Clauses." (*Id.*)

Now before the court is AbbVie's Motion for a Preliminary Injunction (Doc. No. 17), through which AbbVie asks the court to preliminarily enjoin the enforcement of the Act. In the Memorandum of Law filed in support of its motion, AbbVie argues, as it did in its Complaint, that the Act is preempted by the federal 340B program, which constitutes a comprehensive regulatory scheme; effects an unconstitutional taking by compelling drug manufacturers to sell drugs to private parties at discounted prices, thus benefitting the private parties at drug manufacturers' expense; is unconstitutionally vague, insofar as it lacks explicit standards and invites arbitrary enforcement; violates the Dormant Commerce Clause by regulating commerce outside the State of Tennessee; and violates the First Amendment by impeding AbbVie's ability to petition the government. (*See generally* Doc. No. 18.)

The State has filed a Response in Opposition to the Motion (Doc. No. 23), and the American Hospital Association, 340B Health, the Tennessee Hospital Association, and the American Society of Health-System Pharmacists ("Amici"), with the court's permission, have filed a Brief of Amici Curiae in Opposition to the Plaintiffs' Motion (Doc. No. 40). The court heard oral argument on the motion on June 20, 2025, during which the parties focused primarily on the issue of the plaintiffs' standing and their preemption and takings claims.[2]

---

[2] The oral argument did little to clarify the issues and arguments already set forth in the parties' briefs.

Having considered the arguments advanced by both parties and the governing legal standards, the court finds that the plaintiffs have failed to establish a substantial likelihood of success on any of their claims. Accordingly, the plaintiffs' Motion for Preliminary Injunction will be denied.

## I.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Generally, district courts must balance four factors when considering a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365–66 (6th Cir. 2022) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). These "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). However, where the movant fails to establish either likelihood of success on the merits or irreparable harm if the motion were not granted, "an injunction is unwarranted—regardless of the showing on the other factors." *Union Home Mortg. Corp.*, 31 F.4th at 366 (collecting cases).

## II.    BACKGROUND

Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical companies that want to participate in Medicaid and Medicare Part B to offer steep discounts on certain outpatient drugs to "covered entities," a term defined to include public hospitals and community health centers and other entities typically engaged in "car[ing] for low-income and

rural persons." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); *see also* 42 U.S.C. § 256b(b) (defining "covered entity"). This program, referred to as the "340B program," helps covered entities provide "safety-net services to the poor," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011), because the entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699. The 340B program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Astra USA*, 563 U.S. at 113.

"Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform agreements," *id.*, that "require" participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a). "Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir.) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)), *cert. denied*, 145 S. Ct. 768 (2024). "Additionally, covered entities may not engage in diversion of covered outpatient drugs through 'resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity.'" *Id.* at 1142 (quoting 42 U.S.C. § 256b(a)(5)(B)).

HHS and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate provisions. *Id.* (citing 52 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700). Any disputes

arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

Although the 340B program was apparently designed with the expectation that it would apply to covered entities that operated in-house pharmacies, "[s]ince the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

While the Secretary of HHS "lacks rulemaking authority over the section 340B program," the HRSA has, on several occasions, issued non-binding "guidance" documents, such as the 1996 Guidance, "interpreting and implementing the scheme." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). In the 1996 Guidance, the HRSA "acknowledged that section 340B 'is silent as to permissible drug distribution systems,'" and it "sought to fill 'gaps in the legislation' and thereby 'move the program forward.'" *Id.* (quoting 1996 Guidance at 43,549–50). In addition, HRSA "recognized that many covered entities use outside pharmacies to distribute drugs to their patients," and, to accommodate them, HRSA determined that any covered entity that did not have an in-house pharmacy could contract with *one* outside pharmacy to dispense drugs at a single location. *Id.* at 457 (citing 1996 Guidance at 43,550, 43,555).

In 2010, HRSA issued another guidance document, in which it "opined that covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing

Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")). Following the issuance of the 2010 Guidance, "the use of contract pharmacies skyrocketed," increasing by "twentyfold." *Sanofi Aventis*, 58 F.4th at 700.

Worried that "contract pharmacies were driving up duplicate discounting and diversion," drug makers began to respond in 2020 by adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *Id.*; *see also McClain*, 95 F.4th at 1139. In some instances, these limitations "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139.

HHS responded to these efforts, first, by "releas[ing] an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., Advisory Op. 20-06 on Cont. Pharmacies Under the 340B Program (Dec. 30, 2020), https://perma.cc/L7W2-H597). Second, it issued violation letters to several drug manufacturers, who then sued HHS. *Id.* The Third Circuit held that the Advisory Opinion and violation letters were unlawful because § 340B is silent regarding delivery to contract pharmacies. *Id.* at 706. The court enjoined HHS's "reading of Section 340B as *requiring* delivery of discounted drugs to an unlimited number of contract pharmacies," because "[l]egal duties do not spring from silence." *Id.* at 707 (emphasis added). The D.C. Circuit reached the same conclusion. *See Johnson*, 102 F.4th at 461 ("agree[ing] entirely" with the Third Circuit's conclusion that, "because section 340B is 'silent about delivery,' HRSA erred in concluding that the statute 'requires drug makers to deliver drugs to an unlimited number of contract pharmacies'" (quoting *Sanofi Aventis*, 58 F.3d at 703)).

**Exhibit 3**

Following these rulings, Tennessee, like many other states, has attempted to fill the "silence" recognized by the Third and D.C. Circuits by passing laws that prohibit pharmaceutical companies from limiting the number of contract pharmacies with which covered entities can enter agreements pertaining to the delivery of 340B drugs. Specifically, in this case, Tennessee enacted S.B. 1414, which provides that, beginning July 1, 2024, drug manufacturers may not:

> (1) Impose additional requirements or limitations on a 340B entity, including requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law;

> (2) Require a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program;

> (3) Impose any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by the United States department of health and human services or applicable state law;

> (4) Impose any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities;

> (5) Impose requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities; or

> (6) Impose any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program.

S.B. 1414 § 1(a). Generally, in other words, pharmaceutical companies may not impose requirements on covered entities in addition to those requirements expressly set out in § 340B or discriminate against covered entities by imposing upon them requirements that they do not impose on providers that are not 340B entities.

In addition, the Act prohibits drug manufacturers from

**Exhibit 3**

deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law.

*Id.* § 1(c). Subsection 1(c) took effect "immediately upon becoming a law." *Id.* § 4. However, this subsection also contains a "grandfather clause," which provides that this specific subsection "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." *Id.* Subsection 1(a)[3] does not contain a similar grandfathering provision and instead goes into effect on July 1, 2025.

The Act further provides that a violation of subsection (a) or (c) will constitute an "unfair or deceptive act or practice affecting trade or commerce" in violation of the Tennessee Consumer Protection Act and may give rise to a civil penalty of $50,000 "per violation." *Id.* §§ (1)(d)(1), (2).

## III.    THIS LAWSUIT

AbbVie filed this lawsuit on May 6, 2025, challenging the constitutionality of the Act on multiple fronts and seeking injunctive and declaratory relief only. It contends that the Act "impermissibly changes the terms" of the federal 340B program and "significantly increas[es] the cost of participation in that regime." (Doc. No. 1 ¶ 1.)

It explains that, following issuance of the 2010 Guidance effectively authorizing covered entities to enter into contractual arrangements with an unlimited number of commercial pharmacies, many covered entities and contract pharmacies began adopting a "complicated accounting system known as the 'replenishment model.'" (*Id.* ¶ 6.) Edward Scheidler, AbbVie's Head of the 340B Center of Excellence, explains that, under the "replenishment model," contract

---

[3] Subsection 1(b) does not govern the activities of drug manufacturers and is not at issue in this lawsuit.

pharmacies typically "purchase AbbVie products for their general inventories at market prices." (Scheidler Decl., Doc. No. 33-2 ¶ 9.) The contract pharmacies then "dispense drugs to 340B and non-340B patients out of their general inventories. . . . In other words, in almost all instances, contract pharmacies order AbbVie-manufactured drugs and dispense them to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient." (*Id.* ¶ 8.)

Once inventory of a particular drug is low enough, having been "dispensed to pharmacy customers, the pharmacy (either itself or through a Third-Party Administrator ['TPA'] with which it contracts) determines which prior dispensing events should be linked with 340B eligibility." (*Id.* ¶ 9.) According to AbbVie, it has no idea how this determination is made or what criteria the contract pharmacies and TPAs use (sometimes working with covered entities) to decide which of the prescriptions previously filled came from covered entities. (*Id.*) Regardless, after the contract pharmacy determines how many of the prescriptions sold from a given quantum of inventory are "340B eligible," "the contract pharmacy (typically through a TPA) instructs the [relevant] covered entity . . . to place an order of additional quantities of that drug at the discounted 340B price to "replenish" the contract pharmacy's inventory of non-340B-discounted drugs." (*Id.* ¶ 10.) However, the covered entity itself typically does not directly place the replenishment order. Instead, according to AbbVie, "the order is typically generated and submitted by the contract pharmacy (either itself or through a TPA) using a third-party covered entity's purchasing account information." (*Id.*)

Further, "[w]hen a contract pharmacy places an order on behalf of a covered entity, AbbVie usually does not ship its 340B-discounted 'replenishment' drugs to the covered entity." (*Id.* ¶ 12.) Instead, although the covered entity makes the purchase, the "replenishment product is shipped

directly from the wholesaler to the contract pharmacy." (*Id.*) In other words, "the wholesaler bills the covered entity but ships to the contract pharmacy." (*Id.*) And, according to AbbVie, "[t]hese shipments of 340B-priced drugs to contract pharmacies are not based on orders needed for specific 340B-eligible patients based on actual or projected future need." (*Id.*)

AbbVie also maintains that covered entities do not actually maintain title to the 340B drugs while they are "held in a contract pharmacy's general inventory prior to being identified, post-sale, as 340B-linked drugs. Instead, as of the time of sale to a patient, a unit of drugs is owned by the contract pharmacy itself." (*Id.* ¶ 13.) But, when the "drug is 'replenished' at the 340B discounted price, that creates a difference between the full price paid by customers at the pharmacy counter and the discounted price AbbVie offers to covered entities, known as 'spread.' The contract pharmacy and covered entity split that spread pursuant to the terms of the agreements between them . . . ." (*Id.* ¶ 14.)

Scheidler provides an illustration of this model, using a hypothetical "Drug A," which he presumes for purposes of his illustration has a commercial price of $100.00 per unit and is subject to a discount rate of 99% under AbbVie's PPA, meaning that it has a 340B discount price of $1.00 and that the difference between the commercial price and the 340B price is $99.00. (*Id.* ¶ 15.) Assume that a contract pharmacy in Nashville—hypothetically, a CVS Pharmacy—orders ten units of Drug A at the commercial price. It pays $100.00 per unit and sells them at $120.00 per unit. The replenishment model then plays out as follows:

> a. Over the next month, ten customers receive prescriptions for Drug A, have them filled at the CVS Pharmacy, and pay $120 per unit either out-of-pocket (*i.e.*, a $25 copayment) or via private insurance coverage for which they pay a premium. The CVS receives, in total[,] $1,200 from the 10 customers who purchased Drug A,

recouping both the initial commercial price and $200 in profit. . . .[4]

b. Later, the TPA of CVS Pharmacy . . . calculates how many of those ten units of Drug A they believe were dispensed to a 340B patient of a specific Covered Entity under contract with that particular CVS location. . . . [T]hese determinations are often not accurate. Their criteria for determining whether a customer was a 340B patient can include factors like the identity of the prescriber or how long ago the patient last received a prescription from a 340B-eligible covered entity. . . .

c. In our example, let us assume that the CVS Pharmacy and its TPA determine five of the ten customers who purchased Drug A were 340B-eligible patients. The CVS Pharmacy and its TPA then notify the covered entity to order five units of Drug A for the CVS Pharmacy to "replenish" the five full-priced units of Drug A that the CVS Pharmacy previously purchased and dispensed to 340B patients.

d. As explained above, those five 340B patients have already paid full price (or their insurer has) for their unit of Drug A at the $120 price. . . .

e. AbbVie or its wholesaler receive[s] the covered entity's order for five units of Drug A and ships them to the CVS Pharmacy in the same package or on the same pallet as commercially-purchased units of Drug A and other drugs being sent to the CVS Pharmacy via a commercial order.

f. There is no way to discern which units of Drug A are the five units sold at the 340B price. They are not packaged differently, labeled differently, or shipped separately or in a different kind of box. . . . Once received by the contract pharmacy, they are placed into the general inventory and dispensed to any customer who walks in the door, 340B-eligible or otherwise. The only difference between a unit of Drug A shipped for "replenishment" and other units of Drug A is the price AbbVie receives for the shipment of its drugs. Placing 340B replenishment orders has no effect on how AbbVie drugs are transported or delivered.

g. The CVS receives the five units of Drug A at the 340B price and, as a matter of accounting, adjusts the previous paid price for those five units down to the cost of the 340B price, $1.00. The CVS then splits the differential, $495, between itself and the covered entity at some percentage. If we assume it is 70/30 in favor of the covered entity, then CVS keeps $148.50 and pays the covered entity $346.50. The patient who paid the full $120 (or their $25 copayment) receives no discount.

(*Id.* ¶ 15(a)–(g).)

---

[4] AbbVie does not explain what third party pays the remainder when a patient pays only a $25 copayment or how it reaches the $1,200 total based on this math.

According to AbbVie, the use of this type of scheme means that covered entities can contract with "numerous pharmacies—often located hundreds of miles away" and use the 340B discounted prices to "generate profits instead of using them for the benefit of the covered entities' indigent and uninsured patients." (AbbVie Corr. Memo., Doc. No. 33-1 at 11.)[5] The arrangement also allows large, for-profit pharmacies to "obtain massive amounts of manufacturers' drugs for pennies on the dollar, sell them at full price, and split the profits with covered entities." (*Id.*) It also increases the risk of diversion, "since contract pharmacies cannot verify 340B eligibility in real time and dispense from their general inventory rather than from a segregated stock of 340B-priced drugs." (*Id.* at 11–12 (citing, among other exhibits, Doc. No. 33-9 at 4–5, Hr'g Tr. at 59–60, *Pharma. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-cv-997 (W.D. La. June 6, 2024), ECF No. 78).)

In response to the rise of the replenishment model and the *Sanofi Aventis* opinion holding that § 256b is silent about delivery, AbbVie began imposing restrictions designed to prevent covered entities from contracting with numerous contract pharmacies and their use of the replenishment model. Specifically, as relevant here, AbbVie implemented a policy in April 2023 (the "340B Program Integrity Initiative") pursuant to which it would continue to offer any hospital "covered entity" the ability to purchase drugs at the price set by the 340B program but "clarified that it would no longer indiscriminately accept requests to transfer or otherwise ship 340B discounted drugs to an unlimited number of contract pharmacies serving hospital covered entities." (Scheidler Decl. ¶ 4.) Instead, under its current 340B Program Integrity Initiative, AbbVie "facilitates the shipment of orders of 340B-priced medicines to one contract pharmacy location if the hospital covered entity does not have an in-house pharmacy," so long as the hospital covered

---

[5] The court employs the page numbers assigned by the court's electronic filing system, which is not always consistent with the parties' original pagination.

entity also "submits limited claims data on 340B utilization for that contract pharmacy, and the contract pharmacy is located within 40 miles of the HRSA registered covered entity," or, if there is no eligible pharmacy within 40 miles of the covered entity, AbbVie will ship to a "suitable alternative." (*Id.* ¶ 5; *see also* April 17, 2023 340B Program Integrity Initiative, Doc. No. 34-1 at 27–31.)[6] According to AbbVie, its 340B Program Integrity Initiative "does not limit the ***amount*** of drugs available" and "in no way affects patient access to 340B-discounted drugs." (Doc. No. 33-1 at 13.) Rather, "AbbVie's offer condition merely limits the terms upon which non-covered entity pharmacies can access the ***discounted*** price. . . . AbbVie will not indiscriminately and unconditionally accept requests to transfer 340B-discounted drugs to an unlimited number of commercial contract pharmacies." (*Id.*)

As set forth above, Tennessee, like many other states, responded to initiatives like AbbVie's by passing a law that attempts to do something the 340B statute does not—that is, S.B. 1414 (1) requires drug manufacturers that participate in the federal 340B program to deliver drugs purchased by covered entities at the 340B reduced price to an unlimited number of contract pharmacies and (2) bars manufacturers from conditioning delivery upon the provision of claims data or other documentation, from imposing requirements "relating to inventory management systems of 340B drugs," and from imposing any requirements related to audits that are not imposed on "pharmacies or providers that are not 340B entities." S.B. 1414 § 1(a)(3) & (4). AbbVie describes the Act as "effectively forc[ing] manufacturers to sell their drugs at discounted prices to entities not enumerated in the federal 340B statute, all while prohibiting manufacturers from accessing the federal [alternative dispute resolution ("ADR")] system, their only avenue for

---

[6] AbbVie has updated the policy several times since April 2023, but largely only to add additional covered drugs and to update the FAQ section of the initiative. (*See* Doc. No. 34-1 at 36–61.)

redress." (Doc. No. 33-1 at 15.)

AbbVie asks the court to preliminarily enjoin enforcement of the Act, arguing that it has shown a strong likelihood of success on the merits of its constitutional challenges to the Act, that it will be irreparably harmed in the absence of an injunction, and that the public interest favors the preservation of the status quo.

## IV.    DISCUSSION

### A.    Standing

In response to the plaintiffs' arguments regarding their likelihood of success on the merits of their claims, the State asserts that the case is "plagued by threshold issues" that prevent the court from even reaching the merits of the claims in the first place. (Doc. No. 23 at 15.) The only threshold issue the defendant identifies, however, is standing. Because standing raises the question of the court's jurisdiction, the court must address it first. *See Miller v. Bruenger*, 949 F.3d 986, 990 (6th Cir. 2020) ("Before a federal court takes up a case's merits, it must assure itself of its jurisdiction over the case's subject matter.").

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has repeatedly recognized that the "'case or controversy' requirement is 'fundamental to the judiciary's proper role in our system of government.'" *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (some internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Thus, "[f]ederal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law." *Id.* at 57 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)).

A case or controversy exists only when at least one plaintiff "establish[es] that [she] ha[s] standing to sue." *Id.* (quoting *Raines*, 521 U.S. at 818) (alterations in original). "[T]o satisfy Article

III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case." *Welty v. Dunaway*, 749 F. Supp. 3d 882, 901 (M.D. Tenn. 2024).

In the "pre-enforcement context," that is, when a plaintiff challenges a law prior to the commencement of an enforcement against him, "whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact.'" *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014)). The Supreme Court has recognized that "'[a]n allegation of future injury may' satisfy the injury-in-fact requirement if the alleged 'threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.* (some internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

"[D]etermining when the threatened enforcement of a law creates an Article III injury" is a "difficult and 'recurring issue." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024). The Supreme Court and the Sixth Circuit have explained that "a threat of enforcement is 'sufficiently imminent' to constitute an injury in fact if the plaintiff alleges (1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159).

In arguing that AbbVie lacks standing, the State focuses on the injury-in-fact element and argues that (1) AbbVie's fears of criminal sanctions ignore the fact that criminal sanctions under the Tennessee Consumer Protection Act ("TCPA") are entrusted to the State's individual *District* Attorneys General, not to Attorney General Skrmetti, and that corporations are unlikely to face criminal sanctions in Tennessee; (2) AbbVie has failed to show with specificity that it intends to engage in a course of conduct that will violate the Act (particularly with respect to its extraterritoriality claim); (3) AbbVie chose to bring suit "mere days" after the enactment of the Act, before Attorney General Skrmetti had the opportunity to "take any position on its scope or even threaten to wield his new enforcement authority," as a result of which AbbVie cannot establish a credible fear of enforcement and, in any event, the TCPA requires the Attorney General to give at least ten days' notice before bringing an enforcement lawsuit (Doc. No. 23 at 18); (4) AbbVie has not identified any individuals who might bring suit against it under the private enforcement provisions of the TCPA, and even if it had, the private enforcement provisions of the TCPA would not "justify this Court's use of equity power against General Skrmetti" (*id.* at 19).

AbbVie replies that it has established standing, and the court agrees, at least in part. First, as AbbVie argues, it has established an "intent to engage in conduct arguably affected with a constitutional interest," *Christian Healthcare Ctrs.*, 117 F.4th at 843—specifically, an intent to continue selling drugs in Tennessee and in interstate commerce, as a participant of the 340B program, *see Dennis v. Higgins*, 498 U.S. 439, 448 (1991) (describing the Commerce Clause as conferring a "'right' to engage in interstate commerce free from restrictive state regulation").

Second, its anticipated conduct is clearly proscribed by statute. AbbVie's written 340B Program Integrity Initiative provides that it will deliver 340B drugs only to covered entities or, if a covered entity does not have an in-house pharmacy, to *one* outside contract pharmacy, and then

only if the covered entity submits certain claims data for that pharmacy. (*See* Doc. No. 34-1 at 27.)

This policy is directly at odds with the Act, which prohibits drug manufacturers that participate in

the 340B program in Tennessee from placing any limitations on the number or location of the

delivery of drugs to contract pharmacies and further prohibits them from imposing any conditions

on delivery related to the provision of claims data or inventory management systems. S.B. 1414 §

1(a), (c). The State argues that AbbVie has failed to identify "impending, real-world circumstances

in which discrete acts would invite liability." (Doc. No. 23 at 17.) There is no apparent dispute,

however, that AbbVie currently sells and distributes drugs to multiple 340B covered entities in

Tennessee that "purport to maintain contract pharmacy arrangements." (Compl., Doc. No. 1 ¶ 33.)

AbbVie's sales to covered entities in Tennessee are currently governed by its 340B Program

Integrity Initiative and will no longer be legal under S.B. 1414.

As for a credible threat of enforcement, the Sixth Circuit typically considers the so-called

"*McKay* factors," from *McKay v. Federspiel*, 823 F.3d at 969, to evaluate threats of enforcement.

*See Christian Healthcare Ctrs.*, 117 F.4th at 851 (describing the application of the *McKay* factors

in pre-enforcement challenges as "settled circuit law" (collecting cases)). These factors include:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement
> warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an
> attribute of the challenged statute that makes enforcement easier or more likely,
> such as a provision allowing any member of the public to initiate an enforcement
> action"; and (4) the "defendant's refusal to disavow enforcement of the challenged
> statute against a particular plaintiff."

*Id.* at 848 (quoting *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)). "These

*McKay* factors are not exhaustive, nor must each be established." *Id.* (quoting *Online Merchs.*

*Guild*, 995 F.3d at 550); *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that

the McKay factors are not "a laundry list"). This inquiry "distills to whether 'surrounding factual

circumstances' plausibly suggest a credible fear of enforcement." *Id.* (quoting *Universal Life*

**Exhibit 3**

*Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022)).

Here, the history of past enforcement—or lack thereof—carries little, if any weight, because the challenged statute is new. *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) (citation omitted). Likewise, the lack of enforcement warning letters has little bearing, given that the plaintiffs filed suit the day after Governor Bill Lee signed the Act. What the court finds particularly relevant is the fact that the law was evidently passed specifically for the purpose of invalidating policies like AbbVie's 340B Program Integrity Initiative—combined with the fact that there has been ongoing litigation nationwide about the issues raised here for the past several years. The Attorney General certainly has not disavowed an intent to enforce it. While it is true that government officials cannot be required to disavow enforcement of statutes in the *abstract*, here, it does not appear that the defendant would need any "additional fact[s]" to adjudicate a claim against AbbVie under the TCPA, aside from its invoking the policy in its dealings with a covered entity. *Accord Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 929 (5th Cir. 2023). Rather, what the Act says is undisputed; AbbVie has clearly articulated its policy; while the State has not affirmatively admitted that AbbVie's "current practices violate [the Act]," they obviously do; and it is undisputed that S.B. 1414 was enacted for the purpose of countering policies like AbbVie's. *Id.* "There is remarkably little else needed to adjudicate the issue[s]." *Id.*

Two matters bear closer consideration, however. First, subsection 1(c) has a grandfather clause that specifically exempts the application of that subsection to "requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." S.B. 1414 § 1(c). The grandfather clause does not merely provide a defense; it provides an exception, meaning that the provision effectively does not apply to restrictions already in place as of June 1, 2025. Subsection 1(c) contains the prohibition on restrictions on the delivery of "340B drug[s]" to any location

authorized by a 340B covered entity. The plaintiffs argue that this grandfather clause does not provide it any assurance that § 1(c) will not be enforced against them, because they frequently update their 340B policy. However, the record conclusively establishes that AbbVie implemented its one-pharmacy restriction on its delivery of drugs purchased by 340B covered entities in April 2023, and it has not significantly changed that restriction since. (*See* Doc. No. 34-1 at 27–61.) The grandfather clause would not apply to new or more stringent restrictions, but simply altering the drugs included in its 340B program (*e.g.*, expanding its 340B program) or limiting the states to which the restriction applies based on courts' enforcement of laws similar to S.B. 1414 in those states (which would have no effect on the restriction in place in Tennessee), would not remove the policy from the protection of the grandfather clause. AbbVie, in other words, cannot establish a credible threat of imminent enforcement of S.B. 1414 § 1(c) against it.

The other parts of S.B. 1414 have no similar grandfather clause, however, and AbbVie's policy of requiring claims data from covered entities that request 340B drug delivery to a contract pharmacy is clearly implicated by one or more provisions of § 1(a), as discussed in greater detail below. With respect to this provision, at least, AbbVie has established its intent to engage in conduct that is proscribed by statute *and* "'a credible threat' of the statute's enforcement against[it]." *Christian Healthcare Ctrs.*, 117 F.4th at 843. The court finds that AbbVie has standing to bring its constitutional challenges to at least some of the provisions in S.B. 1414 § 1(a) (as detailed below).[7]

---

[7] The broad language used in the statute makes the assessment of what activity is (or is not) subject to the grandfather clause somewhat difficult. For example, subsection 1(c) can be read as prohibiting the imposition of "any restrictions" or other limits on the "acquisition of a 340B drug by . . . a 340B entity . . . unless such receipt is prohibited by" federal law. S.B. 1414 § 1(c). This language could arguably be construed to prohibit conditioning a covered entity's receipt of 340B drugs on the provision of certain claims data, as AbbVie's policy does. If subsection 1(c) is thus construed, however, then subsection 1(a)'s prohibitions on the drug manufacturers' conditioning

The other matter that warrants further discussion is AbbVie's challenge based on the possibility of criminal sanctions. While the TCPA indeed authorizes criminal sanctions, in Tennessee, only District Attorneys—not the Tennessee Attorney General named as a defendant— can bring criminal charges. *Accord Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) ("[A] district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee." (quoting *State v. Spradlin*, 12 S.W.3d 432, 433–34 (Tenn. 2000))), *cert. denied*, 145 S. Ct. 1178 (2025). AbbVie has not named the state District Attorneys as defendants; nor has it addressed the likelihood that they ever do or would bring criminal charges under the TCPA. While, as the State points out, it is at least theoretically possible for a corporation to be criminally charged and convicted, *see Louisville & N. R. Co. v. State*, 40 Tenn. (3 Head) 523, 523 (1859), AbbVie has not cited—and this court is unaware—of any instances in which criminal charges were brought against a corporation for violation of the TCPA. AbbVie, that is, has not established a credible fear of enforcement of the criminal sanctions

delivery of 340B drugs on the provision of claims data or other documentation by the covered entities would be redundant, and it does not appear that either the State or the plaintiffs read subsection 1(c) that broadly. (*See, e.g.*, Doc. No. 23 at 14 ("[T]he Hospital Protection Act prevents drug manufacturers from restricting who can 'receive 340B drugs on behalf of' a 340B Hospital, beyond what is already prohibited by the federal government or 'applicable state law.'" (quoting S.B. 1414 § 1(c)).) Conversely, subsection 1(a)(6) prohibits "[i]mposing any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program." AbbVie argued during the hearing that this provision can be read broadly enough to cover the conduct expressly prohibited by subsection 1(c) and asked the court to conclude, as a result, that none of its intended conduct would be covered by the grandfather clause. As the State points out, however, such "catch-all" provisions should not be construed as encompassing express provisions embodied elsewhere in a statute. *Accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) ("[G]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932))). To read subsection 1(a)(6) that broadly would make subsection 1(c) redundant, thus "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* (quoting *D. Ginsberg*, 285 U.S. at 208).)

provision against it—and particularly not a credible fear that the named defendant will or is authorized to pursue criminal charges against it. AbbVie therefore lacks standing to challenge the criminal sanctions provision of the TCPA, insofar as it incorporates a violation of S.B. 1414.

In any event, because AbbVie has established standing to challenge S.B. 1414 § 1(a) and the Act's civil enforcement provisions, the court will address the merits of its claims addressed to those portions of the Act.

### B.    Likelihood of success on the merits

The first preliminary injunction factor requires the moving party to demonstrate a "a strong likelihood of success on the merits." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). This factor is often "determinative." *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020) (citation omitted). At this stage, the plaintiffs are not required to "prove [their] case in full"; rather, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (internal quotation marks and citations omitted). This standard, however, is "much more stringent than the proof required to survive a summary judgment motion," which requires only that the plaintiff "create a jury issue." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

As noted above, AbbVie argues that the Act violates the U.S. Constitution in five distinct ways: (1) it is preempted by federal law; (2) it effects an unconstitutional taking; (3) it is unconstitutionally vague; (4) it offends the dormant Commerce Clause; and (5) it unlawfully burdens AbbVie's First Amendment right to petition the government. It contends that it has a strong likelihood of success on each of these claims. Because AbbVie has standing only to challenge subsection 1(a) of the Act, the court's inquiry focuses on that part of the statute.

### 1. *Preemption*

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI). Under this provision, known as the Supremacy Clause, "state law that conflicts with federal law is 'without effect.'" *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see also McClain*, 95 F.4th at 1140 (quoting *Cipollone*, 505 U.S. at 516).

While the Supremacy Clause does not "include[] a private right of action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), courts have long recognized that "plaintiffs can challenge an allegedly preempted state law in federal court prior to enforcement by asserting a cause of action in equity," *Farmworker Ass'n of Fla., Inc. v. Uthmeier*, No. 23-CV-22655-RAR, 2025 WL 1133682, at *3–4 (S.D. Fla. Apr. 17, 2025). *Accord, e.g.*, *Armstrong*, 575 U.S. at 326–27 (recognizing that equitable relief from the unconstitutional actions of state officers does not depend upon an implied right of action under the Supremacy Clause); *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012) (noting that the question, at that time (pre-*Armstrong*) of whether the Supremacy Clause created an implied cause of action was a "matter of debate" but that "[e]ven the critics of an implied cause of action" recognize that plaintiffs may "seek[] declaratory or injunctive relief against a state or local government that is presently taking or threatening action against the plaintiff pursuant an allegedly preempted state law").

Preemption may be either express or implied. *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021). Where, as here, Congress did not "explicit[ly] state its intent to preempt state law, *In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012), it may "impliedly preempt state law either through 'field' pre-emption or 'conflict' preemption," *McClain*, 95 F.4th at 1140 (citation modified). Field preemption "applies when federal law is so 'pervasive' in one particular field that

it exclusively occupies that field." *Torres*, 995 F.3d at 491 (quoting *In re Schafer*, 689 F.3d at 614). Conflict preemption "applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws 'interfere[] with the operation of the federal program.'" *Id.* (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011)). "In either situation, federal law must prevail." *McClain*, 95 F.4th at 1140.

AbbVie argues both that the Act "intrudes on a field of federal regulation—340B pricing—created and occupied by Congress" and that it "directly conflicts with Congress's objections . . . by expanding the number of entities entitled to receive 340B discounted prices, effectively barring manufacturers from accessing the 340B programs' ADR system and installing a parallel state enforcement regime." (Doc. No. 33-1 at 17.) In other words, AbbVie contends that both field preemption and conflict preemption apply.

### a)    Field Preemption

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Torres*, 995 F.3d at 491 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). However, "[b]ecause preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Id.* (quoting *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). The Supreme Court has recognized a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985), *quoted in McClain*, 95 F.4th at 1140.

In support of field preemption, AbbVie argues that the federal 340B program "authorizes *no state regulation* of 340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." (Doc. No. 33-1 at 18.) It contends that, "[b]y prohibiting manufacturers from

denying contract pharmacies access to their drugs at the 340B price, Tennessee is ostensibly demanding that manufacturers provide their drugs to entities not otherwise required by federal law and at a particular price." (*Id.*)

The primary problem with the plaintiffs' position is that neither AbbVie's policy nor S.B. 1414 says anything about the *pricing* of 340B drugs; both entirely concern the *delivery* of 340B drugs. AbbVie seeks to limit the locations to which it is required to deliver 340B drugs and to impose additional requirements whenever its drugs are delivered to an outside pharmacy rather than to a covered entity. Tennessee seeks to restrict drug manufacturers' ability to impose such restrictions on delivery. The Third and D.C. Circuit Courts of Appeal have both held that the 340B statute is "silent about delivery." *Sanofi Aventi*s, 58 F.3d at 703; *Johnson*, 102 F.4th at 461. And the Eighth Circuit, presented with an Arkansas statute similar to S.B. 1414, concluded that "the 340B Program is not 'so pervasive . . . that Congress left no room for the States to supplement it.'" *McClain*, 95 F.4th at 1143 (quoting *Arizona*, 567 US. at 399). The court noted that outside pharmacies "have always been an essential part of the 340B Program" and that the program's "silence" regarding the delivery of drugs to patients "contrasts with 340B's provisions that directly address distribution by third-party wholesalers." *Id.* (citing 42 U.S.C. § 256b(a)(8)). The court held that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *Id.* Its conclusion was further bolstered by the fact that "the practice of pharmacy is an area traditionally left to state regulation" and that the court was required to "assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *Id.* at 1143, 1144 (quoting and then citing *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)).

For the same reasons, this court finds that Congress did not intend to preempt the field. *Accord Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *5 (W.D. Mo. Feb. 27, 2025) (finding no field preemption based on *McClain*); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657, 665 (S.D. Miss. 2024) (same); *Pharm. Rsch. & Manufacturers of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *8 (W.D. La. Sept. 30, 2024) (same).

### b)    *Conflict Preemption*

As set forth above, conflict preemption may arise "when federal and state laws conflict in a way that would make compliance with both *impossible*, or when the state laws *interfere* with the operation of the federal program." 995 F.3d at 491 (emphasis added) (citation modified). In other words, there are two types of conflict preemption: "direct conflict" (when compliance with both federal and state law is impossible) and "obstacle preemption" (when a state law interferes with—or "stands as an obstacle" to—Congress's objectives). *See Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 452 (S.D.W. Va. 2024). Without specifically distinguishing between them, AbbVie appears to invoke both types. Specifically, it argues that

> (1) S.B. 1414 directly conflicts with the 340B program's "explicit enumeration of covered entities with access to 340B pricing by forcing manufacturers to transfer their drugs at 340B prices to third parties unenumerated in federal law," *i.e.*, to contract pharmacies (Doc. No. 33-1 at 19);

> (2) S.B. 1414 directly conflicts with "340B's exclusive federal enforcement scheme by prohibiting manufacturers from demanding claims data from or initiating audits of covered entities or contract pharmacies" (*id.*); and

> (3) S.B. 1414 interferes with ("undermines") the "enforcement scheme contemplated by Congress" by "install[ing] its own parallel enforcement regime in the Attorney General and private citizens" (*id.*).

The first conflict preemption argument is directed to S.B. 1414 § 1(c), the provision that, according to the plaintiffs "forc[es] manufacturers to transfer their drugs at 340B prices to third

parties unenumerated in federal law." The court, however, has already found that AbbVie lacks standing to bring this claim, because its policy restricting delivery to contract pharmacies falls directly within the scope of § 1(c)'s grandfather clause. The court, therefore, does not reach the merits of this argument, but will address the other two.[8]

### i. S.B. 1414 § 1(a)—Claims Data Provisions

AbbVie's second argument implicates S.B. 1414 § 1(a)(1), (2), and (4). Subsection (a)(1) prohibits drug manufacturers from requiring covered entities or contract pharmacies to submit "any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity[9] unless such data submission is explicitly required" by federal or state law. Subsection (a)(2)

---

[8] Numerous other courts, however, have held that similar state laws do not directly conflict with the federal 340B program, and this court would largely agree with their reasoning, if called upon to address the merits of the plaintiffs' preemption argument. *See, e.g.*, *McClain*, 95 F.4th at 1144–45 ("Act 1103 does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: Act 1103 assists in fulfilling the purpose of 340B. In arguing otherwise, PhRMA presents no evidence of an obstacle. Instead, PhRMA raises the same arguments it raised with field preemption."); *Murrill*, 2024 WL 4361597, at *8 ("[I]f Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B. Put another way, Plaintiffs cannot credibly argue that it is impossible to comply with both Louisiana Act 358 and the federal Section 340B program in light of *Sanofi*."); *Bailey*, 2025 WL 644281, at *5 ("S.B. 751 does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entities utilizing the 340B program. S.B. 751 does not set or enforce discount pricing but protects covered entities['] use of contract pharmacies. As such, there is no obstacle to the enforcement of the 340B program."); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) ("Plaintiffs do not persuasively show . . . how H.B. 728 creates a substantial obstacle to Section 340B's purposes, or what consideration Congress had in mind in not addressing delivery of 340B drugs.").

[9] The Act defines the term "340B entity" to include both covered entities, as defined by federal law, and "the entity's pharmacy or pharmacies." S.B. 1414 § 1(g)(2). From context, it appears that the "entity's pharmacies" would include both in-house pharmacies and contract pharmacies acting as agents for the covered entity for purposes of distributing 340B drugs. Contrary to AbbVie's arguments elsewhere, S.B. 1414 does not redefine "covered entity," and it

prohibits drug manufacturers from "requir[ing] a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program." Subsection 1(a)(4) prohibits the imposition of "any requirement relating to the frequency, duration, or scope of audits that are [sic] not imposed on pharmacies or providers that are not 340B entities."

AbbVie's position regarding these clauses is that Congress specifically "delineated" the "tools and penalties available to the Secretary" for the enforcement of the 340B program's compliance mechanisms and restrictions on covered entities and placed enforcement "exclusively in HRSA's hands." (Doc. No. 33-1 at 20 (citing 42 U.S.C. § 256b(d)(l)(B)(v), (vi), (d)(3)).) Of particular concern to AbbVie is the ADR system. Under regulations adopted by HHS, drug manufacturers may employ the ADR system "only '*after* the conduct of audits as authorized by' the statute." (*Id.* at 21 (quoting 42 U.S.C. § 256b(d)(3)(A)) (emphasis added by AbbVie)).) According to AbbVie, drug manufacturers cannot access the federal ADR system unless they show "good cause" to obtain the right to an audit, and it will not be able to show the requisite "good cause" unless it is permitted to demand claims data and other documents from covered entities and their contract pharmacies. (*See id.* ("[M]anufacturers have only one avenue available to investigate and enforce suspected abuse of the 340B program—the ADR system—and to access that system, they must be able to provide reasonable cause of suspected violations in the form of claims data. Tennessee's law effectively forecloses the ADR process . . . .").)

More specifically, AbbVie contends that the three provisions referenced above collectively "bar[] manufacturers from demanding the claims data needed to conduct an audit, prohibit[]

---

does not require the sale of drugs at the 340B price to contract pharmacies. Rather, it requires manufacturers to deliver 340B drugs purchased by covered entities to contract pharmacies designated by covered entities.

manufacturers from conducting the audits required to access the ADR system, and thwart[] attempts to resolve any potential claims in good faith—all steps required for manufacturers under the federal 340B statute prior to seeking redress through the ADR system." (*Id.* at 22.) Consequently, it argues, "S.B. 1414 'stand[s] as an obstacle' to Section 340B's twin purposes— "providing discounts to covered entities only and prohibiting fraud.'" (*Id.* (quoting *Morrisey*, 760 F. Supp. 3d at 452).)

The State responds to this argument by arguing, somewhat ineffectually, that the Act does not "prevent AbbVie from gathering information about potential diversions" but instead only prevents it from "requiring 340B Hospitals to assume self-auditing burdens" that are "not imposed on other pharmacies or providers." (Doc. No. 23 at 23 (citation modified).) It asserts that AbbVie can obtain claims data and other information "by other means and through other parties" (without identifying such other means or other parties) and that, if it wants to impose requirements related to audits, it can do so for "*all* healthcare 'providers' and 'in the normal course of business.'" (*Id.* quoting S.B. 1414 § 1(a)(2), (4)).) It also argues that, even if the court views these provisions as imposing a "meaningful hurdle to AbbVie's self-help," that alone is not sufficient to find that the statute poses an obstacle to federal enforcement, because, as AbbVie itself recognizes, Congress vested the executive branch with "exclusive authority to protect the 340B program's integrity." (*Id.* (citation modified).)

More persuasively, the Brief of Amici Curiae points out that nothing in S.B. 1414 prevents manufacturers from *asking* for needed information about disputed drug reimbursement claims—it simply prevents them from *requiring* it as a condition of providing 340B drugs to a designated contract pharmacy. Amici also assert that, while the ADR guidelines require "reasonable cause" for seeking an audit, this standard is "not overly burdensome" and does not "present any barriers

to a manufacturer's ability to perform an audit of a covered entity." (Doc. No. 40 at 16 (quoting 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 FR 28643-01 ("ADR Rule"), at 28,646 (April 19, 2024)); *see id.* (noting that, in the preceding five years, "HRSA has not denied a request for a manufacturer audit of a covered entity" (citing ADR Rule at 28,646)).) In addition, the "reasonable cause" standard required for requesting an audit is broadly defined to mean "that a reasonable person could believe that a covered entity may have violated [certain provisions of the 340B statute]." (*Id.* (quoting 1996 Guidance at 65,406, 65,409).) Amici further posit that manufacturers "can meet this standard in various ways that require little evidence (and certainly do not require claims data)—for example, by pointing to '[s]ignificant changes in quantities of specific drugs ordered by a covered entity,' or by citing 'complaints from patients/other manufacturers about activities of a covered entity.'" (*Id.* (quoting 1996 Guidance at 65,406).)

The plaintiffs rely heavily on *Morrisey*, an opinion from the Southern District of West Virginia addressing a statutory scheme similar to that at issue here. To the court's knowledge, *Morrisey* stands thus far as the sole judicial opinion ruling in favor of drug manufacturers challenging state laws seeking to limit the manufacturers' ability to impose delivery conditions on 340B drugs. The court there held that, "to fit comfortably within the federal law, a state law must not create an obstacle to [the] twin federal purposes" of the 340B program, which the court identified as "providing discounts to covered entities only and prohibiting fraud through duplicate discounts." 760 F. Supp.3d at 452. It found that West Virginia's "no audits" provision posed "an obstacle to both purposes."[10] *Id.*

---

[10] The "no-audits" provision in the West Virginia law states that "no manufacturer shall directly or indirectly 'require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless'

In particular, the court observed that the 340B program authorizes drug manufacturers to utilize the ADR system only after first conducting an audit, meaning that the audit "serves as a condition precedent" to the use of the federal ADR system. *Id.* at 453. And it read West Virginia's "no-audit" provision as "clearly restrict[ing] such a condition from being met," insofar as it "restrict[ed] the very method by which data collection is made," thus "frustrat[ing] drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the [ADR] system." *Id.* The court also found insufficient the State's argument in response that the law did not prevent the plaintiffs from requesting or accessing "dispensing data" through "other lawful means," without actually explaining what other lawful means were available to the drug manufacturers, aside from simply requesting the data. *Id.* The court rejected mere "requests" as a meaningful avenue:

> What then happens if a covered entity declines such a request? Defendants offer no alternatives. In fact, given that the No-Audits Provision forbids manufacturers from "indirectly[] requir[ing] a 340B entity to submit claims utilization data," *see* W. Va. Code § 60A-8-6a(b)(2), it seems there is not much recourse available to a manufacturer. Instead, covered entities—who may be engaging in the kind of fraud that the 340B Program's alternative dispute resolution system is meant to prevent— will essentially be the ones determining whether or not they wish to give manufacturers the very data necessary to start such an audit. The 340B Program certainly did not establish a system where the fox guards the hen house. By restricting a practice that the industry utilizes in order to take the first step toward accessing the 340B Program dispute resolution system, S.B. 325 creates an impermissible obstacle to executing the federal program.

*Id.* at 453. Thus, in short, the court found that the West Virginia statute hampered drug manufacturers' ability to establish the "reasonable cause" necessary to support a request for an audit and, by impeding their ability to conduct an audit, completely obstructed their access to the ADR system. *Id.* The court therefore concluded that the no-audit provision did not simply create

the data is required to be shared by federal law." *Morrisey*, 760 F. Supp. 3d at 449 (quoting W. Va. Code § 60A-8-6a(b)).

"tension with the federal objectives" but, instead, stood "as an obstacle to achieving the federal objective of preventing fraud in the 340B Program." *Id.* On this basis, the court held that the plaintiffs met their burden of demonstrating a substantial likelihood of success on the merits of their claim that the no-audits provision was preempted by the 340B program.

This court, however, is not bound by *Morrisey* and is not persuaded by its reasoning. First, notably, nothing in the federal program has ever *required* covered entities to provide claims data (or "clarification") or other documentation to drug manufacturers upon demand, yet the ADR system has nonetheless been in place and functioning adequately for many years in the absence of any such requirement. Consequently, a state law that prohibits drug manufacturers from imposing upon covered entities a requirement that they submit claims data or other documentation as a precondition to allowing them to purchase drugs at the 340B discount price does not substantially alter the federal system.

Second, the plaintiffs have not actually shown that they need claims data and the other documentation they purport to need in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR. As set forth in the 1996 Guidance, only "reasonable cause" is required to support a manufacturer's request for an audit, to "ensure that the audits are performed where there are valid business concerns." 1996 Guidance at 65,406. "Reasonable cause" is not precisely defined, but the plaintiffs have not provided any evidence that the provision of claims data is necessary to establish such reasonable cause. Rather, according to HRSA, "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." *Id.* In other words, if a manufacturer has an articulable basis for suspecting that a covered entity is engaging in prohibited conduct, it likely will have reasonable

cause to request an audit. And a good faith request by the manufacturer for documents from a covered entity—again, so long as it has an articulable basis for believing that the entity is not in "compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer"—would satisfy its obligation to "attempt in good faith to resolve the matter" before accessing the dispute resolution system. *Id.* at 65,406, 65,410; *see also* 42 C.F.R. § 10.21(b)(4) ("A covered entity or manufacturer filing a claim must provide documentation of good faith efforts, including for example, documentation demonstrating that the initiating party has made attempts to contact the opposing party regarding the specific issues cited in the ADR claim.").

And finally, as Amici also point out, HRSA itself observed in April 2024 that the standards for initiating a manufacturer audit "are *not overly burdensome* [and do not] present any barriers to a manufacturer's ability to perform an audit of a covered entity." ADR Rule at 28,646 (emphasis added). The plaintiffs, in fact, have presented no evidence that they or other drug manufacturers have ever been denied the ability to conduct an audit upon request or that they have been required to submit the kind of claims data they claim to need in order to substantiate a request for an audit. Rather, claims data is more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit*.

In sum, the court finds that the plaintiffs have not established a strong likelihood of success on the merits of their claim that Subsections (a)(1) and (2) are preempted by the 340B program. Regarding Subsection (a)(4), AbbVie has not suggested that its 340B policy contains any provisions relating to audits that would conflict with the state law; nor has it substantiated its argument that this provision actual conflicts with the federal ADR program.

**Exhibit 3**

*ii. S.B. 1414 § 2—The State's Enforcement Scheme*

The Act provides that a violation of § 1(a) or 1(c) constitutes an "unfair or deceptive act or practice affecting trade or commerce" that may entail a civil penalty of $50,000 "per violation." S.B. 1414 § 1(d)(1). "Each package of 340B drugs applicable to a violation . . . constitutes a separate violation." *Id.* § 1(d)(2). In addition, a violation of the Act also constitutes a violation of the TCPA, *id.* § 2, which not only authorizes the Attorney General to bring an investigation and a civil enforcement action, but also permits enforcement actions by private individuals who "suffer[] an ascertainable loss of money or property . . . as a result" of any person's use of a practice described as unfair or deceptive under the TCPA. *See generally* Tenn. Code Ann. § 47-18-109(a)(1). In other words, there is no question that a violation of S.B. 1414 may entail severe penalties.

AbbVie argues that the Supreme Court has confirmed that HHS, acting through HRSA, has sole responsibility for administering and enforcing the 340B program and that Congress provided the "specific enforcement tools and penalties" for doing so. (Doc. No. 33-1 at 23 (citing *Astra USA*, 563 U.S. at 120; 42 U.S.C. § 256b(d)(l)(B)(v), (vi), (d)(3)).) It contends that the Act "contravenes HRSA's exclusive enforcement authority by installing its own parallel enforcement regime" and that it is well established that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." (Doc. No. 33-1 at 23 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000)) (citation modified).) And AbbVie relies on the holding in *Morrisey* that West Virginia's parallel enforcement scheme undermines "what Congress contemplated when it centralized enforcement [of the 340B program] in the government." (*Id.* (internal quotation marks omitted) (quoting *Morrisey*, 760 F. Supp. 3d at 457 (S.D.W. Va. 2024)).)

*McClain* addressed a similar argument. The Arkansas statute at issue there "created [an] oversight and enforcement scheme by empowering a state agency to exact penalties on manufacturers who refuse to distribute to contract pharmacies." *McClain*, 95 F.4th at 1144. The court held that this scheme did not conflict with—and was not preempted by—the 340B program, which "addresses discount pricing" and grants HHS jurisdiction over "disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *Id.*

In *Morrisey*, on the other hand, the West Virginia court distinguished *McClain* on the grounds that the plaintiffs in the case before it had established that the West Virginia statute, even if it purported to address the delivery of 340B discounted drugs, in reality sought to "operate[] as a means to enforce the 340B ceiling price." *Morrisey*, 760 F. Supp. at 456. It explained this conclusion based on the defendant's acknowledgment of the "replenishment model," discussed above, as the "controlling drug distribution model in West Virginia." *Id.* at 455. The court explained its view that, under this model,

> [b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one. Put another way, the system is about delivery at a given price, not delivery *per se*.

> Price is what distinguishes between an "ordinary drug" and a 340B Program drug—a fact that seems to be reflected in the statute itself. [The plaintiffs assert] that S.B. 325 "has a substantial impact on the types of transactions that trigger the 340B discount under federal law and the volume of discounts manufacturers must offer." That is because "[their] wholesalers and retailers already deliver [their] drug products to contract pharmacies throughout West Virginia," irrespective of the ceiling price it may charge. Thus, a manufacturer risks violating S.B. 325 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering its drugs to those pharmacies." None of the non-binding authority that Defendants cite as examples of similarly upheld statutes indicates that the replenishment model was considered by those respective courts.

*Id.* at 455–56 (internal citations omitted). Because *Astra* establishes that "[p]rice regulation is exclusively controlled by the federal statute," the court found that the state's enforcement of its own statute would "necessarily intrude on the federal scheme" and, therefore, that the plaintiffs were likely to succeed on the merits of their claim that the state's enforcement mechanism was preempted. *Id.* at 458.

The court also found that the fact that "differing state and federal adjudications may result" from the state's enforcement mechanism, because adjudication of claims for violation of the state law would necessarily require the state to "make some determinations of federal law." *Id.* Although the defendant argued that a claim of "diversion, which would be adjudicated through the federal dispute resolution system, might operate as a defense to the state's enforcement," the court noted that the state statute did not actually authorize such a defense and that it was more "likely that a drug manufacturer could both restrict distribution at the 340B price because of diversion concerns and be subject to sanction under S.B. 325." *Id.* at 458. The court concluded that "[t]his risk of conflicting results cuts against Congress's vision of 'centralized enforcement'" and that the state enforcement mechanism "present[ed] an obstacle to this centralized purpose." *Id.*

*Morrissey*'s analysis of the potential conflict focused on the replenishment model and the procedure for enforcing the West Virginia provision equivalent to S.B. 1414 § 1(c)—that is, the delivery restrictions that are, as discussed above, unlikely to be enforced against AbbVie in light of the grandfather clause that pertains to the application of § 1(c). This court nonetheless would take issue with *Morrissey*'s characterization of that provision as controlling *price* rather than *delivery*. The Tennessee statute says nothing about price, and, even under the replenishment model, covered entities are the only entities entitled to the 340B discount. Section 1(c), if it applied to AbbVie, would prohibit it from imposing restrictions on where it is willing to *deliver* drugs that

have been purchased by covered entities under the 340B discount. The amount of the discount is not at issue and is not affected by the state scheme.

The claims documentation and audit provisions are also clearly related to delivery rather than price. They restrict drug companies from conditioning the delivery of 340B drugs to a covered entity or any designated outside pharmacy upon the provision of such documentation. They directly implicate AbbVie's policy, which purports to condition delivery to any outside pharmacy upon the submission of certain claims data. Tennessee's enforcement mechanism would be related to the imposition of such *requirements* by a drug company, and the plaintiffs have not articulated how enforcement of that mechanism would in any way interfere with or overlap the federal enforcement procedures related to "disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *McClain*, 95 F.4th at 1144. Nor have they suggested how a manufacturer's suspicion of "diversion" of 340B-discounted drugs, *per se*, would constitute a defense to a state claim based on a violation of § 1(a)(1).[11] In other words, the state's system is not about diversion, and fears of diversion would not justify failure to comply with the state law. Enforcement of the penalties and mechanisms for addressing diversion would instead be pursued—entirely separately—through the federal ADR system. The plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the state enforcement mechanism conflicts with, poses an obstacle to, or is preempted by the federal ADR system embodied in the 340B program.

---

[11] *Morrisey* provides no support for its presumption that the 340B program authorizes drug manufacturers to simply "restrict distribution at the 340B price because of diversion concerns." 760 F. Supp. 3d at 458. Rather, manufacturers apparently must be able to articulate reasonable cause for such concerns, seek an audit, and pursue informal dispute resolution and then resolution of a diversion dispute through ADR, as discussed above.

## 2.    The Takings Clause

The Takings Clause, which is "applicable to the States through the Fourteenth Amendment," *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021), provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The "classic taking [is one] in which the government directly appropriates private property for its own use." *Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). The Takings Clause does not distinguish between personal property and real property. *Id.* at 358. Thus, an appropriation of either type of property "is a *per se* taking that requires just compensation." *Id.*

AbbVie argues that, even if it is not preempted, S.B. 1414 violates the Takings Clause, insofar as it "compels AbbVie and other manufacturers to sell their products at 340B-discounted prices, allowing contract pharmacies and covered entities to reap windfall profits." (Doc. No. 33-1 at 25.) AbbVie's takings theory is that the Act "violates [the] principle" that the government "may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." (*Id.* at 26.) In particular, according to AbbVie, § 1(c) of the Act

> forbids AbbVie from "deny[ing]," "restrict[ing]," "prohibit[ing]," or "otherwise limit[ing]" the "acquisition of a 340B drug by" a "340B entity," including contract pharmacies and any "other location that is under contract with" a 340B entity. Telling manufacturers that they cannot include certain conditions on the sale of their drugs and cannot interfere with the acquisition of their drugs by contract pharmacies is the same as forcing manufacturers to sell their drugs at confiscatory prices under conditions favored by the State. This is not a "public use" recognized in American law.

(*Id.* (quoting S.B. 1414 § 1(c)).)

There are many problems with AbbVie's analogy. First, the State does not require AbbVie to sell its drugs in Tennessee at all; AbbVie voluntarily chooses to participate in Medicare and

Medicaid and to participate in the 340B program as a condition of that choice. Second, the State regulations on delivery do not amount to taking possession of AbbVie's property or conveying it to a third party, and AbbVie's gripe with the whole system is that it does not like the volume of drugs being sold at the 340B discount price. It believes that covered entities' use of contract pharmacies, for inexplicable reasons, increases the quantity of drugs purchased by covered entities at the 340B discount price.

District courts in Mississippi, Louisiana, and Missouri have rejected nearly identical takings challenges, concluding that the laws of those states prohibiting drug manufacturers from limiting or restricting the number of contract pharmacies or locations to which they will deliver 340B-discounted drugs purchased by covered entities do not constitute either a *per se* taking or a regulatory taking and that, even if they did effect a taking, it was a taking for public use, not private use, as a result of which the equitable relief the plaintiffs sought would not be an available remedy. *See AbbVie Inc. v. Fitch*, 2024 WL 3503965, at * 19–20 (denying plaintiffs' preliminary injunction motion); *see also Astrazenca Pharms. LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at *5–6 (W.D. Mo. Feb. 27, 2025) (dismissing takings claim); *Murrill*, 2024 WL 4361597, at *15 (granting summary judgment for the State on the plaintiffs' takings claim). These opinions are highly compelling and persuasive but ultimately of little relevance here, again because the court has found that AbbVie lacks standing to challenge the implementation or enforcement of § 1(c).

AbbVie does not argue that the provisions of § 1(a) constitute a taking. The court therefore finds that AbbVie has not established a substantial likelihood of success on its claim that S.B. 1414 effects an unconstitutional taking.

### 3. *The Due Process Clause and Vagueness*

AbbVie's Complaint sets forth a claim for relief under the Due Process Clause of the Fourteenth Amendment, based on allegations that §§ 1(a)(3), 1(a)(4), 1(a)(6), and 1(c) are

unconstitutionally vague on their face. (Doc. No. 1 ¶¶ 179–88.) Its Motion for Preliminary Injunction argues perfunctorily that subsections 1(a)(3) and (a)(6) are unconstitutionally vague and that their lack of precision is rendered more egregious by the fact that S.B. 1414 "grants the Tennessee Attorney General *criminal* enforcement authority." (Doc. No. 33-1 at 29.)

The State contends that the statute is not untenably vague, as it provides ample notice of what constitutes a violation, and, even if the language of the Act arguably "leave[s] some wiggle room," the Attorney General is required to give notice of a potential violation before pursuing an enforcement action. (Doc. No. 23 at 17–18.) It also points out that, as discussed above, the Act does not actually give the Attorney General criminal enforcement authority. Rather, both S.B. 1414 and the TCPA give the Attorney General civil enforcement authority only.

If a challenged statute does not implicate First Amendment rights or impose criminal sanctions, a plaintiff "only has standing to challenge its purported vagueness as applied to the facts of her case." *Johnson v. Morales*, 946 F.3d 911, 928–29 (6th Cir. 2020). And in that situation, a statute is unconstitutionally vague only "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* at 929 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

The court has already found that the TCPA does not authorize the Attorney General to bring criminal enforcement proceedings and that, in any event, the plaintiff lacks standing to challenge the criminal enforcement provision, because it has not named the state District Attorneys as defendants; nor has it addressed the likelihood that they ever do or would bring criminal charges under the TCPA. Accordingly, the court finds that the standard articulated in *Johnson* applies, and the plaintiffs have the burden of establishing that people of ordinary intelligence would not

understand what the Act prohibits or showing that the Act authorizes or encourages arbitrary enforcement. In addition, the void-for-vagueness doctrine applies less strictly to economic regulations. *Id.* (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982)). In that context, the standard asks whether a "*business person* of ordinary intelligence would understand" the conduct prohibited. *Hoffman*, 455 U.S. at 501 (emphasis added).

Here, the plaintiffs challenge S.B. 1414 § 1(a)(4) as unconstitutionally vague, insofar as it bars drug manufacturers from "impos[ing] any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by [HHS] or applicable state law." (*See* Doc. No. 33-1 at 28.) They object that this subsection leaves manufacturers to guess the meaning of the terms "requirement," "relate," and "inventory management system." They contend that they could be "exposed to liability for routine supply-chain practices, operational policies, or even basic compliance steps—without any clear way to know whether those practices 'relate' to inventory systems under the statute." (*Id.* at 28–29.)

The plaintiffs also object to the "catch-all" provision in § 1(a)(6), which prohibits "any" conduct that the Attorney General deems to "interfere[] with the ability of a 340B entity to access discounts provided under the 340B program. They argue that this provision "impermissibly delegates open-ended enforcement discretion to a state official and invites 'arbitrary, discriminatory and overzealous enforcement.'" (Doc. No. 33-1 at 28 (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 198 (6th Cir. 1990)).) They further contend that the term "interference" itself is amorphous and utterly lacking in standards, unmoored to any objective criteria.

The court finds that these provisions, read in the context of the statute as a whole and considered from the perspective of a reasonable business person—and, more specifically, a

reasonable drug manufacturer—provide adequate notice of what conduct is prohibited and do not invite arbitrary enforcement. The Act is targeted at precisely the conduct in which AbbVie and other drug manufacturers want to engage in order to limit the expansion of the 340B program. That is, the State seeks to ensure that drug manufacturers do not impose restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law. The word "requirement" is not ambiguous in this context. It has its ordinary dictionary meaning of "something required," a "necessity," or a condition—that is, "something essential to the existence or occurrence of something else." *Requirement*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/requirement (last visited June 27, 2025). "Inventory management system," given the context in which it appears, obviously refers to the replenishment model to which AbbVie strenuously objects—and to virtually any other inventory system covered entities and contract pharmacies might devise, so long as they are compliant with federal law. Thus, subsection (a)(4) prohibits drug manufacturers from imposing any inventory-related conditions upon the delivery of 340B discounted drugs to covered entities.

Similarly, ordinarily intelligent drug manufacturers would not need to guess at the meaning of the term "interfere" as used in subsection (a)(6). As another district court observed in addressing a similar challenge to a similar statute enacted in Mississippi,

> Black's Law Dictionary defines "interference" as "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." Interference, *Black's Law Dictionary* (11th ed. 2019). [The Mississippi statute] thus prohibits manufacturers from "obstructing [the] normal operations" of, "or intervening or meddling in the affairs" of a contract pharmacy receiving and dispensing 340B drugs to 340B patients.

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365, at *14 (S.D. Miss. July 1, 2024). As that court concluded:

> The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in

their dispensation of 340B drugs. The Court need not determine the precise contours of the statute in every hypothetical application because Plaintiff's "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications."

*Id.* (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 348 (2023), *reh'g denied*, 144 S. Ct. 629 (2024)).

The Fourteenth Amendment does not require precision. *See Theunick*, 651 F.3d at 585 ("[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952))). Thus, "no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340. Under this standard, the court finds that AbbVie has not established a substantial likelihood of success on the merits of its claim that subsections 1(a)(4) and 1(a)(6) are unconstitutionally vague, either because the provisions themselves fail to provide adequate notice of what conduct is prohibited or because they invite arbitrary enforcement.

### 4.    *Dormant Commerce Clause*

Under the Commerce Clause, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. On its face, the text of the so-called Commerce Clause affirmatively grants Congress the power to "regulate interstate and foreign commerce"; in addition, the Clause has "long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)). The "dormant" Commerce Clause thus "limits the power of states 'to erect barriers against interstate trade.'" *Id.* (quoting *Lewis v. BT Inv.*

*Managers, Inc.*, 447 U.S. 27, 35 (1980)).

The dormant Commerce Clause primarily targets state laws that "discriminate[] against out-of-state goods or nonresident economic actors." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 369 (2023) ("[T]his antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." (citation omitted)). While the Clause also has been construed to invalidate any state law that has "the practical effect of controlling commerce that occurs entirely outside of the state in question," *Int'l Dairy Foods*, 622 F.3d at 644, the Supreme Court has more recently declined to recognize an "'almost *per se*' rule against state laws with 'extraterritorial effects." *Nat'l Pork Prods.*, 598 U.S. at 373, 376; *see id.* at 371 (explaining that its prior decisions that focused on the extraterritorial *effect* of challenged laws were nonetheless motivated by the antidiscrimination principle). Even following *National Pork Products*, however, courts have continued to hold that "a statute [that] has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" will violate the dormant Commerce Clause. *Ass'n for Accessible Medicines v. Ellison*, No. 24-1019, 2025 WL 1660112, at *3 (8th Cir. June 12, 2025). In addition, the dormant Commerce Clause bars "attempts to give local consumers an advantage over consumers in other States." *N.J. Staffing All. v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986)).

In this case, AbbVie contends only that S.B. 1414 impermissibly burdens out-of-state commerce. In support of this claim, AbbVie argues, in two brief paragraphs, that (1) Tennessee courts decline to apply a presumption against extraterritoriality when interpreting Tennessee statutes; (2) S.B. 1414 includes no express language indicating the legislature's intent to limit its scope to intrastate commerce; and (3) by its plain terms, the Act "prohibits *any* manufacturer across

**Exhibit 3**

the country from imposing conditions on transactions between itself and *any* covered entity, pharmacy, or 'other location' authorized by the covered entity across the country, regardless of that manufacturer's or entity's connections to Tennessee." (Doc. No. 33-1 at 30.) According to AbbVie, the "practical effect" of the statute is to "directly control[] commerce occurring wholly outside [the state's] boundaries," making the law unconstitutional, irrespective of the legislature's actual intent. (*Id.* (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013)).)

But, according to *National Pork Products*, the dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach, absent protectionist intent or effect. 598 U.S. at 373. AbbVie has not alleged either. Moreover, aside from that problem, AbbVie's initial premise is incorrect, as a result of which the argument collapses under its own weight. Tennessee *does*, and has for more than one hundred years, applied a presumption against extraterritoriality. The single case AbbVie cites to the contrary, *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512 (Tenn. 2005), did not expressly address extraterritoriality and has not been subsequently construed by any Tennessee court as overruling more than a century of controlling precedent on the topic.

In *Freeman Industries*, the Tennessee Supreme Court was presented with the question of whether an indirect purchaser could bring an action under the Tennessee Trade Practices Act ("TPPA") against defendants involved in a price-fixing scheme. The court answered that question in the affirmative and held that an indirect purchaser could bring suit under the TPPA, even if he was not a resident of the state. *Freeman Indus.*, 172 S.W.3d at 520. Then, to determine whether the conduct at issue fell within the scope of the TPPA, the court applied a "substantial effects" standard, requiring courts to decide "whether the alleged anticompetitive conduct affects

Tennessee trade or commerce to a substantial degree." *Id.* at 522–23. It ultimately held that the plaintiff "fail[ed] to establish how the defendants' anticompetitive conduct affected Tennessee commerce to a substantial degree." *Id.* at 524.

However, as the Tennessee Court of Appeals explained in a very recent opinion, although "[n]othing in the [*Freeman Industries*] opinion mentions extraterritoriality," a 2020 law review article identified Tennessee as "among the states that have 'rejected a presumption against extraterritoriality,' even though 'there are older cases articulating a presumption against extraterritoriality.'" *Renel v. Drexel Chem. Co.*, No. W2023-01693-COA-R3-CV, 2025 WL 1604377, at *7 n.7 (Tenn. Ct. App. June 6, 2025) (quoting William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. 1389, 1417–18, 1451 (2020)). In *Drexel*, the court expressly "decline[d] to interpret the [Tennessee Supreme] Court's silence in the same manner," citing numerous cases standing for the propositions that (1) silence on an issue should not be construed as overruling prior "unequivocal statements," *id.*, and (2) "Tennessee courts have repeatedly recognized the principle of extraterritoriality," pursuant to which courts presume that "[a] local statute has no extraterritorial force, and can be exercised only upon persons and property within the jurisdiction of the state where such statute is enacted," *id.* at *4 (quoting *Kirkland v. Calhoun*, 248 S.W. 302, 304 (Tenn. 1923), and collecting cases). The court also concluded that, to rebut the presumption against extraterritorial application, the statute at issue must "contain a clear affirmative indication that it applies extraterritorially." *Id.* at *8. That is, the "pivotal question" under Tennessee law "is whether the statute itself . . . purports to apply extraterritorially." *Id.*

Here, the plaintiffs do not contend that S.B. 1414 contains language affirmatively indicating that it is intended to be applied extraterritorially. Instead, they argue that it contains no

language *limiting* its extraterritorial application and therefore must be construed as "sweep[ing] broadly to include covered entities and contract pharmacies without any geographic limitation." (Doc. No. 33-1 at 30.) The court declines to construe the statute to apply extraterritorially. To read it thus would contravene both Tennessee's presumption against extraterritoriality and the "well established" canon of construction "that statutes should be construed to avoid constitutional questions if such a construction is fairly possible." *Boos v. Barry*, 485 U.S. 312, 333 (1988); *see also In re Schafer*, 689 F.3d at 605 ("Where, as here, a statute is challenged as unconstitutional, we construe the statute to avoid constitutional infirmity when fairly possible." (internal quotation marks and citation omitted)).

The plaintiffs have not established a substantial likelihood of success on their dormant Commerce Clause claim.

### 5.    *The First Amendment's Petition Clause*

The plaintiffs argue that the Petition Clause of the First Amendment protects their "right to meaningfully access the federal government's established 340B dispute-resolution process" and that S.B. 1414 violates that right by "effectively barring" them from accessing that process. (Doc. No. 33-1 at 31 (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010)).) The defendant responds that this argument is nothing more than an "ambitious repackaging" of AbbVie's preemption argument and that, regardless, it fails to state a cognizable claim under the First Amendment.

The First Amendment prohibits state actors from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "[T]he 'right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002)). "[T]he right allows an ordinary citizen to 'convey[] the special

concerns of [the petition's] author to the government,' and to 'request[] action by the government to address those concerns,' generally without fear of criminal or civil repercussions." *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020) (alterations in original) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011)). Thus, for example, such activities as "fil[ing] a citizen complaint" with a police department and "request[ing] public records about that complaint" constitute conduct protected by the Petition Clause. *Id.* at 514.

For the same reasons propelling the court to reject AbbVie's preemption claim rooted in the same allegations, the court finds that S.B. 1414 does not obstruct AbbVie's right to petition the government by barring its access to the federal ADR system relating to 340B claims. In particular, nothing prevents AbbVie from simply requesting claims data or other documentation from covered entities (or pharmacies) or from requesting an audit of a covered entity based upon reasonable cause. A covered entity's failure to comply with a reasonable request—coupled with the articulable facts that gave rise to suspicions of diversion or other prohibited conduct in the first place, such as, for example, "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity," 1996 Guidance at 65,406—would be sufficient to establish such reasonable cause. And the plaintiffs have not pointed to any facts suggesting, to the contrary, that the standards for requesting an audit require any particular type of claims data or other documentation from the covered entity.

The court finds that the plaintiffs have not established a substantial likelihood of success on the merits of their First Amendment Petition Clause claim.

C.    **Other Elements of Preliminary Injunction Inquiry**

As set forth above, if a plaintiff fails to establish a substantial likelihood of success on the merits, the court's inquiry ends, because, without a substantial likelihood of success on the merits,

**Exhibit 3**

a plaintiff will not be able to establish a substantial risk of irreparable harm or that the public interest weighs in favor of granting relief. Having concluded that AbbVie has not established a substantial likelihood of success on the merits of any of its constitutional claims, the court does not reach the other factors of the preliminary injunction standard and finds instead that AbbVie's failure to establish a substantial likelihood of success on any of claim is fatal to the Motion for a Preliminary Injunction.

## V.    CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion for a Preliminary Injunction (Doc. No. 17) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ABBVIE INC. *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00519** |
| | ) | **Judge Aleta A. Trauger** |
| **JONATHAN SKRMETTI, in his official** | ) | |
| **capacity as ATTORNEY GENERAL OF** | ) | |
| **THE STATE OF TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively "AbbVie" or "plaintiffs") filed suit on May 6, 2025 against Jonathan Skrmetti, in his official capacity as the Attorney General of the State of Tennessee (referred to herein as the "State"), to enjoin the enforcement of the Tennessee Hospital Protection Act (the "Act"), Tenn. Code Ann. § 47-18-136. The Act was signed by Tennessee Governor Bill Lee on May 5, 2025; parts of it went into effect immediately, and parts took effect on July 1, 2025.

AbbVie's Complaint characterizes the Act as mandating that pharmaceutical manufacturers, including the plaintiffs, sell drugs at discounted prices to commercial pharmacies. (Doc. No. 1, Compl. ¶ 1.) AbbVie contends that the Act thus "impermissibly chang[es] the terms of a federal drug-pricing regime—the so-called federal "340B program"—and significantly increase[s] the cost of participation in that regime." (*Id.*) Invoking 42 U.S.C. § 1983, AbbVie challenges the Act as unconstitutional on the grounds that it (1) violates the Supremacy Clause;

(2) effects a taking in violation of the Takings Clause; (3) "unlawfully discriminates against or unduly burdens interstate commerce in violation of the Commerce Clause, as established by Dormant Commerce Clause principles"; (4) is unconstitutionally vague in violation of the Due Process Clause; and (5) "violates the First Amendment's Free Speech and Petition Clauses." (*Id.*)

The court previously denied AbbVie's Motion for Preliminary Injunction, which was filed within days of its Complaint. *See AbbVie Inc. v. Skrmetti* ("*AbbVie I*"), No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025). Now before the court is the State's Motion to Dismiss. (Doc. No. 47.) For largely the same reasons articulated in the court's Memorandum denying the Motion for Preliminary Injunction, the Motion to Dismiss will be granted.

## I.     BACKGROUND

As also described in the court's opinion denying AbbVie's Motion for Preliminary Injunction,[1] Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical companies that want to participate in Medicaid and Medicare Part B to offer steep discounts on certain outpatient drugs to "covered entities," a term defined to include public hospitals and community health centers and other entities typically engaged in "car[ing] for low-income and rural persons." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); *see also* 42 U.S.C. § 256b(a)(4) (defining "covered entity"). (*See also* Compl., Doc. No. 1 ¶¶ 37–38.) This program, referred to as the "340B program," helps covered entities provide "safety-net services to the poor," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011), because the entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699.

---

[1] This background section is taken nearly verbatim from the court's Memorandum denying AbbVie's Motion for Preliminary Injunction, *AbbVie I*, 2025 WL 1805271, at *2–4, with minor revisions.

The 340B program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Astra USA*, 563 U.S. at 113.

"Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform agreements," *id.*, that "require" participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a). "Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir.) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)), *pet. for rehearing en banc and by panel denied*, No. 22-3675, 2024 WL 1919676 (8th Cir. May 2, 2024), *cert. denied*, 145 S. Ct. 768 (2024). "Additionally, covered entities may not engage in diversion of covered outpatient drugs through 'resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity.'" *Id.* at 1142 (quoting 42 U.S.C. § 256b(a)(5)(B)).

HHS and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate prohibitions, "in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits." *Id.* (citing 42 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700). Any disputes arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

Although the 340B program was apparently designed with the expectation that it would apply to covered entities that operated in-house pharmacies, "[s]ince the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

While the Secretary of HHS "lacks rulemaking authority over the section 340B program," the HRSA has, on several occasions, issued non-binding "guidance" documents, such as the 1996 Guidance, "interpreting and implementing the scheme." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). In the 1996 Guidance, the HRSA "acknowledged that section 340B 'is silent as to permissible drug distribution systems,'" and it "sought to fill 'gaps in the legislation' and thereby 'move the program forward.'" *Id.* (quoting 1996 Guidance at 43,549–50). In addition, HRSA "recognized that many covered entities use outside pharmacies to distribute drugs to their patients," and, to accommodate them, HRSA determined that any covered entity that did not have an in-house pharmacy could contract with *one* outside pharmacy to dispense drugs at a single location. *Id.* at 457 (citing 1996 Guidance at 43,550, 43,555).

However, HRSA reversed course in 2010, when it issued another guidance document "opin[ing] that covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")). Following the issuance of the 2010 Guidance, "the

use of contract pharmacies skyrocketed," increasing by "twentyfold." *Sanofi Aventis*, 58 F.4th at 700.

Purportedly worried that "contract pharmacies were driving up duplicate discounting and diversion," drug makers began to respond in 2020 by adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *Id.*; *see also McClain*, 95 F.4th at 1139. In some instances, these limitations "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139.

HHS responded to these efforts, first, by "releas[ing] an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., Advisory Op. 20-06 on Cont. Pharmacies Under the 340B Program (Dec. 30, 2020), https://perma.cc/L7W2-H597). Second, it issued violation letters to several drug manufacturers, who then sued HHS. *Id.* The Third Circuit held that the Advisory Opinion and violation letters were unlawful because § 340B is silent regarding delivery to contract pharmacies. *Id.* at 706. The court enjoined HHS's "reading of Section 340B as *requiring* delivery of discounted drugs to an unlimited number of contract pharmacies," because "[l]egal duties do not spring from silence." *Id.* at 707 (emphasis added). The D.C. Circuit reached the same conclusion. *See Johnson*, 102 F.4th at 461 ("agree[ing] entirely" with the Third Circuit's conclusion that, "because section 340B is 'silent about delivery,' HRSA erred in concluding that the statute 'requires drug makers to deliver drugs to an unlimited number of contract pharmacies'" (quoting *Sanofi Aventis*, 58 F.3d at 703)).

Following these rulings, approximately twenty states, including Tennessee, have attempted to fill the "silence" recognized by the Third and D.C. Circuits by passing laws that prohibit

pharmaceutical companies from limiting the number of contract pharmacies with which covered

entities can enter agreements pertaining to the delivery of 340B drugs or otherwise imposing

distribution obstacles not required by the federal program. Under Tennessee's Hospital Protection

Act, effective July 1, 2025, drug manufacturers and their agents and affiliates "shall not":

> (1) Impose additional requirements or limitations on a 340B entity, including requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law;
>
> (2) Require a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program;
>
> (3) Impose any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by the United States department of health and human services or applicable state law;
>
> (4) Impose any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities;
>
> (5) Impose requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities; or
>
> (6) Impose any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program.

Tenn. Code Ann. § 47-18-136(a). Generally, in other words, pharmaceutical companies may not

impose requirements on covered entities in addition to those requirements expressly set out in

§ 340B or discriminate against covered entities by imposing upon them requirements that they do

not impose on providers that are not 340B entities.

> In addition, the Act prohibits drug manufacturers from
>
> deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise

> authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity
> unless such receipt is prohibited by the United States department of health and
> human services or applicable state law.

*Id.* § 47-18-136(c). Subsection (c), however, also contains a "grandfather clause," which provides

that it "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or

before June 1, 2025." *Id.*

The Act further provides that each violation of subsection (a) or (c)[2] constitutes an "unfair

or deceptive act or practice affecting trade or commerce" in violation of the Tennessee Consumer

Protection Act ("TCPA") and may give rise to a civil penalty of $50,000 "per violation." *Id.* § 47-

18-136(d)(1). As AbbVie points out, under Tennessee law, any act deemed to be an unfair or

deceptive act or practice under the TCPA is also a Class B misdemeanor. *Id.* § 47-18-104(a). The

Act further states that it "must not be construed or applied to be in conflict with or less restrictive

than . . . [a]pplicable federal law and regulations." *Id.* § 47-18-136(e)(1).

While there are minor differences between Tennessee's law and the analogous statutes

passed by other states, the laws share many features, "including prohibitions on certain

manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies

for violations of the prohibitions." *Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-cv-00469-JCN,

2026 WL 184504, at *1 (D. Me. Jan. 23, 2026). Drug manufacturers have filed lawsuits in many

of these states to enjoin the statutes' enforcement. There are at least thirteen district court opinions,

including one issued by this court, denying motions for preliminary injunctions or granting

defendants' motions for summary judgment in cases filed by drug manufacturers seeking to enjoin

enforcement of state statutory schemes, three of which have been affirmed by two different circuit

---

[2] Subsection (b) does not govern the activities of drug manufacturers and is not at issue in this lawsuit.

courts.[3] Only two district courts have granted injunctive relief to drug manufacturers,[4] and a handful of opinions from Utah and the Western District of Missouri have denied in part motions to dismiss filed by state defendants.[5]

[3] *Pharm. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting Louisiana's cross-motion for summary judgment), *aff'd in relevant part and reversed in part sub nom. AbbVie, Inc. v. Murrill*, No. 24-30645, 2026 WL 350685 (5th Cir. Feb. 9, 2026); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024), *aff'd*, 152 F.4th 635 (5th Cir. 2025) (affirming summary judgment for Louisiana); *Pharm. Rsch. & Mfrs. of Am. v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption), *aff'd*, 95 F.4th 1136 (8th Cir.), *pet. for rehearing en banc and by panel denied*, No. 22-3675, 2024 WL 1919676 (8th Cir. May 2, 2024), *cert. denied*, 145 S. Ct. 768 (2024); *AstraZeneca Pharms. LP v. Lopez*, No. 25-00369 MWJS-WRP, 2026 WL 497141 (D. Haw. Feb. 23, 2026) (denying motion for preliminary injunction); *Frey*, 2026 WL 184504 (same), *appeal docketed*, No. 26-1099 (1st Cir. Jan. 28, 2026); *AbbVie, Inc. v. Jackley*, No. 3:25-CV-03006-RAL, 2025 WL 3706066 (D.S.D. Dec. 22, 2025) (same); *AbbVie Inc. v. Hilgers*, No. 4:25-cv-3089, 2025 WL 3688051 (D. Neb. Dec. 19, 2025) (same); *AstraZeneca Pharms. LP v. Weiser*, No. 25-CV-02685-PAB-STV, 2025 WL 3653161 (D. Colo. Dec. 17, 2025) (same), *appeal docketed*, No. 25-1466 (10th Cir. Dec. 22, 2025); *AbbVie, Inc. v. Weiser*, No. 25-CV-1847-WJM-KAS, --- F. Supp. 3d ---, 2025 WL 3041825 (D. Colo. Oct. 31, 2025) (same), *appeal docketed*, No. 25-1438 (10th Cir. Nov. 21, 2025); *Novartis Pharms. Corp. v. Frey*, No. 1:25-CV-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (same), *appeal docketed*, No. 25-1914 (1st Cir. Sept. 26, 2025); *AbbVie Inc. v. Skrmetti*, No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (same); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) (same), *appeal docketed sub nom. Novartis Pharms. Corp. v. Hanaway*, No. 25-1619 (8th Cir. Mar. 28, 2025); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (same), *appeal docketed*, No. 24-60342 (5th Cir. July 9, 2024).

[4] *See AbbVie Inc. v. Drummond*, Nos. CIV-25-726-PRW, 25-727-PRW, 25-1156-PRW, --- F. Supp. 3d ---, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting in part drug manufacturers' motions for preliminary injunction in case challenging Oklahoma statute); *Pharm. Rsch. & Mfrs. of Am., Inc. v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (granting motions for preliminary injunction in consolidated lawsuits challenging West Virginia statute).

[5] *AbbVie, Inc. v. Brown*, Nos. 2:25-CV-00271-RJS-DAO, 2:25-cv-00284-RJS-DAO, 2:25-cv-00308-RJS-DAO, --- F. Supp. 3d ---2025 WL 3228898 (D. Utah Nov. 19, 2025) (dismissing claims for violations of the Due Process and Commerce Clauses and denying motions to dismiss claims under the Supremacy Clause and Takings Clause); *Pharm. Rsch. & Manufacturers of Am. v. Bailey*, No. 2:24-cv-04144-MDH, 2025 WL 644281 (W.D. Mo. Feb. 27, 2025) (dismissing claims for violation of the Supremacy Clause based on various theories of conflict and filed preemption and extraterritorial regulation claims under Contracts Clause, Article IV, and Due Process Clause, but denying motion to dismiss dormant Commerce Clause claim); *AstraZeneca Pharms. LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting motion to dismiss as to preemption and takings claims but denying it as to contract

## II.    THE PLAINTIFFS' CLAIMS

In the present lawsuit, the plaintiffs are all drug manufacturers and signatories (or successors-in-interest to signatories) to 340B Pharmaceutical Pricing Agreements with HRSA. (Doc. No. 1 ¶¶ 23–28.) They allege that the Act "impermissibly changes the terms" of the federal 340B program and "significantly increase[es] the cost of participation in that regime." (Doc. No. 1 ¶ 1.) They further allege that, following issuance of the 2010 Guidance effectively authorizing covered entities to enter into contractual arrangements with an unlimited number of commercial pharmacies, many covered entities have entered into "novel contractual arrangements" with commercial pharmacies that employ a "complicated accounting system known as the 'replenishment model.'" (*Id.* ¶ 6.)

Under the replenishment model, as described by AbbVie, covered entities enter into contractual relationships with commercial pharmacies ("contract pharmacies") pursuant to which the contract pharmacies "sell manufacturers' drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by the covered entity through the federal 340B program at discounted prices, pocketing the difference . . . for their own financial benefit." (*Id.* ¶ 42.) More specifically, a contract pharmacy obtains an

> initial stock of drugs . . . through ordinary commercial purchases [from the manufacturer] at the non-340B price. Initially, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. . . . [T]he pharmacy [subsequently] determines which previous dispenses were 340B eligible and[,] once sufficient eligible dispenses for a particular drug accumulate, the covered entity orders additional quantities of that drug at the federal 340B price. The covered entity directs AbbVie to transfer those drugs to the contract pharmacy to "replenish" the non-340B-priced drugs dispensed by the contract pharmacy on the covered entity's behalf. Sometimes the contract pharmacy actually places the order on behalf of the covered entity for more drugs at the federal 340B price.

impairment claim); *Novartis Pharms. Corp. v. Bailey*, No. 2:24-CV-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025) (same).

(*Id.* ¶ 63 (internal quotation marks and citations omitted). AbbVie supplies a model to illustrate this procedure:



(Compl. 22, Fig. 1.)

AbbVie asserts that these arrangements violate both the "letter and spirit" of the 340B statute. (*Id.* ¶ 44.) They allegedly violate the "spirit" of the 340B program because they do not further the "only valid public purpose" of the program, which, according to AbbVie, is to "help[] low-income and uninsured patients obtain access to medications at discounted prices." (*Id.*)[6] And the arrangement violates the "letter," insofar as it violates the 340B statute's express prohibitions of "diversion," *see* 42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity"), and receiving or causing duplicate

---

[6] In fact, as explained above, this is not the purpose of the 340B program. Instead, its purpose is to benefit the hospitals serving low-income populations by allowing those entities to "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699, which in turn allows covered entities to continue to provide "safety-net services to the poor," *Astra USA*, 563 U.S. at 113.

discounts or rebates, *see id.* § 256b(a)(5)(A). (*See* Compl. ¶¶ 44–46.) This is because, AbbVie believes, the replenishment model permits the "transfer" of 340B-priced drugs to contract pharmacies "with the full knowledge that those drugs will be sold to any customer who comes in the door, whether 340B-eligible or not." (Doc. No. 52 at 9 (citing Compl. ¶¶ 63–64).) And contract pharmacies are not covered entities either, though the replenishment model permits the contract pharmacies to take title to the 340B-priced drugs, despite not being "agents" of the covered entities but, instead, mere "business partners." (*Id.* ¶ 59.)

In other words, AbbVie objects to these arrangements on the grounds that they do not benefit indigent patients but, instead, allow contract pharmacies and covered entities to pocket "billions of dollars every year," allegedly "at the expense of both manufacturers and the needy patients" the covered entities are supposed to serve. (*Id.*) And the arrangements purportedly "unconstitutionally compel AbbVie to make sales under conditions it would not agree to, thereby perpetuating the very abuses federal law forbids." (*Id.* ¶ 47.)

Under its current policy, AbbVie continues to offer covered entities unlimited 340B-priced drugs at or below the ceiling price established by the 340B program, but it will not provide discounted drugs to unlimited, third-party contract pharmacies that are serving hospital-type covered entities. (Doc. No. 52 at 9 (citing Compl. ¶¶ 82–84).) "Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to take orders for the in-house pharmacy." (Compl. ¶ 84.) If the covered entity does not have an in-house pharmacy, "AbbVie will take orders for one designated contract pharmacy, provided that the one contract pharmacy is located with 40 miles of the HRSA covered entity parent site, and the covered entity submits limited claims data on 340B utilization for that pharmacy location." (*Id.*) In addition, it will allow "Grantee Covered Entities" (a term it does not define) to use "an unlimited number of contract pharmacies" if they

agree to submit claims data through a free web-based platform. (*Id.*) "If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative." (*Id.* ¶ 85.)

AbbVie characterizes subsection (c) of § 47-18-136 as eliminating drug manufacturers' "ability to adopt policies to prevent 340B abuse or prevent the taking of their own property by entities not otherwise entitled to it." (Compl. ¶ 104.) While AbbVie acknowledges the grandfather clause in subsection (c), which expressly states that that subsection will not apply to restrictions in place on or before June 1, 2025, AbbVie maintains that, "in practice, AbbVie's policy likely cannot qualify for the exception," because it must "frequently amend and revise [its] policies to comply with the various prohibitions and requirements" imposed by constantly changing state laws. (*Id.* ¶ 105.) It alleges that, if it at any time updates its policy "to reflect a new state law," it will automatically fall outside the protection of the grandfather clause. (*Id.*) For example, as of the May 6, 2025 filing date of the Complaint, AbbVie anticipated updating its "current contract pharmacy policies in South Dakota and North Dakota, on July 1, 2025 and August 1, 2025—the two state law's effective dates"—meaning, according to AbbVie, that it would fall outside the protection of the grandfather clause in § 47-18-136(c) almost immediately upon subsection (c)'s taking effect on June 1, 2025.

AbbVie also takes issue with the restrictions included in subsection (a) of the Act—those that prohibit drug manufacturers from (1) "requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law"; (2) requiring a 340B entity to "reverse, resubmit, or clarify a claim after the

initial adjudication unless these actions are in the normal course of business and not related to the 340B program"; (3) imposing "requirements relating to inventory management systems of 340B drugs"; (4) imposing "any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities"; (5) imposing "requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities"; and (6) imposing any other requirement that, as determined by the Attorney General, "interfere[s] with the ability of a 340B entity to access discounts provided under the 340B program." Tenn. Code Ann. § 47-18-136(a)(1)–(6).

According to AbbVie, these restrictions prevent drug manufacturers from "collecting basic claims and utilization data from covered entities"—even though the entities are already sharing that data with the contract pharmacies. (Compl. ¶ 111.) By impairing its ability to obtain this "basic claims data," AbbVie says, the Act effectively prevents it from accessing the federal audit and dispute resolution process.

It also contends that the Act impermissibly expands the federal definition of a covered entity by defining contract pharmacies as 340B entities, adds requirements to the conditions for participating in the 340B program, compels the transfer of AbbVie's property "at confiscatory prices for private use," and allows the Tennessee Attorney General to "seek remedies for alleged violations of the federal 340B requirements." (*Id.* ¶ 113.) It also contends that violations of the Act are characterized as a crime, through the Act's incorporation of the TCPA, and that individual consumers who lose money or property can also bring actions against drug manufacturers to enforce "Tennessee's expansion of the federal 340B program." (*Id.* ¶¶ 115–16.) "Put together," these provisions mean that the Tennessee Attorney General can "use the full extent of his powers

to impose severe consequences" on any manufacturer that fails to comply with the Act's restrictions.

Based on these and other allegations (many of which are statements of law rather than fact), AbbVie seeks a judicial declaration that the Act is unconstitutional and a permanent injunction barring its enforcement on the basis that: (1) the Act is preempted by federal law, under the Supremacy Clause of the U.S. Constitution, insofar as "[e]very element of the federal 340B program . . . is governed by federal law" (Compl. ¶ 140); (2) the Act "appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies," in violation of the Constitution's Takings and Due Process Clauses (*id.* ¶ 168); (3) the Act violates AbbVie's Fourteenth Amendment due process rights because it is unconstitutionally vague on its face and creates the risk of arbitrary enforcement; (4) the Act violates the Dormant Commerce Clause, insofar as it purports to regulate conduct occurring outside the territorial boundaries of the State of Tennessee; and (5) the Act violates AbbVie's First Amendment rights to free speech and to petition the government for redress.

The State now moves to dismiss all of AbbVie's claims, reprising many of the arguments it raised in opposition to AbbVie's Motion for Preliminary Injunction, including that AbbVie lacks standing, along with arguments that the complaint fails to state a colorable claim for which relief may be granted. (Doc. No. 47.) AbbVie opposes the motion (Doc. No. 52), except in part (as noted in the context of discussing the specific claims). The American Hospital Association, 340B Health, the Tennessee Hospital Association, and the American Society of Health-System Pharmacists ("Amici"), with the court's permission, filed a Brief of Amici Curiae in Opposition to the Plaintiffs' Motion for Preliminary Injunction (Doc. No. 40). The Amici subsequently asked the court to deem their Brief "part of the record in connection with Defendant's now-pending Motion

to Dismiss" (Doc. No. 49); the court granted this request as unopposed (Doc. No. 51). The State filed a Reply brief in further support of its motion. (Doc. No. 54.) The court also acknowledges AbbVie's Notices of Supplemental Authority (Doc. Nos. 59, 64), and the State's Responses (Doc. Nos. 60, 65).

### III.    DISCUSSION

#### A.    Standing

Because standing raises the question of the court's jurisdiction, the court must address it first. *See Miller v. Bruenger*, 949 F.3d 986, 990 (6th Cir. 2020) ("Before a federal court takes up a case's merits, it must assure itself of its jurisdiction over the case's subject matter.").

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A case or controversy exists only when at least one plaintiff "establish[es] that [she] ha[s] standing to sue." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (alterations in original) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To have standing, the plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case." *Welty v. Dunaway*, 749 F. Supp. 3d 882, 901 (M.D. Tenn. 2024).

When, as here, a plaintiff challenges a state law prior to the commencement of an enforcement action against him, "whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact.'" *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016)

(quoting *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014)). "[A]n allegation of future injury may satisfy the injury-in-fact requirement if the alleged threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.* (internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). In this context, "a threat of enforcement is 'sufficiently imminent' to constitute an injury in fact if the plaintiff alleges (1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 159).

The State argues, first, that AbbVie cannot establish a credible threat of *criminal* enforcement of the Act, because the Attorney General is not empowered to initiate criminal prosecutions. Indeed, in Tennessee, only District Attorneys—not the Tennessee Attorney General who is the only defendant in this case—can bring criminal charges. *Accord Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) ("[A] district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee." (quoting *State v. Spradlin*, 12 S.W.3d 432, 433–34 (Tenn. 2000))), *cert. denied*, 145 S. Ct. 1178 (2025). In addition, as the State points out, while criminal charges under the TCPA are technically possible, AbbVie does not allege any instance in which any district attorney has brought such criminal charges. AbbVie does not respond to this argument, likely because the court already held, in ruling on the Motion for Preliminary Injunction, that AbbVie has not alleged a credible fear of enforcement of, and therefore lacks standing to challenge, the criminal enforcement provisions of the TCPA that are incorporated into the Hospital Protection Act. The court reiterates that finding here: AbbVie lacks standing to challenge the criminal enforcement provision of the TCPA.

Likewise, the court already determined, in addressing the Motion for Preliminary Injunction, that AbbVie lacked standing to challenge subsection (c) of the Act, because AbbVie cannot show a credible threat of imminent enforcement of that provision against it in light of the grandfather clause, notwithstanding AbbVie's speculation about the potential effect of its anticipated modification of its policies to address other states' changing legal landscapes. As this court stated in *AbbVie I*,

> [t]he grandfather clause would not apply to new or more stringent restrictions, but simply altering the drugs included in its 340B program . . . or limiting the states to which the restriction applies based on courts' enforcement of laws similar to [the Act] in those states (which would have no effect on the restriction in place in Tennessee), would not remove the policy from the protection of the grandfather clause. AbbVie, in other words, cannot establish a credible threat of imminent enforcement of [§ 47-18-136(c)] against it.

*AbbVie I*, 2025 WL 1805271, at *9. That holding continues to apply. In other words, AbbVie has not established preenforcement standing to challenge subsection (c).

The State continues to argue that AbbVie lacks standing to bring its claims regarding the vagueness and extraterritorial reach of the Act, asserting that AbbVie offers "only the most threadbare and conclusory assertions about how it might test the law's supposed gray areas" and no allegations at all suggesting that there is a credible threat of enforcement of those provisions by the Attorney General in a way that would "test the limits of his enforcement authority." (Doc. No. 47 at 17.) The State also argues very generally that AbbVie has not alleged that it "intends to violate any—much less *every*—provision of the Hospital Protection Act" and that it fails to identify even one Tennessee hospital to which it sells 340B drugs and from which it intends to require "submission of claims data." (Doc. No. 47 at 15.)

Without actually addressing standing or the court's previous opinion, the State appears to acknowledge that AbbVie has plausibly alleged that its current policy of limiting the number of contract pharmacies to which it will deliver 340B drugs is proscribed by the Act, but it argues that

this policy does not put "every provision of the Hospital Protection Act at issue"; instead, at most, it "would put the prohibition on delivery restrictions at issue." (*Id.* at 16.) The State argues that it would be more sensible for the court to address the constitutionality of that provision of the Act if and when the Attorney General actually brings an enforcement action against AbbVie or another manufacturer. (*Id.*) It also argues that, if AbbVie were "limited to litigating the validity of that restriction only, its various theories of obstacle preemption, extraterritorial reach, vagueness, and the right to petition would be irrelevant." (*Id.*) Finally, the State argues that AbbVie simply has not established a basis for the "sweeping" declarations and "injunction covering every attempt to ever enforce the Hospital Protection Act." (*Id.* at 17.)

It is true that the Complaint seeks declarations stating that the Act, in its entirety, is unlawful based on the plaintiffs' various theories, and the plaintiffs seek to enjoin the enforcement of the Act in its entirety. (*See* Compl. at 72–73.) The factual allegations in the Complaint, however, do not suggest that AbbVie intends to violate every portion of the Act. Still, regarding the Act's subsection (a), AbbVie's articulated policies clearly implicate the claims data restrictions set forth in Tenn. Code Ann. § 47-18-136(a)(1), and AbbVie clearly pleaded facts indicating that its policies conflict with that provision, as well as, potentially at least, the dispute resolution and audit limitations in subsections (a)(3) and (4). As the court has already stated, "what the Act says is undisputed; AbbVie has clearly articulated its policy; [and] while the State has not affirmatively admitted that AbbVie's 'current practices violate [the Act],' they obviously do; and it is undisputed that [the Act] was enacted for the purpose of countering policies like AbbVie's." *AbbVie I*, 2025 WL 1805271, at *9. The court finds that AbbVie has standing to bring its challenges to at least parts of subsection (a). Whether it states colorable claims is a wholly different question.

### B.    Substantive Claims

As noted above, while the State proceeds as though it were still an active issue, AbbVie acknowledges in its Response to the defendant's Motion to Dismiss that the court has already concluded that AbbVie lacks standing to challenge Tenn. Code Ann. § 47-18-136(c). (*See* Doc. No. 52 at 19 (recognizing that the court held that "AbbVie's contract-pharmacy limitation is exempted from the statute's reach" by the grandfather clause, and "the remainder of the statute's provisions cannot be construed to prohibit the same conduct as subsection (c)." (citing *AbbVie I*, 2025 WL 1805271, at *9–10 & n.7)).)

Assuming that that ruling continues to apply, AbbVie consents to the dismissal without prejudice of all of its claims that are premised upon the Act's prohibiting AbbVie's contract-pharmacy limitations—the very limitations the court found to be permitted by the grandfather clause. The claims implicated by subsection (c) include AbbVie's claims under the Takings Clause, field preemption related to prescription pricing and eligibility under the 340B program, and the Dormant Commerce Clause.[7] Because the court's previous determination that AbbVie lacks standing to challenge subsection (c) continues to apply, as already discussed above, the claims depending on that subsection will be dismissed without prejudice. This leaves for resolution (1) the Supremacy Clause/preemption claim related to subsection (a) of the Act; (2) the Due Process claim based on vagueness and "unbounded delegation"; and (3) the First Amendment claim premised on the violation of AbbVie's right to "petition the government for redress."

---

[7] AbbVie offers arguments in support of these claims in case the court finds that it has standing to bring its challenges to subsection (c).

### 1.    *Preemption Under the Supremacy Clause*

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). On the other hand, the Supremacy Clause states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, when federal and state laws "'conflict or [are] at cross-purposes,' . . . the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (internal quotation marks omitted) (quoting *Arizona*, 567 U.S. at 399). In other words, federal laws enacted by Congress may preempt state laws. *Id.*

Although the Supremacy Clause does not "include[] a private right of action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), a plaintiff may seek "declaratory or injunctive relief against a state or local government that is presently taking or threatening action against the plaintiff pursuant an allegedly preempted state law," *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012). There are two types of preemption, both of which are implicated in this case: field preemption and conflict preemption.

### a)    *Field Preemption*

Field preemption is "fundamentally . . . a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). It arises "when federal law is so 'pervasive' in one particular field that it exclusively occupies that field." *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021) (quoting *In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012)). "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined

must be regulated by its exclusive governance." *Id.* (quoting *Arizona*, 567 U.S. at 399). However, "[b]ecause preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Id.* (quoting *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). Specifically, "state or local regulation of matters related to health and safety" are presumed not to be preempted under the Supremacy Clause." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985).

In denying AbbVie's Motion for Preliminary Injunction, this court already concluded that AbbVie had failed to show that Congress intended to preempt the entire field of drug distribution. In its response to the defendant's Motion to Dismiss, AbbVie argues that, at a minimum, § 47-18-136(a)(1) "improperly enters an exclusive federal field by seeking to regulate (and eliminate) a liberty that the 340B statute includes: the ability of manufacturers to include claims data conditions in their 340B offers." (Doc. No. 52 at 16.) As the State points out, this is an entirely different theory of field preemption than the one AbbVie raised in moving for a preliminary injunction. Regardless, the court finds that Congress's *silence* on the issue of whether a manufacturer can *require* claims data as a condition of offering drugs to covered entities at the 340B price does not suggest Congress's intent to occupy that "field" exclusively, so field preemption does not apply.

      *b)*      *Conflict Preemption*

Conflict preemption applies if a state law "directly conflict[s]" with federal law—that is, "when compliance with both is impossible, or when . . . state law 'stand[s] as an obstacle to the accomplishment' of Congress's objectives." *Churchill Downs*, 162 F.4th at 638 (first quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011); and then quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)).

AbbVie raises three distinct arguments for why conflict preemption applies. First, it contends that the Act's prohibition on requiring covered entities to provide claims data "stands as

an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the 340B program, insofar as it "prevent[s] AbbVie from obtaining basic claims data," and thus "hamstrings AbbVie's ability to avail itself of the [340B] Program's enforcement tools." (Doc. No. 52 at 14 (citing § 47-13-146(a)(1)).)

Second, it contends that the state statute directly conflicts with a recently adopted "rebate pilot program" intended to "address concerns about the compliance burdens created by the overlap between the [recently enacted] Inflation Reduction Act's Drug Price Negotiation Program and the 340B Program." (*Id.*)

Third, it argues that the Act's creation of a parallel state enforcement mechanism is an obstacle to the creation of a centralized federal enforcement scheme intended to permit the Executive Branch to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." (*Id.* at 16 (quoting *Astra*, 563 U.S. at 120).) AbbVie contends that the Act impedes that goal by "bringing questions about the federal statute into a state forum," including such questions as what entities qualify as 340B entities, what qualifies as a "340B drug," "how that price must be made available," and "what constitutes an 'additional requirement[] or limitation[]' to, or 'interfere[nce]' with, a 340B transaction." (*Id.*)

The court finds that these issues are all largely illusory problems. First, AbbVie expressly concedes that "no rule in the 340B Program has ever required covered entities to provide claims data to manufacturers." (Doc. No. 52 at 15.) Because federal law never expressly *required* covered entities to provide claims data, AbbVie cannot explain how the state law expressly conflicts with federal law. This is particularly so here, where the state law at issue stipulates that manufacturers may not "require[e] the submission of any . . . claims or utilization data . . . unless such data submission is explicitly required" by federal or state law. Tenn. Code Ann. § 47-18-136(a)(1).

Regarding AbbVie's third argument, it is clear that the 340B program does occupy the field of audits and the enforcement of the 340B program, and federal law defines what entities qualify as covered entities, which drugs are covered, and the pricing scheme that applies to covered drugs purchased by covered entities. *Accord AbbVie, Inc. v. Murrill*, No. 24-30645, 2026 WL 350685, at *5 (5th Cir. Feb. 9, 2026) (identifying the fields that the 340B program does and does not regulate). But AbbVie's contentions that the state law disrupts these areas are wholly speculative. More to the point, the fact that the Act may call upon state regulators (and potentially state courts) to construe terms used in federal statutes and regulations does not suggest preemption. Regardless, the state statute does not set up a parallel enforcement scheme; it provides only for the enforcement of the Tennessee law.

Regarding AbbVie's access to the federal enforcement scheme, the Tennessee law only prohibits imposing across-the-board *requirements* relating to "frequency, duration, or scope of audits" that are not imposed on pharmacies and providers not involved in the 340B program, either as contract pharmacies or covered entities. Tenn. Code Ann. § 47-18-136(a)(4). AbbVie does not plausibly allege facts suggesting that this requirement in any way interferes with its ability to participate in the federal dispute resolution process or to request audits in accordance with the procedure established by the 340B regulations, as the court explained exhaustively in denying AbbVie's Motion for Preliminary Injunction. *See AbbVie I*, 2025 WL 1805271, at *14–17.

The Fifth Circuit (which has now had two occasions to address state laws in this arena) recently reconfirmed that the 340B regulatory scheme "is not 'so pervasive that Congress left no room for state supplementation.'" *Murrill*, 2026 WL 350685, at *5 (quoting *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025)). It defined the areas that 340B "*does* regulate: price ceilings for covered outpatient drugs; eligibility criteria for covered entities; prohibitions on duplicate

discounts and diversion; audit and enforcement mechanisms; and the terms governing manufacturers' and wholesalers' sales of discounted drugs to covered entities." *Id.* (citation omitted). And what it "conspicuously does not regulate: 'neither the distribution of drugs to patients nor the role of pharmacies in this distribution.'" *Id.* (quoting *Fitch*, 152 F.4th at 646); *see also id.* at *7 n.61 (noting that the Louisiana statute at issue "does not address the pharmaceutical companies' agreements with HHS or the pricing, diversion, or 'double dipping' restrictions addressed in the HHS[] enforcement scheme" (citation omitted)).

The same analysis applies here, and the court finds that AbbVie's Complaint fails to state a colorable claim based on either field preemption or conflict preemption under the Supremacy Clause, requiring dismissal of the Complaint's First Claim for Relief.

### 2.    Due Process Claims

The Complaint asserts that the Act violates AbbVie's Fourteenth Amendment due process rights because it is unconstitutionally vague on its face and creates the risk of arbitrary enforcement. (*See* Compl. ¶¶ 176–88.) AbbVie points specifically to subsections (a)(3) (prohibiting requirements relating to inventory management systems), (a)(4) (prohibiting requirements relating to the "frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities"), and (a)(6) (which contains a catch-all prohibition on "[i]mpos[ing] any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program") (*Id.* ¶¶ 179, 180, 182.)

Regarding (a)(6), AbbVie contends that this provision impermissibly delegates open-ended enforcement discretion to the Attorney General and leaves manufacturers to "guess what conduct [he] might consider 'interference.'" (*Id.* ¶ 179.) It objects to (a)(3) because the statute does not define "what constitutes a 'requirement'" or explain how it "must 'relate' to an inventory

management system, or even what an 'inventory management system' is." (*Id.* ¶ 180.) It objects to (a)(4) because the Act does not define "providers that are not 340B entities" and further contends that, if the term "audit" does not mean the federal audit process, then it is "unconstitutionally vague." (*Id.* ¶ 182.)

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). Due process "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). At the same time, however, the Due Process Clause does not require precision. *See United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011) ("[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952))). Thus, "no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340.

Regarding subsections (a)(3) and (a)(6), this court already held as follows:

[T]hese provisions, read in the context of the statute as a whole and considered from the perspective of a reasonable business person—and, more specifically, a reasonable drug manufacturer—provide adequate notice of what conduct is prohibited and do not invite arbitrary enforcement. The Act is targeted at precisely the conduct in which AbbVie and other drug manufacturers want to engage in order to limit the expansion of the 340B program. That is, the State seeks to ensure that drug manufacturers do not impose restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law. The word "requirement" is not ambiguous in this context. It has its ordinary dictionary meaning of "something required," a "necessity," or a condition—that is, "something essential to the existence or occurrence of something else." *Requirement*, Merriam-Webster Online Dictionary, https://www.merriam-

webster.com/dictionary/requirement (last visited June 27, 2025). "Inventory management system," given the context in which it appears, obviously refers to the replenishment model to which AbbVie strenuously objects—and to virtually any other inventory system covered entities and contract pharmacies might devise, so long as they are compliant with federal law. Thus, subsection (a)[(3)] prohibits drug manufacturers from imposing any inventory-related conditions upon the delivery of 340B discounted drugs to covered entities.

Similarly, ordinarily intelligent drug manufacturers would not need to guess at the meaning of the term "interfere" as used in subsection (a)(6). As another district court observed in addressing a similar challenge to a similar statute enacted in Mississippi,

> Black's Law Dictionary defines "interference" as "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." Interference, Black's Law Dictionary (11th ed. 2019). [The Mississippi statute] thus prohibits manufacturers from "obstructing [the] normal operations" of, "or intervening or meddling in the affairs" of a contract pharmacy receiving and dispensing 340B drugs to 340B patients.

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365, at *14 (S.D. Miss. July 1, 2024). As that court concluded:

> The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in their dispensation of 340B drugs. The Court need not determine the precise contours of the statute in every hypothetical application because Plaintiff's "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications."

*Id.* (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023), cert. denied, 144 S. Ct. 348, 217 L.Ed.2d 186 (2023), *reh'g denied*, 144 S. Ct. 629 (2024)).

*AbbVie I*, 2025 WL 1805271, at *21–22; *see also Murrill*, 2026 WL 350685, at *11 (finding that the term "interfere" as used in the Louisiana statute at issue there is not unconstitutionally vague). The court adopts its prior holding here and finds that the Complaint fails to state a void-for-vagueness claim in connection with subsections (a)(3) and (a)(6).[8]

---

[8] *AbbVie I* mistakenly referred to subsection (a)(4) as containing the prohibition on imposing requirements related to "inventory management systems," when the court intended to refer to (a)(3).

AbbVie did not argue for a preliminary injunction in connection with (a)(4), the provision relating to requirements relating to the frequency, duration, or scope of audits, but that provision is not unconstitutionally vague either. The use of the term "audits" is obviously intended, by context, to mean the same thing as "audits" in the 340B regulations, and the term "pharmacies or providers that are not 340B entities," given its ordinary meaning, refers to entities that are not "covered entities." AbbVie does not plausibly allege that subsection (a)(4) is so vague that pharmaceutical manufacturers of ordinary sophistication will be left to guess at its meaning.

The Complaint fails to state a Due Process void-for-vagueness claim, and its Third Claim for Relief will be dismissed.

### 3. First Amendment Claims

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "This right 'extends to all departments of the Government.'" *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 863 (6th Cir. 2012) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972)). "[T]he 'right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002)). "[T]he right allows an ordinary citizen to 'convey[] the special concerns of [the petition's] author to the government,' and to 'request[] action by the government to address those concerns,' generally without fear of criminal or civil repercussions." *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020) (alterations in original) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011)).

AbbVie's Complaint asserts that the Act violates AbbVie's First Amendment rights to free speech and to petition the government for redress (Doc. No. 1 at 69), but it focuses its arguments on the latter, arguing that the First Amendment protects its right to "engage in targeted, meaningful

communication necessary to petition the government for redress, which includes access to the [dispute resolution] process." (Doc. No. 52 at 18.) It asserts that the Act violates that right by effectively barring AbbVie from accessing the federal dispute resolution process established by the 340B regulations, which require a "good faith" inquiry prior to seeking HRSA resolution, "and part of that good faith inquiry necessarily requires AbbVie to seek clarity on claims from covered entities." (*Id.* at 19.) .

The plain language of the statute refutes AbbVie's contentions. In particular, subsection (a)(2) of the Act, from which AbbVie's reference to "seeking clarity" is drawn, states that drug manufacturers may not "*[r]equire* a 340B entity to . . . clarify a claim after the initial adjudication unless [this] action[] [is] in the normal course of business and not related to the 340B program." Tenn. Code Ann. § 47-18-136(a)(2). Similar to the provision on requiring claims data, nothing in the Act prevents AbbVie from *requesting* information (as opposed to requiring it), and nothing prevents it from requesting clarity in the "normal course of business." *Id.* AbbVie's contention that it will in the future somehow be barred from seeking an audit or accessing the federal dispute resolution process as a result of covered entities' failure to provide information, whether clarity or claims data, requested by AbbVie in good faith amounts to nothing more than speculation.[9] AbbVie does not plausibly allege that the Act impedes its ability to petition the government.

As the court explained further in denying preliminary injunctive relief,

> For the same reasons propelling the court to reject AbbVie's preemption claim rooted in the same allegations, the court finds that [§ 47-18-136(a)] does not obstruct AbbVie's right to petition the government by barring its access to the federal ADR system relating to 340B claims. In particular, nothing prevents AbbVie from simply requesting claims data or other documentation from covered entities (or pharmacies) or from requesting an audit of a covered entity based upon reasonable cause. A covered entity's failure to comply with a reasonable request—

---

[9] The speculative nature of AbbVie's claims calls into question its standing to bring the claims in the first place.

coupled with the articulable facts that gave rise to suspicions of diversion or other prohibited conduct in the first place . . . —would be sufficient to establish such reasonable cause. And the plaintiffs have not [alleged concrete] facts suggesting, to the contrary, that the standards for requesting an audit require any particular type of claims data or other documentation from the covered entity.

*AbbVie I*, 2025 WL 1805271, at *24 (alterations added).

In short, the court finds that the Complaint fails to plausibly allege that the Act violates AbbVie's First Amendment right to petition the government. This claim, too, will be dismissed.

## IV.    CONCLUSION

For the reasons set forth herein, the State's Motion to Dismiss (Doc. No. 47) will be granted. Those claims premised upon Tenn. Code Ann. § 47-18-136(c), which AbbVie lacks standing to challenge in the preenforcement context, will be dismissed without prejudice. This includes AbbVie's takings claims, its Supremacy Clause challenge to subsection (c), and its dormant Commerce Clause claim. Its First Amendment, Due Process, and Supremacy Clause challenge related to subsection (a) will be dismissed with prejudice.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

**Exhibit 3**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:25-cv-00582** <br> **Judge Aleta A. Trauger** |
| **JONATHAN SKRMETTI, in his official capacity as Attorney General of Tennessee,** | ) ) ) ) ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM</u>

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") filed a Complaint seeking declaratory and injunctive relief against Jonathan Skrmetti in his official capacity as the Attorney General of Tennessee (referred to herein as "Tennessee" or the "State"). (Compl., Doc. No. 1.) PhRMA, a trade association whose members manufacture and sell pharmaceutical products, "advocates for policies that encourage the discovery and development of important new pharmaceutical products." (*Id.* ¶¶ 29, 28.) PhRMA brings claims under 42 U.S.C. § 1983, asserting that the recently enacted Tennessee Hospital Act (the "Tennessee Act" or the "Act"), now codified at Tenn. Code Ann. § 47-18-136, violates the United States Constitution's Supremacy Clause, dormant Commerce Clause, and Due Process Clause. (Doc. No. 1 ¶ 1.) PhRMA seeks declaratory relief to that effect and asks the court to enjoin enforcement of the Act in its entirety. (*See id.* at 58.)

Now before the court are (1) PhRMA's Motion for Preliminary Injunction (Doc. No. 13); and (2) the State's Motion to Dismiss (Doc. No. 16). In addressing these motions, the court does

not write on a completely blank slate, having already addressed many of the same challenges to the same statute in two opinions in a related case. *See AbbVie Inc. v. Skrmetti* ("*AbbVie II*"), No. 3:25-cv-00519, 2026 WL 542712, at *4 (M.D. Tenn. Feb. 26, 2026) (granting the Attorney General's motion to dismiss constitutional challenges to the Act); *AbbVie Inc. v. Skrmetti* ("*AbbVie I*"), No. 3:25-cv-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying pharmaceutical company plaintiffs' motion for preliminary injunction to enjoin enforcement of the Act). Largely for the same reasons set forth in those opinions and as discussed herein, the court will grant the Motion to Dismiss and deny as moot the plaintiff's Motion for Preliminary Injunction.

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

Without referencing which rule governs his motion, the defendant moves to dismiss based in part on the plaintiff's supposed lack of associational standing. (Doc. No. 16 at 13–16.) Generally, to survive a motion to dismiss on standing grounds, "a complaint must 'clearly . . . allege facts demonstrating' standing." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see also id.* (holding that the "plausibility" test established in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), applies to a motion to dismiss on standing grounds). Accordingly, accepting as true the Complaint's factual allegations, the court must determine whether the plaintiff "asserts a 'plausible claim' that one of its members has standing." *Ass'n of Am. Physicians*, 13 F.4th at 544 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

A complaint states a plausible claim when it states "enough facts to raise a reasonable expectation that discovery will reveal evidence" that a plaintiff has standing. *Twombly*, 550 U.S. at 545. Once a plaintiff has demonstrated standing, a court has jurisdiction to consider the ultimate

merits of the claims raised by that plaintiff. *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)).

A Rule 12(b)(1) motion can challenge lack of subject matter jurisdiction in two ways: a facial attack and a factual attack. *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) (citation omitted). "A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (quoting *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When considering a facial challenge to standing, the court accepts as true the material allegations in the complaint and confines its analysis to the four corners of the complaint. *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 706 (6th Cir. 2015).

A factual attack, on the other hand, allows the court to consider evidence outside the pleadings and to "weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012) (citations omitted). In addressing a factual attack, the court may look to amendments to the complaint, sworn declarations, and other materials in the record to decide whether the plaintiff has adequately demonstrated standing. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Plunderbund Media, L.L.C. v. DeWine*, 753 F. App'x 362, 366 (6th Cir. 2018) (authorizing a review of declarations filed in support of a motion for preliminary injunction in ruling on a motion to dismiss).

The defendant addresses only the allegations in the Complaint in his Motion to Dismiss, thus implicitly making only a facial challenge. However, he raises the same associational standing arguments *and* references the plaintiff's Declarations in his Response in Opposition to the Motion for Preliminary Injunction, where he appears to make a factual attack on the court's subject matter jurisdiction. Under these circumstances, the court finds that it is in the interest of justice to look

beyond the Complaint and consider the plaintiff's Declarations to determine whether the plaintiff has standing. *See Warth*, 422 U.S. at 501 (explaining that "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").

### B.    Rule 12(b)(6)

The defendant also seeks dismissal of the plaintiff's claims on the merits. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Background

PhRMA initiated this lawsuit on May 22, 2025, shortly before the effective date of the Act. It claims that the Act is preempted by federal law and is therefore barred by the U.S. Constitution's Supremacy Clause; impermissibly regulates out-of-state conduct in violation of the dormant Commerce Clause; and is unconstitutionally vague under the Due Process Clause. The underlying

federal law at issue, Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical companies that want to participate in Medicaid and Medicare Part B to offer steep discounts on certain outpatient drugs to "covered entities," a term defined to include public hospitals and community health centers and other entities typically engaged in "car[ing] for low-income and rural persons." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); *see also* 42 U.S.C. § 256b(a)(4) (defining "covered entity"). (*See also* Compl., Doc. No. 1 ¶ 40.) This program, referred to as the "340B program," helps covered entities provide "safety-net services to the poor," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011), because the entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699. The 340B program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Astra USA*, 563 U.S. at 113.

Generally, under the 340B program, "[c]overed entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir.) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)), *pet. for rehearing en banc and by panel denied*, No. 22-3675, 2024 WL 1919676 (8th Cir. May 2, 2024), *cert. denied*, 145 S. Ct. 768 (2024). "Additionally, covered entities may not engage in diversion of covered outpatient drugs through 'resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity.'" *Id.* at 1142 (quoting 42 U.S.C. § 256b(a)(5)(B)).

The 340B statute authorizes HHS and drug manufacturers to audit covered entities to ensure compliance with the diversion and duplicate rebate prohibitions, "in accordance with

procedures established by the Secretary relating to the number, duration, and scope of audits." *Id.* (quoting 42 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700). Any disputes arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

Although the 340B program was apparently designed with the expectation that it would apply to covered entities that operated in-house pharmacies, "[s]ince the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

Purportedly worried that the proliferation of contract pharmacies was "driving up duplicate discounting and diversion," in 2020, drug makers began adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 457 (D.C. Cir. 2024); *see also McClain*, 95 F.4th at 1139. When this conduct was challenged by the federal government, manufacturers responded by arguing that the federal law addressed only the pricing structure of 340B drugs but was silent about their *delivery*, leaving manufacturers free to negotiate their contracts with 340B covered entities to address that gap. And the federal courts agreed. *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 703, 706–07 (3d Cir. 2023) (holding that the "text [of § 340B] is silent about delivery" and rejecting HHS's "reading of Section

340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies," because "[l]egal duties do not spring from silence"); *see also Johnson*, 102 F.4th at 461 ("agree[ing] entirely" with the Third Circuit's conclusion that, "because section 340B is 'silent about delivery,' HRSA erred in concluding that the statute '*requires* drug makers to deliver drugs to an unlimited number of contract pharmacies'" (emphasis added) (quoting *Sanofi Aventis*, 58 F.3d at 703)).

In the wake of these rulings, Tennessee—along with approximately twenty other states (so far)—attempted to fill that "silence" by passing a law that prohibits pharmaceutical companies from limiting the number of contract pharmacies with which covered entities can enter agreements pertaining to the delivery of 340B drugs or otherwise imposing distribution obstacles not required by the federal program. As relevant here, under Tennessee's Hospital Protection Act, as of July 1, 2025, drug manufacturers and their agents and affiliates "shall not":

> (1) Impose additional requirements or limitations on a 340B entity, including requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law;
>
> (2) Require a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program;
>
> (3) Impose any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by the United States department of health and human services or applicable state law;
>
> (4) Impose any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities;
>
> (5) Impose requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities; or

**Exhibit 3**

(6) Impose any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program.

Tenn. Code Ann. § 47-18-136(a). Generally, in other words, the Act bars pharmaceutical companies from imposing requirements on covered entities in addition to those requirements expressly set out in § 340B or from discriminating against covered entities by imposing upon them requirements that they do not impose on providers that are not 340B entities.

In addition, the Act prohibits drug manufacturers from

deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law.

Id. § 47-18-136(c). Subsection (c), however, also contains a "grandfather clause," which provides that it "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." Id.

The Act also provides that each violation of subsection (a) or (c)[1] constitutes an "unfair or deceptive act or practice affecting trade or commerce" and, as such, a violation of the Tennessee Consumer Protection Act ("TCPA"), for which a civil penalty of $50,000 per violation may be assessed. Id. § 47-18-136(d)(1); see also Tenn. Code Ann. § 47-18-104(b)(69) (identifying the violation of § 47-18-136 as an unfair or deceptive act or practice). The TCPA further states that unfair or deceptive acts or practices constitute Class B misdemeanors, authorizes civil enforcement by the Tennessee Attorney General, Tenn. Code Ann. § 47-18-114, and, in theory at least, permits

---

[1] Subsection (b) does not govern the activities of drug manufacturers and is not at issue in this lawsuit.

any "person who suffers an ascertainable loss of money or property" to bring a civil action to recover damages, Tenn. Code Ann. § 47-18-109(a)(1).

As this court has previously recognized, although the text of Tennessee's Act is not identical to that of analogous laws passed in other states, these laws share many features, "including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions." *AbbVie II*, 2026 WL 542712, at *4 (quoting *Pharm. Rsch. & Mfrs. of Am. v. Frey*, No. 1:25-cv-00469-JCN, 2026 WL 184504, at *1 (D. Me. Jan. 23, 2026), *appeal filed* (Jan. 28, 2026)). Drug manufacturers have filed lawsuits in many of these states to enjoin the statutes' enforcement, but, to date, these lawsuits have met with very limited success. *See id.* at *4 & nn. 3–6 (collecting cases).

## B.    The Plaintiff's Claims

PhRMA characterizes the Act as "Tennessee's attempt to rewrite the terms" of the 340B program, and it characterizes its lawsuit as "an effort to protect the integrity and viability of 340B by honoring the bounds Congress set on the program. (Compl. ¶¶ 2, 6.) According to PhRMA, "concerns about diversion and illegal 'duplicate discounts' in the 340B program have skyrocketed" in the last ten years, as covered entities and contract pharmacies have adopted the "product replenishment model," pursuant to which "contract pharmacies first order drugs at market prices, and then, following sale of those drugs, seek to replenish their inventories with 340B-priced drugs by retroactively identifying, via black-box algorithms, drugs that are purportedly eligible for 340B pricing." (*Id.* ¶ 7.) As a result of the widespread adoption of this model, "the volume of drugs purchased at reduced 340B pricing has exploded," though the associated price reductions are not passed on to low-income patients. (*Id.* ¶ 8.)

Although the federal government has "warned about the risks of abuse created by the use of contract pharmacies and the product replenishment model," it has done little to curb these

abuses, as a result of which pharmaceutical manufacturers have adopted their own policies to address them and have incorporated these policies into their contracts with 340B covered entities. These policies typically (1) limit the number of outside "contract pharmacies" with which a covered entity may contract to receive 340B-priced drugs (the "one contract pharmacy" policy), and (2) require that contract pharmacies submit data supporting their claims for the 340B-priced drugs (the "claims data" policy). (*Id.* ¶ 9.) Tennessee's Act, like similar statutes enacted in other states, bars these precise policies. (*Id.* ¶ 13.)

As discussed in more detail below, the Complaint itself is devoid of allegations regarding the Act's effect on particular PhRMA members, but PhRMA submitted several Declarations in support of its Motion for Preliminary Injunction, including two on behalf of two different drug manufacturers that are PhRMA members, attesting that the cost of attempting to comply with the Act has imposed and continues to impose significant costs on the manufacturers. (Doc. No. 14-2, Costello Decl.; Doc. No. 14-3, Janco Decl.)

The plaintiff alleges that the Act constitutes "meddling in a purely federal program" by "chang[ing] the requirements of the federal 340B program and the conditions under which manufacturers are forced to provide their drugs at reduced prices," thus violating the Supremacy Clause. More specifically, PhRMA asserts that the Act forbids four specific actions that are "fully permissible" under federal law: (1) it "explicitly limit[s] manufacturers' federal audit rights" (*id.* ¶ 17 (citing Tenn. Code Ann. § 47-18-136(a)(1), (4))); (2) it bars manufacturers from "adopting alternative pricing mechanisms . . . that [would] provide greater transparency" than the replenishment model, and specifies that manufacturers cannot take actions to seek to clarify whether a particular claim is compliant with federal law (*id.* ¶ 18 (citing Tenn. Code Ann. § 47-18-136(a)(3), (2))); (3) it prohibits manufacturers from imposing any "credentialing" or other

requirements that might "interfere with the ability of a 340B entity to access discounts provided under the 340B program" (*id.* ¶ 19 (quoting. Tenn. Code Ann. § 47-18-136(a)(5), (6))); and (4) it "conflicts with the federal regime by forcing drug manufacturers to provide 340B-priced drugs to an *unlimited* number of contract pharmacies and locations, unless the manufacturer had preexisting limits or requirements in place before June 1, 2025" (*id.* ¶ 20 (citing Tenn. Code Ann. § 47-18-136(c))). PhRMA also asserts that the state law "impermissibly intrudes" on the federal enforcement regime by imposing draconian civil and even potential criminal penalties on manufacturers that do not comply with the state law, as well as a private right of action under the Tennessee Consumer Protection Act. (*Id.* ¶¶ 21–22, 117.) In addition, according to PhRMA, any state enforcement action would embroil the state adjudicator in resolving "multiple questions of federal law." (*Id.* ¶ 120.) Based on these allegations, PhRMA asserts that the statute is "both field and conflict preempted under the Supremacy Clause." (*Id.* ¶ 25; *see also id.* at 42–51 ("Claim I").)

Second, the plaintiff asserts that the Act is a "textbook dormant Commerce Clause violation" because it "applies to transactions between manufacturers and wholesalers/distributors" and "thus regulates wholly out-of-state transactions." (*Id.* ¶ 26; *see also id.* at 51–54 ("Claim II").)

Third, PhRMA alleges that the Act is unconstitutionally vague, which is of particular concern in this case because the "statute imposes criminal" penalties as well as civil penalties and implicates First Amendment interests. (*Id.* ¶¶ 160, 161.) The plaintiff specifically takes issue with § 47-18-136(a)(6), the "catch-all provision," because it purports to bar the imposition of "any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program" but does not define the term "interfere." (Doc. No. 1 ¶ 163.) It also contends that the "plain language" of the Act prohibits manufacturers from exercising their rights to "publicize information about unlawful transfers or

duplicate discounting occurring at particular contract pharmacies or covered entities, to audit covered entities and their records relating to contract pharmacies, to file complaints in the context of the federal system that Congress created, and to seek information regarding, and clarify claims from, covered entities and contract pharmacies." (*Id.* ¶ 164.) At the same time, it contends that "[u]ncertainty about the scope of prohibited conduct and speech—which [the Act] presents—is the precise problem with vague laws." (*Id.*)

Based on these allegations, the plaintiff seeks a judicial declaration that the Act in its entirety is unconstitutional and an order enjoining its enforcement as to PhRMA's members. (*Id.* at 58.) It filed its Motion for Preliminary Injunction, supporting Memorandum, and several Declarations shortly after it filed the Complaint. (Doc. Nos. 13, 14, 14-1 through 14-5.) The defendant filed his Motion to Dismiss (Doc. No. 16) on the same date. Both motions have now been fully briefed, each party having filed a Response to the other's motion and a Reply in further support of its own motion. (Doc. Nos. 30, 31, 33, 34.) In addition, the American Hospital Association, 340B Health, the Tennessee Hospital Association, and the American Society of Health-System Pharmacists ("Amici"), with the court's permission, filed a Brief of Amici Curiae (Doc. No. 27) both in support of the defendant's Motion to Dismiss and in opposition to the plaintiff's Motion for Preliminary Injunction (*see* Doc. No. 26).[2]

## III.    DISCUSSION

The State's motion raises a number of standing or standing-related threshold challenges to PhRMA's Complaint. It contends (1) that PhRMA cannot bring suit under 42 U.S.C. § 1983 because that statute "only allows plaintiffs 'to vindicate their *own* constitutional right[s],'" and

---

[2] Amici filed with their Brief the Declaration of Chantelle Britton (Doc. No. 27-1), which the court has not considered for purposes of ruling on the defendant's Motion to Dismiss.

PhRMA, a trade association, seeks to bring claims on behalf its members (Doc. No. 16 at 14 (quoting *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023))); (2) similarly, that PhRMA is not entitled to bring suit under *Ex parte Young*, 209 U.S. 123 (1908), because *Ex parte Young* authorizes only suits that "request . . . personalized protection from a state officer's 'specified un[constitutional] actions,'" but PhRMA does not seek such personalized protection from "individualized harm" (*id.* at 14–15 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021))); and (3) even if PhRMA can skirt those problems, that it lacks associational standing to assert pre-enforcement claims against the State, because it fails to allege with any particularity how any particular member's policies violate the Act or to plead facts showing that the Attorney General poses a "'certainly impending'" threat to any of PhRMA's members, particularly a threat of criminal enforcement, and thus lacks the "'concrete context' ordinarily 'afforded by an enforcement action'" (*id.* at 15 (first quoting *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 1178 (2025); and then quoting *Ammex, Inc. v. Cox*, 351 F.3d 697, 706–07 (6th Cir. 2003)).)

In the alternative, the State seeks dismissal of the Complaint under Rule 12(b)(6), arguing that the plaintiff's claims fail on the merits. Finally, the State argues that, to the extent the court is inclined to permit any of PhRMA's claims to proceed, it must reject the plaintiff's "request for a broad 'declar[ation]' of 'unconstitutional[ity]'" and must instead engage in a "provision-by-provision" assessment of the Act to determine what actions the State cannot take against PhRMA. (*Id.* at 29.)

## A.     Associational Standing

The United States Constitution limits federal judicial jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. Based on this limitation, federal courts are "'without power to decide questions that cannot affect the rights of litigants in the case before them' and

have no power to issue advisory opinions." *Cooper v. Comm'r*, 502 F. App'x 472, 477 (6th Cir. 2012) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). "[T]he requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In short, only a litigant with "standing" is "entitled to have [a] court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish constitutional standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). "In the context of claims for injunctive or declaratory relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical[.]" *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 491 (6th Cir. 2017) (citation and internal quotation marks omitted).

In addition, however, the doctrine of "associational standing" "sometimes permits an entity to sue over injuries suffered by its members even when (as here) the entity itself alleges no personal injury." *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537 (6th Cir. 2021) (citations omitted). In *Association of American Physicians*, the Sixth Circuit observed that recent Supreme Court opinions have called into question the continuing validity of associational standing when the association does not allege its own injury. *Id.* at 542. However, while the court concluded that "it is hard to see how the Supreme Court's more recent caselaw on standing has not undercut its associational-standing test," it also recognized that, in situations like

this one, "lower courts . . . must stick to [the Supreme Court's] directly on-point precedent even if the logic from other cases has called that precedent into doubt." *Id.* at 542 (citations omitted).[3] Accordingly, the court applied the Supreme Court's long-standing test and held that, under current law,

> [a]n organization may sue on behalf of its members if it shows that: (1) its "members would otherwise have standing to sue in their own right"; (2) the "interests" that the suit "seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Id.* at 537 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The State's first two standing arguments do not actually challenge or even address any of these elements of associational standing. Instead, the State simply asserts that suits against state officials under § 1983 and *Ex parte Young* may not be brought by plaintiffs asserting associational standing—a proposition supported by nothing other than quotations taken out of context in which the issue of associational standing was not raised. As the plaintiff points out, the Sixth Circuit has long allowed plaintiffs with associational standing to bring claims under § 1983 against state officials in their official capacity, under *Ex parte Young. See, e.g., Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031–42 (6th Cir. 2022) (finding that nonprofit organization had associational standing to bring § 1983 claim against state officials in their official capacity and that these claims fell within *Ex parte Young* exception to Eleventh Amendment

---

[3] Justice Thomas cited and relied extensively on *Association of American Physicians* in his concurrence in *Food and Drug Administration v. Alliance for Hippocratic Medicine*, arguing that the doctrine of "[a]ssociational standing raises constitutional concerns by relaxing both the injury and redressability requirements for Article III standing" and "upsets other legal doctrines," and urging the Court, in "an appropriate case," to "explain just how the Constitution permits associational standing." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 399 (2024) (Thomas, J., concurring); *see id.* at 400–02 (quoting *Ass'n of Am. Surgeons*, 13 F.4th at 540, 541). To date, however, the Supreme Court does not appear to have retreated from its associational standing doctrine.

immunity); *see also Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (finding that nonprofit advocacy organization had associational standing to bring § 1983 claim against state official in his official capacity); *Westside Mothers v. Haveman*, 289 F.3d 852, 862 (6th Cir. 2002) (same). The State cites no authority to the contrary. Because this court is bound by Sixth Circuit and Supreme Court precedent authorizing plaintiffs asserting associational to bring § 1983 claims against state officials in their official capacity under *Ex parte Young*, the court rejects the defendant's first two arguments. The question, then, is whether the Complaint plausibly alleges facts that establish associational standing under the relevant standard.

### 1.    *Injury in Fact*

As set forth above, to establish "injury in fact" in the pre-enforcement context, a plaintiff must show that it is "under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical." *Sumpter*, 868 F.3d at 491; *see also Crawford v. U.S. Dep't of the Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) ("Standing can derive from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'" (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). One way a plaintiff can satisfy the injury-in-fact requirement in relation to a newly enacted law with no enforcement history is by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [showing that] there exists a credible threat of prosecution thereunder." *Sumpter*, 868 F.3d at 491 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). In addition, however, "compliance costs are a recognized harm for purposes of Article III." *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022). As this court has explained, "[f]ollowing a law . . . can sometimes harm a person just as much as breaking it. That is why the caselaw recognizes that an injury-in-fact can arise not only out of expected enforcement but also 'costly, self-executing compliance burdens.'" *Tenn. State*

*Conf. of the N.A.A.C.P. v. Hargett*, 441 F. Supp. 3d 609, 626 (M.D. Tenn. 2019) (quoting *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution").

Applying the injury-in-fact requirement in the pre-enforcement context to an entity that seeks associational standing, the Sixth Circuit has explained that, for an organization to adequately plead the first element (that its members would have standing to sue in their own right), the organization must, at a minimum, "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." *Ass'n of Am. Physicians*, 13 F.4th at 543 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009)).

In PhRMA's Complaint, the allegations regarding standing are sparse. The plaintiff alleges very generally that its members have adopted "claims data policies and one contract policies" in existence prior to the effective date of the Act, but they now risk violating the Act if they modify their policies. (Doc. No. 1 ¶ 29.) The Complaint does not contain any allegations suggesting that any specific PhRMA member "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution," whether civil or criminal, under the Act. *Sumpter*, 868 F.3d at 491. Nor does it identify any PhRMA member that has incurred or will incur substantial costs in attempting to comply with the Act. However, in Declarations submitted in support of PhRMA's Motion for Preliminary Injunction, representatives of PhRMA members Amgen Inc. ("Amgen") and UCB, Inc. ("UCB") assert that compliance with the Act will "force[] [them] to provide millions of dollars in discounts" that are not required by the federal 340B program and, further, that "compliance with

[the Act] has and will continue to impose significant operational and financial burdens" on Amgen and UCB. (Doc. No. 14-2, Costello Decl. ¶¶ 18, 20; Doc. No. 14-3, Janco Decl. ¶¶ 17, 19; *see also id.* ¶ 20 ("UCB expects it will be required to continue to expend funds to ensure compliance with [the Act]. USCB would not otherwise be required to expend these funds . . . . In addition, UCB will continue re-allocating resources, diverting these resources from other efforts aimed at developing and introducing new medicines to benefit patients.").)[4] Amgen and UCB also allege that they will not be able to recoup these costs, even if a court declares the Act unconstitutional. (Costello Decl. ¶ 19; Janco Decl. ¶ 18.)

The court finds that the assertions in Costello's and Janco's Declarations are adequate to establish that at least two PhRMA members have suffered and expect to continue to suffer concrete and particularized injuries arising from implementation of the Act. Although the Complaint does not incorporate these facts, it would not be difficult for PhRMA to amend its pleading to do so.

### 2.    Other Standing Elements

The defendant does not challenge the other elements of PhRMA's associational standing. The ordinary standing analysis requires a showing that the plaintiff's (or in this case, its members') injury was likely caused by the defendant and that judicial relief would redress the injury. Here, the Tennessee Attorney General is charged with enforcement of the Act; the purpose of the Act is specifically to prohibit the conduct in which PhRMA's members wish to engage; and a judicial

---

[4] Both entities also point to the "specter of criminal penalties" for failure to comply with the Act as "pos[ing] severe reputational risk." (Janco Decl. ¶ 21; *see also* Costello Decl. ¶ 22.) However, as this court already found in a related case, "in Tennessee, only District Attorneys—not the Tennessee Attorney General who is the only defendant in this case—can bring criminal charges," and, "while criminal charges under the TCPA are technically possible," they are highly unlikely. *AbbVie II*, 2026 WL 542712, at *8. The plaintiff's members' cannot establish that criminal enforcement of the Act is imminent or that the risk of it is sufficient to motivate compliance.

injunction barring its enforcement would alleviate PhRMA's members' concerns about the costs of complying with the Act or risking the costs associated with an enforcement action. It also seems clear from the record that the interests PhRMA seeks to protect are germane to its organizational purpose, and, because it seeks prospective relief only rather than money damages, participation of individual members in the lawsuit is not necessary. *Accord CTIA - The Wireless Ass'n v. Keats*, No. 21-5435, 2021 WL 7209356, at *3 (6th Cir. Dec. 3, 2021) (citing *United Food & Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 546 (1996)).

Given that the record reflects facts establishing standing and that amendment of the pleading to allege those facts would be warranted in the interests of justice, the court will not dismiss for lack of subject matter jurisdiction but will proceed to consider the merits of the defendant's Motion to Dismiss under Rule 12(b)(6).

**B.    Whether the Complaint States Colorable Claims for Relief**

*1.    The Supremacy Clause*

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). On the other hand, the Supremacy Clause states that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, when federal and state laws "'conflict or [are] at cross-purposes,' . . . the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (internal quotation marks omitted) (quoting Arizona, 567 U.S. at 399). When that happens, the federal law preempts the state law. *Id.*

The Supremacy Clause does not "include[] a private right of action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), but it is nonetheless well established that a plaintiff may seek "declaratory or injunctive relief against a state or local government that is presently taking or threatening action against the plaintiff pursuant [to] an allegedly preempted state law," *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012).

In this case, PhRMA asserts that the Act "attempts to regulate in an exclusively federal field," "directly conflicts with the federal statute," and "stands as an obstacle to the accomplishment and execution of the full purposes and objections" of the 340B program. (Compl. ¶¶ 25, 131; *see also id.* ¶¶ 124, 129; *see generally id.* ¶¶ 132–45.) That is, the plaintiff invokes both "field preemption" and "conflict preemption."

### a)    Field Preemption

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,'" courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (internal quotation marks and citations omitted). And the Supreme Court has expressly recognized the "historic primacy of state regulation of matters of health and safety." *Id.* Thus, this court begins the preemption analysis with the assumption that the state law at issue is not preempted.

Field preemption occurs only "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (citation omitted). Preemption is not to be "inferred merely from the comprehensive character" of a federal statute; rather, a statute preempts an entire field only if it

"reflect[s] a congressional decision to foreclose any state regulation in the area" and thus "confer[s] a federal right to be free from any other" requirements in the same field. *Id.* (citation omitted).

PhRMA's field-preemption theory rests on its assertions that the federal 340B program is a "comprehensive" scheme, the centralized control of which is vested exclusively with the HHS. (*See* Compl. ¶ 127.) It contends that Congress "designed a pervasive and integrated scheme of regulation through creation of a closed and limited system," by "carefully defin[ing]" the covered entities eligible to receive drugs at the 340B price, the "nature of the benefit," and "limitations on that benefit," and by "set[ting] out an exclusive federal enforcement scheme to maintain the federal programs as a harmonious whole." (*Id.* ¶ 128.) Its Response to the Motion to Dismiss contains one cursory paragraph arguing very generally that the need for "uniform standards, centralized enforcement, and balancing vital federal interests" show that field preemption applies in this case.

As discussed above, several federal appellate courts have held that the 340B statute is "silent about delivery conditions." *Johnson*, 102 F.4th at 460; *Sanofi Aventis*, 58 F.3d at 703. And for precisely that reason, the Fifth and Eighth Circuits have concluded that the 340B statute is not comprehensive and have rejected field preemption challenges to state statutes substantially similar to the Act. *See AbbVie, Inc. v. Murrill*, 166 F.4th 528, 540 (5th Cir. 2026) (finding that Louisiana's analogous statute was not field preempted); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 647 (5th Cir. 2025) (finding that Mississippi's statute was not field preempted); *McClain*, 95 F.4th at 1143 [8th Cir.] (finding that Arkansas's statute was not preempted).

This court agrees and adopts in full the Fifth Circuit's reasoning, which applies equally in this case:

> Here, there is no federal framework so pervasive that Congress left no room for state supplementation. Section 340B is a drug pricing program that imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities, with the intent of supporting services for low-income and rural

communities. Section 340B explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for "covered entity" status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)–(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).

But Section 340B does not provide a full set of standards governing discounted drugs for needy patients. Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution. As the Third Circuit has pointed out, Congress "knew how to impose delivery-related requirements" and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers. *Sanofi Aventis*, 58 F.4th at 704. But Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, "matters left unaddressed" in an otherwise "comprehensive and detailed" federal regulatory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85 (1994).

Next, there is no dominant federal interest in the area regulated by [the Mississippi statute]. [That statute] [like Tennessee's Act] implicates two traditional general areas of state regulation and police power: public health and consumer protection. Although there are instances in which the Supreme Court has held that federal law preempts state law even if the state law exercises a traditional state power, that is usually in cases in which a principal and essential feature of the federal law is replicated in the state law, indicating that it is a fundamental area of federal regulation.

But . . . courts should not infer field preemption in areas that have been traditionally occupied by the states, in which case congressional intent to preempt must be clear and manifest. Here, Congress has expressed no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution.

*Fitch*, 152 F.4th at 646–47 (most internal quotation marks, brackets, and citations omitted).

Like the Fifth and Eighth Circuits, this court applies the presumption against field preemption and concludes that Tennessee's Act is not field preempted.

        *b)*       *Conflict Preemption*

Conflict preemption applies if a state law "directly conflict[s]" with federal law—that is, "when compliance with both is impossible, or when . . . state law 'stand[s] as an obstacle to the

accomplishment' of Congress's objectives." *Churchill Downs*, 162 F.4th at 638 (first quoting *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011); and then quoting *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020)). In other words, conflict preemption exists if a party cannot simultaneously comply with both state and federal law and, alternatively, when the state law interferes with Congress's objectives. This is a "high threshold." *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011).

In a scattershot approach, the plaintiff offers up a variety of ways in which it contends that the state law conflicts with the federal law, none of which is persuasive on closer review. First, PhRMA contends that the Act's prohibition on imposing precisely the type of (delivery) conditions that the courts in *Johnson* and *Sanofi Aventis* held were permissible under the federal law constitutes an "attempt" by the State to "hijack the federal requirement to offer drugs at 340B prices and apply it in circumstances where, as [*Johnson*] explains, federal law would not." (Doc. No. 31 at 19; *see also id.* ("[The Act] bars conditions that have explicitly been upheld by federal appellate courts as permissible components of a 340B offer, such as contract pharmacy limitations and claim data policies.").) PhRMA also contends that the Act is not solely about drug "delivery,"

> [b]ecause there is no purchase of 340B-priced drugs if a buyer does not accept a manufacturer's conditions, there is no federal 340B purchase to which Tennessee can attach any state law delivery requirement. In other words, Tennessee law cannot compel delivery of a drug that has never been purchased. [The Act] would accordingly have no effect if it truly sought to regulate only drug "delivery." [*Johnson*], 102 F.4th at 462-64. There are only two genuine possibilities here: Either [the Act] regulates the content of a federal offer to compel a 340B-priced transaction when federal law does not (triggering preemption), or [the Act] simply does not apply.

(*Id.* at 20.)

But *Johnson* and *Sanofi Aventis* confirmed that the federal program says nothing about the types of conditions the drug manufacturers seek to impose, and, therefore, the State's efforts to regulate in that arena do not conflict either with 340B or with *Johnson* and *Sanofi Aventis*.

Moreover, as the State explains, the Act only alters Tennessee law as it pertains to completed sales of 340B drugs. The Tennessee law says nothing about pricing, and the federal law dictates only the price terms and the identification of what entities qualify as covered entities. Because federal law does not address non-price terms for drug sales to 340B hospitals, Tennessee remains free to do so. *Accord Sanofi Aventis*, 58 F.4th at 704.

Second, PhRMA argues that the Act conflicts with the 340B program by "impermissibly expand[ing] manufacturers' obligations" by "forc[ing]" them to enter into more transactions at the 340B price than the federal law requires. (Doc. No. 31 at 21–22.) Many courts have rejected identical arguments. The Fifth Circuit, citing its own prior opinion, held that laws like Tennessee's Act "require manufacturers to provide discounted drugs to contract pharmacies 'only insofar as they have partnered with covered entities to distribute the drugs to patients.'" *Murrill*, 166 F.4th at 540–41 (quoting *Fitch*, 152 F.4th at 647). But "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts. Covered entities purchase and maintain title to the 340B-discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients.'" *Id.* at 541 (quoting *McClain*, 95 F.4th at 1144). As in *Murrill* and *Fitch*, PhRMA's contrary characterization is "simply incorrect." *Id.* (quoting *Fitch*, 152 F.4th and 647).

Third, PhRMA argues that the Act "interferes" with the federal enforcement regime by prohibiting manufacturers from requiring 340B entities to submit claims data that, it claims, is necessary for detecting 340B abuses; limits manufacturers' federal right to conduct audits by expressly restricting the "frequency, duration, [and] scope of audits"; and restricts manufacturers' ability to request clarification of claims or to impose requirements related to credentialing. (Doc. No. 31 at 22 (citing Tenn. Code Ann. § 47-18-136(a)(1)–(2), (4)–(5)).) It asserts that, without

access to claims data, manufacturers cannot ask for audits and thus are precluded from accessing the "federal remedial regime." (*Id.* at 23.)

First, regarding credentialing, the plaintiff has not explained how this provision impacts any of its members or how it violates federal law. PhRMA both lacks standing to challenge that provision and fails to show how it is preempted.

Regarding claims data, as this court previously recognized, federal law does not expressly require covered entities to provide claims data, so a restriction on manufacturers' ability to require it does not conflict with federal law. *Accord AbbVie II*, 2026 WL 542712, at *11. Moreover, the Act expressly stipulates that manufacturers may not "requir[e] the submission of any . . . claims or utilization data . . . unless such data submission is explicitly required" by federal or state law. Tenn. Code Ann. § 47-18-136(a)(1). The state law, accordingly, is consistent with federal law, insofar as it simply prohibits manufacturers from requiring more data than is expressly required by federal law.

Similarly, the Act prohibits manufacturers from imposing across-the-board requirements relating to the "frequency, duration, or scope of audits" that are "not imposed on pharmacies or providers that are not 340B entities." Tenn. Code Ann. § 47-18-136(a)(4). On its face, this provision does not prohibit specific requests for audits under the 340B program. PhRMA does not plausibly allege that this requirement in any way interferes with its members' ability to request audits in accordance with the procedure established by the 340B regulations or to participate in the federal dispute resolution process. Moreover, as the State points out, "nothing in the [Tennessee Act] prevents federal regulators from gathering information, conducting audits, or meting out punishment." (Doc. No. 16 at 20 (citing *Johnson*, 102 F.4th at 456; *Sanofi Aventis*, 58 F.4th at 700–03).)

Finally, the plaintiff contends that the Act directly conflicts with the federal law, insofar as it attempts to "supplant the exclusive federal enforcement regime." (Doc. No. 31 at 26.) In particular, it points to the Attorney General's enforcement power, as well as the specter of criminal enforcement and private lawsuits—neither of which falls within the Attorney General's authority. (*See* Note 4, *supra*.) Regardless, the likelihood of criminal enforcement and private lawsuits under the Tennessee Consumer Protection Act is simply too remote to give rise to a plausible pre-enforcement claim. Regarding the Attorney General's civil enforcement authority, the Fifth Circuit has rejected this argument too, and the court adopts its reasoning as applied to the Tennessee statute:

> [The Act's] enforcement scheme does not conflict with Section 340B's enforcement scheme. It is true that Congress made HHS the sole enforcer of Section 340B. *See Astra*, 563 U.S. at 120. But [the Act] does not intrude upon this authority because it does not impose penalties for violations of Section 340B, like failing to offer discounted drugs to covered entities or engaging in diversion. Instead, it imposes penalties when drug manufacturers violate [the Act] by interfering with the distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies. [The Act's] enforcement scheme therefore does not "concern[] the same subject matter" as Section 340B and cannot be said to conflict with it.

*Fitch*, 152 F.4th at 647–48. The plaintiff's argument that a conflict arises because state adjudicators might be required to apply and interpret federal law is simply a non-issue, both because the state enforcement scheme does not overlap the federal scheme, and because state adjudicators have always been called upon to address issues of federal law.[5]

---

[5] As just one recent example, the Minnesota Court of Appeals recently was called on to consider matters of federal law when addressing a challenge to Minnesota's analogous statute brought in state court, where that court held that the Minnesota law is not preempted by federal law and does not violate the dormant Commerce Clause. *See Pharm. Rsch. & Mfrs. of Am. v. Ellison*, No. A25-0805, 2026 WL 445719, at *8, 13 (Minn. Ct. App. Feb. 17, 2026)).

Accepting as true the plausible *factual* allegations in the Complaint, as distinct from legal arguments, the court finds, in sum, that PhRMA fails to allege facts that establish conflict preemption or field preemption.

### 2. *The Dormant Commerce Clause*

The Constitution vests Congress with the power to "regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. "Reading between the Constitution's lines," the Supreme Court has further held that the "Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'" *Id.* at 368 (alterations in original) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). This "negative command" has become known as the dormant Commerce Clause. *Id.*

While the jurisprudence around the dormant Commerce Clause "developed gradually," its "core" focus is on prohibiting discrimination. *Id.* at 369. Specifically, the dormant Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* at 369 (some internal quotation marks omitted) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008)); *see also Truesdell v. Friedlander*, 80 F.4th 762, 764 (6th Cir. 2023) ("Under the modern approach to the dormant Commerce Clause, a law's validity largely depends on whether it discriminates against out-of-state businesses in favor of in-state ones."); *accord Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 486 (6th Cir. 2025) (recognizing this "antidiscrimination principle" as the "very core" of dormant Commerce Clause jurisprudence).

That principle was not at issue in *National Pork*. Instead, the petitioners expressly invoked the "extraterritoriality doctrine," arguing that the state statute they challenged violated the dormant Commerce Clause because it had the "practical effect of controlling commerce outside the State" and would "impose substantial new costs on out-of-state pork producers who wish to sell their products in California." *Nat'l Pork*, 598 U.S. at 371. The Court rejected the proposition that the law at issue was impermissible on that ground, noting first that the precedent on which the petitioners relied did not support it and further that, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 374.

To be sure, in a footnote, the Court left open the possibility that a law that "directly regulate[s] out-of-state transactions by those with no connection to the State" might violate the dormant Commerce Clause or some other constitutional limitation. *Id.* at 376 n. 1; *accord Flynt v. Bonta*, 131 F.4th 918, 929 (9th Cir. 2025) (quoting *Nat'l Pork*, 598 U.S. at 371), *cert. denied*, No. 25-173, 2026 WL 79841 (Jan. 12, 2026)). Thus, even following *National Pork*, courts have continued to hold that "a statute [that] has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" will violate the dormant Commerce Clause. *Ass'n for Accessible Medicines v. Ellison*, 140 F.4th 957, 961 (8th Cir. 2025). In addition, the dormant Commerce Clause bars "attempts to give local consumers an advantage over consumers in other States." *N.J. Staffing All. v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986)). Otherwise, however, "[e]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct." *Flynt*, 131 F.4th at 929 (alterations in original) (quoting *Chinatown Neighborhood Ass'n v. Harris*, 794

F.3d 1136, 1145 (9th Cir. 2015)); *see also Fais*, 110 F.4th at 205 ("Although several prior dormant Commerce Clause opinions focused on the extraterritorial effect of challenged laws, the Court explained that those cases were still animated by the antidiscrimination principle." (citing *Nat'l Pork*, 598 U.S. at 371)).

Accordingly, PhRMA's assertion that its allegations about the Act's "impact on non-resident manufacturers and out-of-state residents" are sufficient to state a dormant Commerce Clause claim is simply incorrect. PhRMA also alleges that the Act is discriminatory, insofar as it "privileges in-state participants in the 340B program by providing them monetary benefits not contemplated by Congress, while imposing a significant burden on out-of-state manufacturer participants in the 340B program." (*Id.* ¶ 154.) This is not the type of discrimination targeted by the dormant Commerce Clause, however. As the defendant argues, "there must be 'discrimination between similarly situated entities within and outside the state.'" (Doc. No. 16 at 25 (some internal quotation marks omitted) (quoting *Flynt*, 131 F.4th at 927).) In any event, in its Response to the Motion to Dismiss, PhRMA abandons any attempt to argue that the Act is discriminatory.

PhRMA instead argues that the Act "directly" regulates out-of-state conduct because it contains no express geographical restrictions on its definition of 340B entities or their "location" and that, on its face, the statute appears to govern the conduct of all drug manufacturers, wherever located, from "engaging in certain conduct vis-à-vis pharmacies and 340B entities," wherever located. (Doc. No. 31 at 30.) PhRMA asserts, "[b]y regulating commerce outside Tennessee, [the Act] violates the Constitution's ban on extraterritorial state regulation." (*Id.* at 31.) And it continues to argue that, at this stage, its allegations of the Act's "impact on non-resident manufacturers and out-of-state transactions" are sufficient to permit it to avoid dismissal of this claim. (*Id.*)

Again, this argument is unavailing. As stated above, "[e]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when . . . those effects result from the regulation of in-state conduct." *Flynt*, 131 F.4th at 929. Moreover, the fact that the statute does not *specifically* limit its application to conduct occurring within Tennessee does not establish that it was intended to have extraterritorial reach or that the law "directly regulate[s] out-of-state transactions by those with no connection to the State." *Nat'l Pork*, 598 U.S. at 376 n. 1. The plaintiff's argument to the contrary disregards Tennessee's presumption against extraterritoriality.

As this court has previously explained, "Tennessee courts have repeatedly recognized the principle of extraterritoriality," pursuant to which courts presume that "[a] local statute has no extraterritorial force, and can be exercised only upon persons and property within the jurisdiction of the state where such statute is enacted[.]"*AbbVie I*, 2025 WL 1805271, at *23 (quoting *Renel v. Drexel Chem. Co.*, No. W2023-01693-COA-R3-CV, 2025 WL 1604377, at *4 (Tenn. Ct. App. June 6, 2025), *perm. app. granted*, No. W2023-01693-SC-R11-CV, 2025 WL 3442830 (Tenn. Nov. 25, 2025)). To rebut the presumption against extraterritorial application, "the statute at issue [must] contain a clear affirmative indication that it applies extraterritorially.'" *Id.* (quoting *Renel*, 2025 WL 1604377, at *8).

The Tennessee Act contains no affirmative indication of extraterritorial reach. Moreover, the Tennessee Consumer Protection Act—within which the Tennessee Act is codified—expressly provides that the purpose of Tennessee's consumer protection law is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce *in part or wholly within this state*" and to "declare and to provide for civil legal means for maintaining ethical standards of dealing . . . to the end that good faith dealings between buyers and sellers at all levels of commerce be had *in this state*." Tenn.

Code Ann. § 47-18-102(2) & (4) (emphasis added). Based on this language and the absence of indication of a contrary intent, the court does not construe the statute to apply extraterritorially. To do otherwise "would contravene both Tennessee's presumption against extraterritoriality and the 'well established' canon of construction 'that statutes should be construed to avoid constitutional questions if such a construction is fairly possible.'" *AbbVie I*, 2025 WL 1805271, at *24 (quoting *Boos v. Barry*, 485 U.S. 312, 333 (1988)); *see also In re Schafer*, 689 F.3d at 605 ("Where, as here, a statute is challenged as unconstitutional, we construe the statute to avoid constitutional infirmity when fairly possible." (internal quotation marks and citation omitted)).

In short, the Complaint fails to plausibly allege that the Act violates the dormant Commerce Clause.

### 3. The Due Process Clause

Finally, PhRMA asserts that the Act is unconstitutionally vague. Although it raises other arguments in the Complaint, PhRMA's Response to the Motion to Dismiss argues only that the Act's "restriction on 'impos[ing] any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program,' is unconstitutionally vague." (Doc. No. 31 at 31 (quoting Tenn. Code Ann. § 47-18-136(a)(6)).) Its contention is based on the premise that the term "interfere" is not defined and that a "broad and undefined prohibition against 'interfer[ing]' with a 340B entity's access to discounts also fails to provide minimal enforcement guidelines" to the Attorney General. (Doc. No. 1 ¶ 165.) PhRMA contends that the absence of guidelines will "lead to inconsistent and discriminatory enforcement against manufacturers." (*Id.*; *see also id.* ¶ 162 ("[The Act] is insufficiently definite, and hands the Tennessee Attorney General virtually unlimited enforcement discretion against manufacturers.").)

Due process "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning

and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting

*Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The Due Process Clause, however, does

not require precision. *See United States v. Theunick*, 651 F.3d 578, 585 (6th Cir. 2011) ("[T]he

practical necessities of discharging the business of government inevitably limit[] the specificity

with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*,

342 U.S. 337, 340 (1952))). Thus, "no more than a reasonable degree of certainty can be demanded.

Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed

conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340.

Applying this standard to subsection (a)(6) of the Act, this court has already determined

that the "catch-all" provision is not unconstitutionally vague:

> Th[is] provision[], read in the context of the statute as a whole and considered from
> the perspective of a reasonable business person—and, more specifically, a
> reasonable drug manufacturer—provide[s] adequate notice of what conduct is
> prohibited and do[es] not invite arbitrary enforcement. The Act is targeted at
> precisely the conduct in which . . . drug manufacturers want to engage in order to
> limit the expansion of the 340B program. That is, the State seeks to ensure that drug
> manufacturers do not impose restrictions on covered entities' access to 340B
> discounted drugs that are not expressly authorized by federal law. . . .
>
> [O]rdinarily intelligent drug manufacturers would not need to guess at the meaning
> of the term "interfere" as used in subsection (a)(6). [Interference, as the term is
> commonly used, means] "[t]he act or process of obstructing normal operations or
> intervening or meddling in the affairs of others." *Interference*, Black's Law
> Dictionary (11th ed. 2019). [The Act] thus prohibits manufacturers from
> "obstructing [the] normal operations" of, "or intervening or meddling in the affairs"
> of a contract pharmacy receiving and dispensing 340B drugs to 340B patients. . . .
>
> The statute plainly requires manufacturers to deliver 340B drugs to contract
> pharmacies and prohibits manufacturers from obstructing contract pharmacies in
> their dispensation of 340B drugs. The [c]ourt need not determine the precise
> contours of the statute in every hypothetical application because [the p]laintiff's
> "facial challenge may only be sustained if the enactment is impermissibly vague in
> all of its applications."

*AbbVie I*, 2025 WL 1805271, at *21–22 ( (internal quotation marks and citations omitted). The

Constitution does not require precision, and the Tennessee courts are perfectly capable of assessing

whether particular conduct "interferes" with a 340B entity's access to the 340B program.

Subsection (a)(6) is "'sufficiently clear so that a reasonable person can understand its meaning.'"

*Platt v. Bd. of Comm'rs*, 894 F.3d 235, 247 (6th Cir. 2018) (quoting *Deja Vu of Cincinnati, L.L.C.*

*v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 798 (6th Cir. 2005) (en banc)).

## IV.  CONCLUSION

For the reasons set forth herein, the State's Motion to Dismiss under Rule 12(b)(6) will be

granted, and the plaintiff's Motion for Preliminary Injunction will be denied as moot. An

appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORP., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | 1:25-cv-00407-JCN |
| AARON FREY, | ) ) ) | |
| Defendant | ) | |

| | | |
|---|---|---|
| ABBVIE INC., et al., | ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | 1:25-cv-00416-JCN |
| AARON FREY, et al., | ) ) ) | |
| Defendants | ) | |

**ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION**

In two related cases, Plaintiffs, two pharmaceutical manufacturers and affiliated entities, challenge a Maine statute regarding the role of contract pharmacies within a federal drug discount program.  (Complaints, 1:25-cv-00407-JCN, ECF No. 1; 1:25-cv-00416-JCN, ECF No. 1.)[1]  Plaintiffs contend that the Maine statute is unconstitutional on multiple grounds: the statute is preempted by federal law, violates the commerce clause, constitutes an improper taking, and is impermissibly vague.

---

[1] Plaintiffs in case no. 1:25-cv-00416-JCN are AbbVie, Inc., Allergan, Inc., Durata Therapeutics, AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiff AbbVie or AbbVie").

395

**Exhibit 3**

The matter is before the Court on Plaintiffs' motions for a preliminary injunction. (Motions, 1:25-cv-00407-JCN, ECF No. 17; 1:25-cv-00416-JCN, ECF No. 14.)  The State opposes the motions.  (Responses, 1:25-cv-00407-JCN, ECF No. 28; 1:25-cv-00416-JCN, ECF No. 27.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motions.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    The 340B Statute

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price.  *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the affidavits and exhibits filed in connection with Plaintiffs' pleadings and motions.

**Exhibit 3**

Covered entities are types of facilities that generally provide care to underserved communities. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). "The discounts help uninsured patients, who can get cheaper drugs from covered entities. They also help covered entities themselves. The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference." *Amgen*, 2025 WL 2206948, at *1 (citations omitted).[3] Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly. *Id.* § 256b(a)(5)(D). In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties,

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities. An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but there is evidently little or no dispute that some uninsured patients benefit directly and both uninsured and insured patients likely benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients. *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients"). The expert opinions in the record suggest the parties would dispute the extent of indirect benefits through charitable spending and other services. In any event, resolution of the dispute is not central to Plaintiffs' requests for a preliminary injunction.

disqualification of the entity for a period, and/or reference of the matter to other federal authorities. *Id.* § 256b(d)(2)(B)(v). The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price. *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS. *Astra USA*, 563 U.S. at 113. Several courts, however, have noted that Congress did not grant HHS broad authority to issue regulations. *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021). Rather, rulemaking authority is currently limited to "(1) establishment of [an administrative dispute resolution process (ADR)]; (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations." *Id.* (citing *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41-45 (D. D.C. 2014).

## B. The Role of Contract Pharmacies

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity. 58 Fed. Reg. 68922, 68925. In May 1994, HRSA issued a similar final guidance notice. 59 Fed. Reg. 25110, 25113. In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by placing limitations on sales transactions, manufacturers could be discouraging covered entities from participating in the program.

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services.  60 Fed. Reg. 55586.  In August 1996, HRSA issued a substantially similar final guidance notice.  61 Fed. Reg. 43,549. 43,555–56.  The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services.  The model agreement terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to the contract pharmacy.  Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits.

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site.  72 Fed. Reg. 1540.  In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy. *Id.* at 1541.  In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location.  75 Fed. Red. 10272, 10277–79.  In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated

rural areas and added some of the enforcement provisions found in the current version of the statute.

Since 2010, the 340B program has grown significantly.  According to Plaintiffs, the number of participating contract pharmacy sites increased from 1,300 in 2010 to more than 33,000 in 2024.  Plaintiff AbbVie (AbbVie) asserts that the number of covered entities increased from 15,000 in 2010 to more than 50,000 by 2020.  Plaintiffs attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims.[4]

Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model.  Plaintiffs contend that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

---

[4] There is likely some dispute about the extent and causes of this growth.  For example, Plaintiff Novartis (Novartis) asserts that total spending in the 340B program was $6.6 billion in 2010 and increased by more than a factor of 10 by 2023, reaching $66.3 billion.  AbbVie asserts that by 2024, 340B spending totaled $124 billion.  Plaintiffs, however, do not state whether the figures account for other relevant factors, such as changes in the average price of drugs over time, inflation overall during the period, and other changes since 2010, namely the additional categories of covered entities and thus additional patients using drugs obtained through the program.  Also, by way of example, AbbVie notes that in some cases covered entities have drugs delivered to pharmacies located more than 100 miles from the covered entity's location, which it evidently believes reflects claims that were not contemplated to be within the scope of the 340B program when it was enacted.  Other courts have noted, however, that "some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population." *Pharmaceutical Research & Manufacturers of America v. Murrill,* No. 6:23-CV-00997, 2024 WL 4361597, at *1 (W.D. La. Sept. 30, 2024).  As with some other matters that might be in dispute, the Court need not resolve the issue at this stage of the litigation.

The replenishment model works as follows: (1) The pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for the discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.    HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers, including Novartis, began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site.  Some manufacturers also required covered entities to provide claims data to use contract pharmacies.  Novartis initially requested but did not require that covered entities provide claims data.[5]

In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility.  Several manufacturers filed suit challenging the opinion. One district court struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the

---

[5] AbbVie evidently implemented similar policies later, in 2023.

advisory opinion in June 2021. *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

HRSA also sent letters to the manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program. HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted. The manufacturers again filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers. In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful." *Id.* at 703–04, 706. In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters because the statute merely requires that a manufacturer offer to sell drugs "at or below a specified monetary amount" and because the statute is "silent about delivery conditions," and "statutory silence implies that private parties may act

402

freely." *Id.* at 369, 373. The court noted that a manufacturer would likely violate the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively increase the price above the statutory ceiling or fall short of a "bona fide offer," but the manufacturer's conditions were not so burdensome as to violate the statute on its face. *Id.* at 371–73.

## D.    State Statutes Prohibiting Manufacturer Limits

Approximately twenty states have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. (*See* Complaint at 42–43, 1:25-cv-00416-JCN, ECF No. 1.)  Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief.  At least five district courts, either on a motion for preliminary injunction or a motion for summary judgment, largely or entirely denied injunctive relief against the enforcement of the relevant state statute after addressing similar legal claims to those Plaintiffs assert here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[6]  At least one district court enjoined enforcement of

---

[6] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025) (affirming denial of preliminary injunction); *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (denying plaintiffs' motions for summary judgment); *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-

a state statute based on similar arguments to those Plaintiffs raise here.[7]  Many other similar cases are pending in other district courts.[8]

On June 20, 2025, Maine enacted a statute entitled the "Protect Health Care for Rural and Underserved Communities Act," which statute goes into effect on September 24, 2025.  L.D. 210, Sec. P-5 (132nd Legis. 2025).  The statute creates a new "Chapter 103" within the Maine Insurance Code, and includes the following provision:

### §7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities

**1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.

**2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

---

CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction).

[7] *See Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024).

[8] *See AbbVie, Inc. v. Weiser*, 1:25-cv-01847 (D. Co.); *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Kobach*, 6:24-cv-01111 (D. Kan.); *Novartis Pharmaceuticals Corp. v. Brown*, 1:24-cv-01557 (D. Md.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.); *AbbVie, Inc. v. Hilgers*, 4:25-cv-03089 (D. Neb.); *AbbVie, Inc. v. Jackley*, 3:25-cv-03006 (D. S.D.); *Novartis Pharmaceuticals v. Brown*, 2:25-cv-00284 (D. Utah).

unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

The statute defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program." 24-A M.R.S.A. § 7752(7) (effective Sept. 24, 2025). A "340B drug" is defined as "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. § 7752(6) (eff. Sept. 24, 2025). A "340B contract pharmacy" is defined as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5) (effective Sept. 24, 2025).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act." 24-A M.R.S.A. §7757(1) (effective Sept. 24, 2025). The Maine Unfair Trade Practices Act permits the Attorney General to "bring an action in the name of the State," to seek an injunction and restitution for any person who has suffered an ascertainable loss, and the Act provides that one who violates an injunction can incur a civil penalty up to $10,000 per violation. 5 M.R.S.A. § 209.

Plaintiffs filed suit in this court in August 2025 and sought a preliminary injunction enjoining enforcement of the state statute. In September 2025, amici curiae the American

Hospital Association, 340B Health, the Maine Hospital Association, and the American Society of Health-System Pharmacists, filed briefs in opposition to Plaintiffs' motions for preliminary injunctions. (Amici Briefs, 1:25-cv-00407-JCN, ECF No. 35; 1:25-cv-00416-JCN, ECF No. 34.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted). "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

## DISCUSSION

A. **Likelihood of Success**

1. **Standing**

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish:

(1) an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the injury could be redressed with a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The plaintiff bears the burden of establishing standing" at the time of filing "and maintaining it thereafter" and must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted).

The State argues that Plaintiffs have not established that they have standing to pursue their claims because they are allegedly harmed only when a covered entity claims entitlement to more discount drugs than were dispensed to patients of the covered entity, which conduct is not caused by the enforcement of Maine's law. The State contends this harm would be the result of a violation of the provisions of 340B and not a consequence of Maine law.

"[A] plaintiff satisfies the injury-in-fact requirement where he [or she] alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). While pre-enforcement standing is ordinarily invoked in the face of criminal penalties, courts generally note that civil punitive statutes have a lesser but similar risk of harm and thus apply a similar inquiry for establishing standing in a pre-enforcement challenge. *See e.g., New York Bankers Association, Inc. v. City of New York*, No. 13 CIV. 7212 KPF, 2014 WL 4435427, at *12

(S.D.N.Y. Sept. 9, 2014); *Ostergren v. McDonnell*, No. 3:08CV362, 2008 WL 3895593, at *4 (E.D. Va. Aug. 22, 2008) ("it is not also the case that pre-enforcement challenges are limited to criminal statutes") (collecting cases).

Here, Plaintiffs have demonstrated an intent to follow their policies restricting delivery to contract pharmacies and that following the policies would likely result in state sanctions, as the State has not represented that it would not enforce the Maine statute with its attendant penalties if Plaintiffs followed their policies after the effective date of the statute. *See New York Bankers Association*, 2014 WL 4435427, at *12 (noting presumption, in pre-enforcement context, that a government will enforce punitive statutes, civil or criminal). Plaintiffs need not show more at this stage of the litigation to establish that they have standing to assert their constitutional claims. *See Defenders of Wildlife*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

## 2. Preemption Claims

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations preempt contrary state law because federal law is the "supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2. "Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal*

*Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). There are also two types of implied preemption, "field preemption and conflict preemption." *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

### a.     Field Preemption

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted). "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as the "practice of pharmacy," (Defendant's Responses at 16; *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 at *6 (5th Cir. Sept. 12, 2025). The Maine law would fall within with the broadly defined fields, but as the other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). Consistent with this view, Plaintiffs argue that the relevant field is defined by 340B, which focuses on the drug

manufacturers' principal obligation under 340B—to offer to provide discount drugs to covered entities. (*See e.g.*, AbbVie's Reply at 3, 1:25-cv-00416-JCN, ECF No. 37.)  If the field were defined in this way (i.e., the terms by which manufacturers must offer discounted drugs under the 340B program), there would be no field preemption.  As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field.  *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 2025 WL 2630900 at *6 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively.  *Fitch*, 2025 WL 2630900 at *7. There are evidently no cases where a court has found field preemption of a similar state statute.[9]  Courts have consistently concluded that similar state laws are not within the more

---

[9] The one case in which a court found preemption involving a similar state statute, the court appears to have based the determination on a form of conflict preemption. *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439, 452, 458 (S.D.W. Va. 2024) (concluding that "[m]ost germane

narrowly defined field.  *See e.g., Skrmetti*, 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs.").  While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, the silence has also been viewed by two circuit courts as reflecting that Congress did not intend to preclude state involvement.  *Fitch*, 2025 WL 2630900 at *6; *McClain*, 95 F.4th at 1144.[10]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities), and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiffs have not established that they are likely to succeed on their field preemption claim.

> b.     *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*

---

to the No-Audits Provision is obstacle preemption" and "the Enforcement Provisions present an obstacle to this centralized purpose").

[10] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

*v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Plaintiffs do not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa.  *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law, and weigh the magnitude of the burden or the degree of the interference resulting from the state law.  *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (noting judicial concerns about "ascrib[ing] unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (discussing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion of Gorsuch, J.); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment").

The core congressional objective in this case is not difficult to discern.  The program is designed to use two other large federal spending programs to incentivize manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[11]  *See Novartis*

---

[11] Plaintiffs contend that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations.  Plaintiffs maintain that the limitations and enforcement provisions demonstrate an intent to limit to some degree the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive.  Plaintiffs contend that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program.  In support of this view, Plaintiffs cite one court's conclusion that the 340B statute has "twin federal purposes" of providing discounts and

**Exhibit 3**

*Pharms. Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain kinds of healthcare facilities").  As the State argues, at least as an initial matter, there is little or no tension between the effect of the state law and the central objective of 340B. The effect of the state statute is to prevent limits on and preserve flexibility in the methods of distribution for covered entities, which is in harmony with the 340B goal of providing the entities with prescription drugs at the discounted price for the benefit (directly or indirectly) of underserved patients.

Plaintiffs argue that states have no role in implementing the 340B program and that Maine is categorically prohibited from adopting rules that add any requirements regarding a manufacturer's participation in the 340B program.  In other words, Plaintiffs argue that any state rule related to the 340B program presents an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 373.

Courts might be less inclined to find implied preemption when the federal statute contemplates a state implementation role within the federal program and are more likely to find implied preemption when a federal statute does not specifically provide a role for states.  *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368

---

protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452.  Prevention of excess claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes" suggests that the objectives are unrelated to or of equivalent importance as each other.  In the crafting of most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any such  program. Here, protecting manufacturers against duplicate claims and otherwise preventing fraud are subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations.

(N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish").  Courts also might be more inclined to find preemption when a state law directly targets a federal program and be less inclined to infer congressional intent to preempt generally applicable state laws that impact federal programs incidentally.  *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemption less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program.  Instead, courts must determine whether the alleged obstacle presented by the state law is significant enough to compel preemption.  The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. CIV. 00-157-B-H, 2000 WL 34290605, at *6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the federal law did not specifically permit the federal Medicaid program to be used to further the interests of non-Medicaid recipients. *Id.* at *5. The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure and purpose," the First Circuit reversed. *Pharmaceutical Research & Manufacturers of*

416

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001).  The First Circuit noted that nothing in the text of the federal statute "prevents states from imposing prior authorization requirements; indeed, they are explicitly permitted," and after entertaining the argument that there were federal legislative purposes in "preventing abuse or overprescription of certain expensive medications," and in "achieving the best interests of the Medicaid recipient," the court expressed concerns about the possibility of obstruction but found an "insufficient basis" on the record of competing affidavits at that point in the proceedings to conclude that the statute presented more than a *de minimis* obstacle to achieving the goals that the plaintiff had identified.  *Id.* at 75–78.

The Supreme Court affirmed the First Circuit's decision.  *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003).  Reasoning that the district court erred when it observed that it was sufficient to show any impediment to a discernable federal goal, a plurality of justices concluded that obstacle preemption required a showing of more than a "modest" impediment or harm to a federal statutory goal.  *Id.* at 665, 667 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

417

Plaintiffs contend that the impediment is sufficient to support a preemption finding because the use of the replenishment model, multiple pharmacies, and pharmacies located a considerable distance from a covered entity combine to expand the program beyond that contemplated by Congress, resulting in an unreasonable burden on manufacturers and a greater potential for fraud, which factors could limit manufacturers' involvement in the program. At this time on this record, the Court is not persuaded that the increase in the number of 340B claims with the use of multiple pharmacies is inconsistent with the objectives of the 340B program, provided the claims are made for drugs distributed to patients of covered entities.

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696; *Johnson*, 102 F.4th 452. The silence, however, does not necessarily reflect that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims. *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around"). The Court discerns nothing in 340B to suggest that Congress intended

418

to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate. For instance, there is no persuasive evidence to suggest that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity of a single in-house or designated contract pharmacy. Rather than limit eligibility and participation, in 2010, Congress significantly increased the healthcare facilities that are considered covered entities.

Plaintiffs also assert there is a direct conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial proceeding—and provides an additional enforcement mechanism beyond the federal remedy. Courts have recognized that state efforts to impose additional remedies for the same violations are more likely to be preempted. *See e.g.*, *Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code."). The State argues there is no overlap because potential violations of the state statute would not involve the overcharging, diversion-related, and price disputes, all of which would be subject to the ADR process under the federal statute.

419

The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Plaintiffs argue that their contractual limitations on a covered entity's distribution of the drugs to patients through contract pharmacies, which is the subject of the Maine statute, could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits that 340B does not address distribution. At this stage, therefore, the alleged conflict is too speculative to support a finding that Plaintiffs are likely to prevail on the claim.

Plaintiffs further argue that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent excess claims and fraud, and the ADR process is evidently intended to assist in that objective. Plaintiffs submit that they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. Plaintiffs' concern regarding access to evidence of possible violations is not unreasonable. Plaintiffs, however, have not demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous. For instance, Plaintiffs have not shown that the trends upon which they rely to support their injury-in-fact standing argument would be insufficient to obtain an audit. The 340B program and the audit process

420

have existed for many years, but Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data.  On the current record, the alleged impediment is too speculative to support a finding that Plaintiffs are likely to prevail on their claim.

Finally, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiffs. *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022).  According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the state law regulation.  *Id.* (discussing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)). As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, contract pharmacies, and claims data.

In sum, at this stage of the proceedings on the current record, which includes competing affidavits, the Court is not convinced that it is more likely than not that Plaintiffs will establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B.  As related to obstacle conflict preemption, the Court is not persuaded that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such

that the core objectives of the program would be compromised.  Plaintiffs, therefore, have failed to establish a likelihood of success on their obstacle preemption claim.

### 3.      Dormant Commerce Claim

"The Commerce Clause provides that Congress shall have power to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." *Association To Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 55 (1st Cir. 2025) (quotation marks and modifications omitted) (quoting U.S. Const. art. I, § 8, cl. 3). Although the text is framed as a grant of power to Congress, the Supreme Court has long "held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state [regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

The doctrine primarily "bars states and localities from pursuing economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 78 (1st Cir. 2025) (quotation marks omitted).  "To ascertain whether a regulatory measure is so designed, we look for evidence of either discriminatory purpose or discriminatory effect, recognizing the primacy of the latter in the dormant Commerce Clause analysis of facially neutral legislation." *Id.* (quotation marks and modifications omitted).

Plaintiffs argue that the state statute discriminates against out-of-state manufacturers for the benefit of in-state providers and pharmacies.  Even assuming the

422

burdens and benefits are as Plaintiffs assert, Plaintiffs are not likely to prevail on their claim. The question "is not whether a statute discriminates at all, but whether it discriminates between substantially similar entities in a single market. Indeed, the principle that any notion of discrimination assumes a comparison of substantially similar entities is a fundamental element of dormant Commerce Clause jurisprudence." *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27, 37 (1st Cir. 2024) (quotation marks and citations omitted). Although Plaintiffs contend that contract pharmacies and manufacturers compete for customers "vertically" in a single market, they do not explain why they are substantially similar. In practice, the manufacturers create the drugs and sell them to covered entities for patients, the covered entities buy drugs from the manufacturers and distribute them to patients at an equivalent or reduced cost, and pharmacies act as the conduit for distribution. The roles are meaningfully different and cannot be viewed as similar entities.

Plaintiffs cite *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989), for the proposition that states may not regulate transactions occurring wholly outside their borders. The Supreme Court, however, has arguably limited the concerns about extraterritorial price impacts identified in *Beer Institute*. *See National Pork Producers Council v. Ross*, 598 U.S. 356, 143 (2023) (rejecting "'almost per se' rule against laws that have the 'practical effect' of 'controlling' extraterritorial commerce").

In addition, in *Walsh*, the First Circuit and the Supreme Court rejected the argument that requiring certain discounts for in-state drug transactions had extraterritorial impacts

based on the series of upstream transactions involving out of state middlepersons before a drug is finally distributed to the consumer.

> [A]s the Court of Appeals correctly stated, unlike price control or price affirmation statutes, "the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices." 249 F.3d, at 81–82 (footnote omitted). The rule that was applied in *Baldwin* and *Healy* accordingly is not applicable to this case.

*Walsh*, 538 U.S. at 669. The Court is not convinced that a different analysis applies in this case.

Plaintiffs also invoke the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) to support the commerce clause claim. Under *Pike*, a court is asked "to determine whether a facially non-discriminatory local measure violates the Dormant Commerce Clause" by inquiring "whether the burdens (if any) that the measure imposes on interstate commerce are clearly excessive in relation to the claimed local benefits that it secures." *Sidman*, 147 F.4th at 64. Plaintiffs, however, have not demonstrated that they are likely to establish that the Maine statute imposes an excessive burden on interstate commerce. As Plaintiffs correctly note, despite the language of the Maine statute, there are no 340B drugs. Rather, the drugs that are covered by the 340B program are the same drugs that Plaintiffs manufacture and sell for patients of all healthcare providers. The 340B program simply contemplates that a portion of the drugs that Plaintiffs manufacture and sell would be sold at a discounted rate to covered entities. The Maine statute, therefore, is unlikely to affect significantly the quantity of drugs that will be sold in interstate commerce. Plaintiffs' principal concern is that under the Maine statute, their

administrative costs will increase, and they will be required to sell more drugs at a discounted rate.  In other words, Plaintiffs would be harmed in the form of a reduction in their profits.   A reduction in Plaintiffs' profitability, if proven, would not constitute an excessive burden on interstate commerce. *See Construction Materials Recycling Association Issues & Education Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 172 (D.N.H. 2010) ("A dormant Commerce Clause claim, however, cannot be based merely on a showing that a challenged statute will cause individual out-of-state businesses to lose profits").  In short, Plaintiffs have not established that they are likely to succeed on their dormant commerce claims.

### 4.     Takings Claim

AbbVie contends that "Maine's law effects a physical taking of AbbVie's property by forcing AbbVie to transfer its pharmaceutical products to private third parties for discounted prices." (AbbVie Motion at 18.)

The Fifth Amendment prohibits "private property" from being "taken for public use, without just compensation."  U.S. Const. amend. V.  The Fifth Amendment applies to the federal government, but "[t]hat prohibition . . . applies against the States through the Fourteenth Amendment."  *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980).  "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (citation omitted).

"When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025). A government does not take property by creating a "financial inducement" to comply voluntarily. *See Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *14 (W.D. La. Sept. 30, 2024); *see also*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) ("as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking").

The voluntary nature of the 340B program, therefore, would appear to present an impediment to AbbVie's takings claim. AbbVie asserts that the voluntariness of the federal program does not impact the analysis at least in part because there was no independent state law benefit offered with the state requirements. AbbVie relies on cases finding that alleged benefit was illusory and thus the program was not truly voluntary, *see Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) (discussing *Horne v. Department of Agriculture*, 576 U.S. 350 (2015)), but AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for

426

purposes of a takings claim.  Because AbbVie can choose not to participate in the 340B

program, AbbVie has not demonstrated a likelihood of success on its takings claim.[12]

### 5.      Vagueness Claim

AbbVie maintains that Maine's statute is impermissibly vague because there is little

or no guidance for what it means to "interfere" with covered entities and the delivery of

covered drugs to contract pharmacies on behalf of covered entities.  Under the Due Process

Clauses of the Fifth and Fourteenth Amendments, "[a] statute is impermissibly vague if (1)

'it fails to provide people of ordinary intelligence a reasonable opportunity to understand

what conduct it prohibits' or (2) 'it authorizes or even encourages arbitrary and

discriminatory enforcement.'"  *March v. Frey*, 458 F. Supp. 3d 16, 39 (D. Me. 2020)

(quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  However, legislatures need not

attempt to achieve "semantic certainty," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016),

because "words are rough-hewn tools, not surgically precise instruments."  *URI Student*

*Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

---

[12] AbbVie primarily argues the state law effects a physical taking rather than a regulatory taking.  The Supreme Court has also recognized that even without taking physical possession, "if regulation goes too far it will be recognized as a taking." *Id.* at 326 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). A regulatory taking occurs "where government requires an owner to suffer a permanent physical invasion of her property," or "completely deprive[s] an owner of all economically beneficial use of her property," or demands an exaction as a condition to approving development, such as a public easement, that is disproportionate to the impact of the proposed development. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39, 546–48 (2005) (quotation omitted).  When presented with a regulatory takings claim that does not implicate one of the situations identified in *Lingle*, courts employ a "more nuanced, three-pronged inquiry into (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." *Maine Education Association Benefits Trust v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012) (citing *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978)). To the extent that AbbVie asserted during oral argument that under a regulatory takings analysis, Maine's law constitutes a taking, the voluntariness issue likely still bars the claim, and even if it did not, the Court is not persuaded that AbbVie is likely to satisfy the stringent requirements of a regulatory takings claim.

**Exhibit 3**

While courts have acknowledged that terms like "interfere with" can be indefinite enough to create vagueness concerns if read in a vacuum, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), "[h]ere . . . the challenged [terms] do not appear in a vacuum" because the statute "contains additional terms that supply concrete guidance," at least to some degree, "as to the behavior that it prohibits and the circumstances in which it can be enforced." *URI Student Senate*, 631 F.3d at 14. The statute's language that manufacturers "may not deny, restrict, [or] prohibit" the "acquisition" or "delivery" of certain drugs, and the title of the provision addressing "discriminatory actions by manufacturer or agent related to 340B entities" narrow the scope of the term "interfere" considerably. Nearby provisions in Chapter 103 also use the word "interfere" in the context of discriminatory policies that impose conditions on 340B participants that are not imposed on comparable nonparticipants. *See* 24-A M.R.S.A. §7754(4)–(5) (effective Sept. 24, 2025). The statute itself, therefore, provides reasonable guidance and notice to AbbVie and those similarly situated.

Several other important factors undermine the void-for-vagueness claim here. First, perhaps because imprecise terms can "take on definiteness and clarity" when "directed to a discrete professional group," *In re Bithoney*, 486 F.2d 319, 324 (1st Cir. 1973), "the doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties." *FERC v. Silkman*, 177 F. Supp. 3d 683, 702 (D. Mass. 2016) (citing *U.S. v. Lachman*, 387 F.3d 42, 56–57 (1st Cir. 2004)). AbbVie certainly qualifies. Second, the harm resulting from a lack of specificity is lessened "by the scienter requirement" that must be satisfied before drug manufacturers would face civil penalties. *Id.*; *March*, 458 F. Supp.

428

3d at 39.[13]  Third, statutory imprecision is less likely to offend due process when there is a method "to allow private parties to obtain an official government answer on whether [the conduct] is covered" before facing penalties, *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013), and the enforcement mechanism contains that opportunity before it creates a risk of financial penalties.  Fourth, federal courts are less likely to find a state statute to be unconstitutionally vague in a pre-enforcement context where a plaintiff brings the case before the state court had the opportunity to interpret the state law. *See Donovan v. City of Haverhill*, 311 F.3d 74, 78 (1st Cir. 2002) (courts should "presume that state courts will give [challenged provision] a limiting construction that will preserve its facial constitutionality"); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (treading carefully when the state courts "have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction").  Fifth, "the [Supreme] Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (quotation marks omitted).

Finally, except in the First Amendment context, a plaintiff is not generally permitted to pursue facial pre-enforcement vagueness challenges and courts instead "consider

---

[13] It appears that state enforcement of the Maine statute effectively requires a willful violation before the imposition of monetary penalties.  As the Court reads the statute, to enforce the statute, the state attorney general would initiate a state court proceeding after first providing notice and conferring with the manufacturer, which lawsuit might then lead to an injunction from the state court against the offending practice, and the manufacturer would only face monetary penalties if it continued the offending conduct in violation of the injunction.

whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (quotation marks omitted).  AbbVie asserts an as applied argument. Notably, AbbVie has not argued that it is uncertain whether the state statute prohibits the policies it has implemented in recent years.  All parties acknowledge that the Maine statute and similar statutes enacted in other states are designed to prevent manufacturers from maintaining the restrictive policies employed by AbbVie.

In sum, the word "interfere" is not so indefinite in the context of the state statute and the 340B program that it presents constitutional concerns at this stage.  All the relevant factors suggest that AbbVie is not likely to succeed on its void-for-vagueness claim.

## B.    Other Factors

Because Plaintiffs have failed to establish that they will likely succeed on the merits of their preemption, commerce clause, takings, or vagueness claims, the Court need not dwell on the remaining preliminary injunction factors.  Where Plaintiffs have failed to demonstrate a likelihood of success on their claims, irreparable harm, the balance of hardships, and the public interest are inconsequential.  *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity").

430

## CONCLUSION

After an assessment of the factors relevant to Plaintiffs' requests for a preliminary injunction, the Court concludes that Plaintiffs are not entitled to preliminary injunctive relief.  Accordingly, the Court denies Plaintiffs' motions for a preliminary injunction.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of September, 2025.

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PHARMACEUTICAL RESEARCH )
AND MANUFACTURERS )
OF AMERICA, )
 )
            Plaintiff )
 )
        v. )            1:25-cv-00469-JCN
 )
AARON FREY, et al., )
 )
            Defendants )

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, a trade association representing biopharmaceutical research companies, challenges a Maine statute related to the role of contract pharmacies within a federal drug discount program.  (Complaint, ECF No. 1.)  Plaintiff contends that the Maine statute violates the Supremacy Clause and constitutes an extraterritorial regulation.  The matter is before the Court on Plaintiff's motion for a preliminary injunction.  (Motion, ECF No. 14.) Defendants oppose the motion.[1]  (Response, ECF No. 22.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motion.

---

[1] Plaintiff named Aaron Frey, Maine's Attorney General, and Bob Carey, the Superintendent of the Maine Bureau of Insurance, as defendants.

**FACTUAL AND PROCEDURAL BACKGROUND**[2]

**A.      The 340B Statute**

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (the Secretary or HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price.  *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

Covered entities are types of facilities that generally provide care to underserved communities.  *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011).  "The discounts help uninsured patients, who can get cheaper drugs from covered entities.  They also help covered entities themselves.  The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference."  *Amgen*, 2025

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the declarations filed in connection with Plaintiff's motion.  The Court also reiterates herein some of the background summary and legal analysis included in its decision in two related cases in which two manufacturers asserted similar claims in their challenges to the same Maine statute.  *See Novartis Pharms. Corp. v. Frey*, No. 1:25-cv-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025).

WL 2206948, at *1 (citations omitted).[3]  Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly.  *Id.* § 256b(a)(5)(D).  In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties, disqualification of the entity for a period, and/or reference of the matter to other federal authorities.  *Id.* § 256b(d)(2)(B)(v).  The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price.  *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS.  *Astra*, 563 U.S. at 113.  Several courts, however, have noted that Congress did not grant HHS broad authority to issue

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities.  An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but uninsured patients arguably benefit directly and both uninsured and insured patients arguably benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients.  *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients").  In any event, the potential dispute is not central to Plaintiff's request for a preliminary injunction.

regulations.  *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021).   Rather, rulemaking authority is currently limited to "(1) the establishment of an administrative dispute resolution process [ADR];" (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations.  *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41 (D. D.C. 2014).

## B.   The Role of Contract Pharmacies

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity.  58 Fed. Reg. 68922, 68924.  In May 1994, HRSA issued a similar final guidance notice.   59 Fed. Reg. 25110, 25113.   In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by limiting those sales transactions, manufacturers could be discouraging covered entities from participating in the program. *Id.* at 25111.

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services.  60 Fed. Reg. 55586.  In August 1996, HRSA issued a substantially similar final guidance notice.  61 Fed. Reg. 43549.  The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services. *Id.* at 43555.  The model agreement

435

**Exhibit 3**

terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to a contract pharmacy. *Id.* Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits. *Id.*

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site. 72 Fed. Reg. 1540. In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy. *Id.* at 1541. In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location. 75 Fed. Reg. 10272, 10277. In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated rural areas and added some of the enforcement provisions found in the current version of the statute. *Id.* §§ 7101-7102.

Since 2010, the 340B program has grown significantly. Plaintiff and drug manufacturers attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims. Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs

and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model. Plaintiff contends that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

The replenishment model works as follows: (1) the pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for a 340B discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.      HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site. Some manufacturers also required covered entities to provide claims data to be eligible to use contract pharmacies. In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility. Several manufacturers filed suit challenging the opinion. One district court

struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the advisory opinion in June 2021. *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

In the meantime, HRSA sent letters to manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program. HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted. The manufacturers filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers. In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," *id.* at 703-04, HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful." *Id.* at 706. In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters, *id.* at 373, because the statute merely requires that a

manufacturer offer to sell drugs "at or below a specified monetary amount" and because

the statute is "silent about delivery conditions," and "statutory silence implies that private

parties may act freely." *Id.* at 369. The court noted that a manufacturer would likely violate

the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively

increase the price above the statutory ceiling or fall short of a "bona fide offer," but the

manufacturers' conditions in that case were not so burdensome as to violate the statute on

its face. *Id.* at 371–73.

## D.    State Statutes Prohibiting Manufacturer Limits

In June 2025, Maine enacted a statute entitled the "Protect Health Care for Rural

and Underserved Communities Act," which statute went into effect in September 2025.

2025 Me. Legis. Serv. Ch. 388 (H.P. 132) (L.D. 210) Sec. P-5 (West). The statute created

a new "Chapter 103" within the Maine Insurance Code, and includes the following

provision:

> **Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

unless the claims or utilization data sharing is required by the United States Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise interfere directly or indirectly with a 340B entity unless expressly authorized by the United States Department of Health and Human Services.

24-A M.R.S.A. § 7753.

The statute defines a "340B entity" as "an entity participating or authorized to participate in the federal 340B drug discount program, as described in 42 United States Code, Section 256b, including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the federal 340B drug discount program." 24-A M.R.S.A. § 7752(7). A "340B drug" is defined as "a drug that is purchased or eligible for purchase under Section 340B of the federal Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. § 7752(6). A "340B contract pharmacy" is defined as "a pharmacy that has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair Trade Practices Act[.]" 24-A M.R.S.A. §7757(1). The Maine Unfair Trade Practices Act permits the Attorney General to "bring an action in the name of the State," to seek an injunction and restitution for any person who has suffered an ascertainable loss, and the Act provides that a person who violates an injunction imposed under the Act can incur a civil penalty up to $10,000 per violation. 5 M.R.S.A. § 209.

440

Approximately twenty states, including Maine, have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief. At least nine district courts (including this Court), either on a motion for preliminary injunction or a motion for summary judgment, have declined to enjoin the enforcement of the relevant state statute after considering similar legal claims to those Plaintiff asserts here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[4] Other appeals are pending. At least three district courts have denied a motion to dismiss or

---

[4] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (same); *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025) (affirming denial of preliminary injunction); *Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (denying plaintiffs' motions for summary judgment); *Astrazeneca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction); *Novartis Pharmaceuticals Corp. v. Frey*, No. 1:25-cv-00407-JCN, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (denying plaintiffs' motions for preliminary injunction); *AbbVie, Inc. v. Weiser*, No. 25-CV-1847-WJM-KAS, 2025 WL 3041825 (D. Colo. Oct. 31, 2025) (same); *Astrazeneca Pharmaceuticals v. Weiser*, No. 25-CV-02685-PAB-STV, 2025 WL 3653161 (D. Colo. Dec. 17, 2025) (same); AbbVie v. Hilgers, No. 4:25CV3089, 2025 WL 3688051 (D. Neb. Dec. 19, 2025) (same); *AbbVie, Inc. v. Jackley*, No. 3:25-CV-03006-RAL, 2025 WL 3706066 (D. S.D. Dec. 22, 2025) (same).

441

preliminarily enjoined enforcement of a state statute, accepting similar arguments to those Plaintiff raises here.[5] Other comparable cases are pending in other district courts.[6]

**STANDARD OF REVIEW**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted). "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

---

[5] *See AbbVie, Inc. v. Brown*, No. 2:25-CV-00271-RJS-DAO, 2025 WL 3228898(D. Utah Nov. 19, 2025) (denying motion to dismiss plaintiffs' Supremacy Clause and Takings claims); *AbbVie Inc. v. Drummond*, No. CIV-25-1156-PRW, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting plaintiffs' motions for preliminary injunction in part and enjoining enforcement of select provisions of state law); *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024) (granting plaintiffs' motions for preliminary injunction).

[6] *See, e.g.*, *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.).

**Exhibit 3**

## DISCUSSION

### A.      Likelihood of Success

In Count I of the complaint, Plaintiff asserts a Supremacy Clause claim.  In Count II of the complaint, Plaintiff alleges an extraterritorial regulation claim pursuant to the Due Process Clause, the Commerce Clause, and other provisions.  Plaintiff's arguments in support of the motion for a preliminary injunction concern only Count I.

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations are the "supreme Law of the Land[.]"  U.S. Const. art. VI, cl. 2.  "State law may run afoul of the Supremacy Clause in two distinct ways:" by violating the intergovernmental immunity doctrine or the doctrine of preemption.  *North Dakota v. United States*, 495 U.S. 423, 434-36 (1990).  While Plaintiff ultimately proposes an expansive non-targeting rule distilled from parts of the two separate lines of cases, the Court declines Plaintiff's invitation to so combine and extend the "distinct" doctrines.  *See United States v. California*, 921 F.3d 865, 880 & 884 n.9 (9th Cir. 2019) (deeming the doctrines "distinct" and cautioning against the failure to "accurately distinguish between the doctrines of intergovernmental immunity and obstacle preemption").  As explained below, because neither doctrine applies here, Plaintiff has not established a likelihood of success on its Supremacy Clause claim.

### 1.      Intergovernmental Immunity

A state law offends the modern intergovernmental immunity doctrine "only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals."  *North Dakota v. United States*, 495 U.S. 423, 435 (1990).  A

state law within the scope of the doctrine is invalid under the Supremacy Clause, "unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (quotation marks omitted).

An impermissible direct regulation occurs when a state places a tax "on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned[,]" *United States v. New Mexico*, 455 U.S. 720, 735 (1982), or when a state "places a prohibition on the Federal Government," *Hancock v. Train*, 426 U.S. 167, 180 (1976) (quotation marks and footnote omitted). "[A] state law discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 839 (2022) (quotation marks, citations, and modifications omitted).

To the extent Plaintiff argues that the Maine statute directly regulates the federal government, the argument lacks merit. On its face, Maine's statute does not place any tax, prohibition, or mandate on the federal government or its functions. This is also not a case where a state statute carefully avoids facial restrictions or mandates on the federal government but still interferes directly because it applies to public or private individuals or entities only when they are carrying out the functions of the federal government that the state seeks to restrict. *Cf. CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 320-21 (3d Cir. 2025) (finding an impermissible direct regulation when a state statute prohibited all contracting services for civil immigration detention).

Plaintiff's primary argument is that because its members contract with HHS, its members are "contractors" subject to a discriminatory state statute. Whether an individual or entity is protected under the intergovernmental immunity doctrine depends on the nature of the contract or relationship with the federal government. *See Geo Group, Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (recognizing different degrees of protection under the Supremacy Clause against state laws addressing federal instrumentalities, employees, suppliers, and contract workers). Here, the Pharmaceutical Pricing Agreements between Plaintiff's members and HHS are not ordinary "transactional, bargained-for contracts[,]" *Astra*, 563 U.S. at 113, subject to ordinary contract rules because they "have no negotiable terms" and merely "serve as the means by which drug manufacturers opt into the statutory scheme[,]" *id.* at 118. Drug manufacturers participating in the 340B program agree to provide discounts in the marketplace to certain other private entities; the manufacturers do not agree to perform any function of the federal government or provide any goods or services to the federal government. Plaintiff cites no persuasive authority that would support a finding that the mere participation in a regulatory program or receipt of government incentives confers on the participant a contractor status with the federal government. Plaintiff's members, therefore, do not fall within any of the recognized categories of entities with whom the government "deals" for purposes of intergovernmental immunity, such as employees, contract workers, suppliers, or instrumentalities.

Even if Plaintiff could establish the requisite relationship between the manufacturers' agreements and the performance of federal government functions, Plaintiff

has not demonstrated that Maine's statute violates the relevant antidiscrimination rule.

Courts do not examine any one provision in isolation but instead examine the broader

regulatory context, *North Dakota*, 495 U.S. at 435, to determine whether the economic

burden of a state's rules are "imposed equally on other similarly situated constituents of

the State[,]" *id.* at 438. "The State does not discriminate against the Federal Government

and those with whom it deals unless it treats someone else better than it treats them."

*Washington v. United States*, 460 U.S. 536, 544-45 (1983) (footnote omitted).

Plaintiff has not proposed a relevant or workable set of comparators. To the extent

Plaintiff maintains that the set of similarly situated entities is comprised of all drug

manufacturers doing business in Maine and participating in the 340B program, there is no

discernible discrimination because the state statute does not make any other distinctions

among the participants. To the extent Plaintiff contends that the set of similarly situated

entities consists of all drug manufacturers, Plaintiff evidently argues that the relevant

distinction would be participation or nonparticipation in the 340B program. Plaintiff,

however, has not argued or provided evidence that there are any such nonparticipating drug

manufacturers doing business in Maine. Even if such evidence were presented, Plaintiff

has not established that its additional rules for 340B participants are sufficiently

burdensome to support a finding that Maine seeks to improperly favor nonparticipating

manufacturers over participating manufacturers. *See Dawson v. Steager*, 586 U.S. 171,

177 (2019) ("Whether a State treats similarly situated state and federal employees

differently depends on how the State has defined the favored class."); *McHenry County. v.

Raoul*, 44 F.4th 581, 594 (7th Cir. 2022) (concluding that a state statute's impact on federal

domain "is not enough to establish discrimination" for purposes of the intergovernmental immunity doctrine if a plaintiff "cannot identify any actors similarly situated . . . that receive more favorable treatment" under the state statute); *California*, 921 F.3d at 880–81 (noting that the intergovernmental immunity doctrine is concerned with state rules that burden the federal government and reasoning that a state rule does not "burden" the federal government or those with whom it does business just because the state rule "targets" federal rules).

In sum, the intergovernmental immunity doctrine does not invalidate Maine's statute or Maine's rules for contract pharmacies. The Court declines to extend the doctrine to cover any state law that adds a requirement for participants in a federally regulated market or under a federal program.[7] Because the intergovernmental immunity doctrine does not apply as broadly as Plaintiff contends, Plaintiff's claim to any further degree of

---

[7] The evolution of the doctrine of the doctrine weighs against a broad application of the doctrine. The intergovernmental immunity doctrine developed in the state taxation context, *see McCulloch v. Maryland*, 17 U.S. 316 (1819), and the Supreme Court once applied a broad rule prohibiting "taxes on those who had contractual relationships with the Federal Government or with its instrumentalities whenever the effect of the tax," even an indirect effect, "was or might be to increase the cost to the Federal Government of performing its functions." *United States v. Fresno County*, 429 U.S. 452, 460 (1977). The rationale was that "although a tax was collected from an independent private party, the tax was considered to be 'on' the government because the tax burden might be passed on to it through the contract." *South Carolina v. Baker*, 485 U.S. 505, 518 (1988). The Supreme Court later recognized that the approach was untenable and "repudiated" the broader rule in a series of cases beginning in the 1930s. *Id.* at 520–21 ("The thoroughness with which the Court abandoned the burden theory was demonstrated most emphatically when the Court upheld a state sales tax imposed on a Government contractor even though the financial burden of the tax was entirely passed on, through a cost-plus contract, to the Federal Government"). Plaintiff does not argue that Maine's statute would directly or even indirectly increase costs to the federal government. The lack of any clear or apparent impact on federal government costs underscores the conclusions above, including that 340B participants do not qualify as contractors for the federal government and that Maine's contract pharmacy rules do not discriminate in the relevant sense against drug manufacturers or the federal government.

protection from the state statute "must be resolved under principles of congressional pre-emption." *North Dakota*, 495 U.S. at 435.

### 2.      Preemption

"Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). There are also two types of implied preemption, "field preemption and conflict preemption[.]" *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

#### a.      Field Preemption

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on

448

the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted). "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as "the practice of pharmacy," *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025). The Maine law would fall within with the broadly defined fields, but as other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). Consistent with this view, Plaintiff proposes that the relevant field is the key terms of the 340B statute, namely "eligibility for reduced pricing, the content of a drug manufacturer's 340B offer . . . and the administration and enforcement of the statute's requirements." (Motion at 18.) Yet even if the field were defined in this way, there would be no field preemption. As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide covered drugs, the language of 340B is insufficient to suggest a congressional intent to preclude all state regulation in the field. *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 152 F.4th at 646 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," which is a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively. *Fitch*, 152 F.4th at 647. The Court is not aware of a case where a court found that field preemption applied to

a similar state statute.[8]  Courts have consistently concluded that similar state laws are not within the more narrowly defined field.  *See e.g., Skrmetti*, 2025 WL 1805271, at *12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs."). While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, that silence has also been viewed by two circuit courts as suggesting that Congress did not intend to preclude state involvement.  *Fitch*, 152 F.4th at 647; *McClain*, 95 F.4th at 1144.[9]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities) and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiff has not established that it is likely to succeed on its field preemption claim.

---

[8] In the three cases where courts have been persuaded by manufacturer's preemption arguments and either granted a preliminary injunction or denied a motion to dismiss involving a similar state statute, the basis for the determination was a form of conflict preemption.  *See Morrisey*, 760 F. Supp. 3d at 458; *Drummond*, No. CIV-25-1156-PRW, 2025 WL 3048929, at *7; *Brown*, No. 2:25-CV-00271-RJS-DAO, 2025 WL 3228898, at *9.

[9] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

b.      *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).   While Plaintiff contends that "Maine's process seeks to punish drug manufacturers for obeying federal law," (Motion at 20),  Plaintiff does not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa. *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law and weigh the magnitude of the burden or the degree of the interference resulting from the state law. *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (observing that the Supreme Court has recently questioned "efforts to ascribe unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (citing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) ; *see also Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment[.]").

The core congressional objective in this case is not difficult to discern.  The 340B program is designed to use two other large federal spending programs to incentivize

452

manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[10]

*See Novartis Pharmaceuticals Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov. 5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain kinds of healthcare facilities."). As Defendants argue, at least as an initial matter, there is little or no tension between the effect of the state law and the central objective of 340B. The effect of the state statute is to prevent limits on and preserve flexibility in the methods of distribution for covered entities, which is in harmony with the 340B goal of providing the entities with prescription drugs at the discounted price for the benefit (directly or indirectly) of underserved patients. The harmonious goals of the federal and state are suggestive but not determinative, however. *See International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("it is not enough to say that the ultimate goal of both federal and state law" is the same because "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal").

---

[10] Some manufacturers have argued that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations. Some manufacturers maintain that the limitations and enforcement provisions demonstrate an intent to limit, to some degree, the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive. The manufacturers have argued that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program. One court's conclusion in support of this view is that the 340B statute has "twin federal purposes" of providing discounts and protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452. Prevention of excess claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes" notion suggests that these objectives are unrelated to each other, or of equal importance. In the crafting of most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any such program. Protecting manufacturers against duplicate claims and otherwise preventing fraud are subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations.

Plaintiff argues there is a sufficient obstacle to warrant preemption here because the state statute applies only to participants in the federal 340B program, which program does not rely on the states to implement. According to Plaintiff, state rules are always preempted if they target a federal program by adding requirements for participants. Plaintiff relies on two Supreme Court cases, *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) and *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to support its argument.

The *Boyle* case addressed one of the "few areas" involving "uniquely federal interests" that "are so committed. . . to federal control" that state law can be preempted by judge-made "federal common law," *Boyle*, 487 U.S. at 504, when there is "a significant conflict" with "an identifiable federal policy or interest," *id.* at 507 (internal quotation marks omitted). Because the procurement of equipment by the federal government is an area of uniquely federal interest, the Supreme Court held that state tort liability against contractors for design defects in military equipment is preempted "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.

In *Buckman*, the Supreme Court held that the Federal Food, Drug, and Cosmetic Act preempted state law fraud claims by patients against medical companies for alleged misrepresentations to the Food and Drug Administration while seeking approval for medical devices. *Buckman*, 531 U.S. at 343–44. The *Buckman* Court reasoned that "the federal statutory scheme amply empower[ed] the FDA to punish and deter fraud against the Administration" through investigative tools backed by criminal punishment, injunctive

relief, and civil penalties, and the agency decided whether and how to pursue the available remedies based on a "delicate balance of statutory objectives" that was likely to be disrupted by allowing private parties to bring "fraud-on-the-FDA claims under state tort law." *Id.* at 348–49.

Plaintiff evidently relies on these cases in part because the Supreme Court did not apply the usual presumption against preemption and thus applied a lower threshold for finding preemption than in many other cases. The *Boyle* Court reasoned that in an area of uniquely federal interest, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied." *Boyle*, 487 U.S. at 507 (quotation marks omitted). Similarly, the *Buckman* Court declined to apply the presumption against preemption because "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied," and it cited *Boyle* while noting that "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347 (quotation marks omitted).

The circumstances here are not similar and do not represent a situation where courts have disregarded or should disregard the presumption against preemption. Maine's statute does not regulate the relationship between the federal agency (HHS/HRSA) and the entity it regulates (a drug manufacturer or a covered entity). Maine's statute addresses the relationship between regulated entities and other private entities. There is no dispute that

states have traditionally had a regulatory role addressing the transactions and relationships among drug companies, medical providers, and pharmacies.

This is also not one of the "few areas" where there are "uniquely federal interests" comparable to the terms of the federal government's procurement contracts or the liability of federal officers for actions taken in the course of their duties. As discussed above, the agreements between drug manufacturers and the Secretary are not analogous to many other contracts, including employment or procurement contacts with the federal government. *See Astra*, 563 U.S. at 113. To the extent Plaintiff argues that there are always "uniquely federal interests" in the legal requirements governing participants in a federal program, that fact alone is insufficient for a court to ignore the presumption against preemption. The argument would expand a limited exception to ordinary preemption principles potentially applicable in only a "few areas," *Boyle*, 487 U.S. at 504, to include many contexts where there is understandable and necessary concurrent federal and state regulation.

Even if the Court were to accept Plaintiff's contention regarding the effect of the federal interests on the presumption against preemption, that would "not . . . end the inquiry," *Boyle*, 487 U.S. at 507, or imply that a state law is always preempted if it targets participants in a federal program. Under *Boyle*, a state law is only displaced if it causes "a significant conflict" with or would "frustrate specific objectives" of the federal policy. *Id.* (quotation marks omitted). In other words, the most that can be reasonably inferred from *Boyle* and *Buckman* is that for preemption, courts might reasonably require less evidence of preemptive intent or a lesser obstacle to federal purposes when there are stronger federal interests and weaker state interests; the Supreme Court has never adopted

**Exhibit 3**

a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program.  *See id.* at 507–08 ("Or to put the point differently, the fact that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can.  But conflict there must be.").

The reasoning of other courts also militates against the broad reading of *Boyle* and *Buckman* that Plaintiff proposes.  For instance, courts have found it less tenable to infer that Congress intended to preempt a state statute when the federal statute contemplates a state implementation role within the federal program, while implied preemption is more plausible when a federal statute does not provide any role for states.  *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368 (N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish") (quotation marks omitted).  Courts also more readily find implied preemption when a state law directly targets a federal program and are less likely to find implied preemption when a general state law impacts a federal program only incidentally.  *See Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 & n.5 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a

federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemptive intent less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

Because there is no categorical rule for state statutes targeting participants in federal programs, a court must still determine in each case whether the alleged obstacles presented by the state law are significant enough to compel preemption. The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. Civ. 00-157-B-H, 2000 WL 34290605, at *6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the

458

federal law did not specifically permit the federal Medicaid program to be used to further

the interests of non-Medicaid recipients.  *Id.* at *5.  The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure

and purpose," the First Circuit reversed.  *Pharmaceutical Research & Manufacturers of*

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001).  The First Circuit noted that

nothing in the text of the federal statute "prevents states from imposing prior authorization

requirements; indeed, they are explicitly permitted."  *Id.*  After entertaining the argument

that there were federal legislative purposes in "preventing abuse or overprescription of

certain expensive medications," and in "achieving the[] best interests of the Medicaid

recipient," *id.* at 76-77, the court expressed concerns about the possibility of obstruction

but found an "insufficient basis" on the record of competing affidavits at that point in the

proceedings to conclude that the statute presented more than a *de minimis* obstacle to

achieving the goals that the plaintiff had identified.  *Id.* at 77.

The Supreme Court affirmed the First Circuit's decision.  *Pharmaceutical Research*

*& Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003).  Reasoning that the

district court erred in concluding that it was sufficient to show any impediment to a

discernable federal goal, a plurality of justices concluded that obstacle preemption required

a showing of more than a "modest" impediment or harm to a federal statutory goal. *Id.* at 665-67 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

Plaintiff contends that by requiring drug manufacturers to provide 340B-priced drugs to multiple pharmacies, the Maine statute impermissibly expands the obligations of manufacturers and, therefore, conflicts with federal law. According to Plaintiff, 340B allows manufacturers to determine the conditions of its offers to sell discounted drugs, which conditions may include requiring claims data and limiting a covered entity to the use of a single contract pharmacy. Plaintiff maintains that the Maine statute "vastly expands the number of 340B transactions[,]" (Motion at 22), and "fundamentally alters the bargain struck by Congress with manufacturers for participation in 340B, Medicare, and Medicaid." (*Id.* at 23.)

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696;

460

*Johnson*, 102 F.4th 452.  That silence, however, does not necessarily mean that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication.  As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around.").  The Court discerns nothing in 340B to suggest that Congress intended to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate.  The Court likewise discerns nothing in 340B to suggest that Congress intended for manufacturers to have an unfettered right to adopt policies with the purpose of limiting the number of its patients for whom a covered entity may prescribe drugs at the discounted rate.  For instance, Plaintiffs have offered no reason to believe that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity or a certain radius from the facility.  Instead of limiting eligibility and participation, in 2010, Congress significantly increased the number of healthcare facilities that are considered covered entities, an expansion that included rural facilities serving patients over a greater geographic area.

Second, Plaintiff asserts there is a significant conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial

461

proceeding—and provides an additional enforcement mechanism beyond the federal remedy for the same conduct. Plaintiff contends that "[t]he Supremacy Clause does not permit Maine to adopt a scheme that eviscerates the uniformity Congress intended and upsets the bargain Congress set for a federally-created benefit program." (Motion at 29.)

When a federal statute provides a unified administrative remedial scheme for violations of the federal statute, courts typically disfavor statutory interpretations that permit alternate remedies for the same violations, such as implied private rights of action. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 329 (2015) (concluding that the complexity of enforcing the federal statute "coupled with the express provision of an administrative remedy . . . shows that the [statute] precludes private enforcement of [the provision] in the courts"); *Astra*, 563 U.S. at 120. Similarly, courts have recognized that state efforts to impose additional state law remedies for the same violations of federal law are more likely to be preempted due to the potential to disrupt the tradeoffs embodied in the federal remedial scheme. *See, e.g.*, *Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 193 (4th Cir. 2007) (noting that "the [federal statute] does not explicitly authorize states to create alternative remedies" for violations of the federal statute, and concluding that "in view of the [federal statute]'s unusually elaborate enforcement scheme, there cannot be the exceptionally strong presumption against preemption of such state remedies that would be warranted if the [federal statute]

462

did not provide federal remedies"); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code.").

Defendants argue, however, that the Maine statute does not provide additional overlapping remedies for the same federal violations because alleged violations of the state law would not be based on the same overcharging, diversion, and price disputes that are enforced through the federal administrative process. Defendants' argument has merit. Federal violations like overcharging and diversion are not enforced under the state statute. *See Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90, 96 (1st Cir. 2000) (noting that a state law can impair a federal law "to the extent that the [state law] provides a means of enforcing [the federal law's] commands" but there is no impairment if "the practices made unlawful under [the state law] were not unlawful under [the federal law]") (summarizing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)).

Plaintiff argues that there is the potential for conflicting adjudications because a manufacturer might assert as an affirmative defense in a state enforcement proceeding that the covered entity's drugs which the manufacturer refused to deliver or distribute through a contract pharmacy were not required to be sold at the 340B price under federal law, but it is far from obvious whether or how often such questions would arise. At least at this stage, the alleged conflict is too speculative to support a finding that Plaintiff is likely to prevail. *See English v. General Electric Co.*, 496 U.S. 72, 90 (1990) (finding prospect of overlapping state and federal enforcement proceedings "too speculative a basis on which

463

to rest a finding of pre-emption" because the Supreme Court "has observed repeatedly that pre-emption is ordinarily not to be implied absent an 'actual conflict'").

It is also not clear on this record whether there are any federal remedies available for the conduct the state statute prohibits. The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Manufacturers have argued that contractual policies limiting a covered entity's distribution of the drugs to patients through contract pharmacies (the subject of the Maine statute) could be challenged in a federal agency proceeding as a limitation on the ability of the covered entity to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a significant conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits—that the federal remedy is not available for such conduct because 340B does not address distribution. Again, the alleged conflict is too speculative currently to support a finding that Plaintiff is likely to prevail on the merits of its claim.

Third, Plaintiff argues that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent improper claims and fraud, and the ADR process is evidently intended to assist in that objective. Manufacturers have argued they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. The concern regarding

464

access to evidence of possible violations is not unreasonable. But neither Plaintiff nor the manufacturers have demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous. For instance, the 340B program and the audit process have existed for many years, but there are apparently no cases where a manufacturer requested but was denied an audit due to a lack of relevant claims data. As with the other enforcement arguments, on the current record, the alleged impediment is too speculative to support a finding that Plaintiff is likely to prevail on its claim.[11]

Furthermore, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiff. *Cormier*, 51 F.4th at 8. According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the challenged state regulation. *Id.* (citing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)). As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress

---

[11] Plaintiff argued previously that there could be a conflict for those manufacturers participating in HRSA's rebate pilot program because its rules require the collection of some claims data. The State suggested that there would likely be no conflict because under the savings clause of the state statute, the collection of claims data is not prohibited when it is required under federal law. The Court need not address the issue further as the parties later stipulated that the issue was resolved when the State determined that Chapter 103 is not violated when a manufacturer within the rebate pilot program requires the submission of the specified claims data. (Stipulation at 3–4, ECF No. 47.)

intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, delivery of a covered entity's property to contract pharmacies, and collection of claims data.

Finally, the other prominent case Plaintiff cites, *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003), is not to the contrary. In *Hadley*, the operator of an apartment building financed through a federal subsidized housing program sought to prepay its mortgage and withdraw from the federal program. *Id.* at 727. Although the operator met the federal withdrawal requirements, a state statute imposed additional conditions and different time schedules for withdrawing from the federal program. *Id.* at 730. The Eighth Circuit declined to apply the presumption against preemption based on *Buckman* and found the state statute preempted. *Id.* at 731, 734.

Plaintiff points to certain broad language in the opinion. *See id.* at 732 ("Simply, state statutes may not interfere with the implementation of a federal program by a federal agency.") But other portions of the decision demonstrate that the Eighth Circuit did not adopt the categorical non-targeting rule that Plaintiff contends should apply here. *See id.* at 734 ("We do not suggest that all state attempts at preserving existing federally subsidized, low-income housing are preempted. Nothing . . . indicates that states are prohibited from instituting their own incentive plans or other programs to preserve low-income housing within the framework of the federal prepayment scheme.").

Unlike in this case, the state statute in *Forest Park* imposed requirements inconsistent with the federal rules because they "restrict[ed] the exercise of the participants' federally granted prepayment rights" and used different timelines than the

federal law, "creat[ing] delays in the prepayment process." *Id.* at 734. In addition, unlike here, that state statute regulated the relationship between the federal agency and the regulated entity rather than relationships between private parties. *See id.* at 732 ("[T]he state law forces the federal government to continue to provide financial assistance to the participant when both the federal government and the participant have chosen to end their relationship."). In other words, the state statute was preempted in *Forest Park* not because of a categorical non-targeting rule but because the degree of conflict or interference was of a far greater magnitude than Plaintiff has shown here.

In sum, on the record at this stage of the proceedings, which record includes competing sworn declarations, the Court is not convinced that Plaintiff is more likely than not to establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B. As related to obstacle conflict preemption, the Court is not persuaded that the state statute interferes with or undermines the available federal remedies or that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such that the core objectives of the program would be compromised. Plaintiff has failed to establish a likelihood of success on its obstacle preemption claim. *See Fitch*, 152 F.4th at 647–48; *McClain*, 95 F.4th at 1145.

## B.    Other Factors

Because Plaintiff has failed to establish that it will likely succeed on the merits of its intergovernmental immunity or preemption claims, the Court need not address the remaining preliminary injunction factors (irreparable harm, the balance of hardships, and

the public interest). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### CONCLUSION

After an assessment of the factors relevant to Plaintiff's request for a preliminary injunction, the Court concludes that Plaintiff is not entitled to preliminary injunctive relief. Accordingly, the Court denies Plaintiff's motion for a preliminary injunction.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of January, 2026.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>*Plaintiff,*<br><br>v.<br><br>PETER F. NERONHA, in his official capacity as ATTORNEY GENERAL OF RHODE ISLAND, *et al.*,<br><br>*Defendants.* | Case No. 1:25-CV-387-JJM-AEM |

## NOTICE OF APPEAL

Notice is hereby given that Plaintiff Novartis Pharmaceuticals Corporation appeals to the United States Court of Appeals for the First Circuit from this Court's Order entered orally at the hearing in this action on September 30, 2025, denying Novartis's motion for a preliminary injunction.

**[SIGNATURE PAGE FOLLOWS NEXT]**

Dated: September 30, 2025

Respectfully submitted,

*/s/ Paul M. Kessimian*
Paul M. Kessimian  (#7127)
Robert K. Taylor (#6514)
James P. McGlone (#10847)
PARTRIDGE SNOW & HAHN LLP
40 Westminster Street, Suite 1100,
Providence, RI 02903
Telephone: (401) 861-8200
pkessimian@psh.com

Susan M. Cook*
Jessica L. Ellsworth*
Alexander V. Sverdlov*
Marlan Golden*
Jacob T. Young*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis*
*Pharmaceuticals Corporation*

*\*Admitted pro hac vice*

4920-0551-3326

**Exhibit 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

<table>
<tr>
<td>

**PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,**

    *Plaintiff*,

        **v.**

**PETER NERONHA, in his official capacity as Attorney General of the State of Rhode Island; DAVID BERGANTINO, in his official capacity as Auditor General of Rhode Island,**

    *Defendants*.

</td>
<td>

**No. 1:25-cv-00501-JJM-AEM**

</td>
</tr>
</table>

## NOTICE OF APPEAL

Notice is hereby given that Pharmaceutical Research and Manufacturers of America ("PhRMA"), plaintiff in the above-referenced matter, appeals to the United States Court of Appeals for the First Circuit from the Order entered via text order on December 29, 2025, denying PhRMA's motion for a preliminary injunction and entering final judgment, and final judgment entered on December 29, 2025 (ECF No. 34).

Dated:  December 31, 2025

Respectfully submitted,

**PHARMACEUTICAL RESEARCH
AND MANUFACTURERS OF AMERICA**

 By its attorneys,

/s/*Aaron L. Weisman*
Aaron L. Weisman (#4438)
William E. O'Gara (#4257)
Brian J. Lamoureux (#6211)
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park
130 Atwood Avenue, Suite 215N
Johnston, RI 02919
401 824 5100 t
401 824 5123 f
aweisman@pldolaw.com
wogara@pldolaw.com
bjl@pldolaw.com

Philip J. Perry (*pro hac vice*)
Andrew D. Prins (*pro hac vice*)
Abid R. Qureshi (*pro hac vice*)
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com

2

472

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2025, I caused the foregoing document to be filed via the Court's CM/ECF electronic filing system ("CM/ECF"), which sent notice to all parties receiving notification through CM/ECF.

/s/ *Aaron L. Weisman*
Aaron L. Weisman

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM        Document 129    Filed 06/09/26        Page 477 of 576
pg 1 of 2

**Exhibit 3**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 25-cv-1847-WJM-KAS

ABBVIE, INC., *et al*.,

      Plaintiffs,

v.

PHILIP WEISER, *et al*.,

      Defendants.

---

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Plaintiffs AbbVie, Inc., Allergan, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiffs" or "AbbVie") bring this lawsuit against Defendants Philip Weiser, in his official capacity as Attorney General of the State of Colorado; and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as members of the Colorado State Board of Pharmacy (collectively, "Defendants"), to challenge the constitutionality of Colorado Senate Bill 25-071, now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes (C.R.S.) §§ 6-29-101 *et seq.* (2025) (the "Act").[1]  (ECF No. 43.)

Currently before the Court is AbbVie's Motion for a Preliminary Injunction ("Motion"), by which it seeks to preliminarily enjoin enforcement of the Act.  (ECF No. 7; *see also* ECF No. 43 at 65 ¶ 4.)  The Motion has been fully briefed (ECF Nos. 33, 36,

---

[1] The Act went into effect on August 6, 2025.  (*See* ECF No. 33-1 at 9.)

**Exhibit 3**

52, 74),[2] and the Court presided over an evidentiary hearing on the Motion on September 19, 2025 (ECF No. 93).  Thus, it is now ripe for adjudication.

For the reasons set forth below, the Motion is denied.

## I. BACKGROUND[3]

### A. Section 340B

In 1992, Congress enacted § 340B of the Public Health Service Act, 42 U.S.C. § 256b ("Section 340B")—thereby creating the "340B Program"—"to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving those individuals receive crucial subsidies." *AbbVie, Inc. v. Fitch,* 152 F.4th 635, 639 (5th Cir. 2025).  The 340B Program accomplishes this by "impos[ing] ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities."  *Astra USA, Inc. v. Santa Clara County, Cal.,* 563 U.S. 110, 113 (2011).  Those facilities, called "covered entities," "include public hospitals and community health centers, many of them providers of safety-net services to the poor."  *Id.; see also* § 256b(a)(4) (defining "covered entity").

---

[2] With the Court's leave, *Amici Curiae* American Hospital Association, 340B Health, Colorado Hospital Association, and American Society of Health-System Pharmacists (collectively, the "*Amici*") also filed a brief in opposition to the Motion.  (ECF No. 34-1.)

[3] Numerous federal courts have now had occasion to summarize the history of the 340B Program and related HHS guidance relevant to this lawsuit, including the Supreme Court and four Circuit Courts of Appeal.  *See Astra USA, Inc. v. Santa Clara County, Cal.,* 563 U.S. 110 (2011); *AbbVie, Inc. v. Fitch,* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. McClain,* 95 F.4th 1136 (8th Cir. 2024); *Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696 (3d Cir. 2023).  The Court leverages the factual background set forth in those decisions where applicable and adds further detail from the parties' briefing on the Motion where needed.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 132-9   Filed 06/09/26   Page 479 of 576

Exhibit 3

The 340B Program helps covered entities care for their low-income and rural patients in two ways: "First, it gives them extra revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. Second, it enables them to give uninsured patients drugs at little or no cost." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696, 699 (3d Cir. 2023).

The 340B Program "is superintended by the Health Resources and Services Administration ('HRSA'), a unit of the Department of Health and Human Services ('HHS')." *Astra,* 563 U.S. at 113. "Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement ('PPA') used nationwide." *Id.* "PPAs are not transactional, bargained-for contracts." *Id.* Rather, "[t]hey are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.* Specifically, the PPA obligates manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." § 256b(a)(1). Manufacturers' eligibility to participate in Medicaid and Medicare Part B "is conditioned on their entry into PPAs for covered drugs purchased by [covered] entities." *Astra,* 563 U.S. at 113.

Section 340B also prohibits covered entities from engaging in certain conduct:

> First, it bars 'duplicate discounts or rebates,' forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. [42 U.S.C.] § 256b(a)(5)(A). Second, it bars 'diversion,' providing that a covered entity 'shall not resell or otherwise transfer' a discounted drug 'to a person who is not a patient of the entity.' *Id.* § 256b(a)(5)(B). Third, it requires covered

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 142-9    Filed 06/09/26    Page 480 of 576

**Exhibit 3**

> entities to permit [HHS] and drug manufacturers to 'audit' their records to assess compliance with the duplicate-discount and diversion bans. *Id.* § 256b(a)(5)(C). And fourth, it provides that a covered entity that violates the duplicate-discount or diversion bans 'shall be liable' to the drug manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D).

*Fitch,* 152 F.4th at 640.

## B.    Role of Contract Pharmacies

"When Congress first enacted Section 340B, few covered entities had pharmacies in house," *Sanofi Aventis,* 58 F.4th at 700, in substantial part because, for many, "building or maintaining [an in-house] pharmacy is cost-prohibitive," *PhRMA v. McClain,* 95 F.4th 1136, 1139 (8th Cir. 2024). Thus, "[s]ince the beginning, covered entities have contracted with outside pharmacies," or "contract pharmacies," "for the distribution and dispensation of 340B drugs." *Id.* For covered entities with large, rural service areas, "the outsourcing of pharmacy services [also] allowed for drug dispensation closer to where [their] low-income patients reside." *McClain,* 95 F.4th at 1139. "Covered entities using contract pharmacies would still order and pay for the drugs, but they would be shipped directly to the pharmacies." *Sanofi Aventis,* 58 F.4th at 700.

Noting covered entities' reliance on contract pharmacies and Section 340B's "silen[ce] as to permissible drug distribution systems" to patients, 61 Fed. Reg. 43, 549, 43,549 (Aug. 23, 1996), HRSA issued guidance in 1996 "permitting covered entities lacking an in-house dispensing pharmacy to contract with a single third-party commercial pharmacy to receive and dispense 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM        Document 15-2    Filed 06/09/26    Page 481 of 576

**Exhibit 3**

bans," *Fitch,* 152 F.4th at 640 (citing *id.* at 43,550–55).  Then, in 2010, HRSA "changed course" and "issu[ed] new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients."  *Fitch,* 152 F.4th at 640; 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).

After the 2010 guidance, the use of contract pharmacies proliferated, and pharmaceutical manufacturers became increasingly concerned that "contract pharmacies were driving up duplicate discounting and diversion."  *Sanofi Aventis,* 58 F.4th at 700; *see also Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452, 457 (D.C. Cir. 2024) (citing governmental report indicating that "the number of contract pharmacies participating in the program increased from about 1,300 to 23,000" between 2010 and 2019).  So, manufacturers began adopting policies "that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients."  *McClain,* 95 F.4th at 1139.

AbbVie adopted one such policy, its "340B Program Integrity Initiative," in 2023. (ECF No. 7-1 at 3 ¶ 4.)  Under the current iteration of AbbVie's policy, last updated in February 2025, "hospital covered entities" "*without* an in-house outpatient pharmacy may designate a single contract location" "within 40 miles of the HRSA registered covered entity parent site" to receive "orders of 340B priced medicines," provided that the covered entity also "submits limited claims data on 340B utilization" for that contract pharmacy location.  (*Id.* at 51–52 (emphasis in original).)  *See also Fitch,* 152 F.4th at 641 (noting "AbbVie's contract-pharmacy policy . . . essentially follows HRSA's 1996 guidance").

478

Exhibit 3

"HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies."  *Id*.  In December 2020, HHS issued an advisory opinion concluding that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the ceiling price for those drugs."  OIG Advisory Op. No. 20-06, 2020 WL 11422965, at *1 (Dec. 30, 2020).

Manufacturers sued.  Ultimately, the Third and D.C. Circuits upheld the manufacturers' policies because "Congress never said that drug makers must deliver discounted 340B drugs to an unlimited number of contract pharmacies."  *Sanofi Aventis,* 58 F.4th at 707; *Novartis Pharms.*, 102 F.4th at 455 (agreeing that "section 340B does not prohibit manufacturers from limiting the distribution of discounted drugs by contract").[4]  HHS withdrew the advisory opinion.  *Fitch,* 152 F.4th at 641.

C.    **State Legislatures Weigh In**

Following the Third and D.C. Circuits decisions, "several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion."  *Id*.

As pertinent here, the Act was signed into Colorado law on May 30, 2025.  (ECF No. 33-1 at 10.)  Its operative provision prohibits manufacturers from undertaking the following acts:

>    (a)    Unless the receipt of the 340B drugs is prohibited by
>    the federal department of health and human services, a

---

[4] A third appeal is currently pending before the Seventh Circuit.  *See Eli Lilly & Co. v. HHS, et al.*, No. 21-3405 (7th Cir.).

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 72-229    Filed 06/09/26    Page 483 of 576
pg. 12 of 229

**Exhibit 3**

manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.

(b)    A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

§ 6-29-105(1).  A violation of the Act is an unfair or deceptive trade practice under the Colorado Consumer Protection Act ("CCPA"), and the violator is subject to CCPA enforcement provisions and penalties, including monetary fines of up to $20,000 per violation.  § 6-29-105(3)(a).

Pharmaceutical manufacturers have filed many lawsuits challenging state laws comparable to the Act.  Unlike their earlier challenges to the 2020 HHS guidance, the very large majority of these lawsuits have been unsuccessful to date.[5]

---

[5] *See AbbVie Inc. v. Neronha,* 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (denying preliminary injunction as to Rhode Island law); *AbbVie, Inc. v. Frey,* 2025 WL 2813787, at *1 (D. Me. Sept. 23, 2024) (same as to Maine law); *AstraZeneca Pharms. LP v. Fitch,* 766 F. Supp. 3d 657, 664–65 (W.D. Miss. 2024) (same as to Mississippi law); *Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d 737, 749–50 (S.D. Miss. 2024) (same); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) (same as to Tennessee law); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025) (granting motion to dismiss manufacturer's claims that Missouri law was preempted and violated the Takings Clause); *PhRMA v. Murrill,* 2024 WL 4361597, at *8–9 (W.D. La. Sept. 30, 2024) (granting

**Exhibit 3**

**D.      Procedural History**

AbbVie filed this lawsuit challenging the constitutionality of the Act on June 12, 2025 (ECF No. 1) and moved for a preliminary injunction one day later (ECF No. 7). After setting oral argument on the Motion, AbbVie requested an evidentiary hearing so that it could proffer the testimony of three witnesses in support of its requested relief. (ECF No. 31.)  The Court set an evidentiary hearing at AbbVie's behest.  (ECF No. 32.)

During the September 19, 2025 hearing, the Court heard the testimony of five witnesses in total.  First, AbbVie called expert witness Alice Chen, Ph.D., a professor of public policy at the University of Southern California, to generally "testify about . . . how the [340B] program operates in practice" and "explain the growth of contract pharmacies."  (ECF No. 111 at 19:11–20; *see also* ECF No. 36-2.)  Second, AbbVie called Mr. Edward Scheidler, its corporate representative, to "explain that, in fact, AbbVie will not sell its drugs at the 340B price unless [its] conditions are agreed to, which [AbbVie avers] is a complete answer to the State's position on takings."  (ECF No. 111 at 20:1–6.)  And lastly, AbbVie called expert witness Dr. Amitabh Chandra, a professor of public policy at Harvard University, to "explain where the research shows

summary judgment in favor of State on manufacturers' claims that Louisiana law was preempted and violated the Takings Clause); *AbbVie Inc. v. Fitch,* 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) (denying preliminary injunction as to Mississippi law), *aff'd* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch,* 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) (same); *PhRMA v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (granting summary judgment in favor of Arkansas official on manufacturers' claim that Arkansas law was preempted), *aff'd* 95 F.4th 1136 (8th Cir. 2024), *cert. denied* 145 S.Ct. 768 (2024); *but see AstraZeneca Pharms. LP v. Harris,* No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025), ECF No. 141 (denying judgment on the pleadings as to manufacturer's claim that Arkansas law violated Takings Clause); *PhRMA v. Morrisey,* 760 F. Supp. 3d 439, 452–60 (S.D.W. Va. 2024) (granting preliminary injunction as to West Virginia law and denying the defendants' motion to dismiss).

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 129    Filed 06/09/26    Page 485 of 576

pg. 12 of 29

**Exhibit 3**

that 340B profits go," which, according to AbbVie, "is not to charity care, to uncompensated care, or to benefit patients." (*Id.* at 20:7–11; *see also* ECF No. 36-1.)

Defendants, for their part, proffered testimony from "two witness who work for Colorado hospital systems that are 340B covered entities," both of whom were called to generally testify "about how their systems have been impacted by the drug company restrictions and how they expect it to change under the new law." (ECF No. 111 at 23:13–14.)  Those witnesses included Dr. Kevin Forbush, "a pharmacist who runs the 340B program at Intermountain Health," and Kevin Stansbury, the CEO of Lincoln Health, "a county governmental hospital system" located in the rural town of Hugo, Colorado.  (*Id.* at 23–25.)

The Court refers to some of that hearing evidence where relevant to its analysis below.  But ultimately, it finds it unnecessary to recount much of the testimony put forth at the evidentiary hearing.  In general, the Court concurs with Defendants' view that the testimony presented a compelling case that Section 340B is in dire need of legislative reform, but it did not significantly move the needle on the issues immediately before the Court—namely, whether AbbVie is substantially likely to succeed in demonstrating that the Act is preempted by federal law or effects an unconstitutional taking.

## II.    LEGAL STANDARD

"Because a preliminary injunction is an 'extraordinary remedy never awarded as of right,'. . . the movant must make a 'clear and unequivocal' showing it is entitled to such relief." *Colorado v. U.S. Envtl. Protection Agency,* 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008)); *Port City Props. v. Union Pac. R.R. Co.,* 518 F.3d 1186, 1190 (10th Cir. 2008) (internal citation

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 112-2 29 Filed 06/09/26    Page 486 of 576
Exhibit 3

omitted)).  "To obtain a preliminary injunction, the movant must show (1) it 'is substantially likely to succeed on the merits,' (2) it 'will suffer irreparable injury if the injunction is denied,' (3) its 'threatened injury outweighs the injury the opposing party will suffer under the injunction,' and (4) 'the injunction would not be adverse to the public interest.'"  *Colorado,* 989 F.3d at 883 (quoting *New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior,* 854 F.3d 1236, 1246 (10th Cir. 2017)).  The third and fourth factors merge when the government is the opposing party.  *Denver Homeless Out Loud v. Denver, Colorado,* 32 F.4th 1259, 1278 (10th Cir. 2022) (citation omitted).

### III.    ANALYSIS

AbbVie contends that the Act is unconstitutional because (1) it is preempted by federal law pursuant to the Supremacy Clause and/or (2) it effects a taking in violation of the Takings Clause.  (*See generally* ECF Nos. 7, 43.)  For the reasons explained below, the Court finds that AbbVie has not established a substantial likelihood of success on the merits of either claim.  Accordingly, the Court does not proceed to consider the remaining preliminary injunction factors.  *See Vill. of Logan v. U.S. Dep't of Interior,* 577 F. App'x 760, 766 (10th Cir. 2014) (a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for preliminary injunctive relief unwarranted"); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1266 n. 8 (10th Cir. 2004) (concluding "the other preliminary injunction factors" "need not [be] address[ed]" after finding against the movant on one factor).

### A.    Preemption

"Congress has the power to preempt state law" pursuant to the Supremacy Clause, which "provides a clear rule that federal law 'shall be the supreme Law of the

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 112-2   29 Filed 06/09/26    Page 487 of 576

**Exhibit 3**

Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States,* 567 U.S. 387, 399 (2012) (quoting U.S. Const., Art. VI, cl. 2.)  "[A]ny preemption inquiry begins with the presumption that federal law does not override 'the historic police powers of the States,' without the 'clear and manifest' intent of Congress." *Bradshaw v. Am. Airlines, Inc.,* 123 F.4th 1168, 1173 (10th Cir. 2024) (quoting *Arizona,* 567 U.S. at 400).  Thus, congressional intent is "the ultimate touchstone in every pre-emption case." *Wyeth v. Levine,* 555 U.S. 555, 565 (2009) (citation omitted).

"The party claiming preemption . . . bears the burden of showing with specificity that Congress intended to preempt state law." *Day v. SkyWest Airlines,* 45 F.4th 1181, 1184 (10th Cir. 2022) (internal citation and quotation marks omitted).  "Congress's intent to preempt state law can be shown 'through a statute's express language' or implied 'through its structure and purpose.'" *Bradshaw,* 123 F.4th at 1173 (quoting *Altria Grp., Inc. v. Good,* 555 U.S. 70, 76 (2008)).  Here, AbbVie does not argue that Section 340B expressly preempts the Act.  (*See generally* ECF No. 7.)  Instead, it contends that the Act is impliedly "preempted because it intrudes on a federal field and conflicts with the text and purpose of the 340B statute."  (*Id.* at 7.)

Notably, categories of preemption are not "rigidly distinct." *English v. Gen. Elec. Co.,* 496 U.S. 72, 79 n.5 (1990).  "Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent . . . to exclude state regulation." *Id.*  That sentiment rings true here, where it is, at times, difficult to distinguish between AbbVie's arguments in support of its field preemption and conflict preemption theories.  Nevertheless, the Court

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM      Document 122    Filed 06/09/26    Page 488 of 576

**Exhibit 3**

endeavors to disentangle those arguments and address AbbVie's field and conflict preemption theories separately below.

        1.        <u>Field Preemption</u>

Field preemption "exists where 'a framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399).  AbbVie has not demonstrated that it is substantially likely to succeed in demonstrating that either inference applies here.

At the outset, AbbVie argues that Congress intended to preempt the field because, through Section 340B, it created "a single comprehensive federal scheme that governs every detail" of "the federally occupied 340B field," "from covered-entity eligibility to manufacturer obligations and enforcement . . . ."  (ECF No. 7 at 7–8 (emphasis added).)  Though AbbVie's briefing does not specifically define the "340B field," AbbVie's counsel seemed to affirm at the evidentiary hearing that it views the relevant regulatory field quite broadly: "the field of the 340B program, itself."  (ECF No. 111 at 290:1–4.)

But it cannot be that Congress has enacted a scheme that governs "every detail" of the 340B Program.  *Four* federal Circuit Courts of Appeal now concur that Section 340B "is silent about delivery," *Sanofi Aventis,* 58 F.4th at 703; *Novartis Pharms.,* 102 F.4th at 461 ("agree[ing] entirely"); *McClain,* 95 F.4th at 1143 (relying on *Sanofi Aventis*), and thus "regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution," *Fitch,* 152 F.4th at 646.  The Court is further inclined to

485

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 132 29  Filed 06/09/26    Page 489 of 576

Exhibit 3

think that the manner of distribution of 340B drugs to patients is a relevant "detail" of the 340B Program of which Congress is well-aware, given that (1) "[p]harmacies have always been an essential part of the 340B Program" and (2) Congress *did* "directly address distribution by third-party wholesalers." *McClain,* 95 F.4th at 1143 (citing 42 U.S.C. § 256b(a)(8)); *see also Fitch,* 152 F.4th at 646 ("Congress 'knew how to impose delivery-related requirements' and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers." (quoting *Sanofi Aventis,* 58 F.4th at 704)). That "Congress chose not regulate distribution to patients . . . indicat[es] that it did not intend to occupy the entire field in this area." *Fitch,* 152 F.4th at 646.

Second, AbbVie suggests that there is necessarily a field preemption issue because the Act "could not exist but for the *federal* 340B statute." (ECF No. 7 at 8 (emphasis in original); *see also* ECF No. 111 at 290:1–4 (arguing that the Act facially "targets the regulation of a federal program, and that intrudes on a federal field").) The Court presumes that AbbVie endeavors to show through this argument that there is a "federal interest . . . 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject." *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399).

AbbVie failed to direct the Court to any authority related to this argument in its Motion. (*See id.*) However, in its reply, AbbVie cited two authorities for the somewhat-related proposition that "there is no presumption against preemption where a state law explicitly depends on a federal statute": *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) and *Boyle v. United Techs. Corp.,* 487 U.S. 500 (1988). (ECF No. 36

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM       Document 114-2  29 Filed 06/09/26    Page 490 of 576
**Exhibit 3**

at 4–5.)  Moreover, at the evidentiary hearing, AbbVie's counsel likened the Act to an impermissible state "regulation of a federal instrumentality, like in *McCulloch v. Maryland*."  (ECF No. 111 at 289:10–15.)

*Buckman* and *Boyle* may be a closer fit for AbbVie's argument that the Act is in tension with Section 340B's enforcement scheme, but those authorities do not support the broad contention that there is necessarily a field preemption issue where "a state law explicitly depends on a federal statute."  (ECF No. 36 at 4.)  Rather, the Supreme Court held in those cases that state-law causes of action were impliedly preempted by federal common law because there was a "uniquely federal interest" at stake, like "the civil liabilities arising out of the performance of federal procurement contracts," *Boyle,* 487 U.S. at 506 (government contractors immune from liability under state tort law), or "the relationship between a federal agency and the entity it regulates," *Buckman,* 531 U.S. at 347 (state tort law fraud-on-the-FDA claims impliedly preempted).  AbbVie has not identified a "uniquely federal interest" here.

This case is also unlike *McCulloch v. Maryland,* where the direct subject of state regulation was itself a federal instrumentality.  17 U.S. 316 (1819).  Here, it is the non-governmental participants and beneficiaries of the 340B Program—namely, pharmaceutical manufacturers and covered entities—that are the subject of state regulation.  And "the Supreme Court . . . has never adopted a categorical rule that requires a finding of preemption whenever a state law is directly addressed to those participating in a federal program where the federal statute does not rely on the state to implement the program."  *AbbVie Inc. v. Frey,* 2025 WL 2813787, at *10 (D. Me. Sept. 23, 2025).  To the contrary, "matters left unaddressed in [] a [federal] scheme are

487

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 115-2    29 Filed 06/09/26    Page 491 of 576

Exhibit 3

presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994).

The fundamental problem with AbbVie's argument that the Act is preempted because it depends on a federal statute is that it is backwards. As the Court understands it, AbbVie essentially argues that "the existence of a federal scheme" necessarily establishes there is a sufficiently dominant "federal interest" from which it can be assumed that Congress intended to "preclude enforcement of state laws on the same subject." *Bradshaw,* 123 F.4th at 1173 (citation omitted). But that is not the law, and AbbVie cannot circumvent its burden to identify a compelling federal interest warranting preemption by pointing to the mere existence of a federal statute.

Lastly, AbbVie argues that the Act "goes to the very heart of the federally occupied field: [i]t overrides the *offer* structure Congress established, eliminates manufacturers' federally permitted discretion, and dictates the terms under which entities receive discounted drugs." (ECF No. 7 at 8.) To the extent AbbVie is arguing that the relevant field is defined more narrowly—"the terms by which manufacturers must offer discounted drugs under the 340B program"—"there would still be no field preemption." *Frey,* 2025 WL 2813787, at *8. "[B]ecause 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field." *Id.* (citing *Sanofi Aventis,* 58 F.4th at 704 (observing, as to the terms of an offer, that the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank")).) Congress's intent to preempt the field cannot be inferred solely from the fact that it left certain "terms" to manufacturers'

488

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 162-1   Filed 06/09/26   Page 492 of 576
pg 162 of 229

**Exhibit 3**

discretion. AbbVie's discretion to set those terms—namely, where it is willing to deliver 340B drugs—is derived from Congress's silence. *See Novartis Pharms.,* 102 F.4th at 460 ("Section 340B is . . . silent about delivery conditions.") And "Congressional silence will not be presumed to mandate preemption." *Paul v. Monts,* 906 F.3d 1468, 1475 n.8 (10th Cir. 1990) (internal citation and quotation marks omitted).

The counter inference to AbbVie's arguments is that the Act does not intrude on a federal field but instead implicates "traditional general areas of state regulation," like "public health," *Fitch,* 152 F.4th at 647 (citing *Gobeille v. Lib. Mut. Ins. Co.,* 577 U.S. 312, 325 (2016) (noting "the State's traditional power to regulate in the area of public health")), and "the practice of pharmacy," *McClain,* 95 F.4th at 1143 (citation omitted). The "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria Grp.,* 555 U.S. at 77 (citation omitted), "applies with greater force when the alleged conflict is in an area traditionally occupied by the States," *Ramsey Winch Inc. v. Henry,* 555 F.3d 1199, 1204 (10th Cir. 2009). At this stage, AbbVie has failed to adduce sufficient evidence to persuade the Court that it is substantially likely to succeed in demonstrating that (1) this presumption against preemption does not extend to the Act in the first instance and/or (2) that the presumption is overcome by "a strong showing that Congress intended preemption." *Fitch,* 152 F.4th at 1144.

2.    Conflict Preemption

A state law provision will "also preempted if it conflicts with federal law, either because (1) 'compliance with both federal and state regulations is a physical impossibility,'" "or because the provision (2) 'stands as an obstacle to the

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 117-2   pg 172 of 229   Filed 06/09/26   Page 493 of 576

**Exhibit 3**

accomplishment and execution of the full purposes and objectives of' federal law."

*United States v. Supreme Court of New Mexico,* 839 F.3d 888, 918 (10th Cir. 2016)

(quoting *Arizona,* 567 U.S. at 399).

Here, AbbVie argues that the Act "stands as an obstacle" to Congress's

objectives for three reasons.  (ECF No. 7 at 8–9; ECF No. 52 at 4.)  Whether these

alleged conflicts are "a sufficient obstacle" to warrant a finding of conflict preemption "is

a matter of judgment, to be informed by examining the federal statute as a whole and

identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council,*

530 U.S. 363, 373 (2000).

a.      *Enforcement*

AbbVie first contends that the Act "stands as an obstacle" to Congress's

objectives because it "contravenes HRSA's exclusive enforcement authority."  (ECF

No. 7 at 8.)  On this record, the Court is unpersuaded.

AbbVie asserts that "[f]ederal law vests enforcement solely in HHS and lays out

the precise tools available: audits, dispute resolution, and civil penalties."  (*Id.* at 9

(citing §§ 256b(d)(l)(B)(v), (vi), (d)(3)).)  By contrast, it notes that "[s]tate enforcement

mechanisms" under the Act include "civil suits by third parties, the Attorney General, or

the Board of Pharmacy."  (*Id.*)  AbbVie thus contends that the federal and state

enforcement frameworks are in direct conflict insofar as the Act vests enforcement

authority in actors *other* than HRSA.

Following the Supreme Court's decision in *Astra,* there can be little debate that

Section 340B decidedly does *not* authorize a private right of action for violations of the

federal statute.  Indeed, the parties conceded in that case that covered entities had "no

**Exhibit 3**

[private] right to sue for overcharges under [§ 340B] itself," and the Supreme Court proceeded to hold "that suits by [covered] entities to enforce ceiling-price contracts [the PPAs] running between drug manufacturers and the Secretary of HHS [were also] incompatible with the statutory regime."  563 U.S. at 113.

But this does not end the inquiry.  "'Conflict is imminent' when 'two separate remedies are brought to bear *on the same activity*.'"  *Crosby,* 530 U.S. at 373 (quoting *Wis. Dep't of Indus. v. Gould, Inc.,* 475 U.S. 282, 286 (1986)) (emphasis added); *see also Arizona,* 567 U.S. at 402 ("Permitting the State to impose its own penalties for the *federal offenses* here would conflict with the careful framework Congress adopted." (emphasis added)).  AbbVie has identified two separate remedies, but it does not discuss in its briefing the activities those remedies are intended to redress.

Numerous federal courts have now considered the same argument that AbbVie sets forth here, and nearly all have found that state law enforcement schemes like that found in the Act "do[] not conflict with Section 340B's enforcement scheme."  *E.g., Fitch,* 152 F.4th at 647.  Though "true that Congress made HHS the sole enforcer of Section 340B," the Fifth and Eighth Circuits reasoned that the comparable state laws before them "d[id] not intrude upon this authority because [they did] not impose penalties for *violations of Section 340B*, like failing to offer discounted drugs to covered entities or engaging in diversion."  *Id.* at 647–48 (emphasis added); *McClain,* 95 F.4th at 1144 ("HHS has jurisdiction over different disputes: disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs.").  Rather, the state laws "impose[d] penalties when drug manufacturers [*violated the state law*] by interfering with the

491

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 11-2 29  Filed 06/09/26    Page 495 of 576
**Exhibit 3**

distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies." *Fitch,* 152 F.4th at 648; *McClain,* 95 F.4th at 1145 (reasoning the Arkansas law's penalties were aimed at "deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements"). Put simply, the state law penalties were "aimed at activity that falls outside the purview of 340B." *McClain,* 95 F.4th at 1145.

The same is true of the Act here. *See* § 6-9-105(3)(a) ("A person that violates *this [Act]* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in Article 1 of this Title 6." (emphasis added)).

Nevertheless, at the evidentiary hearing, AbbVie highlighted that, in response to regulatory comments from stakeholders like Dr. Forbush, HRSA recently modified the 340B Administrative Dispute Resolution Regulation to explain that the 340B ADR Panel is permitted to hear "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024). (*See also* ECF No. 111 at 105–108.) Dr. Forbush agreed during his testimony that he, personally, "wanted the government to clarify that it counts as an overcharge of a drug when a manufacturer imposes limits or conditions on a covered entity's ability to purchase drugs at the 340B price." (*Id.* at 105:24–106:3.)

Notably, though, HRSA expressly declined to promulgate "an explicit definition of the term 'overcharge,'" instead choosing to explain only that "[w]hen an overcharge claim is presented before a 340B ADR Panel, the Panel will follow the 340B statute" and

**Exhibit 3**

"relevant case law," among other sources.  89 Fed. Reg. at 28,649.  Given the Third and D.C. Circuits have held that manufacturers do not violate Section 340B when they restrict a covered entity's ability to distribute drugs to patients through contract pharmacies, it is difficult to see how that conduct "could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price *under federal law*" before the ADR Panel.  *Frey,* 2025 WL 2813787, at *11 (emphasis added).  At the very most, "the alleged conflict is too speculative" at this stage "to support a finding that [AbbVie] is likely to prevail on [its] claim" that the Act is preempted because it contains a conflicting enforcement mechanism.  *Id.*

For these reasons, the Court concludes that AbbVie has not demonstrated a likelihood of success on the merits of its preemption claim based on a purported conflict between the enforcement mechanisms of Section 340B and the Act.

b.    *340B Drug Pricing*

Next, AbbVie argues that Section 340B and the Act are in conflict because, "like the federal statute, [the Act] regulates *pricing,* not 'delivery' . . . ."  (ECF No. 7 at 9.)  The Court is unpersuaded.

Much of AbbVie's argument originates with the Act's definition of a "340B drug," which is as follows:

> . . . a drug that:
>
> (a)    Is a covered outpatient drug within the meaning set forth in 42 U.S.C. sec. 256b;
>
> (b)    Has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. sec. 256b(a)(1);

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 112-2129    Filed 06/09/26    Page 497 of 576

**Exhibit 3**

> (c)    Is purchased by a covered entity.  As used in this subsection (2)(c), a drug is considered "purchased" if it would have been purchased but for the restriction or limitation described in section 6-29-105.

§ 6-29-103(2) (emphasis added).

First, AbbVie argues that the Act "by its very text cannot escape the word 'price.'" (ECF No. 7 at 9.)  However, as concisely put by the *Amici,* "[t]he fact that [the Act] includes 'the word price' . . . does not mean that it *regulates* price."  (ECF No. 34-1 at 7 (emphasis in original).)  Indeed, the cited definition makes clear that the price is set "*pursuant to [Section 340B]*."  § 6-29-103(2)(b) (emphasis added); *cf., e.g., McClain,* 95 F.4th at 1145 (concluding substantially similar Arkansas statute "does not set or enforce discount pricing"); *PhRMA v. Murrill,* 2024 WL 4361597, at *9 (W.D. La. Sept. 30, 2024) ("[D]iscounts are set by the federal government, not the State of Louisiana or Act 358."); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) ("The amount of the discount is not at issue and is not affected by the state scheme.").

Second, AbbVie emphasizes that the Act defines a 340B drug as inclusive of one that "*would have been purchased* but for the restriction or limitation" imposed by AbbVie's policy.  § 6-29-103(2) (emphasis added).[6]  In this way, the Court understands AbbVie to argue that the Act conflicts with Section 340B because it compels AbbVie to make sales it otherwise would have refused to make by "attach[ing] 340B discounts to drugs shipped to for-profit pharmacies or other 'authorized' locations."  (ECF No. 7 at 9.)

---

[6] In substantial part, this argument appears to be a repackaging of AbbVie's argument that Congress has preempted the field when it comes to the terms that manufacturers may or may not attach to their offers of 340B drugs.  The Court's analysis as to that issue above applies with equal force to the extent AbbVie bases its conflict preemption claim on the same grounds. (*See* Section III.A.1 *infra.*)

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 22-2    pg 122 of 129    Filed 06/09/26    Page 498 of 576
Exhibit 3

Put still another way, AbbVie insists that the Act conflicts with Section 340B because it

"grants contract pharmacies expanded access to 340B pricing."  (ECF No. 36 at 3.)

Like the Fifth Circuit, the Court understands AbbVie's concern is that the

involvement of contract pharmacies comes with an increased risk of abuse of the 340B

Program.  *See Fitch,* 152 F.4th at 648 (noting AbbVie's grievance is that "it believes that

when covered entities are allowed to distribute Section 340B drugs via contract

pharmacies, those contract pharmacies cause covered entities to place orders for larger

quantities of discounted drugs than they are actually entitled to, and the contract

pharmacies then improperly resell those discounted drugs in ways that increase their

profits").  But, to again borrow the words of the Fifth Circuit, AbbVie's suggestion that

the Act facially requires it to sell 340B drugs to non-covered entities

> is simply incorrect.  [The Act] does not expand Section
> 340B's list of covered entities to include contract
> pharmacies.  By its plain text, [the Act] requires drug
> manufacturers to give custody of discounted drugs to
> contract pharmacies only insofar as they have partnered with
> covered entities to distribute the drugs to patients.  It does
> not compel manufacturers to 'offer' discounted drugs to
> contract pharmacies in the way that Section 340B compels
> them to 'offer' these drugs to covered entities.

*Id.* at 647.  On this record, the Court is further unconvinced that the Act will have the

practical effect of requiring AbbVie to make sales to non-covered entities in conflict with

Section 340B, such that a preliminary injunction is warranted.  *Cf. id.* at 648 ("AbbVie is

essentially alleging that the real problem with [the Mississippi law] is not a *feature* of the

law, but rather a *bug.*  And on this record, we cannot say that this potential bug in [the

state law] merits a preliminary injunction.").

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 23-2    29 Filed 06/09/26    Page 499 of 576
**Exhibit 3**

For these reasons, the Court also concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption claim based on its assertion that, like Section 340B, the Act purports to regulate pricing.

> c. *Pilot Program*

Third, AbbVie avers that the Act's claims data restriction conflicts with the impending 340B Rebate Model Pilot Program ("the "Pilot Program"), which HRSA announced shortly after AbbVie filed the Motion. (ECF No. 52 at 2.) *See also* 90 Fed. Reg. 36,163 (Aug. 1, 2025).

As pertinent background, AbbVie explains that the Pilot Program concerns the interplay between the 340B Program and the Inflation Reduction Act's Drug Price Negotiation Program ("DPNP"), 42 U.S.C. §§ 1320f *et seq.* (*Id.*) Whereas the 340B Program "requires manufacturers to offer drugs to certain 'covered entities' at a statutorily calculated 'ceiling price,'" the DPNP "requires HHS to set a 'maximum fair price' ('MFP') for certain selected drugs," which manufacturers must then make "available to certain Medicare-covered individuals at the MFP." (*Id.* (citing §§ 1320f(a)(3), (c)(2), 1320f-2(a)(3)).) Under the DPNP's "nonduplication" provision, manufacturers must provide the lower of the two price concessions—the 340B ceiling price or the MFP—but not both. (*Id.* (citing § 1320f-2(d)).) According to AbbVie, manufacturers, rather than HHS, "shoulder the task" of "identifying and deduplicating 340B dispenses." (*Id.*)

In response to "widespread concern about the nonduplication and compliance problems" facing manufacturers, AbbVie states that "HRSA announced the Pilot Program to test a rebate model for effectuating the 340B price to covered entities." (*Id.*

**Exhibit 3**

(citing 90 Fed. Reg. at 36,163–65).)  As pertinent here, the Pilot Program allegedly

permits "manufacturers . . . to request from covered entities—and covered entities are

expected to provide—claims data" to better enable manufacturers "[t]o determine which

price concession (if any) is appropriate" under the new rebate model.  (*Id.* at 3.)  AbbVie

believes that the Act poses a barrier to its participation in the Pilot Program because it

restricts manufacturers "from requiring 340B covered entities and contract pharmacies

to 'submit any health information, claims or utilization data, purchasing data, payment

data, or other data.'"  (ECF No. 52 at 3 (quoting § 6-29-105(b)).)[7]

The Court is not persuaded.  Even setting aside the standing and ripeness issues

Defendants raised (ECF No. 74 at 2), there appears to be no conflict between the Act's

plain text and the Pilot Program as far as claims data is concerned.  AbbVie selectively

quoted the Act's prohibitory language on the collection of claims data but ignored its

further qualification that the prohibition applies "*unless such data is . . . otherwise*

*required to be furnished under applicable federal law.*"  § 6-29-105(1)(b) (emphasis

added).  This caveat is further reinforced by § 6-29-105(5), which provides:

> (5) **Data exclusions.**  Subsection (1) of this section does not
> prohibit a manufacturer from requiring health information or
> other data that a covered entity is required to furnish to the
> manufacturer under applicable federal law, including data
> relating to an audit in accordance with procedures
> established by the Federal Department of Health and Human
> Services under 42 U.S.C. § 256b(a)(5)(C).

§ 6-29-105(5).

---

[7] Just before the Court issued this Order, AbbVie filed a notice informing the Court that
HRSA had "officially approved" its application to participate in the Pilot Program, which is
expected to commence on January 1, 2026.  (ECF No. 112.)

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 25-2    pg 502 of 29 Filed 06/09/26    Page 501 of 576

Exhibit 3

Thus, to the extent the Pilot Program requires covered entities to provide certain claims data, it appears at this point that the Act poses no barrier. For at least this reason, the Court easily concludes that AbbVie has also not established a substantial likelihood of success in demonstrating the Act "stands as an obstacle" to the implementation of the Pilot Program.

## B.    Takings Clause

AbbVie's second claim is that the Act runs afoul of the Takings Clause "because it compels AbbVie and other manufacturers to make sales at 340B-discounted prices under terms they would otherwise never agree to." (ECF No. 7 at 11.)

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: '[N]or shall private property be taken for public use, without just compensation.'" *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021). As a general matter, a government taking may occur when the government "physically acquires private property for a public use," or where, "rather than appropriate private property for itself or a third party," the government "instead imposes regulations that restrict an owner's ability to use his own property." *Id.* at 147–48. In the Motion, AbbVie appears to argue only the former—that the Act effects a *per se* taking of its private property. (*See* ECF No. 36 at 8–9 (discussing Supreme Court authority holding that "when there has been a physical appropriation, 'we do not ask . . . whether it deprives the owner of all economically valuable use' of the item taken," *Horne v. Dep't of Agriculture,* 576 U.S. 350, 363 (2015) (internal citation omitted)).) Accordingly, the Court does not analyze herein whether the Act effects a taking as a "use restriction" under the *Penn Central* test. *Cedar Point,* 594 U.S. at 148.

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 26-2 129  Filed 06/09/26    Page 502 of 576

**Exhibit 3**

Critically, "[a] demand for personal property" is not a taking where "it involve[s] a voluntary exchange for a government benefit."  *Valancourt Books, LLC v. Garland,* 82 F.4th 1222, 1232 (D.C. Cir. 2023).  So long as "the property owner is 'aware of the conditions' of an exchange," "the conditions are 'rationally related to a legitimate Government interest,'" and "the purported 'benefit' is [not] illusory," "presenting the exchange poses no takings problem."  *Id.* (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007 (1984)); *see also Baker County Med. Servs., Inc. v. U.S. Atty. Gen.,* 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases "instruct[ing] that no taking occurs where a person or entity voluntarily participates in a regulated program or activity").

As especially pertinent here, numerous Circuit Courts of Appeal have found that regulatory requirements imposed as a condition of participation in Medicaid and Medicare do not effect a taking.  *See, e.g., Baker County Med. Servs.,* 763 F.3d at 1279 (rejecting hospital's takings challenge to "its rate of compensation in a regulated industry for an obligation it voluntarily undertook . . . when it opted into Medicare and became subject to" federal statute requiring hospitals to treat all people who seek treatment in emergency departments); *Burditt v. U.S. Dep't of Health & Hum. Servs.,* 934 F.2d 1362, 1376 (5th Cir. 1991) (similar); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Health Welfare,* 742 F.2d 442, 446 (8th Cir. 1984) (nursing home's voluntary decision to participate in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property").

Extending that rationale to the precise circumstances here, courts have found that the voluntariness of the 340B program poses an obvious impediment to pharmaceutical manufacturers' Takings Clause challenges to state legislation like the

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 27-2 29 Filed 06/09/26    Page 503 of 576
**Exhibit 3**

Act.  *See, e.g., Frey,* 2025 WL 2813787, at *14 ("Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim."); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025) ("Plaintiff voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right to just compensation.").  The Court agrees and adopts the rationale of these decisions, and finds AbbVie's voluntary participation in the 340B program, at least at this early juncture of these proceedings, to present a nearly insurmountable obstacle to the success of their Takings claim.

Still, while AbbVie acknowledges that "[v]oluntarily accepting a government benefit in exchange for giving up property rights can extinguish a takings claim against the government who conferred the bargained-for benefit," it argues that its voluntarily participation in a federal program "cannot justify separate state-imposed requirements where no state benefit is conferred."  (ECF No. 7 at 13.)  The authorities upon which AbbVie relies to support this assertion, however, are inapposite.

In *Valancourt Books,* the D.C. Circuit concluded that a provision of the *federal* Copyright Act "requiring copyright owners to provide physical copies of books" effected a taking because "copyright owners receive[d] no additional benefit for the works they forfeit[ed] pursuant to [the] deposit requirement."  82 F.4th at 1232.  The D.C. Circuit reasoned that "[m]andatory deposit is not required to secure the benefits of copyright."  *Id.*  Rather, authors obtained the benefit of copyright immediately upon fixation of the work, and the "mandatory deposit [provision] grant[ed] no additional benefits."  *Id.* at

500

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 28-2 129 Filed 06/09/26    Page 504 of 576
**Exhibit 3**

1233.  Unlike copyright protection, however, AbbVie has no automatic right to receive the benefits incidental to its participation in Medicare and Medicaid.  And it cites no case law supporting that each time the government (whether federal or state) imposes a new regulatory requirement upon Medicaid and Medicare participants, it must *also* confer some increased "benefit" of participation.  *Cf. Frey,* 2025 WL 2813787, at *14 ("AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for purposes of a takings claim").

*Virginia Hospital & Healthcare Association v. Roberts* is also distinguishable. 671 F. Supp. 3d 633 (E.D. Va. 2023).  There, the plaintiffs' Takings Clause claim was based on the contention that the Virginia program at issue "legally compelled [them] to participate in Medicaid and Medicare programs."  *Id.* at 666;[8] *see also Garelick v. Sullivan,* 987 F.2d 913, 917 (2d Cir. 1993) (where the plaintiffs argued the voluntary participation doctrine was inapplicable "because New York law compels them to render services to Medicare beneficiaries").  Here, AbbVie does not argue that the Act purports to compel its participation in the 340B Program.  To the contrary, it has affirmed that it remains free, in its sole discretion, to withdraw from the Program.  (ECF No. 111 at 261:4–7 ("one day laws like this are going to force manufacturers to withdraw on a manufacturers to withdraw on a nationwide basis Medicare and Medicaid"); *see also*

---

[8] Notably, the district court ultimately did "not fully determine whether Virginia's [] program amount[ed] to legal compulsion" because the plaintiffs' Takings Clause claim against the state defendant was barred by the Eleventh Amendment in any event.  *Id.* at 667. Defendants similarly raise an Eleventh Amendment issue here, though, as noted below, the Court does not reach that issue.

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 29    Filed 06/09/26    Page 505 of 576
**Exhibit 3**

ECF No. 98 (AbbVie's notice of supplemental authority informing the Court that "a large drug manufacturer announced that it will withdraw from both 340B and Medicaid next week").)  Though that would be an unfortunate result, it appears at this juncture that AbbVie has more likely identified a public policy issue, and not a Takings Clause violation.

For these reasons, and most importantly because AbbVie's participation in the 304B Program is wholly voluntary, the Court finds that AbbVie has not established a substantial likelihood of success in demonstrating that the Act effects a *per se* taking. Accordingly, the Court does not reach AbbVie's arguments that the Act runs afoul of the Takings Clause "public use" requirement, nor Defendants' argument that "AbbVie cannot bring a takings claim for injunctive relief against state officers in federal court." (ECF No. 33 at 10.)

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 7) is DENIED.

Dated this 31st day of October, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

502

**Exhibit 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 25-cv-02685-PAB-STV

ASTRAZENECA PHARMACEUTICALS LP,

      Plaintiff,

v.

PHILIP J. WEISER, in his official capacity as the Attorney General of the State of Colorado, et al.,

      Defendants.

---

## ORDER

---

This matter comes before the Court on Plaintiff's Motion for a Preliminary Injunction [Docket No. 25], wherein plaintiff seeks an injunction enjoining the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes §§ 6-29-101 *et seq.* (2025) ("S.B. 71") from being enforced against it.  Defendants oppose plaintiff's motion. Docket No. 48.  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### I.  BACKGROUND

In 1992, Congress created the so-called Section 340B program by enacting § 340B of the Public Health Service Act, 42 U.S.C. § 256b ("Section 340B").  *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 113 (2011).  Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities."  *Id.*  The Section 340B program was created "to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving these individuals receive crucial subsidies." *AbbVie, Inc. v. Fitch*, 152 F.4th 635 (5th Cir. 2025).  The specified health-care facilities

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM        Document 12-23  Filed 06/09/26    Page 507 of 576
**Exhibit 3**

are known as "covered entities" and "include public hospitals and community health centers" which often provide "safety-net services to the poor."  *Astra*, 563 U.S. at 113.

The Section 340B program "is superintended by the Health Resources and Services Administration (HRSA), a unit of the Department of Health and Human Services (HHS).  Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide."  *Id.*  PPAs are "uniform agreements that recite the responsibilities § 340B imposes."  *Id.*  One of these responsibilities requires that manufacturers "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  42 U.S.C. § 256b(a)(1).  Drug manufacturers cannot participate in Medicaid and Medicare Part B unless they participate in the Section 340B program.  *Astra*, 563 U.S. at 113.

Section 340B also places certain restrictions on covered entities.  *See* 42 U.S.C. § 256b(a)(5)(A)-(D); *see also Fitch*, 152 F.4th at 640 (listing the restrictions that Section 340B places on covered entities).  Covered entities are forbidden to seek "duplicate discounts or rebates," meaning they cannot seek a Section 340B discount and a Medicaid rebate on the same drug.  42 U.S.C. § 256b(a)(5)(A).  Covered entities are also forbidden from reselling or transferring a covered drug to a person who is not a patient of the covered entity.  42 U.S.C. § 256b(a)(5)(B).  To ensure compliance with these restrictions, covered entities must permit the Secretary of Health and Human Services and the manufacturer of covered drugs to audit their records.  42 U.S.C. § 256b(a)(5)(C).  If a covered entity fails to comply with these restrictions, it will be liable

2

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 32-2    Filed 06/09/26    Page 508 of 576
pg 13 of 23

**Exhibit 3**

to the drug manufacturer for the amount improperly received.  42 U.S.C.

§ 256b(a)(5)(D).

Since Section 340B was first enacted, "covered entities have contracted with

outside pharmacies, referred to as 'contract pharmacies,' for the distribution and

dispensation of 340B drugs.  This is in large part due to the fact that building or

maintaining a pharmacy is cost-prohibitive for many covered entities.  Additionally, the

outsourcing of pharmacy services has allowed for drug dispensation closer to where

low-income patients reside." *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95

F.4th 1136, 1139 (8th Cir. 2024).

In 1996, HRSA issued guidance stating its belief that Section 340B is silent

regarding how covered drugs were to be distributed, and that silence created a gap in

the legislation.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456-57 (D.C. Cir.

2024) (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992;

Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549-50 (Aug. 23, 1996) ("1996

Guidance")).  Seeking to fill that gap, "HRSA stated that a covered entity without an in-

house pharmacy may contract with a single outside pharmacy to dispense drugs at a

single location."  *Id.* at 457 (citing 1996 Guidance at 43,555).  In 2010, HRSA issued

new guidance stating that "covered entities may contract with an unlimited number of

outside pharmacies and may do so regardless of whether the entities have in-house

pharmacies."  *Id.* (citing Notice Regarding 340B Drug Pricing Program—Contract

Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010

Guidance")).  HRSA recognized that "contract pharmacies enable covered entities to

'create wider patient access by having more inclusive arrangements in their

3

Case No. 1:25-cv-02685-PAB-STV     Document 72     filed 12/17/25     USDC Colorado
Case 6:25-cv-01332-IM          Document 42-2223   Filed 06/09/26     Page 509 of 576
**Exhibit 3**

communities.'"  *Id.* (quoting 2010 Guidance at 10,273).  "After the 2010 guidance, the use of contract pharmacies skyrocketed."  *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023).

Drug manufacturers believed that the proliferative use of contract pharmacies was increasing duplicate discounting and diversion.  *Id.*  Specifically, manufacturers worried that the "replenishment model" used by many contract pharmacies to stock Section 340B discounted drugs led to increased abuse of the Section 340B program.  Docket No. 25 at 4-5; *Johnson*, 102 F.4th at 457-58.  The D.C. Circuit explained how the replenishment model operates and how it can potentially be abused by contract pharmacies:

> While some contract pharmacies maintain separate inventories of section 340B drugs, most fill prescriptions from inventories that intermingle discounted and non-discounted drugs.  Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount.  Many pharmacies outsource this determination to third-party administrators, who often receive a larger fee for every prescription deemed eligible for the discount.  Once the pharmacy or the administrator categorizes a certain number of prescriptions as eligible, the pharmacy places an order to replenish its section 340B purchases.  The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate.  Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount.

*Johnson*, 102 F.4th at 457-58.

In 2020, attempting to combat this alleged abuse, manufacturers adopted policies limiting the use of contract pharmacies.  *Id.* at 458.  AstraZeneca Pharmaceuticals LP ("AstraZeneca") was one of the manufacturers who adopted such a policy, allowing 340B discounts at only a single designated contract pharmacy, and only

4

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 15-2    Filed 06/09/26    Page 510 of 576
**Exhibit 3**

for covered entities that lack an in-house pharmacy.  Docket No. 25 at 5.  In response to these new policies by drug manufacturers, "HHS issued an advisory opinion stating that section 340B requires manufacturers to deliver covered drugs to any contract pharmacies with which a covered entity chooses to partner."  *Johnson*, 102 F.4th at 458.  Drug manufacturers challenged HHS's interpretations in court.  The Third Circuit and the D.C. Circuit held that Section 340B is silent about delivery, and therefore it does not require manufacturers to distribute discounted drugs to contract pharmacies.  *Id.* at 464; *Sanofi Aventis*, 58 F.4th at 707.  "HHS ultimately withdrew the advisory opinion." *Fitch*, 152 F.4th at 641.

"Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion."  *Id.*  Nationwide, drug manufacturers have challenged these state statutes as unconstitutional; to date, courts have largely rejected those challenges.[1]

---

[1] *See Fitch*, 152 F.4th at 648 (affirming order denying preliminary injunction); *McClain*, 95 F.4th at 1146 (affirming order granting summary judgment to state); *Abbvie, Inc. v. Weiser*, No. 25-cv-01847-WJM-KAS, 2025 WL 3041825 (D. Colo. Oct. 31, 2025); *Novartis Pharms. Corp. v. Frey*, 2025 WL 2813787 (D. Me. Sept. 23, 2025) (denying preliminary injunction); *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (same); *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part and denying in part state's motion to dismiss, with denial limited to contract clause argument); *Novartis Pharms. Corp. v. Bailey*, 2025 WL 595189 (W.D. Mo. Feb. 24, 2025) (denying preliminary injunction); *Pharm. Rsch. & Manufacturers of Am v. Murrill*, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (granting summary judgment to state); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657 (S.D. Miss. 2024) (denying preliminary injunction); *AbbVie Inc. v. Fitch*, 2024 WL 3503965 (S.D. Miss. July 22, 2024) (same), *aff'd*; *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (same); *Pharm. Rsch. & Manufacturers of Am v. Fitch*, 2024 WL 3277365 (S.D. Miss. July 1, 2024) (same); *but see Pharm. Rsch. & Manufacturers of Am v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (granting preliminary injunction); *AbbVie Inc. v. Drummond*, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) (granting preliminary injunction in part).

5

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 16-2223  Filed 06/09/26    Page 511 of 576
**Exhibit 3**

Like many other states, Colorado passed a statute, Senate Bill 25-071, which requires drug manufacturers to deliver drugs discounted under Section 340B to unlimited contract pharmacies.  *Weiser*, 2025 WL 3041825, at *3-4.  Senate Bill 25-071 is now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes §§ 6-29-101 *et seq.* (2025).  *Id.* at *1.  S.B. 71 took effect on August 6, 2025.  *Id.* at *1 n.1.  The statute prohibits manufacturers from doing the following:

> (a) Unless the receipt of the 340B drugs is prohibited by the federal department of health and human services, a manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.

> (b) A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

Colo. Rev. Stat. § 6-29-105.

On August 27, 2025, plaintiff AstraZeneca filed this lawsuit against defendants Philip J. Weiser, in his official capacity as the Attorney General of the State of Colorado, and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as Members of the Colorado State Board of Pharmacy

6

**Exhibit 3**

("defendants"), to challenge the constitutionality of S.B. 71.[2]  Docket No. 1.  On

October 1, 2025, AstraZeneca filed a motion for a preliminary injunction seeking

to enjoin S.B. 71 from being enforced against it.  Docket No. 25.  On October

30, 2025, defendants filed a response.  Docket No. 48.  On November 10,

2025, AstraZeneca filed a reply.  Docket No. 57.  The Court heard argument on

the motion on December 2, 2025.  Docket No. 67.

## II.  LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show

(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer

irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

in the movant's favor; and (4) that the injunction is in the public interest.  *RoDa Drilling

Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Def.

Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir.

2010).  The third and fourth factors merge when the government is the opposing party.

*Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022)

(citation omitted).  If a court finds against the movant on one factor, the other factors

need not be addressed.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356

F.3d 1256, 1266 n. 8 (10th Cir. 2004); *see also Vill. of Logan v. U.S. Dep't of Interior*,

577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) (a "plaintiff's failure to prove any

---

[2] In its complaint, AstraZeneca brings claims that S.B. 71 is unconstitutional because it (1) is preempted by Section 340B; (2) is preempted by federal patent laws; (3) violates the Contracts Clause, U.S. Const. art. I § 10, cl. 1; and (4) violates the Takings Clause, U.S. Const., amend. V.  Docket No. 1 at 35-39, ¶¶ 112-131.  However, AstraZeneca only discusses the first two claims in its motion for a preliminary injunction. *See generally* Docket No. 25.  The Court assumes that its motion is limited to these claims.

7

Case No. 1:25-cv-02685-PAB-STV   Document 72   filed 12/17/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 12-23   Filed 06/09/26   Page 513 of 576

Exhibit 3

one of the four preliminary injunction factors renders its request for preliminary injunctive relief unwarranted"). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir. 1989), "is the exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

There are three types of preliminary injunctions that are disfavored: (1) injunctions that disturb the status quo, (2) injunctions that are mandatory rather than prohibitory, and (3) injunctions that provide the movant substantially all the relief it could feasibly attain after a full trial on the merits. *See Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1260 (10th Cir. 2005). In seeking a disfavored injunction, "the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016) (quotations, alterations, and citation omitted); *see also Schrier*, 427 F.3d at 1259 (stating that such injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course" (citation omitted)).

## III. ANALYSIS

AstraZeneca argues that S.B. 71 is preempted by Section 340B and by federal patent laws. Docket No. 25 at 2. First, AstraZeneca asserts that any presumption against preemption does not apply in this case. *Id.* at 7. Second,

8

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 19-23    Filed 06/09/26    Page 514 of 576
**Exhibit 3**

it argues that Section 340B preempts S.B. 71 because (a) both laws regulate price; (b) S.B. 71 recalibrates the burdens and benefits of participating in Section 340B; (c) S.B. 71's enforcement regime conflicts with Section 340B's enforcement regime; and (d) S.B. 71's claims-data restriction conflicts with federal laws and regulations. *Id.* at 8-17. Third, AstraZeneca argues that S.B. 71 is preempted by federal patent laws because it diminishes the rewards to patentees by capping the price at which patented drugs may be sold.

In their response, defendants raise two arguments of their own: (a) that AstraZeneca does not have standing; and (b) that AstraZeneca is seeking a disfavored injunction. Docket No. 48 at 3-6. The Court will first address whether AstraZeneca has standing. *See Colorado Env't Coal. v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004) (stating that standing is jurisdictional).

## A. <u>Standing</u>

At its core, "standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, "a plaintiff must show: (1) that he has 'suffered an injury in fact'; (2) that the injury is 'fairly traceable to the challenged action of the defendant'; and (3) that it is 'likely' that the 'injury will be redressed by a favorable decision.'" *Am. Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d 1243, 1250 (10th Cir. 2017) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133-34 (2011)). The party asserting federal jurisdiction has the burden of supporting each of these elements in "the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of

9

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 11-21 23 Filed 06/09/26    Page 515 of 576

**Exhibit 3**

the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury . . . may suffice." *Id.*

Defendants argue that AstraZeneca does not have standing because its alleged injuries are not fairly traceable to S.B. 71. Docket No. 48 at 5. Defendants state that AstraZeneca's injuries are traceable to its voluntary participation in Section 340B. *Id.* at 5-6. However, AstraZeneca alleges that S.B. 71 makes participation in Section 340B more costly through its requirement to make Section 340B discounted drugs available at unlimited contract pharmacies. Docket No. 25 at 12. AstraZeneca projects this will result in it losing approximately $600,000 per month in sales. Docket No. 25-1 at 7, ¶ 28.

While these losses may ultimately stem from AstraZeneca's participation in Section 340B, the Court finds that AstraZeneca is incentivized to participate in Section 340B because otherwise it cannot participate in Medicaid and Medicare Part B. Thus, making participation in Section 340B more costly is a "concrete and particularized" injury that is fairly traceable to S.B. 71. *See Lujan*, 504 U.S. at 560 (stating that an injury in fact must be "concrete and particularized.") (citations omitted). Defendants also argue that any injury due to diversion or duplicate discounts is traceable to illegal transfers of Section 340B drugs, and not to S.B. 71. Docket No. 48 at 5. However, AstraZeneca alleges that illegal transfers of Section 340B drugs are more common in contract pharmacies, and are thus made more common by S.B. 71. Docket No. 25 at 4-5. Accordingly, the Court concludes that AstraZeneca has established that its injury is fairly traceable to S.B. 71. AstraZeneca therefore has standing to bring this action.

10

**Exhibit 3**

## B. Disfavored Injunction

Defendants argue that AstraZeneca is seeking a disfavored injunction because enjoining the enforcement of S.B. 71 would alter the status quo and because the relief AstraZeneca seeks is coterminous with the relief it seeks at trial. Docket No. 48 at 3-4. However, the Court finds that enjoining the enforcement of S.B. 71 would not alter the status quo. In the context of a disfavored injunction, "the status quo is the last uncontested status between the parties which preceded the controversy." *Schrier*, 427 F.3d at 1260 (internal quotations and citation omitted). Thus, "[i]n the context of a newly enacted statute challenged on constitutional grounds, the status quo is the period prior to the statute's enactment." *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1145 (W.D. Okla. 2024). Therefore, the status quo was the period before S.B. 71 was enacted. Enjoining its enforcement would not alter the status quo.

Furthermore, the relief AstraZeneca seeks in its preliminary injunction motion is not the same as the relief it seeks at trial. AstraZeneca seeks to preliminarily enjoin enforcement of S.B. 71 against it. Docket No. 25 at 2. It is true that AstraZeneca also wants the Court to find S.B. 71 unconstitutional, and thus unenforceable. Docket No. 1 at 39. However, this is not the same relief as preliminarily enjoining enforcement because a prohibition on enforcing S.B. 71 could be undone after trial. *See Black Emergency Response Team*, 737 F. Supp. 3d at 1145-46 (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247-58 (10th Cir. 2001)) ("a preliminary injunction would not irreversibly afford Plaintiffs all the relief they could recover at trial, because a prohibition on enforcing the Act could be undone at the conclusion of a determination on the merits."). Therefore, the relief AstraZeneca seeks is not the same as the relief it seeks at trial. Accordingly, it is not seeking a disfavored injunction.

11

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 122-1 23  Filed 06/09/26    Page 517 of 576

**Exhibit 3**

The Court will now analyze whether AstraZeneca has shown a likelihood of success on the  merits.

### C. <u>Preemption</u>

Article VI, cl. 2 of the Constitution—known as the Supremacy Clause—provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "Under this principle, Congress has the power to preempt state law."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  If a federal law regulates something "inherently federal in character," no presumption against preemption applies.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).  However, if a state law regulates in an area within the historic police power of the States, courts must assume that it is not preempted "unless that was the clear and manifest purpose of Congress."  *Arizona*, 567 U.S. at 400 (citation omitted).  "This makes congressional intent 'the ultimate touchstone in every pre-emption case.'"  *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (citing *Wyeth v. Levine*, 55 U.S. 555, 565 (2009)).  Congress can demonstrate its intent to preempt expressly, through enacting a statute containing a preemption provision.  *Arizona*, 567 U.S. at 399.  Preemption can also by implied through a statute's "structure and purpose."  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  Section 340B does not contain a preemption provision, so any preemption would have to be implied.

There are two types of implied preemption: field preemption and conflict preemption.  *Fitch*, 152 F.4th at 645.  Field preemption "exists where a 'framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can

12

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 13-2    23 Filed 06/09/26    Page 518 of 576
**Exhibit 3**

'be assumed to preclude enforcement of state laws on the subject.'" *Bradshaw*, 123 F.4th at 1173 (citing *Arizona*, 567 U.S. at 399). "Conflict preemption occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir. 2000) (internal quotation and citation omitted).

### D.  Presumption Against Preemption

AstraZeneca argues that the presumption against preemption does not apply in this case because S.B. 71 regulates something inherently federal in character. Docket No. 25 at 7-8 (citing *Buckman*, 531 U.S. at 347). Specifically, AstraZeneca cites *Buckman* to argue that, because S.B. 71 directly targets and depends on federal law, namely, Section 340B, it regulates a uniquely federal interest beyond the States' traditional police power. *Id.* However, *Buckman* "[does] not support the broad contention that there is necessarily a . . . preemption issue where a state law explicitly depends on a federal statute." *Weiser*, 2025 WL 3041825, at *7 (internal quotation omitted).

In *Buckman*, the state law at issue attempted to police fraud against federal agencies. *Buckman*, 531 U.S. at 347. The *Buckman* court determined that this was not "a field which the States have traditionally occupied." *Id.* (citation omitted). Conversely, public health is a matter within a state's traditional police powers. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history, the several States have exercised their police powers to protect the health and safety of their citizens. Because these are primarily, and historically, . . . matter[s] of local concern. The States traditionally have had great latitude under their police powers to legislate as to the

13

515

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM      Document 14-2  23  Filed 06/09/26    Page 519 of 576
**Exhibit 3**

protection of the lives, limbs, health, comfort, and quiet of all persons.") (citations and internal quotations omitted).  Thus, unlike the state law in *Buckman*, the state law here does not implicate a uniquely federal interest.  Accordingly, the presumption against preemption applies.

### E.  Whether S.B. 71 is Preempted by Section 340B

AstraZeneca asserts that S.B. 71 is preempted by Section 340B, noting that a state law is preempted if it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  Docket No. 25 at 11 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).  This is a conflict preemption argument.[3]  *See Keith*, 212 F.3d at 1193 ("Conflict preemption occurs . . . when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (citation and internal quotation omitted).  Specifically, AstraZeneca asserts that S.B. 71 is preempted by Section 340B because: (1) both laws regulate price; (2) S.B. 71 recalibrates Congress's balancing of the burdens and benefits of participating in Section 340B; (3) S.B. 71's enforcement regime conflicts with Section 340B's enforcement regime; and (4) S.B. 71's claims-data restriction conflicts with federal laws and regulations.  Docket No. 25 at 8-17.  The Court will analyze each argument in turn.

### 1.  Whether S.B. 71 Regulates Price or Delivery

AstraZeneca argues that S.B. 71 regulates drug pricing, not delivery.  *Id.* at 8.  It is not entirely clear to the Court why that matters to the preemption analysis.

---

[3] While AstraZeneca does not make a field preemption argument against S.B. 71, one court in this district has already ruled that Congress did not intend to preempt the field when enacting Section 340B.  *Weiser*, 2025 WL 3041825, at *6-8.

14

516

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 15-2  23 Filed 06/09/26    Page 520 of 576

**Exhibit 3**

Apparently, AstraZeneca's argument is that, if S.B. 71 and Section 340B both regulate price, they necessarily conflict such that S.B. 71 is preempted.  However, AstraZeneca fails to explain what conflict would ensue if S.B. 71 and Section 340B both regulate price.  *See id.* at 8-11.  The Court does not find that any such conflict exists.  Section 340B sets discounted drug prices for eligible patients.  S.B. 71 mandates that those Section 340B-discounted drugs must be distributed to unlimited contract pharmacies.  The Court fails to see how those two requirements conflict with one another; if anything, they seem to complement each other.  The federal government, acting through HHS, attempted to enact the same requirement as S.B. 71 through its 2020 guidance.  *Johnson*, 102 F.4th at 459.  The Third Circuit and D.C. Circuit, however, held that Section 340B is silent about delivery and therefore does not contain such a requirement.  *Johnson*, 102 F.4th at 464; *Sanofi Aventis*, 58 F.4th at 707.  Colorado and other states attempted to fill the gap through state legislation that mirrors the earlier guidance of HHS.  Such legislation does not create a conflict, regardless of whether S.B. 71 is considered to regulate price or to regulate delivery.

In any event, the Court finds that S.B. 71 does not regulate price.  Other courts agree.  *Weiser*, 2025 WL 3041825, at *11 ("the Court . . . concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption claim based on its assertion that, like Section 340B, [S.B. 71] purports to regulate pricing.");  *Fitch*, 152 F.4th at 647 (stating that a law substantially similar to S.B. 71 regulates the distribution of drugs, not the pricing of those drugs); *McClain*, 95 F.4th at 1145 (same).

AstraZeneca's arguments to the contrary are unpersuasive.  AstraZeneca notes that S.B. 71 identifies the drugs it regulates in terms of their price.  For example, S.B. 71

15

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 116-2 23  Filed 06/09/26    Page 521 of 576

**Exhibit 3**

states that manufacturers "shall not . . . prohibit . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs."  Colo. Rev. Stat. § 6-29-105(1)(a).  A 340B drug is defined as any drug discounted under the Section 340B program that has been purchased by a covered entity.  Colo. Rev. Stat. § 6-29-103(2).  In AstraZeneca's view, the fact that these drugs are identified by their price is enough to make S.B. 71 a regulation of price.  But S.B. 71 is clear that it is Section 340B that sets the price of the discounted drugs; S.B. 71 merely dictates that those drugs must be made available at more locations, namely, at unlimited contract pharmacies.

AstraZeneca further argues that the "replenishment model" is indicative that S.B. 71 regulates price.  Docket No. 25 at 10-11.  Under the replenishment model, discounted and non-discounted drugs are intermingled on the shelves of the pharmacy, and it is not determined by the pharmacy which drugs are discounted under Section 340B until they are already dispensed.  *Johnson*, 102 F.4th at 457-58.  As a result, AstraZeneca asserts that, "'[b]ecause the drug is already in the hands of the contract pharmacy before the patient arrives at the pharmacy, the question is not about delivery of the drug.'"  Docket No. 25 at 11 (quoting *Morrisey*, 760 F. Supp. 3d at 455).  However, "[r]eplenishment inventory systems are commonplace [and] . . . pharmaceuticals distribution often relies on pharmaceuticals' fungibility to facilitate efficiency."  *Fitch*, 2024 WL 3503965, at *14 (citation omitted).  Thus, the Court agrees that the replenishment model is a means of efficient distribution, and AstraZeneca's argument reflects a

16

518

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 17-2    Filed 06/09/26    Page 522 of 576
pg 117 of 123

**Exhibit 3**

"technicality," which does not suddenly make S.B. 71 a regulation of price. *See id.* at *15 (stating that the replenishment model facilitates efficient distribution of Section 340B drugs and that reality cannot "be undercut by technicality"). Accordingly, S.B. 71 does not regulate price and, even if it did, that would not necessarily mean it is preempted by Section 340B.

### 2.  *Recalibration of the Burdens and Benefits*

AstraZeneca argues that S.B. 71 is an obstacle to the purposes and objectives of Congress because it recalibrates the benefits and burdens of participation in Section 340B.  Docket No. 25 at 11.  According to AstraZeneca, Congress "carefully balanced the benefits and burdens of participation in the 340B program," and S.B. 71 upsets that balance.  *Id.*  However, AstraZeneca provides no evidence that Congress considered whether drug manufacturers would participate in Section 340B if the program was too expensive.

Conversely, there is evidence that Section 340B was enacted so healthcare providers could "'reach[ ] more eligible patients and provid[e] more comprehensive services.'"  340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 FR 28643-01 ("ADR Rule"), at 28,643 (April 19, 2024) (quoting H.R. Rep. No. 102-384(II), at 12 (1992)); *see also Sanofi Aventis*, 58 F.4th at 699 (stating that Section 340B helps providers care for low-income and rural persons).  S.B. 71 helps accomplish this purpose by making Section 340B drugs more accessible to more patients.  Thus, as noted by the Eighth Circuit when analyzing a similar Arkansas law, the state statute "does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: [the statute] assists in fulfilling the purpose of 340B." *McClain*, 95 F.4th at 1144-45.  AstraZeneca does not directly support its argument to

17

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 18-2    Filed 06/09/26    Page 523 of 576

**Exhibit 3**

the contrary.  Instead, AstraZeneca argues that S.B. 71 interferes with federal objectives "because it specifically targets federal law—applying *only* to 340B participants, *only* to 340B drugs, and *only* to pharmacies that contract with 340B-covered entities.  Docket No. 25 at 12.  "The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program."  *Frey*, 2025 WL 2813787, at *10.  S.B. 71 does not interfere with Section 340B's objectives, but instead helps to achieve them.  Thus, there is no preemption issue raised by S.B. 71 attaching itself to Section 340B.

AstraZeneca also claims that, if Colorado is allowed to add to the burdens of participating in Section 340B, then so may other states.  Docket No. 25 at 13.  It argues that such laws run the risk of conflicting adjudications which would "frustrate[ ] Congress's goal of a national, uniform 340B program."  *Id.*  However, AstraZeneca does not provide evidence that Congress intended the Section 340B program to be nationally uniform and, in any event, states are increasingly passing laws that are substantially similar to S.B. 71.  Thus, laws like S.B. 71 are becoming the norm rather than the exception.  While AstraZeneca asserts that all of these laws are slightly different, it does not explain what those differences are or how they create an obstacle to the purposes and objectives of Congress.[4]

---

[4] AstraZeneca argues that the differences between S.B. 71 and similar laws could frustrate Section 340B's enforcement scheme.  Docket No. 25 at 13.  The Court will address the enforcement scheme in the next subsection.

18

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM        Document 19-2 23  Filed 06/09/26    Page 524 of 576
pg 119 of

Exhibit 3

### 3. *Enforcement Schemes*

AstraZeneca notes that Section 340B contains a federal enforcement regime. Docket No. 25 at 13-14.  In *Astra*, the Supreme Court observed that, in certain circumstances, private entities bringing suit under Section 340B would interfere with the administration and enforcement of the program.  563 U.S. at 120.  AstraZeneca points out that S.B. 71 authorizes the Colorado Attorney General and district attorneys to bring civil actions to enjoin violations and recover penalties.  Docket No. 25 at 14.  Thus, relying on *Astra*, AstraZeneca argues that S.B. 71's state enforcement scheme encroaches on the federal government's Section 340B enforcement scheme.  *Id.* However, S.B. 71 does not create new enforcement authority over Section 340B; rather, it creates enforcement authority for violations of S.B. 71 itself.  *See* Colo. Rev. Stat. § 6-29-105(3)(a) ("The attorney general may investigate a complaint concerning a violation of *this article 29*.  A person that violates *this article 29* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in article 1 of this title 6.") (emphasis added).  Thus, S.B. 71's enforcement scheme does not impact enforcement of Section 340B, and there is no conflict between the two.  *See Weiser*, 2025 WL 3041825, at *9 (finding that S.B. 71 only penalizes activity that falls outside the purview of Section 340B).  Other courts have come to the same conclusion about state law enforcement schemes like the one found in S.B. 71.  *See id.* (collecting cases).

AstraZeneca argues that the federal and state enforcement schemes conflict because S.B. 71 would require state adjudicators to "consider and resolve questions of federal law in order to determine whether a manufacturer has violated the statute." Docket No. 25 at 14.  However, "state courts are regularly and rightly called on to decide questions of federal law, as they have throughout our history."  *In re C & M*

19

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 20-1    Filed 06/09/26    Page 525 of 576

**Exhibit 3**

*Props., L.L.C.*, 563 F.3d 1156, 1167 (10th Cir. 2009).  Accordingly, AstraZeneca has not shown a likelihood of success on the merits based on its claim that S.B. 71's enforcement scheme is preempted by Section 340B.

### 4.  Claims-Data Restriction

AstraZeneca's final argument that S.B. 71 is preempted by Section 340B is based on Colo. Rev. Stat. § 6-29-105(1)(b).  Docket No. 25 at 16.  This provision prohibits manufacturers from requiring covered entities or contract pharmacies to submit any "health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law."  Colo. Rev. Stat. § 6-29-105(1)(b).  AstraZeneca argues that this restriction conflicts with federal law in three ways.  Docket No. 25 at 14-16.

First, Astra Zeneca notes that manufacturers must audit covered entities or contract pharmacies prior to manufacturers filing an alternative dispute resolution ("ADR") claim.  *Id.* at 14-15 (citing ADR Rule at 28,644).  However, before auditing, manufacturers need documentation from the covered entity or pharmacy that indicates that there is reasonable cause to support a request for an audit.  Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 FR 65406-01 ("Audit Guidelines"), at 65409 (Dec. 12, 1996).  Because S.B. 71 restricts manufacturers' ability to get this documentation, AstraZeneca argues that it is preempted.  Docket No. 25 at 14-16.  Courts addressing this argument, however, have found that manufacturers have not demonstrated that the "reasonable cause" standard is particularly burdensome, or that manufacturers cannot find reasonable cause to perform an audit without requiring

20

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 21-2 23 Filed 06/09/26    Page 526 of 576
**Exhibit 3**

claims-data from covered entities or contract pharmacies.  *See Skrmetti*, 2025 WL 1805271, at *15-16; *Frey*, 2025 WL 2813787, at *12.  As one court observed, "if a manufacturer has an articulable basis for suspecting that a covered entity is engaging in prohibited conduct, it likely will have reasonable cause to request an audit."  *Skrmetti*, 2025 WL 1805271, at *16.  Therefore, AstraZeneca has not shown a likelihood of success on its argument that S.B. 71's claim-data restriction prevents manufacturers from conducting the audits needed for filing ADR claims.

Second, AstraZeneca asserts that, under the Drug Price Negotiation Program, 42 U.S.C. §§ 1320f *et seq.*, manufacturers have a duty to prevent duplicate price reductions by identifying when a drug is dispensed as a Section 340B drug.  Docket No. 25 at 15 (citing CMS, Medicare Drug Price Negotiation Program: Final Guidance, at 58-60 (Oct. 2, 2024), http://bit.ly/3Y719J0).  Therefore, AstraZeneca argues that S.B. 71 "bars manufacturers from obtaining the data they need to conduct this federally required de-duplication."  *Id.*  This argument lacks merit because S.B. 71's claim-data restriction does not apply if the data is required to be furnished under applicable federal law.  Colo. Rev. Stat. § 6-29-105(1)(b).

Finally, AstraZeneca argues that the claims-data restriction prevents manufacturers from participating in a federal pilot program under which manufacturers may receive sales data from covered entities before paying Section 340B rebates. Docket No. 25 at 15-16.  Judge Martinez held that there is no conflict, because Colo. Rev. Stat. § 6-29-105(5) allows data to be collected if it is required to be furnished under federal law.  *Weiser*, 2025 WL 3041825, at *12.  AstraZeneca, however, argues that this exception would not apply to the pilot program because participation is voluntary, not

21

**Exhibit 3**

required.  Docket No. 57 at 11 n.2.  Even if true, AstraZeneca has not shown that manufacturers could not participate in the pilot program, since S.B. 71 does not prohibit them from requesting covered entities to provide data.  The language of the pilot program discusses the type of data that manufacturers can "request."  340B Program Notice: Application Process for the 340B Rebate Model Pilot Program; Correction, 90 FR 38165-01, at 38,167 (Aug. 7, 2025).  Accordingly, none of these three arguments show a likelihood of success on the claim that S.B. 71's claim-data restriction provision is preempted.

### F.  Whether S.B. 71 is Preempted by Federal Patent Laws

AstraZeneca's final argument is that S.B. 71 is preempted by federal patent laws. Docket No. 25 at 17-18.  In support of this argument, AstraZeneca notes that patent laws incentivize inventors by carefully balancing their rewards and incentives with the public interest.  *Id.* at 17 (citing *Biotech Indus. Org. v. District of Columbia* ("*BIO*"), 496 F.3d 1362, 1373 (Fed. Cir. 2007)).  AstraZeneca argues that laws capping the price of patented drugs skews that balance and are "'contrary to the goals established by Congress in the patent laws."[5]  *Id.* (citing *BIO*, 496 F.3d at 1374).  This argument fails because S.B. 71 does not cap the price of patented drugs—Section 340B does.

Moreover, the case AstraZeneca cites in support of this argument—*BIO*—is inapposite for other reasons as well.  In *BIO*, the disputed law operated exclusively within the scope of patent laws and applied only to patented drugs.  496 F.3d at 1374-75.  Conversely, S.B. 71 does not operate only within the scope of patent laws.  Rather,

---

[5] Five district courts have already rejected this argument as it relates to state laws similar to S.B. 71.  *See Fitch*, 677 F. Supp. 3d at 664-65; *Bailey*, 2025 WL 644285, at *2-3; *Novartis Pharms. Corp. v. Bailey*, 2025 WL 489881, at *2-3 (W.D. Mo. Feb. 13, 2025); *Murrill*, 2024 WL 4361597, at *9; *Fitch*, 738 F. Supp. 3d at 753.

22

Case No. 1:25-cv-02685-PAB-STV    Document 72    filed 12/17/25    USDC Colorado
Case 6:25-cv-01332-IM        Document 23-2  Filed 06/09/26    Page 528 of 576

**Exhibit 3**

it applies to patented and unpatented drugs alike. While *BIO* did set limits on a state's ability to cap the price of patented drugs, "Congress never intended that the patent laws should displace the police powers of the States." *Webber v. State of Virginia*, 103 U.S. 344, 347-48 (1880). Here, a law that neither caps the price of a patented drug nor specifically targets patented drugs cannot justifiably be found preempted under *BIO*. This is particularly true because such a finding would inhibit Colorado's ability to protect public health, an area long recognized as a traditional police power. *Medtronic*, 518 U.S. at 475. Accordingly, AstraZeneca has not shown a likelihood of success on the merits as to its claim that S.B. 71 is preempted by federal patent laws.[6]

## IV. CONCLUSION

Therefore, it is

**ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Docket No. 25] is **DENIED**.

DATED December 17, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[6] Because AstraZeneca has not shown a likelihood of success on the merits as to any of its claims, the Court will not address the other preliminary injunction factors. *See Dominion Video Satellite*, 356 F.3d at 1266 n.8 (refusing to address other preliminary injunction factors after finding that one factor was not met).

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 529 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 1 of 48
PageID.994

Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ASTRAZENECA PHARMACEUTICALS LP, <br><br> Plaintiff, <br><br> vs. <br><br> ANNE E. LOPEZ, <br> Attorney General of the State of Hawaiʻi, <br><br> Defendant. | Civil No. 25-00369 MWJS-WRP <br><br> ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION |

**INTRODUCTION**

Plaintiff AstraZeneca Pharmaceuticals LP moves for a preliminary injunction

against enforcement of Hawaiʻi Act 143, a state statute that prohibits drug

manufacturers from imposing certain restrictions on the sale of discounted drugs within

a federal pricing program.  AstraZeneca argues that Act 143 is preempted by federal

law because it conflicts with the objectives of the federal program and, as applied to

AstraZeneca's patented products, conflicts with federal patent law.

A preliminary injunction is "an extraordinary and drastic remedy," *Lopez v.

Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968,

972 (1997) (per curiam)), and is available only when a party shows a likelihood of

success on the merits, or at least strong questions going to the merits.  Because

526

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 530 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 2 of 48 Exhibit 3
PageID.995

AstraZeneca has not made that showing, at least at this early stage in the case, its

motion is DENIED.

## BACKGROUND

**A.     Factual Background**

In 1992, Congress created the Section 340B Drug Pricing Program under the

Public Health Service Act.  42 U.S.C. § 256b.  The program ties access to lucrative federal

drug reimbursement markets to a pricing commitment:  drug manufacturers that want

their products covered under Medicaid and Medicare Part B must enter into an

agreement with the Secretary of the U.S. Department of Health and Human Services

(HHS) and comply with Section 340B's requirements, including its drug pricing

requirement.  *Id*. § 256b(a)(1).  Under this drug pricing requirement, manufacturers

must "offer" their "covered outpatient drugs" to a limited set of qualifying providers

for purchase at or below a statutory ceiling price.  *Id*.  Those qualifying providers—

known as "covered entities"—then "benefit through insurance reimbursements that

exceed the marked-down cost of the drugs." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th

452, 455 (D.C. Cir. 2024).

Section 340B contains several intersecting provisions that define the scope and

mechanics of the drug pricing requirement.  It sets out how ceiling prices are calculated,

§ 256b(a)(2); identifies what constitutes a covered outpatient drug, §§ 256b(a)(3), (b)(2);

and specifies which categories of providers qualify as covered entities, § 256b(a)(4).

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 531 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 3 of 48    Exhibit 3
PageID.996

Covered entities are generally providers that serve underserved communities, including patients who face financial constraints or limited access to care. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011) (explaining that covered entities "include public hospitals and community health centers, many of them providers of safety-net services to the poor"). By reducing acquisition costs for these providers, the Section 340B program is intended to help them maintain and expand services and improve patient access to medications. But there is no requirement that the covered entities send those savings along to patients.

Administration of the Section 340B program rests with HHS, which acts through the Health Resources and Services Administration (HRSA). *See Astra*, 563 U.S. at 113. The program includes various guardrails to ensure the drug discounts are not abused. Covered entities may not obtain a Section 340B discount for drugs that are also subject to a Medicaid rebate—sometimes described as the prohibition on duplicate discounts. 42 U.S.C. § 256b(a)(5)(A). They also may not transfer discounted drugs to individuals who are not their patients—described as the prohibition on diversion. *Id*. § 256b(a)(5)(B). To support these limits, covered entities must make records available for audits conducted by the Secretary and by manufacturers under procedures the Secretary establishes. *Id*. § 256b(a)(5)(C). If diversion or duplicate discounts occur, the statute authorizes the manufacturer to recoup the difference and includes additional consequences for covered entities. *Id*. §§ 256b(a)(5)(D), (d)(2)(B)(v). The statute also

3

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 532 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 4 of 48     Exhibit 3
PageID.997

provides for penalties when manufacturers charge more than the ceiling price for a drug.  *Id*. § 256b(d)(1)(B)(vi).  But so long as covered entities do not engage in diversion or seek duplicate discounts, Section 340B entitles them to obtain discounted drugs for every single one of their qualifying patients, without limit.

Although Congress enacted these specific statutory guardrails, and entrusted HHS with their enforcement, Congress did not grant HHS broad authority to regulate every aspect of the program through rulemaking.  *See*, *e.g.*, *American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021) ("Congress. . . has not given HHS . . . broad rulemaking authority.").  Instead, the agency's rulemaking authority is limited to specific subjects, including the administrative dispute resolution (ADR) process, drug-pricing methodology, and monetary sanctions for violations.  *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41-45 (D. D.C. 2014).

And while manufacturers participating in the Section 340B program are required to "offer" their covered outpatient drugs to covered entities "for purchase" at or below statutory ceiling prices, Congress enacted no express language prohibiting manufacturers from imposing onerous delivery conditions that might effectively nullify the discounted offers they are required to make.  *See Novartis*, 102 F.4th at 462 (noting the concern that a manufacturer could theoretically "require that a covered entity pick up its orders one pill at a time").  Concerned about that risk—and in spite of the fact

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 533 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 5 of 48
PageID.998

Exhibit 3

that it lacked regulatory authority over the subject matter of delivery conditions—

HRSA issued guidance in 1994 opining that manufacturers may not "single out covered

entities" for "restrictive conditions" such as "minimum purchase amounts." *Id.* at 456

(quoting 1994 Guidance, 59 Fed. Reg. 25,110, 25,113 (May 13, 1994)).

In 1996, HRSA provided further guidance. Recognizing that "many covered

entities use outside pharmacies to distribute drugs to their patients," HRSA opined that

covered entities without in-house pharmacies were authorized to contract with an

outside pharmacy—that is, a "contract" pharmacy—to dispense drugs at a single

location. *Id.* at 457 (citing 1996 Guidance, 61 Fed. Reg. at 43,549–50). HRSA

acknowledged that Section 340B was "silent as to permissible drug distribution

systems," but explained that it sought to fill the "gaps in the legislation" and thereby

"move the program forward." *Id.*; *see also id.* at 460 (noting HRSA's acknowledgment

that Section 340B is "silent about delivery conditions").

For the next fourteen years, Section 340B program participants followed HRSA's

guidance, and covered entities generally relied on a small number of pharmacies to

dispense discounted drugs. *See id.* at 456-57. That practice changed after HRSA issued

new guidance in 2010 taking the position that covered entities could "engage an

unlimited number of outside pharmacies . . . regardless of whether the entities have in-

house pharmacies" to reach areas and patients they could not otherwise. *Id*. at 457. In

the wake of that guidance, the number of covered entities "participating in the program

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 534 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 6 of 48
Exhibit 3
PageID.999

increased from about 9,700 to 13,000 between 2010 and 2019." *Id*.  Contract pharmacy

arrangements, too, increased substantially, as many covered entities entered into

agreements with large numbers of pharmacies across broad geographic areas.  As

contract pharmacy use expanded, a growing share of Section 340B drugs came to be

dispensed through those pharmacies.

During the same period, many covered entities and pharmacies adopted

inventory and accounting practices that differ from traditional segregated drug

inventories.  The most common of these is now the "replenishment" model; it is used by

covered entities across the United States, and limited expedited discovery conducted in

connection with the pending motion reveals that it is in common use in Hawai'i.  Under

the replenishment model, a pharmacy dispenses drugs from its general inventory at the

point of sale.  After dispensing occurs, claims data are reviewed to determine which

transactions are eligible for Section 340B pricing—often by third-party administrators

who have a monetary incentive to declare as many transactions to be eligible for the

Section 340B discount as possible.  For each transaction found to be eligible, the covered

entity purchases replacement drugs at the discounted price through its wholesaler to

replenish the inventory previously used for eligible patients.

These shifts changed how the program operated in practice and eventually

prompted disagreement among manufacturers, covered entities, and HRSA regulators.

Manufacturers expressed concern that the widespread use of contract pharmacies made

6

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 535 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 7 of 48    Exhibit 3
PageID.1000

it more difficult to monitor compliance with statutory limits, including the prohibitions
on diversion and duplicate discounts. *Id*. at 458. Covered entities and pharmacies, by
contrast, emphasized that contract pharmacies were often necessary to ensure that
patients—particularly those living far from hospital facilities or in underserved
communities—could obtain prescribed medications. Beginning in 2020, several
pharmaceutical manufacturers adopted policies limiting the circumstances under which
they would make discounted drugs available for distribution through contract
pharmacies. *See id*. ("In 2020, [Novartis Pharmaceuticals Corporation and United
Therapeutics Corporation] began to limit the number and kinds of contract pharmacies
to which they would ship orders."); *see also AstraZeneca Pharmaceuticals LP v. Becerra*, 543
F. Supp. 3d 47, 52 (describing AstraZeneca's 2020 policy limiting the distribution of
340B drugs). The details of these policies varied among manufacturers, but commonly
included limits on the number of contract pharmacies eligible for discounted pricing,
requirements related to claims data sharing, or conditions tied to reporting and
oversight. Manufacturers characterized these policies as efforts to reduce the risk of
diversion and duplicate discounts. Covered entities and pharmacies responded that the
policies impeded their ability to serve patients and restricted access to discounts that
the 340B program was intended to provide.

In response to manufacturer restrictions, in December 2020, the HHS and HRSA
took the position that the Section 340B statute requires manufacturers to make

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 536 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 8 of 43     Exhibit 3
PageID.1001

discounted drugs available not only to covered entities, but also through contract

pharmacies designated as agents by those entities.  HRSA began taking steps to

challenge manufacturer policies restricting contract pharmacy use, while some

pharmaceutical companies sued to enjoin HRSA's policy mandating sales to contract

pharmacies.  *See, e.g.*, *AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d at 53.

Then, in May 2021, the agency sent violation letters to several manufacturers stating

that limitations on contract pharmacies and claims data requirements were inconsistent

with the Section 340B program.  HRSA directed manufacturers to provide discounted

drugs to covered entities without the conditions imposed by those policies, including by

making drugs available for delivery to pharmacies designated by covered entities.

Manufacturers responded by filing lawsuits in multiple federal courts, seeking to

invalidate the agency's violation letters.

Most district courts that addressed the validity of HRSA's enforcement efforts

through the violation letters concluded that the violation letters could not stand; two

courts of appeals affirmed that conclusion.  In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th

696 (3d Cir. 2023), the Third Circuit held that the Section 340B statute does not require

manufacturers to provide discounted drugs through contract pharmacies, and that

HRSA lacked broad regulatory authority to impose such a requirement.  The court

emphasized that the statute focuses on the price manufacturers must offer to covered

entities and does not prescribe the manner or location of drug delivery.  *Id*. at 703–04.

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 537 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 9 of 18  Exhibit 3
PageID.1002

Indeed, the Third Circuit held that the statute was "silent about delivery." *Id*. at 703.

On that basis, the court determined that the agency had not demonstrated that

manufacturer policies restricting contract pharmacy arrangements violated the statute,

and on that basis enjoined "HHS from enforcing against them its reading of Section

340B as requiring delivery of discounted drugs to an unlimited number of contract

pharmacies." *Id*. at 706.

The D.C. Circuit reached a similar conclusion in favor of the manufacturers in

*Novartis*, 102 F.4th 452.  There, the court explained that the statute obligates

manufacturers to offer drugs at or below a specified price but is "silent about delivery

conditions." *Id*. at 460.  The court reasoned that, absent statutory direction,

manufacturers retain discretion over distribution terms, subject to the limitation that

such terms cannot effectively circumvent the statutory pricing requirement.  *Id*. at 462–

63.  Because the manufacturers' policies at issue did not, on their face, undermine the

statutory ceiling price or the obligation to make a bona fide offer, the court concluded

that HRSA had exceeded its authority in issuing the violation letters.  *Id*.  The court,

however, did not "foreclose the possibility that other, more onerous conditions might

violate the statute," or that even the conditions at issue might be unlawful "as applied

in particular circumstances." *Id*. at 464.

Together, these decisions stand for the proposition that federal law does not

require manufacturers to allow covered entities to use unlimited contract pharmacies in

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 538 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 10 of 48
PageID.1003

all cases and all places. But neither court had occasion to consider whether federal law

might indeed require manufacturers to allow the use of unlimited or at least multiple

contract pharmacies "as applied in particular circumstances." *Id.* Nor did either court

definitively resolve how strictly or deferentially federal law might require a court to

scrutinize, on an as-applied basis, restrictions on the use of contract pharmacies or other

delivery conditions that might impair a covered entity's ability to avail itself of its right

to discounted Section 340B drugs for all of its eligible patients.

**B.    Hawai'i Act 143**

Many states have, however, evidently interpreted the Third Circuit and D.C.

Circuit decisions as signaling that federal law requires little scrutiny of delivery

restrictions, whether facially or as applied. Operating on that assumption, states have

adopted legislation to ensure that manufacturers cannot, in the face of federal law's

assumed silence on delivery conditions, limit or prohibit the use of contract pharmacies

by covered entities. Joining this wave of state legislation, the Hawai'i Legislature

enacted Act 143 in 2025, which became effective on July 1, 2025. Dkt. No. 43, at

PageID.462.

The Hawai'i Legislature adopted Act 143 in the context of ongoing disputes over

manufacturer restrictions on contract pharmacy arrangements and concerns about

access to medications for patients served by covered entities in Hawai'i. *See* Dkt. No.

43-3, at PageID.500-01 ("The legislature additionally finds that contract pharmacies are

10
535

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 539 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 11 of 48    Exhibit 3
PageID.1004

crucial in Hawaii, where geographic barriers make access to health care difficult for many residents."). Covered entities in the state—including hospitals and clinics that serve rural areas—had increasingly relied on contract pharmacies to ensure that patients could obtain prescribed medications without significant logistical barriers. *Id*.

But finding their use of contract pharmacies restricted by manufacturers, hospitals experienced "reduced savings, which could result in cutbacks to essential health care programs." Dkt. No. 43-3, at PageID.501. Act 143 therefore addresses the acquisition and delivery of drugs purchased under the Section 340B program and the role of contract pharmacies in that process. To that end, the provision at issue in this case prohibits manufacturers from interfering with the acquisition or delivery of Section 340B drugs by covered entities and their contract pharmacies. Specifically, Act 143 provides that a manufacturer, or its agent or affiliate, may not "deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or shipping or delivery of a 340B drug to," a pharmacy that is under contract with a covered entity and authorized to dispense Section 340B drugs on its behalf, unless such receipt is prohibited by HHS. *Id*. at PageID.501-02.

C.    **Procedural History**

AstraZeneca responded with this lawsuit, in which it challenges Act 143 on four grounds: that Act 143 is preempted by Section 340B and by federal patent law, and that the Act violates both the Contracts Clause and the Takings Clause. AstraZeneca's

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 540 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 12 of 18    **Exhibit 3**
PageID.1005

motion for a preliminary injunction, however, is limited to its federal preemption claims.  The State, meanwhile, has moved to dismiss the complaint in its entirety.  With the parties' stipulation, the court permitted limited expedited discovery relevant to the preliminary injunction motion and invited supplemental briefing based on that record.

The court held a hearing on the motion for preliminary injunction on February 9, 2026, at which it heard the testimony of Chris Mancill, Senior Vice President & Head of U.S. Market Access at AstraZeneca, and heard argument from counsel.  Dkt. No. 98. Based on the court's evaluation of his demeanor, as well as the consistency of his testimony with other evidence available in the record, the court concludes that Mr. Mancill testified truthfully at the hearing.  The court also commends all counsel for submitting helpful written briefs and presenting exceptionally effective oral argument at the hearing.

By this order, the court now resolves the motion for a preliminary injunction. The State's pending motion to dismiss, on which argument has not been heard, will be resolved by separate order.

### MOTION FOR A PRELIMINARY INJUNCTION

As noted, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez*, 680 F.3d at 1072 (quoting *Mazurek*, 520 U.S. at 972).  To obtain this extraordinary relief, a plaintiff generally must demonstrate "(1) a likelihood of success

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 541 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 13 of 43
Exhibit 3
PageID.1006

on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors of the plaintiff, and (4) that an injunction is in the public interest." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022) (en banc) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Among these factors, likelihood of success on the merits "is the most important" and "is a threshold inquiry." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). So when "a plaintiff [fails] to show the likelihood of success on the merits," *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013)—or at least "serious questions going to the merits," *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)—the court need not reach the remaining factors. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

## DISCUSSION

AstraZeneca seeks to preliminarily enjoin Act 143 on the grounds that it is preempted by federal law. The U.S. Constitution's Supremacy Clause indeed authorizes Congress "to preempt state law," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and Congress often expressly provides for preemption in the text of its statutes. But even "without an express provision," courts have found implied preemption in two circumstances. *Id.* The first is field preemption: "When Congress intends federal law to 'occupy the field,' state law in that area is preempted." *Id.* The

13

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 542 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 14 of 48   Exhibit 3
PageID.1007

other is conflict preemption:  "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute."  *Id.*

There are, in turn, two forms of conflict preemption.  The first arises when it is impossible for a private party to comply with the mandates of overlapping federal and state law.  *Id.*  The second concerns situations in which a state law "creates an unacceptable 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Wyeth v. Levine*, 555 U.S. 555, 563-64 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

AstraZeneca relies here on that latter form of conflict preemption—"obstacle" or "purposes and objectives" preemption.  It bears emphasizing that this is not an easy doctrine to apply.  As the Ninth Circuit has recognized, "deciding just when a state law is 'contrary' to a federal law is often difficult," and "there is an *ad hoc* sense to many of the cases."  *Nexus Pharms., Inc. v. Central Admixture Pharm. Serv's, Inc.*, 48 F.4th 1040, 1045 (9th Cir. 2022) (cleaned up).  And given that the doctrine departs from the enacted text of federal legislation, it has come under criticism.  *See, e.g.*, *Wyeth*, 555 U.S. at 604 (Thomas, J., concurring in the judgment) (observing that "'purposes and objectives' preemption jurisprudence" can "lead[] to decisions giving improperly broad pre-emptive effect to judicially manufactured policies, rather than to the statutory text enacted by Congress pursuant to the Constitution").

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 543 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 15 of 148 Exhibit 3
PageID.1008

But while the assessment of obstacle preemption "is a matter of judgment," the court's exercise of that judgment must be "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. Given these standards, an evaluation of the precise nuances of federal law can have a significant effect on the proper outcome.

AstraZeneca argues that Act 143 must yield because it creates an unacceptable obstacle for two sets of federal laws: the Section 340B program itself, as well as federal law patent law. In addition to defending each of these specific preemption theories, AstraZeneca makes two broad threshold arguments in support of both theories: first, that "Act 143 regulates drug *pricing*, not distribution," Dkt. No. 21-1, at PageID.107 (emphasis in original); and second, that "no presumption against preemption of state law is appropriate here*," id.* at PageID.105. Because they inform the proper analysis of AstraZeneca's specific preemption theories, the court begins by taking up these more general threshold arguments.

### A.    Act 143 Regulates Delivery Conditions, Rather than Price

One of AstraZeneca's threshold arguments—which it advances in support of both of its preemption theories—is that Act 143 does not merely regulate delivery conditions, but instead impermissibly regulates pricing of drugs. As AstraZeneca puts it, "pricing is the only thing distinguishing a sale that complies with Act 143 from a sale

15

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 544 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 16 of 43   Exhibit 3
PageID.1009

that violates the law," and a statute that "forbids charging too much is a law that regulates pricing." Dkt. No. 21-1 at PageID.108–09.

This threshold distinction between price regulation and delivery regulation matters because AstraZeneca's preemption theories rely heavily on it. *See, e.g.*, Dkt. No. 76, at PageID.734-44. As will become clearer below, if Act 143 is understood as a price regulation, AstraZeneca has a considerably stronger argument that both Section 340B and patent law preempt Act 143. That is because these federal laws carefully and thoroughly regulate pricing; a state law purporting to regulate price would be more likely to impede Congress' careful price-related balancing. If, however, Act 143 is understood as regulating delivery—specifically, as regulating whether manufacturers may refuse to ship 340B drugs to authorized contract pharmacies—those preemption arguments lose much of their force. Both AstraZeneca and the State accept, at least at this stage in the litigation, that federal law leaves largely unregulated the matter of delivery conditions. They embrace, in other words, the Third Circuit's conclusion that § 340B imposes a price term while leaving other terms essentially unspecified. *Sanofi Aventis*, 58 F.4th at 704 ("The 'purchased by' provision imposes only a price term for drug sales to covered entities, leaving all other terms blank."). One consequence of the parties' shared assumption is that a state law regulating in that area silence is less likely to conflict with any considered judgment of Congress.

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 545 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 17 of 48     Exhibit 3
PageID.1010

At this preliminary injunction stage, the court need not conclusively resolve whether AstraZeneca's preferred framing of Act 143 as a price regulation is persuasive. But the court does conclude that—at least at this stage—AstraZeneca has not shown a likelihood, or even serious questions, that its preferred framing of Act 143 is correct. The reason, put simply, is that a state statute does not itself regulate price merely because it limits the application of its non-price regulations to the areas in which a federal price regulation applies.

Begin with a hypothetical. Imagine a federal program imposing price caps on housing costs for certain veterans. But imagine that the federal program was completely silent about what kinds of background checks might properly be applied before a veteran is allowed to rent any property at the discounted price. Imagine further that, consistent with their economic incentives, some property owners sought to impose highly burdensome—and arguably unnecessary—background checks on any veterans who sought to avail themselves of the federal price cap. Those same property owners, at the same time, were perfectly willing to waive those checks for any veteran prepared to forgo the price caps and pay prevailing market rates. Now imagine that a state enacted a statute forbidding property owners from imposing burdensome background checks on veterans who sought to benefit from the federal price caps. That state statute would apply by reference to a federal pricing regulation—it would only apply when that price cap is already available because of federal law—but the state

17

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 546 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 18 of 43    Exhibit 3
PageID.1011

statute itself would regulate only the imposition of burdensome background checks, not price. It would not be plausible to say that the state statute itself becomes a pricing regulation merely because it uses the federal price cap to define which transactions are covered by the state rule.

At least at this early stage, AstraZeneca has not shown that it is any more plausible to say that Act 143 regulates pricing. The problem is that AstraZeneca's argument focuses on how the statute defines the drugs to which it applies rather than on the conduct the statute regulates. Act 143 defines a "340B drug" by reference to the federal pricing program, but the operative prohibition is not about price at all. Act 143 provides that no manufacturer "shall deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or shipping or delivery of a 340B drug to, a pharmacy that is under contract with a 340B covered entity and is authorized under the contract to receive and dispense 340B drugs on behalf of the covered entity." § 2(a). The regulated conduct is thus delivery and availability—whether a manufacturer may refuse to ship or deliver drugs to certain pharmacies, and to whom and when delivery must occur—not the amount charged for those drugs.

Act 143 does not impose a new price term or displace an existing one. The relevant price—the Section 340B ceiling price—continues to be established exclusively by federal law. The statute merely defines a "340B" drug as "a prescription drug that is purchased by a Section 340B covered entity through the federal Section 340B drug

18

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 547 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 19 of 48 Exhibit 3
PageID.1012

pricing program authorized by title 42 [U.S.C. section 256b (section 340B of the Public

Health Service Act) and is dispensed by a pharmacy."  Act 143 § 1.  Act 143 neither sets

that price nor alters the transactions to which it applies under Section 340B.  Instead, the

statute addresses whether manufacturers may condition delivery of replenishment

drugs on the identity of the dispensing pharmacy once a covered entity has otherwise

satisfied the federal eligibility criteria.  That price serves as a definitional reference point

does not transform the statute into a pricing regulation.

AstraZeneca rejoins that Act 143 is akin to a hypothetical statute requiring goods

to be sold "for $1," Dkt. No. 21-1, at PageID.109, but that analogy is not a good fit.  Act

143 does not mandate sales a price chosen by the state, nor does it cap prices at which

drugs must become available to contract pharmacies.  Act 143 enforces access to a price

that Congress itself imposed, in a context where the parties both assume that Congress

left other terms of performance—including distribution through contract pharmacies—

largely unregulated.

Nor, at this early stage in the case, does AstraZeneca's reliance on the

replenishment model compel a different conclusion.  As AstraZeneca emphasizes,

under that model, pharmacies dispense from intermingled inventory and only later,

through reconciliation, determine whether a prescription is 340B-eligible, at which point

the pharmacy places a replenishment order at the discounted price.  *Novartis*, 102 F.4th

at 457.  But that description underscores that the discounted price is already fixed by

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 548 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 20 of 48    Exhibit 3
PageID.1013

federal law.  Act 143 does not dictate "what price the pharmacy and the covered entity will pay the manufacturer," *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W. Va. 2024); it governs whether manufacturers may refuse to *deliver* replenishment drugs at that federally defined price once eligibility has been established.  The statute's operation depends on price only because the federal program does—not because Hawaiʻi is regulating price.

Finally, AstraZeneca's reliance on *Engine Mfrs. Ass'n v. South Coast Air Quality Mgt. Dist.*, 541 U.S. 246, 251 (2004), is misplaced.  There, a district in California attempted to accomplish indirectly what federal law under the Clean Air Act expressly prohibited it from doing directly.  541 U.S. at 249-50.  The question was whether local fleet rules prohibiting the purchase or lease of noncompliant vehicles avoided preemption under § 209(a) of the Clean Air Act by regulating purchases rather than the manufacture or sale of vehicles.  *Id*. at 248.  As AstraZeneca acknowledges, "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense."  *Id*. at 255.  That is true, as the Supreme Court reasoned, "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them," *id*., because purchase and sale are two sides of the same coin.  Price and delivery, by contrast, are distinct terms of performance.  A restriction on delivery may make a sale more difficult or less profitable—just as the imposition of unduly restrictive background checks might make it difficult for a veteran

20
545

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 549 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 21 of 48    Exhibit 3
PageID.1014

to benefit from a rental price cap in our hypothetical above—but it operates on a

different component of the transaction.  This is not "meaningless semantics."  *Id*. at 255.

In short, price governs the economic terms of exchange; delivery governs access.

Regulating one does not inherently regulate the other.

For these reasons, the court concludes that AstraZeneca has not shown a

likelihood of success on, or serious questions going to, the merits of its threshold

argument that Act 143 regulates price rather than delivery.

### B.    The Presumption Against Preemption Applies Here

AstraZeneca's other threshold argument is that the presumption against

preemption should not apply here.  The court concludes that, at this early stage,

AstraZeneca has not shown a likelihood of success on, or serious questions going to the

merits of, this argument.

Given that preemption carries "serious implications for federalism," courts are

instructed to "start with the assumption that the historic police powers of the States

were not to be superseded by the Federal Act unless that was the clear and manifest

purpose of Congress."  *Nexus Pharms.*, 48 F.4th at 1045 (cleaned up); *see Wyeth*, 555 U.S.

at 565 (explaining that the presumption applies in "all pre-emption cases," though it

applies "particularly in those in which Congress has legislated in a field which the

States have traditionally occupied" (cleaned up)).  That is why, in express preemption

cases, "when the text of a pre-emption clause is susceptible of more than one plausible

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 550 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 22 of 48 Exhibit 3
PageID.1015

reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria Group, Inc. v. Good*, 555 U.S. 70, 543 (2008). And it is why, in implied preemption cases, the "teaching" of the Supreme Court's "decisions enjoins seeking out conflicts between state and federal regulation where none clearly exists." *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (cleaned up).

AstraZeneca nonetheless argues that no presumption of preemption should apply here. It relies principally on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), in which the Supreme Court declined to apply the presumption against preemption to a state law that sought to regulate a subject matter "inherently federal in character." *Id.* at 347. Act 143, in AstraZeneca's view, similarly seeks to regulate an inherently federal matter: "AstraZeneca's obligations towards 340B covered entities originate from Section 340B; are governed by Section 340B; and will terminate when AstraZeneca no longer participates in the 340B program." Dkt. No. 21-1, at PageID.106.

But the comparison to *Buckman* breaks down at closer look. The state statute at issue in *Buckman* purported to authorize private parties to sue medical device manufacturers for "ma[king] fraudulent representations to the Food and Drug Administration (FDA)" while participating in a federal preapproval program. 531 U.S. at 343. In this way, the state statute sought to regulate the "relationship between a federal agency and the entity it regulates," a relationship that is "inherently federal in character." *Id.* at 347. Given that "[p]olicing fraud against federal agencies is hardly a

22

547

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 551 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 23 of 48 Exhibit 3
PageID.1016

field which the States have traditionally occupied," no presumption against preemption

applied. *Id.* The point, in other words, was not that the state law regulated only within

the confines of a federal program; what mattered was that the subject matter of its

regulation was inherently federal.

Act 143 does not, by contrast, seek to regulate the relationship between any

federal agency and an entity it regulates—let alone to regulate alleged fraud within

such a relationship. Instead, Act 143 regulates the manner in which drug

manufacturers must arrange to provide drugs to hospitals and other covered entities.

And as the State correctly notes, Act 143's stated purposes—"ensuring a patient's access

to affordable medication, and protecting the financial savings that hospitals depend on

to provide these critical services"—sound in traditional public-health concerns. Dkt.

No. 43, at PageID.464. Regulation in this context, and with these goals, is a

"complementary form of drug regulation" that falls within the historic police powers of

a State. *Wyeth*, 555 U.S. at 578-79.

Indeed, AstraZeneca does not meaningfully dispute that Act 143 regulates a

subject matter that would ordinarily fall within such historic powers. AstraZeneca's

argument, instead, is that the presumption against preemption should not apply

anyway, because Act 143 is not a "generally applicable state law[]" that "regulate[s] the

sale and distribution of *all* drugs," rather than "just drugs sold within a federal

program." Dkt. No. 21-1, at PageID.106. AstraZeneca contends, in other words, that

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 552 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 24 of 48   Exhibit 3
PageID.1017

because Act 143 only regulates public health within a federal program, rather than generally, it should not be accorded the presumption against preemption that ordinarily attaches to state laws that operate in this area.

That argument conflates the breadth of a state law with the subject matter it regulates. If a state regulates in an area that implicates "the historic primacy of state regulation of matters of health and safety," *Buckman*, 555 U.S. at 348, then the presumption against preemption applies, even if the state law only regulates that subject matter within the narrow confines of a federal program. *Accord Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 844, 852 (9th Cir. 2024) (applying the presumption against preemption to California law that simply "incorporates by reference all federal food labeling standards"). Just as the presumption against preemption would not have applied in *Buckman* even if the state law at issue had been drafted in broad and general terms (because the subject matter, in its application to fraud on the FDA, was inherently federal) the presumption against preemption still applies to Act 143, even though it only narrowly and specifically regulates within the confines of the Section 340B program (because the subject matter it regulates, within those confines, is one falling within the historic police powers of a state).

Nor is it surprising that Act 143 would focus specifically on participants in the Section 340B program. After all, AstraZeneca itself notes that it does not seek to impose its more onerous delivery conditions outside of the program. Dkt. No. 48, at

24
549

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 553 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 25 of 48     Exhibit 3
PageID.1018

PageID.565 (explaining that its restrictions on the use of unlimited contract pharmacies applies only to discounted Section 340B drugs, and that "AstraZeneca's drugs are available for acquisition by any covered entity, or for delivery to 'any pharmacy in Hawaii,' provided it pays commercial prices"). It is not unreasonable for a state to adopt a statute addressing a problem only in the specific context in which it has arisen.

And the record, at least at this early stage, lends support to the State's belief that manufacturers have specifically targeted covered entities' efforts to obtain discounted Section 340B drugs with restrictive delivery conditions—conditions they see no need to apply when a hospital or other customer purchases drugs at full price. As the State's brief explains, "[s]ince 2020, pharmaceutical manufacturers have increasingly imposed restrictions on the delivery of 340B drugs to contract pharmacies," and "[a]s of this writing, 38 manufacturers, including AstraZeneca, have implemented such restrictions and that number continues to rise year after year." Dkt. No. 43-1, at PageID.488. The State explains that manufacturers "used to email their policies directly to covered entities, but many no longer do so," requiring covered entities "to spend time and resources to manually check the internet for these updates on a regular basis, sometimes weekly." *Id*. at PageID.489. The State further avers that "[t]hese efforts divert critical personnel and funds away from patient care," and that "[t]racking and responding to each manufacturer's 340B shipment policy imposes a substantial burden," necessitating "a team including pharmacy personnel, compliance, and in-

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 554 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 26 of 48 Exhibit 3
PageID.1019

house and outside attorneys" that has spent "countless hours tracking, assessing, and responding to manufacturers' unilateral policies." *Id.*

AstraZeneca itself apparently "has restricted contract pharmacy shipments since at least October 2020," and "has changed its policy several times," resulting in "breakdowns in communications and the use of additional resources." *Id.* at PageID.488–89. Under AstraZeneca's policy, covered entities "are only able to designate one contract pharmacy, and only if they lack an on-site pharmacy," and AstraZeneca "refuses to ship 340B drugs to that one contract pharmacy unless the entity submits patient-specific claims data to a third-party vendor chosen by AstraZeneca." *Id.* at PageID.489–90. The vendor's software includes what the State describes as "nonnegotiable, problematic terms and conditions," including provisions permitting the vendor to "revoke access to the software at any time" and capping liability at "$10,000." *Id.* According to the State, these restrictions have led covered entities to "avoid[] contractual relationships with community and specialty pharmacies because of the inability to access 340B drugs," decisions that "divert money away from patient care." *Id.* at PageID.490. The consequences are particularly acute where "not every pharmacy carries every drug," and where certain "high-cost drugs are only available through 'specialty pharmacies,' which typically ship the patients' drugs by mail." *Id.*

This factual context undermines AstraZeneca's claim that Act 143 improperly "targets" the federal program. The record evidence, at least at this early stage, supports

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 555 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 27 of 48    Exhibit 3
PageID.1020

the conclusion that it is, instead, the manufacturers who are targeting Section 340B

participation—by "restrict[ing] the circumstances under which [they] offer[] [their]

products at 340B-discounted prices," Dkt. No. 40, at PageID.418–19, and by imposing

delivery and administrative conditions that limit covered entities' practical ability to

access the discount they are entitled to under federal law.  And so Act 143 specifically

regulates health and safety in the context—Section 340B program participation—in

which they have been challenged.  That is no reason to deny the statute the

presumption against preemption.[1]

Unpersuaded that Act 143 is a pricing regulation, or that the presumption

against preemption is unavailable here, the court turns to AstraZeneca's specific

preemption theories.

### C.    Act 134 Poses No Obstacle to the Section 340B Program

AstraZeneca's first preemption theory is that Act 143 "stands as an obstacle" to

the Section 340B program because it upsets the balance Congress struck in that program

---

[1]    To be clear, the court does not adopt, at least at this early stage in the litigation, the State's suggestion that AstraZeneca and other manufacturers are adopting these 340B-specific restrictions in a bad faith effort to undermine the access of covered entities to discounted drugs.  AstraZeneca contends that it has adopted some restrictions on the use of outside pharmacies, for example, because of concerns with impermissible diversion.  The point here is simply that in the face of manufacturers' restrictions targeting the Section 340B program (whatever the motivation), it is not unreasonable for the State to adopt a statute that specifically addresses these restrictions in the context in which they have arisen.

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 556 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 28 of 48 Exhibit 3
PageID.1021

and increases the costs of participation.  Dkt. No. 21-2, at PageID.111.  The State joins

issue and argues that Act 143 is no obstacle to Section 340B at all.

As noted earlier, at this early stage in the litigation, both parties have accepted

that Section 340B is largely silent on the question of what delivery conditions a

manufacturer may impose on a covered entity's access to Section 340B drugs.  As the

parties have framed it, then, the conflict preemption question comes down to an

assessment of what Congress' silence in Section 340B signifies.  If Congress' silence on

the matter of delivery reflects an intent to leave no room for additional regulation, then

Act 143 could be understood as an obstacle to federal objectives.  But if that silence

instead reflects Congress' judgment that States would be free to exercise their historic

police powers, then the premise of preemption collapses.

1.  At the outset, it is worth noting that the parties' shared assumption about the

silence of Section 340B on delivery conditions is not obviously correct.  Granted, HRSA

took the position, beginning in 1996, that Section 340B "is silent as to permissible drug

distribution systems," and HRSA therefore sought to fill "gaps in the legislation" to

"move the program forward."  *Notice Regarding Section 602 of the Veterans Health Care Act
of 1992*; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,549–50 (Aug. 23, 1996).

Courts, too, have opined that the statute is "silent about delivery," *Sanofi Aventis*, 58

F.4th at 703, and that it "regulates neither the distribution of drugs to patients nor the

28
553

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 557 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 29 of 48 Exhibit 3
PageID.1022

role of pharmacies in this distribution." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 646 (5th Cir. 2025). The parties in this case embrace that view.

But it is conceivable that Section 340B might properly be interpreted quite differently. Although the Third Circuit and D.C. Circuit held that Section 340B does not require manufacturers to allow covered entities to use unlimited contract pharmacies as a categorical or facial matter, the Ninth Circuit has not yet had occasion to consider whether those decisions are correct. Nor, of course, has the Supreme Court. And despite their forceful language about Section 340B's "silence" on delivery conditions as a facial matter, even the Third Circuit and D.C. Circuit decisions left open the door to potentially robust federal scrutiny of delivery conditions as applied—that is, in the particular circumstances of any geographic region or individual case. The D.C. Circuit, for example, while holding that "section 340B does not categorically prohibit manufacturers from imposing conditions on the distribution of covered drugs to covered entities," nonetheless clarified that this holding did not "foreclose the possibility that other, more onerous conditions might violate the statute." *Novartis*, 102 F.4th at 464. It added that even the restrictions upheld in that case could be found to "violate section 340B as applied in particular circumstances." *Id.*

At the hearing on the motion, to be sure, AstraZeneca confirmed that it accepts the views of the Third Circuit and D.C. Circuit on these issues, and also agreed that extremely unreasonable or burdensome delivery restrictions would violate their

29

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 558 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 30 of 48
PageID.1023
Exhibit 3

obligation to make bona fide offers of discounted Section 340B drugs to covered entities.

But even here, AstraZeneca's interpretation of federal law is that, short of an extreme

imposition, federal law does not stand in their way.  Under this interpretation, if the

record in a particular case showed that a covered entity has 100 patients—and,

therefore, a federal entitlement to obtain discounted drugs for each one of them—

AstraZeneca could nonetheless adopt delivery restrictions that, in practice, make it

impossible for that covered entity to obtain discounted drugs for a substantial number

of those 100.  In short, AstraZeneca accepts that federal law precludes it from acting in

extreme ways, but its general position is that federal law generally does not constrain its

discretion to impose whatever delivery conditions it wishes—even if those conditions

substantially limit the ability of covered entities to obtain the discounted Section 340B

drugs to which federal law entitles them.

But it might be possible to adopt—and the court in this case might ultimately

adopt—a much more robust, expansive view of the federal requirements embedded

within Section 340B.  More precisely, it might be possible to interpret Section 340B as

broadly authorizing a federal law challenge to any delivery condition that unreasonably

limits the ability of a covered entity to take advance of manufacturers' obligation to

"offer" Section 340B drugs "for purchase" at or below statutory price caps.  Under this

interpretation of Section 340B, any restriction of covered entities' ability to use contract

pharmacies in Hawai'i could conceivably be found unlawful—either facially or at least

30

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 559 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 31 of 48     Exhibit 3
PageID.1024

as applied under local and current circumstances—under Section 340B itself.  The result

that the State seeks to accomplish under Act 143 could, on this view, instead be

mandated by federal law.  And it is possible to interpret the Third Circuit and D.C.

Circuit decisions as being entirely compatible with this interpretation of federal law.

At least up to this point in these proceedings, however, neither party has sought

to portray federal law as playing a robust role of that sort.  The State does not do so; the

very reason the Hawaiʻi Legislature adopted Act 143 was because it understood federal

law as being essentially silent in this area.  And AstraZeneca, at least to this stage in the

litigation, has not meaningfully disavowed the position it took in the D.C. Circuit:  that

federal law gives it "a nearly unfettered ability to impose conditions."  *Id.* at 459.

Although the court ultimately need not accept the parties' shared assumption about the

proper interpretation of federal law, it is appropriate at this stage—in which the court is

only assessing whether AstraZeneca has shown a likelihood of success on the merits to

warrant the extraordinary relief of a preliminary injunction—to focus squarely on

whether the moving party's own arguments, including its assumptions about the

breadth of federal law, make that showing.

2.  The parties' shared assumption that Section 340B is largely silent on the

question of delivery conditions stacks the deck in the State's favor at this early stage in

the case.  That is because the less involved federal law is in regulating proper delivery

conditions, the less likely it is that Congress meant for federal law to have an exclusive

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 560 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 32 of 48 Exhibit 3
PageID.1025

say.  And so while AstraZeneca repeatedly asserts that Congress "carefully balanced"

the burdens and benefits of participation in the 340B program and that Act 143 disrupts

that calibration by increasing manufacturers' costs, Dkt. No. 121-1, at PageID.111,

AstraZeneca's assertion is weakened by its assumption that federal law is largely silent

on the matters that Act 143 aims to regulate.

Put differently, it is difficult to conclude that if Section 340B leaves delivery

conditions almost entirely unregulated, that this was because Congress made the

deliberate determination to leave it to manufacturers—who have a financial interest in

making it as difficult as possible for covered entities to obtain discounted Section 340B

drugs—to decide how difficult it should be.  The purpose of Section 340B is not to make

it as difficult as manufacturers would like it to be for covered entities to obtain

discounted drugs.  Rather, the "purpose of Section 340B is clear—it provides discounts

on drugs to certain kinds of healthcare facilities.  To that end, the more opportunities

that covered entities have to purchase discounted drugs, the more money they can

save."  *Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479 (DLF), 2021 WL 5161783, at *7

(D.D.C. Nov. 5, 2021).  And Section 340B entitles covered entities to discounted prices

for Section 340B drugs for each of their eligible patients; the statute contains no limit on

the number of discounted drugs covered entities may obtain.  The court cannot discern,

in the assumed silence of the federal statute, any congressional intent to undermine the

right of covered entities to obtain these discounted drugs through the roundabout

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 561 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 33 of 48     Exhibit 3
PageID.1026

mechanism of allowing manufacturers to impose, at will, whatever onerous delivery conditions they like.

AstraZeneca nonetheless contends that the silence should be construed as reflecting Congress' considered decision to entrust manufacturers with this unfettered authority. The court is not convinced. It is true that, as the D.C. Circuit observed, "[s]tatutory silence implies that manufacturers may impose distribution conditions by contract, not that they are prohibited from doing so." *Novartis*, 102 F.4th at 460. But the D.C. Circuit's observation concerned the scope of federal law. It does not answer the preemption question of whether federal law is meant to be exclusive. And in considering preemption, the court must be mindful that "[o]rdinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *English*, 496 U.S. at 89.

In *English*, for example, the Supreme Court concluded that even though federal law preempted the field of "radiological safety aspects involved in the construction and operation of a nuclear plant," a nuclear plant employee's state law tort claims for workplace misconduct were not preempted. *Id.* at 82. The Court reached that conclusion even though federal law provided a remedial scheme for addressing similar complaints and required that they be filed within 30 days of an alleged violation. *Id.* at 76-78. Although the state law claim was not similarly time-constrained, the Court rejected the argument that it should be preempted to ensure that nuclear plant

33
558

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 562 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 34 of 48    Exhibit 3
PageID.1027

employees did not have "less incentive" to use the federal remedial scheme.  *Id.* at 89.

Perhaps the robust state regime would make the federal scheme less attractive, the

Court acknowledged, but "[s]uch a prospect is simply too speculative a basis on which

to rest a finding of pre-emption."  *Id.* at 90.

Or consider *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011).  There,

the Supreme Court rejected an obstacle preemption challenge to an Arizona state statute

requiring employers to verify the employment eligibility of its employees using the

federal "E-Verify" program.  *Id.* at 607-10.  Although Congress had passed the

legislation "setting up the program that includes E-Verify," it chose to "constrain

federal action:  Absent a prior violation of federal law, 'the Secretary of Homeland

Security may not require any person or other entity [outside of the Federal

Government] to participate in a pilot program' such as E-Verify."  *Id.* at 608.  The Court

rejected the argument that this prohibition on federal action should preempt a state

effort to require more.  *Id.* at 609-10.

The Ninth Circuit reached a similar conclusion in *City of Los Angeles v. AECOM*

*Servs, Inc.*, 854 F.3d 1149 (9th Cir. 2017).  The question in that case was whether a state-

law claim for *de facto* contribution—based on the allegation that a contractor failed to

comply with federal law—was preempted by Title II of the Americans with Disabilities

Act or Section 504 of the Rehabilitation Act of 1974, neither of which authorized a

contribution claim.  Rejecting the argument that Congress' silence should be construed

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 563 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 35 of 48 Exhibit 3
PageID.1028

as a judgment that state law should be preempted, the Ninth Circuit explained that treating "congressional *omission*" as a basis for preempting state law would "turn[] the presumption against preemption on its head." *Id.* at 1160. "The basic premise of the presumption is that absent an affirmative indication to the contrary, a federal regulation will not preempt state law." *Id.*; *accord Davidson v. Sprout Foods, Inc.*, 106 F.4th at 850 (rejecting the argument that a federal statute's "prohibition of private enforcement" should be construed "as evidence of Congress' intent to preempt private enforcement of [a] state law" that incorporated federal law standards, and noting that the argument would "read too much" into the federal statute's omission, "which relates only to the enforcement of federal law" and "does not limit enforcement of state law").

The bottom line is that "congressional and regulatory silence usually defeats a claim of preemption, not the other way around." *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012). Accepting—at this early stage in the case—AstraZeneca's assumption that Section 340B is largely silent on delivery conditions, the court concludes AstraZeneca has not shown a likelihood of success on the merits of its conflict preemption claim based on Section 340B.

3. Resisting this conclusion, AstraZeneca urges the court to conclude that Act 143 undermines the national uniformity of the Section 340B program, particularly as other states enact similar but not identical statutes. Dkt. No. 21-1, at PageID.115. On

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 564 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 36 of 48  Exhibit 3
PageID.1029

this point, AstraZeneca raises a legitimate concern.  Congress undoubtedly sought

nationwide uniformity in the administration of the Section 340B pricing obligation, and

the Supreme Court has emphasized the importance of centralized federal enforcement

in that context.  *Astra*, 563 U.S. 110, 121.  The Section 340B statute establishes a detailed

federal enforcement regime, administered by HHS and supported by audits, refunds,

civil monetary penalties, and administrative dispute resolution.  42 U.S.C. §§ 256b(a)(5),

(d)(1), (d)(3).

But Act 143 does not authorize private parties to enforce Section 340B pricing

obligations, nor does it purport to administer the federal program.  Manufacturers'

obligations under Section 340B remain defined by federal law, as interpreted by federal

courts, and enforced by federal officials.  Act 143 instead creates state law obligations

governing the delivery of drugs through pharmacies operating under state law—a

subject on which the parties jointly assume Congress is largely silent.  In that respect,

Act 143 operates alongside, rather than in place of, the federal enforcement regime.

AstraZeneca nevertheless relies on *Buckman*, 531 U.S. 341, to argue that Act 143

establishes a parallel enforcement scheme that impermissibly intrudes upon federal

prerogatives.  That analogy is unpersuasive.  The concern in *Buckman* was that state-law

"fraud-on-the-FDA" claims would undermine the FDA's "delicate balance of statutory

objectives" in deciding how aggressively to exercise its own enforcement authority.  *Id.*

at 348–49; *accord Nexus Pharms.*, 48 F.4th at 1048 (concluding that a state statute was

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 565 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 37 of 48   Exhibit 3
PageID.1030

preempted because it would interfere with "FDA's enforcement discretion by enabling

what the FDA regards as over-enforcement").

In this case, by contrast, the parties jointly accept that federal law is largely silent

on the question of delivery restrictions. A silent federal statute does not call on a

federal agency to exercise any delicate balance of statutory objectives, or to make

nuanced judgment calls about how aggressively to enforce the law. It allows little or no

role for the federal agency at all. Nor is that silence fairly understood as reflecting

Congress' own careful balancing of statutory objectives. Given the way the parties have

jointly chosen to characterize the role of federal law at this early stage in the litigation,

the court does not find that state law requirements would conflict with any federal

exercise of enforcement or policy discretion.

For similar reasons, the court concludes, at this stage, that AstraZeneca has not

shown a sufficient likelihood of success on (or serious questions about) the merits of its

contention that Act 143 targets some uniquely federal interest embedded within

Spending Clause legislation. Dkt. No. 76, at PageID.745-46 (quoting *Boyle v. United*

*Techs. Corp.*, 487 U.S. 500, 504, 507 (1988)). The parties' agreement that federal law is

largely silent on the matter of delivery restrictions suggests, instead, that Congress has

not expressed any meaningful interest on that matter.

Nor does Act 143 present a substantial risk of conflicting adjudications sufficient

to support obstacle preemption. AstraZeneca suggests that, in a state enforcement

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 566 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 38 of 43 **Exhibit 3**
PageID.1031

proceeding, a manufacturer might assert as a defense that the drugs at issue were not required to be sold at the 340B price under federal law, potentially forcing state courts to resolve federal questions.  Dkt. No. 21-1, at PageID.115.  It is also conceivable that, as the evidentiary record develops in this case, AstraZeneca is ultimately able to show that such a significant amount of unlawful diversion is occurring in Hawaiʻi that it is appropriate to view Act 143, as applied, as effectively requiring pricing discounts in situations in which federal law does not authorize them.  But such conflicts are, at this stage, "too speculative a basis on which to rest a finding of pre-emption."  *English*, 496 U.S. at 90.  While AstraZeneca has conducted limited expedited discovery on the replenishment model and how it is used in Hawaiʻi, it has not, at least this stage, offered any evidence that any covered entity in Hawaiʻi is engaged in unlawful diversion.  And at this stage, the prospect of conflicting adjudication about what might count as diversion is likewise mere speculation.  As the Supreme Court has cautioned, preemption is "ordinarily not to be implied absent an 'actual conflict.'"  *Id.*  Accepting, for now, the parties' assumption that Section 340B does not meaningfully regulate delivery conditions and does not empower HRSA to do so, state enforcement of state-law delivery requirements does not create the kind of parallel enforcement regime condemned in *Astra* or *Buckman*.

In short, while Congress sought national uniformity with respect to the pricing obligations imposed by Section 340B, no party has sought to develop the argument

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 567 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 39 of 48
PageID.1032    Exhibit 3

Congress sought any such uniformity for matters of delivery and distribution. Act 143

operates in that space in which Congress is said to have been silent. Under these

circumstances, the speculative possibility of overlapping adjudication or enforcement is

not enough for AstraZeneca to show a likelihood of success on, or serious questions

going to, the merits of its obstacle preemption claim.

4. At the hearing on the motion, AstraZeneca more fully developed an

alternative argument: that Act 143 is preempted because it amounts to an

impermissible direct regulation of federal contractors, those contractors being the drug

manufacturers who enter into contracts with the government to participate in Medicare

and Medicaid. This argument does not fall neatly into the doctrinal boundaries of

conflict preemption based on the Section 340B program. It is instead invokes a separate

preemption doctrine concerned with intergovernmental immunity.

At least at this stage, AstraZeneca has not shown a likelihood of success on—or

even serious questions going to—the merits of this argument. The intergovernmental

immunity doctrine has its roots in *McCulloch v. Maryland*, 17 U.S. 316 (1819), in which

the Supreme Court held unconstitutional Maryland's attempt to impose a tax on the

Bank of the United States. As Chief Justice John Marshall explained, under the

Supremacy Clause, "the States have no power, by taxation or otherwise, to retard,

impede, burden, or in any manner control, the operations of the constitutional laws

enacted by Congress to carry into execution the powers vested in the general

39

564

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 568 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 40 of 48 Exhibit 3
PageID.1033

government." *Id.* at 436. The doctrine eventually expanded to bar "any state law whose

'effect . . . was or might be to increase the cost to the Federal Government of performing

its functions,' including laws that imposed costs on federal contractors." *United States v.*

*Washington*, 596 U.S. 832, 838 (2022) (quoting *United States v. County of Fresno*, 429 U.S.

452, 460 (1977)). So long as the federal government was picking up the tab, the states

had no power to make the charge. *See County of Fresno*, 429 U.S. at 460 (explaining that

"[f]or many years the Court read the decision in *McCulloch* as forbidding taxes on those

who had contractual relationships with the Federal Government or with its

instrumentalities whenever the effect of the tax was or might be to increase the cost to

the Federal Government of performing its functions").

The Supreme Court more recently has narrowed the intergovernmental

immunity doctrine. Under the current formulation, a state law that seeks to directly

regulate the operations of the United States is still preempted. But when the state law

imposes a financial cost on the federal government, that is no longer a showstopper.

Courts must instead ask a further question: does the state law discriminate against the

federal government, or is it instead generally applicable or neutrally applied? Under

this branch of the intergovernmental immunity doctrine, "a state law is thus no longer

unconstitutional just because it indirectly increases costs for the Federal Government, so

long as the law imposes those costs in a neutral, nondiscriminatory way." *Washington*,

596 U.S. at 839.

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 569 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 41 of 48    Exhibit 3
PageID.1034

Turn back now to Act 143.  Does it directly regulate the operations of the United States?  There is no persuasive argument that it does.  Act 143 prohibits drug manufacturers from imposing certain delivery conditions on the distribution of Section 340B drugs to covered entities.  Those state law requirements do not in any way apply to the United States or any of its agencies or employees.  And while it may be appropriate to characterize drug manufacturers that participate in the Section 340B program as federal contractors, that generalized status is not the relevant question.  A state enforcement action compelling such a drug manufacturer to stop acting in a certain way within a state's boundaries would directly regulate the manufacturer.  But if the manufacturer was not acting at the direction or instruction of the federal government, then the manufacturer is being regulated for its own conduct, not for conduct it has undertaken as an instrumentality of the United States.  Here, the federal government has not ordered or instructed manufacturers to impose restrictions on the ability of covered entities to obtain Section 340B drugs using outside pharmacies; hence, when states regulate manufacturers' efforts to do what federal law does not instruct them to do, the state laws are not regulating any act compelled or directed by the federal government, but instead the private conduct (and choices) of the manufacturers themselves.

Nor has AstraZeneca shown, at this stage in the case, that there is any sense in which the federal government could be said to bear the costs of Act 143.  While it is

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 570 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 42 of 48 Exhibit 3
PageID.1035

possible that further discovery or presentation of evidence could alter this picture, the

current record shows only that manufacturers themselves bear the (potentially

considerable) cost.  This matters because if the federal government is not bearing the

burden of a state law, then there is no occasion to the turn to the follow-on question of

whether the state law imposing that burden on the federal government is generally

applicable.

Take the Supreme Court's decision in *Washington*, for example—on which, at the

hearing, AstraZeneca itself placed heavy reliance.  There, the state sought to apply a

worker's compensation regime "only to a 'person, including a contractor or

subcontractor, who was engaged in the performance of work, either directly or

indirectly, for the United States.'"  596 U.S. at 839.  This law "impos[ed] on the Federal

Government costs that state or private entities do not bear," *id.*, and it did this because

"the Federal Government pa[id] workers' compensation claims for federal contractors,"

*id.* at 836.  *See also id.* (explaining that because the federal government covered the costs

to federal contractors, the state law "increase[d] workers' compensation costs for the

Federal Government").  It was only because of that financial burden on the federal

government that the Supreme Court turned to the question of whether the burden

flowed from a generally applicable state law (which, in that case, the Court readily

concluded it did not).

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 571 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 43 of 48    Exhibit 3
PageID.1036

And so while AstraZeneca makes a persuasive argument that Act 143 is not generally applicable, that argument does not aid AstraZeneca in showing a likelihood of success on the merits, precisely because the question of general applicability is not implicated if the federal government does not bear the financial burden of the state law in the first place.  As noted, AstraZeneca has not—at least to this point in the case—shown that the federal government bears, either directly or indirectly, any amount of the costs of Act 143 on the manufacturers.  To the contrary, the evidence at this stage suggests that AstraZeneca is bearing these costs entirely itself—which is, in fact, precisely the reason it argues that it faces irreparable injury from Act 143.

For these reasons—and recognizing that, at least at this stage, AstraZeneca has not yet had occasion to thoroughly brief the argument of intergovernmental immunity, and may well be able to present stronger evidence at a later stage—the court concludes that AstraZeneca has not shown a likelihood of success on, or even serious questions going to, the merits of this argument.

**D.    Whether Act 143 is Preempted by Federal Patent Law**

AstraZeneca's second theory in favor of a preliminary injunction is that Act 143 is preempted by federal patent law.  But this theory rests on a premise the Supreme Court has never endorsed:  that federal patent law shields all patent-holders from downstream economic regulation that incidentally affects profits.  AstraZeneca asserts that States may not "upset [the] finely calibrated system" of patent incentives by

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 572 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 44 of 48 Exhibit 3
PageID.1037

regulating prices and insists that Act 143 impermissibly constrains a manufacturer's

"opportunity" to enjoy the benefits of exclusivity. *Id.*, at PageID.117–18. But the cases

AstraZeneca cites protect the right to exclude competitors, not a right to maximize

revenue in every regulated market.

As the Supreme Court has explained, federal patent law prevents states from

granting patent-like exclusivity or authorizing copying of protected inventions. *Bonito

Boats*, 489 U.S. at 152 ("[S]tate regulation of intellectual property must yield to the extent

that it clashes with the balance struck by Congress in our patent laws."). AstraZeneca

has not, at this stage, shown a likelihood of success in (or serious questions going to the

merits of) its argument that Act 143 authorizes copying, compulsory licensing, or any of

the other activities generally prohibited under federal patent law. Under Act 143 and

other state regulations like it, AstraZeneca retains "the full exercise of the exclusionary

power that derives from a patent," *id.*, because no competitor is permitted to

manufacture or sell its patented drugs. Act 143 regulates only the terms of certain

commercial transactions in a heavily regulated pharmaceutical marketplace. A state

law does not run up against patent preemption simply because it affects the price at

which a patent-holder chooses to participate in that marketplace.

AstraZeneca relies on *Biotechnology Indus. Org. v. D.C.* ("*BIO*"), arguing that Act

143 "re-balance[s] the statutory framework of rewards and incentives" by "diminishing

the reward to patentees." Dkt. No. 21-1 at PageID.118–19 (quoting *BIO*, 496 F.3d 1362,

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 573 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 45 of 48
Exhibit 3
PageID.1038

1374 (Fed. Cir. 2007)).  But *BIO* involved a statute that directly altered the competitive

structure Congress created in the Drug Price Competition and Patent Term Restoration

Act of 1984 (also known as the "Hatch–Waxman Act") by policing the "proper balance

between innovators' profit and consumer access."  496 F.3d at 1374.  The text of Act 143

does not change who may compete with AstraZeneca, when competition may occur, or

the duration of AstraZeneca's patents' exclusivity.  It leaves the patent bargain intact:

AstraZeneca alone may make and sell its patented products.  The Act affects a subset of

sales, and not the existence or scope of the patent as an "exclusive" right.  *Id*. at 1372.

And any emphasis on reduced "financial savings" and diminished "reward[s]" does

not establish conflict preemption.  Dkt. No. 21-1 at PageID.119.  Looking again to *BIO*,

the court there held that the challenged statute was preempted because its "operation

st[ood] largely—indeed, exclusively—within the scope of the patent laws," and because

it penalized high prices in a manner that "shift[ed] the benefits of a patented invention

from inventors to consumers" by "limiting the full exercise of the exclusionary power

that derives from a patent."  496 F.3d at 1373-74.  Act 143 does none of that.  It neither

caps the price of patented drugs nor penalizes high prices as such, and it applies

regardless of whether the drugs are subject to patent.

More fundamentally, federal patent law's purpose is to balance innovation and

competition; it does not guarantee patentees a particular return.  *See Sears, Roebuck & Co.*

*v. Stiffel Co.*, 376 U.S. 225, 230–31 (1964) ("[T]he patent system is one in which uniform

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 574 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 46 of 48 Exhibit 3
PageID.1039

federal standards are carefully used to promote invention while at the same time preserving free competition."). Patent law protects the right to exclude others from making or selling the invention; it does not police profit margins or insulate patentees from downstream financial effects of regulation. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 451 (2015) ("Patents endow their holders with certain superpowers, but only for a limited time."). To be sure, changes in market conditions may affect a patent holder's investment-backed expectations. But if any law that reduced a patent-holder's margins were preempted, vast areas of traditional state regulation would be suspect.

Moreover, here, the record developed to date does not show that AstraZeneca is prevented from inventing or manufacturing its patented drugs. And the record does not demonstrate that contract pharmacy sales, in particular, have altered AstraZeneca's incentives to invest in or supply its patented products. Rather, AstraZeneca's allegations concern the ability of covered entities and contract pharmacies to capture economic advantages associated with distribution through the 340B program. *See* Dkt. No. 40, at PageID.406-07 ("[T]he boom in contract pharmacy sales has been fueled by the prospect of outsized profit margins on 340B-discounted drugs."). But those dynamics reflect issues of unanticipated demand, not interference with the patent right itself. *See, e.g., Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1513 (D.C. Cir. 1984) ("While the patent holder may exercise control over the supply of the product to the market and the number of suppliers, its lawful power to exclude others does not include the power to

Case 6:25-cv-01332-IM     Document 112-2     Filed 06/09/26     Page 575 of 576
Case 1:25-cv-00369-MWJS-WRP     Document 99     Filed 02/23/26     Page 47 of 48 Exhibit 3
PageID.1040

prevent consumers from responding prudently to any competitive market conditions

created by the patent holder.").

Finally, AstraZeneca's fallback argument—that Act 143 is preempted even if

characterized as a distribution regulation because it imposes a "costly obligation" that

diminishes patent rewards—is unpersuasive.  *See* Dkt. No. 21-1, at PageID.118-19.

Under that theory, any regulation increasing the cost of selling or distributing patented

goods would be per se invalid.  But ordinary economic burdens do not equal

interference with the patent right itself.  And AstraZeneca identifies only an economic

effect, not an intrusion into the core of its patents.[2]  That is insufficient to establish

patent preemption.

In short, for AstraZeneca to succeed on the merits of a patent preemption claim,

it would have to show that state law obstructs Congress' objectives in establishing the

patent system.  *See, e.g., Sears, Roebuck & Co.*, 376 U.S. at 231 ("Obviously a State could

not, consistently with the Supremacy Clause of the Constitution, extend the life of a

patent beyond its expiration date or give a patent on an article which lacked the level of

---

[2]     The district court decisions AstraZeneca invokes do not establish that it has
succeeded on the merits of its patent preemption claims.  AstraZeneca relies on an order
concluding that, "taking AstraZeneca's allegations as true," the complaint plausibly
established a "right to relief."  Dkt. No. 48, at PageID.570-71 (citing *AstraZeneca Pharms.
LP v. McClain*, No. 4:24-cv-268-KGB, 2025 WL 4092197, at *7 (E.D. Ark. Sept. 30, 2025).
But the court in that case considered a motion for judgment on the pleadings under
Federal Rule of Civil Procedure 12(c).  A ruling that allegations must be accepted as true
for those purposes does not establish that Act 143 in fact conflicts with federal patent
law such that it is likely to succeed on the merits of those claims.

Case 6:25-cv-01332-IM    Document 112-2    Filed 06/09/26    Page 576 of 576
Case 1:25-cv-00369-MWJS-WRP    Document 99    Filed 02/23/26    Page 48 of 48    Exhibit 3
PageID.1041

invention required for federal patents."). AstraZeneca is unlikely to persuade the court

that Act 143 "re-balance[s] the statutory framework of rewards and incentives"

established by Congress, and indeed has not shown any serious questions going to the

merits of that argument. *BIO*, 496 F.3d 1362, 1374. It therefore does not meet the

standard for a preliminary injunction on that basis.

## CONCLUSION

A preliminary injunction is an extraordinary form of relief, which a court may

not lightly grant. On the present record, AstraZeneca has not carried its burden to

establish a likelihood of success on, or serious questions going to the merits of, its

federal preemption claims. Its motion for a preliminary injunction is therefore

DENIED.

IT IS SO ORDERED.

DATED: February 23, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 25-00369 MWJS-WRP; *AstraZeneca Pharmaceuticals LP v. Lopez*; ORDER
DENYING MOTION FOR A PRELIMINARY INJUNCTION