# Exhibit 4

## TABLE OF CONTENTS

**Takings Clause Cases**                                                                 **Page #**

**Louisiana**
*Pharm. Rsch. & Manufacturers of Am. v. Murrill,* No. 6:23-CV-00997, 2024 WL
4361597 (W.D. La. Sept. 30, 2024), *aff'd sub nom.*, *AbbVie, Inc. v. Murrill*, 166
F.4th 528 (5th Cir. 2026)……………………………………………………  1, 33

**Mississippi**
Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Fitch*, No. 1:24-cv-00184
(S.D. Miss. July 22, 2024), ECF 28, *aff'd*, *AbbVie, Inc. v. Fitch*, 152 F. 4th 635
(5th Cir. 2025)………………………………………………………………..  53, 101

**Missouri**
Order Granting Mot. to Dismiss, *AbbVie, Inc. v. Bailey,* No. 4:24-CV-00996-SRC
(E.D. Mo. July 11, 2025), ECF 91……………………………………………  115

Order Granting, in Part, Mot. to Dismiss, *AstraZeneca Pharms. LP v. Bailey*, No.
2:24-cv-04143(W.D. Mo. Feb. 27, 2025), ECF 90…………………………...  135

**Tennessee**
Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519
(M.D. Tenn. June 30, 2025), ECF 45…………………………………………  148

**Maine**
Order Denying Mot. for Prelim. Inj., *Novartis Pharms. Corp. v. Frey*, No. 1:25-
cv-00407, 2025 WL 2813787 (D. ME. Sept. 23, 2025), ECF 44 (includes order
for *AbbVie v. Frey*, No. 1:25-cv-00416-JCN), *appeal docketed*, No. 25-1908 (1st
Cir. Sept. 24, 2025)…………………………………………………………...  196

**Colorado**
Order Denying Mot. for Prelim. Inj., *AbbVie, Inc. v. Weiser*, 1:25-cv-01847-
WJM-KAS (D. CO. Oct. 31, 2025), *appeal docketed*, No. 25-1439 (10th Cir.
Nov. 21, 2025) ………………………………………………………………..  233

**Exhibit 4**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | |
|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA** | **CASE NO. 6:23-CV-00997** |
| **VERSUS** | **JUDGE ROBERT R. SUMMERHAYS** |
| **LIZ MURRILL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **ASTRAZENECA PHARMACEUTICALS LP** | **CASE NO. 6:23-CV-01042** |
| **VERSUS** | |
| **LIZ MURRILL** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| **ABBVIE, INC., ET AL** | **CASE NO. 6:23-CV-01307** |
| **VERSUS** | |
| **LIZ MURRILL** | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM RULING**

Presently before the Court in three related matters are: (1) Motions for Summary Judgment filed by Plaintiffs AstraZeneca Pharmaceuticals LP ("AstraZeneca"), AbbVie, Inc. ("AbbVie"), and Pharmaceutical Research and Manufacturers of America ("PRMA") (collectively, "Plaintiffs");[1] (2) Cross Motions for Summary Judgment[2] by defendant, Liz Murrill; and (3) Cross Motions for Summary Judgment[3] by the intervenor, Louisiana Primary Care Association

---

[1] ECF No. 21 in 6:23-cv-997; ECF No. 21 in 6:23-cv-1042; and ECF No. 28 in 6:23-cv-1307.
[2] ECF No. 41 in 6:23-cv-997; ECF No. 43 in 6:23-cv-1042; and ECF No. 49 in 6:23-cv-1307.
[3] ECF No. 44 in 6:23-cv-997; ECF No. 45 in 6:23-cv-1042; and ECF No. 61 in 6:23-cv-1307.

**Exhibit 4**

("LPCA"). The Court held a consolidated hearing on the various motions on June 6, 2024. After oral arguments, the Court took all the motions under advisement.

## I.
### BACKGROUND

Two pharmaceutical companies—AstraZeneca and AbbVie—and Pharmaceutical Research and Manufacturers of America filed the three above-captioned cases challenging Louisiana's recently enacted Act 358 on the grounds, *inter alia*, that it is preempted by the federal Section 340B discount drug program, located at 42 U.S.C. § 256b, *et seq*. Section 340B of the Public Health Service Act was enacted as part of the Veterans Health Care Act of 1992 and requires pharmaceutical companies to offer discounts on covered outpatient drugs to specified "safety-net" health care providers as a condition of the companies' voluntary participation in the Medicaid and Medicare Part B programs.[4] The safety-net hospitals and clinics that are eligible to participate in the Section 340B program are defined as "covered entities," and the eligibility criteria for covered entities are set forth in the statute.[5] The Section 340B program is administered by the Health Resources and Services Administration ("HRSA"), which is a component of the federal Department of Health and Human Services ("HHS").

The present dispute centers on the role of "contract pharmacies" in the Section 340B program. The summary judgment record reflects that many covered entities, including LPCA's members, cannot afford to establish and operate "in-house" pharmacies but instead must enter into contracts with independent, private pharmacies to dispense discounted drugs to their patients.[6] The

---

[4] 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1).

[5] *Id*. § 256b(a)(4) (listing the healthcare providers eligible to participate in the program).

[6] *See* ECF No. 44-4 at 4-5, *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023) ("*PRMA*"); *see also* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) (recognizing that many 340B covered entities cannot afford to "expend precious resources to develop their own in-house pharmacies . . . .").

**Exhibit 4**

record also includes evidence that some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population.[7]

In a 1996 guidance document, HHS permitted covered entities to contract with one outside pharmacy if they did not maintain an in-house pharmacy to distribute discounted drugs under the Section 340B program.[8] In 2010, HHS modified its guidance on contract pharmacies and permitted covered entities to contract with an unlimited number of outside pharmacies.[9] As a result of this change and guidance, the number of contract pharmacies increased from approximately 1,300 in 2010 to approximately 20,000 in 2017.[10]

Beginning in 2020, a number of pharmaceutical companies imposed restrictions and limitations on the distribution of Section 340B discounted drugs to contract pharmacies.[11] In response, HHS issued an opinion stating that "covered entities under the 340B program are entitled to purchase covered outpatient drugs at no more than the 340B ceiling price—and manufacturers are required to offer covered outpatient drugs at no more than the 340B ceiling price—even if those covered entities use contract pharmacies to aid in distributing those drugs to their patients."[12] HHS went on to conclude that the "plain meaning" of Section 340B precluded participating pharmaceutical companies from restricting or otherwise limiting contracts between covered entities and outside, retail pharmacies.[13] Plaintiff AstraZeneca and other pharmaceutical companies challenged HHS' contract pharmacy opinion and, ultimately, prevailed in the Third

---

[7] *Id.*

[8] *Id.*

[9] Notice Regarding 340B Drug Pricing Program – Contract Pharmacy Services, 75 Fed. Reg. 10,272 (Mar. 5, 2010).

[10] U.S. Gov't Accountability Office, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement 2 (June 2018), https://www.gao.gov/assets/700/692697.pdf (last viewed September 10, 2024).

[11] *See, e.g.,* Sanofi Policy, SANOFI (Feb. 1, 2021), https://340besp.com/sanofi-policy-2021-02-02- 09_18_19.pdf.

[12] *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 52-53 (D. Del. 2021).

[13] *Id.*

Circuit in *Sanofi Aventis U.S. LLC (Sanofi) v. U.S. Dep't of Health and Human Services*.[14] In that case, the Third Circuit held that Section 340B is silent with respect to contract pharmacies and, therefore, HHS lacked the statutory authority to issue its opinion restricting the ability of participating pharmaceutical companies to adopt policies on the distribution of discounted drugs to contract pharmacies.[15]

During the *Sanofi* litigation, some states began to enact legislation governing the distribution of 340B drugs to contract pharmacies. In 2021, Arkansas became the first state to successfully pass a law addressing this issue.[16] PhRMA challenged the Arkansas Act on the basis of preemption and on March 12, 2024, the Eighth Circuit held that the Arkansas Act was not barred by preemption.[17] In 2023, Louisiana enacted La. R.S. 40:2881 *et seq*. ("Act 358"), which prevents pharmaceutical companies from restricting contract pharmacy arrangements made by Section 340B covered entities. Louisiana's Act 358, provides that:

> A. A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States Department of Health and Human Services.
>
> B. A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.[18]

Act 358 provides that a violation of these provisions is considered a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401 ("LUTPA").[19] Importantly, § 40:2886(B)(1) provides that "Nothing in this Chapter is to be construed or applied

---

[14] 58 F.4th 696 (3d Cir. 2023).
[15] *Id.* at 703-706.
[16] *See* Ark. Code Ann. § 23-92-604.
[17] *PhRMA v. McClain*, 95 F.4th 1136 (8th Cir. 2024).
[18] La. R.S. § 40:2884.
[19] *Id.* § 40:2885.

to be in conflict with . . . [a]pplicable federal law and related regulations." Act 358 grants the Louisiana Attorney General enforcement authority over LUTPA violations including violations of the Act.[20] That authority includes the power "[t]o investigate, conduct studies and research, [] conduct public or private hearings . . . otherwise investigate complaints [and] institute legal proceedings" concerning acts or practices declared unlawful under LUTPA.[21]

The three above-captioned lawsuits have been filed against Liz Murrill in her official capacity as Attorney General for the State of Louisiana. In 6:23-cv-997, Pharmaceutical Research and Manufacturers of America ("PRMA") alleges that Act 358 is unconstitutional based upon preemption and vagueness. In 6:23-cv-1042, AstraZeneca Pharmaceuticals LP argues that Act 358 is unconstitutional based upon preemption and a violation of the Contracts Clause. In 6:23-cv-1307, AbbVie, Inc., et al ("AbbVie") assert that Act 358 is unconstitutional based upon preemption, vagueness and a violation of the Takings Clause. Louisiana Primary Care Association has intervened as a defendant in each of the three cases. Based upon the similar and overlapping issues, the Court consolidates the ruling in this matter and directs that the ruling be filed into each of the three cases.

## II.
### LAW AND ANALYSIS

#### A. Summary Judgment Standard.

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought."[22] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

---

[20] *Id*. § 51:1404.
[21] *Id*.
[22] Fed. R. Civ. P. 56(a).

**Exhibit 4**

the movant is entitled to judgment as a matter of law."[23] "A genuine issue of material fact exists

when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[24]

As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[25]

When reviewing evidence in connection with a motion for summary judgment, "the court

must disregard all evidence favorable to the moving party that the jury is not required to believe,

and should give credence to the evidence favoring the nonmoving party as well as that evidence

supporting the moving party that is uncontradicted and unimpeached."[26] "Credibility

determinations are not part of the summary judgment analysis."[27] Rule 56 "mandates the entry of

summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof."[28]

### B. **Preemption.**

The Court first addresses Plaintiffs' claims that the statutory and regulatory framework of

the Section 340B program preempts Louisiana's Act 358. Federal preemption of state law flows

from the Supremacy Clause of the United States Constitution, which makes federal law "the

---

[23] *Id.*

[24] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

[25] *Lindsey v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

[26] *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party).

[27] *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002).

[28] *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catlett*, 477 U.S. 317, 322 (1986)).

**Exhibit 4**

supreme law of the land."[29] Under the Supremacy Clause, if there is a conflict between federal law and state law, the latter is "preempted" by federal law.[30] That is, federal law controls and the state law is set aside to the extent it conflicts with federal law.[31] Preemption may be either express or implied. State law is expressly preempted when "Congress expresses an explicit intent to preempt state law."[32] Where Congress has not explicitly displaced state law, federal law may nevertheless impliedly preempt state law where there is a clear congressional intent to preempt state or local law. Courts have identified at least three types of implied preemption: "field" preemption, "conflict" preemption, and "obstacle" preemption.[33] While Plaintiffs' arguments primarily rely on field and conflict preemption, some of their arguments can be construed as arguments for obstacle preemption. Accordingly, the Court will address all three grounds for preemption.

### 1. Field Preemption

Plaintiffs' preemption arguments rely heavily on field preemption. Field preemption arises where "[s]tates are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[34] Congress may expressly provide that it intends to occupy a given field and that state regulation is therefore preempted with respect to that field.[35] When Congress has not expressly stated its intent to occupy a given field, field preemption may also "be inferred from a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to

---

[29] U.S. CONST. art. VI, cl. 2.
[30] *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88. 108 (1992).
[31] *Id.*
[32] *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 363 (5th Cir. 1995).
[33] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013). Some courts treat "obstacle" preemption as a form of "conflict" preemption.
[34] *Arizona v. United States*, 567 U.S. 387, 399 (2012).
[35] *United States v. Texas*, 97 F.4th 268, 278 (5th Cir. 2024)

supplement it."[36] However, "federal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained."[37] Congress has not expressly preempted state regulatory powers with respect to the Section 340B program. Plaintiffs thus argue that field preemption should be inferred.[38]

The gravamen of Plaintiffs' field preemption arguments is that the nature of the Section 340B program is such that Congress left no room for Louisiana to exercise its regulatory powers with respect to contract pharmacies.[39] They argue that "Congress designed 340B to provide a comprehensive and exclusive plan for delivering a unique federal benefit—a substantial drug discount to specific, statutorily defined healthcare providers," and that "340B works through a carefully calibrated incentive structure."[40] They argue that, to achieve this "calibrated incentive structure," Congress "made 304B a closed system."[41] Presumably, Plaintiffs mean that Congress limited the program to the enumerated "covered entities," and precluded the distribution of Section 340B discounted drugs to ineligible healthcare providers or patients of ineligible providers.[42] Plaintiffs also point to HHS' "multi-faceted administrative enforcement scheme," which ensures that participants comply with the rules of the program and prevents the diversion of discounted

---

[36] *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))

[37] *De Canas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)).

[38] ECF No. 21-1 at 14, *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023); ECF No. 21-1 at 23-25, *AstraZeneca Pharmaceuticals LP v. Murrill*, Civ. No. 6:23-cv-1042 (W.D. La. Aug. 8, 2023); ECF No. 28-1 at 20-27, *AbbVie, et al. v. Murrill*, Civ. No. 6:23-cv-1307 (W.D. La. Sept. 21, 2023).

[39] *Id.*

[40] *Pharmaceutical Research and Manufacturers of America v. Liz Murrill*, Civ. No. 6:23-cv-997 (W.D. La. July 27, 2023) (ECF No. 21-1 at 14). Here, the Court quotes from the brief of Plaintiff Pharmaceutical Research and Manufacturers of America because that brief appears to contain most, if not all, of the arguments raised by the other Plaintiffs. The arguments in the *PRMA* brief also reflect the tenor of the arguments in the other Plaintiffs' briefs with respect to field preemption.

[41] *Id.* at 15.

[42] *Id.* at 14-15.

drugs to ineligible recipients.[43] Plaintiffs also note the interrelationship between the Section 340B program and the much larger federal Medicare and Medicaid programs and argue that this interrelationship requires uniformity because "[o]bligations under 340B, and violations of 340B, can have collateral consequences on these other federal programs."[44] Plaintiffs argue that Congress addressed this need for uniformity by making HHS the exclusive administrator of the Section 340B program and eliminating any role for the states: "Congress understandably chose to vest HHS and the federal courts—rather than 50 individual States—with the power to make carefully considered determinations regarding disputes, enforcement, and penalties."[45] Plaintiffs thus contend that "Act 358 invades the field *substantively* by purporting to define as a matter of state law the scope of manufacturers' 340B obligations," and invades "the federal field *procedurally* by creating its own scheme of oversight and enforcement."[46]

In *PhRMA v. McClain*,[47] the Eight Circuit recently affirmed the district court's ruling granting summary judgment and dismissing preemption claims involving an Arkansas statute similar to Act 358. Although *PhRMA* is not binding, the Court finds the reasoning of the district court and Eight Circuit in that case persuasive for the following reasons.

The statutory text governing the Section 340B program does not support the broad field preemption arguments made by Plaintiffs. The regulatory and enforcement framework outlined by Plaintiffs focuses on participating pharmaceutical companies and certain "covered entities" defined and delineated in the governing statutes and regulations.[48] Under the Section 340B program, pharmaceutical companies that wish to participate in the Medicare or Medicaid program

---

[43] *Id.* at 15.
[44] *Id.* at 17.
[45] *Id.*
[46] *Id.* at 18 (emphasis added).
[47] 95 F.4th 1136 (8th Cir. 2024).
[48] 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5).

must enter into written agreements with HHS to provide discounted prices "for covered outpatient drugs purchased by a covered entity."[49] The "covered entities" are health care providers who generally provide services to low-income and rural patients.[50] As Plaintiffs correctly point out, the statute defines which health care providers qualify as "covered entities" eligible to receive discounted drugs under the Section 340B program.[51] The statute places restrictions on covered entities receiving the discounts to ensure that they do not receive duplicate discounts on drugs subject to a Medicare or Medicaid discount-sometimes referred to as "double dipping."[52] The statute also restricts "diversion" by providing that covered entities receiving discounted drugs can only provide them to their patients.[53] And Plaintiffs are correct that the federal statutory scheme imposes significant enforcement mechanisms to ensure compliance.[54]

However, Section 340B is silent with respect to the role of pharmacies who enter into contracts with covered entities to receive and dispense discounted drugs under Section 340B. The statute does not mention contract pharmacies in defining the health care providers qualified as "covered entities," nor does it refer to contract pharmacies in delineating the obligations of participating pharmaceutical companies with respect to covered entities.[55] Plaintiffs seem to suggest that Louisiana's Act 358 expands the federal statute's definition of "covered entities" to include contract pharmacies and, as a result, that it creates new substantive obligations on participating pharmaceutical companies to provide covered drugs directly to contract pharmacies

---

[49] 42 U.S.C. § 1396r-8(a); 42 C.F.R. Part 10 §§ 10.2, 10.3.
[50] *Astra USA, Inc. v. Santa Clara County, Cal.*, 563 U.S. 110, 115 (2011); 42 C.F.R. Part 10 §10.3.
[51] 42 U.S.C § 256b(a); *Astra USA*, 563 U.S. at 115.
[52] 42 U.S.C. § 256b(a)(5)(A)(i).
[53] 42 U.S.C. § 256b(a)(5)(B).
[54] *See, e.g.*, 42 U.S.C. § 256b(d); 42 C.F.R. §§ 10.10, 10.20 - 10.25.
[55] These requirements are sometimes referred to as the "purchase by" or "shall offer" requirements. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699-700 (3d Cir. 2023). Specifically, Section 340B requires participating pharmaceutical companies to provide discounts on covered drugs "purchased by" covered entities. *Id.* It also requires these companies to "offer each covered entity covered outpatient drugs" at a discount. *Id.*

without regard to the statutory and regulatory provisions governing the Section 340B program.[56] They also suggest that Act 358 essentially gives these pharmacies the same status as "covered entities" under the federal program.[57]

Plaintiffs, however, mischaracterize the relationship between covered entities and their contract pharmacies. In each case, discounted drugs under the program delivered to contract pharmacies are delivered *on behalf of* covered entities and subject to the contract between those entities and the pharmacies. When the pharmacies distribute those drugs, they distribute them on behalf of and for the benefit of a covered entity. Section 340B does not prevent covered entities from entering into contracts with independent pharmacies, but these contract pharmacies are not "covered entities" and nothing in Act 358 treats them as such.

The Fifth Circuit has cautioned that in applying the field preemption doctrine courts should define the relevant field "narrowly."[58] Here, Plaintiffs improperly frame the relevant field broadly to include the regulation of contract pharmacies on which the governing statute is silent. Accordingly, even if the 340B program constitutes an exclusive federal "field" with respect to the relationship between participating pharmaceutical companies and healthcare providers that qualify as "covered entities," the field does not extend to the relationship between contract pharmacies and covered entities and Act 358 does not, therefore, intrude on any exclusive federal regulatory scheme.

Moreover, as the courts point out in *PhRMA*, Plaintiffs' field preemption arguments also overstate the extent which the federal government "occupies" the field with respect to covered

---

[56] *See, e.g.*, ECF No. 21-1 at 18, *PRMA* ("Notwithstanding the closed system, Act 358 nonetheless requires manufacturers to also 'offer' 340B-discounted drugs to contract pharmacies … expanding the scope of the federal obligation.") (citations omitted).

[57] *Id.*

[58] *United States v. Texas*, 97 F.4th at 278 (quoting *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018)) ("When analyzing field preemption, 'the relevant field should be defined narrowly.'").

health care providers and their contract pharmacies.[59] According to the Eighth Circuit, "the practice of pharmacy is an area traditionally left to state regulation" and "the federal government has 'traditionally regarded state law as a complementary form of drug regulation and has long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation.'"[60] Given that Section 340B is silent on contract pharmacies that dispense Section 340B drugs under contract with covered entities, the Eighth Circuit was unwilling to dislodge the state from its traditional role in regulating pharmacies.[61]

Plaintiffs' reliance on the Third Circuit's decision in *Sanofi Aventis U.S. LLC (Sanofi) v. U.S. Dep't of Health and Human Services* to support their field preemption claim is misplaced.[62] Plaintiffs argue that *Sanofi* essentially creates a federal right under Section 340B allowing participating pharmaceutical companies to restrict the delivery of discounted drugs to contract pharmacies.[63] According to Plaintiffs, Louisiana's Act 358 intrudes on this right by preventing pharmaceutical companies who participate in the Federal program from restricting deliveries of discounted drugs under Section 340B to contract pharmacies.[64] They also argue that *Sanofi* holds that the statutory silence on contract pharmacies precludes the state from "supplementing" Section 340B by adopting regulations on contract pharmacies.[65]

The Court disagrees on both counts. In *Sanofi*, the plaintiff challenged a regulation promulgated by the Department of Health and Human Services requiring pharmaceutical companies participating in the Section 340B program to provide 340B discounted drugs to an

---

[59] 95 F.4th at 1143.
[60] *Id.* (cleaned up).
[61] *Id.* at 1144.
[62] 58 F.4th 696 (3d Cir. 2023).
[63] ECF No. 28-1 at 14-16, *AbbVie*; ECF No. 21-1 at 22-23, *PRMA*; ECF No. 21-1 at 23-24, *AstraZeneca Pharmaceuticals*.
[64] *Id.*
[65] *Id.*

unlimited number of private pharmacies under contract with "covered entities" eligible to receive

the discounted drugs.[66] Prior to the implementation of the regulation, pharmaceutical companies

participating in the Section 340B program had imposed policies and restrictions on covered entities

receiving discounted drugs.[67] These policies generally provided that participating pharmaceutical

companies would deliver Section 340B discounted drugs to only one outside contract pharmacy

for each covered entity.[68] Participating pharmaceutical companies implemented these policies in

response to a proliferation of outside pharmacies that entered into contracts with covered entities

eligible to receive discounted drugs.[69] In response, HHS took the position that Section 340B

precludes participating pharmaceutical companies from limiting the number of contract

pharmacies eligible to receive discounted drugs under the program.[70] The district court rejected

HHS' reading of the statute, noting that the statute "never mentions pharmacies, which is a 'strong

indication that the statute does not compel any particular outcome with respect to covered entities'

use of pharmacies.'"[71] The district court then entered a permanent injunction enjoining HHS from

implementing the new regulation prohibiting participating pharmaceutical companies from

restricting contract pharmacies.

---

[66] 58 F.4th at 701-703.

[67] *Id.* at 700-701.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 701-701.

[71] *AstraZeneca Pharms. LP v. Becerra ("Becerra II")*, No. CV 21-27-LPS, 2022 WL 484587, at *6 (D. Del. Feb. 16, 2022) (quoting *AstraZeneca Pharms. LP v. Becerra ("Becerra I")*, 543 F. Supp. 3d 47, 59 (D. Del. 2021). In *Becera I*, the same district court again noted the limited scope of the Section 340B program:

> The statute is silent as to the role that contract pharmacies may play in connection with covered entities' purchases of 340B drugs. Pharmacies are not mentioned anywhere in the statutory text – neither in § 256b(a)(1), which (as both parties agree) contains the relevant command, nor in § 256b(a)(4), which provides the definition of "covered entity." When a statute does not include even a single reference to the pertinent word (e.g., "pharmacy"), it is highly unlikely (if not impossible) that the statute conveys a single, clear, and unambiguous directive with respect to that word. ***Here, the absence of any reference to "pharmacies" is a strong indication that the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.***

543 F. Supp. 3d at 59 (emphasis added).

In affirming the district court's permanent injunction, the Third Circuit agreed that the text of the statute does not require "delivery to an unlimited number of contract pharmacies."[72] Like the district court, the Third Circuit noted that "nowhere does section 340B mention contract pharmacies."[73] The court reasoned that section 340B does not address the contractual relationship between covered entities and their contract pharmacies or how discounted drugs are delivered or distributed as long as the drugs are "purchased by" or "offered to" a "covered entity" and the covered entity complies with the program's restrictions on "double dipping" and diversion.[74] Accordingly, the court held that HHS did not have the statutory authority under section 340B to prevent participating pharmaceutical companies from placing restrictions on their deliveries of discounted drugs to contract pharmacies.[75]

Plaintiffs not only misread the scope of *Sanofi*'s holding, but the holding also directly undercuts Plaintiffs' field preemption argument. *Sanofi* addresses only the limited question of HHS' statutory authority to implement a regulation regarding the use of contract pharmacies by covered entities. The courts in *Sanofi* held that HHS lacked statutory authority to regulate contract pharmacies in connection with the Section 340B program because the "statute is silent as to the role that contract pharmacies may play in connection with covered entities' purchases of 340B drugs."[76] The fact that HHS lacks authority to regulate contract pharmacies under Section 340B does not, however, mean that the statute affirmatively precludes state regulation pertaining to contract pharmacies or otherwise "occupies the field."[77] If, as the courts in *Sanofi* hold, Section 340B "does not compel any particular outcome with respect to covered entities' use of

---

[72] *Sanofi*, 58 F.4th at 704.
[73] *Id.* at 703.
[74] *Id.* at 704.
[75] *Id.*
[76] *Becera I*, 543 F. Supp. 3d at 59.
[77] *Id.* ("the statute does not compel any particular outcome with respect to covered entities' use of pharmacies.").

pharmacies," Plaintiffs cannot maintain a field preemption claim on the grounds that "Congress has unmistakably so ordained" that Section 340B displaces state law regulations on contract pharmacies.[78]

Plaintiffs "procedural invasion" argument for field preemption similarly fails. Plaintiffs contend that Louisiana's Act 358 intrudes on the enforcement scheme adopted by HHS to police the Section 340B program. They argue that this enforcement scheme is exclusive and, citing the Supreme Court's decision in *Astra USA, Inc. v. Santa Clara Cnty., Cal.*,[79] argue that "no gap exists and federal authority is exclusive" with respect to enforcement of the parties' rights and obligations under the Section 340B program.[80]

As with *Sanofi*, Plaintiffs misread the Supreme Court's holding in *Astra*. In *Astra*, Santa Clara County sued pharmaceutical companies participating in the Section 340B program for overcharges on covered drugs.[81] The county operated covered entities eligible to participate in the program and alleged that the participating pharmaceutical companies breached the agreements that they entered into with HHS to provide discounted drugs.[82] The Court held that HHS' enforcement mechanism was the exclusive means for policing the pricing requirements of Section 340B and that the statute precluded a private right of action by covered entities seeking to enforce the terms of the agreements between HHS and participating pharmaceutical companies.[83] The Court did not, however, address the role of contract pharmacies—its ruling pertains solely to participating pharmaceutical companies, covered entities, and their compliance with the pricing requirements of the Section 340B program.

---

[78] *De Canas*, 424 U.S. at 356 (quoting *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142 (1963)).
[79] 563 U.S. 110 (2011).
[80] ECF No. 21-1 at 19.
[81] 563 U.S. at 116.
[82] *Id.*
[83] *Id.* at 118-120.

Turning to the text of Act 358, the Louisiana statute creates an enforcement mechanism, but that mechanism pertains solely to pharmaceutical companies' actions toward pharmacies who enter into contracts with covered entities under the Section 340B program.[84] The Louisiana statute does not address the pharmaceutical companies' agreements with HHS or the pricing, diversion, or "double dipping" restrictions addressed in the HHS' enforcement scheme. Accordingly, even if the federal statute "occupies the field" with respect to the enforcement of the Section 340B program, Louisiana's Act 358 does not encroach on that enforcement scheme.

Finally, the Court turns to Plaintiffs' argument based on the interrelationship between the Section 340B program and the Medicaid and Medicare programs. Plaintiffs argue that this interrelationship requires uniformity and precludes states from regulating contract pharmacies.[85] Again, the Court disagrees. As explained above, Section 340B is silent with respect to contract pharmacies, and Plaintiffs have not pointed to any provisions in the statutes governing the Medicare or Medicaid programs that address pharmacies who enter into contracts with covered entities under Section 340B. Accordingly, it is unclear to the Court how the interrelationship between Section 340B and the Medicare and Medicaid programs requires uniformity with respect to contract pharmacies when none of these statutes address contract pharmacies.

In sum, the Court concludes that Plaintiffs cannot establish that "Congress has unmistakably so ordained" that state regulatory power be displaced with respect to contract pharmacies under the Section 340B program. Plaintiffs' field preemption claim therefore fails.

---

[84] La. R.S. 40:2885.
[85] *See, e.g.*, ECF No. 21-1 at 17.

## 2. Conflict Preemption Based on *Sanofi.*

The Court now turns to Plaintiffs' "conflict" preemption claim.[86] "Conflict" preemption applies "where complying with both federal law and state law is impossible…."[87] In arguing conflict preemption, Plaintiffs re-urge many of the same arguments they urge with respect to field preemption: that Act 358 conflicts with the balance of incentives created by the Section 340B program, imposes additional obligations on pharmaceutical companies that conflict with their obligations under the federal statute, and conflicts with HHS' enforcement scheme. For the same reasons explained above with respect to field preemption, these arguments do not support conflict preemption. The statute governing the Section 340B program does not address contract pharmacies, which are the subject matter of Louisiana's Act 358. Therefore, Louisiana's contract pharmacy regulations cannot, by definition, *conflict* with Section 340B. Plaintiffs also, again, rely heavily on *Sanofi* to support their conflict preemption claim.[88] But, as with Plaintiffs' field preemption claim, *Sanofi*'*s* holding is fatal to Plaintiffs' conflict preemption claim. Specifically, if Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B. Put another way, Plaintiffs cannot credibly argue that it is impossible to comply with both Louisiana Act 358 and the federal Section 340B program in light of *Sanofi*.

Plaintiff AstraZeneca Pharmaceuticals also argues that conflict preemption applies because Louisiana Act 358 is "a price regulation that conflicts with, and is preempted by, the federal patent law."[89] In that regard, Plaintiffs cite *Biotechnology Indus. Org. ("BIO") v. District of Columbia*.[90]

---

[86] In *PhRMA*, the Eighth Circuit also rejected the plaintiff's "conflict" and "obstacle" preemption claims. For the reasons that follow, the Court finds the Eighth Circuit's reasoning persuasive.

[87] *Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 200 (5th Cir. 2013).

[88] ECF No. 21-1 at 13, *AstraZeneca Pharmaceuticals*.

[89] ECF No. 21-1 at 16, *AstraZeneca Pharmaceuticals*; ECF No. 228-1.

[90] 496 F.3d 1362 (Fed. Cir. 2007).

Page **17** of **32**

**Exhibit 4**

The *BIO* case does not support AstraZeneca's conflict preemption argument based on federal patent law. In *BIO*, the District of Columbia City Council adopted legislation prohibiting "any patented drug from being sold in the district for an excessive price."[91] The Federal Circuit first observed that one of the objectives of the Patent Clause of the Constitution as well as federal patent statutory protections is to balance the tension between two objectives: "to reward innovators with higher profits and to keep prices reasonable for consumers."[92] The court held that the District of Columbia price statute expressly targeted the price of patented drugs and thus falls directly "within the scope of the patent laws, and its effect is to shift the benefits of a patented innovation from inventors to consumers."[93] Accordingly, the District of Columbia statute "re-balance[s] the statutory framework of rewards and incentives insofar as it relates to inventive new drugs."[94] The Federal Circuit concluded that the D.C. Council's efforts in this regard conflicted with "the goals established by Congress in the patent laws" because the D.C. Council's legislation was expressly "targeted at the patent right" and "applies only to patented drugs."[95]

Here, unlike the D.C. Council's legislation, Louisiana's Act 358 does not, on its face, target patent rights or, by its terms, apply only to patented drugs or the price of patented drugs. As a condition of participating in Medicare and Medicaid, participating pharmaceutical companies agree to provide discounted drugs in the Section 340B program. These discounts are set by the federal government, not the State of Louisiana or Act 358.[96] Act 358, addresses only contract pharmacies, a matter that is not addressed in Section 340B. Accordingly, *BIO* does not support Plaintiffs' conflict preemption claims.

---

[91] *Id*. at 1364.
[92] *Id*. at 1372.
[93] *Id*. at 1373.
[94] *Id*. at 1374.
[95] *Id*.
[96] 42 U.S.C. § 256b(a)(1); 42 C.F.R. Part 10 § 10.10.

### 3. Obstacle Preemption

Finally, the Court turns to Plaintiffs' "obstacle" preemption claims. "Obstacle" preemption occurs where "state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[97] As with their conflict preemption arguments, Plaintiffs' re-urge most of the same arguments urged with respect to their field preemption claims, namely that Act 358 conflicts with the balance of incentives created by the Section 340B program, imposes additional obligations on pharmaceutical companies that conflict with their obligations under the federal statute, and conflicts with HHS' enforcement scheme. For the reasons discussed above, Act 358's provisions addressing contract pharmacies do not create "an unacceptable obstacle to the accomplishment and execution" of Congress' objectives reflected in Section 340B because Section 340B does address contract pharmacies. Moreover, Act 358 arguably *advances* Congress' objectives with respect to the Section 340B program. In *Sanofi*, the Third Circuit noted the objectives of the Section 340B program:

> "[C]overed entities," typically care for low-income and rural persons. Section 340B helps providers do that. First, it gives them ***extra revenue from serving insured patients***: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. Second, ***it enables them to give uninsured patients drugs at little or no cost***.[98]

Louisiana's Act 358 arguably advances these objectives by allowing covered entities who do not operate in-house pharmacies to contract with multiple pharmacies and thus increase their revenues from insured patients who use those pharmacies. Multiple contract pharmacies also arguably provide wider coverage for patients of covered entities.

---

[97] *Janvey*, 712 F.3d at 200.
[98] *Sanofi*, 58 F.4th at 699.

Page **19** of **32**

In sum, Plaintiffs' "obstacle" preemption challenge to Act 358 similarly fails. The Court grants the Defendants' Motions for Summary Judgment with respect to Plaintiffs' preemption claims.

## C. Vagueness.

The Court next addresses the claims by Plaintiffs PRMA and AbbVie that Act 358 is unconstitutionally vague and, therefore, violates the Due Process Clause of the Fourteenth Amendment.[99] A law is unconstitutionally vague when it: "(1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement."[100] Mere imprecision does not render a statute vague.[101] In fact, "[a] facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all."[102]

PRMA's and AbbVie's vagueness challenge centers on the use of the term "interfere" in Act 358. Part A of the statute states that a pharmaceutical manufacturer or distributor "shall not deny, restrict, prohibit, or *otherwise interfere* with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity .…"[103] Part B of the statute simply provides that the manufacturer or distributor "shall not *interfere* with a pharmacy contracted with a 340B entity."[104] According to Plaintiffs, the statute "gives no indication of what conduct will be called 'interference' with 'the acquisition of a 340B drug' under a contract-pharmacy arrangement."[105] As a result, they argue that the statute fails to provide them

---

[99] U.S. CONST. Amend. XIV, § 1.
[100] *City of Chicago v. Morales*, 527 U.S. 41, 90 (1999).
[101] *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983).
[102] *Id*. (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)).
[103] La. R.S. 40:2884(A).
[104] La. R.S. 40:2884(B).
[105] ECF No. 28-1 at 44.

with reasonable notice whether their "conduct is prohibited and is so indefinite that it authorizes the Attorney General to engage in arbitrary and discriminatory enforcement."[106] Plaintiffs argue that Act 358's "geographic scope is also vague" in that it "applies to any 'pharmacy' in the entire United States where 'drugs are dispensed and pharmacy primary care is provided to residents of [Louisiana].'"[107]

Act 358 does not define the term "interfere." But the state argues that the statutory context of the term "interfere" in Part A of Act 358 gives the term a definite meaning sufficient to overcome a vagueness challenge. The Court agrees. The state's argument relies on the *"noscitur a sociis"* canon of statutory construction.[108] That canon is alternatively referred to as the "associated-words canon" and provides that "[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."[109] In Act 358, the term "interfere" is used in the context of the statutory prohibition to "deny, restrict, prohibit, or *otherwise* interfere" with the acquisition or delivery of a Section 340B drug to a contract pharmacy.[110] All of the preceding words in this list involve actions designed to prevent or hinder the acquisition or delivery of these discounted drugs to contract pharmacies designated by covered entities. Accordingly, the term "interfere" as used in Act 358 should be construed as proscribing actions that prevent or hinder the acquisition or delivery of Section 340B drugs to contract pharmacies. This is consistent with one of the dictionary definitions of the term: "to be or create a hindrance or obstacle."[111] It is also consistent with the introductory title of the statute: "Prohibition of certain discriminatory

---

[106] *Id*. at 43.
[107] *Id.* At 46.
[108] ECF No. 49-4 at 25.
[109] SCALIA & GARNER, READING LAW 195 (2012)
[110] La. R.S. 40:2884(A).
[111] "Interfere," *American Heritage Dictionary* (2022), https://www.ahdictionary.com/word/search.html?q=interfere (accessed Sept. 23, 2024).

actions by a manufacturer or distributor related to 340B entities."[112] Considering the definition of

"interfere" and its textual context in Act 358, the term is sufficiently definite to provide notice of

the conduct proscribed and to prevent arbitrary or discriminatory enforcement, at least with respect

to Part A.

Part B of Act 358 does not have the textual clues of Part A with respect to the scope of the

term "interfere"—it simply states that a pharmaceutical company "shall not interfere" with a

contract pharmacy.[113] However, nothing in the statute suggests that the term "interfere" in part B

should be given a meaning different from that in Part A. Part A and Part B should be construed

consistently to proscribe conduct that prevents or hinders the delivery of Section 340B drugs to

pharmacies under contract with covered entities eligible to receive the drugs. As with the use of

the term in Part A, this reading of the term "interfere" is consistent with the dictionary definition

of the term and the title of the statute, which covers both Part A and Part B of La. R.S. 40:2884.

Moreover, Plaintiffs' reliance on *Carolina Youth Action Project ("CYAP"), et al. v. Wilson*

to argue that Act 358 use of the term "interfere" is unconstitutionally vague is misplaced.[114] The

plaintiffs in *CYAP* challenged a state statute that made it a crime to "willfully or unnecessarily"

"interfere with or to disturb in any way or in any place the students or teachers of any school or

college in this State," "to loiter about such school or college premises," or "to act in an obnoxious

manner thereon."[115] The court noted that, in assessing a constitutional vagueness challenge "[t]he

degree of vagueness tolerated ... depends in part on the type of statute."[116] Because "the

'consequences of imprecision are qualitatively less severe,'" "[l]ess clarity is required in purely

---

[112] La. R.S. 40:2884.
[113] La. R.S. 40:2884(B).
[114] 60 F.4th 770, 786 (4th Cir. 2023).
[115] *Id.*
[116] *Id.* at 781 (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019)).

civil statutes," while "laws imposing 'criminal penalties' or 'threaten[ing] to inhibit the exercise of constitutionally protected rights' are subject to 'a stricter standard.'"[117] The court concluded that, given the disjunctive text of the statute, the statute failed to "explain the law's scope" or limit the discretion of prosecutors, and thus posed the danger of sweeping in protected speech.[118]

Act 358 does not pose the same danger to constitutionally protected activities as the statute at issue in *CYAP*. Act 358 is enforceable through civil penalties and injunctive relief under Louisiana's Unfair Trade Practices and Consumer Protection Law and thus does not invoke criminal penalties in contrast to the law at issue in *CYAP*.[119] Moreover, as explained above, Act 358 provides sufficient textual context for the term "interfere" to allow Plaintiffs to determine the scope of the law and to limit the discretion of the state in enforcing the statute. Moreover, the law at issue in the other case implicated significant First Amendment concerns given how the term "interfere" or "interference" was used in the statute. Here, Plaintiffs suggest that Act 358 may similarly infringe protected speech. But the statutory context of the term "interfere" limits its application to unprotected, non-expressive conduct aimed at preventing or hindering contract pharmacies from acquiring or receiving Section 340B drugs on behalf of covered entities.

Finally, Plaintiffs argue that Act 358 is "geographically" vague in the sense that it is not limited to contract pharmacies in the State of Louisiana, but instead broadly applies to any pharmacy in the United States that serves patients in Louisiana. The Court disagrees. Act 358 is specifically limited to pharmacies under contract with a covered entity in Louisiana—in other words, a Louisiana healthcare provider—and that provider's Louisiana-based patients. It is unclear to the Court how this provision renders the statute "geographically" vague given that the statute

---

[117] *Id.* (quoting *Manning*, 930 F.3d at 272)
[118] *Id.* (quoting *Manning*, 930 F.3d at 272)
[119] La. R.S. 40:2885.

turns on the existence of a contractual relationship between the pharmacy—whether in-state or out-of-state—and a Louisiana healthcare provider. The limitation of the statute to pharmacies that have a contractual relationship with a covered entity in Louisiana provides some boundaries and limitations on the scope of the Act 358.

In sum, Plaintiffs' constitutional vagueness arguments fail as a matter of law. Accordingly, the Court grants the Defendants' Motions for Summary Judgment with respect to these claims.

### D.  Contracts Clause.

The Contracts Clause prohibits States from passing laws "impairing the Obligation of Contracts."[120] The Supreme Court's current two-step analysis for Contracts Clause challenges requires that a court first determine whether the state law at issue substantially impairs a contractual relationship, and if so, whether it does so for a legitimate purpose.[121] The Fifth Circuit, relying on the last Supreme Court case to strike down a state law on the basis of a Contracts Clause violation,[122] has adopted basically the same test, albeit in three steps: (1)  the court must determine whether the state law has in fact operated as a substantial impairment of a contractual relationship; (2) if it does, the court must consider the justification offered by the state for that impairment, which must be significant and legitimate; and (3) if the state offers a legitimate justification for the impairment, the court must determine whether the impairment is reasonable and necessary.[123]

Under the Section 340B Program, private prescription drug companies, as a condition of having their outpatient drugs covered through Medicaid and Medicare Part B, are required to enter a pharmaceutical pricing agreement ("PPA") with the HHS Secretary under which they agree to

---

[120] U.S. CONST. art. I, § 10.
[121] *Sven v. Melin*, 138 S. Ct. 1815, 1822 (2018).
[122] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978).
[123] *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010); *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504–05 (5th Cir. 2001).

offer Section 340B providers outpatient drugs at or below an applicable discounted and statutorily determined price referred to as the "ceiling price."[124] The terms of a PPA effectively mirror the statute. In fact, the Supreme Court has held that "the PPAs simply incorporate statutory obligations and record the manufacturers' agreement to abide by them. The form agreements, composed by HHS, contain no negotiable terms . . . . [Thus,] the 340B Program agreements serve [merely] as the means by which drug manufacturers opt into the statutory scheme."[125]

Plaintiff AstraZeneca alleges that Act 358 expands the list of covered entities and is therefore an "expansion of beneficiaries."[126] But Act 358 does not change or expand which entities qualify as 340B "covered entities." Thus, it does not expand or otherwise enlarge the beneficiaries of the Section 340B program. Nor does Act 358 change what prices drug companies may charge covered entities—Act 358 only affects the *delivery* or *acquisition* of Section 340B drugs. As a result, AstraZeneca cannot point to any way in which the Act expands or contradicts its PPA because, like the statute, the PPA is silent as to delivery to or acquisition of Section 340B drugs to contract pharmacies.

The cases on which AstraZeneca predicates its Contracts Clause claim are easily distinguishable. In *Allied Structural v. Spannaus*, the Supreme Court struck down a Minnesota law that required a company to provide additional pension benefits after it had agreed to provide such benefits under specific contractual provisions.[127] Unlike the Act, the Minnesota law in that case effectively changed the terms of the contract. Here, the terms of the PPA remain unchanged. Similarly, in *United Healthcare Ins. Co. v. Davis,* the Fifth Circuit held that the Contracts Clause prohibited Louisiana from enacting legislation increasing obligations on companies that had

---

[124] See 42 U.S.C. § 256b(a)(1).
[125] *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011).
[126] See Complaint, ECF No. 1, at ¶¶ 78-79.
[127] 438 U.S. at 245–46.

agreed to insure state employees under specific conditions.[128] Nothing that Louisiana has done in Act 358 increases or in any way changes AstraZeneca's obligations under its PPA. Finally, in *Lipscomb v. Columbus Municipal Separate School District*, the Fifth Circuit determined that the voiding of longstanding land leases violated the Contacts Clause.[129] Act 358, in contrast, does not void any contracts.

Even if the Court were to find that Act 358 somehow impairs AstraZeneca's PPA by preventing restrictions on contract pharmacies, the State would have a legitimate purpose for doing so. The Supreme Court has "repeatedly held that unless the State is itself a contracting party, courts should 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'"[130] The Fifth Circuit has also stated that "[u]nder modern caselaw, states have some leeway to alter parties' contractual relationships 'to safeguard the vital interests of [their] people.'"[131] The Fifth Circuit has also observed that "remedying . . . a broad and general social or economic problem qualifies as a significant and legitimate public purpose."[132] As the Eighth Circuit noted in *PhRMA*, the practice of pharmacy is an area traditionally left to state regulation" and "the federal government has 'traditionally regarded state law as a complementary form of drug regulation and has long maintained that state law offers an additional, and important, layer of consumer protection that complements [federal] regulation.'"[133] The state could credibly argue that Act 358 promotes greater access to discounted drugs by preventing restrictions on the distribution of those drugs through multiple contract pharmacies.

---

[128] 602 F.3d at 630.
[129] 269 F.3d at 514.
[130] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413 (1983) (citations omitted)).
[131] *Next Era Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 328 (5th Cir. 2022) (quoting Energy Reserves Grp., 459 U.S. at 410).
[132] *Jones v. La. Bd. of Supervisors of Univ. of La. Sys.*, 809 F.3d 231, 242 (5th Cir. 2015).
[133] *Id.* (cleaned up).

The Fifth Circuit also recently observed that "the Contracts Clause is not what it once was."[134] One of the principles that "sapped the Contracts Clause of its earlier force" is applicable in the present case, namely the expectation that contracting parties must recognize that regulation is possible, which rings "especially true in highly regulated industries."[135] The drug industry is a "pervasively regulated business."[136] Since AstraZeneca can reasonably expect regulation with respect to the sale of drugs and, especially with respect to its voluntary participation in federal benefit programs such as Medicaid and Medicare, its claim "fails at the threshold question for proving a modern Contracts Clause violation."[137]

### E.  Takings Clause.

The Takings Clause of the Fifth Amendment to the Constitution, which is "applicable to the States through the Fourteenth Amendment,"[138] provides: "[N]or shall private property be taken for public use, without just compensation."[139] Takings claims are recognized as to both personal property, including goods, and real property.[140] A taking can be either *per se* or regulatory, both of which entitle the property owner to just compensation.[141] A *per se* taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it."[142]

---

[134] *NextEra Energy Cap. Holdings, Inc.,* 48 F.4th at 328.
[135] *Id.*
[136] *United States v. Schiffman*, 572 F.2d 1137, 1142 (5th Cir. 1978).
[137] *NextEra Energy Cap. Holdings, Inc.,* 48 F.4th at 328; *see also United Healthcare Ins. Co. v. Davis,* 602 F.3d 618, 627-28 (5th Cir. 2010).
[138] *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021).
[139] U.S. Const. Amend. V.
[140] *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015).
[141] *Cedar Point Nursey*, 594 U.S. at 147–49.
[142] *Id.* at 147.

Page **27** of **32**

A taking can also occur as a result of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign."[143] The Supreme Court has held that a regulatory taking occurs when a regulation "goes too far" in limiting an owner's use of her property.[144]

In order to determine whether a regulation amounts to a taking, courts apply the test developed in *Penn Central Transportation Company v. City of New York*.[145] The *Penn Central* test requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[146] A regulation that deprives a property owner of "all economically beneficial uses" of her property constitutes a regulatory taking.[147]

Regardless of whether the government pays just compensation for a taking, property may only "be taken for public use."[148] The Supreme Court has held that the phrase "public use" requires that the taking "serve[ ] a 'public purpose.'"[149] The Court has "defined that concept broadly, reflecting [the Court's] longstanding policy of deference to legislative judgments" in redevelopment of property, and in "a purely economic context" as well.[150]

The Fifth Circuit has held that when private parties "voluntarily accept responsibilities under" federal law because "they consider it in their best interest to do so," no taking occurs.[151] Under this principle, "[g]overnmental regulation that affects a group's property interests does not

---

[143] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks and citation omitted).

[144] *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

[145] 438 U.S. 104 (1978).

[146] *Id*.

[147] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019–20 (1992) (emphasis in original) (finding a regulatory taking, and thus requiring just compensation, when enforcement of a "coastal-zone construction ban" rendered beachfront property "valueless").

[148] U.S. Const. Amend. V.

[149] *Kelo v. New London,* 545 U.S. 469, 480 (2005).

[150] *Id*. at 480–82 (citing Berman v. Parker, 348 U.S. 26 (1954), *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984), and *Monsanto*, 467 U.S. at 1014).

[151] *Burditt v. U.S. Dep't of Health & Hum. Servs.,* 934 F.2d 1362, 1376 (5th Cir. 1991).

constitute a taking of property where the regulated group is not required to participate in the regulated industry."[152] In *Burditt*, the Fifth Circuit held that a "state law limiting fees that nursing homes voluntarily participating in Medicaid may charge non-Medicaid patients effects no taking '[d]espite the strong financial inducement to participate in Medicaid.'"[153]

The Supreme Court has also applied the *Penn Central* test to determine whether a voluntary exchange with the federal government constituted a taking. In *Monsanto*, the Supreme Court rejected in part a takings challenge to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, as amended, 7 U.S.C. § 136, *et seq*. 467 U.S. at 1006–08.[154] The 1978 amendments to FIFRA allowed the Environmental Protection Agency ("EPA") to disclose trade secrets contained in applications for licenses to sell pesticides ten years after the applicant filed its application. The Court rejected the takings claim to the extent an applicant was "aware of the conditions under which the data [were] submitted" because "a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking."[155] *Monsanto* framed the issue under the *Penn Central* test.[156] After considering the *Penn Central* factors, the Court focused on the third factor: the statute's "interference with reasonable investment-backed expectations."[157] As to submissions of applications after 1978—meaning, those submitted with knowledge of the potential for disclosure of trade secrets contained therein—"the force of [the third] factor [was] so overwhelming" as to

---

[152] *Id*. (internal quotation marks and citations omitted).
[153] *Id*. (quoting parenthetically *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984), cert. denied, 469 U.S. 1215 (1985)).
[154] 467 U.S. at 1014
[155] *Id*.
[156] *See id*. at 1005–06.
[157] *Id*. (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)).

Page **29** of **32**

be dispositive.[158] The Court further concluded that "the conditions [were] rationally related to a legitimate Government interest" in regulating pesticides.[159]

The Court disagrees with Plaintiffs' characterization of Act 358 as compelling direct, confiscatory sales to private pharmacies. Discounted drugs are sold to *covered entities* under the terms and conditions of the PPAs and the Section 340B program—they are not sold to pharmacies that enter into contracts to dispense the drugs on behalf of covered entities. Act 358 only prevents pharmaceutical companies from restricting the ability of covered entities to contract with multiple pharmacies to dispense Section 340B drugs to their patients. Because Act 358 does not compel Plaintiffs to directly sell 340B drugs to pharmacies, it is not a taking for purposes of the Takings Clause.

In *Eli Lilly*,[160] the court rejected the argument AbbVie asserts here that an unconstitutional private taking occurs when the government requires that a drug company transfer its drugs to contract pharmacies as a condition of obtaining coverage of its drugs under federal health insurance programs. The court there reasoned that the plaintiff's voluntary participation in these programs "foreclosed the possibility that the statute could result in an imposed taking of private property."[161] The Court finds this reasoning persuasive. Act 358 does not compel drug manufacturers to transfer Section 340B discounted drugs either to the government or to a private party. The statute only applies to drug manufacturers who voluntarily participate in the Medicaid and Medicare programs. AbbVie is not compelled to participate in these programs.

Furthermore, consideration of the *Penn Central* factors suggest that Act 358 is not so onerous as to constitute a regulatory taking. The history of the Section 340B program and litigation

---

[158] *Id*.
[159] *Id*. at 1007.
[160] 2021 WL 5039566 (S.D. Ind. 2021).
[161] *Id*.

surrounding it suggests that regulations requiring delivery and forbidding restrictions against delivery to contract pharmacies were foreseeable. In *Penn Central*,[162] the Supreme Court recognized that a taking is less readily found in a case where the governmental interference with property arises from a public program that adjusts to benefits and burdens of economic life to promote public welfare. This character of regulation stands in contrast to a physical invasion of property by the government. The character of the regulations at issue resembles the former and not the latter.

In sum, AbbVie cannot succeed on its takings claim. The Court, therefore, grants Defendants' Motions for Summary Judgment with respect to this claim.

### III.
#### CONCLUSION

For the foregoing reasons, the Court rules as follows:

(1) PRMA's Motion for Summary Judgment in Case No. 6:23-cv-997 [ECF No. 21] is DENIED;

(2) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No. 41] and the Louisiana Primary Care Association [ECF No. 44] in Case No. 6:23-cv-997 are GRANTED; all claims asserted in Case No. 6:23-cv-997 are DISMISSED;

(3) AstraZeneca's Motion for Summary Judgment in Case No. 6:23-cv-1042 [ECF No. 21] is DENIED;

(4) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No. 43] and the Louisiana Primary Care Association [ECF No. 45] in Case No. 6:23-cv-1042 are GRANTED; all claims asserted in Case No. 6:23-cv-1042 are DISMISSED;

---

[162] 438 U.S. 104 (1978).

(5) AbbVie's Motion for Summary Judgment in Case No. 6:23-cv-1307 [ECF No. 28] is

DENIED;

(6) The Cross Motions for Summary Judgment filed by the State of Louisiana [ECF No.

49] and the Louisiana Primary Care Association [ECF No. 61] in Case No. 6:23-cv-

1307 are GRANTED; all claims asserted in 6:23-cv-1307 are DISMISSED.

THUS DONE in Chambers on this 30th day of September, 2024.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

166 F.4th 528
United States Court of Appeals, Fifth Circuit.

ABBVIE, INCORPORATED; Allergan, Incorporated; Durata Therapeutics, Incorporated; AbbVie Products, L.L.C.; Aptalis Pharma US, Incorporated; Allergan Sales, L.L.C.; Pharmacyclics, L.L.C., Plaintiffs—Appellants,

v.

Liz MURRILL, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee,

AstraZeneca Pharmaceuticals, L.P., Plaintiff—Appellant,

v.

Liz Murrill, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee.

Pharmaceutical Research and Manufacturers of America, Plaintiff—Appellant,

v.

Liz Murrill, in her official capacity as Attorney General of Louisiana, Defendant—Appellee,

Louisiana Primary Care Association, Intervenor Defendant—Appellee,

No. 24-30645
|
consolidated with No. 24-30651,
consolidated with No. 24-30673
|
FILED February 9, 2026

**Synopsis**
**Background:** Pharmaceutical manufacturers and trade association brought actions alleging that Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was preempted by federal law and violated Takings Clause, Contracts Clause, and Due Process Clause's prohibition on vagueness. The United States District Court for the Western District of Louisiana, Carol B. Whitehurst, United States Magistrate Judge, 2024 WL 5453479, allowed membership organization of federally qualified health centers to intervene, and the same court, Robert R. Summerhays, J., 2024 WL 4361597, entered summary judgment in state's favor. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Willett, Circuit Judge, held that:

[1] federal question jurisdiction existed over actions;

[2] law was not field preempted by federal law;

[3] law was not conflict preempted by federal law;

[4] law did not effect physical taking;

[5] law did not effect regulatory taking;

[6] law did not violate Contracts Clause;

[7] law was not unconstitutionally vague; and

[8] organization was not entitled to intervene as of right.

Affirmed in part and reversed in part.

**Procedural Posture(s):** On Appeal; Motion to Intervene; Motion for Summary Judgment.

West Headnotes (34)

| [1] | **Federal Courts** 🔑 Summary judgment |
| --- | --- |
| | **Federal Courts** 🔑 Summary judgment |
| | Court of Appeals reviews summary judgment de novo, viewing all evidence in light most favorable to nonmoving party and drawing all |

reasonable inferences in that party's favor. Fed. R. Civ. P. 56(a).

**[2]**    **Federal Courts**  ➠  Theory and Grounds of Decision of Lower Court

**Federal Courts**  ➠  Grounds for sustaining decision not relied upon or considered

Court of Appeals may affirm summary judgment on any ground supported by record, even if it is different from that relied on by district court.

**[3]**    **Federal Courts**  ➠  Matters of Procedure in General

**Federal Courts**  ➠  Governments and Political Subdivisions

Federal courts have federal question jurisdiction over claims that assert federal preemption and seek declaratory and injunctive relief against state official. 28 U.S.C.A. § 1331.

**[4]**    **Federal Courts**  ➠  "Well-pleaded complaint" rule

Under well-pleaded complaint rule, federal court does not have federal question jurisdiction unless federal question appears on face of plaintiff's well-pleaded complaint. 28 U.S.C.A. § 1331.

**[5]**    **Federal Courts**  ➠  Environment and health

Federal courts had federal question jurisdiction over actions brought by pharmaceutical manufacturers and trade association alleging that Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was preempted by federal law and violated Takings Clause, Contracts Clause, and Due Process Clause's prohibition on vagueness. U.S. Const. art. 1, § 10, cl. 1; U.S. Const. art. 6, cl. 2; U.S. Const. Amend. 14; 28 U.S.C.A. § 1331; La. Rev. Stat. Ann. § 40:2884.

More cases on this issue

**[6]**    **Federal Preemption**  ➠  Presumptions and burden of proof

When evaluating preemption, court begins with presumption against preemption, particularly in areas of law traditionally reserved to states. U.S. Const. art. 6, cl. 2.

2 Cases that cite this headnote

**[7]**    **Federal Preemption**  ➠  Traditionally or historically regulated by states

**Federal Preemption**  ➠  Health, safety, morals, and welfare

Public health and consumer protection fall squarely within state's historic police powers, and thus where those interests are at stake, assumption is that historic police powers of states were not to be superseded by federal act unless that was clear and manifest purpose of Congress. U.S. Const. art. 6, cl. 2.

2 Cases that cite this headnote

**[8]**    **Federal Preemption**  ➠  Occupation of field; field preemption

Field preemption fundamentally is question of congressional intent; it arises only when Congress, acting within its proper authority, has determined that certain conduct must be regulated by its exclusive governance, thereby leaving no room for state regulation. U.S. Const. art. 6, cl. 2.

**[9]**    **Federal Preemption**  ➠  Presumptions and burden of proof

Matters unaddressed by Congress in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to disposition provided by state law.

**[10]**    **Antitrust and Trade Regulation**  ➠  Preemption

**Federal Preemption** 🔑 Trade Regulation

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not field preempted by federal law; law implicated two traditional general areas of state regulation and police power—public health and consumer protection—and federal law evinced no clear and manifest intent to preempt state laws regulating distribution of drugs to patients and role of pharmacies in such distribution. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

4 Cases that cite this headnote
More cases on this issue

[11]    **Federal Preemption** 🔑 Impossibility of complying with both state and federal law

**Federal Preemption** 🔑 State law as obstacle to objectives or purpose of federal law

Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where state law creates unacceptable obstacle to accomplishment and execution of full purposes and objectives of Congress. U.S. Const. art. 6, cl. 2.

[12]    **Antitrust and Trade Regulation** 🔑 Preemption

**Federal Preemption** 🔑 Trade Regulation

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not conflict preempted by federal law, despite manufacturers' contentions that law impermissibly expanded universe of covered entities, and clashed with Congress's enforcement scheme; pharmacies did not purchase drugs or receive price discounts, but merely dispensed drugs to covered entities'

patients, there was no overlap between state and federal enforcement schemes, law did not regulate prices, only conduct, and Congress did not undertake regulation of delivery of discounted drugs or role of pharmacies in that process. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

7 Cases that cite this headnote
More cases on this issue

[13]    **Eminent Domain** 🔑 Necessity of just or full compensation or indemnity

When government physically acquires private property for public use, takings clause imposes clear and categorical obligation to provide owner with just compensation. U.S. Const. Amend. 5.

[14]    **Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

"Physical taking" occurs when government uses its power of eminent domain to formally condemn property or when it physically takes possession of property without acquiring title to it. U.S. Const. Amend. 5.

1 Case that cites this headnote

[15]    **Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain** 🔑 Necessity of just or full compensation or indemnity

Government may effect taking—obligating government to provide just compensation—through regulation. U.S. Const. Amend. 5.

1 Case that cites this headnote

[16]    **Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

When evaluating claim that government effected taking by imposing regulations that restrict owner's ability to use his own property, courts must determine whether restriction goes too far, applying fact-specific, flexible test

that balances regulation's economic impact, its interference with reasonable investment-backed expectations, and government action's character. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[17]  Eminent Domain** 🔑 Health

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not effect physical taking of manufacturer's property; law did not compel manufacturers to complete more sales in first instance, but instead applied only after covered entities had purchased discounted drugs and directed their delivery. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

**[18]  Eminent Domain** 🔑 Health

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not effect regulatory taking of manufacturer's property, even though law might increase number of drugs for which manufacturer had to provide discounts; manufacturer would still receive large percentage of market price, law did not significantly interfere with manufacturer's reasonable investment-backed expectations, and law advanced core public purpose of ensuring that low-income and rural patients had access to discounted medications. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

**[19]  Constitutional Law** 🔑 Existence and extent of impairment

**Constitutional Law** 🔑 Police power; purpose of regulation

To determine whether law violates Contracts Clause, court must first ask whether law operates as substantial impairment of contractual relationship, and if it does, court must then examine whether it is drawn in appropriate and reasonable way to advance significant and legitimate public purpose. U.S. Const. art. 1, § 10, cl. 1.

**[20]  Constitutional Law** 🔑 Existence and extent of impairment

In determining whether state law operates as substantial impairment of contractual relationship, as used to decide whether state law violates Contracts Clause, court must consider factors such as extent to which law undermines contractual bargain, interferes with party's reasonable expectations, and prevents party from safeguarding or reinstating its rights. U.S. Const. art. 1, § 10, cl. 1.

**[21]  Antitrust and Trade Regulation** 🔑 Validity

**Constitutional Law** 🔑 Contracts with United States

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies did not substantially impair manufacturer's contractual relationship with federal government under its pharmaceutical pricing agreement (PPA), in violation of Contracts Clause, by expanding universe of covered entities and imposing new obligations on it as result of its PPA; industry was heavily regulated, PPA did not contain delivery terms, and law did not alter terms of manufacturer's PPA, but only regulated relationships between covered entities and their contract pharmacies, and did not expand its

AbbVie, Incorporated v. Murrill, 166 F.4th 528 (2026)
123 Fed.R.Serv.3d 1430

obligation to provide discounts. U.S. Const. art. 1, § 10, cl. 1; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

5 Cases that cite this headnote

**[22]    Constitutional Law** 🔑 **Existence and extent of impairment**

In evaluating claim that state law violates Contracts Clause, courts look to contract's terms to determine parties' reasonable expectations. U.S. Const. art. 1, § 10, cl. 1.

**[23]    Antitrust and Trade Regulation** 🔑 **Validity**

**Constitutional Law** 🔑 **Particular Subjects and Regulations**

Louisiana law prohibiting pharmaceutical manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies was not unconstitutionally vague, in violation of Due Process Clause, despite manufacturer's contention that term "interfere" was so open-ended that it could prohibit manufacturers from even asking for information for audits, thus chilling lawful conduct; "interfere" appeared alongside "deny, restrict, prohibit," indicating that "interfere" targeted conduct that obstructed or impeded acquisition or delivery of discounted drugs to contract pharmacies—not routine communications or lawful auditing practices. U.S. Const. Amend. 14; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; La. Rev. Stat. Ann. § 40:2884.

1 Case that cites this headnote

**[24]    Constitutional Law** 🔑 **Certainty and definiteness; vagueness**

"Void-for-vagueness doctrine"—a component of due process—bars enforcement of statute that either forbids or requires doing of act in terms so vague that men of common intelligence must

necessarily guess at its meaning and differ as to its application. U.S. Const. Amends. 5, 14.

**[25]    Constitutional Law** 🔑 **Certainty and definiteness; vagueness**

Law is unconstitutionally vague under Due Process Clause only when it fails to specify standard of conduct at all—not when it merely requires person to conform his conduct to imprecise but comprehensible normative standard. U.S. Const. Amends. 5, 14.

**[26]    Constitutional Law** 🔑 **Certainty and definiteness; vagueness**

In civil context, statute is unconstitutionally vague, in violation of due process, only if it is so vague and indefinite as really to be no rule at all. U.S. Const. Amends. 5, 14.

**[27]    Statutes** 🔑 **Associated terms and provisions; noscitur a sociis**

Under canon "noscitur a sociis," word is known by its associates, i.e., word is given more precise content by neighboring words with which it is associated.

**[28]    Federal Courts** 🔑 **Parties**

Court of Appeals reviews district court's ruling on motion to intervene de novo. Fed. R. Civ. P. 24.

**[29]    Federal Civil Procedure** 🔑 **Intervention**

Federal courts should allow intervention where no one would be hurt and greater justice could be attained. Fed. R. Civ. P. 24.

**[30]    Federal Civil Procedure** 🔑 **Proceedings for intervention**

Although rule governing intervention is to liberally construed, movant still bears burden of

establishing its right to intervene. Fed. R. Civ. P. 24.

**[31]**    **Federal Civil Procedure** 🔑 Grounds and Factors

To intervene as of right, applicant must satisfy four requirements: (1) application for intervention must be timely; (2) applicant must have interest relating to property or transaction that is subject of action; (3) applicant must be so situated that action's disposition action may, as practical matter, impair, or impede his ability to protect that interest; (4) applicant's interest must be inadequately represented by existing parties to suit. Fed. R. Civ. P. 24(a)(2).

**[32]**    **Federal Civil Procedure** 🔑 Inadequacy of representation of applicant's interest

When state is already party, applicant for intervention as of right must demonstrate that its interest is in fact different from that of state and that its interest will not be represented by state. Fed. R. Civ. P. 24(a)(2).

**[33]**    **Federal Civil Procedure** 🔑 Inadequacy of representation of applicant's interest

Applicant for intervention as of right need not show that representation by state will certainly be inadequate; rather, applicant must show that representation of its interests may be inadequate. Fed. R. Civ. P. 24(a)(2).

**[34]**    **Federal Civil Procedure** 🔑 Particular Intervenors

Membership organization of federally qualified health centers was not entitled to intervene as of right in pharmaceutical manufacturer's action against state challenging Louisiana law prohibiting manufacturers from interfering with ability of designated health care providers to obtain and deliver discounted drugs pursuant to federal drug-pricing program for underserved populations through contract pharmacies, even though it sought to protect business interests of

its members, absent showing that its interests diverged from state's, or that it offered any defense distinct from state's. La. Rev. Stat. Ann. § 40:2884; Fed. R. Civ. P. 24(a)(2).

More cases on this issue

Appeals from the United States District Court for the Western District of Louisiana, USDC Nos. 6:23-CV-1307, 6:23-CV-1042, 6:23-CV-997, Robert R. Summerhays, U.S. District Judge

**Attorneys and Law Firms**

Matthew Scott Owen, Lucas Henry Funk, Meredith Marie Pohl, Kirkland & Ellis, L.L.P., Washington, DC, for Plaintiffs—Appellants in No. 24-30645.

Allon Kedem, Jeffrey Handwerker, Arnold & Porter Kaye Scholer, L.L.P., Washington, DC, Brent Bennett Barriere, Fishman Haygood, L.L.P., New Orleans, LA, for Plaintiff—Appellant in No. 24-30651.

Louis Victor Gregoire, Jr., Esq., Kean Miller, L.L.P., Baton Rouge, LA, Philip J. Perry, Cherish Alise Drain, Andrew D. Prins, Abid Qureshi, Latham & Watkins, L.L.P., Washington, DC, Jeffrey Joseph Gelpi, I, Esq., Kean Miller, L.L.P., New Orleans, LA, for Plaintiff—Appellant in No. 24-30673.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for Defendant—Appellee in No. 24-30645.

Jorge Benjamin Aguinaga, Louisiana Department of Justice, Baton Rouge, LA, Michael Brent Hicks, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Riley T. Svikhart, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., New Orleans, LA, for Defendant—Appellee in No. 24-30651.

Jorge Benjamin Aguinaga, Alexander Theodore Reinboth, Louisiana Department of Justice, Baton Rouge, LA, Michael Brent Hicks, Baker, Donelson, Bearman, Caldwell &

Berkowitz, P.C., Baton Rouge, LA, Zachary Faircloth, Louisiana Department of Justice, Federalism Division, Baton Rouge, LA, Caitlin Ann Huettemann, Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, Riley T. Svikhart, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., New Orleans, LA, for Defendant—Appellee in No. 24-30673.

Ronald S. Connelly, Delaney Bounds, Hannah E. Hauer, Fernando Montoya, Esq., Powers, Pyles, Sutter & Verville, P.C., Washington, DC, for Intervenor Defendant—Appellee in Nos. 24-30645 and 24-30651.

Ronald S. Connelly, Delaney Bounds, Hannah E. Hauer, Fernando Montoya, Esq., Powers, Pyles, Sutter & Verville, P.C., Washington, DC, Carroll Devillier, Jr., Attorney, Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, LA, for Intervenor Defendant—Appellee in No. 24-30673.

William B. Schultz, Margaret Dotzel, Alyssa Howard, Zuckerman Spaeder, L.L.P., Washington, DC, for Amici Curiae.

Before Higginson, Willett, and Engelhardt, Circuit Judges.

**Opinion**

Don R. Willett, Circuit Judge:

 **\*534** When Congress created the Section 340B Drug Pricing Program, it struck a straightforward bargain: drug manufacturers that choose to participate in Medicaid must provide discounted drugs to certain "covered entities"— most often clinics and hospitals that serve low-income and rural patients.[1] The goal was simple: stretch scarce healthcare dollars and expand access to essential medications for vulnerable communities.

In practice, many covered entities lack the resources to operate in-house pharmacies. To bridge that gap— particularly in rural and underserved areas—they purchase discounted drugs and partner with independent contract pharmacies to dispense them. Some manufacturers, however, have bristled at that arrangement, characterizing it as an "arbitrage opportunity" for pharmacies rather than a lifeline for patients. Acting on that view, certain manufacturers adopted policies restricting **\*535** covered entities' use of contract pharmacies.

Louisiana responded as other states have in matters of pharmaceutical regulation. It enacted Act 358, which prohibits manufacturers from interfering with covered entities' ability to obtain and deliver discounted drugs through contract pharmacies. The statute does not seek to upend the federal scheme; rather, it seeks to preserve access to medicines for the populations Congress sought to protect.

States regulate pharmacies—and the distribution of drugs to those pharmacies—every day. Act 358 fits comfortably within that tradition. We hold that it is not preempted by federal law and does not violate the Takings Clause, the Contracts Clause, or the Due Process Clause's prohibition on vagueness. We further hold that the district court erred in permitting the Louisiana Primary Care Association to intervene, because it failed to show that it would offer any defense distinct from the State or that its divergent interests otherwise affect this litigation.

We therefore AFFIRM the district court's grant of summary judgment for Louisiana and REVERSE its order granting the LPCA's motion to intervene in the underlying *AbbVie* case.

I

A

Congress enacted 42 U.S.C. § 256b as part of the Veterans Healthcare Act of 1992.[2] Section 256b created what is commonly known as the 340B Program, which requires pharmaceutical manufacturers that participate in Medicaid and Medicare Part B to sell certain outpatient drugs at "no more than the statutorily-set ceiling price" to designated healthcare providers.[3]

These providers—called "covered entities"—include federally qualified health centers, family-planning projects, state-operated AIDS facilities, black lung clinics, and other safety-net institutions that serve low-income and uninsured patients.[4] In exchange for access to discounted drugs, the statute "places several key restrictions on covered entities," including prohibitions on duplicate discounts and drug diversion, audit requirements, and penalties for noncompliance.[5]

The Health Resources and Services Administration (HRSA), an agency within the Department of Health and Human Services, administers the 340B Program.[6] Manufacturers

"opt into the 340B Program by signing" Pharmaceutical Pricing Agreements (PPAs) with HHS.[7] These agreements "are not transactional, bargained-for contracts"—rather, they are "uniform agreements" that merely "recite" the statutory obligations of manufacturers and the HHS Secretary.[8] By signing a PPA, a manufacturer agrees to provide 340B discounts to covered entities as a condition of receiving Medicaid and Medicare Part B reimbursements.

**\*536** From the program's inception, Congress has said nothing about how discounted drugs must be dispensed. In 1996, HRSA issued guidance addressing that silence. Recognizing that many covered entities lacked in-house pharmacies—particularly in rural or underserved areas—HRSA permitted such entities to contract with a single outside pharmacy to dispense 340B drugs.[9] Under that arrangement, covered entities would purchase and pay for drugs, while manufacturers would ship them to the contract pharmacy for distribution to eligible patients. The pharmacy functioned solely as a distribution intermediary.

Fourteen years later, HRSA significantly expanded that model. In 2010, it issued guidance allowing *all* covered entities—including those with their own pharmacies—to contract with an unlimited number of outside pharmacies.[10] The effects were swift and significant. After the 2010 guidance, "the use of contract pharmacies skyrocketed."[11]

Manufacturers soon pushed back. Expressing concern that contract pharmacies were unlawfully profiting from these discounted drugs rather than merely dispensing them, manufacturers adopted policies limiting the distribution of Section 340B drugs through contract pharmacies.[12] In 2020, HHS responded, "act[ing] quickly" to issue an advisory opinion "stating that, 'to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs.' "[13] Unsurprisingly, manufacturers sued.

Both the Third Circuit and the D.C. Circuit rejected HHS's opinion, holding that the 340B statute does not require manufacturers to deliver discounted drugs to an unlimited number of contract pharmacies.[14] In the wake of those decisions, states began to "attempt to do by [state law] what

HHS had done in its advisory opinion"[15]—thereby setting the stage for the dispute before us.

## B

In 2023, Louisiana enacted Act 358, joining a growing number of states responding to manufacturers' restrictions on the distribution of 340B drugs.[16] The statute imposes two core prohibitions on manufacturers and distributors of 340B drugs:

> A. A manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy **\*537** that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity unless such receipt is prohibited by the United States Department of Health and Human Services.

> B. A manufacturer or distributor shall not interfere with a pharmacy contracted with a 340B entity.[17]

Violations of either provision constitute violations of Louisiana's Unfair Trade Practices and Consumer Protection Law,[18] exposing manufacturers to various "investigative demands, remedies, and penalties."[19]

## C

Two manufacturers and one trade association promptly challenged Act 358 in separate suits against Louisiana's Attorney General, Liz Murrill, in her official capacity. Each asserted that Act 358 is preempted by § 340B—but each also advanced its own combination of federal constitutional claims seeking declaratory and injunctive relief.[20]

AbbVie, Inc. alleged federal preemption, an unconstitutional taking, and unconstitutional vagueness. AstraZeneca Pharmaceuticals, L.P. brought preemption and Contracts Clause claims. And Pharmaceutical Research & Manufacturers of America (PhRMA) asserted preemption and vagueness challenges.

The district court resolved all three cases together. In a single opinion, it denied the manufacturers' motions for summary judgment and granted summary judgment in

favor of Louisiana—and the LPCA—on every claim.[21] The manufacturers appealed, and the three appeals are consolidated before us.

## II

**[1]** **[2]** We review summary judgment *de novo*, "viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor."[22] "Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' "[23] "We may affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court."[24]

## III

**[3]** We begin, as always, with jurisdiction. Federal courts have subject-matter jurisdiction over cases "arising under" federal law.[25] And it is "well-established" that **\*538** federal courts have jurisdiction over claims that assert federal preemption and seek declaratory and injunctive relief against a state official.[26]

Louisiana nonetheless argues that the district court lacked subject-matter jurisdiction over the manufacturers' preemption claims. In support, the State invokes our decision in *Elam v. Kansas City Southern Railway Co.*, quoting the "black-letter" proposition that "[d]efensive preemption does not create federal jurisdiction and simply declares the primacy of federal law, regardless of the forum or the claim."[27]

That argument misses the mark. *Elam* involved a state-law tort action in which preemption was raised defensively.[28] This case is different. As AstraZeneca correctly observes, this is "a classic *Ex parte Young* suit."[29] The manufacturers invoke the Supremacy Clause as a sword, not a shield, seeking prospective relief against state officials alleged to be enforcing a preempted statute.

**[4]** **[5]** Defensive-preemption cases like *Elam*—which turn on the well-pleaded complaint rule, under which "a federal court does not have federal question jurisdiction unless a federal question appears on the face of the plaintiff's well-pleaded complaint"[30]—are therefore inapposite. Here, the federal question appears on the face of the complaint. Federal-question jurisdiction therefore exists.[31]

With jurisdiction secure, we turn to the merits. Each manufacturer presses a federal preemption challenge and advances additional constitutional claims. AbbVie contends that Act 358 violates the Takings Clause. AstraZeneca argues that the Act violates the Contracts Clause. And PhRMA asserts that the statute is unconstitutionally vague. We also address AbbVie's challenge to the district court's decision allowing LPCA to intervene. We consider each issue in turn.

## IV

We begin with the claim common to all three manufacturers: federal preemption. The district court rejected AbbVie's, AstraZeneca's, and PhRMA's arguments that Act 358 is preempted by federal law under theories of field, conflict, or obstacle preemption. We agree.

**\*539** A

The Supremacy Clause declares that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[32] Through it, Congress possesses "the power to preempt state law"[33]—either "through express language in a statute" or implicitly.[34] But the exercise of that power is not lightly presumed.

**[6]** **[7]** When evaluating preemption, we begin with the "presumption against preemption," particularly in "areas of law traditionally reserved to the states."[35] Public health and consumer protection fall squarely within a State's historic police powers. Where those interests are at stake, "the assumption [is] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[36]

The manufacturers urge us to dispense with that presumption, arguing that Louisiana's police powers cannot regulate conduct touching the federal 340B Program. We are unpersuaded. Act 358 does not regulate the 340B Program

itself. It regulates the distribution of drugs to patients and the role of pharmacies in this distribution—areas left free under the 340B Program for state supplementation.[37] In close cases, "when there is doubt about preemption, the tie goes to the state."[38]

We need not reinvent the wheel. Just months ago, we held in *AbbVie, Inc. v. Fitch* that Mississippi's materially indistinguishable law raises no preemption concerns—whether under field, conflict, or obstacle preemption.[39] *Fitch* controls here.[40]

 [8] Field preemption "fundamentally is a question of congressional intent."[41] It arises only when "Congress, acting within its proper authority, has determined [that certain conduct] must be regulated by its exclusive governance," thereby leaving no room for state regulation.[42] For that reason, the Supreme Court has cautioned courts to hesitate to infer field preemption absent a showing of "complete ouster of state power."[43]

 **\*540**  In *Fitch*, we examined § 340B—the very same federal program and statutory provision at issue here—and concluded that its regulatory scheme is not "so pervasive that Congress left no room for state supplementation."[44] We catalogued what § 340B *does* regulate: price ceilings for covered outpatient drugs; eligibility criteria for covered entities; prohibitions on duplicate discounts and diversion; audit and enforcement mechanisms; and the terms governing manufacturers' and wholesalers' sales of discounted drugs to covered entities.[45]

 [9] We also identified what § 340B conspicuously *does not* regulate: "neither the distribution of drugs to patients nor the role of pharmacies in this distribution"[46]—the precise subjects addressed by Mississippi's law in *Fitch* and Louisiana's Act 358 here. Our sister circuits have reached the same conclusion,[47] emphasizing § 340B's "silence" on contract pharmacies and delivery logistics.[48] Where Congress has left such matters "unaddressed in an otherwise comprehensive and detailed federal regulatory scheme," they "are presumably left subject to the disposition provided by state law."[49]

 [10] Further, as with Mississippi's analogous statute, Louisiana's Act 358 "implicates two traditional general areas of state regulation and police power: public health and consumer protection."[50] And because § 340B evinces "no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution," Act 358 is not field preempted.[51]

 [11]  [12]  Nor is it conflict preempted. "Conflict preemption applies (1) where complying with both federal law and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[52]

The manufacturers advance several conflict-preemption theories. None is persuasive.

First, AbbVie and PhRMA argue that Act 358 impermissibly "expands" the universe of covered entities by requiring manufacturers to provide discounted drugs to contract pharmacies. That argument ignores the basic mechanics of the 340B Program.

As we explained in *Fitch*, laws like Mississippi's—and Louisiana's—require manufacturers to provide discounted drugs to contract pharmacies "only insofar as they have partnered with covered entities to **\*541** *distribute* the drugs to patients."[53] Put simply: "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts. Covered entities purchase and maintain title to the 340B-discounted drugs, while contract pharmacies dispense these drugs to covered entities' patients."[54] The manufacturers' contrary characterization was rejected in *Fitch* as "simply incorrect,"[55] and it fares no better here.

AbbVie and PhRMA's second conflict-preemption argument likewise falls short. They contend that Act 358 impermissibly "clashes with Congress's enforcement scheme" which vests HHS with exclusive authority to enforce 340B. That framing presents a false conflict. Two things can be true at once.

While "it is true that Congress made HHS the sole enforcer of Section 340B,"[56] it is also true that Louisiana's Attorney General enforces Act 358. The two regimes operate in distinct spheres. As Louisiana explains, if a manufacturer believes a covered entity has engaged in duplicate discounting, "only the 340B statute provides recourse ... and Act 358 has nothing to say about it." Conversely, if a manufacturer refuses to deliver discounted drugs to a contract pharmacy acting on behalf of a covered entity, "only Act 358 provides recourse" because

§ 340B is silent on delivery logistics.[57] As in *Fitch*, there is no overlap in the enforcement Venn Diagram—and thus no conflict.[58]

We are similarly unpersuaded by AstraZeneca's obstacle-preemption theory. This argument rests on the premise that Act 358 "regulates pricing on its face." We reject that premise —just as the Eighth Circuit did when evaluating Arkansas's materially similar statute.[59]

AstraZeneca reasons that Act 358 must regulate pricing because a *violation* would occur whenever a manufacturer attempts to sell a § 340B drug at full price rather than the discounted price. But that is circular reasoning. Act 358 does not regulate **\*542** prices; it regulates conduct. By its terms, the statute prohibits manufacturers from interfering with the "acquisition" by—or "delivery" to—a "pharmacy that is under contract with a 340B entity."[60] The district court correctly recognized that distinction.[61]

AstraZeneca further argues that even if Act 358 does not regulate pricing, it nevertheless " 'skews' the program's 'delicate balance of statutory objectives' " because Act 358 applies only to 340B participants. "As with any piece of legislation, Congress did indeed seek to strike a balance among a variety of interests" in enacting the Section 340B Program.[62] But "[p]art of that balance ... involved allocating authority between the Federal Government and the States."[63] Congress decided not to undertake regulation of the delivery of 340B drugs or the role of pharmacies in that process —thereby leaving, absent congressional amendment, those matters to state law.

Act 358 operates comfortably within that space. The statute does not disturb the federally regulated relationship between manufacturers and covered entities. Manufacturers must still offer covered entities the 340B ceiling price, exactly as federal law requires. Act 358 comes into play only after a covered entity has purchased the drugs and directs their delivery to a contract pharmacy. Far from frustrating § 340B's objectives, the two laws work in tandem to advance Congress's central aim: ensuring that "manufacturers participating in Medicaid ... offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor."[64]

Federal law therefore does not preempt Act 358.

V

Because Act 358 is not preempted, we turn to the remaining constitutional claims—beginning with AbbVie's Takings Clause argument.[65]

**[13] [14] [15] [16]** "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation."[66] A physical taking occurs when the government "uses its power of eminent domain to formally condemn property" or when it "physically takes possession of property without acquiring title to it."[67] The government may also effect a taking —obligating the government to provide just compensation —through regulation. "[W]hen the government ... imposes regulations that restrict an owner's ability to use his own property,"[68] courts must determine whether the restriction "goes too far,"[69] applying **\*543** a fact-specific, "flexible test" that balances "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[70]

AbbVie insists that Act 358 effects a *physical* taking, not a regulatory one. As a fallback, AbbVie argues that even if Act 358 is analyzed as a regulatory taking, it still violates the Fifth Amendment. Under either theory, AbbVie's claim fails.

**[17]** We begin with AbbVie's frontline contention: that Act 358 effects a physical taking "because it compels the transfer of AbbVie's property to private parties that will sell the drugs at regular prices and retain the profit for themselves." That argument is foreclosed by *Fitch.*

In *Fitch*, AbbVie advanced the same theory against Mississippi's virtually identical statute. We rejected it, explaining that the law:

[D]oes not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone. Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price. Under [the Mississippi law], AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B. [The Mississippi law] simply

imposes on drug manufacturers a negative obligation of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.[71]

The same is true here. Although AbbVie disagrees with *Fitch*'s characterization of how such statutes operate, it identifies no material difference between Mississippi's law and Act 358 that would justify a different result. We adhere to *Fitch.* Like its Mississippi counterpart, Act 358 does not deprive AbbVie of anything to which § 340B entitles it. Act 358 does not compel manufacturers to "complete more sales in the first instance," as AbbVie asserts; rather, it applies only "*after* [covered entities] have purchased" the discounted drugs and directed their delivery.[72]

 **[18]**  AbbVie's alternative regulatory-taking theory fares no better. In determining whether a law crosses the line between permissible regulation and impermissible taking, courts "balanc[e] factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action."[73] The first factor weighs against AbbVie. While Act 358 "could increase the number of drugs for which [AbbVie] must provide discounts ... for most drugs, [AbbVie] will still receive a large percentage of the market price."[74] The second factor likewise cuts against AbbVie. Contract pharmacies have been **\*544** part of the 340B landscape for decades, and Act 358 "does not significantly interfere" with AbbVie's reasonable investment-backed expectations.[75] Finally, the character of the government action favors the State. Act 358 advances a core public purpose: ensuring that low-income and rural patients have access to discounted medications.

Relying on *Fitch*, we conclude that Act 358 effects neither a physical nor a regulatory taking.[76]

VI

We next consider AstraZeneca's Contracts Clause challenge.

The Contracts Clause limits a State's power to disrupt contractual relationships, providing that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."[77] The Clause applies broadly—"to any kind of contract."[78] But it does not insulate contracts against all legislative change. As the Supreme Court has long recognized, "states have some leeway to alter parties' contractual relationships 'to safeguard the vital interests of [their] people.' "[79] Indeed, "parties contract with an expectation of possible regulation"—"especially ... in highly regulated industries."[80]

 **[19]**    **[20]**   To determine whether a law violates the Contracts Clause, the Supreme Court "has long applied a two-step test."[81] First, we ask whether the law "operate[s] as a substantial impairment of a contractual relationship."[82] This "threshold issue" considers factors such as "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating [its] rights."[83] Only if a substantial impairment exists do we proceed to step two, examining the "means and ends" of Act 358—specifically whether it is "drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.' "[84]

 **[21]**  Because Act 358 does not substantially impair AstraZeneca's contractual obligations, "we may stop after step one."[85]

AstraZeneca argues that Act 358 substantially impairs its contractual relationship with the federal government under its pharmaceutical pricing agreement (PPA). Under the § 340B Program, manufacturers sign PPAs with HHS promising to provide **\*545** discounted drugs to covered entities as a condition of receiving Medicaid and Medicare Part B reimbursements. According to AstraZeneca, Act 358 interferes with that agreement by expanding the universe of covered entities and "imposing costly new obligations on it *only* as a result of entering into" the PPA.

We disagree. Act 358 does not alter the terms, rights, or obligations of AstraZeneca's PPA with the federal government. The statute regulates relationships between covered entities and their contract pharmacies—relationships to which AstraZeneca is not a party.[86] Where Act 358 addresses acquisition and delivery of discounted drugs to contract pharmacies, the PPAs are silent.

Nor does Act 358 "undeniably expand[ ]" AstraZeneca's obligations to "provide discounts for unlimited contract

pharmacy sales." The D.C. Circuit and Third Circuit decisions on which AstraZeneca relies held only that HHS lacks authority under § 340B to mandate delivery to unlimited contract pharmacies. They did not hold—nor suggest— that States lack authority to regulate delivery through their traditional police powers.[87]

AstraZeneca's reliance on *Allied Structural Steel Co. v. Spannaus* also fails. There, Minnesota imposed retroactive pension obligations that "substantially altered" contractual relationships by superimposing duties "conspicuously beyond those that it had voluntarily agreed to undertake."[88] The law imposed "a sudden, totally unanticipated, and substantial retroactive obligation," effectively rewriting the contract, and the Supreme Court held it unconstitutional.[89]

Act 358 does nothing of the sort. It does not rewrite PPAs or impose new contractual terms. AstraZeneca points to nothing in its PPA that addresses—much less limits—delivery to contract pharmacies.[90] And unlike Minnesota's statute in *Allied Structural Steel*, Louisiana's Act 358 implicates "traditional general areas of state regulation and police power,"[91] not "a field it had never before sought to regulate."[92]

The absence of delivery terms in the PPAs is dispositive. Because delivery logistics were never part of the federal pricing agreements, a covered entity's decision to use a contract pharmacy—and Act 358's requirement that manufacturers not interfere with that choice—does not alter the contractual bargain between AstraZeneca and the federal government.

 [22]  Reasonable expectations confirm the point. "Courts look to terms of the contract to determine the parties' reasonable expectations."[93] And where a "market [is] heavily regulated at the time the parties entered the contract," the parties are on notice that "the landscape [in which they do business] is subject to change."[94]

 *546  Consider *Energy Reserves Group, Incorporated v. Kansas Power and Light Company.*[95] There, the Supreme Court rejected a Contracts Clause challenge to a Kansas law imposing intrastate gas price controls—even though the contracts at issue contemplated only *federal* price regulation. The Court emphasized the natural gas industry's long history of pervasive regulation and held that the parties could not

reasonably expect regulatory stasis. Although "Kansas did not regulate natural gas prices specifically," state authority to do so "was well established," and "its supervision of the industry was extensive and intrusive."[96] In that setting, the Court explained, parties could not claim that supplemental state regulation violated their contractual rights.[97]

So too here. AstraZeneca entered into its PPA as part of a comprehensive federal program governing pharmaceutical pricing—within a heavily regulated industry in which state and federal oversight have long coexisted. "That history of regulation" puts manufacturers "on notice."[98] And while the PPAs do not expressly contemplate state regulation of delivery to contract pharmacies, that silence cuts against AstraZeneca, not in its favor. Because the agreements say nothing about delivery at all, AstraZeneca could not reasonably expect that delivery obligations would arise exclusively from federal law.

For all these reasons, Act 358 does not substantially impair AstraZeneca's contractual obligations under the PPA. The district court correctly concluded that Act 358 comports with the Contracts Clause.

VII

 [23]  Nor is Act 358 unconstitutionally vague, as PhRMA contends.

 [24]    [25]    [26]  "In our constitutional order, a vague law is no law at all."[99] The void-for-vagueness doctrine—a component of due process—"bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' "[100] But a law is unconstitutionally vague only when it fails to specify a standard of conduct "at all"—not when it merely "requires a person to conform his conduct to an imprecise but comprehensible normative standard."[101] In the civil context, the bar is especially high: "[T]he statute must be so vague and indefinite as really to be no rule at all."[102]

Act 358 does not come close to that line. The statute provides that "[a] manufacturer ... shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to,

a pharmacy that is under contract with a 340B entity."[103] It further bars manufacturers **\*547** from "interfer[ing] with a pharmacy contracted with a 340B entity."[104]

PhRMA's vagueness challenge focuses on a single word: "interfere." According to PhRMA, the term is so open-ended that it could "prohibit manufacturers from even asking for information" for audits, thus chilling lawful conduct.

[27] The text forecloses that reading. Under the familiar canon *noscitur a sociis*, a word is "known by its associates."[105] "This canon 'counsels that a word is given more precise content by the neighboring words with which it is associated.' "[106] Here, "interfere" appears alongside "deny, restrict, prohibit"[107]—terms that plainly mean "to refuse to grant, to withhold" (deny),[108] "to limit, to confine" (restrict),[109] and "to forbid by authority or command, to interdict" (prohibit).[110] Read in context, "interfere" targets conduct that obstructs or impedes the acquisition or delivery of 340B drugs to contract pharmacies —not routine communications or lawful auditing practices. While that standard may be "imprecise" at the margins, it is readily "comprehensible."[111] Act 358, therefore, is not unconstitutionally vague.

## VIII

[28]   Finally, we address LPCA's intervention, which we review *de novo*.[112]

[29]   [30]   In each of the three consolidated cases, LPCA moved to intervene—though we address it only in AbbVie's case because the other Plaintiffs do not challenge the intervention. We recognize our "broad policy favoring intervention"[113] and the principle that "[f]ederal courts should allow intervention where no one would be hurt and the greater justice could be attained."[114] Even so, although "Rule 24 is to liberally construed,"[115] the movant still "bears the burden of establishing its right to intervene."[116] LPCA has not met that burden here.

**\*548** [31]   To intervene as of right under Rule 24(a)(2),[117] LPCA must satisfy four requirements:

(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.[118]

[32]   [33]   Here, the fourth prong is dispositive. When a State is already a party, "the applicant for intervention must demonstrate that its interest is in fact different from that of the state and that the interest will not be represented by the state."[119] But an applicant need not show that representation by the State will certainly be inadequate; rather, an applicant satisfies this requirement when it shows that representation of its interests "may be" inadequate.[120] That requirement flows from the settled presumption that, "[i]n a suit involving a matter of sovereign interest, the State is presumed to represent the interests of all of its citizens."[121]

[34]   Only AbbVie opposes LPCA's intervention. It argues that "LPCA's interests are adequately represented by the Attorney General" of Louisiana and that, because LPCA lacks any right to enforce Act 358, it "has no interest" requiring protection. LPCA responds that it is intervening as a defendant, not suing, and that its interests diverge from the State's because Louisiana "has a broad interest in protecting laws that impact the public health of Louisianans," whereas LPCA seeks to protect the business interests of its members. LPCA does not explain why or how its divergent interests would affect the defense of this case.

We rejected similar reasoning in *Hopwood v. Texas.*[122] There, private organizations sought to intervene alongside Texas to defend the State's affirmative-action policy, asserting that their interests were more focused and that the State's broader obligations would dilute its defense. They contended that "the State must balance competing goals," whereas they were "sharply focused on preserving the admissions policy," and that the State therefore was "not in as good a position to bring in evidence" supporting the policy.[123] We disagreed, holding that the proposed intervenors failed to show either that they possessed an interest "that the State w[ould] not adequately represent" or that the State would not "strongly defend its affirmative action program."[124] Critically, they also failed to

demonstrate that they may offer any defense distinct from the one the State intended to present.[125]

**\*549**  The same is true here. LPCA has not shown that it would advance a defense of Act 358 different from Louisiana's. At most, it has shown that it would be an *additional* defender—not a *necessary* one. Under our precedent, that is insufficient where the State is already a party presumed to represent the relevant interests.

Because LPCA failed to satisfy Rule 24(a)(2)'s inadequate-representation requirement, its intervention was improper.

* * *

Accordingly, we AFFIRM summary judgment for Louisiana on all counts and REVERSE the district court's order permitting LPCA to intervene in *AbbVie*'s case.

**All Citations**

166 F.4th 528, 123 Fed.R.Serv.3d 1430

Footnotes

1    *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011) (citations omitted).

2    42 U.S.C. § 256b.

3    *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 639–40 (5th Cir. 2025) (per curiam) (citing 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5) (internal quotation marks omitted)).

4    *See* § 256b(a)(4) (defining covered entity).

5    *Fitch*, 152 F.4th at 640; §§ 256b(a)(5)(A)–(D).

6    *See Astra*, 563 U.S. at 117, 131 S.Ct. 1342 ("Congress vested authority to oversee compliance with the 340B Program in HHS.").

7    *Id.* at 113, 131 S.Ct. 1342.

8    *Id.* at 113, 131 S.Ct. 1342.

9    *Notice Regarding Section 602 of the Veterans Health Care Act of 1992-Contract Pharmacy Services*, 61 Fed. Reg. 43549, 43550 (Aug. 23, 1996).

     "340B drugs" refer to the discounted drugs purchased by covered entities pursuant to 42 U.S.C. § 256b.

10   *Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services*, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010).

11   *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023).

12   *Fitch*, 152 F.4th at 640–641.

13   *Id.* at 641 (quoting *Advisory Op. 20-06 on Contract Pharmacies Under the 340B Program*, 2020 WL 11422965, at *1 (Dec. 30, 2020) (footnote omitted)).

14   *See Sanofi*, 58 F.4th at 703–04; *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024).

15   *Fitch*, 152 F.4th at 641.

16   *See, e.g.*, Ark. Code Ann. § 23-92-604(c) (2021); Miss. Code Ann. § 41-149-1 *et seq* (2024).

17   La. Stat. Ann. § 40:2884 (2023).

*Id.* § 51:1401 *et seq.*

*Id.* § 40:2885.

We note that the Louisiana Primary Care Association (LPCA) moved to intervene in each case, and only AbbVie opposed. The district court granted LPCA's intervention in each case.

*Pharm. Rsch. & Mfrs. of Am. v. Murrill*, Nos. 6:23-CV-1042, 6:23-CV-1307, 2024 WL 4361597, at *15 (W.D. La. Sept. 30, 2024).

*Sheet Pile, L.L.C. v. Plymouth Tube Co., USA*, 98 F.4th 161, 165 (5th Cir. 2024) (quoting *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007)).

*Id.* (quoting Fed. R. Civ. P. 56(a)).

*Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001) (citing *Tex. Refrigeration Supply, Inc. v. FDIC*, 953 F.2d 975, 980 (5th Cir. 1992)).

28 U.S.C. § 1331.

*Planned Parenthood of Hou. & Se. Tex. v. Sanchez*, 403 F.3d 324, 331 (5th Cir. 2005) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.")); *see also New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 330 (5th Cir. 2008) ("[T]he principle articulated in *Shaw*—that a plaintiff who seeks injunctive relief on preemption grounds necessarily presents a federal question—does not apply in a suit exclusively between private parties, in the absence of some showing of state action.").

635 F.3d 796, 803 (5th Cir. 2011) (cleaned up).

*See id.* at 802–04.

*See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *see also Reed v. Goertz*, 598 U.S. 230, 234, 143 S.Ct. 955, 215 L.Ed.2d 218 (2023) ("[T]he *Ex parte Young* doctrine allows suits ... for declaratory or injunctive relief against state officers in their official capacities.") (citing *Young*, 209 U.S. at 159–61, 28 S.Ct. 441)).

*See Elam*, 635 F.3d at 803 (citation omitted).

*See Planned Parenthood*, 403 F.3d at 331 (internal quotations omitted).

U.S. Const. art. VI, cl. 2.

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *see Gibbons v. Ogden*, 22 U.S. 1, 82, 9 Wheat. 1, 6 L.Ed. 23 (1824).

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015).

*Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (cleaned up).

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947).

*Fitch*, 152 F.4th at 646–47.

*Id.* at 645 (internal quotation omitted).

39    *Id.* at 645–48. The operative language of the Mississippi law is nearly identical to that of Act 358. *Compare* Miss. Code Ann. § 41-149-7 (2024), *with* La. Stat. ANN. § 40:2884 (2023).

40    Plaintiffs attempt to cabin *Fitch*'s holding by emphasizing its language that the holding was based on the "specific claims and sparse record" of a preliminary-injunction proceeding. *See id.* at 639. Of course, we recognize the summary-judgment posture here. Even so, we are not only persuaded, but *bound*, by this on-point decision.

41    *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

42    *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (cleaned up).

43    *De Canas v. Bica*, 424 U.S. 351, 357, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

44    *Fitch*, 152 F.4th at 646.

45    *Id.*

46    *Id.*

47    *Id.*

48    *See Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir. 2024), *cert. denied*, —— U.S. ——, 145 S. Ct. 768, 220 L.Ed.2d 272 (2024) (noting "Congressional silence on pharmacies in the context of 340B"); *Sanofi*, 58 F.4th at 703 (describing Section 340B as "silent about delivery" of drugs to patients and contract pharmacies); *Novartis*, 102 F.4th at 460 (describing Section 340B as "silent about delivery conditions").

49    *Fitch*, 152 F.4th at 646 (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (internal quotation marks omitted)).

50    *Id.*

51    *Id.* at 647.

52    *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quotation omitted), *cert. denied*, —— U.S. ——, 144 S. Ct. 557, 217 L.Ed.2d 296 (2024).

53    *Fitch*, 152 F.4th at 647 (emphasis added).

54    *McClain*, 95 F.4th at 1144 (citing *Sanofi*, 58 F.4th at 700).

55    *Fitch*, 152 F.4th at 647.

56    *Id.*

57    In its briefing and during oral argument, AbbVie emphasized § 340B's federal Alternative Dispute Resolution process, maintaining that Act 358 forces "Louisiana courts to answer the same questions as federal ADR panels." But AbbVie's own arguments highlight the flaw in its reasoning. It argues that Act 358 covers enforcement "whenever a manufacturer 'denies, restricts, or prohibits ... acquisition of a 340B drug by, or delivery of a 340B drug' " to a contract pharmacy. *See* La. Stat. Ann. § 40.2884(A). We note that AbbVie omitted the statutory prohibition on "interfere[nce]." *See id.* § 40:2884(B). Other than that, we agree with AbbVie's characterization. What we find surprising is AbbVie's concern that Act 358's enforcement scheme somehow conflicts with "the federal scheme [that] covers claims 'by a covered entity ... that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price.' " *See* 42 C.F.R. § 10.21(a)(1). Act 358 provides the mechanism by which Louisiana can enforce the *delivery* of the 340B drugs to the contract pharmacies. By contrast, the federal scheme allows HHS to enforce covered entities' *ability to purchase* 340B drugs. These are distinct matters.

58    *See Fitch*, 152 F.4th at 647–48 (finding no conflict with the Mississippi law's enforcement scheme because it "does not concern the same subject matter as Section 340B") (cleaned up).

59    *See McClain*, 95 F.4th at 1142–45 (rejecting preemption arguments because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies" and "does not set or enforce discount pricing").

60    La. Rev. Stat. § 40:2884(A).

61    *See Murrill*, 2024 WL 4361597, at *8 (finding Act 358 "does not address the pharmaceutical companies' agreements with HHS or the pricing, diversion, or 'double dipping' restrictions addressed in the HHS[ ] enforcement scheme").

62    *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 606–07, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) (plurality op.).

63    *Id.*

64    *Astra*, 563 U.S. at 115, 131 S.Ct. 1342.

65    *See* U.S. Const. amend. V.

66    *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021).

67    *Id.* (collecting cases).

68    *Id.* at 148, 141 S.Ct. 2063.

69    *Id.* (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

70    *Id.* (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

71    *Fitch*, 152 F.4th at 643.

72    *Id.* (emphasis added). We appreciate AbbVie's point that "[t]he 340B offer is *always* held open to *all* covered entities," so in practice, "there is no period" before the "offer" to a covered entity. But that does not lead to AbbVie's conclusion that Act 358 somehow forces a series of sales at the outset. It simply means Act 358 prevents drug makers from interfering *post*-sale.

73    *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646.

74    *Fitch*, 152 F.4th at 644.

75    *Id.* (describing "the potential for dispensation of Section 340B drugs by contract pharmacies" as "foreseeable").

76    And following *Fitch*, because we reject both the physical and regulatory takings theories, "we need not consider the parties' additional arguments" regarding the voluntary participation doctrine, whether the alleged taking was for a "public use," or whether injunctive relief is available for a regulation that advances a public use. *Id.* at 644 n.4.

77    U.S. Const. art. I, § 10, cl. 1.

78    *Sveen v. Melin*, 584 U.S. 811, 818, 138 S.Ct. 1815, 201 L.Ed.2d 180 (2018) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)).

79    *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 328 (5th Cir. 2022) (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983)).

80    *Id.*

81    *Sveen*, 584 U.S. at 819, 138 S.Ct. 1815.

82    *See id.* (quoting *Allied Structural Steel*, 438 U.S. at 244, 98 S.Ct. 2716).

83    *Id.*

84    *See id.* (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411–12, 103 S.Ct. 697).

85    *See id.*

86    *See* La. Stat. Ann. § 40:2884 (2023).

87    *See Novartis*, 102 F.4th at 460, 464; *Sanofi*, 58 F.4th at 703.

88    438 U.S. at 240, 98 S.Ct. 2716.

89    *Id.* at 249, 98 S.Ct. 2716.

90    And, as the courts in *Novartis* and *Sanofi* concluded, the PPAs *couldn't* contain terms about contract pharmacies—because HHS lacked authority to regulate those entities. *See Novartis*, 102 F.4th at 460, 464; *Sanofi*, 58 F.4th at 703.

91    *Fitch*, 152 F.4th at 646.

92    *See Allied Structural Steel*, 438 U.S. at 249, 98 S.Ct. 2716.

93    *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) (citation omitted).

94    *See id.* at 630–31 (citation omitted).

95    459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

96    *Id.* at 413–14, 103 S.Ct. 697.

97    *Id.* at 416, 103 S.Ct. 697.

98    *See NextEra Energy*, 48 F.4th at 328.

99    *United States v. Davis*, 588 U.S. 445, 447, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019).

100    *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

101    *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

102    *Tex. v. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quoting *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 217 (5th Cir. 2000)).

103    La. Stat. Ann. § 40:2884(A) (2023).

104    *Id.* § 40:2884(B).

105    Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012); *see also Yates v. United States*, 574 U.S. 528, 543, 135 S.Ct. 1074, 191 L.Ed.2d 64 (2015).

106    *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 243 (5th Cir. 2022) (quoting *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)).

107    *See* § 40:2884(A).

108    *Deny*, Webster's New Int'l Dictionary (2d ed. 1939).

AbbVie, Incorporated v. Murrill, 166 F.4th 528 (2026)

123 Fed.R.Serv.3d 1430

109    *Restrict*, Webster's New Int'l Dictionary (2d ed. 1939).

110    *Prohibit*, Webster's New Int'l Dictionary (2d ed. 1939).

111    *See Coates*, 402 U.S. at 614, 91 S.Ct. 1686. We note that the use of "interfer[e]" in § 40:2884(B) likewise clears the void-for-vagueness bar—even though that provision does not mention the neighboring words of "deny, restrict, prohibit." *See* § 40:2884(B). Our precedent requires a statute to provide "a fair and reasonable warning," not "the utmost precision." *Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d 471, 477 (5th Cir. 2020). Section 40:2884(B)'s prohibition on "interfer[ing] with a pharmacy contracted with a 340B entity" does just that.

112    *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994).

113    *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016).

114    *Sierra Club*, 18 F.3d at 1205 (internal quotation marks and citation omitted).

115    *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (citation omitted).

116    *Id.*

117    Fed. R. Civ. P. 24(a)(2).

118    *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (internal quotation marks and citation omitted).

119    *Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994) (citations omitted).

120    *Texas*, 805 F.3d at 661 (citation omitted).

121    *Hopwood*, 21 F.3d at 605.

122    21 F.3d 603, 605 (5th Cir. 1994) (internal citation omitted). LPCA is correct that we have held that "associations representing licensed business owners have a right to intervene in lawsuits challenging the regulatory scheme that governs the profession." *Wal-Mart Stores*, 834 F.3d at 567.

123    *Hopwood*, 21 F.3d at 605.

124    *Id.* at 606 (cleaned up).

125    *Id.* (citation omitted).

---

**End of Document**                        © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ABBVIE INC., et al.** | § | **PLAINTIFFS** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-184-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH** | § | |
| *in her official capacity as the* | § | |
| *Attorney General of the State of* | § | |
| *Mississippi* | § | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER DENYING MOTION [8] FOR PRELIMINARY INJUNCTION

This matter comes before the Court on Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, and Allergan Sales, LLC's (collectively "Plaintiffs") Motion [8] for Preliminary Injunction. Having considered the allegations set forth in Plaintiffs' Complaint [1], the parties' Memoranda [9], [23], [25], and relevant legal authority, and having heard argument at a hearing held on July 12, 2024, the Court will deny the Motion [8].

## I. BACKGROUND

Plaintiffs' Motion [8] asks the Court to enjoin the enforcement of Mississippi's recently enacted "Defending Affordable Prescription Drug Costs Act," 2024 Miss. H.B. 728 ("H.B. 728"), which took effect on July 1, 2024. House Bill 728 concerns a federal program referred to as Section 340B. *See* 42 U.S.C. § 256b. Under Section 340B, pharmaceutical manufacturers who participate in Medicaid and Medicare Part B must offer certain drugs at discounted prices to certain healthcare providers,

1

called "covered entities," that generally provide care for the poor. *See infra*, Part I.A. In essence, H.B. 728 requires manufacturers to deliver drugs ordered through the 340B Program to for-profit pharmacies called "contract pharmacies" with which covered entities have arrangements under which the pharmacy will dispense discounted 340B drugs to the covered entity's patients.

Plaintiffs assert that H.B. 728, in requiring them to deliver 340B drugs to an unlimited number of contract pharmacies, invalidly expands their obligation under federal law to provide discounted drugs to covered entities. *See* Mem. [9] at 13–16. They assert that H.B. 728 is preempted by § 256b, and that it constitutes a per se unconstitutional taking for private use under the Fifth Amendment to the United States Constitution. *See id.* at 13–22. Plaintiffs therefore seek a preliminary injunction to stay the enforcement of H.B. 728. *Id.* at 26. Because they are unable to satisfy the necessary elements for such relief, Plaintiffs' Motion [8] will be denied.

A.     The Section 340B program

Section 340B requires pharmaceutical manufacturers that want the federal government to cover their drugs under Medicaid and Medicare Part B to provide discounts on their drugs to certain healthcare providers. 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5); *see Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). Those healthcare providers are "called '340B' or 'covered' entities," and "include public hospitals and community health centers, many of" which are "providers of safety-net services to the poor." *Astra USA, Inc. v.*

2

54

*Santa Clara Cnty.*, 563 U.S. 110, 113 (2011); *see* Ex. [24-20] at 13–14 (outlining categories of covered entities).  The 340B Program "is superintended by the Health Resources and Services Administration," ("HRSA"), "a unit of the Department of Health and Human Services," ("HHS").  *Astra*, 563 U.S. at 113.

"Drug manufacturers," such as Plaintiffs, "opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement" ("PPA") "used nationwide."  *Id.* These agreements "are not transactional, bargained-for contracts.  They are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS."  *Id.*  PPAs must "require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  § 256b(a)(1).

Through Section 340B, Congress leverages the federal government's subsidization of healthcare—Medicare and Medicaid cover "almost half the annual nationwide spending on prescription drugs," *Sanofi Aventis*, 58 F.4th at 699 (citing Cong. Budget Off., *Prescription Drugs: Spending, Use, and Prices* 8 (2022))—to aid covered entities in their mission to care for low-income Americans, *see id.*  The statute enables covered entities "to give uninsured patients drugs at little or no cost."  *Id.*  Covered entities also obtain "extra revenue from serving insured patients" because "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount."  *Id.* (citing Gov't Accountability Off., *Drug Pricing: Manufacturer Discounts in the 340B Program*

3

55

*Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011)).

As the Supreme Court recently observed, Congress arguably "intended for the 340B program's drug reimbursements to subsidize other services provided by 340B hospitals" because they "perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730, 738 (2022). A federal district court has also discussed how "the purpose of the 340B program was to provide a means to make 340B entities profitable." *Genesis Health Care, Inc. v. Becerra*, No. 4:19-CV-01531-RBH, 2023 WL 7549156, at *1 (D.S.C. Nov. 3, 2023).

According to a House Report on Section 340B, Congress enacted Section 340B in response to pharmaceutical manufacturers increasing prices of drugs to make up for lost revenue after Congress enacted the Omnibus Budget Reconciliation Act of 1990, which created the Medicaid Drug Rebate Program. *Id.* (citing H.R. Rep. No. 102-384(II), at 7–11 (1992)). Congress's goal, as stated in House Report 384(II), was to protect covered entities from such price increases because they "reduced the level of services and the number of individuals that these hospitals and clinics" could serve. *Id.* (quoting H.R. Rep. No. 102-384(II), at 11).

A 1991 House Report on Section 340B specifically noted "sharp increases in drug prices to the" Department of Veterans Affairs. H.R. Rep. No. 102-384(I), at 1 (1991). The Committee on Veterans' Affairs "believe[d] that, absent the enactment of legislation which would result in rolling back prices VA pays for needed

4

pharmaceuticals to levels comparable to those in place prior to [the Omnibus

Budget Reconciliation Act of 1990], veterans [would] suffer." *Id.* at 2. "As

graphically depicted in [House Report 384(I)], the veteran has become the ultimate

and unwitting victim of pharmaceutical companies' circumventing Congress' intent

by raising VA prices to protect their profit margins." *Id.* Following these price

increases:

> the Co[m]mittee received correspondence from many veterans who wrote to complain that they had received "Dear Veteran" letters informing them that as of a specified date their VA medical center would discontinue filling outpatient prescriptions for specified drugs as an economy measure. Some centers responded to the pharmacy budget dilemma which these price increases posed by substituting lower cost drugs for higher cost medications or even by denying outpatient medications to nonservice-connected veterans altogether.

*Id.* at 6. The VA Secretary testified before Congress that, to make up for an

estimated $60 million annual increase in drug acquisition costs per year, the VA

would likely need to "cut programs" and "[c]lose beds." *Id.* at 7.

Congress's goal was that "the 340B program would 'enable [covered entities]

to stretch scarce Federal resources as far as possible, reaching more eligible

patients and providing more comprehensive services.'" *Genesis Health Care*, 2023

WL 7549156, at *1 (quoting H.R. Rep. 102-384(II), at 12) (alteration in original). In

other words, Congress wanted to ensure certain healthcare providers can afford to

provide the care that qualifies an entity to be a covered entity under § 256b. *See*

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract

Pharmacy Services, 61 Fed. Reg. 43,549, 43,549 (Aug. 23, 1996) (hereinafter

"August 1996 Guidance") (discussing how covered entities could "use savings

realized from participation in the program to help subsidize prescriptions for their lower income patients, increase the number of patients whom they can subsidize and expand services and formularies"). Section 256b(a)'s text plainly exhibits that purpose by requiring that manufacturers offer covered entities discounts. *See* § 256b(a)(1)–(4). And by "stretch scarce Federal resources," House Report 102-384(II) presumably referred to the fact that many covered entities are federally funded. *See Genesis Health Care*, 2023 WL 7549156, at *1, *10; H.R. Rep. No. 102-384(II), at 7 ("The purpose of H.R. 2890 is to enable the Department of Veterans Affairs and certain Federally-funded clinics to obtain lower prices on the drugs that they provide to their patients.").[1]

Section 340B contains two provisions that prohibit covered entities from abusing their ability to obtain discounted drugs. Covered entities cannot "resell or otherwise transfer" discounted drugs "to a person who is not a patient of the entity." § 256b(a)(5)(B). Covered entities also cannot obtain "duplicate discounts or rebates," meaning they cannot obtain Medicaid rebates under title XIX of the Social Security Act, *see* 42 U.S.C. § 1396, *et seq.*, for drugs that they purchase at a discount under Section 340B, *see* § 256b(a)(5)(A)(i).

To ensure covered entities do not resell discounted drugs or obtain duplicate discounts, the statute contains an auditing provision. It states:

---

[1] Although a different provision of the same Act specifically addresses prescription drugs acquired by the VA, *see* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 603, 106 Stat. 4943, 4971 (1992); 38 U.S.C. § 8126, the historical context recorded in House Report 384(I) illustrates why Congress provided discounts to covered entities, thus clarifying Congress's purposes and objectives, *see infra*, Part II.B. and note 3.

6

> A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs (A) or (B) with respect to drugs of the manufacturer.

§ 256b(a)(5)(C). And "[i]f the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing," that the covered entity illegally resold discounted drugs or obtained duplicate discounts, "the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . provided under the agreement between the entity and the manufacturer." § 256b(a)(5)(D).

The Secretary can impose additional sanctions. Covered entities that the Secretary finds knowingly and intentionally resold discounted drugs must "pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under [§ 256(a)(5)(D)]." § 256b(d)(2)(B)(v)(I). Where the Secretary finds the covered entity's reselling "was systematic and egregious as well as knowing and intentional," the Secretary can remove the covered entity from the program entirely. § 256b(d)(2)(B)(v)(II).

B.      The dispensation of 340B drugs at contract pharmacies and related litigation

The issue in this case concerns a matter notably absent from the foregoing discussion: how discounted drugs under Section 340B are delivered to patients of covered entities. *See* August 1996 Guidance at 43,549 ("The statute is silent as to permissible drug distribution systems."). Section 340B does discuss distribution,

7

directing the Secretary to "establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution." § 256b(a)(8) (emphasis added). These provisions do not mandate how delivery is to occur. And § 256b(a)(8) does not expressly permit or forbid covered entities to pay for drugs to be delivered or dispensed to patients off their physical premises.

HRSA has attempted to fill the statutory silence about delivery with guidance. Between 1996 and March 2010, HRSA's August 1996 Guidance "acknowledged that section 340B 'is silent as to permissible drug distribution systems,' but it nonetheless sought to fill 'gaps in the legislation' and thereby 'move the program forward.'" *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456–57 (D.C. Cir. 2024) (quoting August 1996 Guidance at 43,549–50). Given that "many covered entities use outside pharmacies to distribute drugs to their patients," HRSA's 1996 Guidance "stated that a covered entity without an in-house pharmacy may contract with a single outside pharmacy to dispense drugs at a single location." *Id.* at 457 (citing August 1996 Guidance at 43,555). The August 1996 Guidance also required that, "in directing shipments to its contract pharmacy," the covered entity "must retain title to the drugs and thus 'be responsible' for any diversion or duplicate discounts." *Id.* (citing 1996 Guidance at 43,553).

The August 1996 Guidance did not conclude that use of a contract pharmacy, in and of itself, constitutes illegal diversion under § 256b(a)(5)(B). *See* August 1996

8

60

**Exhibit 4**

Guidance at 43,549–50 ("If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance."); *see also id.* (explaining how, because "[t]he statute is silent as to permissible drug distribution systems," and "[t]here is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself," that "[i]t is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities"). The August 1996 Guidance responded to extensive comments concerning "[p]otential [d]rug [d]iversion." *Id.* at 43,552. HRSA ultimately concluded that risks of diversion did not warrant precluding covered entities without in-house pharmacies from dispensing 340B drugs that they purchase at a contract pharmacy, and it noted how "[a]lthough some manufacturers expressed concerns regarding the potential for drug diversion, the Department ha[d] received no evidence of diversion that has required an official Departmental investigation." *See id.* at 43,549, 43,552.

HRSA also noted that, while its guidelines would require that "only one site [be] used for" contract pharmacy services, the Office of Drug Pricing ("ODP") would "be evaluating the feasibility of permitting these covered entities to contract with more than one site and contractor." *Id.* at 43,555. The August 1996 Guidance appears to have set forth guidelines in the way of compromise, not an interpretation that the statute's silence about delivery implies a one-pharmacy limit for covered

9

**Exhibit 4**

entities without in-house pharmacies. *See id.* at 43549–50 (referring to its proposal as "guidelines" issued because "there were many gaps in the legislation and some form of program structure was necessary to move the program forward").

In 2010, HRSA decided it was no longer appropriate for its guidelines to limit the number of contract pharmacies that covered entities could use. HRSA's 2010 Guidance took the position that "covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Novartis*, 102 F.4th at 457 (citing Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) (hereinafter "2010 Guidance")). In its view, this Guidance "would permit covered entities to more effectively utilize the 340B program and create wider patient access by having more inclusive arrangements in their communities which would benefit covered entities, pharmacies and patients." 2010 Guidance at 10,273. HRSA also explained how, "[s]ince 2001, covered entities that have wanted to use other types of arrangements, or to blend the method of providing services (e.g. contract pharmacy to supplement an in-house pharmacy)," which would go beyond the August 1996 Guidance, "have needed to apply to the [Office of Pharmacy Affairs] for an Alternative Methods Demonstration Project (AMDP) and secure approval in order to proceed." *Id.* "Upon review of the evidence" it collected from these demonstration projects, "HRSA [did] not find sufficient basis to continue limiting contract pharmacies to a single site." *Id.*

In its 2010 Guidance, HRSA did not change its view that covered entities "must maintain title to and responsibility for the drugs." *Novartis*, 102 F.4th at 457 (citing 2010 Guidance at 10,277). HRSA considered comments following the release of proposed guidelines in 2007, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 72 Fed. Reg. 1,540 (Jan. 12, 2007) (hereinafter "2007 HRSA Notice"), asserting that allowing covered entities to dispense Section 340B drugs through multiple contract pharmacies would enable diversion and duplicate discounts, *see* 2010 Guidance at 10,272–75. But it ultimately decided that covered entities could use multiple contract pharmacies if "they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition," including that "[a]uditable records must be maintained to demonstrate compliance with those requirements." *Id.* at 10,273.

In 2020, many pharmaceutical manufacturers sought to prevent covered entities from using multiple contract pharmacies to dispense Section 340B drugs by implementing policies "limit[ing] the number and kinds of contract pharmacies to which they would ship orders." *Novartis*, 102 F.4th at 458. As Plaintiffs argue in their Memorandum [9], pharmaceutical manufacturers were and remain concerned about the model covered entities and contract pharmacies often use in dispensing and accounting for Section 340B drugs. *See* Mem. [9] at 17–18. Plaintiffs refer to that model as the "replenishment model." *Id.* Put simply, under this model, a contract pharmacy first dispenses prescription drugs to all its customers from one supply of drugs, which it purchased at full price from the manufacturer. *Id.*

11

63

**Exhibit 4**

According to Plaintiffs, the pharmacy—or a third-party administrator—determines whether a customer was a covered-entity patient after it dispenses the drug. *Id.* The pharmacy then informs the covered entity of the quantity of drugs it dispensed to the entity's patients. *Id.* The covered entity then places an order of Section 340B drugs in that quantity as a "replenishment" of the drugs dispensed to covered-entity patients. *See id.*

According to Plaintiffs, sometimes the pharmacies or third-party administrators in fact place the order. *Id.* "Surprisingly, a covered entity might not even be aware that the pharmacy is placing this order as the pharmacy (or its third-party vendor) often places such orders." *Id.* (citing Ex. [8-1] at 7, Scheidler Dec., at ¶ 13). But Plaintiffs have not adduced evidence that anyone but the covered entity ever *pays for* replenishment orders, or that pharmacies nakedly place orders on their own behalf for non-340B purposes.

As the D.C. Circuit recognized, "[m]anufacturers," such as Plaintiffs, "have argued that these arrangements lead to unlawful diversion and duplicate discounts." *Novartis*, 102 F.4th at 458. Under the replenishment model, "[t]he covered entity [and] the pharmacy . . . often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. So, covered entities and contract pharmacies both have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457–58. Conversely, it seems evident that pharmaceutical manufacturers would prefer as few orders of their products be considered discount-eligible as possible.

12

64

**Exhibit 4**

In 2020, in response to manufacturers' policies limiting distribution to contract pharmacies, HHS issued an advisory opinion stating that pharmaceutical manufacturers were *required* to permit Section 340B drugs to be delivered to an unlimited number of contract pharmacies.  *See Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., *Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program* (Dec. 30, 2020), https://perma.cc/L7W2-H597 (hereinafter "2020 Advisory Opinion")).  "HHS reasoned that 340B drugs are 'purchased by' a covered entity no matter how they are distributed," and so, "the 'situs of delivery . . . is irrelevant.'"  *Id.* at 701 (citing 2020 Advisory Opinion at 1–3).  Both the Third and the D.C. Circuits concluded, however, that Section 340B is silent about delivery, and that the federal statute's requirement that manufacturers offer discounts to covered entities did not implicitly permit HHS to mandate that they comply with any delivery practice the covered entities desire.  *See id.* at 703–06; *Novartis*, 102 F.4th at 460–63.

In response, states have begun to impose explicitly what HHS had purported to impose by guidance.  For example, in 2021, Arkansas enacted Act 1103, which "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs," and "prohibits pharmaceutical manufacturers from interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution."  *Pharm.*

13

*Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024) (citing Ark. Code Ann. § 23-92-604(c)).

An association of pharmaceutical manufacturers sought an injunction against enforcement of the Arkansas law on a theory that Section 340B preempts it. *Id.* at 1139–40. The Eighth Circuit disagreed. *Id.* As to field preemption, the Eighth Circuit concluded that "the 340B Program is not so pervasive that Congress left no room for the States to supplement it," given that the statute is "'is silent about delivery' of drugs to patients." *Id.* at 1143 (quoting *Sanofi Aventis U.S. LLC*, 58 F.4th at 703) (other quotation marks and citation omitted). Concerning conflict preemption, because the Arkansas law "does not require manufacturers to provide 340B pricing discounts to contract pharmacies," and "does not set or enforce discount pricing," the Eighth Circuit found that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to the statute's purpose. *Id.* at 1145. In fact, the Eighth Circuit observed that the Arkansas law "assists in fulfilling the purpose of 340B," in that it facilitates the distribution and dispensation of discounted 340B drugs. *Id.*

On April 12, 2024, the Governor of Mississippi signed H.B. 728, which had been enacted by the state legislature. Ex. [22-1] (H.B. 728). House Bill 728 provides that "[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on

14

behalf of the covered entity." H.B. 728 § 4. The law defines a "340B drug" as a covered outpatient drug "that has been subject to any offer for reduced prices by a manufacturer pursuant to [Section 340B]." H.B. 728 § 2(a). A violation of H.B. 728 constitutes a violation of the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*, *see* H.B. 728 § 5, which provides for both civil and criminal penalties and is enforced by Mississippi's Attorney General, *see* Miss Code Ann. §§ 75-24-9 (covering injunctive relief), 75-24-19 (covering civil penalties for violations of injunctions issued under § 75-24-9, and for knowing and willful violations of the statute), 75-24-20 (covering criminal penalties for knowing and willful violations).

C.     Procedural history

On June 18, 2024, Plaintiffs filed a Complaint [1] in this Court seeking a declaratory judgment under 28 U.S.C. § 2201 that H.B. 728 is unlawful and unenforceable. Compl. [1] at 46. They likewise sought temporary, preliminary, and permanent injunctive relief against the Attorney General of Mississippi, enjoining her from enforcing H.B. 728 against Plaintiffs. *Id.* Plaintiffs filed a Motion [8] for Preliminary Injunction on June 19, 2024, arguing that H.B. 728 is preempted under conflict and field preemption, and that it coerces transfers of discounted drugs to private pharmacies such that it amounts to an unconstitutional taking for private use. *See generally* Mem. [9]. Defendant, Mississippi Attorney General Lynn Fitch, ("Defendant") responded on July 8, 2024, Resp. [22]. The Court held a hearing on the Motion [8] on July 12, 2024.

15

**Exhibit 4**

## II. <u>DISCUSSION</u>

A party seeking a preliminary injunction must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction does not issue, (3) that the threatened injury outweighs any harm that will result if the injunction is granted, and (4) that granting the injunction is in the public interest." *Clark v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640–41 (5th Cir. 2023); *see* Fed. R. Civ. P. 65. Factors three and four, "[t]he balance-of-harms and public-interest factors[,] merge when the government opposes an injunction." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "A preliminary injunction is an extraordinary remedy and should be granted only if the movant has clearly carried the burden of persuasion with respect to all four factors." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

Plaintiffs cannot satisfy the first requirement because they have not demonstrated a "substantial likelihood of success on the merits." *Clark*, 74 F.4th at 640. The Court will therefore deny the Motion [8] and need not reach the other elements.

A.      <u>Preemption generally</u>

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the

16

Contrary notwithstanding." Art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012).

When a party raises preemption, "'[t]he purpose of Congress is the ultimate touchstone' of [the] analysis." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)) (other citations and quotations omitted). Preemption may be "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation marks and citation omitted). But the Court cannot "assume[] lightly that Congress has derogated state regulation, but instead [should] address[] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). And "[d]eference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks and citations omitted).

Three categories of preemption exist: "when (1) a federal statute expressly preempts state law," ("express preemption"); "(2) federal legislation pervasively occupies a regulatory field," ("field preemption"); "or (3) a federal statute conflicts with state law," ("conflict preemption"). *Deanda v. Becerra*, 96 F.4th 750, 760–61 (5th Cir. 2024) (citing *Arizona*, 567 U.S. at 398–400). Plaintiffs do not contend that

17

69

Case 1:25-cv-00134-HSO-BWR   Document 112-3   Filed 06/09/25   Page 72 of 263
Case 1:24-cv-00148-HSO-BWR   Document 28   Filed 06/09/24   Page 21 of 46

**Exhibit 4**

the 340B Program expressly preempts Mississippi law.  *See generally* Mem. [9].

Rather, Plaintiffs argue that the 340B Program implicitly preempts Mississippi law

under conflict preemption and field preemption.  *Id.* at 13–19.

B.       Section 340B does not preempt H.B. 728 under conflict preemption

Conflict preemption arises "where 'compliance with both state and federal

law is impossible,' or where 'the state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'"

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quoting *California v. ARC*

*America Corp.*, 490 U.S. 93, 100, 101 (1989)) (other internal quotation marks

omitted).  "In either situation, federal law must prevail."  *Id.*

Plaintiffs do not contend that compliance with both Mississippi and federal

law is impossible.  *See generally* Mem. [9].  So, Plaintiffs must show that the

Mississippi law "produce[s] a result inconsistent with the objective of the federal

statute," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), such that it

"stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress," *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941).  Plaintiffs must

cross "a high threshold" to succeed on such a theory.  *Barrosse v. Huntington*

*Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023) (quoting *Chamber of Com. v. Whiting*,

563 U.S. 582, 607 (2011)), *cert. denied*, 144 S. Ct. 557 (2024).  "Courts may not

conduct 'a freewheeling judicial inquiry into whether a state statute is in tension

with federal objectives [because] such an endeavor would undercut the principle

18

**Exhibit 4**

that it is Congress rather than the courts that pre-empts state law.'" *Id.* (quoting *Whiting*, 563 U.S. at 607) (alteration in original).

In a case like this one, "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda*, 96 F.4th at 761 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). That is because a state law regulating health and safety falls within a state's traditional police powers. *See Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 710, 716 (1985) (holding that a local regulation of blood donation centers, including "donor testing and recordkeeping requirements beyond those contained in the federal regulations," was not preempted because the challenger did not "present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that [was] strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation"); *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 813 (5th Cir. 2011) (discussing how the Court should "begin with the assumption that Congress did not intend to supersede the historic police powers of the states to protect the health and safety of their citizens" (internal quotation marks and citation omitted)).

House Bill 728 plainly falls under the umbrella of a health and safety regulation. It prohibits manufacturers from refusing to deliver Section 340B drugs to contract pharmacies, presumably to maximize covered-entity patients' access to

19

Case 1:25-cv-00134-HSO-BWR   Document 112-3   Filed 06/09/25   Page 74 of 263
Case 1:24-cv-01342-HSO-BWR   Document 112-3   Filed 06/09/24   Page 74 of 263

Exhibit 4

drugs for which the manufacturers have already agreed to provide a discount.  The state statute therefore triggers the presumption against preemption.  *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (plurality opinion of Stevens, J.) (applying "[t]he presumption against federal pre-emption of a state statute designed to foster public health" (citing *Hillsborough Cnty.*, 471 U.S. at 715–18), and rejecting a preemption claim challenging a Maine policy that subjected drug manufacturers' pharmaceuticals to prior authorization procedures before providing state Medicaid coverage for them unless the manufacturers agreed to provide rebates to Maine residents beyond rebates the Medicaid Act provides for); *Wyeth v. Levine*, 555 U.S. 555, 578 (2009) ("[T]he FDA traditionally regarded state law as a complementary form of drug regulation."); *McClain*, 95 F.4th at 1144 (holding that Section 340B does not preempt state law prohibiting manufacturers from precluding covered entities from making dispensation contracts with pharmacies in part because "[p]harmacy has traditionally been regulated at the state level, and we must assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted").

Plaintiffs argue that the law does not trigger this presumption, but the Court is unpersuaded.  *See* Reply [25] at 7.  Plaintiffs cite *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012), but *Lofton* merely states that "whatever value or relevance a presumption against preemption of state tort law should play is uncertain" given its observation that the Supreme Court's "majority

20

72

**Exhibit 4**

opinion in [*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011)] made no reference to the 'presumption' in the course of upholding implied conflict preemption over state law claims for failure to maintain adequate warning labels for FDA-approved generic drugs."  672 F.3d at 378.  *Lofton*'s statements about the scope of the presumption against preemption do not mean that the presumption against preemption no longer applies.

Further, *Lofton*'s note that "the primacy of the state's police powers is not universal" does not alter whether the presumption against preemption applies.  *Id.* *Lofton* discussed state-law tort claims based on fraud on the FDA.  *See id.* at 378–79.  In that context, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."  *Id.* at 378 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).  House Bill 728 does not purport to prohibit fraud on a federal agency.

Plaintiffs also argue that the presumption against preemption does not apply because H.B. 728 "explicitly depends on a federal statute," Section 340B, and "imposes additional terms and conditions on drug manufacturers' 340B arrangements with the federal government."  Reply [25] at 7.  The argument is essentially that, by regulating the delivery of drugs discounted under a federal program, Mississippi is in effect amending a federal regulation, not enacting its own health and safety regulation under its police powers.  But the Fifth Circuit has explained how, even when a given field is "an area of significant federal presence," a

21

73

Case 6:25-cv-00184-HSO-BWR Document 112-3 Filed 06/09/25 Page 76 of 248
Case 1:24-cv-01342-JMC Document 28 Filed 09/23/24 Page 22 of 48

**Exhibit 4**

state law regulating the same subject matter can be "grounded instead in consumer protection, an area traditionally reserved to the States," and thus entitled to the presumption against preemption. *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 236 (5th Cir. 2012).

Notably, the Supremacy Clause's text does not indicate that states cannot regulate by reference to pre-existing federal programs. The Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. This language indicates federal law governs despite a conflict with state law, but not that states lack the power to enact regulations by reference to federal law. *See McCulloch v. Maryland*, 4 Wheat. 316, 361 (1819) ("By this declaration, the states are prohibited from passing any acts which shall be repugnant to a law of the United States."). True, "[s]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress." *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020) (citing *McCulloch*, 4 Wheat. at 436). But the authorities cited show that state laws that do not conflict with the federal law are constitutional.

Applying the presumption against preemption here, the Court does not find that Section 340B exhibits a clear purpose to preempt state laws that would require manufacturers to deliver covered entities' drugs to contract pharmacies for dispensation. Section 340B does not explicitly mandate how delivery of discounted drugs is to occur. *See McClain*, 95 F.4th at 1142 ("[T]he 340B Program 'is silent

22

74

**Exhibit 4**

about delivery' and distribution of pharmaceuticals to patients." (quoting *Sanofi Aventis*, 58 F.4th at 703)).  Section 340B merely requires participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price."  § 256b(a)(1).  And it prohibits the resale of those discounted drugs to anyone "who is not a patient of the entity."  § 256b(a)(5)(B).

Sanofi Aventis and *Novartis* concluded that, under the terms of Section 340B, HHS may not *require* manufacturers to ship drugs intended for covered-entity patients to any contract pharmacy the entity deals with.  *Sanofi Aventis*, 58 F.4th at 703 (concluding that "Section 340B does not require delivery to an unlimited number of contract pharmacies"); *Novartis*, 102 F.4th at 460–63.  But the same "[s]tatutory silence[]," *Sanofi Aventis*, 58 F.4th 699, that does not *implicitly mandate* that manufacturers deliver to any contract pharmacy does not, on the other hand, show that Congress clearly intended to *preclude states* from enacting their own public health regulations aimed at maximizing the availability of low-cost drugs for covered-entity patients, *see McClain*, 95 F.4th at 1145 (concluding that "the delivery of a covered entity's 340B drugs to contract pharmacies for dispensing creates no obstacle" to Section 340B's objectives).  If anything, H.B. 728 arguably promotes Section 340B's objective by ensuring covered-entity patients can conveniently access 340B drugs.  *See id.* at 1144–45 (explaining how Arkansas's prohibition on manufacturers preventing covered entities from contracting with pharmacies for drug distribution "does not create an obstacle for pharmaceutical

23

Case 1:25-cv-00134-HSO-BWR   Document 11-3   Filed 06/09/25   Page 78 of 263
Case 1:24-cv-01342-HSO-BWR   Document 28   Filed 06/09/24   Page 78 of 248
Exhibit 4

manufacturers to comply with 340B, rather it does the opposite: [the law] assists in fulfilling the purpose of 340B").

Even if most covered-entity patients who obtain discounted drugs at contract pharmacies have insurance that reimburses the pharmacy—which passes on the reimbursement to the covered entity, less service and administrative fees, *see* Ex. [24-20] at 19—*some* patients lack insurance and rely on 340B discounts at pharmacies. Plaintiffs cite a study based on an analysis of pharmacy claims data that found 1.4% of contract-pharmacy dispensations of branded 340B drugs were to patients using "340B discount cards," which are cards pharmacies give to uninsured covered-entity patients. Ex. [24-10] at 8–12. On average, patients with these cards received a 92.9% discount. *Id.* at 11. Of other dispensations, 50.8% were paid by Medicaid or Medicare coverage, and 39.0% were paid by commercial insurance. *Id.*

To support its argument that, at least in Mississippi, contract pharmacies benefit patients, Defendant submitted the Declaration of Trenton Deland Lott, Pharm.D., A.C.E., "a Managing Member and co-founder of 340B Together, LLC, which provides management services to 340B covered entities." Ex. [22-7] at 1. He declared that use of contract pharmacies "enables 340B entities to provide medications to needy Mississippians across a wider geographic area than is currently permitted under AbbVie's recently adopted restrictions," which limit covered entities to a single contract pharmacy within 40 miles of the entity. *Id.* at 2. He emphasized how covered-entity patients may struggle to transport themselves to the covered entity's in-house pharmacy or a far-away contract

24

pharmacy, rendering it more difficult for them "to obtain needed pharmaceuticals in a timely fashion." *Id.* He also stated that "[t]he Mississippi 340B hospitals and other covered entities with which [he] work[s] routinely pass on 340B savings to 340B qualified patients without third-party coverage in the form of cash cards to be used when purchasing 340B drugs." *Id.*

The Court does not find, at this juncture, that Plaintiffs have shown that patients do not benefit from contract pharmacies through H.B. 728. Regardless, Congress also intended that Section 340B would incentivize providers to provide certain kinds of care by ensuring they can obtain drugs for their patients at discounted prices. *See Am. Hosp. Ass'n*, 596 U.S. at 730, 738; *Genesis Health Care*, 2023 WL 7549156, at *1 (citing H.R. Rep. 102-384(II) at 12). The history behind the statute illustrates that Congress passed it out of concern for covered entities' margins, and that covered entities' margins affect patient care. *See supra*, Part I.A.

Plaintiffs cite several studies and reports arguing that Section 340B does not sufficiently ensure that covered entities use the margins they obtain through the program to serve patients, and that covered entities focus expansion of services and contract pharmacies in areas mostly inhabited by insured patients to maximize their margins.[2] *See* Ex. [24-3] at 6; Ex. [24-4] at 3; Ex. [24-5] at 2; Ex. [24-6] at 3–5; Ex. [24-7] at 3; Ex. [24-8] at 2–3; Ex. [24-9] at 1–4; Ex. [24-10] at 12; Ex. [24-14] at 8. But criticism of Section 340B's effectiveness in achieving its *own* purposes cannot

---

[2] Plaintiffs included these reports at least in part to argue that enjoining enforcement H.B. 728 will not disserve the public interest. *See Clark*, 74 F.4th at 640–41 (outlining the preliminary injunction factors).

25

Exhibit 4

give rise to a conflict-preemption claim when the state statute is not inconsistent with Section 340B's terms. *See Barrosse*, 70 F.4th at 320 ("Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives [because] such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" (quoting *Whiting*, 563 U.S. at 607)) (alteration in original).

The upshot of Plaintiffs' argument that Section 340B and H.B. 728 conflict is that Congress deliberately left to pharmaceutical manufacturers the discretion to refuse to ship 340B discounted drugs to contract pharmacies simply because it was silent in the statute about delivery. *See* Reply [25] at 8 (citing *Sanofi Aventis*, 58 F.4th at 704; *Novartis*, 102 F.4th at 460). True, federal law can preempt state law when Congress, or a federal agency implementing federal law, makes a policy choice that balances competing objectives in such a way that a state regulation aimed at the same subject matter upsets the balance that the federal government struck. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000). But that is not this case.

In *Geier*, for example, the Court held that a Department of Transportation regulation, FMVSS 208, requiring automobile manufacturers to equip some, but not all, of their 1987 vehicles with passive restraints—such as airbags—preempted state tort law requiring airbags beyond what that regulation required. 529 U.S. at 864–65. But there, the Supreme Court found that "clear evidence of a conflict" existed between state tort law and the regulation. *Id.* at 885. The Court reached this conclusion based on the agency's "contemporaneous explanation" of several

26

**Exhibit 4**

"significant considerations" it had in mind in designing the regulation. *See id.* at 877–81. The regulation "deliberately provided [car manufacturers] with a range of choices among different passive restraint devices," so as to "lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance." *Id.* at 875.

Here, Plaintiffs do not persuasively show, at least at this stage of the proceedings, how H.B. 728 creates a substantial obstacle to Section 340B's purposes, or what consideration Congress had in mind in not addressing delivery of 340B drugs. In other words, there is no clear evidence of an "actual," "significant" conflict. *Id.* at 884–85 (internal quotation marks and citation omitted). House Bill 728 does not require pharmaceutical manufacturers to offer 340B drugs below applicable ceiling prices, expand the definition of what a 340B healthcare provider is, or expand the remedies available to a covered entity when a manufacturer overcharges it for 340B drugs. House Bill 728 prohibits manufacturers from interfering with covered entities ordering delivery of Section 340B drugs to pharmacies for dispensation—something § 256b neither requires nor precludes.

To the extent that delivering discounted drugs to contract pharmacies raises the risk of diversion, Section 340B prohibits diversion and provides for comprehensive enforcement mechanisms. *See supra*, Part I.A. If Section 340B healthcare providers are conspiring with pharmacies to divert discounted drugs, HHS can require the provider to compensate the manufacturer for its losses, § 256b(a)(5), and remove the provider from the program, § 256b(d)(2)(B)(v)(II). The

27

**Exhibit 4**

Court is not prepared to find Section 340B likely preempts H.B. 728 on a theory that Congress's remedial scheme under Section 340B is inadequate to deter violations of federal law. As written, H.B. 728 and Section 340B do not conflict.

Congress also increased enforcement mechanisms against diversion in the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102, 124 Stat. 119 (enacted March 23, 2010), by adding § 256b(d), *id.* at 823–26, which was enacted 18 days after the 2010 HRSA Guidance that advised that covered entities can use an unlimited number of contract pharmacies, Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010). Congress also added several categories of hospitals as covered entities. Pub. L. No. 111-148, 124 Stat. 821–822; 42 U.S.C. § 256b(a)(4)(M)–(O). Thus, Congress was presumably aware of potential risks of diversion through the use of contract pharmacies, and it expanded Section 340B while increasing enforcement against diversion. Yet Congress remained silent about delivery—not to mention about preemption. And while "failures to enact legislation 'are not reliable indicators of congressional intent,'" *Novartis*, 102 F.4th at 462 (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989)), Plaintiffs' argument relies on an inference of preemptive intent from Congress's silence as to delivery, so the Court considers legislative context relevant in interpreting that silence, *see Arizona*, 567 U.S. at 405–406 (discussing policy proposals Congress did not enact in analyzing preemption).[3]

---

[3] Ordinarily, it is the party claiming preemption that will "rely on legislative history to demonstrate

Exhibit 4

In addition, Plaintiffs argue that H.B. 728 "conflicts with" Section 340B's enforcement provisions "by creating its own enforcement scheme entirely separate and apart from federal law."  Mem. [9] at 17.  The Court disagrees: H.B. 728 addresses delivery and Section 340B does not, so adjudications under H.B. 728 will not interfere with federal enforcement of Section 340B's compliance mechanisms.

Plaintiffs further argue that H.B. 728's terms literally require manufacturers to sell drugs at discounts directly to private pharmacies.  Plaintiffs point out how H.B. 728 requires "that '[a] manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, *the acquisition of a 340B drug by*, or delivery of a 340B drug to, *a pharmacy* that is under contract with a 340B entity.'"  Mem. [9] at 17 (quoting H.B. 728 § 4(1)) (Plaintiffs' emphasis and alteration).  Plaintiffs argue that the term "acquisition" means H.B. 728 compels direct sales to pharmacies, not covered entities.

The Court cannot agree.  House Bill 728 defines a "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to use pursuant to 42 USC 256b and is purchased by a covered entity as defined in 42 USC 256b(a)(4)."  H.B. 728 § 2(a).  Incorporating this definition into § 4(1), H.B. 728 prohibits manufacturers from interfering with delivery of drugs "purchased by a

___

Congress" intended to preempt state law by inaction.  *TelTech*, 702 F.3d at 238.  For that reason, Justice Thomas has noted his skepticism of purposes and objectives preemption, arguing that, under it, "the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law."  *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring in the judgment).

Case 1:25-cv-00134-HSO-BWR   Document 28   Filed 06/09/25   Page 84 of 648
Case 1:24-cv-01342-HSO-BWR   Document 112-3   Filed 06/09/24   Page 84 of 648

Exhibit 4

covered entity" to contract pharmacies. *Id.* If the drugs are not purchased by a covered entity, § 4(1) does not apply.

Further, § 4(1)'s terms "should be 'interpreted in [their] statutory and historical context and with appreciation for [their] importance to the [statute] as a whole.'" *Texas v. Biden*, 646 F. Supp. 3d 753, 767 (N.D. Tex. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). The rest of H.B. 728 § 4(1) plainly addresses delivery. Section 4(1) discusses the pharmacy's contract with a 340B entity, confirming that it addresses distribution of drugs, not sale of drugs directly to pharmacies. *See* H.B. 728 § 4(1). And if the Mississippi Legislature meant to use H.B. 728 to require manufacturers to sell drugs at 340B discounts to private pharmacies, it could have straightforwardly borrowed the phrase "shall . . . offer" from § 256b(a)(1), rather than deploy the phrase "deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by . . . a pharmacy under contract with" a covered entity. H.B. 728 § 4(1).

The history behind H.B. 728, *see supra*, Parts I.A.–B., further demonstrates that Mississippi passed the law to fill the gap in Section 340B concerning delivery of Section 340B drugs. HRSA recognized early on how "Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." August 1996 Guidance at 43,549. House Bill 728's broad language is thus reasonably read as ensuring manufacturers

Case 1:25-cv-00134-HSO-BWR   Document 28   Filed 06/09/25   Page 85 of 263
Case 1:24-cv-00184-HSO-BWR   Document 11-3   Filed 09/23/24   Page 31 of 48

**Exhibit 4**

do not craft creative distribution schemes or conditions to avoid providing discounts on 340B drugs.

Further, H.B. 728 states that it should not be construed to conflict with federal law, H.B. 728 § 6, and the Court must apply the presumption against preemption to construe state laws not to conflict with federal law when possible, *see Fox v. Washington*, 236 U.S. 273, 277 (1915) ("So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." (citation omitted)).  The Court will not read H.B. 728 § 4(1) to accidently conflict with federal law.

The Court finally addresses Plaintiffs' argument that H.B. 728 conflicts with § 256b(a)(5)(B) because it compels manufacturers to cooperate with the replenishment model.  *See* Mem. [9] at 17–18; *supra*, Part I.B. (explaining the replenishment model).  Plaintiffs assert that replenishment orders are, in and of themselves, illegal diversion.  *See* Mem. [9] at 17–18.  Plaintiffs' theory is that the covered entity purchases the replenishment supply at the Section 340B discount for delivery to the pharmacy, which places the drugs on its shelf in a commingled supply for dispensation to its next customer, who may be "a person who is not a patient of the [covered] entity."  § 256b(a)(5)(B).

Although that may be true in a literal sense, the Court does not find that the replenishment model constitutes illegal diversion.  As Plaintiffs' Exhibit [24-17], which is a copy of Intervenor Defendant's Reply in Support of Its Motion for

31

83

Summary Judgment in *AbbVie et al. v. Murrill*, No. 6:23-cv-1307-RRS-CBW (April

26, 2024), ECF No. 74, explains:

> Replenishment inventory systems are commonplace. When a
> manufacturer sells drugs through a wholesaler, the drugs shipped to the
> wholesaler are not intended to fill a particular order placed by a
> pharmacy; instead, they supply inventory to the wholesaler that the
> wholesaler then sells to a pharmacy. *See, e.g.*, Robert Handfield,
> Biopharmaceutical Supply Chains 11-13 (2012) (ebook). Even if the
> drugs shipped by the manufacturer to the wholesaler filled an order
> placed by a pharmacy, the drugs would not necessarily be the same
> drugs delivered by the wholesaler to the pharmacy because prescription
> drugs are manufactured in a precise and reproducible manner that
> make them fungible. *See* 21 U.S.C. §§ 360(e), 360eee-1; 21 C.F.R.
> § 207.33.

Ex. [24-17] at 11. Accordingly, it appears that pharmaceuticals distribution often

relies on pharmaceuticals' fungibility to facilitate efficiency. So, Section 340B

presumably contemplates that efficient distribution of fungible drugs to covered-

entity patients might utilize a replenishment model.

Importantly, Section 340B's terms in no way prohibit the use of contract

pharmacies. Section 340B mandates that manufacturers "offer" discounted drugs to

covered entities, § 256b(a)(1), and prohibits covered entities from diverting those

drugs to persons who are not their patients, § 256b(a)(5)(B). While § 256b discusses

distribution options, directing the Secretary to "establish a prime vendor program

under which covered entities may enter into contracts with prime vendors for the

distribution of covered outpatient drugs," and providing, "*If* a covered entity obtains

drugs directly from a manufacturer, the manufacturer shall be responsible for the

costs of distribution," § 256b(a)(8) (emphasis added), § 256b does not mandate how

delivery must occur. HRSA has also taken the position since 1996 that "[i]f [a

32

84

covered] entity directs [a] drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance." August 1996 Guidance at 43,549–43,550. HRSA even noted the following comment and response:

> Comment: As a matter of State law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. As a general rule, a person or entity privileged to perform an act may appoint an agent to perform the act unless contrary to public policy or an agreement requiring personal performance. Restatement of Agency 2d § 17 (1995). Hence, even in the absence of Federal guidelines, covered entities have the right to contract with retail pharmacies for the purpose of dispensing 340B drugs. By issuing guidelines in this area, ODP is not seeking to create a new right but rather is simply recognizing an existing right that covered entities enjoy under State law.

> Response: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion [and duplicate discounts].

*Id.* Given that § 256b's text does not prohibit distribution through contract pharmacies, and that such distribution has long been understood not to constitute diversion, the Court does not find that the replenishment model, which facilitates that distribution, can be undercut by technicality.

All told, the Court concludes that Plaintiffs have not shown a substantial likelihood that they will succeed on the merits of a conflict-preemption claim.

C.      Section 340B does not preempt H.B. 728 under field preemption

The Court is also unpersuaded that Section 340B preempts H.B. 728 under a theory of field preemption. Field preemption requires that Congress has passed such comprehensive legislation in an area that it has "occupied the field." *Arizona*, 567 U.S. at 401. Congress's intent to displace state law can be inferred from its

33

enactment of a federal regulatory scheme "'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* at 399 (quoting *Rice*, 331 U.S. at 230). Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham Cnty., N.C.*, 479 U.S. 130, 149 (1986).

"Field preemption of state law is disfavored." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir. 2024). The Fifth Circuit has emphasized that "Courts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Id.* (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). "And importantly, field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation.'" *Id.* (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

House Bill 728 implicates public health and welfare, a traditional area of state regulation, triggering the presumption against preemption, *see supra*, Part II.B., and rendering inapplicable *Arizona*'s discussion of dominant federal interests, *see Arizona*, 567 U.S. at 399. While H.B. 728 surely regulates in "an area of significant federal presence," that does not preclude the application of the presumption against preemption. *Teltech*, 702 F.3d at 236. Every plausible case of field preemption must involve significant federal regulation. Significant federal

regulation cannot turn traditional areas of state authority into areas dominated by federal interests, *see Arizona*, 567 U.S. at 399, if "field preemption is not to be found where federal 'regulations, while detailed, appear to contemplate some concurrent state regulation,'" *Nat'l Press Photographers Ass'n*, 90 F.4th at 796 (quoting *R.J. Reynolds Tobacco*, 479 U.S. at 149).

Section 340B contemplates concurrent state regulation. The statute does not control how covered entities or manufacturers must deliver discounted drugs to patients of covered entities. *See supra*, Part II.B. Section 340B thus leaves room for states to impose their own regulations on delivery of Section 340B drugs to promote patients' access to their medications. "[M]erely because [Section 340B is] sufficiently comprehensive to meet the need identified by Congress [does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." *Hillsborough Cnty.*, 471 U.S. at 717.

While federal law comprehensively regulates the determination of ceiling prices on Section 340B drugs and provides robust enforcement mechanisms that ensure covered entities and manufacturers comply with the statute's requirements, *see supra*, Part I.A., Congress has not precluded Mississippi from enacting its own policy governing delivery of Section 340B drugs. In fact, as far back as its August 1996 Guidance about dispensation at contract pharmacies, HRSA observed that "[d]uring the early months following enactment, it became clear that there were many gaps in the legislation," demonstrating that the statute is not sufficiently comprehensive to give rise to field preemption. August 1996 Guidance at 43,549.

35

The Court is also not persuaded that field preemption is compelled by *Astra*'s holding that covered entities cannot bring overcharging claims as third-party beneficiaries to PPAs. *See Astra*, 563 U.S. at 117–19. *Astra* rejected an argument that, despite a covered entity's "inability to assert a statutory right of action" under Section 340B itself, "PPAs implementing the 340B Program are agreements enforceable by covered entities as third-party beneficiaries." *Astra*, 563 U.S. at 117. Because PPAs are essentially contracts whereby manufacturers opt into Section 340B, the Court reasoned that "[a] third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself." *Id.* at 118. Accordingly, "[t]he absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead." *Id.*

The Supreme Court's rejection of a right of action for covered entities under PPAs has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs. And *Astra* did not apply any presumption in favor of such a right of action analogous to the presumption against preemption applicable here. *See Arizona*, 567 U.S. at 400 ("In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." (internal quotation marks and citations omitted)). The Court therefore concludes that Plaintiffs have not shown a substantial likelihood of success on the merits of their field preemption claim.

D.      House Bill 728 is not an unconstitutional taking

Plaintiffs next contend that "H.B. 728 effects an unconstitutional taking because it requires drug manufacturers to give their property to other private parties, for free, and not for any recognized public use." Mem. [9] at 3.  The Court disagrees.

1.      The Takings Clause generally

The Takings Clause of the Fifth Amendment, which is "applicable to the States through the Fourteenth Amendment," *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021), provides: "[N]or shall private property be taken for public use, without just compensation," U.S. Const. amend. V.  Takings claims are cognizable as to both personal property, including goods, and real property.  *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015).  A taking can be *per se* or regulatory, both of which entitle the property owner to just compensation.  *Cedar Point Nursey*, 594 U.S. at 147–49.  A *per se* taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it." *Id.* at 147.

A taking can also occur by virtue of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005–06 (1984) (internal quotation marks and citation omitted).  To that end, a regulation constitutes a taking when it "goes too far" in limiting an owner's use of her property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

37

To determine whether a regulation amounts to a taking, courts apply "the flexible test developed in" *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). *Cedar Point Nursey*, 594 U.S. at 148. The *Penn Central* test requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* A regulation that deprives a property owner of "*all* economically beneficial uses" of her property constitutes a regulatory taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019–20 (1992) (emphasis in original) (finding a regulatory taking, and thus requiring just compensation, when enforcement of a "coastal-zone construction ban" rendered beachfront property "valueless").

Regardless of whether the government pays just compensation for a taking, however, property may only "be taken for *public* use." U.S. Const. amend. V (emphasis added). The Supreme Court has held that the phrase "public use" requires that the taking "serve[] a 'public purpose.'" *Kelo v. New London*, 545 U.S. 469, 480 (2005). The Supreme Court has "defined that concept broadly, reflecting [the Court's] longstanding policy of deference to legislative judgments" in redevelopment of property, and in "a purely economic context" as well. *Id.* at 480–82 (citing *Berman v. Parker,* 348 U.S. 26 (1954), *Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229 (1984), and *Monsanto,* 467 U.S. at 1014). While recognizing that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation," *Kelo* upheld a

38

90

taking for economic development by private businesses that included a research facility for Pfizer—a pharmaceutical company—restaurants, and shops. *Id.* at 473–77.

As Plaintiffs point out, both states and the federal government are free to bargain with private parties. When private parties "voluntarily accept responsibilities under" federal law because "they consider it in their best interest to do so," no taking occurs. *Burditt v. U.S. Dep't of Health & Hum. Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991). Under this principle, "[g]overnmental regulation that affects a group's property interests does not constitute a taking of property where the regulated group is not required to participate in the regulated industry." *Id.* (internal quotation marks and citations omitted). To that end, a "state law limiting fees that nursing homes voluntarily participating in Medicaid may charge non-Medicaid patients effects no taking '[d]espite the strong financial inducement to participate in Medicaid.'" *Id.* (quoting parenthetically *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984), *cert. denied,* 469 U.S. 1215 (1985)).

While the principle that no taking occurs in a voluntary exchange appears to exist independently of any *Penn Central* analysis, *see id.*, the Supreme Court has also applied *Penn Central* to determine whether a voluntary exchange with the federal government constituted a taking. In *Monsanto*, the Supreme Court rejected in part a takings challenge to the 1978 amendments to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 61 Stat. 163, *as amended*, 7 U.S.C. § 136,

Exhibit 4

*et seq.* 467 U.S. at 1006–08. The 1978 amendments to FIFRA allowed the Environmental Protection Agency ("EPA") to disclose trade secrets contained in applications for licenses to sell pesticides ten years after the applicant filed its application. *See id.* The Court rejected the takings claim to the extent an applicant was "aware of the conditions under which the data [were] submitted" because "a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking." *Id.*

*Monsanto* framed the issue under the *Penn Central* test. *See id.* at 1005–06. After reciting the *Penn Central* factors, the Court focused on the third one: the statute's "interference with reasonable investment-backed expectations." *Id.* (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83 (1980)). As to submissions of applications after 1978—meaning, those submitted with knowledge of the potential for disclosure of trade secrets contained therein—"the force of [the third] factor [was] so overwhelming" as to be dispositive. *Id.* The Court further concluded that "the conditions [were] rationally related to a legitimate Government interest" in regulating pesticides. *Id.* at 1007.

FIFRA's 1978 amendments also permitted EPA to disclose trade secrets contained in applications submitted before 1978, meaning before any explicit notice of the potential for disclosure. *See id.* at 1008. Because Congress amended FIFRA in 1972 to promise applicants their trade secrets would not be disclosed, *Monsanto* concluded that a taking occurred as to any disclosed trade secrets submitted in applications between 1972 and 1978. *See id.* at 1010–14.

40

Case 1:25-cv-00342-HSO-BWR   Document 11-3   Filed 06/09/25   Page 95 of 263
Case 1:24-cv-01842   Document 28   Filed 06/09/24   Page 54 of 68

**Exhibit 4**

Before the 1972 amendments to FIFRA, however, the statute "was silent with respect to EPA's authorized use and disclosure of data submitted to it in connection with an application for registration." *Id.* at 1008. Notwithstanding that the Trade Secrets Act, 18 U.S.C. § 1905, prohibited federal employees from disclosing trade secrets revealed to them in the course of their official duties, the Court found that "absent an express promise" directed to it—rather than to federal employees— "Monsanto had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA." *Id.* The Court emphasized,

> In an industry that long has been the focus of great public concern and significant government regulation, the possibility was substantial that the Federal Government, which had thus far taken no position on disclosure of health, safety, and environmental data concerning pesticides, upon focusing on the issue, would find disclosure to be in the public interest.

*Id.* at 1008–09.

Conditions for permits cannot go too far, however. The inquiry turns on "whether the permit condition bears an 'essential nexus' and 'rough proportionality' to the impact of the proposed use of the property." *Cedar Point Nursery*, 594 U.S. at 161 (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 386, 391 (1994)). So, the government cannot "hold hostage, to be ransomed by the waiver of constitutional protection," uses of property that are "basic and familiar." *Horne*, 576 U.S. at 366. In *Horne*, the Court concluded that a requirement that raisin growers turn over large portions of their crops to the government in exchange for "the 'benefit' of being allowed to sell" the rest of the raisins constituted a taking. *Id.* Distinguishing

41

*Monsanto*, the Court emphasized that selling produce, unlike selling pesticides, is "not a special governmental benefit that the Government may hold hostage." *Id.*

2.      House Bill 728 does not work an unconstitutional taking for private use

Plaintiffs claim H.B. 728 effects a *per se* taking of their pharmaceutical products for private use. They rely on "the most basic principle of takings law . . . that legislatures may not take property from private party A and give it to private party B." Mem. [9] at 20 (citing *Kelo*, 545 U.S. at 477, and *Midkiff*, 467 U.S. at 245). They claim that H.B. 728 does so because it forces pharmaceutical manufacturers subject to Section 340B to sell their products at discounted rates to private pharmacies. They accordingly assert that "a taking occurs each and every time a drug manufacturer is required, against its own volition, to transfer its drugs at the 340B discount price to a commercial pharmacy for the private benefit of that pharmacy." *Id.* at 24. In arguing that H.B. 728 effects private takings, Plaintiffs contend that "H.B. 728 advances no 'public use' recognized in American law." *Id.* at 21.

Plaintiffs also maintain that "the voluntary participation doctrine" is inapplicable here. *Id.* at 22. They acknowledge that, "[u]nder certain circumstances, voluntarily accepting a government benefit in exchange for giving up property rights can extinguish a takings claim against the government who conferred the bargained-for benefit." *Id.* (citing *Monsanto*, 467 U.S. at 1007). But "[their] participation in *federal* Medicare and Medicaid programs—and the assumption of *federal* obligations under the 340B program—cannot justify the

42

94

separate *state* requirements H.B. 728 seeks to impose" because "Mississippi provides 'no additional benefit' to AbbVie under H.B. 728." *Id.* (quoting *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023)).

First and foremost, the Court does not agree with Plaintiffs' characterization of H.B. 728 as compelling direct, confiscatory sales from them to private pharmacies. *See supra*, Part II.B.  The statute only requires Plaintiffs to offer 340B drugs for purchase by covered entities, § 256b(a)(1), regardless of whether the covered entity will have those drugs delivered and dispensed to its patients at a private pharmacy with which it has an arrangement, *see supra*, Part II.B.  Because H.B. 728 does not compel Plaintiffs to directly sell 340B drugs to pharmacies, it does not cause takings for private use according to Plaintiffs' theory.  Nor is the Court persuaded that the manner of delivery to covered-entity patients can constitute a *per se* taking: Plaintiffs are still only required to sell at 340B discounts to covered entities, and they can still only have drugs dispensed to their patients.

To the extent that H.B. 728's delivery obligation can be conceptualized as a regulatory limit on Plaintiffs' property rights, it is not a taking under *Penn Central*. *Monsanto*, applying *Penn Central* to a voluntary exchange involving the disclosure of trade secrets contained in license applications, found such disclosure was foreseeable even before Congress amended FIFRA to explicitly warn of disclosure. 467 U.S. at 1008.  That states might require Section 340B drugs to be distributed for dispensation at private pharmacies should have been foreseeable to Plaintiffs, as Section 340B has had a well-known "gap" about how delivery must occur since

43

95

Congress enacted it. *See* August 1996 Guidance at 43,549–50 (discussing "gaps" in Section 340B including that it "is silent as to permissible drug distribution systems"). Congress's silence left delivery options open because "a matter not covered is not covered." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) (discussing the *casus omissus* canon).

Plaintiffs rely on HRSA's August 1996 Guidance to show that Section 340B limits dispensation at contract pharmacies, but that Guidance did not purport to find a one-pharmacy limit in the text. HRSA in fact stated that Section 340B contemplates that "various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." August 1996 Guidance at 43,549. HRSA only published "guidelines" in 1996 "to move the program forward," *id.*, and eventually backed off any limit on contract pharmacies after finding "there ha[d] been no evidence of drug diversion or duplicate manufacturer's discounts on 340B drugs in the AMDP program," which permitted use of multiple contract pharmacies and enabled ODP to study their operations, 2007 HRSA Notice at 1,540.

Further, when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500)," such that the potential for contract pharmacy dispensation was foreseeable. August 1996 Guidance at 43,550. While the August 1996 Guidance's "guideline[]" of one contract pharmacy for covered entities without in-house pharmacies is not consistent with H.B. 728, that same Guidance appears to contemplate that state law might protect

44

covered entities' "right" to purchase drugs at 340B prices and have them dispensed at multiple pharmacies. *See id.* (*Comment:* "As a matter of State [agency] law, [covered] entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. . . . *Response:* We agree.").

In "an industry," such as pharmaceuticals, "that long has been the focus of great public concern and significant government regulation," enhanced regulation where Congress was previously silent is foreseeable, which cuts against finding a regulatory taking. *Monsanto*, 467 U.S. at 1008–09. Likewise, because Section 340B does not preempt state laws requiring delivery of 340B drugs to contract pharmacies, *see supra*, Parts II.B.–C., Plaintiffs could have foreseen that states might enact policies favoring dispensation at contract pharmacies as well, *see Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987) ("[I]nvestment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest.").

Further, H.B. 728 is "rationally related to a legitimate Government interest." *Monsanto*, 467 U.S. at 1007. The Mississippi Legislature has evidently determined that dispensation of 340B drugs at contract pharmacies advances public health, which falls squarely within its police powers. *See supra*, Part II.B.

To the extent that dispensation of 340B drugs at contract pharmacies will increase the number of medications for which Plaintiffs must provide discounts, and thus cut into Plaintiffs' profits, "the economic impact of the regulation" is not drastic, *Cedar Point Nursery*, 594 U.S. at 148, and will not deprive Plaintiffs of all

45

economically beneficial use of their products, *Lucas*, 505 U.S. at 1019–20.  Although

a small portion of 340B discounts drop the drug price to a penny under particular

circumstances,[4] "the average discount rate appears to be between 25 and 50

percent," *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F.

Supp. 3d 129, 208 (D.N.J. 2021) *aff'd in part, rev'd in part on other grounds sub*

*nom. Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58

F.4th 696 (3d Cir. 2023); *see* Ex. [24-3] at 6 (discussing the Centers for Medicare and

Medicaid Services's estimated average discount on 340B drugs, 34.7%, which

excludes "'penny-priced' drugs"); Ex. [24-4] at 4 (same).

Even if H.B. 728 effects a taking, the Court also finds that H.B. 728 is not a

private taking, but a taking that "serves a 'public purpose.'"  *Kelo*, 545 U.S. at 480.

The Supreme Court has defined the concept of a public purpose "broadly, reflecting

[its] longstanding policy of deference to legislative judgments."  *Id.*  If condemning

Ms. Kelo's home so that a pharmaceutical company could build a facility served the

public purpose of economic development, then so would facilitating Mississippians'

access to medications for which manufacturers have already agreed to provide a

discount.  *See Sanofi-Aventis*, 570 F. Supp. 3d at 209 ("The 340B Program assists

uninsured patients in affording costly medications and under-resourced providers in

---

[4] *See* Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; New Categories for Hospital Outpatient Department Prior Authorization Process; Clinical Laboratory Fee Schedule: Laboratory Date of Service Policy; Overall Hospital Quality Star Rating Methodology; and Physician-Owned Hospitals, 85 Fed. Reg. 48,772, 48,886–90 (Aug. 12, 2020) (explaining the methodology underlying the estimated 34.7% average 340B discount, when drugs are penny-priced, and why CMS considered penny drugs as outliers in its analysis).

serving more people, decidedly public purposes even if it is also true that contract pharmacies benefit from the Program.").

Plaintiffs seek a preliminary injunction on the theory that H.B. 728 effects a taking for private use, which would be unconstitutional and subject to injunctive relief. *See* Mem. [9] at 20–22. On the other hand, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Monsanto*, 467 U.S. at 1016. Plaintiffs have not moved for a preliminary injunction on a theory that H.B. 728 effects a taking for public use for which just compensation is owed. *See* Mem. [9] at 20–22. So, the Court's conclusion that H.B. 728 serves a public purpose, *see Kelo*, 545 U.S. at 480, is also a sufficient reason to deny Plaintiffs' Motion [8] as to their takings claim.

### III. CONCLUSION

Because Plaintiffs have not shown a substantial likelihood of success on the merits as required to obtain a preliminary injunction, they are not entitled to such relief, and the Court need not address the remaining Rule 65 factors. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008) (declining to address other preliminary injunction factors after finding against the plaintiffs on one such factor). To the extent the Court has not addressed any of the parties' remaining arguments, it has considered them and determined they would not alter the Court's conclusion.

47

**Exhibit 4**

**IT IS, THEREFORE, ORDERED AND ADJUDGED THAT**, Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Aptalis Pharma US, Inc., Pharmacyclics LLC, and Allergan Sales, LLC's Motion [8] for Preliminary Injunction is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 22nd day of July, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

48

ABBVIE, INC. v. FITCH    **635**
Cite as 152 F.4th 635 (5th Cir. 2025)

*BIA's* power to "accommodate special cases" through *sua sponte* reopening. *Iavorski*, 232 F.3d at 131–32. And that is especially true when Congress has displaced whatever discretion we might otherwise have by statutorily limiting second and successive motions to reopen.

Finally, some of our sister circuits conclude that the Due Process Clause requires us to equitably toll the number bar—a conclusion that directly contradicts this court's precedent. The Ninth Circuit, for example, held that a petitioning alien was "denied due process" and entitled to equitable tolling of the number bar because his attorney's ineffective assistance "ultimately" cost him "the opportunity to have his first motion to reopen heard on the merits." *Ray v. Gonzales*, 439 F.3d 582, 588–90 (9th Cir. 2006); *see also Zhao v. INS*, 452 F.3d 154, 158–60 (2d Cir. 2006) (BIA erred when it refused to equitably toll the number bar for a second motion to reopen when the first motion was denied because of ineffective assistance of counsel).

[18, 19]    But our court has held that the Due Process Clause doesn't apply to proceedings involving motions to reopen at all. Indeed, "[t]he decision to grant or deny a motion to reopen is purely discretionary. . . . Even if a moving party has established a prima facie case for relief, an IJ [or the BIA] can still deny a motion to reopen." *Altamirano-Lopez v. Gonzales*, 435 F.3d 547, 550 (5th Cir. 2006) (citing 8 C.F.R. § 1003.23(b)(1)(iv)).[5] So even if Garcia Morin is right that the attorney managing his first motion to reopen was incompetent, he has "no liberty interest at stake" in his motion to reopen "given its entirely discretionary nature." *Garcia-Gonzalez v. Garland*, 76 F.4th 455, 466 (5th Cir. 2023)

(quotation omitted); *see also Finlay v. INS*, 210 F.3d 556, 557 (5th Cir. 2000) ("[T]he denial of discretionary relief does not rise to the level of a constitutional violation."). Garcia Morin's due process argument thus fails.

\*

We hold, as a matter of law, that equitable tolling is unavailable to the INA's number bar. The BIA therefore did not err in refusing to reopen Garcia Morin's removal proceeding. The petition for review is DISMISSED in part and DENIED in part.



ABBVIE, INCORPORATED, a Delaware corporation; Allergan, Incorporated, a Delaware corporation; Durata Therapeutics, Incorporated, a Delaware corporation; AbbVie Products, L.L.C., a Georgia limited liability company; Aptalis Pharma US, Incorporated, a Delaware corporation; Pharmacyclics, L.L.C., a Delaware limited liability company; Allergan Sales, L.L.C., a Delaware limited liability company, Plaintiffs—Appellants,

v.

Lynn FITCH, in her official capacity as the Attorney General of the State of Mississippi, Defendant—Appellee.

No. 24-60375

United States Court of Appeals,
Fifth Circuit.

FILED September 12, 2025

**Background:** Manufacturers subject to price caps for uninsured and low-income

---

**5.** 8 C.F.R. § 1003.23(b)(1)(iv) addresses an IJ's power to deny a motion to reopen. But the BIA also has the discretion to deny a

motion to reopen "even if a moving party has made out a prima facie case for relief." 8 C.F.R. § 1003.2(a).

individuals brought action against Mississippi Attorney General to challenge state statutes prohibiting manufacturers from interfering with covered entities' distribution of such drugs via contract pharmacies. Manufacturers alleged takings and preemption claims and sought declaratory and injunctive relief. The United States District Court for the Southern District of Mississippi, Halil Suleyman Ozerden, Chief Judge, 2024 WL 3503965, denied manufacturers' motion for preliminary injunction. Manufacturers appealed.

**Holdings:** The Court of Appeals held that:

(1) Mississippi statutes did not effectuate physical taking of manufacturers' property;

(2) balance of factors weighed heavily in favor of state on drug manufacturers' claim of regulatory taking;

(3) state statutes were not field preempted; and

(4) they were not conflict preempted.

Affirmed.

**1. Federal Courts ⟞3616(2)**

Decision to grant or deny preliminary injunction lies within discretion of district court and may be reversed on appeal only by showing of abuse of discretion.

**2. Federal Courts ⟞3567, 3603(2)**

Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo.

**3. Injunction ⟞1075, 1572**

Preliminary injunction is extraordinary and drastic remedy which should not be granted unless movant clearly carries burden of persuasion.

**4. Injunction ⟞1092**

To obtain preliminary injunction, movant must establish: (1) substantial likelihood of success on merits, (2) substantial threat of irreparable injury if injunction is not issued, (3) that threatened injury if injunction is denied outweighs any harm that will result if injunction is granted, and (4) that grant of injunction will not disserve public interest.

**5. Injunction ⟞1244, 1246**

Preliminary injunction factors that threatened injury if injunction is denied outweighs any harm that will result if injunction is granted and that grant of injunction will not disserve the public interest merge when the government is a party.

**6. Eminent Domain ⟞81.1**

For a party to have a viable takings claim, it must show that it had a compensable property interest in the property allegedly taken at the time of the alleged taking. U.S. Const. Amend. 5.

**7. Federal Courts ⟞3069(6)**

State law governs what is property interest compensable under Fifth Amendment. U.S. Const. Amend. 5.

**8. Eminent Domain ⟞87**

Manufacturers of drugs for uninsured and low-income individuals had compensable property interest in the drugs under Mississippi law before sales to contract pharmacies, and, thus, as to unsold drugs, manufacturers satisfied requirement for takings claim challenging Mississippi statutes prohibiting manufacturers from interfering with covered entities' distribution of the drugs via contract pharmacies. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**9. Eminent Domain ⟞2.1**

Government effectuates physical taking when it physically takes possession of interest in property for some public purpose. U.S. Const. Amend. 5.

**ABBVIE, INC. v. FITCH**    **637**

Cite as 152 F.4th 635 (5th Cir. 2025)

**10. Eminent Domain ⚖2.29**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies did not effectuate physical taking of manufacturers' property; statutes did not impose positive obligation on manufacturers to directly transfer or sell drugs to anyone or to sell larger quantities of drugs at discounted prices than required and thereby deprive them of sales at full market price, but manufacturers still received payment of full discounted amounts, and statutes simply imposed negative obligation of non-interference with covered entities' arrangements, by preventing manufacturers from refusing to sell drugs to covered entities and from restricting what covered entities could do with purchased drugs. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**11. Eminent Domain ⚖2.1**

Government effectuates a "regulatory taking" when it goes too far in imposing regulations that restrict an owner's ability to use his own property. U.S. Const. Amend. 5.

See publication Words and Phrases for other judicial constructions and definitions.

**12. Eminent Domain ⚖2.1**

To determine whether law effectuates regulatory taking, courts apply flexible test which requires balancing factors such as economic impact of regulation, its interference with reasonable investment-backed expectations, and character of government action. U.S. Const. Amend. 5.

**13. Eminent Domain ⚖2.1**

Inquiry into factors for determining whether a law effectuates a regulatory taking necessarily entails complex factual assessments of purposes and economic effects of government actions. U.S. Const. Amend. 5.

**14. Eminent Domain ⚖2.29**

Balancing economic impact, interference with reasonable investment-backed expectations, and character of government action weighed heavily in favor of state on drug manufacturers' claim of regulatory taking as result of Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies; although statutes could increase number of drugs subject to discounts and cut into profits, manufacturers would still receive large percentage of market price for most drugs, potential for dispensing drugs by contract pharmacies was foreseeable, and statutes furthered important government interests by expanding needy patients' access to care and giving covered entities better ability to improve services. U.S. Const. Amend. 5; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**15. Federal Preemption ⚖13**

Congress may preempt a state law, rule, or other state action through federal legislation, either through express language in a statute or implicitly. U.S. Const. art. 6, cl. 2.

**16. Federal Preemption ⚖6, 9**

Congress may implicitly preempt state law in two ways: field preemption and conflict preemption. U.S. Const. art. 6, cl. 2.

**17. Federal Preemption ⚖24**

Deference to federalism counsels presumption that areas of law traditionally reserved to states are not to be disturbed by federal preemption absent clear and manifest purpose of Congress; in keeping

with this presumption, when there is doubt about preemption, tie goes to state. U.S. Const. art. 6, cl. 2.

**18. Federal Preemption ☞9**

States are precluded from regulating conduct in field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance. U.S. Const. art. 6, cl. 2.

**19. Federal Preemption ☞9**

Intent to displace state law altogether can be inferred from framework of regulation so pervasive that Congress left no room for states to supplement it or where there is federal interest so dominant that federal system will be assumed to preclude enforcement of state laws on same subject. U.S. Const. art. 6, cl. 2.

**20. Federal Preemption ☞9, 10**
   **Municipal, County, and Local Government ☞1752**

Field preemption should not be inferred simply because agency's regulations are comprehensive; comprehensiveness of federal provisions to meet need identified by Congress does not mean that states and localities are barred from identifying additional needs or imposing further requirements in the field. U.S. Const. art. 6, cl. 2.

**21. Antitrust and Trade Regulation ☞458**
   **Federal Preemption ☞56**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies were not field preempted by federal statutes capping prices of covered drugs, controlling eligibility for "covered entity" status, prohibiting duplicate discounts and drug diversion, enforcing compliance with caps and bars, and governing distribution of discounted drugs to covered entities by manufacturers and

third-party wholesalers; Mississippi statutes implicated traditional areas of state regulation and police power, i.e., public health and consumer protection, and Congress expressed no clear and manifest intent to preempt state laws regulating distribution of drugs and role of pharmacies in such distribution. U.S. Const. art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

**22. Federal Preemption ☞7, 8**

"Conflict preemption" applies when compliance with both federal and state regulations is physical impossibility and when challenged state law stands as obstacle to accomplishment and execution of full purposes and objectives of Congress. U.S. Const. art. 6, cl. 2.

> See publication Words and Phrases for other judicial constructions and definitions.

**23. Antitrust and Trade Regulation ☞458**
   **Federal Preemption ☞56**

Mississippi statutes prohibiting drug manufacturers from interfering with covered entities' distribution of drugs for uninsured and low-income patients via contract pharmacies were not conflict preempted by federal statutes capping prices of covered drugs, controlling eligibility, prohibiting duplicate discounts and drug diversion, and governing distribution of discounted drugs; Mississippi statutes did not intrude upon federal enforcement authority since they did not impose penalties for violations of federal statutes, but regulated matters traditionally within domain of states and imposed penalties when manufacturers violated state law by interfering with drug distribution pursuant to covered entities' partnerships with contract pharmacies and did not concern same subject matter as federal law. U.S. Const.

art. 6, cl. 2; Public Health Service Act § 340B, 42 U.S.C.A. § 256b; Miss. Code Ann. § 41-149-1 et seq.

———————

Appeal from the United States District Court for the Southern District of Mississippi, USDC No. 1:24-CV-184, Halil S. Ozerden, Chief Judge

Matthew Scott Owen (argued), Lucas Henry Funk, Meredith Marie Pohl, Kirkland & Ellis, L.L.P., Washington, DC, William Lucien Smith, Sr., Esq., Balch & Bingham, L.L.P., Jackson, MS, for Plaintiffs-Appellants.

Justin Lee Matheny, Esq., Scott G. Stewart (argued), Rex Morris Shannon, III, Esq., Mississippi Attorney General's Office, Jackson, MS, for Defendant-Appellee.

Carey Thompson Jones, Esq., Office of the Attorney General for the State of Louisiana, Baton Rouge, LA, for Amici Curiae State of Louisiana, State of Arkansas, State of Maryland, State of Minnesota, State of Missouri.

Margaret Dotzel, Alyssa Howard, William B. Schultz, Zuckerman Spaeder, L.L.P., Washington, DC, for Amici Curiae American Hospital Association, 340B Health, Mississippi Hospital Association, Rural Hospital Alliance, American Society for Health-System Pharmacists.

Before Elrod, Chief Judge, and Clement and Ramirez, Circuit Judges.

Per Curiam:

Under the federal Section 340B program, drug manufacturers that participate in Medicaid and Medicare Part B must offer certain drugs to healthcare providers ("covered entities") that serve uninsured and low-income individuals at discounted prices. In recent years, drug manufacturers have enacted policies that prevent covered entities from contracting with third-party commercial pharmacies ("contract pharmacies") to distribute these discounted drugs to patients, allegedly to prevent contract pharmacies from improperly distributing the drugs to consumers for profit. But in 2024, to combat such policies, Mississippi enacted H.B. 728, which prohibits drug manufacturers from interfering with covered entities' distribution of Section 340B drugs via contract pharmacies.

Appellants, a group of drug manufacturers that participate in the 340B program (collectively, "AbbVie"), sued the Attorney General of Mississippi, alleging takings and preemption claims and seeking declaratory and injunctive relief from H.B. 728. The district court denied AbbVie's motion for a preliminary injunction.

If H.B. 728 works the way that AbbVie alleges it does—allowing covered entities and contract pharmacies to flout Section 340B's diversion ban by improperly reselling discounted Section 340B drugs—it would undoubtedly be a problematic statute. But on the specific claims and sparse record before us, we cannot say that injunctive relief is appropriate. The district court's denial of a preliminary injunction on this record was not erroneous, so we AFFIRM.

I

A

In 1992, Congress created the Section 340B program to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving these individuals receive crucial subsidies. *See* 42 U.S.C. § 256(b); *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 115, 131 S.Ct. 1342, 179 L.Ed.2d 457 (2011). Section 340B requires drug manufacturers, as a condition of coverage of their products under Medicaid and Medicare Part B, to agree to offer

105

certain drugs to "covered entities" at no more than the statutorily-set "ceiling price." 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1), (5). The list of covered entities includes, *inter alia*, federal-or state-funded hospitals and community health centers that primarily serve low-income patients. *See id.* § 256b(a)(4).

The 340B program places several key restrictions on covered entities. First, it bars "duplicate discounts or rebates," forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. *Id.* § 256b(a)(5)(A). Second, it bars "diversion," providing that a covered entity "shall not resell or otherwise transfer" a discounted drug "to a person who is not a patient of the entity." *Id.* § 256b(a)(5)(B). Third, it requires covered entities to permit the Secretary of Health & Human Services ("HHS") and drug manufacturers to "audit" their records to assess compliance with the duplicate-discount and diversion bans. *Id.* § 256b(a)(5)(C). And fourth, it provides that a covered entity that violates the duplicate-discount or diversion bans "shall be liable" to the drug manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D).

### B

In 1996, four years after Section 340B's enactment, the Health Resources & Services Administration ("HRSA") noted the statute's "silen[ce] as to permissible drug distribution systems" to patients. *See* Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43549, 43549 (Aug. 23, 1996). HRSA therefore issued guidance permitting covered entities lacking an in-house dispensing pharmacy to

contract with a single third-party commercial pharmacy to receive and dispense Section 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion bans. *Id.* at 43550–55.

But in 2010, HRSA changed course, issuing new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients. Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010). Covered entities were quick to take advantage of this, and the number of contract pharmacies partnered with covered entities increased from 1,300 to 23,000 by 2019. *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-212, 340B DRUG DISCOUNT PROGRAM: OVERSIGHT OF THE INTERSECTION WITH THE MEDICAID DRUG REBATE PROGRAM NEEDS IMPROVEMENT 2 (2020). In these partnerships, "the covered entity orders and pays for the 340B drugs, which are then shipped from the manufacturer to the contract pharmacy," and the contract pharmacy then takes physical possession of but not title to the drugs. *Advisory Op. 20-06 on Contract Pharmacies under the 340B Program*, 2020 WL 11422965, at *1 (Dec. 30, 2020).[1]

By 2020, AbbVie and other drug manufacturers sought to combat the proliferation of partnerships between covered entities and contract pharmacies, which they believed "le[d] to unlawful diversion and duplicate discounts." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 458 (D.C. Cir. 2024). Drug manufacturers therefore began to adopt policies that restricted cov-

---

**1.** This is how contract pharmacy partnerships are supposed to work, according to HHS. AbbVie asserts that things work differently in

practice, averring that, in reality, the contract pharmacy often takes title to the drugs.

ered entities' ability to partner with contract pharmacies. AbbVie's contract-pharmacy policy, which essentially follows HRSA's 1996 guidance, permits a covered entity lacking an in-house pharmacy to distribute its Section 340B drugs through only one contract pharmacy, located within 40 miles of the covered entity.

HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies, issuing an advisory opinion in December 2020 stating that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." *Advisory Op. 20-06*, 2020 WL 11422965, at *1. Drug manufacturers took HHS and HRSA to court to challenge this advisory opinion, and several circuits upheld the drug manufacturers' contract-pharmacy policies as consistent with Section 340B. *See Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 704 (3d Cir. 2023); *Novartis*, 102 F.4th at 460. HHS ultimately withdrew the advisory opinion.

### C

Soon after, several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion.

Mississippi enacted H.B. 728, which states that drug manufacturers "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity," nor can they "interfere with a pharmacy contracted with" a covered entity. Miss. H.B. 728 § 4(1)–(2) (2024). H.B. 728 defines a "340B drug" as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. § 256b and is purchased by a covered entity as defined in 42 U.S.C. § 256b(a)(4)."

A manufacturer that violates H.B. 728 is subject to statutory penalties for unlawful business practices under the Mississippi Consumer Protection Act, MISS. CODE ANN. § 75-24-1 *et seq.*, including injunctions, civil penalties, criminal penalties, and restitution or revocation of licenses or certificates to "engage in business" in Mississippi. *Id.* §§ 75-24-9, -11, -19, - 20.

### D

In June 2024, AbbVie, a group of drug manufacturers that participate in the 340B program, sued the Attorney General of Mississippi, challenging H.B. 728 as unconstitutional and seeking declaratory judgment and injunctive relief.

Twelve days before H.B. 728 took effect, AbbVie moved for a preliminary injunction. In its motion, AbbVie contended that: (1) H.B. 728 effectuates an unconstitutional taking of property because it compels AbbVie to transfer its drugs at significant discounts to private, for-profit pharmacies, rather than for a "public use"; and (2) H.B. 728 is preempted by federal law because it expands manufacturers' obligations under the 340B program and brings its own enforcement scheme to bear. The district court denied AbbVie's motion, concluding that AbbVie had not shown a substantial likelihood of success on the merits of its claims and therefore was not entitled to preliminary injunctive relief. AbbVie timely appealed.

**642**          **152 FEDERAL REPORTER, 4th SERIES**

## II

**[1, 2]** "The decision to grant or deny a preliminary injunction lies within the discretion of the district court and may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023), *cert. denied sub nom. Anibowei v. Mayorkas*, ⸺ U.S. ⸺, 144 S. Ct. 551, 217 L.Ed.2d 293 (2024). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018).

**[3–5]** "[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Anibowei*, 70 F.4th at 902. To obtain a preliminary injunction, the movant must establish:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Jones*, 880 F.3d at 759 (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The third and fourth factors "merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

## III

We turn first to AbbVie's takings claim. AbbVie asserts that H.B. 728 effectuates a physical taking, or, in the alternative, a regulatory taking, for private use and without just compensation. We consider AbbVie's physical takings and regulatory takings arguments in turn.

**[6–8]** Although it is possible that H.B. 728 could, as AbbVie asserts, allow covered entities and contract pharmacies to engage in illicit behavior that violates Section 340B, we conclude that, to the extent AbbVie has a compensable property interest in the drugs regulated by H.B. 728,[2] the dis-

---

**2.** We "understand takings analysis to be centered on the deprivation of a former owner's property interest, and not on the accretion of that interest to the government." *United States v. 0.073 Acres of Land*, 705 F.3d 540, 544 (5th Cir. 2013). Thus, for a party to have a viable takings claim, it must show that it had a "compensable property interest" in the property allegedly taken at the time of the alleged taking. *Id.* at 544–45. State law governs "what is a property interest compensable under the Fifth Amendment." *United States v. 131.68 Acres of Land*, 695 F.2d 872, 875 (5th Cir. 1983). Here, it is unclear whether AbbVie has a compensable property interest in all drugs regulated by H.B. 728. The statute defines a "340B" drug as "a drug that has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. 256b and *is purchased by a covered entity* as defined in 42 U.S.C. § 256b(a)(4)." H.B. 728 § 2(a) (emphasis added). The language "is purchased by" could plausibly refer to drugs both before

and after they are purchased by a covered entity.

To the extent H.B. 728 regulates drugs prepurchase, AbbVie has a compensable property interest in the drugs, because it still owns them. *See State v. Murphy*, 202 So.3d 1243, 1251 (Miss. 2016) (en banc) (Mississippi Constitution protects private property). But to the extent H.B. 728 regulates drugs post-purchase, AbbVie may not have a compensable property interest in the drugs, because AbbVie is no longer the drugs' owner after the point of sale. As AbbVie describes, when a covered entity partners with a contract pharmacy, orders for Section 340B drugs are placed with AbbVie using the covered entity's account. After the Section 340B drugs are purchased, AbbVie ships them to the contract pharmacy. *Advisory Op. 20-06*, 2020 WL 11422965, at *1. While AbbVie still has physical custody of the post-purchase drugs until it ships them, we have found no indication that Mississippi law recognizes a compensable property interest in goods that a party temporarily possesses on

ABBVIE, INC. v. FITCH
Cite as 152 F.4th 635 (5th Cir. 2025)

643

trict court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's takings claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

A

[9] The government effectuates a physical taking when it "physically takes possession of an interest in property for some public purpose." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Examples of physical takings include when the government "uses its power of eminent domain to formally condemn property," "physically takes possession of property without acquiring title to it," or "occupies property"—whether on its own behalf or for the benefit of a third party. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–48, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021).

[10] AbbVie has not shown that H.B. 728 effectuates a physical taking of AbbVie's property. The record indicates that H.B. 728 does not impose on drug manufacturers a positive obligation to directly transfer or sell their drugs to anyone. Nor does it require them to sell larger quantities of their drugs at discounted prices than Section 340B requires and thereby deprive them of sales at full market price. Under H.B. 728, AbbVie still receives payment of the full discounted amounts to which it is entitled under Section 340B. H.B. 728 simply imposes on drug manufacturers a negative obligation

of non-interference with covered entities' arrangements with contract pharmacies, by preventing them from refusing to sell Section 340B drugs to covered entities that have arrangements with contract pharmacies and from restricting what covered entities can do with Section 340B drugs after they have purchased them.

Because AbbVie has not shown that H.B. 728 effectuates a physical taking, AbbVie cannot meet its burden of showing a substantial likelihood of success on the merits of this argument.

B

[11–13] The government effectuates a regulatory taking when it "goes too far" in "impos[ing] regulations that restrict an owner's ability to use his own property." *Cedar Point Nursery*, 594 U.S. at 148, 141 S.Ct. 2063 (first quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). To determine whether a law effectuates a regulatory taking, courts apply "the flexible test" announced in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which requires "balancing factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Cedar Point Nursery*, 594 U.S. at 148, 141 S.Ct. 2063. This inquiry "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Yee v. City*

the owner's behalf. To the contrary, Mississippi law might consider AbbVie a bailee with an obligation to transfer the drugs as directed by the covered entity as bailor. *See* Miss. Code Ann. § 75-7-403 (West 2025); *Baggett v. McCormack*, 73 Miss. 552, 19 So. 89, 90 (1896) (recognizing that a bailee has "no legal interest in [property], as against his bailor," but instead only a possessory interest "in the

custody and care of the property" that accords with the bailor's rights as owner). Consequently, it may be the case that because AbbVie does not own the Section 340B drugs after the point of sale, it has no compensable property interest in at least some of the drugs regulated by H.B. 728. We need not decide this question, though, because we conclude that AbbVie's takings claim fails regardless.

*of Escondido*, 503 U.S. 519, 523, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992).

[14]   To the extent the regulatory takings doctrine applies,[3] AbbVie has not shown that H.B. 728 effectuates a regulatory taking under the *Penn Central* test. As to the first factor: H.B. 728 may have an economic impact on drug manufacturers, because it could increase the number of drugs for which they must provide discounts and therefore cut into their profits. AbbVie asserts that it will "face the threat of millions of dollars in forced unnecessary discounts each year." But for most drugs, manufacturers will still receive a large percentage of the market price. *See Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Hum. Servs.*, 570 F.Supp.3d 129, 208 (D.N.J. 2021) ("[T]he average discount rate appears to be between 25 and 50 percent . . . ."), *aff'd in part, rev'd in part on other grounds*, 58 F.4th 696 (3d Cir. 2023).

As to the second *Penn Central* factor: H.B. 728 does not significantly interfere with drug manufacturers' reasonable investment-backed expectations. As the district court remarked, when Congress enacted Section 340B, "only a very small number of the 11,500 covered entities used in-house pharmacies (approximately 500)," meaning that the potential for dispensation of Section 340B drugs by contract pharmacies was foreseeable. Notice Regarding Section 602, 61 Fed. Reg. at 43550. And while HRSA's August 1996 guidance provided a "guideline[ ]" of one contract pharmacy per covered entity without an in-house pharmacy, that guidance nonetheless appears to contemplate that state law might protect covered entities' "right" to

purchase drugs at 340B prices and have them dispensed at multiple pharmacies. *See id.* ("*Comment:* As a matter of State [agency] law, [covered] entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients . . . . *Response:* We agree.").

As to the third *Penn Central* factor: the character of the government action in H.B. 728 weighs in the state's favor. H.B. 728 was not "enacted solely for the benefit of private parties," but rather furthers "important public interests," like expanding needy patients' access to care and giving covered entities better ability to expand and improve their services. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Record evidence shows that restrictive contract-pharmacy policies detrimentally affect patient access and provider offerings.

On balance, the *Penn Central* factors weigh heavily in the state's favor, causing us to conclude that AbbVie has not shown that H.B. 728 effectuates a regulatory taking and that AbbVie therefore has not met its burden of showing a substantial likelihood of success on the merits of this argument.

\* \* \*

In sum, because AbbVie has not met its burden of showing a substantial likelihood of success on the merits of its takings claim, whether on a physical takings or regulatory takings theory, we conclude that the district court did not abuse its discretion in denying AbbVie preliminary injunctive relief on this claim.[4]

---

**3.**  AbbVie asserts that the regulatory takings doctrine does not apply in this case but maintains that if it does apply, H.B. 728 effectuates a regulatory taking and AbbVie still prevails. The district court applied the doctrine and

concluded that H.B. 728 does not effectuate a regulatory taking.

**4.**  Because H.B. 728 effectuates neither a physical taking nor a regulatory taking, we need not consider the parties' additional argu-

ABBVIE, INC. v. FITCH     **645**
Cite as 152 F.4th 635 (5th Cir. 2025)

IV

We turn next to AbbVie's preemption claim. AbbVie asserts that federal law implicitly preempts H.B. 728 under both field preemption and conflict preemption theories. The district court disagreed and denied AbbVie's request for preliminary injunctive relief. We consider AbbVie's field preemption and conflict preemption arguments in turn.

Again, it could be the case that H.B. 728 permits illicit behavior that violates Section 340B. But we conclude, as the district court did, that there is insufficient evidence in the record to support this allegation. Accordingly, we hold that the district court did not abuse its discretion as to AbbVie's preemption claim, because AbbVie has not shown a substantial likelihood of success on the merits of this claim.

A

[15, 16] The Supremacy Clause provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution are "the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Consequently, Congress may "pre-empt a state law, rule, or other state action" through federal legislation, either "through express language in a statute" or "implicitly." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may implicitly preempt state law in two ways: field preemption and conflict preemption.

[17] "Deference to our federalism counsels a presumption that areas of law traditionally reserved to the states . . . are not to be disturbed absent the clear and

manifest purpose of Congress." *In re Davis*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc) (internal quotation marks omitted); *see Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (a "presumption against preemption" applies to "areas of law traditionally reserved to the states"). In keeping with this presumption, when there is doubt about preemption, the "tie goes to the state." *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005).

B

[18, 19] "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013).

[20] Field preemption "should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986). Just because "federal provisions [a]re sufficiently comprehensive to meet the need identified by

ments regarding whether any alleged taking is for a "public use" or whether the voluntary

participation doctrine applies.

Congress d[oes] not mean that States and localities [a]re barred from identifying additional needs or imposing further requirements in the field." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 717, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

[21]    Here, there is no federal framework so pervasive that Congress left no room for state supplementation. Section 340B is a drug pricing program that "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra*, 563 U.S. at 113, 131 S.Ct. 1342; *see* 42 U.S.C. § 256(b), with the intent of supporting "services for low-income and rural communities," *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738, 142 S.Ct. 1896, 213 L.Ed.2d 251 (2022). Section 340B explicitly regulates several key matters: it caps the prices of covered drugs, 42 U.S.C. § 256b(a)(1), (a)(10); controls eligibility for "covered entity" status, *id.* § 256b(a)(4); prohibits covered entities from claiming duplicate discounts and engaging in diversion, *id.* § 256b(a)(5)(A)-(B); enforces compliance with its caps and bars, *id.* § 256b(a)(5)(D), (d)(1)-(3); and governs distribution of discounted drugs to covered entities by manufacturers and third-party wholesalers, *id.* § 256b(a)(8).

But Section 340B does not "provide a full set of standards governing" discounted drugs for needy patients. *Arizona*, 567 U.S. at 401, 132 S.Ct. 2492. Notably, it regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution. *See* Notice Regarding Section 602, 61 Fed. Reg. at 43549–50 (noting "many gaps in the legislation" and that Section 340B "is silent as to permissible drug distribution systems"); *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1144 (8th Cir.) (noting "Congressional silence on pharmacies in the context of

340B"), *cert. denied*, —— U.S. ——, 145 S. Ct. 768, 220 L.Ed.2d 272 (2024); *Novartis*, 102 F.4th at 460 (stating that Section 340B is "silent about delivery conditions"); *Sanofi Aventis*, 58 F.4th at 703 (noting that Section 340B "is silent about delivery" of drugs to patients and "[n]owhere . . . mention[s] contract pharmacies"). As the Third Circuit has pointed out, Congress "knew how to impose delivery-related requirements" and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers. *Sanofi Aventis*, 58 F.4th at 704. But Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, "matters left unaddressed" in an otherwise "comprehensive and detailed" federal regulatory scheme "are presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

Next, there is no dominant federal interest in the area regulated by H.B. 728. H.B. 728 implicates two traditional general areas of state regulation and police power: public health and consumer protection. *See, e.g., Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 325, 136 S.Ct. 936, 194 L.Ed.2d 20 (2016) (noting "the State's traditional power to regulate in the area of public health"); *Castro v. Collecto, Inc.*, 634 F.3d 779, 784–85 (5th Cir. 2011) ("[S]tates have traditionally governed matters regarding contracts and consumer protections . . . ."). Although there are instances in which the Supreme Court has held that federal law preempts state law "even if the state law exercises a traditional state power," that is usually in cases in which a "principal and essential feature" of the federal law is replicated in the state law, indicating that it is a "fundamental area of

ABBVIE, INC. v. FITCH                                    **647**
Cite as 152 F.4th 635 (5th Cir. 2025)

[federal] regulation." *Gobeille*, 577 U.S. at 325–26, 136 S.Ct. 936.[5]

But we have recently reiterated that "[c]ourts should not infer field preemption in 'areas that have been traditionally occupied by the states,' in which case congressional intent to preempt must be 'clear and manifest.'" *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 796 (5th Cir.) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)), *cert. denied sub nom. Nat'l Press Photographers Ass'n v. Higgins*, —— U.S. ——, 145 S. Ct. 140, 220 L.Ed.2d 13 (2024). Here, Congress has expressed no clear and manifest intent to preempt state laws regulating the distribution of drugs to patients and the role of pharmacies in such distribution. Accordingly, applying the presumption against field preemption, we conclude that H.B. 728 is not field preempted.

### C

**[22]**  Conflict preemption applies when "compliance with both federal and state regulations is a physical impossibility" and when the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492 (internal quotations omitted); *see Janvey*, 712 F.3d at 200. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352

(2000). "'Conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Id.* at 380, 120 S.Ct. 2288.

**[23]**  AbbVie raises the latter of the two conflict preemption scenarios, contending that H.B. 728 "stand[s] as an obstacle to" Congress's purposes and objectives under Section 340B, *Arizona*, 567 U.S. at 399, 132 S.Ct. 2492, because it: (1) compels manufacturers to provide their drugs at Section 340B prices to entities other than those specifically enumerated in § 256b(a)(4); and (2) imposes civil and criminal penalties for noncompliance with its provisions.

AbbVie's first argument is simply incorrect. H.B. 728 does not expand Section 340B's list of covered entities to include contract pharmacies. By its plain text, H.B. 728 requires drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients. It does not compel manufacturers to "offer" discounted drugs to contract pharmacies in the way that Section 340B compels them to "offer" these drugs to covered entities.

AbbVie's second argument also fails because H.B. 728's enforcement scheme does not conflict with Section 340B's enforcement scheme. It is true that Congress made HHS the sole enforcer of Section 340B. *See Astra*, 563 U.S. at 120, 131 S.Ct. 1342. But H.B. 728 does not intrude upon this authority because it does not impose penalties for violations of Section 340B,

---

**5.**  For instance, the Supreme Court and this court have recognized that there is a dominant federal interest in certain key areas of public health and consumer protection regulation. *See, e.g., Gobeille*, 577 U.S. at 319–20, 136 S.Ct. 936 (noting that ERISA preempts state laws that have a "reference to" ERISA plans or an impermissible "connection with"

ERISA plans); *Texas v. United States*, 945 F.3d 355, 369–71 (5th Cir. 2019) (noting the Affordable Care Act's displacement of certain state healthcare and consumer protection laws), *rev'd on other grounds sub nom. California v. Texas*, 593 U.S. 659, 141 S.Ct. 2104, 210 L.Ed.2d 230 (2021).

like failing to offer discounted drugs to covered entities or engaging in diversion. Instead, it imposes penalties when drug manufacturers violate H.B. 728 by interfering with the distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies. H.B. 728's enforcement scheme therefore does not "concern[ ] the same subject matter" as Section 340B and cannot be said to conflict with it.

Regardless, as set out above, the presumption against preemption applies here because H.B. 728 regulates matters that have traditionally been the domain of the states. *See Deanda*, 96 F.4th at 761. Applying this presumption, we conclude that H.B. 728 is not conflict preempted.

\* \* \*

Again, we recognize that H.B. 728 could, if AbbVie's allegations are true, have the effect of allowing covered entities and contract pharmacies to engage in illicit activities that flout Section 340B's diversion ban. But on the record before us, we conclude that the district court did not abuse its discretion in denying preliminary injunctive relief as to AbbVie's preemption claim because AbbVie has not proffered sufficient evidence to show a substantial likelihood of success on the merits of this claim.

V

As we understand it, AbbVie's grievance is this: it believes that when covered entities are allowed to distribute Section 340B drugs via contract pharmacies, those contract pharmacies cause covered entities to place orders for larger quantities of discounted drugs than they are actually entitled to, and the contract pharmacies then improperly resell those discounted drugs in ways that increase their profits. AbbVie avers that H.B. 728 has the practical effect of allowing this type of illicit activity to occur.

AbbVie is essentially alleging that the real problem with H.B. 728 is not a *feature* of the law, but rather a *bug*. And on this record, we cannot say that this potential bug in H.B. 728 merits a preliminary injunction. Because AbbVie has not proffered the requisite facts as to either of its claims, the district court did not abuse its discretion in denying AbbVie preliminary injunctive relief. *See Jones*, 880 F.3d at 759.

AFFIRMED.



**GENESIS ENERGY, L.P.; Genesis Energy, L.L.C., Defendants— Appellants,**

**v.**

**DANOS, L.L.C., Defendant—Appellee.**

No. 24-20357

United States Court of Appeals, Fifth Circuit.

FILED September 15, 2025

**Background:** Worker who was injured while transferring from offshore oil and gas platform to vessel brought state court action against company that owned platform, contractor that was hired to repair platform, and owner of vessel. After removal of action, platform owner filed crossclaim against contractor, seeking judgment that contractor was obligated to defend and indemnify platform owner against worker's claims. The United States District Court for the Southern District of Texas, Charles Eskridge, J., 724 F.Supp.3d 673, granted contractor's cross-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ABBVIE INC. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00996-SRC |
| | ) | |
| ANDREW BAILEY, in his official | ) | |
| capacity as Attorney General of the State | ) | |
| of Missouri et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>Memorandum and Order</u>**

The federal government allows AbbVie Inc., a pharmaceutical manufacturer, to participate in Medicaid.  In exchange, federal law requires AbbVie to offer its drugs at discounted prices to healthcare providers serving underserved communities.  Not all those providers have their own pharmacies, so some of them ask AbbVie to deliver the discounted drugs to for-profit, commercial pharmacies with which the providers have contracts.  AbbVie doesn't like that because, it claims, those third-party pharmacies use special accounting and inventory methods to buy drugs at a discount and resell them at a higher price, in violation of federal law.  Last year, Missouri enacted a law that prevents companies like AbbVie from refusing to deliver the discounted drugs to these pharmacies.  AbbVie sued various state officials to enjoin enforcement of the law.  Missouri moves to dismiss for failure to state a claim and failure to join necessary parties, and two organizations of healthcare providers move to intervene.  But because AbbVie only alleges injuries stemming not from the Missouri law at issue but from violations of federal law—which violations AbbVie does not ask the Court to

115

address—the complaint fails to adequately allege standing.  Thus, the Court does not reach the

merits of either motion.

## I.       Background

### A.       Section 340B

Section 340B of the Public Health Service Act (codified at 42 U.S.C. § 256b) "imposes

ceilings on prices drug manufacturers may charge for medications sold to specified health-care

facilities."  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).  Section 340B

requires the Secretary of the United States Department of Health and Human Services to "enter

into an agreement with each manufacturer of covered outpatient drugs."  42 U.S.C. § 256b(a)(1).

Manufacturers include entities engaged in the production of prescription drugs.  42 U.S.C.

§ 1396r-8(k)(5)(A).  Whether a drug qualifies as a "covered outpatient drug" depends on whether

the drug satisfies a complex, and, for purposes of the pending motions, irrelevant, statutory

definition.  *See* 42 U.S.C. § 1396r-8(k)(2).  As part of the deal with HHS (which has delegated

its authority to the Health Resources and Services Administration (HRSA)), *see Astra*, 563 U.S.

at 113–14, manufacturers must "offer each covered entity covered outpatient drugs for purchase

at or below" a price ceiling, 42 U.S.C. § 256b(a)(1).  Long story short, section 340B requires

pharmaceutical manufacturers that participate in Medicaid to offer drugs at discounted prices to

certain entities called "covered entities."

Section 340B defines "covered entity" to include fifteen subsets of healthcare providers.

*See* 42 U.S.C. § 256b(a)(4).  Federally qualified health centers, Native Hawaiian health centers,

black-lung clinics, some children's hospitals, and a host of other providers qualify as covered

entities.  *See id.*

2

Through two provisions, section 340B restricts covered entities from abusing their access to discounted drugs.  First, a covered entity—which is the only type of entity qualified to receive 340B discounts, *see* 42 U.S.C. § 256b(a)(1)—may not "resell or otherwise transfer" a drug for which it obtained a discount to anyone "who is not a patient of the [covered] entity," 42 U.S.C. § 256b(a)(5)(B).  This operates as a no-resale provision.

Second, if the covered entity obtains a drug through section 340B, the covered entity may not request payment for medical assistance with respect to that drug if the same drug is subject to the payment of a Medicaid rebate.  42 U.S.C. § 256b(a)(5)(A)(i).  "Medical assistance" includes Medicaid payments for "part or all of the cost" of prescription drugs, i.e. a subsidy.  42 U.S.C. §§ 1396d(a), 1396d(a)(12).  To have its drugs covered by Medicaid, a manufacturer must agree to pay a rebate to the state Medicaid plan determined by the number of drug units that the plan covers.  *See* 42 U.S.C. §§ 1396r–8(a)(1), 1396r–8(b)(1)(A), 1396r–8(c)(1)(A).  To tie it all together, if a manufacturer pays a Medicaid rebate for a drug, then a covered entity cannot obtain from the manufacturer a 340B discount for the same drug.  *See Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023) (noting that "covered entities cannot get the 340B discount on drugs already subject to a Medicaid rebate" (citing 42 U.S.C. § 256b(a)(5)(A)(i)).  This operates as a no-double-discount provision.

Section 340B provides a number of avenues to ensure compliance and resolve disputes among HRSA, manufacturers, and covered entities.  For one, a covered entity must permit HRSA and manufacturers to audit the "records of the entity that directly pertain to the entity's compliance with the requirements" of section 340B.  42 U.S.C. § 256b(a)(5)(C).  And section 340B provides for an administrative-dispute-resolution process to resolve claims of

3

117

Exhibit 4

manufacturers' overcharging and of covered entities' violations of the no-resale and no-double-discount provisions. *See* 42 U.S.C. § 256b(d)(3).

To opt into the 340B program, manufacturers must enter into a "form contract" with HHS called the Pharmaceutical Pricing Agreement (PPA). *Astra*, 563 U.S. at 115; *see also* 58 Fed. Reg. 27,289, 27,289 (May 7, 1993). Neither section 340B nor the PPAs require manufacturers to transfer 340B drugs to anyone besides covered entities. *See generally* 42 U.S.C. § 256b; *see also Astra*, 563 U.S. at 113 (describing PPAs as "uniform agreements that recite the responsibilities [section] 340B imposes, respectively, on drug manufacturers and the Secretary of HHS").

## B. Contract pharmacies

### 1. Legal framework

As described above, only covered entities may obtain discounted drugs under section 340B. But what happens when, as is often the case, a covered entity doesn't have a pharmacy of its own? In 1996, HRSA issued a notice stating its position that a covered entity that lacks an on-site pharmacy may, without violating section 340B, have an outside pharmacy receive and dispense 340B drugs on the covered entity's behalf:

> [Section 340B] is silent as to permissible drug distribution systems. There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities.
>
> It has been [HHS's] position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price. If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance. However, the entity must comply, under any distribution mechanism, with the statutory prohibition on drug diversion.

4

61 Fed. Reg. 43,549, 43,549–43,550 (Aug. 23, 1996).  These outside pharmacies are referred to as "contract pharmacies."  HRSA envisioned that "[t]he contract pharmacy would act as an agent of the covered entity, in that it would not resell a prescription drug but rather distribute the drug on behalf of the covered entity."  *Id.* at 43,550.

In 2010, HRSA issued new guidance.  This time, HRSA stated that it would permit covered entities to use *multiple* contract pharmacies "as long as [the covered entities] comply with guidance developed to help ensure against diversion and duplicate discounts."  75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).  And HRSA clarified that "[t]he covered entity has, and continues to bear, full responsibility and accountability for compliance with all requirements to prevent diversion of covered drugs to individuals other than patients of the covered entity."  *Id.*

## 2.    AbbVie's factual allegations

AbbVie alleges the following about the on-the-ground use of contract pharmacies.  "Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 4,228% between 2010 and 2020."  Doc. 1 at ¶ 54.  Contract pharmacies "are predominantly large commercial pharmacy chains" that "do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities."  *Id.* at ¶ 57.  Contract pharmacies use one of two inventory models to track sales of 340B drugs:  (1) pre-purchased inventory or (2) replenishment.  *Id.* at ¶ 58.

Under the pre-purchased-inventory model, the contract pharmacy keeps 340B drugs in stock at the pharmacy.  *Id.* at ¶ 59.  When the covered entity's patient comes to the pharmacy to get a prescription filled, the pharmacy fills it with drugs from the 340B stock.  *Id.*  But "few

contract pharmacies use the pre-purchased inventory model," because most use the replenishment model instead.  *Id.* at ¶¶ 59–60.

AbbVie alleges the following about the replenishment model.  "Under the replenishment model, no 340B purchased drugs are kept in stock at the contract pharmacy."  *Id.* at ¶ 60. "Instead, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities."  *Id.*  "After a sufficient quantity of a particular drug is dispensed, the covered entity orders additional quantities of that drug at the federal 340B price [to] be transferred to the contract pharmacy to 'replenish' the non-340B drugs dispensed by the contract pharmacy on the covered entity's behalf."  *Id.* (citation omitted).  Thus, the contract pharmacy, or a third-party administrator with which it contracts, determines which sales qualified for 340B prices "at the back end, well after a drug has been dispensed."  *Id.* at ¶ 61.  In theory, if the contract pharmacy accurately tracks which dispensations qualify for 340B treatment, then "the post-sale determination may be able to calculate how many 340B drugs AbbVie must sell."  *Id.* at ¶ 63. But AbbVie alleges that in practice, contract pharmacies and their third-party administrators "use their own distorted criteria to mark otherwise 340B-ineligible sales as deserving the federally mandated low prices."  *Id.* at ¶ 64.  And as a result, contract pharmacies can instruct covered entities "to place orders of additional quantities of drugs at the discounted 340B price to 'replenish' their general inventories that they will use to supply non-340B eligible sales."  *Id.*

AbbVie alleges that, due to the expansion in the use of contract pharmacies, abuses of the 340B program have skyrocketed.  Although section 340B prohibits covered entities from transferring drugs to persons who aren't their patients, "contract pharmacies take title to the drugs" that covered entities obtain through the 340B program.  *Id.*  And "[a]t no point in time

6

120

does a covered entity take title to the drugs." *Id.* (citation omitted). "AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the contract pharmacy acts at the direction of a principal covered entity." *Id.*

AbbVie alleges that when contract pharmacies and covered entities obtain extra drugs at 340B prices, they "share in the 'spread' generated by selling the drugs at higher prices to pharmacy customers." *Id.* at ¶ 65. "For-profit, commercial pharmacies thereby obtain significant profits from selling [at a higher price] the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices." *Id.*

Disillusioned by the section 340B abuses, some manufacturers, including AbbVie, have taken matters into their own hands. *See id.* at ¶¶ 73–79. AbbVie implemented a policy that it will not tolerate covered entities' requests to transfer 340B drugs to an unlimited number of contract pharmacies. *Id.* at ¶ 74. "Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy is to only take orders for direct delivery to the in-house pharmacy." *Id.* at ¶ 75. And "if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, it is permitted to designate one contract pharmacy located within 40 miles of the HRSA[-]registered covered[-]entity parent site." *Id.*

Policies like AbbVie's have provoked litigation between manufacturers and HHS. Two federal courts of appeals have held that similar delivery restrictions comply with the manufacturers' obligations under section 340B. *See Sanofi*, 58 F.4th at 706; *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 464 (D.C. Cir. 2024).

7

## C.    S.B. 751

Missouri enacted S.B. 751 (codified at Mo. Rev. Stat. § 376.414) in response to *Sanofi*

and *Novartis*.  Doc. 1 at ¶ 11–12.  S.B. 751 says, in relevant part:

> A pharmaceutical manufacturer, third-party logistics provider, or an agent or
> affiliate of such pharmaceutical manufacturer or third-party logistics provider shall
> not deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B
> drug by, or delivery of a 340B drug to, a pharmacy that is under contract with, or
> otherwise authorized by, a covered entity to receive 340B drugs on behalf of the
> covered entity unless such receipt is prohibited by the United States Department of
> Health and Human Services.

Mo. Rev. Stat. § 376.414.2.  S.B. 751 defines "340B drug" as "a drug that:  (a) [i]s a covered

outpatient drug within the meaning of [s]ection 340B . . . (b) [h]as been subject to any offer for

reduced prices by a manufacturer under 42 U.S.C. [s]ection 256b(a)(1); and (c) [i]s purchased by

a covered entity."  Mo. Rev. Stat. § 376.414.1(1).  S.B. 751's definition of "covered entity"

matches the definition supplied by section 340B.  Mo. Rev. Stat. § 376.414.1(2); *see* 42 U.S.C. §

256b(a)(4).

## D.    AbbVie's complaint

AbbVie and related companies sued the Missouri Attorney General and the president,

vice president, and three members of the Missouri Board of Pharmacy, all in their official

capacities, in July 2024.  Doc. 1.  AbbVie sought a declaratory judgment that S.B. 751 is invalid

and an injunction to restrain Missouri from enforcing the law.  Doc. 1 at 43–44 (The Court cites

to page numbers as assigned by CM/ECF.).  In its complaint, AbbVie argued that S.B. 751 runs

afoul of four higher laws:  (1)  the Takings Clause of the Fifth Amendment to the United States

Constitution, *see id.* at ¶¶ 110–18, (2) the Takings Clause of article I, section 28 of the Missouri

Constitution, *see id.* at ¶¶ 119–21, (3) the Supremacy Clause of article VI, clause 2 of the United

States Constitution, *see id.* at ¶¶ 122–31, and (4) the so-called "dormant" Commerce Clause of the United States Constitution, *see id.* at ¶¶ 132–38.

### E.      Missouri's Motion to Dismiss

In September 2024, Missouri moved to dismiss AbbVie's claims.  Doc. 32.  Missouri moves to dismiss each of AbbVie's claims for failure to state a claim upon which relief can be granted.  *Id.* at 1.  And Missouri moves to dismiss the first two claims for failure to join necessary parties.  *Id.*

### F.      Intervenors' Motion to Intervene and Motion to Dismiss

Fifteen days after Missouri moved to dismiss, the Missouri Hospital Association and the Missouri Primary Care Association (collectively "Movants") filed a Motion to Intervene and a Motion to Dismiss of their own.  *See* docs. 46–47.  Movants allege that their members "participate in the 340B [p]rogram and rely on contract pharmacies to meet the needs of their patients and communities."  Doc. 46 at 3.  Missouri did not oppose Movants' Motion to Intervene, but AbbVie did.  *See* doc. 72.

### G.      Oral argument

After the pending motions ripened, the Court scheduled oral argument.  Doc. 80.  The Court ordered the parties to come prepared to discuss not only the merits of the pending motions but also "whether AbbVie's complaint adequately alleges an Article III injury in fact" and "[t]o the extent that AbbVie's complaint adequately alleges an injury in fact, whether AbbVie's complaint adequately alleges that its injury is fairly traceable to Missouri's enforcement of S.B. 751 rather than to abuses of the 340B drug-pricing program."  *Id.* at 2.

In April 2025, the Court heard oral argument.  Doc. 84.  At the end of the argument, the Court ordered AbbVie and Missouri to submit supplemental briefs on the standing issues that the

9

Court raised, which the parties filed. *See* doc. 88, Oral Arg. Tr. at 78:21–79:9; docs. 89–90. Having thoroughly reviewed AbbVie's complaint, the oral-argument transcript, and the supplemental briefs, the Court rules as follows.

## II.    Standard

"Article III of the Constitution limits the jurisdiction of the federal courts to cases or controversies." *In re SuperValu, Inc.*, 870 F.3d 763, 767–68 (8th Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016)). "A plaintiff invoking the jurisdiction of the court must demonstrate standing to sue by showing that she has suffered an injury in fact that is fairly traceable to the defendant's conduct and that is likely to be redressed by the relief she seeks." *Id.* (citing *Spokeo*, 578 U.S. at 337). "To establish an injury in fact, a plaintiff must show that her injury is '"concrete and particularized" and "actual or imminent, not conjectural or hypothetical."'" *Id.* (quoting *Spokeo*, 578 U.S. at 339). "An injury is fairly traceable if the plaintiff shows 'a causal connection between the injury and the conduct complained of' that is 'not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

"Standing . . . is a jurisdictional requirement, and thus 'can be raised by the court sua sponte at any time during the litigation.'" *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156–57 (8th Cir. 2008) (quoting *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir. 2004)). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing. *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). The Court "accept[s] as true the factual allegations in the complaint[] but give[s] 'no effect to conclusory allegations of law.'" *In re Polaris Mktg., Sales*

*Pracs., & Prods. Liab. Litig.*, 9 F.4th 793, 796 (8th Cir. 2021) (quoting *Stalley ex rel. United*

*States v. Cath. Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007)).

### III.    Discussion

#### A.      Article III standing

In its supplemental brief, AbbVie characterizes its alleged injury as economic:

> AbbVie has adequately alleged its injuries flow from the additional 340B sales that
> S.B. 751 compels. . . . AbbVie's injury is concrete and particularized because S.B.
> 751 bans AbbVie's contract-pharmacy policy and compels it to complete sales it
> otherwise would not.  AbbVie, through terms it lawfully includes in its 340B
> transactions, reasonably limits covered entities to in-house pharmacies or one
> designated contract pharmacy for purposes of accessing the 340B price.  And to be
> clear, AbbVie's policy does not limit the number of discounted units available for
> sale.  Covered entities can still obtain as many 340B-priced drugs as they need.
> However, S.B. 751 leads to a higher number of discounted transactions not because
> AbbVie imposes any cap, but because the statute expands the number of contract
> pharmacies that can receive 340B-priced drugs.  With more pharmacies comes
> more orders and more compelled discounted sales—transactions that would not
> have occurred but for the Missouri law.  S.B. 751 expressly protects the expansion
> of the pool.  And, without S.B. 751, AbbVie's policy would have remained in
> effect—those discounted transactions would not have occurred.

Doc. 90 at 5– 6 (citations omitted).  At oral argument, though, AbbVie attempted to characterize

its injury differently, as a matter of property rights rather than economic loss:

> To be clear, AbbVie alleges that it is injured by S.B. 751, not as a matter of an
> economic injury but because it affects [sic] a per se taking.  I suppose in the end
> that could have an economic effect, but actually the injury that AbbVie alleges is
> that it is dispossessed of its chattels . . . .  [I]ts physical drugs are transferred through
> the covered entity/contract pharmacy arrangement, back to contract pharmacies
> who can then sell them at full price and keep some of that profit spread.

Doc. 88, Oral Arg. Tr. at 18:25–19:8.  But both theories remain essentially the same:  AbbVie

argues that S.B. 751 requires it to provide more discounted drugs than AbbVie would be required

to provide absent S.B. 751, and thus, AbbVie concludes, S.B. 751 causes AbbVie financial loss.

Financial loss doubtless qualifies as an Article III injury in fact.  *See, e.g.*, *Muff v. Wells*

*Fargo Bank NA*, 71 F.4th 1094, 1103 (8th Cir. 2023) (holding that the estate had standing

because it "assert[ed] a classic monetary injury to Joseph's personal account at Wells Fargo");

*Biden v. Nebraska*, 600 U.S. 477, 490 (2023) (finding injury in fact based on "financial harm").

But AbbVie's mere labelling of S.B. 751 as a "per se taking" does not. *See Polaris*, 9 F.4th at

796 (holding that courts must "give 'no effect to conclusory allegations of law'" when

determining whether a plaintiff has adequately alleged Article III standing (quoting *Stalley*, 509

F.3d at 521). Thus, the Court must determine whether, based on the factual allegations in the

complaint, AbbVie's alleged financial loss is fairly traceable to Missouri's enforcement of S.B.

751.

The gravamen of AbbVie's complaint is that its contract-pharmacy policy "address[es]

abuses of the 340B program by covered entities and contract pharmacies." Doc. 1 at ¶ 77. So

framed, the Court must then address the question of what 340B "abuses" does AbbVie seek to

address? AbbVie identifies only one in its complaint—the transfer of title of discounted 340B

drugs from AbbVie to contract pharmacies *through the replenishment model. See, e.g.*, doc. 1 at

¶ 5 ("Instead of serving the covered entities' uninsured and low-income patients, the for-profit

contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to

patients (including indigent patients) at full price, and pocket the difference. Contract

pharmacies accomplish this arbitrage through . . . the 'replenishment model,' . . . ."); *id.* at ¶ 57

("Contract pharmacies are not 'agents' of the covered entities; they are merely business

partners."); *id.* at ¶ 64 ("Significantly, *as a result of such replenishment*, contract pharmacies

take title to the drugs they purchase from manufacturers, either through covered entities or on

their own behalf. At no point in time does a covered entity take title to the drugs under this

model." (emphasis added)); *id.* ("AbbVie is also not aware of any instance where a contract

pharmacy or covered entity represents that an agency relationship exists between them such that

12

126

the contract pharmacy acts at the direction of a principal covered entity."); *id.* at ¶ 68 ("Because

contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as

drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities

for unlawful distributions to ineligible patients increases, ***allowing covered entities and contract***

***pharmacies to profit from the diversion that Congress intended to prohibit***." (emphasis

added)); *id.* at ¶ 107 ("[S.B. 751] effects a repeated and ongoing mandatory private wealth

transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the

private benefit of that pharmacy and for no recognized public use, in violation of the United

States' Constitution.").

The federal 340B statute does not require AbbVie to transfer the title of discounted drugs

to contract pharmacies (which, AbbVie alleges, "do not themselves qualify as covered entities,"

*id.* at ¶ 57).  Only covered entities can purchase 340B drugs from drug manufacturers.  42 U.S.C.

§ 256b(a)(1) (discount applies to drugs "purchased by a covered entity").  And section 340B

*prohibits* covered entities from transferring title of discounted drugs to anyone except their own

patients.  *See* 42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is

subject to an agreement under this subsection, a covered entity shall not resell or otherwise

transfer the drug to a person who is not a patient of the entity.").

The very HRSA notices that *allow* the use of contract pharmacies clarify that contract

pharmacies may not themselves take title to the discounted drugs.  *See* 61 Fed. Reg. at 43,549–50

("If the [covered] entity directs the drug shipment to its contract pharmacy, we see no basis on

which to conclude that section 340B precludes this type of transaction or otherwise exempts the

manufacturer from statutory compliance.  *However, the entity must comply, under any*

*distribution mechanism, with the statutory prohibition on drug diversion*."  (emphasis added));

*id.* at 43,550 ("Under the guidelines, the contract pharmacy would dispense 340B drugs to patients of the covered entity pursuant to a prescription. *The contract pharmacy would act as an agent of the covered entity, in that it would not resell a prescription drug but rather distribute the drug on behalf of the covered entity*." (emphasis added)); 75 Fed. Reg. at 10,273 ("The covered entity has, and continues to bear, full responsibility and accountability for compliance with all requirements to prevent diversion of covered drugs to individuals other than patients of the covered entity . . . ."); *id.* ("Covered entities will be permitted to use multiple pharmacy arrangements *as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition*." (emphasis added)). And even AbbVie's own complaint concedes that section 340B prohibits the transactions of which it complains. *See* doc. 1 at ¶ 42 (arguing that the complained-of 340B abuses "violate both the letter and spirit of the federal 340B statute").

S.B. 751 doesn't require AbbVie to transfer title of discounted drugs to contract pharmacies, either. Two provisions of S.B. 751 support this conclusion.

First, S.B. 751 doesn't apply to any receipt that "is prohibited by the United States Department of Health and Human Services." Mo. Rev. Stat. § 376.414.2. Transfers that violate section 340B—such as transfers to anyone not a covered entity or a patient of a covered entity— plainly fall within this exception to S.B. 751. *See Astra*, 563 U.S. at 114 (holding that "Congress placed the Secretary [of the Department of Health and Human Services] . . . in control of § 340B's drug-price prescriptions").

Second, S.B. 751 provides that manufacturers may not "deny, restrict, or prohibit . . . the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is *under contract with*, or *otherwise authorized by*, a covered entity to receive 340B drugs *on behalf of the covered*

14

128

**Exhibit 4**

*entity*." Mo. Rev. Stat. § 376.414.2 (emphasis added). In context, "otherwise" means "in a different way or manner." *Otherwise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/otherwise (last visited July 11, 2025). Thus, whether a contract exists or not, a delivery or acquisition does not fall within S.B. 751 unless the pharmacy is "authorized" to receive the drugs "on behalf of the covered entity." Mo. Rev. Stat. § 376.414.2; *see State ex rel. Hillman v. Beger*, 566 S.W.3d 600, 604–05 (Mo. 2019) (holding that "[a]ny time a court is called upon to apply a statute, the primary obligation 'is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning.'" (quoting *S. Metro. Fire Prot. Dist. v. City of Lee's Summit*, 278 S.W.3d 659, 666 (Mo. 2009)). In other words, if no agency relationship exists between the covered entity and the contract pharmacy, the statute doesn't require AbbVie to deliver the 340B drugs to the contract pharmacy. *See Bach v. Winfield-Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. 2008) (holding that "[a]gency is the fiduciary relationship resulting from the manifestation of consent by an agent to a principal *that the agent will act on the principal's behalf* and subject to his control" (emphasis added) (citations omitted)).

So to the extent that contract pharmacies take 340B drugs for themselves through the replenishment model, in violation of section 340B, S.B. 751 has no hand in AbbVie's injury. To the extent that AbbVie's complaint alleges financial loss from increased sales of discounted drugs, two things bear responsibility for that financial loss: (1) section 340B, and (2) illegal transfers of 340B drugs through the replenishment model. S.B. 751 neither requires nor permits illegal transfers of 340B drugs. That renders AbbVie's alleged financial injury—to the extent that AbbVie has adequately alleged such an injury—not fairly traceable to S.B. 751. *See SuperValu*, 870 F.3d at 768 ("An injury is fairly traceable if the plaintiff shows 'a causal

15

connection between the injury and the conduct complained of' that is 'not . . . th[e] result [of] the independent action of some third party not before the court.'"  (alterations in original) (quoting *Lujan*, 504 U.S. at 560)).

AbbVie's additional arguments do not save its complaint.  AbbVie, citing *Sanofi* and *Novartis*, argues that "the extent to which AbbVie will recognize a contract pharmacy's access to the 340B price on behalf of a covered entity is a decision the federal statute left with AbbVie; S.B. 751 is the law the [sic] seeks to take that decision out of AbbVie's hands."  Doc. 90 at 10. The Court need not—and thus will not—decide whether the *Sanofi* and *Novartis* courts got it right with respect to the legality of manufacturers' contract-pharmacy restrictions.  But even if those courts did get it right, that wouldn't supply AbbVie with standing.  As explained above, S.B. 751 bears no responsibility for the transactions that give rise to AbbVie's alleged injury. Indeed, AbbVie conceded at oral argument that it would sell the same number of drugs to 340B-qualifying patients regardless of S.B. 751:

> **THE COURT:**  [I]sn't it, at the end of the day, essentially that S.B. 751 is preventing you from limiting the number of pharmacies to which you sell, but it's not going to limit the number of drugs that you sell?
>
> **[Counsel for AbbVie]:**  That's correct, Your Honor.  I agree with that conception. I'm sorry if I didn't understand your question before.  I agree with that.

Doc. 88, Oral Arg. Tr. at 22:16–22:22; *see also id.* at 46:16–46:17 (conceding that S.B. 751 "doesn't change the number of drugs that are sold at the 340B price to the covered entity").

In other words, S.B. 751 does not require AbbVie to sell any more drugs than it otherwise would.  It is the replenishment model, i.e. the buyer's inventory-and-accounting model, that causes AbbVie's alleged losses.  Another way to look at it is this:  if the federal government banned the replenishment model, and S.B. 751 remained in effect, AbbVie would suffer no

16

130

damages.  However, if S.B. 751 were repealed but the replenishment model were still allowed, AbbVie would continue to suffer the exact same damages it complains of here.

Next, AbbVie argues that "S.B. 751 will compel AbbVie to make additional *discounted* sales, irrespective of the inventory or accounting methods that contract pharmacies utilize."  Doc. 90 at 10 (emphasis added) (citing doc. 1 at ¶¶ 58–62).  But the well-pleaded allegations in the complaint fail to support this conclusion.  AbbVie cites to paragraphs 58–62 of its complaint to support its argument.  *See id.*  But those paragraphs merely *describe* two different types of accounting models that contract pharmacies use:  the pre-purchased-inventory model and the replenishment model.  *See* doc. 1 at ¶¶ 58–62.  They don't mention S.B. 751 *at all*.  *See id.* Much less do they allege—with any well-pleaded facts—that S.B. 751 causes AbbVie financial loss.  *See id.*

Finally, AbbVie argues that it has standing based on Missouri's threatened enforcement of S.B. 751.  *See* doc. 90 at 13 ("S.B. 751 presents a classic pre-enforcement injury Hobson's choice:  comply with an unconstitutional mandate or risk enforcement and severe penalties."). But again, AbbVie's mere labeling of S.B. 751 as an "unconstitutional mandate" does not supply AbbVie with standing.  *Id.*  As already explained, AbbVie's damages flow not from S.B. 751 but from the replenishment model.  While the Supreme Court has held that "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)), the *Susan B. Anthony List* Court found that the plaintiff had established injury in fact because the plaintiff "pleaded specific statements [it] intend[ed] to make" that "concern[ed] political speech," *id.* at 161–62.

17

131

Thus, the Supreme Court held, the plaintiff's intended conduct "[was] certainly 'affected with a constitutional interest[,]'" and the harms plaintiffs alleged flowed from the enforcement of the statute. *Id.* at 162 (quoting *Babbit*, 442 U.S. at 298). But here, the only interest that AbbVie claims to have in its contract-pharmacy policy is its interest in preventing transactions for which S.B. 751 bears no responsibility. Thus, AbbVie's complaint fails to establish, through well-pleaded facts, that the enforcement of S.B. 751 arguably affects a constitutional interest.

Thus, AbbVie's complaint fails to adequately allege Article III standing. The Court therefore dismisses it. The Court denies as moot Missouri's Motion to Dismiss. Doc. 32.

### B. Leave to amend

In its supplemental brief, AbbVie alternatively requests leave to amend its complaint. Doc. 90 at 15–16. AbbVie argues that, in its amended complaint, it would plead, among other things, facts showing that the cost of compliance with S.B. 751 has already totaled around $35 million. *Id.* Missouri argues that "any amendment would be futile." Doc. 89 at 16.

For at least two reasons, the Court cannot construe AbbVie's request as a motion for leave to amend. First, under Federal Rule of Civil Procedure 7(b)(1)(B), a motion must "state with particularity the grounds for seeking the order" that the movant seeks. "The particularity requirement of Rule 7(b) is met by submitting a proposed amendment with the motion for leave to amend the complaint." *Wolgin v. Simon*, 722 F.2d 389, 394 (8th Cir. 1983) (citations omitted). But here, AbbVie did not attach a proposed amended complaint to its supplemental brief. *See* doc. 90.

Second, both the Local Rules and the undersigned's Judge's Requirements require a party seeking leave to amend to present a tracked-changes version of its proposed amended pleading. *See* E.D. Mo. L.R. 4.07; Judge's Requirements at 4. Without having access to a full version of

**Exhibit 4**

AbbVie's proposed amended complaint (with changes tracked), the Court cannot determine whether it should allow amendment.

To the extent that AbbVie still seeks leave to amend its complaint, it must file, no later than July 25, 2025, a motion for leave to amend that complies with all applicable rules, including the undersigned's Judge's Requirements. If AbbVie fails to timely file a motion for leave to amend, the Court will dismiss the case without prejudice and without further notice.

### C.     Intervention

Having dismissed AbbVie's complaint, the Court finds that Movants lack standing at this time. *See Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996) ("An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing as well."). Indeed, Movants allege that they have suffered an Article III injury in fact because AbbVie's "attack on S.B. 751 threatens the protections for delivery of 340B drugs to contract pharmacies, which are essential to the continued viability of the operations and services provided by [Movants'] members." Doc. 46 at 10. But now that the Court has dismissed AbbVie's complaint, an injunction against S.B. 751 depends on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), namely, (1) that AbbVie will move to amend its complaint, (2) that the Court will allow amendment, and (3) that the Court will enjoin enforcement of S.B. 751. Because Movants lack standing, the Court denies, without prejudice, Movants' Verified Motion to Intervene and Suggestions in Support. Doc. 46. Movants may file a renewed motion to intervene if, and only if, the Court allows AbbVie to amend its complaint. The Court denies as moot, without prejudice, Movants' Motion to Dismiss. Doc. 47.

19

## IV.    Conclusion

Accordingly, the Court dismisses, without prejudice, for lack of standing, AbbVie's [1] Complaint for Declaratory and Injunctive Relief.  If AbbVie seeks to amend its complaint, it must file, no later than July 25, 2025, a motion for leave to amend its complaint that complies with all applicable rules, including the Eastern District of Missouri Local Rules and the undersigned's Judge's Requirements.  AbbVie's failure to file a compliant motion for leave to amend by this date will result in the dismissal of this case without prejudice and without further notice.  The Court denies as moot, without prejudice, Missouri's [32] Motion to Dismiss.  The Court denies, without prejudice, for lack of standing, Movants' [46] Verified Motion to Intervene and Suggestions in Support.  The Court denies as moot, without prejudice, Movants' [47] Motion to Dismiss.

So ordered this 11th day of July 2025.

_____

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

20

134

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| ASTRAZENCA PHARMACEUTICALS LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  2:24-cv-04143-MDH |
| | ) | |
| ANDREW BAILEY, in his official capacity as | ) | |
| ATTORNEY GENERAL OF THE STATE OF | ) | |
| MISSOURI; JAMES L. GRAY, in his official | ) | |
| capacity as President of the Missouri Board of | ) | |
| Pharmacy; CHRISTAN S. TADRUS, in his | ) | |
| official capacity as Vice-President of the | ) | |
| Missouri Board of Pharmacy; and DOUGLAS | ) | |
| R. LANG, ANITA K. PARRAN, COLBY | ) | |
| GROVE, TAMMY THOMPSON, and DARREN | ) | |
| HARRIS, in their official capacities as members | ) | |
| of the Missouri Board of Pharmacy, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MISSOURI HOSPTIAL ASSOCIATION, | ) | |
| And MISSOURI PRIMARY CARE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Intervenors | ) | |

**ORDER**

Before the Court are State Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 30) and Intervenor's Motion to Dismiss for Failure to State a Claim. (Doc. 68). Plaintiff has filed its suggestions in opposition. (Docs. 50 and 74). Both State Defendants and Intervenor Defendants (collectively "Defendants") have filed their replies. (Docs. 58 and 76). The matter is now ripe for adjudication. For reasons herein, Defendants' Motions are **GRANTED IN PART** and **DENIED IN PART**.

1

## BACKGROUND

This case arises out of Senate Bill ("S.B.") 751 which created protections to the delivery of 340B drugs to contract pharmacies on behalf of "covered entities". Section 340B incentivizes pharmaceutical manufactures to provide qualified health care providers, referred to as "covered entities," with pricing discounts on certain drugs prescribed to individuals and families whose income falls below the federal poverty level. Covered entities have contracted with outside pharmacies or "contract pharmacies," for the distribution and dispensation of 340B drugs. S.B. 751 protects hospitals, federal qualified health centers ("FQHC"), and their patients from drug manufacturers' restrictions on the number of contract pharmacies a hospital or FQHC can use and still receive discount pricing under 340B plan. Plaintiff is a limited partnership organized under the laws of Delaware with its principal place of business in Wilmington, Delaware. State Defendants are all residents of Missouri that are responsible for administering and enforcing the provisions of S.B. 751. Intervenors Missouri Hospital Association and Missouri Primary Care Association are Missouri, not-for-profit member organizations.

Plaintiff alleges three Counts seeking declaratory relief that S.B. 751 is unconstitutional and injunctive relief barring enforcement of S.B. 751. Count I alleges S.B. 751 is preempted by federal patent laws under the Supremacy Clause. Count II alleges S.B. 751 violates the Contracts Clause of the U.S. Constitution and Count III alleges S.B. 751 violates the Takings Clause of the U.S. Constitution. Defendants argue S.B. 751 is not preempted by federal patent laws because S.B. 751 does not adjust 340B drug prices nor does it fit the requirements for conflict preemption. Defendants next argue Plaintiff has not pleaded facts that would give rise to relief of a violation of the Contracts Clause. Finally, Defendants assert that S.B. 751 neither forcibly takes property from Plaintiff nor is a regulatory taking.

2

## STANDARD OF REVIEW

A complaint must contain factual allegations that, when accepted as true, are sufficient to state a claim of relief that is plausible on its face. *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005) (internal citations omitted). The complaint's factual allegations must be sufficient to "raise a right to relief above the speculative level," and the motion to dismiss must be granted if the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 545 (2007). Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## ANALYSIS

### I.      Count I – Preemption by Federal Patent Laws

Count I seeks declaratory and injunctive relief claiming S.B. 751 is preempted by federal patent laws under the Supremacy Clause of the United States Constitution. Specifically, federal patent laws conflict preempt S.B. 751. Defendants argue that Count I should be dismissed because S.B. 751 does not cap or fix drug prices, only the federal 340B program does. Additionally, Defendants argue that S.B. 751 does not otherwise fit the requirements for conflict preemption.

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. art. VI, cl. 2. State laws that conflict with federal law are "without

effect." *Cipollone v. Liggett grp., Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, L.Ed.2d 407 (1992). Congress may preempt a state law through federal legislation, but where a federal statute does not refer expressly to preemption, Congress may implicitly preempt a state law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 135 S.Ct. 1591, 191 L.Ed.2d 511 (2015). Congress may impliedly pre-empt state law "either through 'field' preemption or "conflict' preemption." *Id*. Conflict pre-emption exists where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objections of Congress.'" *Id*. (quoting *California v. ARC Am. Corp.*, 490 U.S. 93, 100, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

Plaintiff argues that S.B. 751 restricts the prices at which manufacturers can sell their patented drugs by requiring drug manufacturers to make 340B drugs available for unlimited contract pharmacy sales. (Complaint ¶ 64). Plaintiff asserts S.B. 751 functions as a price cap for an unlimited number of contract pharmacy sales that impermissibly constrains manufacturers' "opportunity" to take advantage of the benefit of exclusivity conferred by Congress "during the patent's term." *Id*. (quoting *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1372 (Fed. Cir. 2007).

The Eighth Circuit in *Pharm. Rsch. & Manufacturers of Am. v. McClain* reviewed a similar Arkansas statute where the plaintiff in that case argued an analogues Arkansas law set a price cap and thus was conflict preempted by a different federal law. The Eighth Circuit ruled the Arkansas law did not require manufactures to provide 340B pricing discounts to contract pharmacies nor does the state statute set or enforce discount pricing. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1145 (8th Cir. 2024), *cert. denied*, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024). S.B. 751 likewise does the same thing as the Arkansas statute and does not require

4

manufacturers to extend the federal 340B discount to contract pharmacies. S.B. 751 which revised

Mo. Rev. Stat. § 376.414 states:

> A pharmaceutical manufacturer, third-party logistics provider, or an agent or affiliate of such pharmaceutical manufacturer or third-party logistics provider, *shall not deny, restrict, or prohibit, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with, or otherwise authorized by, a covered entity to receive 340B drugs on behalf of the covered entity* unless such receipt is prohibited by the United States Department of Health and Human Services. A wholesale drug distributer, as defined in section 338.330, shall not be considered an agent or affiliate for purposes of this subsection.

Mo. Rev. Stat. § 376.414.2. (emphasis added). The statute by its plain terms only places restrictions

on what pharmaceutical manufacturers or third-party logistic providers can restrict or prohibit

regarding the acquisition or delivery of 340B drug to a contract pharmacy on a covered entity's

behalf. The statute does not make any mention of exclusivity periods, patent terms, or even pricing

discounts.

The 340B Program has specific enforcement measures that safeguards the prices at which

manufacturers can sell their patented drug while also complying with the provisions of the 340B

program. The discounted price or "ceiling price" a drug manufacturer may change in the 340B

program is determined by statutory formula. 42 U.S.C. §§ 256b(a)(2), 1396r-8(c). Covered entities

may only prescribe 340B discounted drugs to patients who qualify and may not request or receive

duplicative 340B discounts and Medicaid rebates for the same drug. *Id*. § 256b(a)(5)(A)-(B).

Additionally, covered entities may not engage in diversion of covered outpatient drugs through

"resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the [covered]

entity." *Id*. § 256b(a)(5)(b).

Taking Plaintiff's allegation as true for the purposes of a motion to dismiss it has failed to

show a right to relief above a speculative level. Covered entities cannot prescribe discounted 340B

**Exhibit 4**

drugs except to those who qualify under the program. Both the plain language of the statute as well as precedent within the Eighth Circuit has established that statutes akin to S.B. 751 do not directly regulate the pricing of 340B drugs as regulation of pricing is determined by the federal 340B statute. Further, S.B. 751 does not require manufacturers to give the 340B discount to contract pharmacies. As such S.B. 751 does not conflict preempt federal patent laws under the Supremacy Clause. For the reasons stated, Defendant's Motion to Dismiss on Count I are **GRANTED**.

## II.    Count II – Violation of the Contracts Clause

Count II seeks declaratory and injunctive relief alleging S.B. 751 violates the Contracts Clause of the U.S. Constitution. Specifically, S.B. 751 substantially impairs the pharmaceutical pricing agreements ("PPA") entered to participate in the federal 340B program and that the State of Missouri has no legitimate justification for requiring unlimited contract pharmacy arrangements. Defendants argue that Plaintiff has not pleaded facts that would give rise to relief of a violation of the Contracts Clause.

The Contract Clause of the United States Constitution provides that no state shall "pass any law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. A three-part test determines whether state action violates the Contract Clause. First the court asks whether "the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships." *Am. Fed'n of State, Cnty. & Mun. Emps. v. City of Benton, Arkansas*, 513 F.3d 874, 879 (8th Cir. 2008) (quoting *Equip. Mfrs. Inst. V. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002). The first prong involves a three-part inquiry: "(1) whether there is a contractual relationship; (2) whether a change in law impairs that contractual relationship; and (3) whether the impairment is substantial." *Gen. Motors Corp v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). If substantial impairment existed, the court will determine whether the state has a "significant and legitimate

public purpose behind the regulation." *Educ. Employees Credit Union v. Mut. Guar. Corp.*, 50 F.3d 1432, 1438 (8th Cir. 1995). If there is no significant and legitimate public purpose, the state law is unconstitutional under the Contract Clause. *See Equip. Mfrs.*, 300 F.3d at 850. If, however the state identifies such a public purpose, the court will consider "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983).

Taking as true Plaintiff's allegations for the purpose of a motion to dismiss, it has raised its right to relief above a speculative level. Plaintiff alleges that it signed a PPA to participate in the federal 340B program. (Complaint ¶ 69). As part of the terms of the PPA is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of covered entities. *Id*. Neither the 340B statute nor the PPA requires drug manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies. *Id*. Plaintiff claims that S.B. 751 expands its obligations under the PPA to unlimited contract pharmacies thus causing a substantial impairment of Plaintiff's expectation of the 340B program. (Complaint ¶ 70). Plaintiff further argues that the State of Missouri has no legitimate justification for requiring unlimited contract pharmacy arrangements. Plaintiff states its policy already ensures that every covered entity is offered those drugs at a discount and that its polices allow covered entities to designate a single contract pharmacy if it does not have an on-site pharmacy to dispense the 340B drugs. (Complaint ¶ 72). Additionally, Plaintiff argues that S.B. 751 will advance the economic interest of for-profit entities without a cost-reduction for patients. (Complaint ¶¶ 73 and 74).

Taking as true Plaintiff's allegations, it has raised a right to relief above a speculative level. Plaintiff has sufficiently alleged the existence of a contract, that would be substantially impaired

by S.B. 751. For the reasons stated, Defendants' Motion to Dismiss on Count II of Plaintiff's Complaint is **DENIED**.

### III.    Count III – Violation of the Takings Clause

Count III alleges that S.B. 751 violates the Takings Clause by a physical appropriation of manufactures prescription drugs by contract pharmacies and covered entities. Alternatively Count III alleges if not a physical appropriation, it would still constitute a regulatory taking. Defendants argue that S.B. 751 neither forcibly takes property from Plaintiff nor is a regulatory taking.

The Takings Clause of the Fifth Amendment to the Constitution, which is "applicable to the States through the Fourteenth Amendment," provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. Takings claims are recognized as to both personal property, including goods, and real property. *Horne v. Dep't of Agriculture*, 576 U.S. 350, 358 (2015). A taking can be either per se or regulatory, both of which entitle the property owner to just compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-49, 141 S. Ct. 2063, 2071, 210 L. Ed. 2d 369 (2021). A per se taking occurs "[w]hen the government physically acquires private property for a public use," including "when the government physically takes possession of property without acquiring title to it." *Id*. at 147. A taking can also occur as a result of "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 968, 1005-06 (1984). The Supreme Court has held that a regulatory taking occurs when a regulation "goes too far" in limiting an owner's use of her property. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L.Ed. 322 (1922).

#### a.    **Physical Appropriation**

Defendants argue that S.B. 751 does not forcibly take any property from Plaintiff or compel a transfer of title to contract pharmacies and thus Plaintiff's argument for a physical appropriation of private property must fail. Further, Defendants argue that because Plaintiff has voluntarily participated in the federal 340B program it cannot give rise to an unconstitutional taking. Plaintiff argues that S.B. 751 takes the private property of drug manufacturers to transfer their prescription drugs to private entities, covered entities and the pharmacies with which they contract. (Complaint ¶ 78). Plaintiff asserts this forced transfer results in the physical appropriation of manufacturers' prescription drugs by contract pharmacies and covered entities, and it therefore constitutes a per se taking. (Complaint ¶ 80).

When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation. *Se. Arkansas Hospice, Inc. v. Burwell*, 815 F.3d 448, 450 (8th Cir. 2016) (quoting *Minnesota Ass'n of Health Care Facilities, Inc.*, 742 F.2d at 446 (8th Cir. 1984)). As described above, Plaintiff has voluntarily agreed to be a part of the federal 340B program. Plaintiff signed a PPA to participate in the federal 340B program. (Complaint ¶ 69). As part of the terms of the PPA is the requirement that manufacturers offer discounted drugs only to a specifically delineated set of covered entities. Plaintiff voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right of just compensation. For the reasons stated Defendants' Motions to Dismiss Plaintiff's Physical Appropriation Claim is **GRANTED**.

b.  **Unconstitutional Regulatory Taking**

9

**Exhibit 4**

Defendants argue that S.B. 751 is not an unconstitutional regulatory taking because Plaintiff has failed to allege facts showing it is a taking under the *Penn Central* test. Plaintiff argues that S.B. 751 has (1) a profound economic impact on the value of the property subject to the law; (2) significantly interferes with its investment-backed expectations; and (3) forces Plaintiff to transfer title to their property, depriving them of full use and enjoyment of said property.

The default test for determining whether a regulation constitutes a taking is known as the *Penn Central* Test. The *Penn Central* Court crafted a test that focuses largely "upon the particular circumstances [in each] case." *Becker v. City of Hillsboro, Missouri*, 125 F.4th 844, 852 (8th Cir. 2025) (quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662, 57 L. Ed. 2d 631 (1978)).Under the *Penn Central* balancing test, courts consider: (1) "the economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-back expectations," and (3) "the character of the government action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130-31, 98 S.Ct. 2646, 2662, 57 L. Ed. 2d 631 (1978).

While Plaintiff has not specified in its third count the specific facts to illustrate the elements of a *Penn Central* taking, the Complaint does allege facts that allows the Court to consider this claim at the motion to dismiss stage of the litigation. Plaintiff alleges that the economic impact of the regulation stems from the below market costs the 340B drugs costs Plaintiff by providing them to covered entities and contract pharmacies. (Complaint ¶¶ 95-96). Plaintiff argues that it joined the 340B program with the expectation and understanding that it would be required to provide discounted drugs only for a limited category of sales to covered entities and accepted that obligation when it joined the federal 340B program. (Complaint ¶ 70). Lastly, Plaintiff argues that Missouri has no legitimate justification for requiring unlimited contract arrangements, which will

advance the economic interest of for-profit entities at the expense of drug manufacturers. (Complaint ¶ 73).

Taking these allegations as true for the purpose of a motion to dismiss, Plaintiff has failed to raise a right to relief above a speculative level. A reasonable investment-backed expectation requires "more than a 'unilateral expectation or an abstract need.'" *Becker v. City of Hillsboro, Missouri*, 125 F. 4th 844, 858 (8th Cir. 2025) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 968, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). The reasonableness of an expectation may be shaped by "the regulatory regime in place at the time the claimant acquires the property." *Id.* (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 633, 121, S. Ct. 2448, 2465, 150 L. Ed. 2d 592 (2001)). The 340B program "is silent about delivery" and distribution of pharmaceuticals to patients. *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F. 4th 1136, 1142 (8th Cir. 2024), cert. denied, No. 24-118, 2024 WL 5011712 (U.S. Dec. 9, 2024) (quoting Sanofi Aventis U.S. LLC v. *United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 702 (3d Cir. 2023), *judgment entered*, No. 21-3167, 2023 WL 1325507 (3d Cir. Jan. 30, 2023). Investment-backed expectations are often "informed by the law in force in the State in which the property is located." *Id.* (quoting *Ark. Game & Fish Comm'n v. United States*, 568, U.S. 23, 38, 133 S.Ct. 511, 184 L.Ed.2d 417 (2012)). The practice of pharmacy is an area traditionally left to state regulation. *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021).

Here, the regulatory regime in place when Plaintiff entered the 340B program was silent about delivery. States were free to change delivery and acquisition requirements regarding 340B drugs in their respective jurisdictions. This is consistent with the idea that the practice of pharmacy is an area traditionally left to state regulation. Plaintiff did not have a reasonable investment-backed expectation that states would not, at some point, deicide to change requirements of the

11

340B program that Congress had deliberately left silent in an area that is traditionally left to the states to regulate. As such, Plaintiff has not demonstrated a reasonable investment-backed expectation.

Further, Plaintiff has not shown the character of the government action is that of a regulatory taking. The inquiry into character of the government action focuses on "whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Becker v. City of Hillsboro, Missouri*, 125 F. 4th 844, 859 (8th Cir. 2025) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082, 161 L. Ed. 2d 876 (2005)). As discussed above regarding a physical appropriation, S.B. 751 does not create any new obligation outside of the federal 340B program except with regard to delivery and acquisition of 340B drugs to contract pharmacies. S.B. 751 was intended to ensure delivery of 340B drugs to covered entities and contract pharmacies to which help disseminating the drugs to those patients who are qualified through the federal 340B program. As such, the character of the government action does not suggest a physical taking but merely adjusting the benefits and burdens of economic life to promote the common good. For the reasons stated, Defendants' Motion to Dismiss Count III as a regulatory taking is **GRANTED**.

## CONCLUSION

For reasons herein, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motions to Dismiss Count I are **GRANTED**. Defendants' Motion to Dismiss Count II are **DENIED** and Defendants' Motion to Dismiss Count III are **GRANTED**.

**Exhibit 4**

**IT IS SO ORDERED**.

DATED: February 27, 2025

 */s/ Douglas Harpool*
 **DOUGLAS HARPOOL**
 **UNITED STATES DISTRICT JUDGE**

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| ABBVIE INC. *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 3:25-cv-00519** |
| | ) | **Judge Aleta A. Trauger** |
| JONATHAN SKRMETTI, in his official | ) | |
| capacity as ATTORNEY GENERAL OF | ) | |
| THE STATE OF TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively "AbbVie" or "plaintiffs") seek to enjoin the enforcement of a recently enacted Tennessee law (the "Act" or "S.B. 1414"), which the defendant, Jonathan Skrmetti, sued in his official capacity as the Attorney General of the State of Tennessee (referred to herein as the "State"), calls the Hospital Protection Act. The Act was signed by Tennessee Governor Bill Lee on May 5, 2025 and went into effect immediately, although some provisions of it are not slated to take effect until July 1, 2025. (*See* Doc. No. 23-1.)[1]

AbbVie characterizes the Act as mandating pharmaceutical manufacturers to sell drugs at discounted prices to commercial pharmacies. (Doc. No. 1, Compl. ¶ 1.) It contends that, in doing so, the Act "impermissibly chang[es] the terms of a federal drug-pricing regime—the federal 340B program—and significantly increase[s] the cost of participation in that regime." (*Id.*) AbbVie challenges the Act as unconstitutional on the grounds that it (1) violates the Supremacy Clause;

---

[1] The Act is to be codified at Tenn. Code Ann. § 47-18-13. (*See* Doc. No. 23-1, Act § 1.)

(2) effects a taking in violation of the Takings Clause; (3) "unlawfully discriminates against or unduly burdens interstate commerce in violation of the Commerce Clause, as established by Dormant Commerce Clause principles"; (4) is unconstitutionally vague in violation of the Due Process Clause; and (5) "violates the First Amendment's Free Speech and Petition Clauses." (*Id.*)

Now before the court is AbbVie's Motion for a Preliminary Injunction (Doc. No. 17), through which AbbVie asks the court to preliminarily enjoin the enforcement of the Act. In the Memorandum of Law filed in support of its motion, AbbVie argues, as it did in its Complaint, that the Act is preempted by the federal 340B program, which constitutes a comprehensive regulatory scheme; effects an unconstitutional taking by compelling drug manufacturers to sell drugs to private parties at discounted prices, thus benefitting the private parties at drug manufacturers' expense; is unconstitutionally vague, insofar as it lacks explicit standards and invites arbitrary enforcement; violates the Dormant Commerce Clause by regulating commerce outside the State of Tennessee; and violates the First Amendment by impeding AbbVie's ability to petition the government. (*See generally* Doc. No. 18.)

The State has filed a Response in Opposition to the Motion (Doc. No. 23), and the American Hospital Association, 340B Health, the Tennessee Hospital Association, and the American Society of Health-System Pharmacists ("Amici"), with the court's permission, have filed a Brief of Amici Curiae in Opposition to the Plaintiffs' Motion (Doc. No. 40). The court heard oral argument on the motion on June 20, 2025, during which the parties focused primarily on the issue of the plaintiffs' standing and their preemption and takings claims.[2]

---

[2] The oral argument did little to clarify the issues and arguments already set forth in the parties' briefs.

Having considered the arguments advanced by both parties and the governing legal standards, the court finds that the plaintiffs have failed to establish a substantial likelihood of success on any of their claims. Accordingly, the plaintiffs' Motion for Preliminary Injunction will be denied.

## I.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Generally, district courts must balance four factors when considering a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 365–66 (6th Cir. 2022) (quoting *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (per curiam)). These "are factors to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) (quoting *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001)). However, where the movant fails to establish either likelihood of success on the merits or irreparable harm if the motion were not granted, "an injunction is unwarranted—regardless of the showing on the other factors." *Union Home Mortg. Corp.*, 31 F.4th at 366 (collecting cases).

## II.    BACKGROUND

Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical companies that want to participate in Medicaid and Medicare Part B to offer steep discounts on certain outpatient drugs to "covered entities," a term defined to include public hospitals and community health centers and other entities typically engaged in "car[ing] for low-income and

rural persons." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696, 699 (3d Cir. 2023); *see also* 42 U.S.C. § 256b(b) (defining "covered entity"). This program, referred to as the "340B program," helps covered entities provide "safety-net services to the poor," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011), because the entities "turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount," *Sanofi Aventis*, 58 F.4th at 699. The 340B program is administered by the Secretary of Health and Human Services ("HHS") and "superintended by the Health Resources and Services Administration" ("HRSA"), which is an HHS agency. *Astra USA*, 563 U.S. at 113.

"Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide." *Id.* PPAs are "uniform agreements," *id.*, that "require" participating manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a). "Covered entities may only prescribe 340B discounted drugs to patients who qualify and may not request or receive duplicative 340B discounts and Medicaid rebates for the same drug." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1141–42 (8th Cir.) (citing 42 U.S.C. § 256b(a)(5)(A)–(B)), *cert. denied*, 145 S. Ct. 768 (2024). "Additionally, covered entities may not engage in diversion of covered outpatient drugs through 'resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity.'" *Id.* at 1142 (quoting 42 U.S.C. § 256b(a)(5)(B)).

HHS and drug manufacturers are authorized to audit covered entities to ensure compliance with the diversion and duplicate rebate provisions. *Id.* (citing 52 U.S.C. § 256b(a)(5)(C)). The program contains enforcement mechanisms and penalties for manufacturers and covered entities that fail to comply with those provisions. *Id.* (citing *Sanofi Aventis*, 58 F.4th at 700). Any disputes

arising under the 340B program must first be submitted to HHS's dispute resolution program. *Id.* (citing 42 U.S.C. § 256b(d)(3)).

Although the 340B program was apparently designed with the expectation that it would apply to covered entities that operated in-house pharmacies, "[s]ince the beginning, covered entities have contracted with outside pharmacies, referred to as 'contract pharmacies,' for the distribution and dispensation of 340B drugs." *Id.* at 1139. "Indeed, early in the 340B Program, HRSA observed that most covered entities relied on contract pharmacies, while only about four percent of such entities used in-house pharmacies." *Id.* at 1142 (citing Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance")).

While the Secretary of HHS "lacks rulemaking authority over the section 340B program," the HRSA has, on several occasions, issued non-binding "guidance" documents, such as the 1996 Guidance, "interpreting and implementing the scheme." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). In the 1996 Guidance, the HRSA "acknowledged that section 340B 'is silent as to permissible drug distribution systems,'" and it "sought to fill 'gaps in the legislation' and thereby 'move the program forward.'" *Id.* (quoting 1996 Guidance at 43,549–50). In addition, HRSA "recognized that many covered entities use outside pharmacies to distribute drugs to their patients," and, to accommodate them, HRSA determined that any covered entity that did not have an in-house pharmacy could contract with *one* outside pharmacy to dispense drugs at a single location. *Id.* at 457 (citing 1996 Guidance at 43,550, 43,555).

In 2010, HRSA issued another guidance document, in which it "opined that covered entities may contract with an unlimited number of outside pharmacies and may do so regardless of whether the entities have in-house pharmacies." *Id.* (citing Notice Regarding 340B Drug Pricing

Program—Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010) ("2010 Guidance")). Following the issuance of the 2010 Guidance, "the use of contract pharmacies skyrocketed," increasing by "twentyfold." *Sanofi Aventis*, 58 F.4th at 700.

Worried that "contract pharmacies were driving up duplicate discounting and diversion," drug makers began to respond in 2020 by adopting policies that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients. *Id.*; *see also McClain*, 95 F.4th at 1139. In some instances, these limitations "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139.

HHS responded to these efforts, first, by "releas[ing] an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., Advisory Op. 20-06 on Cont. Pharmacies Under the 340B Program (Dec. 30, 2020), https://perma.cc/L7W2-H597). Second, it issued violation letters to several drug manufacturers, who then sued HHS. *Id.* The Third Circuit held that the Advisory Opinion and violation letters were unlawful because § 340B is silent regarding delivery to contract pharmacies. *Id.* at 706. The court enjoined HHS's "reading of Section 340B as *requiring* delivery of discounted drugs to an unlimited number of contract pharmacies," because "[l]egal duties do not spring from silence." *Id.* at 707 (emphasis added). The D.C. Circuit reached the same conclusion. *See Johnson*, 102 F.4th at 461 ("agree[ing] entirely" with the Third Circuit's conclusion that, "because section 340B is 'silent about delivery,' HRSA erred in concluding that the statute 'requires drug makers to deliver drugs to an unlimited number of contract pharmacies'" (quoting *Sanofi Aventis*, 58 F.3d at 703)).

Following these rulings, Tennessee, like many other states, has attempted to fill the "silence" recognized by the Third and D.C. Circuits by passing laws that prohibit pharmaceutical companies from limiting the number of contract pharmacies with which covered entities can enter agreements pertaining to the delivery of 340B drugs. Specifically, in this case, Tennessee enacted S.B. 1414, which provides that, beginning July 1, 2024, drug manufacturers may not:

> (1) Impose additional requirements or limitations on a 340B entity, including requiring the submission of any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless such data submission is explicitly required by the United States department of health and human services or applicable state law;

> (2) Require a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program;

> (3) Impose any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by the United States department of health and human services or applicable state law;

> (4) Impose any requirement relating to the frequency, duration, or scope of audits that are not imposed on pharmacies or providers that are not 340B entities;

> (5) Impose requirements relating to accreditation, recertification, credentialing, or recredentialing that are not imposed on pharmacies or providers that are not 340B entities; or

> (6) Impose any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program.

S.B. 1414 § 1(a). Generally, in other words, pharmaceutical companies may not impose requirements on covered entities in addition to those requirements expressly set out in § 340B or discriminate against covered entities by imposing upon them requirements that they do not impose on providers that are not 340B entities.

In addition, the Act prohibits drug manufacturers from

deny[ing], impos[ing] any restrictions or prohibitions on, discriminat[ing] against, or otherwise limit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity or other location that is under contract with, or otherwise authorized by, a 340B entity to receive 340B drugs on behalf of the 340B entity unless such receipt is prohibited by the United States department of health and human services or applicable state law.

*Id.* § 1(c). Subsection 1(c) took effect "immediately upon becoming a law." *Id.* § 4. However, this subsection also contains a "grandfather clause," which provides that this specific subsection "does not apply to any requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." *Id.* Subsection 1(a)[3] does not contain a similar grandfathering provision and instead goes into effect on July 1, 2025.

The Act further provides that a violation of subsection (a) or (c) will constitute an "unfair or deceptive act or practice affecting trade or commerce" in violation of the Tennessee Consumer Protection Act and may give rise to a civil penalty of $50,000 "per violation." *Id.* §§ (1)(d)(1), (2).

## III.    THIS LAWSUIT

AbbVie filed this lawsuit on May 6, 2025, challenging the constitutionality of the Act on multiple fronts and seeking injunctive and declaratory relief only. It contends that the Act "impermissibly changes the terms" of the federal 340B program and "significantly increas[es] the cost of participation in that regime." (Doc. No. 1 ¶ 1.)

It explains that, following issuance of the 2010 Guidance effectively authorizing covered entities to enter into contractual arrangements with an unlimited number of commercial pharmacies, many covered entities and contract pharmacies began adopting a "complicated accounting system known as the 'replenishment model.'" (*Id.* ¶ 6.) Edward Scheidler, AbbVie's Head of the 340B Center of Excellence, explains that, under the "replenishment model," contract

---

[3] Subsection 1(b) does not govern the activities of drug manufacturers and is not at issue in this lawsuit.

pharmacies typically "purchase AbbVie products for their general inventories at market prices." (Scheidler Decl., Doc. No. 33-2 ¶ 9.) The contract pharmacies then "dispense drugs to 340B and non-340B patients out of their general inventories. . . . In other words, in almost all instances, contract pharmacies order AbbVie-manufactured drugs and dispense them to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient." (*Id.* ¶ 8.)

Once inventory of a particular drug is low enough, having been "dispensed to pharmacy customers, the pharmacy (either itself or through a Third-Party Administrator ['TPA'] with which it contracts) determines which prior dispensing events should be linked with 340B eligibility." (*Id.* ¶ 9.) According to AbbVie, it has no idea how this determination is made or what criteria the contract pharmacies and TPAs use (sometimes working with covered entities) to decide which of the prescriptions previously filled came from covered entities. (*Id.*) Regardless, after the contract pharmacy determines how many of the prescriptions sold from a given quantum of inventory are "340B eligible," "the contract pharmacy (typically through a TPA) instructs the [relevant] covered entity . . . to place an order of additional quantities of that drug at the discounted 340B price to "replenish" the contract pharmacy's inventory of non-340B-discounted drugs." (*Id.* ¶ 10.) However, the covered entity itself typically does not directly place the replenishment order. Instead, according to AbbVie, "the order is typically generated and submitted by the contract pharmacy (either itself or through a TPA) using a third-party covered entity's purchasing account information." (*Id.*)

Further, "[w]hen a contract pharmacy places an order on behalf of a covered entity, AbbVie usually does not ship its 340B-discounted 'replenishment' drugs to the covered entity." (*Id.* ¶ 12.) Instead, although the covered entity makes the purchase, the "replenishment product is shipped

directly from the wholesaler to the contract pharmacy." (*Id.*) In other words, "the wholesaler bills the covered entity but ships to the contract pharmacy." (*Id.*) And, according to AbbVie, "[t]hese shipments of 340B-priced drugs to contract pharmacies are not based on orders needed for specific 340B-eligible patients based on actual or projected future need." (*Id.*)

AbbVie also maintains that covered entities do not actually maintain title to the 340B drugs while they are "held in a contract pharmacy's general inventory prior to being identified, post-sale, as 340B-linked drugs. Instead, as of the time of sale to a patient, a unit of drugs is owned by the contract pharmacy itself." (*Id.* ¶ 13.) But, when the "drug is 'replenished' at the 340B discounted price, that creates a difference between the full price paid by customers at the pharmacy counter and the discounted price AbbVie offers to covered entities, known as 'spread.' The contract pharmacy and covered entity split that spread pursuant to the terms of the agreements between them . . . ." (*Id.* ¶ 14.)

Scheidler provides an illustration of this model, using a hypothetical "Drug A," which he presumes for purposes of his illustration has a commercial price of $100.00 per unit and is subject to a discount rate of 99% under AbbVie's PPA, meaning that it has a 340B discount price of $1.00 and that the difference between the commercial price and the 340B price is $99.00. (*Id.* ¶ 15.) Assume that a contract pharmacy in Nashville—hypothetically, a CVS Pharmacy—orders ten units of Drug A at the commercial price. It pays $100.00 per unit and sells them at $120.00 per unit. The replenishment model then plays out as follows:

> a. Over the next month, ten customers receive prescriptions for Drug A, have them filled at the CVS Pharmacy, and pay $120 per unit either out-of-pocket (*i.e.*, a $25 copayment) or via private insurance coverage for which they pay a premium. The CVS receives, in total[,] $1,200 from the 10 customers who purchased Drug A,

recouping both the initial commercial price and $200 in profit. . . .[4]

b. Later, the TPA of CVS Pharmacy . . . calculates how many of those ten units of Drug A they believe were dispensed to a 340B patient of a specific Covered Entity under contract with that particular CVS location. . . . [T]hese determinations are often not accurate. Their criteria for determining whether a customer was a 340B patient can include factors like the identity of the prescriber or how long ago the patient last received a prescription from a 340B-eligible covered entity. . . .

c. In our example, let us assume that the CVS Pharmacy and its TPA determine five of the ten customers who purchased Drug A were 340B-eligible patients. The CVS Pharmacy and its TPA then notify the covered entity to order five units of Drug A for the CVS Pharmacy to "replenish" the five full-priced units of Drug A that the CVS Pharmacy previously purchased and dispensed to 340B patients.

d. As explained above, those five 340B patients have already paid full price (or their insurer has) for their unit of Drug A at the $120 price. . . .

e. AbbVie or its wholesaler receive[s] the covered entity's order for five units of Drug A and ships them to the CVS Pharmacy in the same package or on the same pallet as commercially-purchased units of Drug A and other drugs being sent to the CVS Pharmacy via a commercial order.

f. There is no way to discern which units of Drug A are the five units sold at the 340B price. They are not packaged differently, labeled differently, or shipped separately or in a different kind of box. . . . Once received by the contract pharmacy, they are placed into the general inventory and dispensed to any customer who walks in the door, 340B-eligible or otherwise. The only difference between a unit of Drug A shipped for "replenishment" and other units of Drug A is the price AbbVie receives for the shipment of its drugs. Placing 340B replenishment orders has no effect on how AbbVie drugs are transported or delivered.

g. The CVS receives the five units of Drug A at the 340B price and, as a matter of accounting, adjusts the previous paid price for those five units down to the cost of the 340B price, $1.00. The CVS then splits the differential, $495, between itself and the covered entity at some percentage. If we assume it is 70/30 in favor of the covered entity, then CVS keeps $148.50 and pays the covered entity $346.50. The patient who paid the full $120 (or their $25 copayment) receives no discount.

(*Id.* ¶ 15(a)–(g).)

---

[4] AbbVie does not explain what third party pays the remainder when a patient pays only a $25 copayment or how it reaches the $1,200 total based on this math.

According to AbbVie, the use of this type of scheme means that covered entities can contract with "numerous pharmacies—often located hundreds of miles away" and use the 340B discounted prices to "generate profits instead of using them for the benefit of the covered entities' indigent and uninsured patients." (AbbVie Corr. Memo., Doc. No. 33-1 at 11.)[5] The arrangement also allows large, for-profit pharmacies to "obtain massive amounts of manufacturers' drugs for pennies on the dollar, sell them at full price, and split the profits with covered entities." (*Id.*) It also increases the risk of diversion, "since contract pharmacies cannot verify 340B eligibility in real time and dispense from their general inventory rather than from a segregated stock of 340B-priced drugs." (*Id.* at 11–12 (citing, among other exhibits, Doc. No. 33-9 at 4–5, Hr'g Tr. at 59–60, *Pharma. Rsch. & Mfrs. of Am. v. Murrill*, No. 6:23-cv-997 (W.D. La. June 6, 2024), ECF No. 78).)

In response to the rise of the replenishment model and the *Sanofi Aventis* opinion holding that § 256b is silent about delivery, AbbVie began imposing restrictions designed to prevent covered entities from contracting with numerous contract pharmacies and their use of the replenishment model. Specifically, as relevant here, AbbVie implemented a policy in April 2023 (the "340B Program Integrity Initiative") pursuant to which it would continue to offer any hospital "covered entity" the ability to purchase drugs at the price set by the 340B program but "clarified that it would no longer indiscriminately accept requests to transfer or otherwise ship 340B discounted drugs to an unlimited number of contract pharmacies serving hospital covered entities." (Scheidler Decl. ¶ 4.) Instead, under its current 340B Program Integrity Initiative, AbbVie "facilitates the shipment of orders of 340B-priced medicines to one contract pharmacy location if the hospital covered entity does not have an in-house pharmacy," so long as the hospital covered

---

[5] The court employs the page numbers assigned by the court's electronic filing system, which is not always consistent with the parties' original pagination.

entity also "submits limited claims data on 340B utilization for that contract pharmacy, and the contract pharmacy is located within 40 miles of the HRSA registered covered entity," or, if there is no eligible pharmacy within 40 miles of the covered entity, AbbVie will ship to a "suitable alternative." (*Id.* ¶ 5; *see also* April 17, 2023 340B Program Integrity Initiative, Doc. No. 34-1 at 27–31.)[6] According to AbbVie, its 340B Program Integrity Initiative "does not limit the ***amount*** of drugs available" and "in no way affects patient access to 340B-discounted drugs." (Doc. No. 33-1 at 13.) Rather, "AbbVie's offer condition merely limits the terms upon which non-covered entity pharmacies can access the ***discounted*** price. . . . AbbVie will not indiscriminately and unconditionally accept requests to transfer 340B-discounted drugs to an unlimited number of commercial contract pharmacies." (*Id.*)

As set forth above, Tennessee, like many other states, responded to initiatives like AbbVie's by passing a law that attempts to do something the 340B statute does not—that is, S.B. 1414 (1) requires drug manufacturers that participate in the federal 340B program to deliver drugs purchased by covered entities at the 340B reduced price to an unlimited number of contract pharmacies and (2) bars manufacturers from conditioning delivery upon the provision of claims data or other documentation, from imposing requirements "relating to inventory management systems of 340B drugs," and from imposing any requirements related to audits that are not imposed on "pharmacies or providers that are not 340B entities." S.B. 1414 § 1(a)(3) & (4). AbbVie describes the Act as "effectively forc[ing] manufacturers to sell their drugs at discounted prices to entities not enumerated in the federal 340B statute, all while prohibiting manufacturers from accessing the federal [alternative dispute resolution ("ADR")] system, their only avenue for

---

[6] AbbVie has updated the policy several times since April 2023, but largely only to add additional covered drugs and to update the FAQ section of the initiative. (*See* Doc. No. 34-1 at 36–61.)

redress." (Doc. No. 33-1 at 15.)

AbbVie asks the court to preliminarily enjoin enforcement of the Act, arguing that it has shown a strong likelihood of success on the merits of its constitutional challenges to the Act, that it will be irreparably harmed in the absence of an injunction, and that the public interest favors the preservation of the status quo.

## IV. DISCUSSION

### A. Standing

In response to the plaintiffs' arguments regarding their likelihood of success on the merits of their claims, the State asserts that the case is "plagued by threshold issues" that prevent the court from even reaching the merits of the claims in the first place. (Doc. No. 23 at 15.) The only threshold issue the defendant identifies, however, is standing. Because standing raises the question of the court's jurisdiction, the court must address it first. *See Miller v. Bruenger*, 949 F.3d 986, 990 (6th Cir. 2020) ("Before a federal court takes up a case's merits, it must assure itself of its jurisdiction over the case's subject matter.").

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has repeatedly recognized that the "'case or controversy' requirement is 'fundamental to the judiciary's proper role in our system of government.'" *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (some internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Thus, "[f]ederal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law." *Id.* at 57 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)).

A case or controversy exists only when at least one plaintiff "establish[es] that [she] ha[s] standing to sue." *Id.* (quoting *Raines*, 521 U.S. at 818) (alterations in original). "[T]o satisfy Article

III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case." *Welty v. Dunaway*, 749 F. Supp. 3d 882, 901 (M.D. Tenn. 2024).

In the "pre-enforcement context," that is, when a plaintiff challenges a law prior to the commencement of an enforcement against him, "whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact.'" *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014)). The Supreme Court has recognized that "'[a]n allegation of future injury may' satisfy the injury-in-fact requirement if the alleged 'threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.* (some internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

"[D]etermining when the threatened enforcement of a law creates an Article III injury" is a "difficult and 'recurring issue." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024). The Supreme Court and the Sixth Circuit have explained that "a threat of enforcement is 'sufficiently imminent' to constitute an injury in fact if the plaintiff alleges (1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159).

In arguing that AbbVie lacks standing, the State focuses on the injury-in-fact element and argues that (1) AbbVie's fears of criminal sanctions ignore the fact that criminal sanctions under the Tennessee Consumer Protection Act ("TCPA") are entrusted to the State's individual *District* Attorneys General, not to Attorney General Skrmetti, and that corporations are unlikely to face criminal sanctions in Tennessee; (2) AbbVie has failed to show with specificity that it intends to engage in a course of conduct that will violate the Act (particularly with respect to its extraterritoriality claim); (3) AbbVie chose to bring suit "mere days" after the enactment of the Act, before Attorney General Skrmetti had the opportunity to "take any position on its scope or even threaten to wield his new enforcement authority," as a result of which AbbVie cannot establish a credible fear of enforcement and, in any event, the TCPA requires the Attorney General to give at least ten days' notice before bringing an enforcement lawsuit (Doc. No. 23 at 18); (4) AbbVie has not identified any individuals who might bring suit against it under the private enforcement provisions of the TCPA, and even if it had, the private enforcement provisions of the TCPA would not "justify this Court's use of equity power against General Skrmetti" (*id.* at 19).

AbbVie replies that it has established standing, and the court agrees, at least in part. First, as AbbVie argues, it has established an "intent to engage in conduct arguably affected with a constitutional interest," *Christian Healthcare Ctrs.*, 117 F.4th at 843—specifically, an intent to continue selling drugs in Tennessee and in interstate commerce, as a participant of the 340B program, *see Dennis v. Higgins*, 498 U.S. 439, 448 (1991) (describing the Commerce Clause as conferring a "'right' to engage in interstate commerce free from restrictive state regulation").

Second, its anticipated conduct is clearly proscribed by statute. AbbVie's written 340B Program Integrity Initiative provides that it will deliver 340B drugs only to covered entities or, if a covered entity does not have an in-house pharmacy, to *one* outside contract pharmacy, and then

only if the covered entity submits certain claims data for that pharmacy. (*See* Doc. No. 34-1 at 27.) This policy is directly at odds with the Act, which prohibits drug manufacturers that participate in the 340B program in Tennessee from placing any limitations on the number or location of the delivery of drugs to contract pharmacies and further prohibits them from imposing any conditions on delivery related to the provision of claims data or inventory management systems. S.B. 1414 § 1(a), (c). The State argues that AbbVie has failed to identify "impending, real-world circumstances in which discrete acts would invite liability." (Doc. No. 23 at 17.) There is no apparent dispute, however, that AbbVie currently sells and distributes drugs to multiple 340B covered entities in Tennessee that "purport to maintain contract pharmacy arrangements." (Compl., Doc. No. 1 ¶ 33.) AbbVie's sales to covered entities in Tennessee are currently governed by its 340B Program Integrity Initiative and will no longer be legal under S.B. 1414.

As for a credible threat of enforcement, the Sixth Circuit typically considers the so-called "*McKay* factors," from *McKay v. Federspiel*, 823 F.3d at 969, to evaluate threats of enforcement. *See Christian Healthcare Ctrs.*, 117 F.4th at 851 (describing the application of the *McKay* factors in pre-enforcement challenges as "settled circuit law" (collecting cases)). These factors include:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Id.* at 848 (quoting *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)). "These *McKay* factors are not exhaustive, nor must each be established." *Id.* (quoting *Online Merchs. Guild*, 995 F.3d at 550); *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that the McKay factors are not "a laundry list"). This inquiry "distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Id.* (quoting *Universal Life*

*Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022)).

Here, the history of past enforcement—or lack thereof—carries little, if any weight, because the challenged statute is new. *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022) (citation omitted). Likewise, the lack of enforcement warning letters has little bearing, given that the plaintiffs filed suit the day after Governor Bill Lee signed the Act. What the court finds particularly relevant is the fact that the law was evidently passed specifically for the purpose of invalidating policies like AbbVie's 340B Program Integrity Initiative—combined with the fact that there has been ongoing litigation nationwide about the issues raised here for the past several years. The Attorney General certainly has not disavowed an intent to enforce it. While it is true that government officials cannot be required to disavow enforcement of statutes in the *abstract*, here, it does not appear that the defendant would need any "additional fact[s]" to adjudicate a claim against AbbVie under the TCPA, aside from its invoking the policy in its dealings with a covered entity. *Accord Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 929 (5th Cir. 2023). Rather, what the Act says is undisputed; AbbVie has clearly articulated its policy; while the State has not affirmatively admitted that AbbVie's "current practices violate [the Act]," they obviously do; and it is undisputed that S.B. 1414 was enacted for the purpose of countering policies like AbbVie's. *Id.* "There is remarkably little else needed to adjudicate the issue[s]." *Id.*

Two matters bear closer consideration, however. First, subsection 1(c) has a grandfather clause that specifically exempts the application of that subsection to "requirements, prohibitions, limitations, or restrictions in place on or before June 1, 2025." S.B. 1414 § 1(c). The grandfather clause does not merely provide a defense; it provides an exception, meaning that the provision effectively does not apply to restrictions already in place as of June 1, 2025. Subsection 1(c) contains the prohibition on restrictions on the delivery of "340B drug[s]" to any location

authorized by a 340B covered entity. The plaintiffs argue that this grandfather clause does not provide it any assurance that § 1(c) will not be enforced against them, because they frequently update their 340B policy. However, the record conclusively establishes that AbbVie implemented its one-pharmacy restriction on its delivery of drugs purchased by 340B covered entities in April 2023, and it has not significantly changed that restriction since. (*See* Doc. No. 34-1 at 27–61.) The grandfather clause would not apply to new or more stringent restrictions, but simply altering the drugs included in its 340B program (*e.g.*, expanding its 340B program) or limiting the states to which the restriction applies based on courts' enforcement of laws similar to S.B. 1414 in those states (which would have no effect on the restriction in place in Tennessee), would not remove the policy from the protection of the grandfather clause. AbbVie, in other words, cannot establish a credible threat of imminent enforcement of S.B. 1414 § 1(c) against it.

The other parts of S.B. 1414 have no similar grandfather clause, however, and AbbVie's policy of requiring claims data from covered entities that request 340B drug delivery to a contract pharmacy is clearly implicated by one or more provisions of § 1(a), as discussed in greater detail below. With respect to this provision, at least, AbbVie has established its intent to engage in conduct that is proscribed by statute *and* "'a credible threat' of the statute's enforcement against[it]." *Christian Healthcare Ctrs.*, 117 F.4th at 843. The court finds that AbbVie has standing to bring its constitutional challenges to at least some of the provisions in S.B. 1414 § 1(a) (as detailed below).[7]

---

[7] The broad language used in the statute makes the assessment of what activity is (or is not) subject to the grandfather clause somewhat difficult. For example, subsection 1(c) can be read as prohibiting the imposition of "any restrictions" or other limits on the "acquisition of a 340B drug by . . . a 340B entity . . . unless such receipt is prohibited by" federal law. S.B. 1414 § 1(c). This language could arguably be construed to prohibit conditioning a covered entity's receipt of 340B drugs on the provision of certain claims data, as AbbVie's policy does. If subsection 1(c) is thus construed, however, then subsection 1(a)'s prohibitions on the drug manufacturers' conditioning

The other matter that warrants further discussion is AbbVie's challenge based on the possibility of criminal sanctions. While the TCPA indeed authorizes criminal sanctions, in Tennessee, only District Attorneys—not the Tennessee Attorney General named as a defendant—can bring criminal charges. *Accord Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 439 (6th Cir. 2024) ("[A] district attorney general has the sole duty, authority, and discretion to prosecute criminal matters in the State of Tennessee." (quoting *State v. Spradlin*, 12 S.W.3d 432, 433–34 (Tenn. 2000))), *cert. denied*, 145 S. Ct. 1178 (2025). AbbVie has not named the state District Attorneys as defendants; nor has it addressed the likelihood that they ever do or would bring criminal charges under the TCPA. While, as the State points out, it is at least theoretically possible for a corporation to be criminally charged and convicted, *see Louisville & N. R. Co. v. State*, 40 Tenn. (3 Head) 523, 523 (1859), AbbVie has not cited—and this court is unaware—of any instances in which criminal charges were brought against a corporation for violation of the TCPA. AbbVie, that is, has not established a credible fear of enforcement of the criminal sanctions

---

delivery of 340B drugs on the provision of claims data or other documentation by the covered entities would be redundant, and it does not appear that either the State or the plaintiffs read subsection 1(c) that broadly. (*See, e.g.*, Doc. No. 23 at 14 ("[T]he Hospital Protection Act prevents drug manufacturers from restricting who can 'receive 340B drugs on behalf of' a 340B Hospital, beyond what is already prohibited by the federal government or 'applicable state law.'" (quoting S.B. 1414 § 1(c)).) Conversely, subsection 1(a)(6) prohibits "[i]mposing any requirement determined by the attorney general and reporter to interfere with the ability of a 340B entity to access discounts provided under the 340B program." AbbVie argued during the hearing that this provision can be read broadly enough to cover the conduct expressly prohibited by subsection 1(c) and asked the court to conclude, as a result, that none of its intended conduct would be covered by the grandfather clause. As the State points out, however, such "catch-all" provisions should not be construed as encompassing express provisions embodied elsewhere in a statute. *Accord RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012) ("[G]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932))). To read subsection 1(a)(6) that broadly would make subsection 1(c) redundant, thus "violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* (quoting *D. Ginsberg*, 285 U.S. at 208).)

provision against it—and particularly not a credible fear that the named defendant will or is authorized to pursue criminal charges against it. AbbVie therefore lacks standing to challenge the criminal sanctions provision of the TCPA, insofar as it incorporates a violation of S.B. 1414.

In any event, because AbbVie has established standing to challenge S.B. 1414 § 1(a) and the Act's civil enforcement provisions, the court will address the merits of its claims addressed to those portions of the Act.

### B.    Likelihood of success on the merits

The first preliminary injunction factor requires the moving party to demonstrate a "a strong likelihood of success on the merits." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). This factor is often "determinative." *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020) (citation omitted). At this stage, the plaintiffs are not required to "prove [their] case in full"; rather, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (internal quotation marks and citations omitted). This standard, however, is "much more stringent than the proof required to survive a summary judgment motion," which requires only that the plaintiff "create a jury issue." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

As noted above, AbbVie argues that the Act violates the U.S. Constitution in five distinct ways: (1) it is preempted by federal law; (2) it effects an unconstitutional taking; (3) it is unconstitutionally vague; (4) it offends the dormant Commerce Clause; and (5) it unlawfully burdens AbbVie's First Amendment right to petition the government. It contends that it has a strong likelihood of success on each of these claims. Because AbbVie has standing only to challenge subsection 1(a) of the Act, the court's inquiry focuses on that part of the statute.

### 1.    *Preemption*

"Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI). Under this provision, known as the Supremacy Clause, "state law that conflicts with federal law is 'without effect.'" *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see also McClain*, 95 F.4th at 1140 (quoting *Cipollone*, 505 U.S. at 516).

While the Supremacy Clause does not "include[] a private right of action," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015), courts have long recognized that "plaintiffs can challenge an allegedly preempted state law in federal court prior to enforcement by asserting a cause of action in equity," *Farmworker Ass'n of Fla., Inc. v. Uthmeier*, No. 23-CV-22655-RAR, 2025 WL 1133682, at *3–4 (S.D. Fla. Apr. 17, 2025). *Accord, e.g.*, *Armstrong*, 575 U.S. at 326–27 (recognizing that equitable relief from the unconstitutional actions of state officers does not depend upon an implied right of action under the Supremacy Clause); *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012) (noting that the question, at that time (pre-*Armstrong*) of whether the Supremacy Clause created an implied cause of action was a "matter of debate" but that "[e]ven the critics of an implied cause of action" recognize that plaintiffs may "seek[] declaratory or injunctive relief against a state or local government that is presently taking or threatening action against the plaintiff pursuant an allegedly preempted state law").

Preemption may be either express or implied. *Torres v. Precision Indus., Inc.*, 995 F.3d 485, 491 (6th Cir. 2021). Where, as here, Congress did not "explicit[ly] state its intent to preempt state law, *In re Schafer*, 689 F.3d 601, 614 (6th Cir. 2012), it may "impliedly preempt state law either through 'field' pre-emption or 'conflict' preemption," *McClain*, 95 F.4th at 1140 (citation modified). Field preemption "applies when federal law is so 'pervasive' in one particular field that

it exclusively occupies that field." *Torres*, 995 F.3d at 491 (quoting *In re Schafer*, 689 F.3d at 614). Conflict preemption "applies when federal and state laws conflict in a way that would make compliance with both impossible, or when the state laws 'interfere[] with the operation of the federal program.'" *Id.* (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011)). "In either situation, federal law must prevail." *McClain*, 95 F.4th at 1140.

AbbVie argues both that the Act "intrudes on a field of federal regulation—340B pricing—created and occupied by Congress" and that it "directly conflicts with Congress's objections . . . by expanding the number of entities entitled to receive 340B discounted prices, effectively barring manufacturers from accessing the 340B programs' ADR system and installing a parallel state enforcement regime." (Doc. No. 33-1 at 17.) In other words, AbbVie contends that both field preemption and conflict preemption apply.

### a)    Field Preemption

"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Torres*, 995 F.3d at 491 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). However, "[b]ecause preemption can trammel upon state sovereignty, courts apply a 'strong presumption' against implied preemption in fields that States traditionally regulate." *Id.* (quoting *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015)). The Supreme Court has recognized a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985), *quoted in McClain*, 95 F.4th at 1140.

In support of field preemption, AbbVie argues that the federal 340B program "authorizes *no state regulation* of 340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." (Doc. No. 33-1 at 18.) It contends that, "[b]y prohibiting manufacturers from

denying contract pharmacies access to their drugs at the 340B price, Tennessee is ostensibly demanding that manufacturers provide their drugs to entities not otherwise required by federal law and at a particular price." (*Id.*)

The primary problem with the plaintiffs' position is that neither AbbVie's policy nor S.B. 1414 says anything about the *pricing* of 340B drugs; both entirely concern the *delivery* of 340B drugs. AbbVie seeks to limit the locations to which it is required to deliver 340B drugs and to impose additional requirements whenever its drugs are delivered to an outside pharmacy rather than to a covered entity. Tennessee seeks to restrict drug manufacturers' ability to impose such restrictions on delivery. The Third and D.C. Circuit Courts of Appeal have both held that the 340B statute is "silent about delivery." *Sanofi Aventi*s, 58 F.3d at 703; *Johnson*, 102 F.4th at 461. And the Eighth Circuit, presented with an Arkansas statute similar to S.B. 1414, concluded that "the 340B Program is not 'so pervasive . . . that Congress left no room for the States to supplement it.'" *McClain*, 95 F.4th at 1143 (quoting *Arizona*, 567 US. at 399). The court noted that outside pharmacies "have always been an essential part of the 340B Program" and that the program's "silence" regarding the delivery of drugs to patients "contrasts with 340B's provisions that directly address distribution by third-party wholesalers." *Id.* (citing 42 U.S.C. § 256b(a)(8)). The court held that "Congress's decision not to legislate the issue of pharmacy distribution indicates that Section 340B is not intended to preempt the field." *Id.* Its conclusion was further bolstered by the fact that "the practice of pharmacy is an area traditionally left to state regulation" and that the court was required to "assume that absent a strong showing that Congress intended preemption, state statutes that impact health and welfare are not preempted." *Id.* at 1143, 1144 (quoting and then citing *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)).

For the same reasons, this court finds that Congress did not intend to preempt the field. *Accord Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 2:24-CV-04144-MDH, 2025 WL 644281, at *5 (W.D. Mo. Feb. 27, 2025) (finding no field preemption based on *McClain*); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657, 665 (S.D. Miss. 2024) (same); *Pharm. Rsch. & Manufacturers of Am. v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *8 (W.D. La. Sept. 30, 2024) (same).

#### b)    *Conflict Preemption*

As set forth above, conflict preemption may arise "when federal and state laws conflict in a way that would make compliance with both *impossible*, or when the state laws *interfere* with the operation of the federal program." 995 F.3d at 491 (emphasis added) (citation modified). In other words, there are two types of conflict preemption: "direct conflict" (when compliance with both federal and state law is impossible) and "obstacle preemption" (when a state law interferes with— or "stands as an obstacle" to—Congress's objectives). *See Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 452 (S.D.W. Va. 2024). Without specifically distinguishing between them, AbbVie appears to invoke both types. Specifically, it argues that

> (1) S.B. 1414 directly conflicts with the 340B program's "explicit enumeration of covered entities with access to 340B pricing by forcing manufacturers to transfer their drugs at 340B prices to third parties unenumerated in federal law," *i.e.*, to contract pharmacies (Doc. No. 33-1 at 19);

> (2) S.B. 1414 directly conflicts with "340B's exclusive federal enforcement scheme by prohibiting manufacturers from demanding claims data from or initiating audits of covered entities or contract pharmacies" (*id.*); and

> (3) S.B. 1414 interferes with ("undermines") the "enforcement scheme contemplated by Congress" by "install[ing] its own parallel enforcement regime in the Attorney General and private citizens" (*id.*).

The first conflict preemption argument is directed to S.B. 1414 § 1(c), the provision that, according to the plaintiffs "forc[es] manufacturers to transfer their drugs at 340B prices to third

parties unenumerated in federal law." The court, however, has already found that AbbVie lacks standing to bring this claim, because its policy restricting delivery to contract pharmacies falls directly within the scope of § 1(c)'s grandfather clause. The court, therefore, does not reach the merits of this argument, but will address the other two.[8]

### i. S.B. 1414 § 1(a)—Claims Data Provisions

AbbVie's second argument implicates S.B. 1414 § 1(a)(1), (2), and (4). Subsection (a)(1) prohibits drug manufacturers from requiring covered entities or contract pharmacies to submit "any health information, claims or utilization data, purchasing data, payment data, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity[9] unless such data submission is explicitly required" by federal or state law. Subsection (a)(2)

---

[8] Numerous other courts, however, have held that similar state laws do not directly conflict with the federal 340B program, and this court would largely agree with their reasoning, if called upon to address the merits of the plaintiffs' preemption argument. *See, e.g.*, *McClain*, 95 F.4th at 1144–45 ("Act 1103 does not create an obstacle for pharmaceutical manufacturers to comply with 340B, rather it does the opposite: Act 1103 assists in fulfilling the purpose of 340B. In arguing otherwise, PhRMA presents no evidence of an obstacle. Instead, PhRMA raises the same arguments it raised with field preemption."); *Murrill*, 2024 WL 4361597, at *8 ("[I]f Section 340B does not address contract pharmacies or the relationship between covered entities and their contract pharmacies, a state statute that specifically addresses contract pharmacies cannot conflict with Section 340B. Put another way, Plaintiffs cannot credibly argue that it is impossible to comply with both Louisiana Act 358 and the federal Section 340B program in light of *Sanofi*."); *Bailey*, 2025 WL 644281, at *5 ("S.B. 751 does not require manufacturers to extend the federal 340B discount to contract pharmacies, it just restricts pharmaceutical companies from infringing on the distribution and delivery of 340B drugs bought by covered entities utilizing the 340B program. S.B. 751 does not set or enforce discount pricing but protects covered entities['] use of contract pharmacies. As such, there is no obstacle to the enforcement of the 340B program."); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) ("Plaintiffs do not persuasively show . . . how H.B. 728 creates a substantial obstacle to Section 340B's purposes, or what consideration Congress had in mind in not addressing delivery of 340B drugs.").

[9] The Act defines the term "340B entity" to include both covered entities, as defined by federal law, and "the entity's pharmacy or pharmacies." S.B. 1414 § 1(g)(2). From context, it appears that the "entity's pharmacies" would include both in-house pharmacies and contract pharmacies acting as agents for the covered entity for purposes of distributing 340B drugs. Contrary to AbbVie's arguments elsewhere, S.B. 1414 does not redefine "covered entity," and it

prohibits drug manufacturers from "requir[ing] a 340B entity to reverse, resubmit, or clarify a claim after the initial adjudication unless these actions are in the normal course of business and not related to the 340B program." Subsection 1(a)(4) prohibits the imposition of "any requirement relating to the frequency, duration, or scope of audits that are [sic] not imposed on pharmacies or providers that are not 340B entities."

AbbVie's position regarding these clauses is that Congress specifically "delineated" the "tools and penalties available to the Secretary" for the enforcement of the 340B program's compliance mechanisms and restrictions on covered entities and placed enforcement "exclusively in HRSA's hands." (Doc. No. 33-1 at 20 (citing 42 U.S.C. § 256b(d)(l)(B)(v), (vi), (d)(3)).) Of particular concern to AbbVie is the ADR system. Under regulations adopted by HHS, drug manufacturers may employ the ADR system "only '*after* the conduct of audits as authorized by' the statute." (*Id.* at 21 (quoting 42 U.S.C. § 256b(d)(3)(A)) (emphasis added by AbbVie)).) According to AbbVie, drug manufacturers cannot access the federal ADR system unless they show "good cause" to obtain the right to an audit, and it will not be able to show the requisite "good cause" unless it is permitted to demand claims data and other documents from covered entities and their contract pharmacies. (*See id.* ("[M]anufacturers have only one avenue available to investigate and enforce suspected abuse of the 340B program—the ADR system—and to access that system, they must be able to provide reasonable cause of suspected violations in the form of claims data. Tennessee's law effectively forecloses the ADR process . . . .").)

More specifically, AbbVie contends that the three provisions referenced above collectively "bar[] manufacturers from demanding the claims data needed to conduct an audit, prohibit[]

---

does not require the sale of drugs at the 340B price to contract pharmacies. Rather, it requires manufacturers to deliver 340B drugs purchased by covered entities to contract pharmacies designated by covered entities.

manufacturers from conducting the audits required to access the ADR system, and thwart[] attempts to resolve any potential claims in good faith—all steps required for manufacturers under the federal 340B statute prior to seeking redress through the ADR system." (*Id.* at 22.) Consequently, it argues, "S.B. 1414 'stand[s] as an obstacle' to Section 340B's twin purposes— "providing discounts to covered entities only and prohibiting fraud.'" (*Id.* (quoting *Morrisey*, 760 F. Supp. 3d at 452).)

The State responds to this argument by arguing, somewhat ineffectually, that the Act does not "prevent AbbVie from gathering information about potential diversions" but instead only prevents it from "requiring 340B Hospitals to assume self-auditing burdens" that are "not imposed on other pharmacies or providers." (Doc. No. 23 at 23 (citation modified).) It asserts that AbbVie can obtain claims data and other information "by other means and through other parties" (without identifying such other means or other parties) and that, if it wants to impose requirements related to audits, it can do so for "*all* healthcare 'providers' and 'in the normal course of business.'" (*Id.* quoting S.B. 1414 § 1(a)(2), (4)).) It also argues that, even if the court views these provisions as imposing a "meaningful hurdle to AbbVie's self-help," that alone is not sufficient to find that the statute poses an obstacle to federal enforcement, because, as AbbVie itself recognizes, Congress vested the executive branch with "exclusive authority to protect the 340B program's integrity." (*Id.* (citation modified).)

More persuasively, the Brief of Amici Curiae points out that nothing in S.B. 1414 prevents manufacturers from *asking* for needed information about disputed drug reimbursement claims—it simply prevents them from *requiring* it as a condition of providing 340B drugs to a designated contract pharmacy. Amici also assert that, while the ADR guidelines require "reasonable cause" for seeking an audit, this standard is "not overly burdensome" and does not "present any barriers

to a manufacturer's ability to perform an audit of a covered entity." (Doc. No. 40 at 16 (quoting 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 FR 28643-01 ("ADR Rule"), at 28,646 (April 19, 2024)); *see id.* (noting that, in the preceding five years, "HRSA has not denied a request for a manufacturer audit of a covered entity" (citing ADR Rule at 28,646)).) In addition, the "reasonable cause" standard required for requesting an audit is broadly defined to mean "that a reasonable person could believe that a covered entity may have violated [certain provisions of the 340B statute]." (*Id.* (quoting 1996 Guidance at 65,406, 65,409).) Amici further posit that manufacturers "can meet this standard in various ways that require little evidence (and certainly do not require claims data)—for example, by pointing to '[s]ignificant changes in quantities of specific drugs ordered by a covered entity,' or by citing 'complaints from patients/other manufacturers about activities of a covered entity.'" (*Id.* (quoting 1996 Guidance at 65,406).)

The plaintiffs rely heavily on *Morrisey*, an opinion from the Southern District of West Virginia addressing a statutory scheme similar to that at issue here. To the court's knowledge, *Morrisey* stands thus far as the sole judicial opinion ruling in favor of drug manufacturers challenging state laws seeking to limit the manufacturers' ability to impose delivery conditions on 340B drugs. The court there held that, "to fit comfortably within the federal law, a state law must not create an obstacle to [the] twin federal purposes" of the 340B program, which the court identified as "providing discounts to covered entities only and prohibiting fraud through duplicate discounts." 760 F. Supp.3d at 452. It found that West Virginia's "no audits" provision posed "an obstacle to both purposes."[10] *Id.*

---

[10] The "no-audits" provision in the West Virginia law states that "no manufacturer shall directly or indirectly 'require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity unless'

In particular, the court observed that the 340B program authorizes drug manufacturers to utilize the ADR system only after first conducting an audit, meaning that the audit "serves as a condition precedent" to the use of the federal ADR system. *Id.* at 453. And it read West Virginia's "no-audit" provision as "clearly restrict[ing] such a condition from being met," insofar as it "restrict[ed] the very method by which data collection is made," thus "frustrat[ing] drug manufacturers' ability to take the initial steps necessary to start the very audit required to access the [ADR] system." *Id.* The court also found insufficient the State's argument in response that the law did not prevent the plaintiffs from requesting or accessing "dispensing data" through "other lawful means," without actually explaining what other lawful means were available to the drug manufacturers, aside from simply requesting the data. *Id.* The court rejected mere "requests" as a meaningful avenue:

> What then happens if a covered entity declines such a request? Defendants offer no alternatives. In fact, given that the No-Audits Provision forbids manufacturers from "indirectly[] requir[ing] a 340B entity to submit claims utilization data," *see* W. Va. Code § 60A-8-6a(b)(2), it seems there is not much recourse available to a manufacturer. Instead, covered entities—who may be engaging in the kind of fraud that the 340B Program's alternative dispute resolution system is meant to prevent—will essentially be the ones determining whether or not they wish to give manufacturers the very data necessary to start such an audit. The 340B Program certainly did not establish a system where the fox guards the hen house. By restricting a practice that the industry utilizes in order to take the first step toward accessing the 340B Program dispute resolution system, S.B. 325 creates an impermissible obstacle to executing the federal program.

*Id.* at 453. Thus, in short, the court found that the West Virginia statute hampered drug manufacturers' ability to establish the "reasonable cause" necessary to support a request for an audit and, by impeding their ability to conduct an audit, completely obstructed their access to the ADR system. *Id.* The court therefore concluded that the no-audit provision did not simply create

---

the data is required to be shared by federal law." *Morrisey*, 760 F. Supp. 3d at 449 (quoting W. Va. Code § 60A-8-6a(b)).

"tension with the federal objectives" but, instead, stood "as an obstacle to achieving the federal objective of preventing fraud in the 340B Program." *Id.* On this basis, the court held that the plaintiffs met their burden of demonstrating a substantial likelihood of success on the merits of their claim that the no-audits provision was preempted by the 340B program.

This court, however, is not bound by *Morrisey* and is not persuaded by its reasoning. First, notably, nothing in the federal program has ever *required* covered entities to provide claims data (or "clarification") or other documentation to drug manufacturers upon demand, yet the ADR system has nonetheless been in place and functioning adequately for many years in the absence of any such requirement. Consequently, a state law that prohibits drug manufacturers from imposing upon covered entities a requirement that they submit claims data or other documentation as a precondition to allowing them to purchase drugs at the 340B discount price does not substantially alter the federal system.

Second, the plaintiffs have not actually shown that they need claims data and the other documentation they purport to need in order either to request an audit or to attempt to resolve a dispute in good faith before proceeding to ADR. As set forth in the 1996 Guidance, only "reasonable cause" is required to support a manufacturer's request for an audit, to "ensure that the audits are performed where there are valid business concerns." 1996 Guidance at 65,406. "Reasonable cause" is not precisely defined, but the plaintiffs have not provided any evidence that the provision of claims data is necessary to establish such reasonable cause. Rather, according to HRSA, "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." *Id.* In other words, if a manufacturer has an articulable basis for suspecting that a covered entity is engaging in prohibited conduct, it likely will have reasonable

cause to request an audit. And a good faith request by the manufacturer for documents from a covered entity—again, so long as it has an articulable basis for believing that the entity is not in "compliance with the prohibitions against drug diversion and the generation of duplicate drug rebates and discounts with respect to drugs of the manufacturer"—would satisfy its obligation to "attempt in good faith to resolve the matter" before accessing the dispute resolution system. *Id.* at 65,406, 65,410; *see also* 42 C.F.R. § 10.21(b)(4) ("A covered entity or manufacturer filing a claim must provide documentation of good faith efforts, including for example, documentation demonstrating that the initiating party has made attempts to contact the opposing party regarding the specific issues cited in the ADR claim.").

And finally, as Amici also point out, HRSA itself observed in April 2024 that the standards for initiating a manufacturer audit "are *not overly burdensome* [and do not] present any barriers to a manufacturer's ability to perform an audit of a covered entity." ADR Rule at 28,646 (emphasis added). The plaintiffs, in fact, have presented no evidence that they or other drug manufacturers have ever been denied the ability to conduct an audit upon request or that they have been required to submit the kind of claims data they claim to need in order to substantiate a request for an audit. Rather, claims data is more likely to be precisely the documentation that would be reviewed *in the course of conducting an audit*.

In sum, the court finds that the plaintiffs have not established a strong likelihood of success on the merits of their claim that Subsections (a)(1) and (2) are preempted by the 340B program. Regarding Subsection (a)(4), AbbVie has not suggested that its 340B policy contains any provisions relating to audits that would conflict with the state law; nor has it substantiated its argument that this provision actual conflicts with the federal ADR program.

### *ii. S.B. 1414 § 2—The State's Enforcement Scheme*

The Act provides that a violation of § 1(a) or 1(c) constitutes an "unfair or deceptive act or practice affecting trade or commerce" that may entail a civil penalty of $50,000 "per violation." S.B. 1414 § 1(d)(1). "Each package of 340B drugs applicable to a violation . . . constitutes a separate violation." *Id.* § 1(d)(2). In addition, a violation of the Act also constitutes a violation of the TCPA, *id.* § 2, which not only authorizes the Attorney General to bring an investigation and a civil enforcement action, but also permits enforcement actions by private individuals who "suffer[] an ascertainable loss of money or property . . . as a result" of any person's use of a practice described as unfair or deceptive under the TCPA. *See generally* Tenn. Code Ann. § 47-18-109(a)(1). In other words, there is no question that a violation of S.B. 1414 may entail severe penalties.

AbbVie argues that the Supreme Court has confirmed that HHS, acting through HRSA, has sole responsibility for administering and enforcing the 340B program and that Congress provided the "specific enforcement tools and penalties" for doing so. (Doc. No. 33-1 at 23 (citing *Astra USA*, 563 U.S. at 120; 42 U.S.C. § 256b(d)(l)(B)(v), (vi), (d)(3)).) It contends that the Act "contravenes HRSA's exclusive enforcement authority by installing its own parallel enforcement regime" and that it is well established that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." (Doc. No. 33-1 at 23 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000)) (citation modified).) And AbbVie relies on the holding in *Morrisey* that West Virginia's parallel enforcement scheme undermines "what Congress contemplated when it centralized enforcement [of the 340B program] in the government." (*Id.* (internal quotation marks omitted) (quoting *Morrisey*, 760 F. Supp. 3d at 457 (S.D.W. Va. 2024)).)

*McClain* addressed a similar argument. The Arkansas statute at issue there "created [an] oversight and enforcement scheme by empowering a state agency to exact penalties on manufacturers who refuse to distribute to contract pharmacies." *McClain*, 95 F.4th at 1144. The court held that this scheme did not conflict with—and was not preempted by—the 340B program, which "addresses discount pricing" and grants HHS jurisdiction over "disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *Id.*

In *Morrisey*, on the other hand, the West Virginia court distinguished *McClain* on the grounds that the plaintiffs in the case before it had established that the West Virginia statute, even if it purported to address the delivery of 340B discounted drugs, in reality sought to "operate[] as a means to enforce the 340B ceiling price." *Morrisey*, 760 F. Supp. at 456. It explained this conclusion based on the defendant's acknowledgment of the "replenishment model," discussed above, as the "controlling drug distribution model in West Virginia." *Id.* at 455. The court explained its view that, under this model,

> [b]ecause the drug is already in the hands of the contract pharmacy even before the patient arrives at the pharmacy, the question is not about delivery of the drug. The question is only about what price the pharmacy and the covered entity will pay the manufacturer for the replenished drug upon distribution of the 340B Program eligible one. Put another way, the system is about delivery at a given price, not delivery *per se*.

> Price is what distinguishes between an "ordinary drug" and a 340B Program drug—a fact that seems to be reflected in the statute itself. [The plaintiffs assert] that S.B. 325 "has a substantial impact on the types of transactions that trigger the 340B discount under federal law and the volume of discounts manufacturers must offer." That is because "[their] wholesalers and retailers already deliver [their] drug products to contract pharmacies throughout West Virginia," irrespective of the ceiling price it may charge. Thus, a manufacturer risks violating S.B. 325 "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering its drugs to those pharmacies." None of the non-binding authority that Defendants cite as examples of similarly upheld statutes indicates that the replenishment model was considered by those respective courts.

*Id.* at 455–56 (internal citations omitted). Because *Astra* establishes that "[p]rice regulation is exclusively controlled by the federal statute," the court found that the state's enforcement of its own statute would "necessarily intrude on the federal scheme" and, therefore, that the plaintiffs were likely to succeed on the merits of their claim that the state's enforcement mechanism was preempted. *Id.* at 458.

The court also found that the fact that "differing state and federal adjudications may result" from the state's enforcement mechanism, because adjudication of claims for violation of the state law would necessarily require the state to "make some determinations of federal law." *Id.* Although the defendant argued that a claim of "diversion, which would be adjudicated through the federal dispute resolution system, might operate as a defense to the state's enforcement," the court noted that the state statute did not actually authorize such a defense and that it was more "likely that a drug manufacturer could both restrict distribution at the 340B price because of diversion concerns and be subject to sanction under S.B. 325." *Id.* at 458. The court concluded that "[t]his risk of conflicting results cuts against Congress's vision of 'centralized enforcement'" and that the state enforcement mechanism "present[ed] an obstacle to this centralized purpose." *Id.*

*Morrissey*'s analysis of the potential conflict focused on the replenishment model and the procedure for enforcing the West Virginia provision equivalent to S.B. 1414 § 1(c)—that is, the delivery restrictions that are, as discussed above, unlikely to be enforced against AbbVie in light of the grandfather clause that pertains to the application of § 1(c). This court nonetheless would take issue with *Morrissey*'s characterization of that provision as controlling *price* rather than *delivery*. The Tennessee statute says nothing about price, and, even under the replenishment model, covered entities are the only entities entitled to the 340B discount. Section 1(c), if it applied to AbbVie, would prohibit it from imposing restrictions on where it is willing to *deliver* drugs that

have been purchased by covered entities under the 340B discount. The amount of the discount is not at issue and is not affected by the state scheme.

The claims documentation and audit provisions are also clearly related to delivery rather than price. They restrict drug companies from conditioning the delivery of 340B drugs to a covered entity or any designated outside pharmacy upon the provision of such documentation. They directly implicate AbbVie's policy, which purports to condition delivery to any outside pharmacy upon the submission of certain claims data. Tennessee's enforcement mechanism would be related to the imposition of such *requirements* by a drug company, and the plaintiffs have not articulated how enforcement of that mechanism would in any way interfere with or overlap the federal enforcement procedures related to "disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs." *McClain*, 95 F.4th at 1144. Nor have they suggested how a manufacturer's suspicion of "diversion" of 340B-discounted drugs, *per se*, would constitute a defense to a state claim based on a violation of § 1(a)(1).[11] In other words, the state's system is not about diversion, and fears of diversion would not justify failure to comply with the state law. Enforcement of the penalties and mechanisms for addressing diversion would instead be pursued—entirely separately—through the federal ADR system. The plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the state enforcement mechanism conflicts with, poses an obstacle to, or is preempted by the federal ADR system embodied in the 340B program.

---

[11] *Morrisey* provides no support for its presumption that the 340B program authorizes drug manufacturers to simply "restrict distribution at the 340B price because of diversion concerns." 760 F. Supp. 3d at 458. Rather, manufacturers apparently must be able to articulate reasonable cause for such concerns, seek an audit, and pursue informal dispute resolution and then resolution of a diversion dispute through ADR, as discussed above.

### 2.    *The Takings Clause*

The Takings Clause, which is "applicable to the States through the Fourteenth Amendment," *Cedar Point Nursey v. Hassid*, 594 U.S. 139, 147 (2021), provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The "classic taking [is one] in which the government directly appropriates private property for its own use." *Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015) (quoting *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 (2002)). The Takings Clause does not distinguish between personal property and real property. *Id.* at 358. Thus, an appropriation of either type of property "is a *per se* taking that requires just compensation." *Id.*

AbbVie argues that, even if it is not preempted, S.B. 1414 violates the Takings Clause, insofar as it "compels AbbVie and other manufacturers to sell their products at 340B-discounted prices, allowing contract pharmacies and covered entities to reap windfall profits." (Doc. No. 33-1 at 25.) AbbVie's takings theory is that the Act "violates [the] principle" that the government "may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation." (*Id.* at 26.) In particular, according to AbbVie, § 1(c) of the Act

> forbids AbbVie from "deny[ing]," "restrict[ing]," "prohibit[ing]," or "otherwise limit[ing]" the "acquisition of a 340B drug by" a "340B entity," including contract pharmacies and any "other location that is under contract with" a 340B entity. Telling manufacturers that they cannot include certain conditions on the sale of their drugs and cannot interfere with the acquisition of their drugs by contract pharmacies is the same as forcing manufacturers to sell their drugs at confiscatory prices under conditions favored by the State. This is not a "public use" recognized in American law.

(*Id.* (quoting S.B. 1414 § 1(c)).)

There are many problems with AbbVie's analogy. First, the State does not require AbbVie to sell its drugs in Tennessee at all; AbbVie voluntarily chooses to participate in Medicare and

Medicaid and to participate in the 340B program as a condition of that choice. Second, the State regulations on delivery do not amount to taking possession of AbbVie's property or conveying it to a third party, and AbbVie's gripe with the whole system is that it does not like the volume of drugs being sold at the 340B discount price. It believes that covered entities' use of contract pharmacies, for inexplicable reasons, increases the quantity of drugs purchased by covered entities at the 340B discount price.

District courts in Mississippi, Louisiana, and Missouri have rejected nearly identical takings challenges, concluding that the laws of those states prohibiting drug manufacturers from limiting or restricting the number of contract pharmacies or locations to which they will deliver 340B-discounted drugs purchased by covered entities do not constitute either a *per se* taking or a regulatory taking and that, even if they did effect a taking, it was a taking for public use, not private use, as a result of which the equitable relief the plaintiffs sought would not be an available remedy. *See AbbVie Inc. v. Fitch*, 2024 WL 3503965, at * 19–20 (denying plaintiffs' preliminary injunction motion); *see also Astrazenca Pharms. LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at *5–6 (W.D. Mo. Feb. 27, 2025) (dismissing takings claim); *Murrill*, 2024 WL 4361597, at *15 (granting summary judgment for the State on the plaintiffs' takings claim). These opinions are highly compelling and persuasive but ultimately of little relevance here, again because the court has found that AbbVie lacks standing to challenge the implementation or enforcement of § 1(c).

AbbVie does not argue that the provisions of § 1(a) constitute a taking. The court therefore finds that AbbVie has not established a substantial likelihood of success on its claim that S.B. 1414 effects an unconstitutional taking.

### 3.    *The Due Process Clause and Vagueness*

AbbVie's Complaint sets forth a claim for relief under the Due Process Clause of the Fourteenth Amendment, based on allegations that §§ 1(a)(3), 1(a)(4), 1(a)(6), and 1(c) are

unconstitutionally vague on their face. (Doc. No. 1 ¶¶ 179–88.) Its Motion for Preliminary Injunction argues perfunctorily that subsections 1(a)(3) and (a)(6) are unconstitutionally vague and that their lack of precision is rendered more egregious by the fact that S.B. 1414 "grants the Tennessee Attorney General *criminal* enforcement authority." (Doc. No. 33-1 at 29.)

The State contends that the statute is not untenably vague, as it provides ample notice of what constitutes a violation, and, even if the language of the Act arguably "leave[s] some wiggle room," the Attorney General is required to give notice of a potential violation before pursuing an enforcement action. (Doc. No. 23 at 17–18.) It also points out that, as discussed above, the Act does not actually give the Attorney General criminal enforcement authority. Rather, both S.B. 1414 and the TCPA give the Attorney General civil enforcement authority only.

If a challenged statute does not implicate First Amendment rights or impose criminal sanctions, a plaintiff "only has standing to challenge its purported vagueness as applied to the facts of her case." *Johnson v. Morales*, 946 F.3d 911, 928–29 (6th Cir. 2020). And in that situation, a statute is unconstitutionally vague only "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* at 929 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

The court has already found that the TCPA does not authorize the Attorney General to bring criminal enforcement proceedings and that, in any event, the plaintiff lacks standing to challenge the criminal enforcement provision, because it has not named the state District Attorneys as defendants; nor has it addressed the likelihood that they ever do or would bring criminal charges under the TCPA. Accordingly, the court finds that the standard articulated in *Johnson* applies, and the plaintiffs have the burden of establishing that people of ordinary intelligence would not

understand what the Act prohibits or showing that the Act authorizes or encourages arbitrary enforcement. In addition, the void-for-vagueness doctrine applies less strictly to economic regulations. *Id.* (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982)). In that context, the standard asks whether a "*business person* of ordinary intelligence would understand" the conduct prohibited. *Hoffman*, 455 U.S. at 501 (emphasis added).

Here, the plaintiffs challenge S.B. 1414 § 1(a)(4) as unconstitutionally vague, insofar as it bars drug manufacturers from "impos[ing] any requirements relating to inventory management systems of 340B drugs, unless such requirement is required by [HHS] or applicable state law." (*See* Doc. No. 33-1 at 28.) They object that this subsection leaves manufacturers to guess the meaning of the terms "requirement," "relate," and "inventory management system." They contend that they could be "exposed to liability for routine supply-chain practices, operational policies, or even basic compliance steps—without any clear way to know whether those practices 'relate' to inventory systems under the statute." (*Id.* at 28–29.)

The plaintiffs also object to the "catch-all" provision in § 1(a)(6), which prohibits "any" conduct that the Attorney General deems to "interfere[] with the ability of a 340B entity to access discounts provided under the 340B program. They argue that this provision "impermissibly delegates open-ended enforcement discretion to a state official and invites 'arbitrary, discriminatory and overzealous enforcement.'" (Doc. No. 33-1 at 28 (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 198 (6th Cir. 1990)).) They further contend that the term "interference" itself is amorphous and utterly lacking in standards, unmoored to any objective criteria.

The court finds that these provisions, read in the context of the statute as a whole and considered from the perspective of a reasonable business person—and, more specifically, a

reasonable drug manufacturer—provide adequate notice of what conduct is prohibited and do not invite arbitrary enforcement. The Act is targeted at precisely the conduct in which AbbVie and other drug manufacturers want to engage in order to limit the expansion of the 340B program. That is, the State seeks to ensure that drug manufacturers do not impose restrictions on covered entities' access to 340B discounted drugs that are not expressly authorized by federal law. The word "requirement" is not ambiguous in this context. It has its ordinary dictionary meaning of "something required," a "necessity," or a condition—that is, "something essential to the existence or occurrence of something else." *Requirement*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/requirement (last visited June 27, 2025). "Inventory management system," given the context in which it appears, obviously refers to the replenishment model to which AbbVie strenuously objects—and to virtually any other inventory system covered entities and contract pharmacies might devise, so long as they are compliant with federal law. Thus, subsection (a)(4) prohibits drug manufacturers from imposing any inventory-related conditions upon the delivery of 340B discounted drugs to covered entities.

Similarly, ordinarily intelligent drug manufacturers would not need to guess at the meaning of the term "interfere" as used in subsection (a)(6). As another district court observed in addressing a similar challenge to a similar statute enacted in Mississippi,

> Black's Law Dictionary defines "interference" as "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others." Interference, *Black's Law Dictionary* (11th ed. 2019). [The Mississippi statute] thus prohibits manufacturers from "obstructing [the] normal operations" of, "or intervening or meddling in the affairs" of a contract pharmacy receiving and dispensing 340B drugs to 340B patients.

*Pharm. Rsch. & Mfrs. of Am. v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365, at \*14 (S.D. Miss. July 1, 2024). As that court concluded:

> The statute plainly requires manufacturers to deliver 340B drugs to contract pharmacies and prohibits manufacturers from obstructing contract pharmacies in

their dispensation of 340B drugs. The Court need not determine the precise contours of the statute in every hypothetical application because Plaintiff's "facial challenge may only be sustained if the enactment is impermissibly vague in all of its applications."

*Id.* (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 348 (2023), *reh'g denied*, 144 S. Ct. 629 (2024)).

The Fourteenth Amendment does not require precision. *See Theunick*, 651 F.3d at 585 ("[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952))). Thus, "no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340. Under this standard, the court finds that AbbVie has not established a substantial likelihood of success on the merits of its claim that subsections 1(a)(4) and 1(a)(6) are unconstitutionally vague, either because the provisions themselves fail to provide adequate notice of what conduct is prohibited or because they invite arbitrary enforcement.

> 4.    *Dormant Commerce Clause*

Under the Commerce Clause, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. On its face, the text of the so-called Commerce Clause affirmatively grants Congress the power to "regulate interstate and foreign commerce"; in addition, the Clause has "long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984)). The "dormant" Commerce Clause thus "limits the power of states 'to erect barriers against interstate trade.'" *Id.* (quoting *Lewis v. BT Inv.*

*Managers, Inc.*, 447 U.S. 27, 35 (1980)).

The dormant Commerce Clause primarily targets state laws that "discriminate[] against out-of-state goods or nonresident economic actors." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 369 (2023) ("[T]his antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." (citation omitted)). While the Clause also has been construed to invalidate any state law that has "the practical effect of controlling commerce that occurs entirely outside of the state in question," *Int'l Dairy Foods*, 622 F.3d at 644, the Supreme Court has more recently declined to recognize an "'almost *per se*' rule against state laws with 'extraterritorial effects." *Nat'l Pork Prods.*, 598 U.S. at 373, 376; *see id.* at 371 (explaining that its prior decisions that focused on the extraterritorial *effect* of challenged laws were nonetheless motivated by the antidiscrimination principle). Even following *National Pork Products*, however, courts have continued to hold that "a statute [that] has the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" will violate the dormant Commerce Clause. *Ass'n for Accessible Medicines v. Ellison*, No. 24-1019, 2025 WL 1660112, at *3 (8th Cir. June 12, 2025). In addition, the dormant Commerce Clause bars "attempts to give local consumers an advantage over consumers in other States." *N.J. Staffing All. v. Fais*, 110 F.4th 201, 207 (3d Cir. 2024) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580 (1986)).

In this case, AbbVie contends only that S.B. 1414 impermissibly burdens out-of-state commerce. In support of this claim, AbbVie argues, in two brief paragraphs, that (1) Tennessee courts decline to apply a presumption against extraterritoriality when interpreting Tennessee statutes; (2) S.B. 1414 includes no express language indicating the legislature's intent to limit its scope to intrastate commerce; and (3) by its plain terms, the Act "prohibits *any* manufacturer across

the country from imposing conditions on transactions between itself and *any* covered entity, pharmacy, or 'other location' authorized by the covered entity across the country, regardless of that manufacturer's or entity's connections to Tennessee." (Doc. No. 33-1 at 30.) According to AbbVie, the "practical effect" of the statute is to "directly control[] commerce occurring wholly outside [the state's] boundaries," making the law unconstitutional, irrespective of the legislature's actual intent. (*Id.* (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 373 (6th Cir. 2013)).)

But, according to *National Pork Products*, the dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach, absent protectionist intent or effect. 598 U.S. at 373. AbbVie has not alleged either. Moreover, aside from that problem, AbbVie's initial premise is incorrect, as a result of which the argument collapses under its own weight. Tennessee *does*, and has for more than one hundred years, applied a presumption against extraterritoriality. The single case AbbVie cites to the contrary, *Freeman Industries, LLC v. Eastman Chemical Co.*, 172 S.W.3d 512 (Tenn. 2005), did not expressly address extraterritoriality and has not been subsequently construed by any Tennessee court as overruling more than a century of controlling precedent on the topic.

In *Freeman Industries*, the Tennessee Supreme Court was presented with the question of whether an indirect purchaser could bring an action under the Tennessee Trade Practices Act ("TPPA") against defendants involved in a price-fixing scheme. The court answered that question in the affirmative and held that an indirect purchaser could bring suit under the TPPA, even if he was not a resident of the state. *Freeman Indus.*, 172 S.W.3d at 520. Then, to determine whether the conduct at issue fell within the scope of the TPPA, the court applied a "substantial effects" standard, requiring courts to decide "whether the alleged anticompetitive conduct affects

Tennessee trade or commerce to a substantial degree." *Id.* at 522–23. It ultimately held that the plaintiff "fail[ed] to establish how the defendants' anticompetitive conduct affected Tennessee commerce to a substantial degree." *Id.* at 524.

However, as the Tennessee Court of Appeals explained in a very recent opinion, although "[n]othing in the [*Freeman Industries*] opinion mentions extraterritoriality," a 2020 law review article identified Tennessee as "among the states that have 'rejected a presumption against extraterritoriality,' even though 'there are older cases articulating a presumption against extraterritoriality.'" *Renel v. Drexel Chem. Co.*, No. W2023-01693-COA-R3-CV, 2025 WL 1604377, at *7 n.7 (Tenn. Ct. App. June 6, 2025) (quoting William S. Dodge, *Presumptions Against Extraterritoriality in State Law*, 53 U.C. Davis L. Rev. 1389, 1417–18, 1451 (2020)). In *Drexel*, the court expressly "decline[d] to interpret the [Tennessee Supreme] Court's silence in the same manner," citing numerous cases standing for the propositions that (1) silence on an issue should not be construed as overruling prior "unequivocal statements," *id.*, and (2) "Tennessee courts have repeatedly recognized the principle of extraterritoriality," pursuant to which courts presume that "[a] local statute has no extraterritorial force, and can be exercised only upon persons and property within the jurisdiction of the state where such statute is enacted," *id.* at *4 (quoting *Kirkland v. Calhoun*, 248 S.W. 302, 304 (Tenn. 1923), and collecting cases). The court also concluded that, to rebut the presumption against extraterritorial application, the statute at issue must "contain a clear affirmative indication that it applies extraterritorially." *Id.* at *8. That is, the "pivotal question" under Tennessee law "is whether the statute itself . . . purports to apply extraterritorially." *Id.*

Here, the plaintiffs do not contend that S.B. 1414 contains language affirmatively indicating that it is intended to be applied extraterritorially. Instead, they argue that it contains no

language *limiting* its extraterritorial application and therefore must be construed as "sweep[ing] broadly to include covered entities and contract pharmacies without any geographic limitation." (Doc. No. 33-1 at 30.) The court declines to construe the statute to apply extraterritorially. To read it thus would contravene both Tennessee's presumption against extraterritoriality and the "well established" canon of construction "that statutes should be construed to avoid constitutional questions if such a construction is fairly possible." *Boos v. Barry*, 485 U.S. 312, 333 (1988); *see also In re Schafer*, 689 F.3d at 605 ("Where, as here, a statute is challenged as unconstitutional, we construe the statute to avoid constitutional infirmity when fairly possible." (internal quotation marks and citation omitted)).

The plaintiffs have not established a substantial likelihood of success on their dormant Commerce Clause claim.

### 5. The First Amendment's Petition Clause

The plaintiffs argue that the Petition Clause of the First Amendment protects their "right to meaningfully access the federal government's established 340B dispute-resolution process" and that S.B. 1414 violates that right by "effectively barring" them from accessing that process. (Doc. No. 33-1 at 31 (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010)).) The defendant responds that this argument is nothing more than an "ambitious repackaging" of AbbVie's preemption argument and that, regardless, it fails to state a cognizable claim under the First Amendment.

The First Amendment prohibits state actors from "abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "[T]he 'right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (quoting *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002)). "[T]he right allows an ordinary citizen to 'convey[] the special

concerns of [the petition's] author to the government,' and to 'request[] action by the government to address those concerns,' generally without fear of criminal or civil repercussions." *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020) (alterations in original) (quoting *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388–89 (2011)). Thus, for example, such activities as "fil[ing] a citizen complaint" with a police department and "request[ing] public records about that complaint" constitute conduct protected by the Petition Clause. *Id.* at 514.

For the same reasons propelling the court to reject AbbVie's preemption claim rooted in the same allegations, the court finds that S.B. 1414 does not obstruct AbbVie's right to petition the government by barring its access to the federal ADR system relating to 340B claims. In particular, nothing prevents AbbVie from simply requesting claims data or other documentation from covered entities (or pharmacies) or from requesting an audit of a covered entity based upon reasonable cause. A covered entity's failure to comply with a reasonable request—coupled with the articulable facts that gave rise to suspicions of diversion or other prohibited conduct in the first place, such as, for example, "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity," 1996 Guidance at 65,406—would be sufficient to establish such reasonable cause. And the plaintiffs have not pointed to any facts suggesting, to the contrary, that the standards for requesting an audit require any particular type of claims data or other documentation from the covered entity.

The court finds that the plaintiffs have not established a substantial likelihood of success on the merits of their First Amendment Petition Clause claim.

**C.      Other Elements of Preliminary Injunction Inquiry**

As set forth above, if a plaintiff fails to establish a substantial likelihood of success on the merits, the court's inquiry ends, because, without a substantial likelihood of success on the merits,

a plaintiff will not be able to establish a substantial risk of irreparable harm or that the public

interest weighs in favor of granting relief. Having concluded that AbbVie has not established a

substantial likelihood of success on the merits of any of its constitutional claims, the court does

not reach the other factors of the preliminary injunction standard and finds instead that AbbVie's

failure to establish a substantial likelihood of success on any of claim is fatal to the Motion for a

Preliminary Injunction.

## V.      CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion for a Preliminary Injunction (Doc.

No. 17) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NOVARTIS                         )
PHARMACEUTICALS CORP.,           )
                                 )
  Plaintiff            )
                                 )
  v.                   )  1:25-cv-00407-JCN
                                 )
AARON FREY,                      )
                                 )
  Defendant            )

---

ABBVIE INC., et al.,             )
                                 )
  Plaintiffs           )
                                 )
  v.                   )  1:25-cv-00416-JCN
                                 )
AARON FREY, et al.,              )
                                 )
  Defendants           )

**ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION**

In two related cases, Plaintiffs, two pharmaceutical manufacturers and affiliated entities, challenge a Maine statute regarding the role of contract pharmacies within a federal drug discount program.  (Complaints, 1:25-cv-00407-JCN, ECF No. 1; 1:25-cv-00416-JCN, ECF No. 1.)[1]  Plaintiffs contend that the Maine statute is unconstitutional on multiple grounds: the statute is preempted by federal law, violates the commerce clause, constitutes an improper taking, and is impermissibly vague.

---

[1] Plaintiffs in case no. 1:25-cv-00416-JCN are AbbVie, Inc., Allergan, Inc., Durata Therapeutics, AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiff AbbVie or AbbVie").

196

The matter is before the Court on Plaintiffs' motions for a preliminary injunction. (Motions, 1:25-cv-00407-JCN, ECF No. 17; 1:25-cv-00416-JCN, ECF No. 14.)  The State opposes the motions.  (Responses, 1:25-cv-00407-JCN, ECF No. 28; 1:25-cv-00416-JCN, ECF No. 27.)

After consideration of the parties' oral and written arguments, and following a review of the record, the Court denies the motions.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.    The 340B Statute

In 1992, Congress created a drug discount program referred to as the 340B program. 42 U.S.C. § 256b.  All drug manufacturers who want their drugs to be covered under Medicaid and Medicare Part B must enter into an agreement with the Secretary of Health and Human Services (HHS) to comply with 340B program requirements, including that drug manufacturers must sell covered outpatient drugs to covered entities at or below a ceiling price. *Id.* § 256b(a)(1).  Among other provisions, the statute establishes a formula for calculating ceiling prices, *id.* § 256b(a)(2), defines covered drugs, *id.* § 256b(a)(3), (b)(2), and lists the types of healthcare facilities qualifying as covered entities, *id.* § 256(a)(4).  The discounts in the program are significant, "typically knocking 20–50% off the drug's sticker price."  *Amgen, Inc. v. Kennedy*, No. CV 24-3571 (JEB), 2025 WL 2206948, at *1 (D. D.C. Aug. 4, 2025).

---

[2] The following facts are derived primarily from public documents amenable to judicial notice and the affidavits and exhibits filed in connection with Plaintiffs' pleadings and motions.

Covered entities are types of facilities that generally provide care to underserved communities. *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). "The discounts help uninsured patients, who can get cheaper drugs from covered entities. They also help covered entities themselves. The entities can buy drugs at a discount, get reimbursed by insurers for the drug's full price, and pocket the difference." *Amgen*, 2025 WL 2206948, at *1 (citations omitted).[3] Covered entities are prohibited from requesting the 340B discount for drugs that also qualify for a Medicaid rebate (referred to as a double discount), 42 U.S.C. § 256b(a)(5)(A), may not resell or otherwise transfer the discounted drugs to anyone who is not a patient of the covered entity (referred to as diversion), *id.* § 256b(a)(5)(B), and must allow the Secretary and manufacturers to audit their records according to procedures established by the Secretary, *id.* § 256b(a)(5)(C).

If the Secretary finds that a covered entity has engaged in double-discounting or diversion, the entity shall be liable to the manufacturer for the discounts it received improperly. *Id.* § 256b(a)(5)(D). In appropriate cases, the Secretary may also impose sanctions on a covered entity, which sanctions could include interest penalties,

---

[3] There may be some dispute about the extent to which insured patients benefit from the discount or whether the entire discount is retained by covered entities and others, like third-party administrators, who coordinate with covered entities. An insured patient may not benefit directly from the lower price if their out-of-pocket cost is the same, regardless of whether the drug is eligible for the discount, but there is evidently little or no dispute that some uninsured patients benefit directly and both uninsured and insured patients likely benefit indirectly because one purpose of allowing the covered entity to retain the amount of the discount is that they are able to use the extra funds in service of their patients. *See American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *1 (N.D. Cal. Feb. 17, 2021) ("covered entities . . . use the discounts to stretch scarce federal resources and serve a greater number of uninsured and under-insured patients"). The expert opinions in the record suggest the parties would dispute the extent of indirect benefits through charitable spending and other services. In any event, resolution of the dispute is not central to Plaintiffs' requests for a preliminary injunction.

disqualification of the entity for a period, and/or reference of the matter to other federal authorities. *Id.* § 256b(d)(2)(B)(v). The Secretary can also impose monetary sanctions on manufacturers for charging more than the ceiling price. *Id.* § 256b(d)(1)(B)(vi).

The 340B program "is superintended by the Health Resources and Services Administration (HRSA)," a sub-agency within HHS. *Astra USA*, 563 U.S. at 113. Several courts, however, have noted that Congress did not grant HHS broad authority to issue regulations. *See, e.g., American Hospital Association v. HHS*, No. 4:20-CV-08806-YGR, 2021 WL 616323, at *7 (N.D. Cal. Feb. 17, 2021). Rather, rulemaking authority is currently limited to "(1) establishment of [an administrative dispute resolution process (ADR)]; (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations." *Id.* (citing *Pharmaceutical Research & Manufacturers of America v. HHS*, 43 F. Supp. 3d 28, 41-45 (D. D.C. 2014).

## B.     The Role of Contract Pharmacies

In December 1993, HRSA proposed a guidance notice regarding the 340B program which, as relevant here, specified that a covered entity may enter into a written agreement with a purchasing agent to negotiate contracts or receive drug shipments for distribution to the entity. 58 Fed. Reg. 68922, 68925. In May 1994, HRSA issued a similar final guidance notice. 59 Fed. Reg. 25110, 25113. In response to comments requesting that manufacturers not be required to sell to intermediaries, HRSA advised that covered entities often use purchasing agents or contract pharmacies, and that by placing limitations on sales transactions, manufacturers could be discouraging covered entities from participating in the program.

**Exhibit 4**

In November 1995, HRSA proposed a guidance notice regarding the 340B program and contract pharmacy services. 60 Fed. Reg. 55586. In August 1996, HRSA issued a substantially similar final guidance notice. 61 Fed. Reg. 43,549. 43,555–56. The notices encouraged covered entities to sign a contract pharmacy service agreement with a contractor based on model agreement terms to facilitate participation in the 340B program by covered entities that lacked access to in-house pharmacy services. The model agreement terms included a limit for one contractor site and a procedure where the covered entity would purchase the drug, the manufacturer would bill the covered entity, but the drug would be shipped directly to the contract pharmacy. Other terms in the model agreement included a commitment not to divert drugs to individuals who are not patients of a covered entity and to be subject to audits.

In 2001, HRSA established Alternate Methods Demonstration Projects, which, among other things, allowed some covered entities to apply and be approved to use a contract pharmacy to supplement an in-house pharmacy and to use multiple contract pharmacy service sites instead of a single site. 72 Fed. Reg. 1540. In January 2007, HRSA proposed new guidance that would permit all covered entities to use multiple contract pharmacy sites and to use contract pharmacies to supplement an in-house pharmacy. *Id.* at 1541. In March 2010, HRSA issued final guidelines stating that covered entities are not limited to providing in-house or contract pharmacy services at one location. 75 Fed. Red. 10272, 10277–79. In the same month, as part of the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119 (2010), Congress expanded the 340B program, which expansion provided that "covered entities" would also include hospitals serving isolated

rural areas and added some of the enforcement provisions found in the current version of the statute.

Since 2010, the 340B program has grown significantly. According to Plaintiffs, the number of participating contract pharmacy sites increased from 1,300 in 2010 to more than 33,000 in 2024. Plaintiff AbbVie (AbbVie) asserts that the number of covered entities increased from 15,000 in 2010 to more than 50,000 by 2020. Plaintiffs attribute much of the growth to the unlimited use of contract pharmacies and suggest that some of the growth is a result of improper discount claims.[4]

Covered entities and pharmacies have also shifted away from segregated inventories for 340B drugs and other drugs and toward retroactive methods of claiming and tracking 340B discounts, including a method known as the replenishment model. Plaintiffs contend that the use of multiple contract pharmacies and retroactive accounting methods makes it more difficult to detect diversion and double discounting and increases the risk that diversion, double discounting, and wrongful discount requests will occur.

---

[4] There is likely some dispute about the extent and causes of this growth. For example, Plaintiff Novartis (Novartis) asserts that total spending in the 340B program was $6.6 billion in 2010 and increased by more than a factor of 10 by 2023, reaching $66.3 billion. AbbVie asserts that by 2024, 340B spending totaled $124 billion. Plaintiffs, however, do not state whether the figures account for other relevant factors, such as changes in the average price of drugs over time, inflation overall during the period, and other changes since 2010, namely the additional categories of covered entities and thus additional patients using drugs obtained through the program. Also, by way of example, AbbVie notes that in some cases covered entities have drugs delivered to pharmacies located more than 100 miles from the covered entity's location, which it evidently believes reflects claims that were not contemplated to be within the scope of the 340B program when it was enacted. Other courts have noted, however, that "some covered entities service large geographic areas and that contract pharmacies assist those providers in serving a dispersed population." *Pharmaceutical Research & Manufacturers of America v. Murrill,* No. 6:23-CV-00997, 2024 WL 4361597, at *1 (W.D. La. Sept. 30, 2024). As with some other matters that might be in dispute, the Court need not resolve the issue at this stage of the litigation.

**Exhibit 4**

The replenishment model works as follows: (1) The pharmacy purchases a quantity of a drug at market price and maintains it in common inventory; (2) the pharmacy dispenses drugs from the common inventory whenever a customer arrives with a prescription without regard to whether the customer is a patient of a covered entity; (3) an administrator later reviews claims data to analyze which transactions were for covered drugs to a patient of a covered entity and thus eligible for the discount; and (4) after enough qualifying transactions have occurred, the covered entity orders more units of the drug at the discounted price to replenish the units dispensed to patients of the covered entity.

## C.    HRSA Prohibition of Manufacturer Limits

In 2020, some manufacturers, including Novartis, began to limit both the number of pharmacies to which they would deliver drugs and the maximum distance between the covered entity and the pharmacy site.  Some manufacturers also required covered entities to provide claims data to use contract pharmacies.  Novartis initially requested but did not require that covered entities provide claims data.[5]

In December 2020, the HHS Office of the General Counsel issued an advisory opinion stating that the statute unambiguously obligated manufacturers to deliver drugs to contract pharmacies because the statute only required that drugs be purchased by a covered entity and set no other requirements for eligibility.  Several manufacturers filed suit challenging the opinion. One district court struck down the advisory opinion under the Administrative Procedure Act, and the Office of the General Counsel withdrew the

---

[5] AbbVie evidently implemented similar policies later, in 2023.

advisory opinion in June 2021. *See AstraZeneca Pharmaceuticals LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021); *see also*, *Eli Lilly & Co. v. HHS*, No. 1:21-CV-00081-SEB-MJD, 2021 WL 5039566, at *9 (S.D. Ind. Oct. 29, 2021).

HRSA also sent letters to the manufacturers in May 2021 notifying them that by placing contract pharmacy and claims data limitations on covered entities, the manufacturers were in violation of the 340B program. HRSA ordered the manufacturers to sell discounted drugs to covered entities without contractual conditions, including by delivering the drugs to the pharmacies with which the covered entities contracted. The manufacturers again filed suit in several courts to challenge the alleged violations.

Most of the district courts to consider the legality of the violation letters vacated the letters, and two circuit courts ruled in favor of the manufacturers. In *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), the Third Circuit reasoned that because HRSA had not been granted broad rulemaking authority, because the statute did not mention contract pharmacies or delivery locations, and because the statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank," HRSA could not establish that the manufacturers violated 340B by imposing conditions on requests for delivery to contract pharmacies, which meant "the Violation Letters and Advisory Opinion are unlawful." *Id.* at 703–04, 706. In *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), the D.C. Circuit determined that the district court properly set aside the violation letters because the statute merely requires that a manufacturer offer to sell drugs "at or below a specified monetary amount" and because the statute is "silent about delivery conditions," and "statutory silence implies that private parties may act

freely." *Id.* at 369, 373. The court noted that a manufacturer would likely violate the statute by imposing terms that are "unreasonable" or "onerous enough" to effectively increase the price above the statutory ceiling or fall short of a "bona fide offer," but the manufacturer's conditions were not so burdensome as to violate the statute on its face. *Id.* at 371–73.

### D.   State Statutes Prohibiting Manufacturer Limits

Approximately twenty states have enacted laws in response to the court decisions finding that HRSA lacked statutory authority to prohibit the manufacturers' policies. While differences exist among the state statutes, they share certain features, including prohibitions on certain manufacturer limits on covered entities and contract pharmacies, as well as alternative remedies for violations of the prohibitions. (*See* Complaint at 42–43, 1:25-cv-00416-JCN, ECF No. 1.) Drug manufacturers filed lawsuits challenging the state statutes and seeking injunctive relief. At least five district courts, either on a motion for preliminary injunction or a motion for summary judgment, largely or entirely denied injunctive relief against the enforcement of the relevant state statute after addressing similar legal claims to those Plaintiffs assert here; on appeal, the Eighth Circuit and Fifth Circuit upheld two of those decisions.[6] At least one district court enjoined enforcement of

---

[6] *See Pharmaceutical Research & Manufacturers of America v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (denying plaintiff's motion for summary judgment on preemption); *Pharmaceutical Research & Manufacturers of America v. McClain,* 95 F.4th 1136 (8th Cir. 2024) (affirming conclusion that Arkansas statute is not preempted), cert. denied, 145 S. Ct. 768 (2024); *Novartis Pharmaceuticals Corp. v. Fitch*, 738 F. Supp. 3d 737 (S.D. Miss. 2024) (denying plaintiff's motion for preliminary injunction); *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 (5th Cir. Sept. 12, 2025) (affirming denial of preliminary injunction); *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) (denying plaintiffs' motions for summary judgment); *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285 (W.D. Mo. Feb. 27, 2025) (granting in part defendant's motion to dismiss plaintiff's complaint); *AbbVie Inc. v. Skrmetti*, No. 3:25-

a state statute based on similar arguments to those Plaintiffs raise here.[7]  Many other similar

cases are pending in other district courts.[8]

On June 20, 2025, Maine enacted a statute entitled the "Protect Health Care for

Rural and Underserved Communities Act," which statute goes into effect on September

24, 2025.  L.D. 210, Sec. P-5 (132nd Legis. 2025).  The statute creates a new "Chapter

103" within the Maine Insurance Code, and includes the following provision:

> **§7753. Prohibition of certain discriminatory actions by manufacturer or agent related to 340B entities**
>
> **1. Interference with acquisition or delivery of 340B drugs prohibited.** A manufacturer or its agent may not deny, restrict, prohibit or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B contract pharmacy on behalf of a 340B entity unless receipt of that 340B drug is prohibited by the United States Department of Health and Human Services.
>
> **2. Submission of claims or utilization data prohibited.** A manufacturer or its agent may not, either directly or indirectly, require a 340B entity to submit any claims or utilization data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B entity

---

CV-00519, 2025 WL 1805271 (M.D. Tenn. June 30, 2025) (denying plaintiffs' motion for preliminary injunction).

[7] *See Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024).

[8] *See AbbVie, Inc. v. Weiser*, 1:25-cv-01847 (D. Co.); *AbbVie v. Lopez*, 1:25-cv-00230 (D. Haw.); *AbbVie, Inc. v. Kobach*, 6:24-cv-01111 (D. Kan.); *Novartis Pharmaceuticals Corp. v. Brown*, 1:24-cv-01557 (D. Md.); *AbbVie, Inc. v. Bailey*, 4:24-cv-00996 (E.D. Mo.); *AbbVie, Inc. v. Wrigley*, 1:25-cv-00081 (D. N.D.); *AbbVie, Inc. v. Hilgers*, 4:25-cv-03089 (D. Neb.); *AbbVie, Inc. v. Jackley*,  3:25-cv-03006 (D. S.D.); *Novartis Pharmaceuticals v. Brown*, 2:25-cv-00284 (D. Utah).

unless the claims or utilization data sharing is required by the United States
Department of Health and Human Services.

**3. Other interference prohibited.** A manufacturer may not otherwise
interfere directly or indirectly with a 340B entity unless expressly authorized
by the United States Department of Health and Human Services.

The statute defines a "340B entity" as "an entity participating or authorized to

participate in the federal 340B drug discount program, as described in 42 United States

Code, Section 256b, including its pharmacy, or any pharmacy contracted with the

participating entity to dispense drugs purchased through the federal 340B drug discount

program." 24-A M.R.S.A. § 7752(7) (effective Sept. 24, 2025).  A "340B drug" is defined

as "a drug that is purchased or eligible for purchase under Section 340B of the federal

Public Health Service Act, 42 United States Code, Section 256b(a)(3)." 24-A M.R.S.A. §

7752(6) (eff. Sept. 24, 2025).  A "340B contract pharmacy" is defined as "a pharmacy that

has a contract with a 340B entity to receive and dispense 340B drugs to the 340B entity's

patients on behalf of the 340B entity." 24-A M.R.S.A. § 7752(5) (effective Sept. 24, 2025).

Each violation of Chapter 103 is "subject to enforcement under the Maine Unfair

Trade Practices Act." 24-A M.R.S.A. §7757(1) (effective Sept. 24, 2025). The Maine

Unfair Trade Practices Act permits the Attorney General to "bring an action in the name

of the State," to seek an injunction and restitution for any person who has suffered an

ascertainable loss, and the Act provides that one who violates an injunction can incur a

civil penalty up to $10,000 per violation.  5 M.R.S.A. § 209.

Plaintiffs filed suit in this court in August 2025 and sought a preliminary injunction

enjoining enforcement of the state statute.  In September 2025, amici curiae the American

Hospital Association, 340B Health, the Maine Hospital Association, and the American Society of Health-System Pharmacists, filed briefs in opposition to Plaintiffs' motions for preliminary injunctions. (Amici Briefs, 1:25-cv-00407-JCN, ECF No. 35; 1:25-cv-00416-JCN, ECF No. 34.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). A district court must decide whether the party seeking a preliminary injunction has carried the burden of establishing that the balance of four factors weighs in its favor:

> (1) the movant's likelihood of success on the merits, (2) whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief, (3) the balance of relative hardships, and (4) the effect, if any, that an injunction or the lack of one may have on the public interest.

*Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 77 (1st Cir. 2025) (quotation marks omitted). "[T]he four factors are not entitled to equal weight in the decisional calculus; rather, likelihood of success is the main bearing wall of the four-factor framework." *Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9–10 (1st Cir. 2013) (quotation marks and modifications omitted).

## DISCUSSION

A. **Likelihood of Success**

1. **Standing**

The United States Constitution's limitation on the federal courts' jurisdiction to "Cases" and "Controversies" requires that a party invoking federal jurisdiction establish:

(1) an injury in fact that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and conduct complained of; and (3) a likelihood that the injury could be redressed with a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The plaintiff bears the burden of establishing standing" at the time of filing "and maintaining it thereafter" and must "support each element of standing with the manner and degree of evidence required at the successive stages of the litigation." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation marks omitted).

The State argues that Plaintiffs have not established that they have standing to pursue their claims because they are allegedly harmed only when a covered entity claims entitlement to more discount drugs than were dispensed to patients of the covered entity, which conduct is not caused by the enforcement of Maine's law. The State contends this harm would be the result of a violation of the provisions of 340B and not a consequence of Maine law.

"[A] plaintiff satisfies the injury-in-fact requirement where he [or she] alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). While pre-enforcement standing is ordinarily invoked in the face of criminal penalties, courts generally note that civil punitive statutes have a lesser but similar risk of harm and thus apply a similar inquiry for establishing standing in a pre-enforcement challenge. *See e.g., New York Bankers Association, Inc. v. City of New York*, No. 13 CIV. 7212 KPF, 2014 WL 4435427, at *12

(S.D.N.Y. Sept. 9, 2014); *Ostergren v. McDonnell*, No. 3:08CV362, 2008 WL 3895593, at *4 (E.D. Va. Aug. 22, 2008) ("it is not also the case that pre-enforcement challenges are limited to criminal statutes") (collecting cases).

Here, Plaintiffs have demonstrated an intent to follow their policies restricting delivery to contract pharmacies and that following the policies would likely result in state sanctions, as the State has not represented that it would not enforce the Maine statute with its attendant penalties if Plaintiffs followed their policies after the effective date of the statute. *See New York Bankers Association*, 2014 WL 4435427, at *12 (noting presumption, in pre-enforcement context, that a government will enforce punitive statutes, civil or criminal). Plaintiffs need not show more at this stage of the litigation to establish that they have standing to assert their constitutional claims. *See Defenders of Wildlife*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

## 2. Preemption Claims

Under the Supremacy Clause, the Constitution, treaties, federal statutes, and federal regulations preempt contrary state law because federal law is the "supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2. "Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute." *Tobin v. Federal*

14

*Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). There are also two types of implied preemption, "field preemption and conflict preemption." *Capron v. Office of Attorney General of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019).

A "presumption against preemption" ordinarily applies to implied preemption claims, *id.*, because courts have long assumed that Congress is reluctant to displace the broad police powers of the states, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The presumption does not apply to express preemption claims, where courts instead "use the usual tools of statutory interpretation, focusing on the plain wording of the [preemption] clause, which necessarily contains the best evidence of Congress's preemptive intent." *Northwestern Selecta, Inc. v. Gonzalez-Beiro*, 145 F.4th 9, 15 (1st Cir. 2025) (quotation marks and modifications omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks and modifications omitted).

    a.    *Field Preemption*

Field preemption "can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks and modifications omitted). "Implied field preemption analysis has two parts: (1) defining the relevant regulatory field; and (2) evaluating the scope of federal regulation in that field." *Hall v. Delta Air Lines, Inc.*, No. 2:16-CV-00417-JAW, 2018 WL 1570788, at *19 (D. Me. Mar. 30, 2018).

Defining the relevant field at the proper level of generality can be challenging. Some level of specificity is required, *see Basiliali v. Allegiant Air, LLC*, No. 2:18-CV-03888-RGK-MRW, 2018 WL 6219951, at *2 (C.D. Cal. Aug. 30, 2018), but defining the field too narrowly "result[s] in an analysis that resembles conventional conflict preemption." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 705 n.22 (3d Cir. 2016).

Assessing the 340B statute at the highest level of generality, courts and parties have examined proposed fields such as the "practice of pharmacy," (Defendant's Responses at 16; *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024), the "regulation of contract pharmacies," *Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at *6 (W.D. La. Sept. 30, 2024), and (somewhat more specifically) the provision of "discounted drugs for needy patients." *AbbVie, Inc., v. Fitch*, No. 24-60375, 2025 WL 2630900 at *6 (5th Cir. Sept. 12, 2025). The Maine law would fall within with the broadly defined fields, but as the other courts have found, there can be no inference of preemptive intent because there is no dominant federal interest in such broad fields and the scope and extent of the regulations found in the 340B statute cannot reasonably be characterized as comprehensive or pervasive relative to the breadth of the fields.

Assessing the 340B statute at a lower level of generality, some courts and parties have examined proposed fields such as "340B pricing or entity eligibility to access manufacturers' drugs at 340B discounted prices." *AbbVie Inc. v. Skrmetti*, No. 3:25-CV-00519, 2025 WL 1805271, at *12 (M.D. Tenn. June 30, 2025). Consistent with this view, Plaintiffs argue that the relevant field is defined by 340B, which focuses on the drug

manufacturers' principal obligation under 340B—to offer to provide discount drugs to covered entities. (*See e.g.*, AbbVie's Reply at 3, 1:25-cv-00416-JCN, ECF No. 37.) If the field were defined in this way (i.e., the terms by which manufacturers must offer discounted drugs under the 340B program), there would be no field preemption. As with the broader proposals of the relevant field, because 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field. *See Sanofi Aventis*, 58 F.4th at 704 (regarding the terms of an offer, the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank"); *Fitch*, 2025 WL 2630900 at *6 ("Congress chose not to regulate distribution to patients, indicating that it did not intend to occupy the entire field in this area. As the Supreme Court has held, matters left unaddressed in an otherwise comprehensive and detailed federal regulatory scheme are presumably left subject to the disposition provided by state law.") (quotation marks omitted).

The state law addresses covered entities' "distribution of drugs to patients and the role of pharmacies in such distribution," a subject that does not fall within a specific field that Congress manifested an intent occupy exclusively. *Fitch*, 2025 WL 2630900 at *7. There are evidently no cases where a court has found field preemption of a similar state statute.[9] Courts have consistently concluded that similar state laws are not within the more

---

[9] The one case in which a court found preemption involving a similar state statute, the court appears to have based the determination on a form of conflict preemption. *Pharmaceutical Research & Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439, 452, 458 (S.D.W. Va. 2024) (concluding that "[m]ost germane

narrowly defined field. *See e.g., Skrmetti*, 2025 WL 1805271, at \*12 ("The primary problem with the plaintiffs' position is that" the state law does not "say[ ] anything about the pricing of 340B drugs" and only "concern[s] the delivery of 340B drugs."). While the silence in 340B as to delivery or distribution has been interpreted by some courts to permit drug manufacturers to impose "at least some delivery conditions" and not to require manufacturers to deliver to multiple contract pharmacies as a matter of federal law, *see Johnson*, 102 F.4th at 460, the silence has also been viewed by two circuit courts as reflecting that Congress did not intend to preclude state involvement. *Fitch*, 2025 WL 2630900 at \*6; *McClain*, 95 F.4th at 1144.[10]

Given 340B's silence regarding the acts and transactions required to accomplish the objectives of the 340B program (e.g., the distribution of prescription medication at a discounted rate to covered entities), and given the sound reasoning of other courts on the field preemption issue presented here, the Court concludes that Plaintiffs have not established that they are likely to succeed on their field preemption claim.

   b.  *Conflict Preemption*

Conflict preemption occurs "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where the state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*

---

to the No-Audits Provision is obstacle preemption" and "the Enforcement Provisions present an obstacle to this centralized purpose").

[10] The D.C. Circuit in *Johnson* did not address whether state involvement was permissible.

*v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000).  Plaintiffs do not argue that it is impossible to comply with both the federal and state obligations.  This is not a case where "federal law forbids an action that state law requires," or vice versa.  *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 486 (2013).

When analyzing whether a state statute presents an obstacle to the objectives of Congress in the enactment of a statute, a court must identify the relevant purposes, goals, or objectives of the federal law, and weigh the magnitude of the burden or the degree of the interference resulting from the state law.  *See Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (noting judicial concerns about "ascrib[ing] unenacted purposes and objectives to a federal statute" because "hidden legislative wishes" can be "difficult to discern" and the task "risks displacing the legislative compromises") (quotation marks omitted) (discussing *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (lead opinion of Gorsuch, J.); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment").

The core congressional objective in this case is not difficult to discern.  The program is designed to use two other large federal spending programs to incentivize manufacturers to provide a subsidy to healthcare entities caring for underserved patients.[11]  *See Novartis*

---

[11] Plaintiffs contend that providing covered entities with discounted drugs is not the sole objective of the program. Congress placed some specific limitations on discount claims—a formula to calculate the amount of the discount, prohibitions on diversion and double discounting, and auditing requirements and penalties for violations.  Plaintiffs maintain that the limitations and enforcement provisions demonstrate an intent to limit to some degree the number of claims that would be made by covered entities and to prevent covered entities from claiming more discounts than they are entitled to receive.  Plaintiffs contend that 340B reflects Congress' intent to achieve an appropriate balance between providing discounted drugs to the covered entities and incentivizing manufacturers to participate in the program.  In support of this view, Plaintiffs cite one court's conclusion that the 340B statute has "twin federal purposes" of providing discounts and

*Pharms. Corp. v. Espinosa*, No. 21-CV-1479-DLF, 2021 WL 5161783, at *7 (D.D.C. Nov.

5, 2021) ("The purpose of Section 340B is clear—it provides discounts on drugs to certain

kinds of healthcare facilities").  As the State argues, at least as an initial matter, there is

little or no tension between the effect of the state law and the central objective of 340B.

The effect of the state statute is to prevent limits on and preserve flexibility in the methods

of distribution for covered entities, which is in harmony with the 340B goal of providing

the entities with prescription drugs at the discounted price for the benefit (directly or

indirectly) of underserved patients.

Plaintiffs argue that states have no role in implementing the 340B program and that

Maine is categorically prohibited from adopting rules that add any requirements regarding

a manufacturer's participation in the 340B program.  In other words, Plaintiffs argue that

any state rule related to the 340B program presents an "obstacle to the accomplishment and

execution of the full purposes and objectives of Congress."  *Crosby*, 530 U.S. at 373.

Courts might be less inclined to find implied preemption when the federal statute

contemplates a state implementation role within the federal program and are more likely to

find implied preemption when a federal statute does not specifically provide a role for

states.  *See Fresenius Medical Care Holdings, Inc. v. Francois*, 832 F. Supp. 2d 1364, 1368

---

protecting manufacturers or preventing fraud. *Morrisey*, 760 F. Supp. 3d at 452.  Prevention of excess
claims and fraud by covered entities is a discernible goal of the 340B statute, but the "twin federal purposes"
suggests that the objectives are unrelated to or of equivalent importance as each other.  In the crafting of
most, if not all, federal legislation establishing a program with eligibility requirements, fraud prevention is
a consideration. Ensuring that the program serves only those who are eligible is an ancillary goal of any
such  program. Here, protecting manufacturers against duplicate claims and otherwise preventing fraud are
subsidiary goals to the objective of the 340B program, which is to subsidize the cost of drugs to underserved
populations.

(N.D. Fla. 2011) (indicating that when a federal statute "has been recognized as a cooperative state-federal program . . . the case for federal preemption is less persuasive and difficult to establish").  Courts also might be more inclined to find preemption when a state law directly targets a federal program and be less inclined to infer congressional intent to preempt generally applicable state laws that impact federal programs incidentally.  *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 53–54 (1st Cir. 1991) (noting that federal law preempts state laws addressing occupational safety standards but finding no basis for preemption "in the workplace of private rights and remedies traditionally afforded by state laws of general application" or "state criminal laws of general application"); *compare Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 341 (5th Cir. 2005) (finding preemption more likely because "[the state] is attempting to impose regulations that restrict the scope of a federal program"), *with Deanda v. Becerra*, 96 F.4th 750, 762 n.9 (5th Cir. 2024) (finding preemption less likely because the state law did not target eligibility requirements of a federal program but was instead "a generally applicable state law").

The Supreme Court, however, has never adopted a categorical rule that requires a finding of preemption whenever a state law is addressed directly to those participating in a federal program where the federal statute does not rely on the state to implement the program.  Instead, courts must determine whether the alleged obstacle presented by the state law is significant enough to compel preemption.  The case of *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644 (2003) is particularly instructive.

In 2000, the Maine state legislature created the Maine Rx Program, which was intended to authorize anyone in the state to purchase prescription drugs at the lower prices negotiated on behalf of and available to those who purchase drugs through the Medicaid program. *Id.* at 649. Maine used the prospect of imposing prior authorization requirements on nonparticipating manufacturers selling drugs through the Medicaid program to convince drug manufacturers to participate in the state program and provide similar lower prices to the public. *Id.* at 649–50. The district court granted a preliminary injunction in favor of the drug manufacturers, precluding implementation of the program. *Pharmaceutical Research & Manufacturers of America v. Commissioner, Maine DHS*, No. CIV. 00-157-B-H, 2000 WL 34290605, at *6 (D. Me. Oct. 26, 2000). The district court found obstacle preemption because although the federal Medicaid statute allowed states to impose restrictions on drug distribution as necessary to assure that care and services would be provided in a manner consistent with the best interests of Medicaid's requirements, the federal law did not specifically permit the federal Medicaid program to be used to further the interests of non-Medicaid recipients. *Id.* at *5. The district court reasoned:

> No matter how modest an obstacle the new prior authorization amounts to (the parties disagree on the severity of the obstacle), it is an obstacle—drugs on the list must be approved by the state Medicaid Medical Director before they can be dispensed or prescribed—and therefore an obstacle to the accomplishment and execution of the Congressional objectives of federal Medicaid.

*Id.* (quotation marks omitted).

"[P]erceiv[ing] no conflict between the [Maine Rx statute] and Medicaid's structure and purpose," the First Circuit reversed. *Pharmaceutical Research & Manufacturers of*

*America v. Concannon*, 249 F.3d 66, 75 (1st Cir. 2001). The First Circuit noted that nothing in the text of the federal statute "prevents states from imposing prior authorization requirements; indeed, they are explicitly permitted," and after entertaining the argument that there were federal legislative purposes in "preventing abuse or overprescription of certain expensive medications," and in "achieving the best interests of the Medicaid recipient," the court expressed concerns about the possibility of obstruction but found an "insufficient basis" on the record of competing affidavits at that point in the proceedings to conclude that the statute presented more than a *de minimis* obstacle to achieving the goals that the plaintiff had identified. *Id.* at 75–78.

The Supreme Court affirmed the First Circuit's decision. *Pharmaceutical Research & Manufacturers of America v. Walsh*, 538 U.S. 644, 670 (2003). Reasoning that the district court erred when it observed that it was sufficient to show any impediment to a discernable federal goal, a plurality of justices concluded that obstacle preemption required a showing of more than a "modest" impediment or harm to a federal statutory goal. *Id.* at 665, 667 (opinion of Stevens, J.), 671 (Breyer, J., concurring); *compare Townsend v. Swank*, 404 U.S. 282, 286 (1971) (finding preempted an additional "state eligibility standard" that had the effect of excluding from welfare benefits a whole category of persons the federal program deemed eligible for assistance), *with New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421–22 (1973) (not finding complimentary state law work requirements for welfare benefits preempted simply because they might become conditions for continued assistance for some individuals but remanding for further analysis of the eligibility implications of each specific work rule).

Plaintiffs contend that the impediment is sufficient to support a preemption finding because the use of the replenishment model, multiple pharmacies, and pharmacies located a considerable distance from a covered entity combine to expand the program beyond that contemplated by Congress, resulting in an unreasonable burden on manufacturers and a greater potential for fraud, which factors could limit manufacturers' involvement in the program.  At this time on this record, the Court is not persuaded that the increase in the number of 340B claims with the use of multiple pharmacies is inconsistent with the objectives of the 340B program, provided the claims are made for drugs distributed to patients of covered entities.

Under the reasoning of the Third and D.C. Circuits, congressional silence regarding the conditions that drug manufacturers can include in their offers to sell the drugs to covered entities precludes HRSA from dictating the number of pharmacies to which the manufacturers must deliver on behalf of a covered entity. *Sanofi Aventis*, 58 F.4th 696; *Johnson*, 102 F.4th 452.  The silence, however, does not necessarily reflect that Congress intended to prevent state involvement or somehow limit the number of legitimate discounted claims.  *See Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Department of Health*, 699 F.3d 962, 985 (7th Cir. 2012)  ("The question is not whether [the federal law] expressly allows a recipient state to impose its own subgrant conditions . . . [i]nstead, the pertinent question is whether [the federal law] prohibits state-imposed eligibility conditions, either expressly or by necessary implication. As we have noted, congressional and regulatory silence usually defeats a claim of preemption, not the other way around").  The Court discerns nothing in 340B to suggest that Congress intended

to limit the number of patients for whom covered entities may prescribe drugs at the discounted rate. For instance, there is no persuasive evidence to suggest that Congress intended to limit the number of legitimate discounted claims to a subset of a covered entity's eligible patients that corresponds to patients living in the immediate vicinity of a single in-house or designated contract pharmacy. Rather than limit eligibility and participation, in 2010, Congress significantly increased the healthcare facilities that are considered covered entities.

Plaintiffs also assert there is a direct conflict because the state law remedy overlaps with the federal remedy—namely the ADR process to be followed by a judicial proceeding—and provides an additional enforcement mechanism beyond the federal remedy. Courts have recognized that state efforts to impose additional remedies for the same violations are more likely to be preempted. *See e.g.*, *Idaho Building & Construction Trades Council, AFL-CIO v. Inland Pacific Chapter of Associated Builders & Contractors, Inc.*, 801 F.3d 950, 961 (9th Cir. 2015) (finding preemption when a state added a criminal penalty for violating a federal program enforced by federal civil and administrative remedies); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 447 (1st Cir. 2000), *amended on denial of rehearing* (Dec. 15, 2000) ("[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code."). The State argues there is no overlap because potential violations of the state statute would not involve the overcharging, diversion-related, and price disputes, all of which would be subject to the ADR process under the federal statute.

The ADR rule provides that ADR is available to a covered entity that "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). Plaintiffs argue that their contractual limitations on a covered entity's distribution of the drugs to patients through contract pharmacies, which is the subject of the Maine statute, could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price under the federal law. The Court is not persuaded that such an interpretation presents a conflict because HRSA, the governing agency, has adopted a contrary view—a view consistent with the decisions of the Third and D.C. Circuits that 340B does not address distribution. At this stage, therefore, the alleged conflict is too speculative to support a finding that Plaintiffs are likely to prevail on the claim.

Plaintiffs further argue that the state law's requirement that manufacturers cannot condition participation in the program on the covered entities providing claims data impermissibly conflicts with 340B. A discernible secondary goal of 340B is to prevent excess claims and fraud, and the ADR process is evidently intended to assist in that objective. Plaintiffs submit that they need claims data to prevent fraud and meet the "reasonable cause" level of suspicion necessary to initiate an audit. Plaintiffs' concern regarding access to evidence of possible violations is not unreasonable. Plaintiffs, however, have not demonstrated that claims data are necessary to obtain an audit or that the proof necessary to obtain an audit is particularly onerous. For instance, Plaintiffs have not shown that the trends upon which they rely to support their injury-in-fact standing argument would be insufficient to obtain an audit. The 340B program and the audit process

have existed for many years, but Plaintiffs have not identified cases where a manufacturer had requested but been denied an audit due to a lack of relevant claims data. On the current record, the alleged impediment is too speculative to support a finding that Plaintiffs are likely to prevail on their claim.

Finally, the "subtle refram[ing]" of the obstacle preemption inquiry, which the First Circuit has identified in more recent Supreme Court opinions, does not assist Plaintiffs. *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022). According to the First Circuit, the Supreme Court has asked whether the federal statute "implicitly confer[s] a right" to engage in certain conduct subject only to certain federal standards and be free from the state law regulation. *Id.* (discussing *Kansas v. Garcia*, 589 U.S. 191, 210 (2020) and *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 479 (2018)). As discussed above, the limited specified requirements of the 340B program and Congress's silence on all other aspects of the transactions necessary to accomplish the objectives of 340B do not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, contract pharmacies, and claims data.

In sum, at this stage of the proceedings on the current record, which includes competing affidavits, the Court is not convinced that it is more likely than not that Plaintiffs will establish that Maine's statute represents more than a modest impediment to drug manufacturers' participation in and the goals of 340B. As related to obstacle conflict preemption, the Court is not persuaded that there is a significant risk that the state law is likely to cause manufacturers to withdraw from or not participate in the 340B program such

that the core objectives of the program would be compromised.  Plaintiffs, therefore, have failed to establish a likelihood of success on their obstacle preemption claim.

### 3. Dormant Commerce Claim

"The Commerce Clause provides that Congress shall have power to regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." *Association To Preserve & Protect Local Livelihoods v. Sidman*, 147 F.4th 40, 55 (1st Cir. 2025) (quotation marks and modifications omitted) (quoting U.S. Const. art. I, § 8, cl. 3). Although the text is framed as a grant of power to Congress, the Supreme Court has long "held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state [regulation] even when Congress has failed to legislate on the subject." *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

The doctrine primarily "bars states and localities from pursuing economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Becky's Broncos, LLC v. Town of Nantucket*, 138 F.4th 73, 78 (1st Cir. 2025) (quotation marks omitted). "To ascertain whether a regulatory measure is so designed, we look for evidence of either discriminatory purpose or discriminatory effect, recognizing the primacy of the latter in the dormant Commerce Clause analysis of facially neutral legislation." *Id.* (quotation marks and modifications omitted).

Plaintiffs argue that the state statute discriminates against out-of-state manufacturers for the benefit of in-state providers and pharmacies.  Even assuming the

burdens and benefits are as Plaintiffs assert, Plaintiffs are not likely to prevail on their claim. The question "is not whether a statute discriminates at all, but whether it discriminates between substantially similar entities in a single market. Indeed, the principle that any notion of discrimination assumes a comparison of substantially similar entities is a fundamental element of dormant Commerce Clause jurisprudence." *American Trucking Associations, Inc. v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27, 37 (1st Cir. 2024) (quotation marks and citations omitted). Although Plaintiffs contend that contract pharmacies and manufacturers compete for customers "vertically" in a single market, they do not explain why they are substantially similar. In practice, the manufacturers create the drugs and sell them to covered entities for patients, the covered entities buy drugs from the manufacturers and distribute them to patients at an equivalent or reduced cost, and pharmacies act as the conduit for distribution. The roles are meaningfully different and cannot be viewed as similar entities.

Plaintiffs cite *Healy v. Beer Institute*, 491 U.S. 324, 336 (1989), for the proposition that states may not regulate transactions occurring wholly outside their borders. The Supreme Court, however, has arguably limited the concerns about extraterritorial price impacts identified in *Beer Institute*. *See National Pork Producers Council v. Ross*, 598 U.S. 356, 143 (2023) (rejecting "'almost per se' rule against laws that have the 'practical effect' of 'controlling' extraterritorial commerce").

In addition, in *Walsh*, the First Circuit and the Supreme Court rejected the argument that requiring certain discounts for in-state drug transactions had extraterritorial impacts

based on the series of upstream transactions involving out of state middlepersons before a

drug is finally distributed to the consumer.

> [A]s the Court of Appeals correctly stated, unlike price control or price affirmation statutes, "the Maine Act does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect. Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price. Similarly, Maine is not tying the price of its in-state products to out-of-state prices." 249 F.3d, at 81–82 (footnote omitted). The rule that was applied in *Baldwin* and *Healy* accordingly is not applicable to this case.

*Walsh*, 538 U.S. at 669. The Court is not convinced that a different analysis applies in this

case.

Plaintiffs also invoke the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137,

142 (1970) to support the commerce clause claim. Under *Pike*, a court is asked "to

determine whether a facially non-discriminatory local measure violates the Dormant

Commerce Clause" by inquiring "whether the burdens (if any) that the measure imposes

on interstate commerce are clearly excessive in relation to the claimed local benefits that it

secures." *Sidman*, 147 F.4th at 64. Plaintiffs, however, have not demonstrated that they

are likely to establish that the Maine statute imposes an excessive burden on interstate

commerce. As Plaintiffs correctly note, despite the language of the Maine statute, there

are no 340B drugs. Rather, the drugs that are covered by the 340B program are the same

drugs that Plaintiffs manufacture and sell for patients of all healthcare providers. The 340B

program simply contemplates that a portion of the drugs that Plaintiffs manufacture and

sell would be sold at a discounted rate to covered entities. The Maine statute, therefore, is

unlikely to affect significantly the quantity of drugs that will be sold in interstate

commerce. Plaintiffs' principal concern is that under the Maine statute, their

administrative costs will increase, and they will be required to sell more drugs at a discounted rate. In other words, Plaintiffs would be harmed in the form of a reduction in their profits. A reduction in Plaintiffs' profitability, if proven, would not constitute an excessive burden on interstate commerce. *See Construction Materials Recycling Association Issues & Education Fund, Inc. v. Burack*, 686 F. Supp. 2d 162, 172 (D.N.H. 2010) ("A dormant Commerce Clause claim, however, cannot be based merely on a showing that a challenged statute will cause individual out-of-state businesses to lose profits"). In short, Plaintiffs have not established that they are likely to succeed on their dormant commerce claims.

### 4. Takings Claim

AbbVie contends that "Maine's law effects a physical taking of AbbVie's property by forcing AbbVie to transfer its pharmaceutical products to private third parties for discounted prices." (AbbVie Motion at 18.)

The Fifth Amendment prohibits "private property" from being "taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment applies to the federal government, but "[t]hat prohibition . . . applies against the States through the Fourteenth Amendment." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980). "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (citation omitted).

"When an entity voluntarily participates in a federal program, it forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation." *Astrazenca Pharmaceuticals LP v. Bailey*, No. 2:24-CV-04143-MDH, 2025 WL 644285, at \*4 (W.D. Mo. Feb. 27, 2025). A government does not take property by creating a "financial inducement" to comply voluntarily. *See Pharmaceutical Research & Manufacturers of America v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597, at \*14 (W.D. La. Sept. 30, 2024); *see also*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007 (1984) ("as long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking").

The voluntary nature of the 340B program, therefore, would appear to present an impediment to AbbVie's takings claim. AbbVie asserts that the voluntariness of the federal program does not impact the analysis at least in part because there was no independent state law benefit offered with the state requirements. AbbVie relies on cases finding that alleged benefit was illusory and thus the program was not truly voluntary, *see Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023) (discussing *Horne v. Department of Agriculture*, 576 U.S. 350 (2015)), but AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for

purposes of a takings claim. Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim.[12]

### 5.      Vagueness Claim

AbbVie maintains that Maine's statute is impermissibly vague because there is little or no guidance for what it means to "interfere" with covered entities and the delivery of covered drugs to contract pharmacies on behalf of covered entities. Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "[a] statute is impermissibly vague if (1) 'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *March v. Frey*, 458 F. Supp. 3d 16, 39 (D. Me. 2020) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). However, legislatures need not attempt to achieve "semantic certainty," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016), because "words are rough-hewn tools, not surgically precise instruments." *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

---

[12] AbbVie primarily argues the state law effects a physical taking rather than a regulatory taking. The Supreme Court has also recognized that even without taking physical possession, "if regulation goes too far it will be recognized as a taking." *Id.* at 326 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). A regulatory taking occurs "where government requires an owner to suffer a permanent physical invasion of her property," or "completely deprive[s] an owner of all economically beneficial use of her property," or demands an exaction as a condition to approving development, such as a public easement, that is disproportionate to the impact of the proposed development. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39, 546–48 (2005) (quotation omitted). When presented with a regulatory takings claim that does not implicate one of the situations identified in *Lingle*, courts employ a "more nuanced, three-pronged inquiry into (1) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; (2) the regulation's economic impact on the property owner; and (3) the character of the government action." *Maine Education Association Benefits Trust v. Cioppa*, 695 F.3d 145, 153 (1st Cir. 2012) (citing *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124 (1978)). To the extent that AbbVie asserted during oral argument that under a regulatory takings analysis, Maine's law constitutes a taking, the voluntariness issue likely still bars the claim, and even if it did not, the Court is not persuaded that AbbVie is likely to satisfy the stringent requirements of a regulatory takings claim.

While courts have acknowledged that terms like "interfere with" can be indefinite enough to create vagueness concerns if read in a vacuum, *see Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 786 (4th Cir. 2023), "[h]ere . . . the challenged [terms] do not appear in a vacuum" because the statute "contains additional terms that supply concrete guidance," at least to some degree, "as to the behavior that it prohibits and the circumstances in which it can be enforced." *URI Student Senate*, 631 F.3d at 14. The statute's language that manufacturers "may not deny, restrict, [or] prohibit" the "acquisition" or "delivery" of certain drugs, and the title of the provision addressing "discriminatory actions by manufacturer or agent related to 340B entities" narrow the scope of the term "interfere" considerably. Nearby provisions in Chapter 103 also use the word "interfere" in the context of discriminatory policies that impose conditions on 340B participants that are not imposed on comparable nonparticipants. *See* 24-A M.R.S.A. §7754(4)–(5) (effective Sept. 24, 2025). The statute itself, therefore, provides reasonable guidance and notice to AbbVie and those similarly situated.

Several other important factors undermine the void-for-vagueness claim here. First, perhaps because imprecise terms can "take on definiteness and clarity" when "directed to a discrete professional group," *In re Bithoney*, 486 F.2d 319, 324 (1st Cir. 1973), "the doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties." *FERC v. Silkman*, 177 F. Supp. 3d 683, 702 (D. Mass. 2016) (citing *U.S. v. Lachman*, 387 F.3d 42, 56–57 (1st Cir. 2004)). AbbVie certainly qualifies. Second, the harm resulting from a lack of specificity is lessened "by the scienter requirement" that must be satisfied before drug manufacturers would face civil penalties. *Id.*; *March*, 458 F. Supp.

**Exhibit 4**

3d at 39.[13]  Third, statutory imprecision is less likely to offend due process when there is a method "to allow private parties to obtain an official government answer on whether [the conduct] is covered" before facing penalties, *United States v. Zhen Zhou Wu*, 711 F.3d 1, 15 (1st Cir. 2013), and the enforcement mechanism contains that opportunity before it creates a risk of financial penalties.  Fourth, federal courts are less likely to find a state statute to be unconstitutionally vague in a pre-enforcement context where a plaintiff brings the case before the state court had the opportunity to interpret the state law. *See Donovan v. City of Haverhill*, 311 F.3d 74, 78 (1st Cir. 2002) (courts should "presume that state courts will give [challenged provision] a limiting construction that will preserve its facial constitutionality"); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (treading carefully when the state courts "have had no occasion to construe the law in the context of actual disputes . . . or to accord the law a limiting construction").  Fifth, "the [Supreme] Court has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (quotation marks omitted).

Finally, except in the First Amendment context, a plaintiff is not generally permitted to pursue facial pre-enforcement vagueness challenges and courts instead "consider

---

[13] It appears that state enforcement of the Maine statute effectively requires a willful violation before the imposition of monetary penalties.  As the Court reads the statute, to enforce the statute, the state attorney general would initiate a state court proceeding after first providing notice and conferring with the manufacturer, which lawsuit might then lead to an injunction from the state court against the offending practice, and the manufacturer would only face monetary penalties if it continued the offending conduct in violation of the injunction.

whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (quotation marks omitted). AbbVie asserts an as applied argument. Notably, AbbVie has not argued that it is uncertain whether the state statute prohibits the policies it has implemented in recent years. All parties acknowledge that the Maine statute and similar statutes enacted in other states are designed to prevent manufacturers from maintaining the restrictive policies employed by AbbVie.

In sum, the word "interfere" is not so indefinite in the context of the state statute and the 340B program that it presents constitutional concerns at this stage. All the relevant factors suggest that AbbVie is not likely to succeed on its void-for-vagueness claim.

## B.    Other Factors

Because Plaintiffs have failed to establish that they will likely succeed on the merits of their preemption, commerce clause, takings, or vagueness claims, the Court need not dwell on the remaining preliminary injunction factors. Where Plaintiffs have failed to demonstrate a likelihood of success on their claims, irreparable harm, the balance of hardships, and the public interest are inconsequential. *See New Comm Wireless Services, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity").

36

231

## CONCLUSION

After an assessment of the factors relevant to Plaintiffs' requests for a preliminary injunction, the Court concludes that Plaintiffs are not entitled to preliminary injunctive relief.  Accordingly, the Court denies Plaintiffs' motions for a preliminary injunction.


/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of September, 2025.

**Exhibit 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-1847-WJM-KAS

ABBVIE, INC., *et al*.,

     Plaintiffs,

v.

PHILIP WEISER, *et al*.,

     Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

Plaintiffs AbbVie, Inc., Allergan, Inc., AbbVie Products LLC, Pharmacyclics LLC, and Allergan Sales, LLC (collectively, "Plaintiffs" or "AbbVie") bring this lawsuit against Defendants Philip Weiser, in his official capacity as Attorney General of the State of Colorado; and Kristen Wolf, Ryan Leyland, Patricia Evacko, Avani Soni, Michael Scruggs, Alexandra Zuccarelli, and Jayant Patel, in their official capacities as members of the Colorado State Board of Pharmacy (collectively, "Defendants"), to challenge the constitutionality of Colorado Senate Bill 25-071, now codified as the Colorado 340B Contract Pharmacy Protection Act, Colorado Revised Statutes (C.R.S.) §§ 6-29-101 *et seq.* (2025) (the "Act").[1]  (ECF No. 43.)

Currently before the Court is AbbVie's Motion for a Preliminary Injunction ("Motion"), by which it seeks to preliminarily enjoin enforcement of the Act.  (ECF No. 7; *see also* ECF No. 43 at 65 ¶ 4.)  The Motion has been fully briefed (ECF Nos. 33, 36,

---

[1] The Act went into effect on August 6, 2025.  (*See* ECF No. 33-1 at 9.)

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 12-329   Filed 06/09/26   Page 236 of 263

**Exhibit 4**

52, 74),[2] and the Court presided over an evidentiary hearing on the Motion on September 19, 2025 (ECF No. 93).  Thus, it is now ripe for adjudication.

For the reasons set forth below, the Motion is denied.

## I.     BACKGROUND[3]

### A.     Section 340B

In 1992, Congress enacted § 340B of the Public Health Service Act, 42 U.S.C. § 256b ("Section 340B")—thereby creating the "340B Program"—"to ensure that uninsured and low-income individuals can access the medications they need and to ensure that medical providers serving those individuals receive crucial subsidies." *AbbVie, Inc. v. Fitch,* 152 F.4th 635, 639 (5th Cir. 2025).  The 340B Program accomplishes this by "impos[ing] ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities."  *Astra USA, Inc. v. Santa Clara County, Cal.,* 563 U.S. 110, 113 (2011).  Those facilities, called "covered entities," "include public hospitals and community health centers, many of them providers of safety-net services to the poor."  *Id.; see also* § 256b(a)(4) (defining "covered entity").

---

[2] With the Court's leave, *Amici Curiae* American Hospital Association, 340B Health, Colorado Hospital Association, and American Society of Health-System Pharmacists (collectively, the "*Amici*") also filed a brief in opposition to the Motion.  (ECF No. 34-1.)

[3] Numerous federal courts have now had occasion to summarize the history of the 340B Program and related HHS guidance relevant to this lawsuit, including the Supreme Court and four Circuit Courts of Appeal.  *See Astra USA, Inc. v. Santa Clara County, Cal.,* 563 U.S. 110 (2011); *AbbVie, Inc. v. Fitch,* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. McClain,* 95 F.4th 1136 (8th Cir. 2024); *Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696 (3d Cir. 2023).  The Court leverages the factual background set forth in those decisions where applicable and adds further detail from the parties' briefing on the Motion where needed.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

**Exhibit 4**

The 340B Program helps covered entities care for their low-income and rural patients in two ways: "First, it gives them extra revenue from serving insured patients: they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. Second, it enables them to give uninsured patients drugs at little or no cost." *Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.,* 58 F.4th 696, 699 (3d Cir. 2023).

The 340B Program "is superintended by the Health Resources and Services Administration ('HRSA'), a unit of the Department of Health and Human Services ('HHS')." *Astra,* 563 U.S. at 113. "Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement ('PPA') used nationwide." *Id.* "PPAs are not transactional, bargained-for contracts." *Id.* Rather, "[t]hey are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of HHS." *Id.* Specifically, the PPA obligates manufacturers to "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." § 256b(a)(1). Manufacturers' eligibility to participate in Medicaid and Medicare Part B "is conditioned on their entry into PPAs for covered drugs purchased by [covered] entities." *Astra,* 563 U.S. at 113.

Section 340B also prohibits covered entities from engaging in certain conduct:

> First, it bars 'duplicate discounts or rebates,' forbidding covered entities from seeking both the 340B discount and a Medicaid rebate on the same drug. [42 U.S.C.] § 256b(a)(5)(A). Second, it bars 'diversion,' providing that a covered entity 'shall not resell or otherwise transfer' a discounted drug 'to a person who is not a patient of the entity.' *Id.* § 256b(a)(5)(B). Third, it requires covered

3

235

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 42-3 29    Filed 06/09/26    Page 238 of 263

**Exhibit 4**

> entities to permit [HHS] and drug manufacturers to 'audit' their records to assess compliance with the duplicate-discount and diversion bans. *Id.* § 256b(a)(5)(C). And fourth, it provides that a covered entity that violates the duplicate-discount or diversion bans 'shall be liable' to the drug manufacturer for the amount improperly received. *Id.* § 256b(a)(5)(D).

*Fitch,* 152 F.4th at 640.

## B.    Role of Contract Pharmacies

"When Congress first enacted Section 340B, few covered entities had pharmacies in house," *Sanofi Aventis,* 58 F.4th at 700, in substantial part because, for many, "building or maintaining [an in-house] pharmacy is cost-prohibitive," *PhRMA v. McClain,* 95 F.4th 1136, 1139 (8th Cir. 2024). Thus, "[s]ince the beginning, covered entities have contracted with outside pharmacies," or "contract pharmacies," "for the distribution and dispensation of 340B drugs." *Id.* For covered entities with large, rural service areas, "the outsourcing of pharmacy services [also] allowed for drug dispensation closer to where [their] low-income patients reside." *McClain,* 95 F.4th at 1139. "Covered entities using contract pharmacies would still order and pay for the drugs, but they would be shipped directly to the pharmacies." *Sanofi Aventis,* 58 F.4th at 700.

Noting covered entities' reliance on contract pharmacies and Section 340B's "silen[ce] as to permissible drug distribution systems" to patients, 61 Fed. Reg. 43, 549, 43,549 (Aug. 23, 1996), HRSA issued guidance in 1996 "permitting covered entities lacking an in-house dispensing pharmacy to contract with a single third-party commercial pharmacy to receive and dispense 340B drugs to their patients, so long as they abided by Section 340B's requirements and its duplicate-discount and diversion

4

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 52-3    Filed 06/09/26    Page 239 of 263
**Exhibit 4**

bans," *Fitch,* 152 F.4th at 640 (citing *id.* at 43,550–55).  Then, in 2010, HRSA "changed course" and "issu[ed] new guidance permitting all covered entities—even those with an in-house dispensing pharmacy—to contract with an unlimited number of outside pharmacies to distribute Section 340B drugs to their patients."  *Fitch,* 152 F.4th at 640; 75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).

After the 2010 guidance, the use of contract pharmacies proliferated, and pharmaceutical manufacturers became increasingly concerned that "contract pharmacies were driving up duplicate discounting and diversion."  *Sanofi Aventis,* 58 F.4th at 700; *see also Novartis Pharms. Corp. v. Johnson,* 102 F.4th 452, 457 (D.C. Cir. 2024) (citing governmental report indicating that "the number of contract pharmacies participating in the program increased from about 1,300 to 23,000" between 2010 and 2019).  So, manufacturers began adopting policies "that limited or prohibited covered entities from contracting with outside pharmacies for the dispensation of 340B drugs to patients."  *McClain,* 95 F.4th at 1139.

AbbVie adopted one such policy, its "340B Program Integrity Initiative," in 2023.  (ECF No. 7-1 at 3 ¶ 4.)  Under the current iteration of AbbVie's policy, last updated in February 2025, "hospital covered entities" "*without* an in-house outpatient pharmacy may designate a single contract location" "within 40 miles of the HRSA registered covered entity parent site" to receive "orders of 340B priced medicines," provided that the covered entity also "submits limited claims data on 340B utilization" for that contract pharmacy location.  (*Id.* at 51–52 (emphasis in original).)  *See also Fitch,* 152 F.4th at 641 (noting "AbbVie's contract-pharmacy policy . . . essentially follows HRSA's 1996 guidance").

5

237

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 16-2 page 62 of 329    Filed 06/09/26    Page 240 of 263
**Exhibit 4**

"HHS acted quickly to prohibit drug manufacturers from imposing these restrictive contract-pharmacy policies." *Id*.  In December 2020, HHS issued an advisory opinion concluding that, "to the extent contract pharmacies are acting as agents of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the ceiling price for those drugs."  OIG Advisory Op. No. 20-06, 2020 WL 11422965, at *1 (Dec. 30, 2020).

Manufacturers sued.  Ultimately, the Third and D.C. Circuits upheld the manufacturers' policies because "Congress never said that drug makers must deliver discounted 340B drugs to an unlimited number of contract pharmacies."  *Sanofi Aventis,* 58 F.4th at 707; *Novartis Pharms.*, 102 F.4th at 455 (agreeing that "section 340B does not prohibit manufacturers from limiting the distribution of discounted drugs by contract").[4]  HHS withdrew the advisory opinion.  *Fitch,* 152 F.4th at 641.

## C.    State Legislatures Weigh In

Following the Third and D.C. Circuits decisions, "several states passed laws to protect covered entities' partnerships with contract pharmacies, attempting to do by statute what HHS had done in its advisory opinion."  *Id*.

As pertinent here, the Act was signed into Colorado law on May 30, 2025.  (ECF No. 33-1 at 10.)  Its operative provision prohibits manufacturers from undertaking the following acts:

> (a)    Unless the receipt of the 340B drugs is prohibited by the federal department of health and human services, a

---

[4] A third appeal is currently pending before the Seventh Circuit.  *See Eli Lilly & Co. v. HHS, et al.*, No. 21-3405 (7th Cir.).

6

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 72-3    Filed 06/09/26    Page 241 of 263
**Exhibit 4**

manufacturer, third-party logistics provider, or repackager, or an agent, contractor, or affiliate of a manufacturer, third-party logistics provider, or repackager, including an entity that collects or processes health information, shall not, directly or indirectly, deny, restrict, prohibit, discriminate against, or otherwise limit the acquisition of a 340B drug by, or delivery of a 340B drug to, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or a location otherwise authorized by a 340B covered entity to receive and dispense 340B drugs.

(b)    A manufacturer shall not directly or indirectly require, including as a condition, a 340B covered entity, a pharmacy contracted with a 340B covered entity, or any other location authorized to receive 340B drugs by a 340B covered entity to submit any health information, claims or utilization data, purchasing data, payment data, or other data that does not relate to a claim submitted to a federal health care program, unless such data is voluntarily furnished by such covered entity or otherwise required to be furnished under applicable federal law.

§ 6-29-105(1).  A violation of the Act is an unfair or deceptive trade practice under the

Colorado Consumer Protection Act ("CCPA"), and the violator is subject to CCPA

enforcement provisions and penalties, including monetary fines of up to $20,000 per

violation.  § 6-29-105(3)(a).

Pharmaceutical manufacturers have filed many lawsuits challenging state laws

comparable to the Act.  Unlike their earlier challenges to the 2020 HHS guidance, the

very large majority of these lawsuits have been unsuccessful to date.[5]

---

[5] *See AbbVie Inc. v. Neronha,* 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (denying preliminary injunction as to Rhode Island law); *AbbVie, Inc. v. Frey,* 2025 WL 2813787, at *1 (D. Me. Sept. 23, 2024) (same as to Maine law); *AstraZeneca Pharms. LP v. Fitch,* 766 F. Supp. 3d 657, 664–65 (W.D. Miss. 2024) (same as to Mississippi law); *Novartis Pharms. Corp. v. Fitch,* 738 F. Supp. 3d 737, 749–50 (S.D. Miss. 2024) (same); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) (same as to Tennessee law); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025) (granting motion to dismiss manufacturer's claims that Missouri law was preempted and violated the Takings Clause); *PhRMA v. Murrill,* 2024 WL 4361597, at *8–9 (W.D. La. Sept. 30, 2024) (granting

7

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 18-29    Filed 06/09/26    Page 242 of 263
**Exhibit 4**

### D.    Procedural History

AbbVie filed this lawsuit challenging the constitutionality of the Act on June 12, 2025 (ECF No. 1) and moved for a preliminary injunction one day later (ECF No. 7). After setting oral argument on the Motion, AbbVie requested an evidentiary hearing so that it could proffer the testimony of three witnesses in support of its requested relief. (ECF No. 31.)  The Court set an evidentiary hearing at AbbVie's behest.  (ECF No. 32.)

During the September 19, 2025 hearing, the Court heard the testimony of five witnesses in total.  First, AbbVie called expert witness Alice Chen, Ph.D., a professor of public policy at the University of Southern California, to generally "testify about . . . how the [340B] program operates in practice" and "explain the growth of contract pharmacies."  (ECF No. 111 at 19:11–20; *see also* ECF No. 36-2.)  Second, AbbVie called Mr. Edward Scheidler, its corporate representative, to "explain that, in fact, AbbVie will not sell its drugs at the 340B price unless [its] conditions are agreed to, which [AbbVie avers] is a complete answer to the State's position on takings."  (ECF No. 111 at 20:1–6.)  And lastly, AbbVie called expert witness Dr. Amitabh Chandra, a professor of public policy at Harvard University, to "explain where the research shows

---

summary judgment in favor of State on manufacturers' claims that Louisiana law was preempted and violated the Takings Clause); *AbbVie Inc. v. Fitch,* 2024 WL 3503965, at \*12 (S.D. Miss. July 22, 2024) (denying preliminary injunction as to Mississippi law), *aff'd* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch,* 2024 WL 3277365, at \*11 (S.D. Miss. July 1, 2024) (same); *PhRMA v. McClain,* 645 F. Supp. 3d 890 (E.D. Ark. 2022) (granting summary judgment in favor of Arkansas official on manufacturers' claim that Arkansas law was preempted), *aff'd* 95 F.4th 1136 (8th Cir. 2024), *cert. denied* 145 S.Ct. 768 (2024); *but see AstraZeneca Pharms. LP v. Harris,* No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025), ECF No. 141 (denying judgment on the pleadings as to manufacturer's claim that Arkansas law violated Takings Clause); *PhRMA v. Morrisey,* 760 F. Supp. 3d 439, 452–60 (S.D.W. Va. 2024) (granting preliminary injunction as to West Virginia law and denying the defendants' motion to dismiss).

8

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 12-329    Filed 06/09/26    Page 243 of 263

Exhibit 4

that 340B profits go," which, according to AbbVie, "is not to charity care, to uncompensated care, or to benefit patients." (*Id.* at 20:7–11; *see also* ECF No. 36-1.)

Defendants, for their part, proffered testimony from "two witness who work for Colorado hospital systems that are 340B covered entities," both of whom were called to generally testify "about how their systems have been impacted by the drug company restrictions and how they expect it to change under the new law." (ECF No. 111 at 23:13–14.) Those witnesses included Dr. Kevin Forbush, "a pharmacist who runs the 340B program at Intermountain Health," and Kevin Stansbury, the CEO of Lincoln Health, "a county governmental hospital system" located in the rural town of Hugo, Colorado. (*Id.* at 23–25.)

The Court refers to some of that hearing evidence where relevant to its analysis below. But ultimately, it finds it unnecessary to recount much of the testimony put forth at the evidentiary hearing. In general, the Court concurs with Defendants' view that the testimony presented a compelling case that Section 340B is in dire need of legislative reform, but it did not significantly move the needle on the issues immediately before the Court—namely, whether AbbVie is substantially likely to succeed in demonstrating that the Act is preempted by federal law or effects an unconstitutional taking.

## II.    LEGAL STANDARD

"Because a preliminary injunction is an 'extraordinary remedy never awarded as of right,'. . . the movant must make a 'clear and unequivocal' showing it is entitled to such relief." *Colorado v. U.S. Envtl. Protection Agency,* 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008)); *Port City Props. v. Union Pac. R.R. Co.,* 518 F.3d 1186, 1190 (10th Cir. 2008) (internal citation

9

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM      Document 112-6    Filed 06/09/26    Page 244 of 263

Exhibit 4

omitted)).  "To obtain a preliminary injunction, the movant must show (1) it 'is substantially likely to succeed on the merits,' (2) it 'will suffer irreparable injury if the injunction is denied,' (3) its 'threatened injury outweighs the injury the opposing party will suffer under the injunction,' and (4) 'the injunction would not be adverse to the public interest.'"  *Colorado,* 989 F.3d at 883 (quoting *New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior,* 854 F.3d 1236, 1246 (10th Cir. 2017)).  The third and fourth factors merge when the government is the opposing party.  *Denver Homeless Out Loud v. Denver, Colorado,* 32 F.4th 1259, 1278 (10th Cir. 2022) (citation omitted).

### III.    ANALYSIS

AbbVie contends that the Act is unconstitutional because (1) it is preempted by federal law pursuant to the Supremacy Clause and/or (2) it effects a taking in violation of the Takings Clause.  (*See generally* ECF Nos. 7, 43.)  For the reasons explained below, the Court finds that AbbVie has not established a substantial likelihood of success on the merits of either claim.  Accordingly, the Court does not proceed to consider the remaining preliminary injunction factors.  *See Vill. of Logan v. U.S. Dep't of Interior,* 577 F. App'x 760, 766 (10th Cir. 2014) (a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for preliminary injunctive relief unwarranted"); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1266 n. 8 (10th Cir. 2004) (concluding "the other preliminary injunction factors" "need not [be] address[ed]" after finding against the movant on one factor).

### A.    Preemption

"Congress has the power to preempt state law" pursuant to the Supremacy Clause, which "provides a clear rule that federal law 'shall be the supreme Law of the

10

242

**Exhibit 4**

Land . . . any Thing in the Constitution or Laws of any state to the Contrary

notwithstanding.'" *Arizona v. United States,* 567 U.S. 387, 399 (2012) (quoting U.S.

Const., Art. VI, cl. 2.)  "[A]ny preemption inquiry begins with the presumption that federal

law does not override 'the historic police powers of the States,' without the 'clear and

manifest' intent of Congress." *Bradshaw v. Am. Airlines, Inc.,* 123 F.4th 1168, 1173

(10th Cir. 2024) (quoting *Arizona,* 567 U.S. at 400).  Thus, congressional intent is "the

ultimate touchstone in every pre-emption case." *Wyeth v. Levine,* 555 U.S. 555, 565

(2009) (citation omitted).

"The party claiming preemption . . . bears the burden of showing with specificity

that Congress intended to preempt state law." *Day v. SkyWest Airlines,* 45 F.4th 1181,

1184 (10th Cir. 2022) (internal citation and quotation marks omitted).  "Congress's intent

to preempt state law can be shown 'through a statute's express language' or implied

'through its structure and purpose.'" *Bradshaw,* 123 F.4th at 1173 (quoting *Altria Grp.,*

*Inc. v. Good,* 555 U.S. 70, 76 (2008)).  Here, AbbVie does not argue that Section 340B

expressly preempts the Act.  (*See generally* ECF No. 7.)  Instead, it contends that the

Act is impliedly "preempted because it intrudes on a federal field and conflicts with the

text and purpose of the 340B statute."  (*Id.* at 7.)

Notably, categories of preemption are not "rigidly distinct." *English v. Gen. Elec.*

*Co.,* 496 U.S. 72, 79 n.5 (1990).  "Indeed, field pre-emption may be understood as a

species of conflict pre-emption: A state law that falls within a pre-empted field conflicts

with Congress' intent . . . to exclude state regulation." *Id.*  That sentiment rings true

here, where it is, at times, difficult to distinguish between AbbVie's arguments in support

of its field preemption and conflict preemption theories.  Nevertheless, the Court

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 122-6 29 Filed 06/09/26   Page 246 of 263

**Exhibit 4**

endeavors to disentangle those arguments and address AbbVie's field and conflict preemption theories separately below.

  1.  <u>Field Preemption</u>

  Field preemption "exists where 'a framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'" *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399). AbbVie has not demonstrated that it is substantially likely to succeed in demonstrating that either inference applies here.

  At the outset, AbbVie argues that Congress intended to preempt the field because, through Section 340B, it created "a single comprehensive federal scheme that governs every detail" of "the federally occupied 340B field," "from covered-entity eligibility to manufacturer obligations and enforcement . . . ." (ECF No. 7 at 7–8 (emphasis added).) Though AbbVie's briefing does not specifically define the "340B field," AbbVie's counsel seemed to affirm at the evidentiary hearing that it views the relevant regulatory field quite broadly: "the field of the 340B program, itself." (ECF No. 111 at 290:1–4.)

  But it cannot be that Congress has enacted a scheme that governs "every detail" of the 340B Program. *Four* federal Circuit Courts of Appeal now concur that Section 340B "is silent about delivery," *Sanofi Aventis,* 58 F.4th at 703; *Novartis Pharms.,* 102 F.4th at 461 ("agree[ing] entirely"); *McClain,* 95 F.4th at 1143 (relying on *Sanofi Aventis*), and thus "regulates neither the distribution of drugs to patients nor the role of pharmacies in this distribution," *Fitch,* 152 F.4th at 646. The Court is further inclined to

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 132-6 29  Filed 06/09/26    Page 247 of 263

**Exhibit 4**

think that the manner of distribution of 340B drugs to patients is a relevant "detail" of the 340B Program of which Congress is well-aware, given that (1) "[p]harmacies have always been an essential part of the 340B Program" and (2) Congress *did* "directly address distribution by third-party wholesalers." *McClain,* 95 F.4th at 1143 (citing 42 U.S.C. § 256b(a)(8)); *see also Fitch,* 152 F.4th at 646 ("Congress 'knew how to impose delivery-related requirements' and regulate distribution, because Section 340B does authorize distribution of drugs by manufacturers and third-party wholesalers." (quoting *Sanofi Aventis,* 58 F.4th at 704)). That "Congress chose not regulate distribution to patients . . . indicat[es] that it did not intend to occupy the entire field in this area." *Fitch,* 152 F.4th at 646.

Second, AbbVie suggests that there is necessarily a field preemption issue because the Act "could not exist but for the *federal* 340B statute." (ECF No. 7 at 8 (emphasis in original); *see also* ECF No. 111 at 290:1–4 (arguing that the Act facially "targets the regulation of a federal program, and that intrudes on a federal field").) The Court presumes that AbbVie endeavors to show through this argument that there is a "federal interest . . . 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject." *Bradshaw,* 123 F.4th at 1173 (quoting *Arizona,* 567 U.S. at 399).

AbbVie failed to direct the Court to any authority related to this argument in its Motion. (*See id.*) However, in its reply, AbbVie cited two authorities for the somewhat-related proposition that "there is no presumption against preemption where a state law explicitly depends on a federal statute": *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) and *Boyle v. United Techs. Corp.,* 487 U.S. 500 (1988). (ECF No. 36

13

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 114-6 29   Filed 06/09/26   Page 248 of 263

**Exhibit 4**

at 4–5.)  Moreover, at the evidentiary hearing, AbbVie's counsel likened the Act to an impermissible state "regulation of a federal instrumentality, like in *McCulloch v. Maryland*."  (ECF No. 111 at 289:10–15.)

*Buckman* and *Boyle* may be a closer fit for AbbVie's argument that the Act is in tension with Section 340B's enforcement scheme, but those authorities do not support the broad contention that there is necessarily a field preemption issue where "a state law explicitly depends on a federal statute."  (ECF No. 36 at 4.)  Rather, the Supreme Court held in those cases that state-law causes of action were impliedly preempted by federal common law because there was a "uniquely federal interest" at stake, like "the civil liabilities arising out of the performance of federal procurement contracts," *Boyle,* 487 U.S. at 506 (government contractors immune from liability under state tort law), or "the relationship between a federal agency and the entity it regulates," *Buckman,* 531 U.S. at 347 (state tort law fraud-on-the-FDA claims impliedly preempted).  AbbVie has not identified a "uniquely federal interest" here.

This case is also unlike *McCulloch v. Maryland,* where the direct subject of state regulation was itself a federal instrumentality.  17 U.S. 316 (1819).  Here, it is the non-governmental participants and beneficiaries of the 340B Program—namely, pharmaceutical manufacturers and covered entities—that are the subject of state regulation.  And "the Supreme Court . . . has never adopted a categorical rule that requires a finding of preemption whenever a state law is directly addressed to those participating in a federal program where the federal statute does not rely on the state to implement the program."  *AbbVie Inc. v. Frey,* 2025 WL 2813787, at *10 (D. Me. Sept. 23, 2025).  To the contrary, "matters left unaddressed in [] a [federal] scheme are

14

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 115-6 29 Filed 06/09/26    Page 249 of 263

Exhibit 4

presumably left subject to the disposition provided by state law." *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994).

The fundamental problem with AbbVie's argument that the Act is preempted because it depends on a federal statute is that it is backwards. As the Court understands it, AbbVie essentially argues that "the existence of a federal scheme" necessarily establishes there is a sufficiently dominant "federal interest" from which it can be assumed that Congress intended to "preclude enforcement of state laws on the same subject." *Bradshaw,* 123 F.4th at 1173 (citation omitted). But that is not the law, and AbbVie cannot circumvent its burden to identify a compelling federal interest warranting preemption by pointing to the mere existence of a federal statute.

Lastly, AbbVie argues that the Act "goes to the very heart of the federally occupied field: [i]t overrides the *offer* structure Congress established, eliminates manufacturers' federally permitted discretion, and dictates the terms under which entities receive discounted drugs." (ECF No. 7 at 8.) To the extent AbbVie is arguing that the relevant field is defined more narrowly—"the terms by which manufacturers must offer discounted drugs under the 340B program"—"there would still be no field preemption." *Frey,* 2025 WL 2813787, at *8. "[B]ecause 340B does not dictate many of the terms regarding manufacturers' obligation to offer and provide the drugs, the language of 340B is insufficient to imply a congressional intent to preclude all state regulation in the field." *Id.* (citing *Sanofi Aventis,* 58 F.4th at 704 (observing, as to the terms of an offer, that the 340B statute "imposes only a price term for drug sales to covered entities, leaving all other terms blank")).) Congress's intent to preempt the field cannot be inferred solely from the fact that it left certain "terms" to manufacturers'

15

247

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 116-6 29  Filed 06/09/26    Page 250 of 263
**Exhibit 4**

discretion.  AbbVie's discretion to set those terms—namely, where it is willing to deliver 340B drugs—is derived from Congress's silence.  *See Novartis Pharms.,* 102 F.4th at 460 ("Section 340B is . . . silent about delivery conditions.")  And "Congressional silence will not be presumed to mandate preemption."  *Paul v. Monts,* 906 F.3d 1468, 1475 n.8 (10th Cir. 1990) (internal citation and quotation marks omitted).

The counter inference to AbbVie's arguments is that the Act does not intrude on a federal field but instead implicates "traditional general areas of state regulation," like "public health," *Fitch,* 152 F.4th at 647 (citing *Gobeille v. Lib. Mut. Ins. Co.,* 577 U.S. 312, 325 (2016) (noting "the State's traditional power to regulate in the area of public health")), and "the practice of pharmacy," *McClain,* 95 F.4th at 1143 (citation omitted). The "assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria Grp.,* 555 U.S. at 77 (citation omitted), "applies with greater force when the alleged conflict is in an area traditionally occupied by the States," *Ramsey Winch Inc. v. Henry,* 555 F.3d 1199, 1204 (10th Cir. 2009).  At this stage, AbbVie has failed to adduce sufficient evidence to persuade the Court that it is substantially likely to succeed in demonstrating that (1) this presumption against preemption does not extend to the Act in the first instance and/or (2) that the presumption is overcome by "a strong showing that Congress intended preemption."  *Fitch,* 152 F.4th at 1144.

2.    Conflict Preemption

A state law provision will "also preempted if it conflicts with federal law, either because (1) 'compliance with both federal and state regulations is a physical impossibility,'" "or because the provision (2) 'stands as an obstacle to the

16

248

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 11208 29 Filed 06/09/26    Page 251 of 263
Exhibit 4

accomplishment and execution of the full purposes and objectives of' federal law."

*United States v. Supreme Court of New Mexico,* 839 F.3d 888, 918 (10th Cir. 2016)

(quoting *Arizona,* 567 U.S. at 399).

Here, AbbVie argues that the Act "stands as an obstacle" to Congress's

objectives for three reasons.  (ECF No. 7 at 8–9; ECF No. 52 at 4.)  Whether these

alleged conflicts are "a sufficient obstacle" to warrant a finding of conflict preemption "is

a matter of judgment, to be informed by examining the federal statute as a whole and

identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council,*

530 U.S. 363, 373 (2000).

> a.    *Enforcement*

AbbVie first contends that the Act "stands as an obstacle" to Congress's

objectives because it "contravenes HRSA's exclusive enforcement authority."  (ECF

No. 7 at 8.)  On this record, the Court is unpersuaded.

AbbVie asserts that "[f]ederal law vests enforcement solely in HHS and lays out

the precise tools available: audits, dispute resolution, and civil penalties."  (*Id.* at 9

(citing §§ 256b(d)(l)(B)(v), (vi), (d)(3)).)  By contrast, it notes that "[s]tate enforcement

mechanisms" under the Act include "civil suits by third parties, the Attorney General, or

the Board of Pharmacy."  (*Id.*)  AbbVie thus contends that the federal and state

enforcement frameworks are in direct conflict insofar as the Act vests enforcement

authority in actors *other* than HRSA.

Following the Supreme Court's decision in *Astra,* there can be little debate that

Section 340B decidedly does *not* authorize a private right of action for violations of the

federal statute.  Indeed, the parties conceded in that case that covered entities had "no

17

249

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 18-6 29 Filed 06/09/26    Page 252 of 263
**Exhibit 4**

[private] right to sue for overcharges under [§ 340B] itself," and the Supreme Court proceeded to hold "that suits by [covered] entities to enforce ceiling-price contracts [the PPAs] running between drug manufacturers and the Secretary of HHS [were also] incompatible with the statutory regime."  563 U.S. at 113.

But this does not end the inquiry.  "'Conflict is imminent' when 'two separate remedies are brought to bear *on the same activity*.'"  *Crosby,* 530 U.S. at 373 (quoting *Wis. Dep't of Indus. v. Gould, Inc.,* 475 U.S. 282, 286 (1986)) (emphasis added); *see also Arizona,* 567 U.S. at 402 ("Permitting the State to impose its own penalties for the *federal offenses* here would conflict with the careful framework Congress adopted." (emphasis added)).  AbbVie has identified two separate remedies, but it does not discuss in its briefing the activities those remedies are intended to redress.

Numerous federal courts have now considered the same argument that AbbVie sets forth here, and nearly all have found that state law enforcement schemes like that found in the Act "do[] not conflict with Section 340B's enforcement scheme."  *E.g., Fitch,* 152 F.4th at 647.  Though "true that Congress made HHS the sole enforcer of Section 340B," the Fifth and Eighth Circuits reasoned that the comparable state laws before them "d[id] not intrude upon this authority because [they did] not impose penalties for *violations of Section 340B*, like failing to offer discounted drugs to covered entities or engaging in diversion."  *Id.* at 647–48 (emphasis added); *McClain,* 95 F.4th at 1144 ("HHS has jurisdiction over different disputes: disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify for discounted drugs.").  Rather, the state laws "impose[d] penalties when drug manufacturers [*violated the state law*] by interfering with the

18

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 112-6  29 Filed 06/09/26    Page 253 of 263

**Exhibit 4**

distribution of Section 340B drugs pursuant to covered entities' partnerships with contract pharmacies." *Fitch,* 152 F.4th at 648; *McClain,* 95 F.4th at 1145 (reasoning the Arkansas law's penalties were aimed at "deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements"). Put simply, the state law penalties were "aimed at activity that falls outside the purview of 340B." *McClain,* 95 F.4th at 1145.

The same is true of the Act here. *See* § 6-9-105(3)(a) ("A person that violates *this [Act]* . . . is subject to the enforcement provisions, civil penalties, and damages set forth in Article 1 of this Title 6." (emphasis added)).

Nevertheless, at the evidentiary hearing, AbbVie highlighted that, in response to regulatory comments from stakeholders like Dr. Forbush, HRSA recently modified the 340B Administrative Dispute Resolution Regulation to explain that the 340B ADR Panel is permitted to hear "[c]laims by a covered entity that it has been overcharged by a manufacturer for a covered outpatient drug, including claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024). (*See also* ECF No. 111 at 105–108.) Dr. Forbush agreed during his testimony that he, personally, "wanted the government to clarify that it counts as an overcharge of a drug when a manufacturer imposes limits or conditions on a covered entity's ability to purchase drugs at the 340B price." (*Id.* at 105:24–106:3.)

Notably, though, HRSA expressly declined to promulgate "an explicit definition of the term 'overcharge,'" instead choosing to explain only that "[w]hen an overcharge claim is presented before a 340B ADR Panel, the Panel will follow the 340B statute" and

19

251

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 20-6 29  Filed 06/09/26    Page 254 of 263

**Exhibit 4**

"relevant case law," among other sources.  89 Fed. Reg. at 28,649.  Given the Third and D.C. Circuits have held that manufacturers do not violate Section 340B when they restrict a covered entity's ability to distribute drugs to patients through contract pharmacies, it is difficult to see how that conduct "could be challenged as a limitation on the ability to purchase drugs at or below the ceiling price *under federal law*" before the ADR Panel.  *Frey,* 2025 WL 2813787, at *11 (emphasis added).  At the very most, "the alleged conflict is too speculative" at this stage "to support a finding that [AbbVie] is likely to prevail on [its] claim" that the Act is preempted because it contains a conflicting enforcement mechanism.  *Id.*

For these reasons, the Court concludes that AbbVie has not demonstrated a likelihood of success on the merits of its preemption claim based on a purported conflict between the enforcement mechanisms of Section 340B and the Act.

> b.    *340B Drug Pricing*

Next, AbbVie argues that Section 340B and the Act are in conflict because, "like the federal statute, [the Act] regulates *pricing,* not 'delivery' . . . ."  (ECF No. 7 at 9.)  The Court is unpersuaded.

Much of AbbVie's argument originates with the Act's definition of a "340B drug," which is as follows:

> . . . a drug that:
>
> (a)    Is a covered outpatient drug within the meaning set forth in 42 U.S.C. sec. 256b;
>
> (b)    Has been subject to any offer for reduced prices by a manufacturer pursuant to 42 U.S.C. sec. 256b(a)(1);

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 21-6 29    Filed 06/09/26    Page 255 of 263

**Exhibit 4**

>     (c)    Is purchased by a covered entity.  As used in this subsection (2)(c), a drug is considered "purchased" if it would have been purchased but for the restriction or limitation described in section 6-29-105.

§ 6-29-103(2) (emphasis added).

First, AbbVie argues that the Act "by its very text cannot escape the word 'price.'" (ECF No. 7 at 9.)  However, as concisely put by the *Amici,* "[t]he fact that [the Act] includes 'the word price' . . . does not mean that it *regulates* price."  (ECF No. 34-1 at 7 (emphasis in original).)  Indeed, the cited definition makes clear that the price is set "*pursuant to [Section 340B]*."  § 6-29-103(2)(b) (emphasis added); *cf., e.g., McClain,* 95 F.4th at 1145 (concluding substantially similar Arkansas statute "does not set or enforce discount pricing"); *PhRMA v. Murrill,* 2024 WL 4361597, at *9 (W.D. La. Sept. 30, 2024) ("[D]iscounts are set by the federal government, not the State of Louisiana or Act 358."); *AbbVie Inc. v. Skrmetti,* 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) ("The amount of the discount is not at issue and is not affected by the state scheme.").

Second, AbbVie emphasizes that the Act defines a 340B drug as inclusive of one that "*would have been purchased* but for the restriction or limitation" imposed by AbbVie's policy.  § 6-29-103(2) (emphasis added).[6]  In this way, the Court understands AbbVie to argue that the Act conflicts with Section 340B because it compels AbbVie to make sales it otherwise would have refused to make by "attach[ing] 340B discounts to drugs shipped to for-profit pharmacies or other 'authorized' locations."  (ECF No. 7 at 9.)

---

[6] In substantial part, this argument appears to be a repackaging of AbbVie's argument that Congress has preempted the field when it comes to the terms that manufacturers may or may not attach to their offers of 340B drugs.  The Court's analysis as to that issue above applies with equal force to the extent AbbVie bases its conflict preemption claim on the same grounds. (*See* Section III.A.1 *infra*.)

21

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 22-6 29 Filed 06/09/26    Page 256 of 263
pg 22 of 6

**Exhibit 4**

Put still another way, AbbVie insists that the Act conflicts with Section 340B because it "grants contract pharmacies expanded access to 340B pricing." (ECF No. 36 at 3.)

Like the Fifth Circuit, the Court understands AbbVie's concern is that the involvement of contract pharmacies comes with an increased risk of abuse of the 340B Program. *See Fitch,* 152 F.4th at 648 (noting AbbVie's grievance is that "it believes that when covered entities are allowed to distribute Section 340B drugs via contract pharmacies, those contract pharmacies cause covered entities to place orders for larger quantities of discounted drugs than they are actually entitled to, and the contract pharmacies then improperly resell those discounted drugs in ways that increase their profits"). But, to again borrow the words of the Fifth Circuit, AbbVie's suggestion that the Act facially requires it to sell 340B drugs to non-covered entities

> is simply incorrect. [The Act] does not expand Section 340B's list of covered entities to include contract pharmacies. By its plain text, [the Act] requires drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients. It does not compel manufacturers to 'offer' discounted drugs to contract pharmacies in the way that Section 340B compels them to 'offer' these drugs to covered entities.

*Id.* at 647. On this record, the Court is further unconvinced that the Act will have the practical effect of requiring AbbVie to make sales to non-covered entities in conflict with Section 340B, such that a preliminary injunction is warranted. *Cf. id.* at 648 ("AbbVie is essentially alleging that the real problem with [the Mississippi law] is not a *feature* of the law, but rather a *bug.* And on this record, we cannot say that this potential bug in [the state law] merits a preliminary injunction.").

22

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 23-6 29    Filed 06/09/26    Page 257 of 263

**Exhibit 4**

For these reasons, the Court also concludes that AbbVie has not demonstrated a substantial likelihood of success on the merits of its preemption claim based on its assertion that, like Section 340B, the Act purports to regulate pricing.

        c.     *Pilot Program*

Third, AbbVie avers that the Act's claims data restriction conflicts with the impending 340B Rebate Model Pilot Program ("the "Pilot Program"), which HRSA announced shortly after AbbVie filed the Motion.  (ECF No. 52 at 2.)  *See also* 90 Fed. Reg. 36,163 (Aug. 1, 2025).

As pertinent background, AbbVie explains that the Pilot Program concerns the interplay between the 340B Program and the Inflation Reduction Act's Drug Price Negotiation Program ("DPNP"), 42 U.S.C. §§ 1320f *et seq.*  (*Id.*)  Whereas the 340B Program "requires manufacturers to offer drugs to certain 'covered entities' at a statutorily calculated 'ceiling price,'" the DPNP "requires HHS to set a 'maximum fair price' ('MFP') for certain selected drugs," which manufacturers must then make "available to certain Medicare-covered individuals at the MFP."  (*Id.* (citing §§ 1320f(a)(3), (c)(2), 1320f-2(a)(3)).)  Under the DPNP's "nonduplication" provision, manufacturers must provide the lower of the two price concessions—the 340B ceiling price or the MFP—but not both.  (*Id.* (citing § 1320f-2(d)).)  According to AbbVie, manufacturers, rather than HHS, "shoulder the task" of "identifying and deduplicating 340B dispenses."  (*Id.*)

In response to "widespread concern about the nonduplication and compliance problems" facing manufacturers, AbbVie states that "HRSA announced the Pilot Program to test a rebate model for effectuating the 340B price to covered entities."  (*Id.*

23

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM      Document 24-6 29  Filed 06/09/26      Page 258 of 263
**Exhibit 4**

(citing 90 Fed. Reg. at 36,163–65).)  As pertinent here, the Pilot Program allegedly permits "manufacturers . . . to request from covered entities—and covered entities are expected to provide—claims data" to better enable manufacturers "[t]o determine which price concession (if any) is appropriate" under the new rebate model.  (*Id.* at 3.)  AbbVie believes that the Act poses a barrier to its participation in the Pilot Program because it restricts manufacturers "from requiring 340B covered entities and contract pharmacies to 'submit any health information, claims or utilization data, purchasing data, payment data, or other data.'"  (ECF No. 52 at 3 (quoting § 6-29-105(b)).)[7]

The Court is not persuaded.  Even setting aside the standing and ripeness issues Defendants raised (ECF No. 74 at 2), there appears to be no conflict between the Act's plain text and the Pilot Program as far as claims data is concerned.  AbbVie selectively quoted the Act's prohibitory language on the collection of claims data but ignored its further qualification that the prohibition applies "*unless such data is . . . otherwise required to be furnished under applicable federal law.*"  § 6-29-105(1)(b) (emphasis added).  This caveat is further reinforced by § 6-29-105(5), which provides:

> (5) **Data exclusions.**  Subsection (1) of this section does not prohibit a manufacturer from requiring health information or other data that a covered entity is required to furnish to the manufacturer under applicable federal law, including data relating to an audit in accordance with procedures established by the Federal Department of Health and Human Services under 42 U.S.C. § 256b(a)(5)(C).

§ 6-29-105(5).

---

[7] Just before the Court issued this Order, AbbVie filed a notice informing the Court that HRSA had "officially approved" its application to participate in the Pilot Program, which is expected to commence on January 1, 2026.  (ECF No. 112.)

24

**Exhibit 4**

Thus, to the extent the Pilot Program requires covered entities to provide certain claims data, it appears at this point that the Act poses no barrier.  For at least this reason, the Court easily concludes that AbbVie has also not established a substantial likelihood of success in demonstrating the Act "stands as an obstacle" to the implementation of the Pilot Program.

## B.    Takings Clause

AbbVie's second claim is that the Act runs afoul of the Takings Clause "because it compels AbbVie and other manufacturers to make sales at 340B-discounted prices under terms they would otherwise never agree to."  (ECF No. 7 at 11.)

"The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: '[N]or shall private property be taken for public use, without just compensation.'"  *Cedar Point Nursery v. Hassid,* 594 U.S. 139, 147 (2021).  As a general matter, a government taking may occur when the government "physically acquires private property for a public use," or where, "rather than appropriate private property for itself or a third party," the government "instead imposes regulations that restrict an owner's ability to use his own property."  *Id.* at 147–48.  In the Motion, AbbVie appears to argue only the former—that the Act effects a *per se* taking of its private property.  (*See* ECF No. 36 at 8–9 (discussing Supreme Court authority holding that "when there has been a physical appropriation, 'we do not ask . . . whether it deprives the owner of all economically valuable use' of the item taken," *Horne v. Dep't of Agriculture,* 576 U.S. 350, 363 (2015) (internal citation omitted)).)  Accordingly, the Court does not analyze herein whether the Act effects a taking as a "use restriction" under the *Penn Central* test.  *Cedar Point,* 594 U.S. at 148.

25

Case No. 1:25-cv-01847-WJM-KAS   Document 115   filed 10/31/25   USDC Colorado
Case 6:25-cv-01332-IM   Document 26-3 29 Filed 06/09/26   Page 260 of 263
pg 262 of

Exhibit 4

Critically, "[a] demand for personal property" is not a taking where "it involve[s] a voluntary exchange for a government benefit."  *Valancourt Books, LLC v. Garland,* 82 F.4th 1222, 1232 (D.C. Cir. 2023).  So long as "the property owner is 'aware of the conditions' of an exchange," "the conditions are 'rationally related to a legitimate Government interest,'" and "the purported 'benefit' is [not] illusory," "presenting the exchange poses no takings problem."  *Id.* (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007 (1984)); *see also Baker County Med. Servs., Inc. v. U.S. Atty. Gen.,* 763 F.3d 1274, 1276 (11th Cir. 2014) (collecting cases "instruct[ing] that no taking occurs where a person or entity voluntarily participates in a regulated program or activity").

As especially pertinent here, numerous Circuit Courts of Appeal have found that regulatory requirements imposed as a condition of participation in Medicaid and Medicare do not effect a taking.  *See, e.g., Baker County Med. Servs.,* 763 F.3d at 1279 (rejecting hospital's takings challenge to "its rate of compensation in a regulated industry for an obligation it voluntarily undertook . . . when it opted into Medicare and became subject to" federal statute requiring hospitals to treat all people who seek treatment in emergency departments); *Burditt v. U.S. Dep't of Health & Hum. Servs.,* 934 F.2d 1362, 1376 (5th Cir. 1991) (similar); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Health Welfare,* 742 F.2d 442, 446 (8th Cir. 1984) (nursing home's voluntary decision to participate in Medicaid "forecloses the possibility that the statute could result in an imposed taking of private property").

Extending that rationale to the precise circumstances here, courts have found that the voluntariness of the 340B program poses an obvious impediment to pharmaceutical manufacturers' Takings Clause challenges to state legislation like the

26

258

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 27-6 29 Filed 06/09/26    Page 261 of 263
**Exhibit 4**

Act.  *See, e.g., Frey,* 2025 WL 2813787, at *14 ("Because AbbVie can choose not to participate in the 340B program, AbbVie has not demonstrated a likelihood of success on its takings claim."); *AstraZeneca Pharms. LP v. Bailey,* 2025 WL 644285, at *4 (W.D. Mo. Feb. 27, 2025) ("Plaintiff voluntarily chose to participate in a federal program, and as Eighth Circuit precedent has noted, it forecloses the possibility that the federal 340B program, or S.B. 751, results in an imposed taking of private property which would give right to the constitutional right to just compensation.").  The Court agrees and adopts the rationale of these decisions, and finds AbbVie's voluntary participation in the 340B program, at least at this early juncture of these proceedings, to present a nearly insurmountable obstacle to the success of their Takings claim.

Still, while AbbVie acknowledges that "[v]oluntarily accepting a government benefit in exchange for giving up property rights can extinguish a takings claim against the government who conferred the bargained-for benefit," it argues that its voluntarily participation in a federal program "cannot justify separate state-imposed requirements where no state benefit is conferred."  (ECF No. 7 at 13.)  The authorities upon which AbbVie relies to support this assertion, however, are inapposite.

In *Valancourt Books,* the D.C. Circuit concluded that a provision of the *federal* Copyright Act "requiring copyright owners to provide physical copies of books" effected a taking because "copyright owners receive[d] no additional benefit for the works they forfeit[ed] pursuant to [the] deposit requirement."  82 F.4th at 1232.  The D.C. Circuit reasoned that "[m]andatory deposit is not required to secure the benefits of copyright." *Id.*  Rather, authors obtained the benefit of copyright immediately upon fixation of the work, and the "mandatory deposit [provision] grant[ed] no additional benefits."  *Id.* at

27

**Exhibit 4**

1233.  Unlike copyright protection, however, AbbVie has no automatic right to receive the benefits incidental to its participation in Medicare and Medicaid.  And it cites no case law supporting that each time the government (whether federal or state) imposes a new regulatory requirement upon Medicaid and Medicare participants, it must *also* confer some increased "benefit" of participation.  *Cf. Frey,* 2025 WL 2813787, at *14 ("AbbVie does not provide any persuasive authority to support the contention that each new regulatory condition must be accompanied by a separate benefit to maintain the voluntary nature of the program for purposes of a takings claim").

*Virginia Hospital & Healthcare Association v. Roberts* is also distinguishable. 671 F. Supp. 3d 633 (E.D. Va. 2023).  There, the plaintiffs' Takings Clause claim was based on the contention that the Virginia program at issue "legally compelled [them] to participate in Medicaid and Medicare programs."  *Id.* at 666;[8] *see also Garelick v. Sullivan,* 987 F.2d 913, 917 (2d Cir. 1993) (where the plaintiffs argued the voluntary participation doctrine was inapplicable "because New York law compels them to render services to Medicare beneficiaries").  Here, AbbVie does not argue that the Act purports to compel its participation in the 340B Program.  To the contrary, it has affirmed that it remains free, in its sole discretion, to withdraw from the Program.  (ECF No. 111 at 261:4–7 ("one day laws like this are going to force manufacturers to withdraw on a manufacturers to withdraw on a nationwide basis Medicare and Medicaid"); *see also*

---

[8] Notably, the district court ultimately did "not fully determine whether Virginia's [] program amount[ed] to legal compulsion" because the plaintiffs' Takings Clause claim against the state defendant was barred by the Eleventh Amendment in any event.  *Id.* at 667. Defendants similarly raise an Eleventh Amendment issue here, though, as noted below, the Court does not reach that issue.

28

Case No. 1:25-cv-01847-WJM-KAS    Document 115    filed 10/31/25    USDC Colorado
Case 6:25-cv-01332-IM    Document 22-6 29  Filed 06/09/26    Page 263 of 263
**Exhibit 4**

ECF No. 98 (AbbVie's notice of supplemental authority informing the Court that "a large drug manufacturer announced that it will withdraw from both 340B and Medicaid next week").)  Though that would be an unfortunate result, it appears at this juncture that AbbVie has more likely identified a public policy issue, and not a Takings Clause violation.

For these reasons, and most importantly because AbbVie's participation in the 304B Program is wholly voluntary, the Court finds that AbbVie has not established a substantial likelihood of success in demonstrating that the Act effects a *per se* taking. Accordingly, the Court does not reach AbbVie's arguments that the Act runs afoul of the Takings Clause "public use" requirement, nor Defendants' argument that "AbbVie cannot bring a takings claim for injunctive relief against state officers in federal court." (ECF No. 33 at 10.)

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 7) is DENIED.

Dated this 31st day of October, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

29

261